David E. Kleinfeld (Bar No. 110734)
Barry J. Tucker (Bar No. 164163)
HELLER EHRMAN LLP
4350 La Jolla Village Drive, 7th Floor
San Diego, CA 92122
Telephone: (858) 450-8400

Robert T. Haslam (Bar No. 71134)
Nitin Subhedar (Bar No. 171802)
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA 94025
Telephone: (650) 324-7000

James R. Batchelder (Bar No. 136347)
DAY CASEBEER MADRID & BATCHELDER LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014
Telephone: (408) 873-0110

Louis M. Lupin (Bar No. 120846)
Alexander H. Rogers (Bar No. 131879)
Roger Martin (Bar No. 195003)
QUALCOMM INCORPORATED
5775 Morehouse Drive
San Diego, CA 92121
Telephone: (858) 658-1121

Attorneys for Plaintiff and Counterdefendant
QUALCOMM INCORPORATED

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM INCORPORATED, | 05 CV 1958 B (BLM) |
| Plaintiff, | **QUALCOMM INCORPORATED'S SUPPLEMENTAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW [INEQUITABLE CONDUCT]** |
| v. | |
| BROADCOM CORPORATION, | **DATE: JANUARY 9, 2006** |
| Defendant. | **CTRM: COURTROOM 2** |
| | **JUDGE: HON. RUDI M. BREWSTER** |
| BROADCOM CORPORATION, | |
| Counterclaimant, | |
| v. | |
| QUALCOMM INCORPORATED, | |
| Counterdefendant. | |

# TABLE OF CONTENTS

PAGE NO.

I.      INTRODUCTION .................................................................................. 1

II.     BROADCOM'S COUNTERCLAIM FOR INEQUITABLE CONDUCT
        LACKS MERIT, AND SHOULD NOT BE USED TO PREJUDICE TO
        THE JURY .......................................................................................... 1

        A.      Broadcom's Counterclaim is "Too Little" ................................... 1

        B.      Broadcom's Counterclaim is "Too Late" .................................... 2

III.    THE DUTY OF DISCLOSURE ............................................................. 3

        A.      Chen '90 is Not Material to the '104 Patent .............................. 7

                1.      Correcting Broadcom's Characterizations of Chen '90 ..................... 8

                        a.      Summary of the Teachings of Chen '90 ................. 8

                        b.      Chen '90 Cannot Fairly Be Characterized As
                                Disclosing the Use of "redundancy in DC
                                coefficients," As Asserted by Broadcom ................. 9

                2.      The Broadcom-identified Attributes of Chen '90 Were
                        Standard and Well Known Approaches to One of Ordinary
                        Skill in the Art of Video Compression Technology ......................... 11

                3.      Several Attributes of Chen '90 Are Not Even Relevant to the
                        Patentability of the Claims of the '104 Patent ................................ 13

                        a.      Chen '90's Disclosures Of "Adaptive Thresholding"
                                And "Adaptive Quantization" Are Completely
                                Irrelevant To The Claims Of The '104 Patent ..................... 13

                        b.      Chen '90's Disclosures Of "Considering Similarity In
                                The Mean Of Adjacent Sub-Blocks To Make Block
                                Size Determinations" Is Likewise Irrelevant To The
                                Claims Of The '104 Patent ............................................... 13

                4.      Chen '90 is not material to the '104 Patent Because Chen '90
                        is Cumulative to Several References of Record ............................... 14

                        a.      Chen '90 is Cumulative to the Strobach '91 Reference......... 15

                        b.      Chen '90 is Cumulative to the Dinstein Reference of
                                Record ............................................................................. 21

                        c.      Therefore Chen '90 is Cumulative and Immaterial ............. 24

5.  Chen '90 Is Not Material To The '104 Patent Because Chen '90 Does Not Establish, By Itself Or In Combination With Other Information Known To The Applicant Or Before The Examiner, A Prima Facie Case Of Unpatentability ........................... 24

6.  In Summary, Chen '90 Is Immaterial ................................. 25

B.  Vaisey is Not Material to the '104 Patent .................................... 26

1.  Clarifying Broadcom's Ambiguous Characterization of Vaisey ..................................................................... 27

    a.  Summary of the Teachings of Vaisey .................................. 27

    b.  Clarifying Broadcom's Characterization of Vaisey .............. 27

2.  The Broadcom-Identified Attributes Of Vaisey Were Standard And Well Known Approaches To One Of Ordinary Skill In The Art Of Video Compression Technology ...................................... 28

3.  Vaisey is Less Relevant Than References of Record for the '104 Patent ...................................................................... 29

4.  Vaisey is Cumulative to References of Record in the Prosecution History of the '104 Patent ................................................ 30

    a.  Vaisey is Cumulative to the Strobach '91 Reference ........... 31

    b.  Vaisey is Cumulative to the '341 Patent ................................. 33

    c.  Vaisey is Cumulative to the Dinstein Reference .................. 35

    d.  Therefore Vaisey is Cumulative and Immaterial .................. 36

5.  Vaisey Is Not Material To The '104 Patent Because Vaisey Does Not Establish, By Itself Or In Combination With Other Information Known To The Applicant Or Before The Examiner, A Prima Facie Case Of Unpatentability ........................... 37

6.  Therefore Vaisey is Immaterial ................................. 37

C.  Alternatively, Even Evaluated Under the Pre-1992 Version of Rule 56, Chen '90 and Vaisey are Not Material ................................. 38

IV.  THE ELEMENTS OF INEQUITABLE CONDUCT ................................. 40

A.  Materiality .................................................................... 41

1.  Chen '90 and Vaisey, the Allegedly Withheld References, Are Not Material ............................................................... 41

    a.  Dr. Lee Did Not Know Of the Materiality of Chen '90

and Vaisey ....................................................................... 43

      2.     Dr. Lee Had No Intent to Deceive the Patent Office ......................... 44

B.    Balancing Materiality and Intent .................................................... 47

C.    Procedural Requirements ............................................................... 47

      1.     Inequitable Conduct Must be Pled with Particularity ...................... 47

      2.     The Party Asserting Inequitable Conduct Has the Burden to Prove *Each Element* by Clear and Convincing Evidence ................ 48

1

TABLE OF AUTHORITIES

2

PAGE NO.

3

**Cases**

4

*Agfa Corp. v. Creo Products, Inc.*,
  451 F.3d 1366 (Fed. Cir. 2006)..........................................................................43

5

*Allen Organ Co. v. Kimball International, Inc.*,
  839 F.2d 1556 (Fed. Cir.), *cert. denied,* 488 U.S. 850 (1988).........................45

6

*Allied Colloids Inc. v. American Cyanamid Co.*,
  64 F.3d 1570 (Fed. Cir. 1995)...............................................................43, 44, 46

7

8

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
  725 F.2d 1350, *cert. denied,* 469 U.S. 821 (1984) ...........................................48

9

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003)...........................................................................47

10

11

*Andrew Corp. v. Gabriel Electronics, Inc.*,
  847 F.2d 819 (Fed. Cir.), *cert. denied,* 488 U.S. 927 (1988)...........................49

12

*Applera Corp. v. Micromass UK, Ltd.*,
  204 F.Supp.2d 724 (D.Del. 2002) ......................................................................43

13

14

*Atofina v. Great Lakes Chem. Corp.*,
  441 F.3d 991 (Fed. Cir. 2006)............................................................................45

15

*Avco Corp. v. PPG Industries*,
  867 F. Supp. 84 (D. Mass. 1994) ..................................................................40, 48

16

17

*Baxter Int'l, Inc. v. McGaw, Inc.*,
  149 F.3d 1321 (Fed. Cir. 1998)...........................................................41, 45, 48, 49

18

*Burlington Industries Inc. v. Dayco Corp.*,
  849 F.2d 1418 (Fed. Cir. 1988).............................................................................2

19

20

*Colorado v. New Mexico*,
  467 U.S. 310 (1983)..........................................................................................48

21

*Cordis Corp. v. Boston Scientific Corp.*,
  188 Fed. Appx. 984 (Fed. Cir. 2006)..................................................................40

22

23

*Critikon, Inc. v. Becton Dickinson VascularAccess, Inc.*,
  120 F.3d 1253 (Fed. Cir.2003)......................................................................40, 47

24

*Dayco Products, Inc. v. Total Containment, Inc.*,
  329 F.3d 1358 (Fed. Cir. 2003)......................................................5, 40, 45, 47

25

26

*Derrick Mfg. Corp. v. Southwestern Wire Cloth*,
  1998 U.S. App. LEXIS 5809 (Fed. Cir. 1998) ...................................................42

27

*Digital Control Inc. v. Charles Machine Works*,
  437 F.3d 1309 (Fed. Cir. 2006).................................................................passim

28

*Ferring B.V. v. Barr Laboratories, Inc.*,
    437 F.3d 1181 (Fed. Cir. 2006) ................................................................... 40, 42, 43, 47

*FMC Corp. v. Manitowoc Co.*,
    835 F.2d 1411 (Fed. Cir. 1987) ................................................................................ 40

*Fox Indus., Inc. v. Structural Preservation Sys., Inc.*,
    922 F.2d 801 (Fed. Cir. 1990) .................................................................................. 5

*GFI, Inc. v. Franklin Corp.*,
    265 F.3d 1268 (Fed. Cir. 2001) .............................................................................. 44

*Graco Children's Products, Inc. v. Century Products Co., Inc.*,
    1996 WL 39476, *18 (E.D. Pa. 1996) ...................................................................... 6

*Haliburton Co. v. Schlumberger Tech. Corp.*,
    925 F.2d 1435 (Fed. Cir. 1991) ........................................................................ passim

*Harrah's Entertainment, Inc. v. Station Casinos, Inc.*,
    321 F.Supp.2d 1184 (D. Nev. 2004) ....................................................................... 43

*Hebert v. Lisle Corp.*,
    99 F.3d 1109 (Fed. Cir. 1996) ............................................................................ 6, 45

*Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods.*,
    21 F.3d 1068 (Fed. Cir. 1994) ................................................................................ 44

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
    882 F.2d 1556 (Fed. Cir. 1989) .............................................................................. 45

*Hupp v. Siroflex of America, Inc.*,
    122 F.3d 1456 (Fed. Cir. 1997) .............................................................................. 45

*Impax Laboratories, Inc. v. Aventis Pharmaceuticals Inc*,
    2006 WL 3346151, *8-9 (Fed. Cir. Nov. 20, 2006) ...................................... 42, 44, 47

*In re Jerabek*,
    789 F.2d 886 (Fed. Cir. 1986) ................................................................................ 38

*Kao Corp v. Unilever United States, Inc.*,
    441 F.3d 963 (Fed. Cir. 2006) ................................................................................ 45

*Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*,
    863 F.2d 867 (Fed. Cir. 1988), *cert. denied*, 490 U.S. 1067 (1989) ........................ 40, 44, 45, 48

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*,
    439 F.3d 1335 (Fed. Cir. 2006) ......................................................................... 41, 46

*Manville Sales Corp. v. Paramount Sys., Inc.*,
    917 F.2d 544 (Fed. Cir. 1990) ................................................................................ 44

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*
    244 F.3d 1365 (Fed. Cir. 2001) .............................................................................. 48

*Micro Motion Inc., v. Exac Corp.*,
    112 F.R.D. 2 (N. D. Cal. 1985) .............................................................................. 47

*Molins PLC v. Textron, Inc.*,
48 F.3d 1172 (Fed. Cir. 1995) ............................................................................ 5, 41

*Monsanto Co. v. Bayer Bioscience N.V.*,
363 F.3d 1235 (Fed. Cir. 2004) .......................................................................... 47

*Monsanto Company v. Mycogen Plant Sci., Inc.*,
61 F.Supp. 2d 133 (D. Del. 1999) ...................................................................... 5, 25

*Northern Telecom, Inc. v. Datapoint Corp.*,
908 F.2d 931 (Fed Cir. 1990) ............................................................................. 2, 48

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*,
984 F.2d 1182 (Fed. Cir. 1993) .......................................................................... 44

*Price v. Symsk*,
988 F.2d 1187 (Fed. Cir. 1993) .......................................................................... 48

*Pro-Mold Tool Co. v. Great Lakes Plastics, Inc.*,
75 F.3d 1568, 37 USPQ2d 1626, 1633 (Fed.Cir.1996) ...................................... 42

*Purdue Pharma L.P. v. Endo Pharms., Inc.*,
438 F.3d 1123 (Fed. Cir. 2006) .......................................................................... 46

*Regents of the Univ. of California v. Eli Lilly & Co.*,
119 F.3d 1559 (Fed. Cir. 1997) .......................................................................... 5

*Seiko Epson Corp. v. Nu-Kote Intern., Inc.*,
190 F.3d 1360 (Fed. Cir. 1999) .......................................................................... 44

*Symbol Techs., Inc. v. Opticon, Inc.*,
935 F.2d 1569 (Fed. Cir. 1991) .......................................................................... 45

*The Upjohn Company v. MOVA Pharmaceutical Corp.*,
225 F.3d 1306 (Fed. Cir. 2000) .......................................................................... 44, 45

*Therma-Tru Corp. v. Peachtree Doors Inc.*,
44 F.3d 988 (Fed. Cir. 1995) ............................................................................. 44

*Tol-O-Matic v. Proma Produkt-Und Mktg. Gesellschaff m. b. H*,
945 F.2d 1546 (Fed. Cir. 1991) .......................................................................... 44

*Wolf v. Reliance Standard Life Ins. Co.*,
71 F.3d 444 (1St Cir. 1995) ............................................................................. 47

**Statutes**

35 U.S.C. § 102 ..................................................................................................... 1, 25

Fed. R. Civ. P. § 9(b) ............................................................................................ 47

**Other Authorities**

35 U.S.C. §  102 ................................................................................................... 26

37 C.F.R. § 1.56 ................................................................................................................ passim

37 CFR § 1.56 ................................................................................................................... passim

42 Fed. Reg. 5589 .................................................................................................................. 39

C.F.R. § 1.56 ................................................................................................................... 26, 38

57 Federal Register 2026 ............................................................................................ 5, 25, 38

*Chisum on Patents,* §19.03[3](b) at 19-166 *et seq.* ........................................................ 42

MPEP § 2001.05 ...................................................................................................................... 6

I.      INTRODUCTION

1.      Pursuant to the Court's ruling, during a hearing held on December 4-5, 2006, that Broadcom may amend its pleadings to add a counterclaim for inequitable conduct, QUALCOMM hereby submits this Supplemental Memorandum of Contentions of Fact and Law relating to inequitable conduct.

II.     BROADCOM'S COUNTERCLAIM FOR INEQUITABLE CONDUCT LACKS MERIT, AND SHOULD NOT BE USED TO PREJUDICE TO THE JURY

2.      Broadcom's counterclaim for inequitable conduct is literally "too little, too late," and is a transparent effort to attack the motives and integrity of an inventor in order to confuse and improperly sway the sympathies of the jury.  Accordingly, Broadcom's inequitable conduct counterclaim should be stricken.

A.      BROADCOM'S COUNTERCLAIM IS "TOO LITTLE"

3.      As set forth in more detail below, Broadcom's counterclaim is based on the thin premises that, (a) by becoming aware of two technical papers[1] after he filed his original and apparently first patent application, and (b) not providing copies of them to the Patent Office, Dr. Chong Lee, the inventor on the '104 Patent, committed inequitable conduct.

4.      The claim falls apart because neither of the papers are material to the patentability of the claims of the '104 patent.  Each is merely cumulative of art that QUALCOMM did cite to the PTO, and the more technically relevant of the papers fails to qualify as prior art.

5.      In addition, there is not a whiff of evidence that Dr. Lee, had any intent whatsoever to defraud or deceive the PTO; rather, he has offered a perfectly sensible good-faith explanation for the fact that these two papers were not disclosed to the PTO, which explanation is supported by contemporaneous evidence.

6.      Based on these facts, Broadcom's inequitable conduct claim falls squarely within the spirit of the Federal Circuit's sharp criticism of the practice of charging inequitable conduct in nearly every case without sufficient justification:

---

[1] As it has failed to do with respect to other references upon which it relies in this Action, Broadcom has failed to sustain its burden to establish that one or more of these papers are prior art, within the meaning of 35 U.S.C. § 102.

"The habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps. They get anywhere with the accusation in but a small percentage of the cases, but such charges are not inconsequential on that account. They destroy the respect for one another's integrity, for being fellow members of an honorable profession, that used to make the bar a valuable help to the courts in making a sound disposition of their cases, and to sustain the good name of the bar itself. A patent litigant should be made to feel, therefore, that an unsupported charge of 'inequitable conduct in the Patent Office' is a negative contribution to the rightful administration of justice. The charge was formerly known as 'fraud on the Patent Office,' a more pejorative term, but the change of name does not make the thing itself smell any sweeter. Even after complete testimony the court should find inequitable conduct only if shown by clear and convincing evidence."[2]

## B.    BROADCOM'S COUNTERCLAIM IS "TOO LATE"

7.    Broadcom did not move to add inequitable conduct to this case until six months after the case management order's deadline for amending pleadings and only one month before trial. At the last minute, Broadcom has pointed to a pair of cumulative and immaterial references to accuse an inventor of inequitable conduct, without a scrap of evidence of intent to deceive the Patent Office.

8.    In *November 2005,* Broadcom received the two references upon which it now relies in its inequitable conduct claims. Yet, it waited more than *ten months* before putting its first question about the references to the inventor of the '104 Patent. On **April 28, 2006,** Broadcom filed its Preliminary Invalidity Contentions, which reflect a detailed analysis of the two references upon which it now relies. Yet it waited more than *five months* thereafter before putting its first question about the references to the inventor. On *June 26, 2006,* Broadcom received a copy of a conference paper *written by the inventor* in which the two references were discussed. Yet it waited more than *three months* from its receipt before putting its first question about the references to the inventor. Indeed, Broadcom never asked the prosecuting patent attorney a single question about the two references when he was deposed two months after Broadcom's Preliminary Invalidity Contentions were filed. Broadcom's attempt to excuse its own lack of diligence by blaming QUALCOMM's allegedly late production of documents is a smoke screen. Despite having all of this information at

---

[2] *Burlington Industries Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422 (Fed. Cir. 1988); *see also Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 939 (Fed Cir. 1990).

509929v2

1  its fingertips for many months, Broadcom waited until the close of discovery before pursuing the

2  issue, as an apparent afterthought, in an attempt to delay trial.

3        9.    Broadcom's claim comes entirely too late in the process and greatly prejudices

4  QUALCOMM. Trial is scheduled to start on January 9, 2007, one month after inequitable conduct

5  was added to the case. Fact discovery and expert discovery closed months before Broadcom's

6  motion to amend. The parties had already filed pretrial briefs, trial exhibit lists, and witness lists by

7  the time that Broadcom filed its motion to amend.

8        10.    Adding inequitable conduct issues at such a late date imposes significant prejudice to

9  QUALCOMM during a crucial time because QUALCOMM is now required to divert resources from

10  trial preparation to supplement its patent law and technical expert reports—work that could have

11  been done during ordinary expert discovery, had Broadcom timely raised its defense.

12  **III.  THE DUTY OF DISCLOSURE**

13        11.    The doctrine of inequitable conduct is premised on the duty of disclosure. Inventors,

14  as well as those involved in the filing and prosecution of patent applications, are under a duty of

15  disclosure in dealing with the Patent Office in connection with the prosecution of patent applications.

16  The Patent Office has set forth its standard of an applicant's duty of disclosure in its Rule 56. [3]

17

18  ---

[3] 37 CFR § 1.56 Duty to disclose information material to patentability.

19      (a) A patent by its very nature is affected with a public interest. The public interest is best

20      served, and the most effective patent examination occurs when, at the time an
application is being examined, the Office is aware of and evaluates the teachings of all

21      information material to patentability. Each individual associated with the filing and
prosecution of a patent application has a duty of candor and good faith in dealing with

22      the Office, which includes a ***duty to disclose to the Office all information known to
that individual to be material to patentability*** as defined in this section. The duty to

23      disclose information exists with respect to each pending claim until the claim is
cancelled or withdrawn from consideration, or the application becomes abandoned.

24      Information material to the patentability of a claim that is cancelled or withdrawn from
consideration need not be submitted if the information is not material to the

25      patentability of any claim remaining under consideration in the application. ***There is no
duty to submit information which is not material to the patentability of any existing***

26      ***claim.*** The duty to disclose all information known to be material to patentability is
deemed to be satisfied if all information known to be material to patentability of any

27      claim issued in a patent was cited by the Office or submitted to the Office in the manner
prescribed by §§ 1.97(b)-(d) and 1.98. However, no patent will be granted on an

28      application in connection with which fraud on the Office was practiced or attempted or
the duty of disclosure was violated through bad faith or intentional misconduct. The
Office encourages applicants to carefully examine:

12.     This duty of disclosure includes the duty to disclose to the USPTO all information known to them to be "material" to the patentability of the application.[4]

13.     Under Rule 56, information is "material" if "it is not cumulative to information already of record or being made of record in the application," ***and either*** "establishes, by itself or in

----

 (1)  Prior art cited in search reports of a foreign patent office in a counterpart application, and

 (2)  The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

(b) Under this section, ***information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and***

 (1)  ***It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim***; or

 (2)  ***It refutes, or is inconsistent with, a position the applicant takes in***:

  (i) ***Opposing an argument of unpatentability*** relied on by the Office, or

  (ii) ***Asserting an argument of patentability***.

A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

(c) Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

 (1)  Each inventor named in the application;

 (2)  Each attorney or agent who prepares or prosecutes the application; and

 (3)  Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

(d) Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor.

(e) In any continuation-in-part application, the duty under this section includes the duty to disclose to the Office all information known to the person to be material to patentability, as defined in paragraph (b) of this section, which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

[42 FR 5593, Jan. 28, 1977; paras. (d) & (e) - (i), 47 FR 21751, May 19, 1982, effective July 1, 1982; para. (c), 48 FR 2710, Jan. 20, 1983, effective Feb. 27, 1983; paras. (b) and (j), 49 FR 554, Jan. 4, 1984, effective Apr. 1, 1984; paras. (d) and (h), 50 FR 5171, Feb. 6, 1985, effective Mar. 8, 1985; para. (e), 53 FR 47808, Nov. 28, 1988, effective Jan. 1, 1989; 57 FR 2021, Jan. 17, 1992, effective Mar. 16, 1992; para. (e) added, 65 FR 54604, Sept. 8, 2000, effective Nov. 7, 2000] (emphasis added).

[4] *Id.*

combination with other information, a prima facie case of unpatentability of a claim," or "refutes, or is inconsistent with, a position the applicant takes in [refuting an argument of unpatentability relied on by the USPTO or making an argument of patentability]."[5]

14.     Information that is cumulative to that already of record or being made of record in the application is not material to patentability. Information is cumulative if it teaches no more than what a reasonable Examiner would consider to be taught by the prior art already before the USPTO.[6] The scope of what is relevant for this inquiry is what is taught by the patent's claims themselves. In other words, for example, if the patent's claims cover subjects A, B, and C; the art of record covers A and B; and the undisclosed art covers A, D, E, F, G, then the undisclosed art is cumulative because D-G are irrelevant to the materiality determination, and A is already before the examiner.

15.     A prior art reference may "establish[], by itself … a prima facie case of unpatentability of a claim" where the reference anticipates the claim or is an undisclosed simultaneous application that would serve as the basis for a double-patenting rejection.[7]

16.     An applicant has no duty to submit information which is not material to the patentability of any existing claim.[8] Moreover, the PTO has explained that "while information may be material under the definition, there is no duty on an individual to disclose the information if the information is unknown to the individual."[9] The PTO has also noted that "there can be no duty to disclose the information if it is material only in combination with unknown information."[10]

17.     Even if the allegedly undisclosed information, alone or in combination with other references, does establish a prima facie case of unpatentability, it is nonetheless ***not material*** if it is cumulative of information already before the Examiner. In other words, to be material, information must ***both*** be non-cumulative ***and*** establish a prima facie case of unpatentability.[11]

---

[5] 37 CFR § 1.56(b).

[6] *Regents of the Univ. of California v. Eli Lilly & Co.,* 119 F.3d 1559, 1574-75 (Fed. Cir. 1997).

[7] *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1366 (Fed. Cir. 2003); *Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 804 (Fed. Cir. 1990).

[8] 37 C.F.R. § 1.56(a) (2006).

[9] 57 Federal Register 2026 (Jan. 17, 1992).

[10] *Id.*; *Monsanto Company v. Mycogen Plant Sci., Inc.*, 61 F.Supp. 2d 133, 194 (D. Del. 1999).

[11] *See, e.g., Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1185 (Fed. Cir. 1995) (claim of undisclosed

18.     As noted in 37 C.F.R. Section 1.56 (b)(2), one way in which information may be material is if it is non-cumulative and is inconsistent with a position concerning patentability that the applicant took before the Patent Office.[12]  If the applicant did not take a position concerning patentability that is inconsistent with the allegedly undisclosed information, then this portion of Rule 56 is inapplicable.   Here, Broadcom does not argue that Dr. Lee or anyone else involved in the prosecution of the '104 Patent took any positions concerning patentability that are inconsistent with Chen '90 or Vaisey—indeed, by disclosing Strobach to the Examiner as prior art, Dr. Lee's position during prosecution was entirely ***consistent*** with these references, namely, that what they disclose was known in the art at the time of prosecution.   Therefore, 37 C.F.R. Section 1.56 (b)(2) is not applicable to the facts of this action.

19.     There is no duty to disclose information to the USPTO that is not "material" to the patentability of the application, including information that is already before the Examiner or that is cumulative of information that is before the Examiner.[13]

20.     The burden of proving that a violation of the duty of disclosure has occurred is on the party making such an assertion.  That party must establish by a showing through clear and convincing evidence that the individual having a duty of disclosure obligation failed to bring to the Examiner's attention information known to have been material to patentability.  This means that the party asserting that a violation of the duty of disclosure has been committed, must establish by clear and convincing evidence that the information not disclosed to the Examiner was not cumulative, that it was material to patentability as defined by 37 C.F.R. § 1.56 and that one of the individuals identified in 37 C.F.R. § 1.56(c) knew or should have known that such information was material to patentability.[14]  Proof of knowledge of materiality may be probative of whether there was a violation

---

prior art patent was not material to prosecution of patent-in-suit where undisclosed patent claim was cumulative of other, disclosed prior art patent).

[12] 37 CFR § 1.56.

[13] MPEP § 2001.05 ("If information is not material, there is no duty to disclose the information to the Office."); *Hebert v. Lisle Corp.,* 99 F.3d 1109, 1116 (Fed. Cir. 1996) (an applicant need not disclose a material reference if it is cumulative to … those already before the examiner).

[14] *Graco Children's Products, Inc. v. Century Products Co., Inc.,* 1996 WL 39476, *18 (E.D. Pa. 1996) ("In advancing the affirmative defense of inequitable conduct, [defendant] has the burden of proving each element by clear and convincing evidence.").

of the duty of disclosure, but it is inadequate as proof of whether there was intent to deceive the Examiner.

A.   **CHEN '90 IS NOT MATERIAL TO THE '104 PATENT**[15]

21.   Broadcom asserts that Chen '90 is material to the patentability of the claimed invention in the '104 Patent because it discloses the following four attributes that Broadcom appears to consider relevant to the claims:

1)   "a quadtree-based adaptive block size system in which variable block size Discrete Cosine Transforms ("DCT") are performed,"

2)   "adaptive thresholding,"

3)   "adaptive quantization," and

4)   the use of "redundancy in DC coefficients (specifically, by considering similarity in the mean of adjacent sub-blocks) to increase the amount of compression."[16,17]

22.   One of ordinary skill in the art would have understood Chen '90 to be immaterial to the patentability of the claims of the '104 Patent for at least four reasons.  First, it would be understood that the Broadcom-identified attributes of Chen '90 were well known to one of ordinary skill in the art of video compression technology at the time that the '104 Patent was filed.  Second, it would be understood that several of the attributes of Chen '90 were not relevant to the patentability of the claims of the '104 Patent.  Third, it would be understood that Chen '90 is cumulative to the references disclosed to the USPTO in the prosecution history of the '104 Patent based on the teachings in each of Strobach '91[18] and Dinstein[19].  Fourth, it would be understood that Chen '90 is

---

[15] QUALCOMM refers to and incorporates herein by reference all contentions of law and fact set forth in the Declaration of Dr. Maja Bystrom Regarding the Immateriality of Chen '90 and Vaisey, dated November 20, 2006.

[16] Broadcom Corporation's First Amended Answer And Counterclaims To QUALCOMM Incorporated's Complaint For Patent Infringement, served December 8, 2006 (hereinafter "Broadcom's Answer") at ¶ 59.

[17] Broadcom also appears to identify a fifth attribute of Chen '90: "DCT-based quadtree adaptive block size system." However, one of ordinary skill in the art would readily realize that "DCT-based quadtree adaptive block size system" is a simple rephrasing of the first identified attribute of "a quadtree-based adaptive block size system in which variable block size Discrete Cosine Transforms ("DCT") are performed."

[18] "Quadtree-Structured Recursive Plane Decomposition Coding of Images," by Peter Strobach, *IEEE Transactions on Signal Processing,* Vol. 38, No. 6, June 1991, pp. 1380-1397.

[19] "Variable Block-Size Transform Image Coder," by Its'Hak Dinstein et al., *IEEE Transactions on*

technically inapposite, or only tangentially related, to the invention claimed in the '104 Patent because Chen '90 does not disclose a second stage DCT operation applied to DC coefficients of a preceding DCT operation. In summary, one of ordinary skill in the art would consider Chen '90 to be immaterial for these reasons.

23. Each point is further discussed below after a preliminary consideration of Broadcom's characterization of Chen '90.

### 1. Correcting Broadcom's Characterizations of Chen '90

24. As a threshold issue, one of ordinary skill in the art would question Broadcom's characterizations of Chen '90 at two levels. First, one of ordinary skill in the art would not characterize Chen '90 as disclosing the use of "redundancy in DC coefficients (specifically, by considering similarity in the mean of adjacent sub-blocks) to increase the amount of compression" as asserted by Broadcom. Second, one of ordinary skill in the art would discount Broadcom's characterizations of Chen '90 as including "adaptive thresholding" and "adaptive quantization" because such attributes, while perhaps technically accurate, have no apparent relevance to the asserted claims in the '104 Patent. Each of Broadcom's mischaracterizations will be discussed in turn.

### a. Summary of the Teachings of Chen '90

25. Chen '90 discloses a variable block size video compression system that performs a quadtree-based block size determination in the pixel domain based upon a consideration of the similarities (variance) between the pixels within each sub-block and the similarities of the average (mean) of the pixel values in a sub-block with the average of the pixel values of the neighboring sub-blocks. The block size determination sequence is intended to yield larger block sizes in areas of an image that is generally uniform, and smaller block sizes in "busy" areas of an image.

26. After block size determinations are completed, Chen '90 teaches that a single stage DCT operation is performed on the variable block size image, followed by a well-known quantization step and further encoding/compressing steps.

_Communications_, Vol. 38, No. 11, Nov. 1990, pp. 2073-2078.

27.     Chen '90 makes clear that a primary contribution of his paper relates to incorporating adaptive thresholding and adaptive quantization into a known variable-block-size, DCT-based system. "Since adaptive thresholder and adaptive quantizer result in a better image quality with lower bit rate, it is desirable to incorporate them into the variable block size DCT for further performance improvements."[20] "This motivates the work in this paper."[21]

28.     Chen '90 summarizes its contributions as disclosing the following three steps: (1) "The input image is divided into smaller disjoint blocks,"[22] (2) "Each block of image data is then transformed via DCT into a more compact form to facilitate the compression process which consists of thresholding and quantization of the DCT coefficients,"[23] and (3) "Finally the compressed 2-D DCT coefficients are scanned, according to the zigzag pattern [3], into a 1-D sequence whose non-zero amplitudes and run-length of zeros are entropy-coded."[24]

#### b.     Chen '90 Cannot Fairly Be Characterized As Disclosing the Use of "redundancy in DC coefficients," As Asserted by Broadcom

29.     One of ordinary skill in the art would not characterize Chen '90 as disclosing a system that uses "redundancy in DC coefficients (specifically, by considering similarity in the mean of adjacent sub-blocks) to increase the amount of compression" as asserted by Broadcom.  Rather, and as apparently conceded by Broadcom, it is more accurate to characterize Chen '90 as teaching "considering similarity in the mean of adjacent sub-blocks to increase the amount of compression."

30.     Broadcom's reference to "redundancy in DC coefficients" as a part of its characterization of Chen '90 is misleading and not consistent with the actual text of Chen '90.  For example, nowhere in Chen '90 is it ever expressed that the system uses "redundancy in DC coefficients to increase the amount of compression."  Indeed, the only place where Chen '90 even

---

[20] Chen, Cheng-Tie; "Transform Coding of Digital Images Using Variable Block Size DCT with Adaptive Thresholding and Quantization," SPIE Vol. 1349 Applications of Digital Image Processing XIII (1990) pp. 43-54 ("Chen '90") at 44, ¶ 2.

[21] Chen '90, at 44, ¶ 2.

[22] Chen '90, at 43, ¶ 2.

[23] Chen '90, at 43, ¶ 2.

[24] Chen '90, at 43, ¶ 2.

509929v2

1   uses the term "DC coefficients" is at a much later stage in the compression process, after quadtree

2   partitioning of the image is performed, and after a DCT operation has been performed on the pixel

3   data, in the context of normalization.[25]

4        31.     Nor would one of ordinary skill in the art infer that Chen '90's disclosure of either

5   thresholding or quantization teach a process that uses "redundancy in DC coefficients … to increase

6   the amount of compression."  Chen '90 applies adaptive thresholding and adaptive quantization only

7   after application of DCT to the pixel data to facilitate the compression process.[26]

8        32.     Also, nowhere in Chen '90 beyond normalization is it taught that the DC coefficients

9   resulting from a DCT operation are to be processed in any way distinct from the associated AC

10  coefficients that result from the DCT operation, or that a second stage DCT operation is to be

11  applied to coefficients resulting from an earlier DCT operation.

12       33.     In summary, one of ordinary skill in the art would not characterize Chen '90 as

13  disclosing the use of "redundancy in DC coefficients (specifically, by considering similarity in the

14  mean of adjacent sub-blocks) to increase the amount of compression" as asserted by Broadcom.  To

15  the extent that Broadcom's characterization of Chen '90 is a reference to the block size

16  determination techniques disclosed in Chen '90, it is more accurate to characterize that as

17  "considering similarity in the mean of adjacent sub-blocks to increase the amount of compression."

18  For the purpose of determining the materiality of Chen '90 in relation to the references of record

19  before the USPTO, it is necessary to refer to the actual technical teachings of Chen '90 rather than

20  Broadcom's misleading characterization.  Even if the materiality inquiry is focused on the technical

21  teachings of Chen '90 identified by Broadcom, as discussed in detail below, those teachings were

22  well known to one of ordinary skill in the art, were in large part not relevant to the patentability of

23  the claims of the '104 Patent and, in any case, were clearly cumulative when compared to the

---

[25] Chen '90 details that "After the block sizes are segmented (see Fig. 2), each subblock is transformed by a DCT of appropriate size," where "the range of the transformed coefficients are normalized to a range of [0, 510] for the DC coefficient [sic] and [-255, 255] for the AC coefficients." at 45 ¶ 3.  One of ordinary skill in the art would not confuse normalization with using "redundancy in DC coefficients (specifically, by considering similarity in the mean of adjacent sub-blocks) to increase the amount of compression."

[26] Chen '90, at 43, ¶ 2.

QUALCOMM'S SUPPLEMENTAL MEMORANDUM OF
CONTENTIONS OF FACT AND LAW                    10               CASE NO. 05 CV 1958 B(BLM

teaching of several of the references of record for the '104 Patent.

2.   **The Broadcom-identified Attributes of Chen '90 Were Standard and Well Known Approaches to One of Ordinary Skill in the Art of Video Compression Technology**

34.   Broadcom argues that Chen '90 is material to the patentability of the claimed invention in the '104 Patent because it discloses the four attributes identified above, i.e., (1) "a quadtree-based adaptive block size system in which variable block size Discrete Cosine Transforms ("DCT") are performed," (2) "adaptive thresholding," (3) "adaptive quantization," and (4) the use of "redundancy in DC coefficients (specifically, by considering similarity in the mean of adjacent sub-blocks) to increase the amount of compression."[27]   These attributes were standard and well known to one of ordinary skill in the art of video compression technology.

35.   For example, variable block size compression systems were well known and widely discussed prior to the filing date of the '104 Patent.  Such a system was disclosed as early as 1985, in Clarke.[28] Among the references of record in the prosecution history of the '104 Patent, variable block size compression systems were discussed in at least Strobach '91[29], the '341 Patent[30], and Dinstein.[31]

36.   Quadtree-based compression systems were also well known and widely discussed prior to the filing date of the '104 Patent.  For example, such a system was disclosed as early as 1980, in Tanimoto and Klinger.[32]   Among the references of record in the prosecution history of the '104 Patent, quadtree-based compression systems were discussed in at least Strobach '91, the '341 Patent, and Dinstein.

---

[27] Broadcom's Answer at ¶ 59.

[28] R.J. Clarke, *Transform Coding of Images*, Academic Press, 1985, at 192.

[29] "Quadtree-Structured Recursive Plane Decomposition Coding of Images" by Peter Strobach, *IEEE Transactions on Signal Processing*, Vol. 39, No. 6, June 1991.

[30] U.S. Patent No. 4,922,341, entitled "Adaptive block transform image coding method and apparatus."

[31] "Variable Block-Size Transform Image Coder" by Its'Hak Dinstein et al., IEEE *Transactions on Communications*, Vol. 38, No. 11, Nov. 1990, pp. 2073-2078.

[32] "Structured Computer Vision: Machine Perception through Hierarchical Computation Structures," ed. by S. Tanimoto and A. Klinger, Academic Press, 1980, at 48; Image Analysis" by Azriel Rosenfeld, "in *Digital Image Processing Techniques*, ed. by Michael P. Ekstrom, Academic Press, Inc., 1984, at 272-74.

37.     Performing DCT operations for image compression was also well known and widely discussed prior to the filing date of the '104 Patent.  For example, such a system was disclosed as early as 1985, in Clarke.[33]  DCT operations were discussed in virtually all of the references of record in the prosecution history of the '104 Patent.

38.     Adaptive thresholding in an image compression system was also well known and widely discussed prior to the filing date of the '104 Patent.  For example, such a system was disclosed as early as 1979, in Castleman.[34]  Among the references of record in the prosecution history of the '104 Patent, adaptive thresholding in an image compression system was discussed in at least Strobach '91 the '341 Patent and implicit in Dinstein.

39.     Adaptive quantization in an image compression system was also well known and widely discussed prior to the filing date of the '104 Patent.  For example, such a system was disclosed as early as 1984, in Ekstrom.[35]  Among the references of record in the prosecution history of the '104 Patent, adaptive quantization in an image compression system was discussed in at least Strobach '91, the '341 Patent, and Dinstein.

40.     Considering similarity in the mean of adjacent sub-blocks to make block size determinations was also well known and widely discussed prior to the filing date of the '104 Patent. For example, such a system was disclosed as early as 1980, in Chen and Pavlidis.[36]  Among the references of record in the prosecution history of the '104 Patent, considering similarity in the mean of adjacent sub-blocks to make block size determinations was discussed in at least Strobach '91, and Dinstein.

---

[33] R.J. Clarke, *Transform Coding of Images*, Academic Press, 1985, at 111-15; "Interframe Cosine Transform Image Coding" by John A. Roese et al., *IEEE Transaction on Communications,* Vol. Com-25, No. 11, 1329-1339.

[34] Kenneth R. Castleman, *Digital Image Processing*, Prentice-Hall, Inc., 1979, at 304; "Image Data Compression" by Anil K. Jain *et al.*, in *Digital Image Processing Techniques*, ed. by Michael P. Ekstrom, Academic Press, Inc., 1984, at 193-95.

[35] "Image Data Compression" by Anil K. Jain *et al.*, in *Digital Image Processing Techniques*, ed. by Michael P. Ekstrom, Academic Press, Inc., 1984, at 200.

[36] "Image Segmentation as an Estimation Problem," by P.C. Chen and T. Pavlidis, *Computer Graphics and Image Processing*, Vol. 12, No. 2, Feb. 1980, pp. 153-172, at 158; "Tree-structured scene adaptive coder" by P. Strobach, *IEEE Transactions on Communications,* Vol. 38 No. 4, April 1990, pp. 477-486, at 481.

41.     Indeed, Chen '90 is immaterial because the attributes of Chen '90 are standard and well known approaches to one of ordinary skill in the art of video compression technology. As such, disclosing such common and well known attributes would have been unnecessary.

### 3.     Several Attributes of Chen '90 Are Not Even Relevant to the Patentability of the Claims of the '104 Patent

42.     For the reasons described below, one of ordinary skill in the art would question how or why Broadcom's identified attributes of "adaptive thresholding," "adaptive quantization," or "considering similarity in the mean of adjacent sub-blocks to make block size determinations," are at all relevant to the patentability of the claims of the '104 Patent.

### a.     Chen '90's Disclosures Of "Adaptive Thresholding" And "Adaptive Quantization" Are Completely Irrelevant To The Claims Of The '104 Patent

43.     One of ordinary skill in the art would question how or why Broadcom's identified attributes of "adaptive thresholding" and "adaptive quantization" are at all relevant to the patentability of the asserted claims of the '104 Patent. One of ordinary skill in the art might reasonably conclude that Chen '90 discloses adaptive thresholding and adaptive quantization, but the claims in the '104 Patent do not recite and are not dependent upon either adaptive thresholding or adaptive quantization. For example, Claim 3 of the '104 Patent recites

> "an encoding means for receiving said DQT composite block, selecting values from said DQT composite block and encoding said selected values of said DQT composite block to provide a signal indicative of compressed DC DCT coefficient values."

44.     While adaptive thresholding and/or adaptive quantization are approaches that might be used as a part of an "encoding means," nothing in Claim 3 recites such steps nor is limited by such steps. Claim 3 (and all other claims of the '104 Patent) are silent with respect to such known encoding techniques such adaptive thresholding and/or adaptive quantization, as those steps are utilized within Chen '90.

45.     Therefore, the fact that Chen '90 may disclose adaptive thresholding and adaptive quantization would not be considered relevant to the claims of the '104 Patent.

### b.     Chen '90's Disclosures Of "Considering Similarity In The Mean Of Adjacent Sub-Blocks To Make Block Size

**Determinations" Is Likewise Irrelevant To The Claims Of The '104 Patent**

46. In addition, one of ordinary skill in the art would question how or why the attribute of Chen '90 of "considering similarity in the mean of adjacent sub-blocks to increase the amount of compression" is at all relevant to the patentability of the claims of the '104 Patent. As discussed above, one of ordinary skill in the art might reasonably conclude that Chen '90 discloses considering similarity in the mean of adjacent sub-blocks increase the amount of compression," but the claims in the '104 Patent do not recite and are not dependent upon such an attribute. The claims of the '104 Patent do not recite that the similarity in the mean of adjacent sub-blocks is to be considered in making block size determinations. Therefore, the fact that Chen '90 may disclose considering similarity in the mean of adjacent sub-blocks would not be considered relevant to the claims of the '104 Patent.

**4. Chen '90 is not material to the '104 Patent Because Chen '90 is Cumulative to Several References of Record**

47. Broadcom argues that Chen '90 is material to the patentability of the claimed invention in the '104 Patent because it discloses the four attributes identified above, *i.e.*, (1) "a quadtree-based adaptive block size system in which variable block size Discrete Cosine Transforms ("DCT") are performed," (2) "adaptive thresholding," (3) "adaptive quantization," and (4) the use of "redundancy in DC coefficients (specifically, by considering similarity in the mean of adjacent sub-blocks) to increase the amount of compression."[37]

48. As discussed above, Chen '90 cannot be fairly characterized as disclosing the use of "redundancy in DC coefficients … to increase the amount of compression" and that the attributes of "adaptive thresholding" and "adaptive quantization" are irrelevant to the asserted claims in the '104 Patent.

49. As also discussed, fairly characterized, the attributes identified by Broadcom would have been standard and well known approaches to one of ordinary skill in the art of video compression technology. Several of the references of record in the prosecution history of the '104 patent each teach all four of the attributes of Chen '90 identified by Broadcom. Therefore, Chen '90

---

[37] Broadcom's Answer at ¶ 59.

is cumulative to the references of record in the prosecution history of the '104 Patent and immaterial to the patentability of the asserted claims.

### a. Chen '90 is Cumulative to the Strobach '91 Reference

50.     One of ordinary skill in the art would understand that Strobach '91 discusses, among other things, all subject matter disclosed by Chen '90 that Broadcom has identified as relevant to the patentability of the '104 Patent.[38]  Strobach '91 was disclosed to the USPTO by QUALCOMM in the Information Disclosure Statement dated January 22, 1992 and appears on the cover page of the '104 Patent under the heading "References Cited," indicating that the Patent Examiner considered Strobach '91 during the prosecution of the '104 Patent.[39]

51.     Strobach '91 was a particularly useful and appropriate reference to be disclosed to the USPTO because it included in its introduction section a lengthy and wide ranging review of many different approaches taken by earlier researchers of video compression techniques.

52.     Included in Strobach '91's review of various prior approaches were discussions of and numerous citations to examples of (1) quadtree-based variable block size techniques,[40] (2) the consideration of the average (mean) of the pixel values of adjacent sub-blocks in making block size determinations,[41] (3) use of DCT operations on pixel data of variable sized blocks to facilitate image compression,[42] (4) adaptive thresholding of transform coefficients,[43] and (5) adaptive quantization of transform coefficients.[44]

53.     Thus, one of ordinary skill in the art would understand Strobach '91's overview of various approaches taken by earlier research to include discussions of each of the Chen '90 attributes identified by Broadcom: (1) "a quadtree-based adaptive block size system in which variable block

---

[38] *See* Broadcom's Answer at ¶ 59.

[39] '104 Patent, References Cited.

[40] Strobach '91, at 1380, Abstract; Col. 2, ¶ 2.

[41] Strobach '91, at 1381, Col. 2, ¶ 1; 1386, Col. 1, ¶ 1; "Tree-structured scene adaptive coder" by P. Strobach, *IEEE Transactions on Communications,* Vol. 38 No. 4, April 1990, pp. 477-486, at 481.

[42] Strobach '91, at 1380, Col. 2, ¶ 3.

[43] Strobach '91, at 1390 Col. 1.

[44] Strobach '91, at 1387, Col. 1, ¶ 3 *et seq.*

509929v2

1   size Discrete Cosine Transforms ('DCT') are performed," (2) "adaptive thresholding," (3) "adaptive

2   quantization," and (4) "considering similarity in the mean of adjacent sub-blocks to increase the

3   amount of compression."

4     54. In particular, Strobach '91 discusses the approach of "a quadtree-based adaptive

5   block size system in which variable block size Discrete Cosine Transforms ('DCT') are performed"

6   when it discusses "a *quadtree data structure* to obtain a new *variable block size image coding*

7   algorithm,"[45] "*adaptive variable block size image coding algorithms*"[46] and "*an adaptive variable*

8   *block size segmentation process*."[47] Strobach '91 elaborates in its overview that "*the discrete cosine*

9   *transform (DCT)*"[48] possesses the "sometimes important property that the coefficients of a block of

10  size 2Nx2N can be computed order recursively and efficiently"[49] where "These order recursive laws

11  facilitate a much more efficient computation of coefficients of increasing block sizes when

12  compared to the simple non-recursive case, where the *coefficients must be computed* completely

13  new for each block size"[50] and where "such efficient order recursive construction properties *play a*

14  *central role in the area of variable block size image coding.*"[51]

15    55. From this and related discussions in the overview section of Strobach '91, one of

16  ordinary skill in the art would understand Strobach '91 to inform the reader of the approach of "a

17  quadtree-based adaptive block size system in which variable block size Discrete Cosine Transforms

18  ('DCT') are performed."  This is the most relevant of the attributes of Chen '90 identified by

19  Broadcom.

20    56. Regarding the second attribute identified by Broadcom concerning Chen '90,[52] one of

---

[45] Strobach '91, at 1380, Abstract.

[46] Strobach '91, at 1380, Col. 2, ¶ 3.

[47] Strobach '91, at 1380, Col. 2, ¶ 4.

[48] Strobach '91, at 1380, Col. 2, ¶ 3.

[49] Strobach '91, at 1380, Col. 2, ¶ 3.

[50] Strobach '91, at 1380, Col. 2, ¶ 3.

[51] Strobach '91, at 1380, Col. 2, ¶ 3 (emphasis added).

[52] As explained above, this attribute is not relevant to the claims of the '104 Patent.  However, in the event that the Court is uncertain of its relevance, it is also cumulative to the references of record before the USPTO.

509929v2

ordinary skill in the art would understand that Strobach '91 discusses a number of variable block size image coding approaches that reflect the use of adaptive thresholding for two distinct purposes and at two distinct stages in the image compression process.

57.    One approach that Strobach '91 identifies involves applying adaptive thresholding at the block merging stage. In particular, Strobach '91 teaches a "methodology for automatic computation of *optimal merging thresholds in dependence of the data characteristics*."[53] Strobach '91 elaborates on this approach to adaptive thresholding:

> "When the differential increase in approximation energy ... *for each block size N* is monitored during the successive merging process, one obtains the progress of the *corresponding optimal thresholds* ... This way, one obtains the *optimal thresholds for each block size* as a function of the desired rate. ... Clearly, when the thresholds are chosen as suggested by [the curves in Fig. 8], the true coder will produce exactly the same quadtree structures as produced by the optimization process itself."[54]

One of ordinary skill in the art would understand that Strobach '91 discloses "adaptive thresholding" by virtue of these teachings.

58.    The other approach to adaptive thresholding that Strobach '91 identifies occurs at the transform coefficient coding stage, and involves the use of adaptive thresholding applied to transform coefficients. Concerning this application of adaptive thresholding concepts, Strobach '91 particularly references another article by Chen, "Adaptive transform coding via quadtree-based variable block size DCT" (1989) ("Chen '89"). In the context of a transform coding algorithm, Chen '89 explicitly states that the "parameters of importance are blocksize, threshold, and the quantizer stepsize."[55] Chen '89 further elaborates that "to yield a better trade-off between the bitrate and image quality, the parameters used in the algorithm have to be adaptive to the image contents."[56] Therefore, one of ordinary skill in the art would understand that Strobach '91 recognizes "adaptive thresholding" in at least two forms.

---

[53] Strobach '91, at 1381, Col. 1, ¶ 2.

[54] Strobach '91, at 1390 Col. 1.

[55] Chen '89, at 1854, Col. 1, ¶ 2.

[56] Chen '89, at 1854, Col. 1-2.

59. Regarding the third attribute identified by Broadcom concerning Chen '90,[57] one of ordinary skill in the art would understand that Strobach '91 discusses "adaptive quantization."

60. For example, Strobach '91 discusses adaptive quantization through his reference to "all important aspects of this [quadtree data based] coding concept, such as parameter *quantization*."[58] Strobach '91 particularly teaches that "*At increasing block sizes*, the mean parameter … must be *quantized at successively smaller step sizes*."[59] Strobach '91 further elaborates on "the relationship between mean *quantizer step size* and gradient *quantizer step size* which are *dependent on the block size*" and "the choice of the absolute values of mean or gradient quantizer stepsizes [sic] at increasing values of the block size N."[60] One of ordinary skill in the art would understand that Strobach '91 discloses "adaptive quantization" by virtue of these teachings.

61. Regarding the fourth attribute identified by Broadcom concerning Chen '90, one of ordinary skill in the art would understand that Strobach '91 discloses "considering similarity in the mean of adjacent sub-blocks to increase the amount of compression." As discussed above, this is a more accurate characterization of what Broadcom describes as "redundancy in DC coefficients (specifically, by considering similarity in the mean of adjacent sub-blocks) to increase the amount of compression" in reference to Chen '90. Strobach '91 recognizes the same technical content as Chen '90, however it is characterized.

62. In particular, Strobach '91 indicates that "As soon as an adaptive variable block size segmentation process reaches large block sizes, this automatically indicates that the corresponding part of the image is of low detail, and hence the high frequency coefficients of a transform applied to these blocks are close to zero or less significant and can therefore be omitted."[61] Strobach '91 continues that "Clearly more informative to the problem of signal representation in adaptive variable

---

[57] As explained above, this attribute is not relevant to the claims of the '104 Patent. However, in the event that the Court is uncertain of its relevance, it is also cumulative to the references of record before the USPTO.

[58] Strobach '91, at 1381, Col. 1, ¶ 2.

[59] Strobach '91, at 1381, Col. 2, ¶ 2.

[60] Strobach '91, at 1387, Col. 1, ¶ 3 *et seq*.

[61] Strobach '91, at 1380, Col. 2, ¶ 4.

blocksize image coding schemes would be a transform with a number of coefficients per block which is fixed …."[62]  Strobach '91 elaborates that "The key step to the derivation of such 'fixed number of coefficients' transforms is the approximation of the luminance signal by a parametric function in blocks of a different size," where Strobach '91 specifically defines the parameters as including "the mean parameter" and "plane gradient" parameters."[63]  In the context of decomposing an image block into sub-blocks of various sizes, Strobach '91 teaches that "*When the plane gradient … is forced to zero*, one obtains a simplified method termed '*quad-tree-structured regular mean decomposition coding'*" and cites for greater detail to three of his own prior papers "[32]-[34]."[64] Based on these teachings, one of ordinary skill in the art would understand Strobach '91 to suggest "considering similarity in the mean of adjacent sub-blocks to increase the amount of compression," just as in Chen '90.

63.     This understanding is confirmed by a review of the earlier Strobach papers cited in Strobach'91, which include:  (1) "Space-variant regular de-composition quadtrees in adaptive interframe coding" (1988) (Strobach IEEE '88), and (2) "Tree-structured scene adaptive coder" (eventually published in April 1990) (Strobach '90).

64.     In the context of building quadtree structures and "concentrate[ing] on the *bottom-up* realization,"[65] Strobach IEEE '88 expressly teaches that "*four adjacent subblocks are tested if they are homogeneous* with respect to the property of interest,"[66] "If the test is positive, the four subblocks are *merged* to a new subblock which has four times the size of it predecessors,"[67] "The procedure can be repeated recursively until the largest possible blocksize is reached,"[68] and "Among several possibilities we consider a test where *the sample means* of adjacent subblocks … are *compared with the sample mean* of the merged (larger) subblock."[69]  Based on these teachings, one

---

[62] Strobach '91, at 1381, Col. 1.

[63] Strobach '91, at 1381, Col. 1, ¶ 1.

[64] Strobach '91, at 1381, Col. 2, ¶ 1.

[65] Strobach IEEE '88, at 1098, Col.1, ¶ 1.

[66] Strobach IEEE '88, at 1098, Col. 1, ¶ 1.

[67] Strobach IEEE '88, at 1098, Col. 1, ¶ 1.

[68] Strobach IEEE '88, at 1098, Col. 1, ¶ 1.

of ordinary skill in the art would understand Strobach IEEE '88 to suggest "considering similarity in the mean of adjacent sub-blocks to increase the amount of compression," just as in Chen '90.

65.     In a similar vein, Strobach '90 illustrates "properties of different hypothesis tests in the merge or subdivide operations," where subblocks "are represented by their *sample means*."[70] Strobach '90 elaborates that "it is easy to check that in the case of a bottom up construction of the *quadtree mean decomposition*, as described above, … The bottom-up *regular mean decomposition* thus provides us with a computationally very efficient way of encoding …."[71]  As such, one of ordinary skill in the art would understand Strobach '90 to suggest "considering similarity in the mean of adjacent sub-blocks to increase the amount of compression," just as in Chen '90.  Further still, Strobach '90 comes back full circle to Strobach '91 by clearly laying out that "This corresponds with a *zero-order model* of the lumiance [sic] function inside a block,"[72] which maps to the Strobach '91 teaching that "When the plane gradient … *is forced to zero*, one obtains a simplified method termed '*quad-tree-structured regular mean decomposition coding'* [32]-[34]."[73]

66.     Therefore, one of ordinary skill in the art would understand Strobach '91 to suggest "considering similarity in the mean of adjacent sub-blocks to increase the amount of compression," just as in Chen '90.  This understanding is set forth in Strobach '91 and confirmed by the earlier Strobach papers cited as references in Strobach '91.

67.     As it is clear from the above discussion, one of ordinary skill in the art would understand that Chen '90 does not teach any subject matter relevant to the '104 Patent as characterized by Broadcom that is not recognized, discussed, and elaborated by Strobach '91.  As such, Chen '90 is cumulative to what was disclosed to the USPTO during the prosecution of the '104 Patent by way of Strobach '91 and is therefore immaterial.

---

[69] Strobach IEEE '88, at 1098, Col. 1, ¶ 1.

[70] Strobach '90, at 481, Col. 2, ¶ 1.

[71] Strobach '90, at 481, Col. 2, ¶ 4.

[72] Strobach '90, at 481, Col. 2, ¶ 1.

[73] Strobach '91, at 1381, Col. 2, ¶ 1.

### b.      Chen '90 is Cumulative to the Dinstein Reference of Record

68.      Also, one of ordinary skill in the art would understand that ("Dinstein") teaches, among other things, the subject matter disclosed by Chen '90 that Broadcom has identified as relevant for the reasons described below.[74]  Dinstein was disclosed to the USPTO by QUALCOMM on the Information Disclosure Statement dated January 22, 1992, and appears on the cover page of the '104 Patent under the heading "References Cited," indicating that the Patent Examiner considered Dinstein during the prosecution of the '104 Patent.[75]

69.      Dinstein discusses a video compression system that includes adaptively determined variable block sizes, a quadtree structure, a single stage of DCT operations on pixel data, and adaptive thresholding and quantization of DCT coefficients to achieve image compression.

70.      One of ordinary skill in the art would understand Dinstein to discuss the approaches of (1) "a quadtree-based adaptive block size system in which variable block size Discrete Cosine Transforms ("DCT") are performed," (2) "adaptive thresholding," (3) "adaptive quantization," and (4) "considering similarity in the mean of adjacent sub-blocks to increase the amount of compression."

71.      In particular, one of ordinary skill in the art would understand that Dinstein acknowledges the approach of "a quadtree-based adaptive block size system in which variable block size Discrete Cosine Transforms ("DCT") are performed."  Dinstein teaches "A *discrete cosine transform image coding scheme* based on *adaptive block size*,"[76] discussing by way of motivational background that "*Adaptive block-size image coding* is intended to take advantage of the high compactness by *using large blocks within homogeneous regions* of the image, while maintaining good adaptation by *using small blocks near the borders* between homogeneous regions."[77]  By way of referencing a "block-size image coder" proposed in Vaisey,[78] Dinstein continues with a

---

[74] *See* Broadcom's Answer at ¶ 59.

[75] '104 Patent, References Cited.

[76] Dinstein, Abstract.

[77] Dinstein, at 2073, Col. 2, ¶ 2.

[78] "Variable block-size image coding," by D. J. Vaisey and A. Gersho, in *Proc. ICASSP*, Dallas, TX, Apr. 6-8-, 1987.

1    discussion that "The image is partitioned into various sizes … The ***partition is based on the***

2    ***quadtree*** presentation of the image."[79]

3           72.    Based on these explicit discussions, one of ordinary skill in the art would understand

4    Dinstein to discuss the subject matter disclosed in Chen '90 of  "a quadtree-based adaptive block

5    size system in which variable block size Discrete Cosine Transforms ("DCT") are performed."

6           73.    One of ordinary skill in the art would also understand that Dinstein discloses

7    "adaptive thresholding."  Dinstein teaches that "A variance matrix is computed for each cluster,

8    where the *(u, v)* element of the matrix is the variance of the *(u, v)* DCT coefficient of superblocks

9    belonging to that cluster,"[80] that "The number of bits allocated to the *(u, v)* coefficient of

10   superblocks belong to cluster *r* is based on rate distortion function …,"[81] "The ***transform samples***

11   ***are normalized before being quantized***,"[82] and that "***Selecting the maximum rather than the***

12   ***average variance avoids excessive clipping of coefficients*** larger than the highest value of the

13   quantizers [sic] output."[83]  One of ordinary skill in the art would understand that Dinstein discloses

14   "adaptive thresholding" by virtue of these teachings.

15          74.    One of ordinary skill in the art would also understand that Dinstein discloses

16   "adaptive quantization" by teaching that "Samples in the transform domain are selected, ***quantized,***

17   and coded ***according to the number of bits allocated for their transmission***,"[84] where "***adaptive***

18   ***schemes are required in order to obtain reasonably reconstructed image quality*** … [such as]

19   ***adaptation of quantizer levels***."[85]  One of ordinary skill in the art would understand that Dinstein

20   discloses "adaptive quantization" by virtue of these teachings.

21          75.    Regarding the fourth attribute identified by Broadcom concerning Chen '90, one of

22   ordinary skill in the art would understand that Dinstein acknowledges the approach of "considering

23

24   [79] Dinstein, at 2073, Col. 2, ¶ 2.

25   [80] Dinstein, at 2075, Col. 1, ¶ 5.

     [81] Dinstein, at 2075, Col. 1, ¶ 6.

26   [82] Dinstein, at 2075, Col. 1, ¶ 6.

27   [83] Dinstein, at 2075, Col. 1, ¶ 6 - Col. 2.

     [84] Dinstein, at 2073, Col. 1, ¶ 2.

28   [85] Dinstein, at 2073, Col. 1, ¶ 2-3.

QUALCOMM'S SUPPLEMENTAL MEMORANDUM OF
CONTENTIONS OF FACT AND LAW                    22            CASE NO. 05 CV 1958 B(BLM

similarity in the mean of adjacent sub-blocks to increase the amount of compression." As discussed above, this is a more accurate characterization of what Broadcom describes as "redundancy in DC coefficients (specifically, by considering similarity in the mean of adjacent sub-blocks) to increase the amount of compression" in reference to Chen '90. Dinstein recognizes the same technical content as Chen '90, however it is characterized.

76. In particular, Dinstein discusses by way of motivational background that "Adaptive block-size image coding is intended to take advantage of the high compactness by *using large blocks within homogeneous regions* of the image, while maintaining good adaptation by *using small blocks near the borders* between homogeneous regions."[86] It was known and common to one of ordinary skill in the art of video compression to make determinations concerning the similarity of adjacent blocks based at least in part upon the average (mean) of the pixel values.

77. While Dinstein does not explicitly teach this well known approach, Dinstein identifies that "A variable block-size image coder is proposed in [13],"[87] where reference [13] refers to Vaisey. Vaisey, in turn, teaches segmenting an image into blocks of varying size, and uses "*mean subtraction*" *within a quad-tree approach*.[88] Vaisey details that "The idea is to develop a variable-rate scheme where more bits are used to encode the local mean in the areas of the image where the mean evolves quickly,"[89] in which "The first step in the development is to choose the starting block-size, which specifies the root of the quad-tree,"[90] and "We chose to start with a partition of the image into 32x32 blocks, *since we found that the local mean within a larger block is almost always inhomogeneous*."[91] Indeed Vaisey spells out that the algorithm "*starts by calculating the pixel mean for each 32x32 block*."[92] Vaisey continues that "At this stage a decision to stop or descend

---

[86] Dinstein, at 2073, Col. 2, ¶ 2.

[87] Dinstein, at 2073, Col. 2, ¶ 2.

[88] Vaisey, at 1052, Col. 1, ¶¶ 1, 4.

[89] Vaisey, at 1052, Col. 1, ¶ 3.

[90] Vaisey, at 1052, Col. 1, ¶ 3.

[91] Vaisey, at 1052, Col. 1, ¶ 3.

[92] Vaisey, at 1052, Col. 1, ¶ 4.

further into the tree is made,"[93] where "If this decision is positive, then four children are generated from the appropriate parent block," and where "***Means are then calculated … to form the next level***…."[94] By virtue of the discussion in Dinstein and via Dinstein's reference to Vaisey, one of ordinary skill in the art would understand that Dinstein acknowledges the approach of "considering similarity in the mean of adjacent sub-blocks to increase the amount of compression," just as in Chen '90.

78. As it is clear from the above discussion, one of ordinary skill in the art would understand that Chen '90 does not teach any subject matter relevant to the '104 Patent as characterized by Broadcom that is not recognized, discussed, and taught by Dinstein. As such, Chen '90 is cumulative to what was disclosed to the USPTO during the prosecution of the '104 Patent by way of Dinstein, and is therefore immaterial.

### c. Therefore Chen '90 is Cumulative and Immaterial

79. Based on the teachings in Strobach '91 and Dinstein, one of ordinary skill in the art would understand that Chen '90 does not teach any subject matter relevant to the '104 Patent that is not taught by the references disclosed to the USPTO during the prosecution of the '104 Patent. Therefore, Chen '90 is cumulative to the references on record and is therefore immaterial.

### 5. Chen '90 Is Not Material To The '104 Patent Because Chen '90 Does Not Establish, By Itself Or In Combination With Other Information Known To The Applicant Or Before The Examiner, A Prima Facie Case Of Unpatentability

80. One of ordinary skill in the art would understand that the teachings of Chen '90, like all of the other references that were of record before the USPTO, fail to disclose a central element of the novel combination of elements claimed in the '104 Patent: the DQT. Chen '90 discloses the use of only a single stage of DCT that is applied to pixel data to generate an array of corresponding DCT coefficients.

81. In contrast, the invention claimed in the '104 Patent includes the application of a DQT, including a second stage DCT operation that is applied to DC coefficients of the preceding

---

[93] Vaisey, at 1052, Col. 1, ¶ 4.

[94] Vaisey, at 1052, Col. 2.

509929v2

1    DCT operation.  Neither Chen '90, nor any of the other references of record before the USPTO,

2    included teaching of this distinguishing characteristic of the invention claimed in the '104 Patent.

3        82.    Therefore, Chen '90 is only tangentially related to the '104 Patent and, even if it had

4    been considered by the USPTO, could not have reasonably formed the basis for a rejection of the

5    claims of the '104 Patent.

6                    **6.    In Summary, Chen '90 Is Immaterial**

7        83.    As discussed above, one of ordinary skill in the art would understand Chen '90 to be

8    immaterial to the '104 Patent for at least four reasons.  First, it would be understood that the

9    Broadcom-identified attributes of Chen '90 were well known in the art of video compression

10   technology to one of ordinary skill in the art.  Second, it would be understood that most of the

11   Broadcom-identified attributes of Chen '90 are not relevant to the patentability of the claims of the

12   '104 Patent.  Third, it would be understood that Chen '90 is cumulative to the references disclosed to

13   the USPTO in the prosecution history of the '104 Patent based on the teachings in Strobach '91 and

14   Dinstein.  Fourth, it would be understood that Chen '90 is technically inapposite, or only tangentially

15   related, to the invention claimed in the '104 Patent because Chen '90 does not disclose a second

16   stage DCT operation applied to DC coefficients of a preceding DCT operation.  In summary, one of

17   ordinary skill in the art would consider Chen '90 to be simply immaterial for these reasons.

18       84.    Chen '90 is immaterial under the 1992 version of Rule 56 for two additional reasons.

19       85.    First, Broadcom alleges that Chen '90 and Vaisey render the '104 patent obvious only

20   in combination with other purported prior art that was unknown to the inventors and the PTO.  There

21   is no duty to disclose information if it is material only in combination with unknown information.[95]

22   The Wu reference, upon which Broadcom bases its obviousness contentions in combination with

23   Chen '90 and/or Vaisey, was unknown to Dr. Lee and was not prior art of record.  Moreover,

24   Broadcom has failed to meet its burden to establish that the Chen '90 paper received by Dr. Lee is

25   prior art under 35 U.S.C. § 102.  Consequently, Chen '90 and Vaisey are not material under 37

26

27
─────────────────────
28   [95] 57 Federal Register 2026 (Jan. 17, 1992) ("there can be no duty to disclose the information if it is
        material only in combination with unknown information."); *Monsanto* 61 F.Supp. 2d at 194 (citing
        comment to 37 C.F.R. 1.56).

1  C.F.R. § 1.56(b)(1) and non-disclosure of these two references does not amount to inequitable

2  conduct.

3       86.    Moreover, the '104 Patent is presumed to be entitled to the benefit of the February 27,

4  1990 filing date of U.S. Patent No. 5,021,891, and Broadcom has not presented any evidence to the

5  contrary. The copy of the Chen '90 paper produced from Dr. Lee's files appears to have been

6  published after July 1990, and is therefore not prior art under 35 U.S.C. § 102, and (a) not

7  information a reasonable examiner would substantially likely find important in deciding whether to

8  allow the '104 Patent to issue, and (b) not material under the 1992 version of Rule 56.

9       87.    Second, Broadcom has made no allegation that either Chen '90 or Vaisey is

10  inconsistent with any positions Dr. Lee took during prosecution of the '104 Patent. Therefore, 37

11  C.F.R. § 1.56(b)(2) is inapplicable as well.

12      **B.**    **VAISEY IS NOT MATERIAL TO THE '104 PATENT**[96]

13       88.    Broadcom argues that Vaisey is material to the patentability of the claimed invention

14  in the '104 Patent because it discloses certain attributes that Broadcom appears to consider relevant

15  and characterizes as follows:

16          (1)    "a variable block size image coder that uses a quadtree-based segmentation
17                 algorithm to partition an image into variable blocks according to the local
               detail of the image,"

18          (2)    "transform coding," and

19          (3)    "vector quantization to encode the segmented blocks."[97]

20

21       89.    One of ordinary skill in the art would have understood Vaisey to be immaterial to the

22  patentability of the claims of the '104 Patent for at least four reasons. First, it would be understood

23  that each of the Broadcom-identified attributes of Vaisey were well known in the art of video

24  compression technology to one of ordinary skill in the art. Second, it would be understood that

25  certain of the attributes of Vaisey are not are relevant to the patentability of the claims of the '104

26

27  ───────────────────

[96] QUALCOMM refers to and incorporates herein by reference all contentions of law and fact set
    forth in the Declaration of Dr. Maja Bystrom Regarding the Immateriality of Chen '90 and Vaisey,
    dated November 20, 2006.

28  [97] *See* Broadcom's Answer at ¶ 58.

1   Patent.  Third, it would be understood that Vaisey is cumulative to the references disclosed to the

2   USPTO in the prosecution history of the '104 Patent based on the disclosures in Strobach '91, the

3   '341 Patent, and Dinstein.  Fourth, it would be understood that Vaisey is technically inapposite, or

4   only tangentially related, to the invention claimed in the '104 Patent because Vaisey discloses the

5   use of only a single stage of transform operation that is applied to pixel data to generate an array of

6   corresponding DCT coefficients.  In summary, one of ordinary skill in the art would consider Vaisey

7   to be immaterial for these reasons.

8       90.     Each point is further discussed below after a preliminary consideration of

9   Broadcom's characterization of Vaisey.

### 1.   Clarifying Broadcom's Ambiguous Characterization of Vaisey

11      91.     Broadcom characterized Vaisey in a highly ambiguous fashion when it described

12  Vaisey as including "transform coding and vector quantization to encode the segmented blocks."

### a.   Summary of the Teachings of Vaisey

14      92.     Vaisey teaches a video compression system that includes variable block sizes,

15  quadtree structures, for larger block sizes the use of transform coding followed by vector

16  quantization, and for small block sizes the use of vector quantization alone.  As discussed above,

17  Vaisey also considers the similarity of the mean of the pixel values in adjacent sub-blocks when

18  making block size determinations.

### b.   Clarifying Broadcom's Characterization of Vaisey

20      93.     Through a careful reading of the paper, it is clear that Vaisey teaches the use of vector

21  quantization in two quite different and distinct ways:  in one circumstance in lieu of transform

22  coding and in another circumstance after and in conjunction with the coefficients resulting from an

23  earlier transform coding operation.

24      94.     To the extent that Broadcom's characterization is intended to be directed to the use by

25  Vaisey of vector quantization in lieu of transform coding, this usage of vector quantization is wholly

26  irrelevant to the claims of the '104 Patent and therefore irrelevant to any consideration of the

27  cumulativeness of Vaisey in relation to the references that were of record at the USPTO.  The '104

28  Patent is directed to a system that uses DCTs (one particular type of transform) to transform pixel

data to DCT coefficients, and a reference that taught the use of vector quantization rather than DCT would have little relevance to the patentability of the claims of the '104 Patent.

95.     Therefore for purposes of the cumulativeness analysis that follows, QUALCOMM assumes that Broadcom's characterization of Vaisey refers to a system in which pixel data is transformed, and thereafter the coefficients are subjected to a vector quantization operation.[98]

96.     Applying that assumption, one of ordinary skill in the art would understand Vaisey to disclose the use of vector quantization of transform coefficients.  In other words, one of ordinary skill in the art would understand Vaisey to actually disclose a vector quantization process that uses transform coefficients to encode a block.  This understanding is confirmed by Vaisey detailing that "the 32x32, the 16x16 and the 8x8 blocks are both encoded using a TC [transform coding] algorithm,"[99] where "In this algorithm *the TC coefficients of each block are* grouped into vectors which are then individually *coded using [vector quantization] VQ*."[100]

### 2. The Broadcom-Identified Attributes Of Vaisey Were Standard And Well Known Approaches To One Of Ordinary Skill In The Art Of Video Compression Technology

97.     Broadcom argues that Vaisey is material to the patentability of the claimed invention in the '104 Patent because it discloses the following three attributes that Broadcom appears to consider relevant and characterizes as follows:  (1) "a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image," (2) "transform coding" and (3) "vector quantization to encode the segmented blocks."[101]  As discussed above, it is assumed that Broadcom's characterization of Vaisey refers to a system in which pixel data is first transformed, and thereafter the transform coefficients are subjected to a vector quantization operation.

98.     Each of these attributes of Vaisey involves approaches or techniques that were standard and well known to one of ordinary skill art of video compression technology.  Quantization

---

[98] To the extent that it is determined that the other application of vector quantization is deemed relevant, Strobach '91 clearly discusses that topic at 1380, Section 1.

[99] Vaisey, at 1053, Col. 1, ¶ 1.

[100] Vaisey, at 1053, Col. 1, ¶ 1.

[101] *See* Broadcom's Answer at ¶ 58.

1  (either scalar or vector) is a compression process that was very common and well known following a

2  transform operation.

3      99.    As discussed above, "variable block size compression systems" were well known and

4  widely discussed prior to the filing date of the '104 Patent.  Among the references of record in the

5  prosecution history of the '104 Patent, variable block size compression systems were discussed in at

6  least Strobach '91, the '341 Patent, and Dinstein.

7      100.    Similarly, as discussed above, "quadtree-based segmentation algorithm to partition an

8  image into variable blocks according to the local detail of the image" was well known and widely

9  discussed prior to the filing date of the '104 Patent.  Among the references of record in the

10  prosecution history of the '104 Patent, quadtree-based segmentation algorithm to partition an image

11  into variable blocks according to the local detail of the image was discussed in at least Strobach '91,

12  the '341 Patent, and Dinstein.

13      101.    Transform coding, of which the DCT operations discussed above are a specific

14  example, was well known and widely discussed prior to the filing date of the '104 Patent, including

15  in virtually all of the references of record in the prosecution history of the '104 Patent.

16      102.    Finally, "vector quantization to encode the segmented blocks" was well known and

17  widely discussed prior to the filing date of the '104 Patent.  For example, such a technique was

18  disclosed as early as 1984, in Jain.[102]  Among the references of record in the prosecution history of

19  the '104 Patent, vector quantization to encode the segmented blocks was discussed in at least

20  Strobach '91, the '341 Patent, and Dinstein.

21      103.    As a result, Vaisey is immaterial to the patentability of the claims of the '104 Patent

22  because the Broadcom-identified attributes of Vaisey are standard and well known approaches to

23  one of ordinary skill art of video compression technology.  As such, disclosing such common and

24  well known attributes would have been unnecessary.

25          **3.    Vaisey is Less Relevant Than References of Record for the '104**
              **Patent**

26

27      104.    As an initial matter, vector quantization is not recited in or relevant to the

28

---

[102] "Image Data Compression" by Anil K. Jain et al., at 188-202.

patentability of the asserted claims of the '104 Patent, and accordingly should not be a relevant attribute for consideration in determining the cumulativeness of the Vaisey reference. Notwithstanding its lack of relevance to the claims of the '104 Patent, Vaisey is cumulative to several of the references of record for the '104 Patent.

105.    Vaisey is clearly less relevant to the patentability of the claims of the '104 Patent than Strobach '91, the '341 Patent, and Dinstein. The claims of the '104 Patent specifically recite performing ***DCT operations*** on blocks of pixel data.[103] Strobach '91, the '341 Patent, and Dinstein each specifically discuss the use of ***DCT operations*** on blocks of pixel data. In contrast, Vaisey is far less specific, never once mentioning DCT operations explicitly.

106.    In addition, one embodiment of the '104 Patent performs ***DCT operations*** on all blocks of pixel data. In contrast, Vaisey clearly teaches that it is desirable to refrain from performing transform operations on blocks of smaller sizes, instead applying a vector quantization operation only to such small blocks.

107.    Each of Strobach '91, the '341 Patent, and Dinstein discusses compression systems in which a ***DCT*** operation is applied to all blocks of pixel data.

108.    Thus, the teachings of Vaisey would clearly be considered less relevant to the '104 Patent than the teachings of any one of Strobach '91, the '341 Patent, or Dinstein which are already on record for the '104 Patent.

### 4.    Vaisey is Cumulative to References of Record in the Prosecution History of the '104 Patent

109.    Broadcom argues that Vaisey is material to the patentability of the claimed invention in the '104 Patent because it discloses the following three attributes that Broadcom appears to consider relevant and characterizes as follows: (1) "a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image," (2) "transform coding" and (3) "vector quantization to encode the segmented blocks."[104] Several of the references of record in the prosecution history of the '104

---

[103] *See, e.g.,* '104 Patent, Abstract; Col. 1:15-20; Col 2:25-35.

[104] *See* Broadcom's Answer at ¶ 58.

QUALCOMM'S SUPPLEMENTAL MEMORANDUM OF
CONTENTIONS OF FACT AND LAW                    30                    CASE NO. 05 CV 1958 B(BLM

patent teach all of the attributes of Vaisey identified by Broadcom. Therefore, Vaisey is cumulative to and immaterial based on the references of record in the prosecution history of the '104 Patent.

### a. Vaisey is Cumulative to the Strobach '91 Reference

110. Strobach '91 explicitly cites Vaisey as an example of "a combination of [transform coding] TC and [vector quantization] VQ".[105] Thus, one of ordinary skill in the art who had access to Strobach '91 also had knowledge of much of the relevant content of Vaisey and ready access to all of the details of the Vaisey paper.

111. One of ordinary skill in the art would understand that Strobach '91 teaches all of the subject matter disclosed by Vaisey that Broadcom has identified as relevant to the '104 Patent:[106] (1) "a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image," (2) "transform coding" and (3) "vector quantization to encode the segmented blocks."

112. In particular, Strobach '91 discloses "a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image," by discussing in its Abstract and introduction sections "a *quadtree data structure* to obtain a new *variable block size image coding algorithm*,"[107] and "an *adaptive variable block size segmentation process*."[108] Strobach '91 also discusses the reason for the variable block size approach of Vaisey: "It is a common experience that most *natural images can be divided into regions of high and regions of low detail*."[109]

113. One of ordinary skill in the art would understand from these discussions in Strobach '91 that the art in existence before Strobach '91 included "a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image."

---

[105] Strobach '91, at 1380, Col. 2, ¶ 1.

[106] *See* Broadcom's Answer at ¶ 58.

[107] Strobach '91, at 1380, Abstract.

[108] Strobach '91, at 1380, Col. 2, ¶ 4.

[109] Strobach '91, at 1380, Col. 1, ¶ 1.

114.    One of ordinary skill in the art would also understand that Strobach '91 discloses "transform coding" by discussing in its introduction section that "Current algorithms for … image coding … generally employ one of three techniques:  1) *transform coding (TC)* … ."[110]  Further, Strobach '91 discusses that "The block size in *TC* is usually too large to handle partial high-detail regions satisfactorily.  'Ringing' effects are a well-known problem of fixed block size *TC* and various attempts have been made to cope with difficulty."[111]  Strobach '91 elaborates that "Many [variable block size image coding algorithms] attempt to combine *classical schemes such as TC* … with spatial segmentation techniques"[112] and that "*In TC, variable block size coding can be employed in the original domain … or even in the transform (coefficient) domain* …."[113]  One of ordinary skill in the art would understand that Strobach '91 discloses "transform coding" to encode the segmented blocks based on these discussions.

115.    Finally, one of ordinary skill in the art would also understand that Strobach '91 discloses "vector quantization to encode the segmented blocks" by discussing that "*Current algorithms* for … image coding … generally employ one of three techniques:  …, 2) *vector quantization (VQ)* …."[114]  Strobach '91 continues that "It is a common experience that most natural images can be divided into regions of high and regions of low detail."[115]  Further, Strobach '91 elaborates that "the *block size in conventional VQ coding* is too small to take advantage of large homogeneous and unstructured regions in an image."[116]  Strobach '91 further informs that "Many [variable block size image coding algorithms] attempt to *combine classical schemes such as VQ … with spatial segmentation techniques.*"[117]  Based upon the disclosures identified above, one of ordinary skill in the art would understand that Strobach '91 discloses "vector quantization to encode

---

[110] Strobach '91, at 1380, Col. 1, ¶ 1.

[111] Strobach '91, at 1380, Col. 1, ¶ 2.

[112] Strobach '91, at 1380, Col. 2, ¶ 1.

[113] Strobach '91, at 1380, Col. 2, ¶ 1.

[114] Strobach '91, at 1380, Col. 1, ¶ 1.

[115] Strobach '91, at 1380, Col. 1, ¶ 1.

[116] Strobach '91, at 1380, Col. 1, ¶ 2.

[117] Strobach '91, at 1380, Col. 2, ¶ 1.

the segmented blocks."

116.    As it is clear from the above discussion, one of ordinary skill in the art would understand that Vaisey does not teach any Broadcom-identified subject matter relevant to the '104 Patent that is not disclosed by Strobach '91.  Therefore, Vaisey is cumulative to what was disclosed to the USPTO during the prosecution of the '104 Patent.

**b.    Vaisey is Cumulative to the '341 Patent**

117.    Also, one of ordinary skill in the art would understand that U.S. Patent No. 4,922,341 (the "341 Patent") titled "Adaptive block transform image coding method and apparatus" teaches the subject matter disclosed by Vaisey that Broadcom has identified as relevant.[118]  The '341 Patent (on which the author of Strobach '91 is the inventor) appears on the cover page of the '104 Patent under the heading "References Cited," indicating that the Patent Examiner considered the '341 Patent during the prosecution of the '104 Patent.[119]

118.    Just as with Strobach '91, one of ordinary skill in the art would understand that the '341 Patent reveals the subject matter disclosed by Vaisey that Broadcom has identified as relevant to the '104 Patent:[120] (1) "a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image," (2) "transform coding," and (3) "vector quantization to encode the segmented blocks."

119.    In particular, one of ordinary skill in the art would understand that the '341 Patent "a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image," by discussing a quadtree-based adaptive block size system in which variable block size DCT are performed.  The '341 Patent discusses that "*blocks of variable size* are organized according to a *known quad-tree data structure*."[121]  The '341 Patent discusses "a method for scene-model-assisted reduction of image data … whereby the frame to frame information is composed of … an *adaptively acquired quad-tree*

---

[118] *See* Broadcom's Answer at ¶ 58.

[119] '104 Patent, References Cited.

[120] *See* Broadcom's Answer at ¶ 58.

[121] '341 Patent, Abstract; Col. 10:12-13 (claiming "organizing the blocks of variable size according to a known quad-tree data structure").

QUALCOMM'S SUPPLEMENTAL MEMORANDUM OF
CONTENTIONS OF FACT AND LAW                    33                    CASE NO. 05 CV 1958 B(BLM

*division structure*"[122] and "such that the **blocks of variable size** are **organized according to a known quad-tree data structure**."[123]  Further still, the '341 Patent discusses that "The underlying, **content-dependent division structure (quad-tree)** must thus be co-transmitted to the receiver."[124]  One of ordinary skill in the art would understand from these teachings in the '341 Patent "a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image."

120.    One of ordinary skill in the art would also understand that the '341 Patent discusses "transform coding" to encode the segmented blocks by teaching subjecting data to a DCT operation, *i.e.*, transforming them.  The '341 Patent states that "The prediction error signal that has been already minimized by the motion-compensated prediction is now further decorrelated in the second step by **using a transformation (typically, discrete cosine transformation-DCT**, as shown in FIG. 1)."[125]  Therefore, one of ordinary skill in the art would understand that the '341 Patent acknowledges the approach of transform coding to encode the segmented blocks.

121.    One of ordinary skill in the art would also understand that the '341 Patent discloses "vector quantization to encode the segmented blocks" by teaching through FIG. 1 that "the **quantizer** … sees an input from a transformation unit T,"[126]  One of ordinary skill in the art would know that there are two primary classes of quantization approaches: scalar quantization and vector quantization, with the former subsumed by the latter.

122.    Therefore, one of ordinary skill in the art would understand that the '341 Patent discloses vector quantization to encode the segmented blocks.

123.    As it is clear from the above discussion, one of ordinary skill in the art would understand that Vaisey does not teach any subject matter relevant to the '104 Patent as characterized by Broadcom that is not taught by the '341 Patent.  Therefore, Vaisey is immaterial because it is

---

[122] '341 Patent, Col. 2:46-55.

[123] '341 Patent, Col. 2:68-3:2.

[124] '341 Patent, FIG. 5 and Col. 4:20-22.

[125] '341 Patent, Col. 1:46-51.

[126] '341 Patent, Col. 8:64-65.

QUALCOMM'S SUPPLEMENTAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW          34          CASE NO. 05 CV 1958 B(BLM

cumulative to what was disclosed to the USPTO during the prosecution of the '104 Patent by way of the '341 Patent.

### c. Vaisey is Cumulative to the Dinstein Reference

124. Dinstein explicitly cites Vaisey as an example of "A variable block-size image coder."[127] Thus, one of ordinary skill in the art who had access to Dinstein also had knowledge of much of the fundamental content of Vaisey and ready access to all of the details of the Vaisey paper.

125. One of ordinary skill in the art would understand that Dinstein discusses all of the subject matter disclosed by Vaisey that Broadcom has identified as relevant:[128] (1) "a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image," (2) "transform coding," and (3) "vector quantization to encode the segmented blocks."

126. In particular, one of ordinary skill in the art would understand that Dinstein discloses "a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image." Dinstein discusses "*A discrete cosine transform* image *coding scheme based on adaptive block size*."[129] Dinstein further discusses that "*Adaptive block-size image coding* is intended to take advantage of the high compactness by *using large blocks with homogeneous regions* of the image, while maintaining good adaptation by *using small blocks near the borders* between homogeneous regions,"[130] and that "The image is partitioned into various sizes … The *partition is based on the quadtree presentation of the image*."[131] Based upon this clear content in Dinstein, one of ordinary skill in the art would understand that the art included "a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image."

---

[127] Dinstein, at 2073, Col. 2, ¶ 2.

[128] *See* Broadcom's Answer at ¶ 58.

[129] Dinstein, Abstract.

[130] Dinstein, at 2073, Col. 2, ¶ 2.

[131] Dinstein, at 2073, Col. 2, ¶ 2.

127.    One of ordinary skill in the art would also understand that Dinstein discloses "transform coding" to encode the segmented blocks by teaching "*A discrete cosine transform image coding scheme based on adaptive block size*."[132]  Dinstein further discusses that there exists a "need to *apply the DCT to various block sizes*."[133]  From this, one of ordinary skill in the art would understand that Dinstein discloses "transform coding" to encode the segmented blocks.

128.    One of ordinary skill in the art would also understand that Dinstein discloses "vector quantization to encode the segmented blocks."  In particular, Dinstein teaches that "Samples in the transform domain are selected, *quantized*, and coded *according to the number of bits allocated for their transmission*."[134]  One of ordinary skill in the art would know that there two primary classes of quantization approaches; scalar quantization and vector quantization.  Indeed, one of ordinary skill in the art would understand Dinstein to suggest the use of vector quantization because it discusses "stationary memoryless Gaussian source,"[135] for which it would be known that vector quantization is the more efficient method for quantization purposes.  From this, one of ordinary skill in the art would understand that Dinstein discloses "vector quantization" to encode the segmented blocks.

129.    As it is clear from the above discussion, one of ordinary skill in the art would understand that Vaisey does not teach any subject matter relevant to the '104 Patent as characterized by Broadcom that is not taught by Dinstein.  Therefore, Vaisey is immaterial because it is cumulative to what was disclosed to the USPTO during the prosecution of the '104 Patent by way of Dinstein.

### d.    Therefore Vaisey is Cumulative and Immaterial

130.    Based on the teachings in Strobach '91, the '341 Patent, and Dinstein, one of ordinary skill in the art would understand that Vaisey does not teach any subject matter relevant to the '104 Patent that is not taught by the references disclosed to the USPTO during the prosecution of the '104

---

[132] Dinstein, Abstract.

[133] Dinstein, at 2075, Col. 2, ¶ 7.

[134] Dinstein, at 2073, Col. 1, ¶ 2.

[135] Dinstein, at 2075, Col. 1, ¶ 6.

QUALCOMM'S SUPPLEMENTAL MEMORANDUM OF
CONTENTIONS OF FACT AND LAW                    36              CASE NO. 05 CV 1958 B(BLM

Patent. Vaisey is cumulative to the references of record and is therefore immaterial.

### 5. Vaisey Is Not Material To The '104 Patent Because Vaisey Does Not Establish, By Itself Or In Combination With Other Information Known To The Applicant Or Before The Examiner, A Prima Facie Case Of Unpatentability

131. One of ordinary skill in the art would understand that the teachings of Vaisey, like all of the other references that were of record before the USPTO, fail to disclose a central element of the novel combination of elements claimed in the '104 Patent: the DQT. Vaisey discloses the use of only a single stage transform operation that is applied exclusively to pixel data to generate an array of corresponding DCT coefficients.

132. In contrast, the invention claimed in the '104 Patent includes the application of a DQT, including a second stage DCT operation that is applied to DC coefficients of the preceding DCT operation. Neither Vaisey, nor any of the other references of record before the USPTO, included teaching of this distinguishing characteristic of the invention claimed in the '104 Patent.

133. Therefore, Vaisey is only tangentially related to the '104 Patent and, even if it had been considered by the USPTO, could not have reasonably formed the basis for a rejection of the claims of the '104 Patent.

### 6. Therefore Vaisey is Immaterial

134. In summary, one of ordinary skill in the art would understand Vaisey to be immaterial to the '104 Patent for at least four reasons. First, it would be understood that the attributes of Vaisey are well known in the art of video compression technology to one of ordinary skill in the art. Second, it would be understood that the attributes of Vaisey are not relevant to the patentability of the asserted claims of the '104 Patent. Third, it would be understood that Vaisey is cumulative to the references disclosed to the USPTO in the prosecution history of the '104 Patent based on the teachings in Strobach '91, the '341 Patent, and Dinstein. Fourth, it would be understood that Vaisey is technically inapposite, or only tangentially related, to the invention claimed in the '104 Patent because Vaisey does not disclose at least one important element of the '104 Patent. In summary, one of ordinary skill in the art would consider Vaisey to be simply immaterial for these reasons.

135. Chen '90 is immaterial under the 1992 version of Rule 56 for two additional reasons.

136. First, Broadcom alleges that Chen '90 and Vaisey render the '104 patent obvious only

509929v2

in combination with other purported prior art that was unknown to the inventors and the PTO. There is no duty to disclose information if it is material only in combination with unknown information.[136] The Wu reference, upon which Broadcom bases its obviousness contentions in combination with Chen '90 and/or Vaisey, was unknown to Dr. Lee and was not prior art of record. Consequently, Chen '90 and Vaisey are not material under 37 C.F.R. § 1.56(b)(1) and non-disclosure of these two references does not amount to inequitable conduct.

137. Second, Broadcom has made no allegation that either Chen '90 or Vaisey is inconsistent with any positions Dr. Lee took during prosecution of the '104 Patent. Therefore, 37 C.F.R. § 1.56(b)(2) is inapplicable as well.

C.   **ALTERNATIVELY, EVEN EVALUATED UNDER THE PRE-1992 VERSION OF RULE 56, CHEN '90 AND VAISEY ARE NOT MATERIAL**

138. In the alternative, if it is determined that the pre-1992 version of Rule 56 is applicable, Chen '90 and Vaisey are still not material.

139. Before and after 1992, the Patent Office had two different standards for materiality.[137] The pre-1992 version of Rule 56 stated:

> (a) A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. ***Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.*** The duty is commensurate with the degree of involvement in the preparation or prosecution of the application.[138]

140. "[I]n 1977, the PTO amended Rule 56 to clarify the duty of candor and good faith before the PTO. That version of Rule 56 required applicants to disclose 'information they are aware

---

[136] 57 Federal Register 2026 (Jan. 17, 1992) ("there can be no duty to disclose the information if it is material only in combination with unknown information."); *Monsanto,* 61 F.Supp. 2d at 194 (citing comment to 37 C.F.R. 1.56).

[137] *Compare* 37 CFR § 1.56 (1991) *with* 37 CFR § 1.56 (1992); *see In re Jerabek,* 789 F.2d 886, 890 (Fed. Cir. 1986).

[138] 37 CFR § 1.56 (1991) (emphasis added).

1    of which is material,' stating that information is material 'where there is a substantial likelihood that

2    a reasonable Examiner would consider it important in deciding whether to allow the application to

3    issue as a patent.' 37 C.F.R. § 1.56 (1977).  In adopting this standard of materiality, the PTO did not

4    claim to be replacing or supplanting the existing case law addressing materiality, but rather noted

5    that it was 'codif[ying] the existing Office policy on fraud and inequitable conduct, which is

6    believed consistent with the prevailing case law in the federal courts.'  *Duty of Disclosure*, 42 Fed.

7    Reg. 5589 (Jan. 28, 1977)."[139]

8         141.    As the Federal Circuit explained in *Digital Control*, before the 1977 codification of

9    Rule 56, there were three judicially-created tests for materiality: "the objective 'but for' standard,

10   where the misrepresentation was so material that the patent should not have issued; the subjective

11   'but for' test, where the misrepresentation actually caused the examiner to approve the patent

12   application when he would not otherwise have done so, and the 'but it may have' standard, where

13   the misrepresentation may have influenced the pa[t]ent examiner in the course of prosecution."[140]

14   Each of these tests is narrower than the 1977 "reasonable examiner" standard under Rule 56,

15   meaning that less information is potentially material under those tests than under the pre-1992

16   version of Rule 56.[141]

17        142.    Even under the "reasonable examiner" test of the pre-1992 standard, "a withheld

18   otherwise material prior art reference is *not* material for the purposes of inequitable conduct if it is

19   merely cumulative to that information considered by the examiner."[142]

20        143.    Because, as discussed above, both Chen '90 and Vaisey are cumulative of prior art of

21   record, including the Strobach and Dinstein references, neither reference is material under the pre-

22   1992 "reasonable examiner" standard.

23        144.    Broadcom does not identify in its memoranda of contentions of fact and law any

24   factual contentions (other than cumulativeness) about whether a reasonable examiner would have

---

[139] *Digital Control Inc. v. Charles Machine Works,* 437 F.3d 1309, 1315 (Fed. Cir. 2006).

[140] *Id*. at 1315.

[141] *Id.*

[142] *Id.* at 1319.

considered its alleged prior art important in deciding whether to allow QUALCOMM's patent applications. Consequently, QUALCOMM addresses cumulativeness as the only argument raised by Broadcom germane to the reasonable examiner standard.

## IV. THE ELEMENTS OF INEQUITABLE CONDUCT

145. In order to establish inequitable conduct, the alleged infringer must prove by clear and convincing evidence that an individual having a duty of disclosure failed to disclose to the Patent Office information that he or she knew or should have known was material to patentability, and that the failure to disclose was made with an intent to deceive the Examiner.[143]

146. "The party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence."[144]

147. One who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to the applicant of that prior art or information ***and*** of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO.[145]

148. "The inequitable conduct analysis is performed in two steps comprising 'first, a determination of whether the withheld reference meets a threshold level of materiality and intent to mislead, and second, a weighing of the materiality and intent in light of all the circumstances to determine whether the applicant's conduct is *so culpable* that the patent should be held unenforceable.'"[146]

149. If either threshold is not met (that is, if the evidence fails to establish either materiality or intent), then no balancing is undertaken.[147]

---

[143] *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 872 (Fed. Cir. 1988), *cert. denied,* 490 U.S. 1067 (1989); *Avco Corp. v. PPG Industries,* 867 F. Supp. 84, 94 (D. Mass. 1994); *see also Digital Control,* 437 F.3d at 1313.

[144] *Digital Control,* 437 F.3d at 1313.

[145] *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987) (cited in *Cordis Corp. v. Boston Scientific Corp.*, 188 Fed. Appx. 984 (Fed. Cir. 2006)).

[146] *Ferring B.V. v. Barr Laboratories, Inc.*, 437 F.3d 1181, 1186 (Fed. Cir. 2006) (quoting *Dayco Prods.,* 329 F.3d at 1362-1363).

[147] *Critikon, Inc. v. Becton Dickinson VascularAccess, Inc.,* 120 F.3d 1253, 1256 (Fed. Cir.2003) ("If . . . either materiality or intent is not found, then no further analysis need be performed and unenforceability must be denied."); *Haliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435,

## A.    MATERIALITY

### 1.    Chen '90 and Vaisey, the Allegedly Withheld References, Are Not Material

150.    Where information allegedly withheld is cumulative to other information actually considered by the Examiner during prosecution of a patent application, such information is not material and cannot support a claim of inequitable conduct.[148]  Therefore, there is no obligation on the part of so inventors or prosecuting attorneys[149] to disclose to the USPTO references that provide no additional technical information or teachings beyond the information already considered by the Examiner.[150]  Similarly, if information not disclosed by an individual having a duty of disclosure

---

1439 (Fed. Cir. 1991) (because the evidence did not meet "the threshold level of materiality or intent to mislead, we need not weigh the materiality and intent in light of all circumstances to determine whether the [patent owner's] conduct was so culpable that the patent should be unenforceable"); *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1327 (Fed. Cir. 1998) ("Determination of inequitable conduct requires a two step analysis. First, the trial court must determine whether the withheld reference meets a threshold level of materiality. The trial court must then also determine whether the evidence shows a threshold level of intent to mislead the PTO. … *Once the threshold levels of materiality and intent have been established*, the trial court is required to weigh materiality and intent.") (citations omitted) (emphases added); *Digital Control,* 437 F.3d at 1313 ("The party asserting inequitable conduct must prove a *threshold level of materiality and intent* by clear and convincing evidence. … The court must *then determine* whether the questioned conduct amounts to inequitable conduct by balancing the levels of materiality and intent … .") (citations omitted) (emphases added); *Molins PLC*, 48 F.3d at 1178 ("The withholding of information must meet thresholds of *both* materiality and intent. … *Once threshold findings of materiality and intent are established*, the court must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred.") (citations omitted) (emphases added); *see also*, *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*, 439 F.3d 1335, 1339-40 (Fed. Cir. 2006) (confirming that intent to deceive cannot be inferred from materiality, and is instead a separate and essential component of inequitable conduct).

[148] *E.g., Digital Control*, 437 F.3d at 1319.

[149] Individuals who have a duty of disclosure obligation as set forth in 37 C.F.R. § 1.56(c) are:

(c) Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

(1)    Each inventor named in the application;

(2)    Each attorney or agent who prepares or prosecutes the application; and

(3)    Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

[150] *Halliburton Co.*, 925 F.2d at 1440 ("[A] patentee has no obligation to disclose an otherwise material reference if the reference is cumulative or less material than those already before the examiner.") (citation omitted).

obligation was actually considered by the Examiner during the prosecution of the application, then the individual having a duty of disclosure obligation cannot be found to have intentionally withheld such information.[151]

151.    The failure to disclose references that are cumulative of or less relevant than the prior art which was before the Examiner is not inequitable conduct.[152]  If references that were considered by the Examiner are more relevant than the allegedly undisclosed reference, then the allegedly undisclosed reference is not material, and cannot form the basis of a claim for inequitable conduct.[153]

152.    Neither Chen '90 nor Vaisey is material.  As discussed above, each is cumulative of, and less relevant than, art that was actually considered by the Examiner.  Moreover, neither reference is inconsistent with positions taken by Dr. Lee or anyone else concerning patentability, and neither reference establishes a prima facie case of unpatentability of the asserted claims.

153.    Although the Federal Circuit has recently applied the pre-1992 "reasonable examiner" standard of materiality without regard to whether the patent was prosecuted under the pre-1992 or post-1992 version of Rule 56,[154] even more recent decisions have independently analyzed materiality under both versions of Rule 56.[155]  At least one member of the Federal Circuit has sharply disapproved use of the pre-1992 standard for materiality determinations: "The court in *Digital Control* holds, in contradiction of precedent, that it will hold practitioners to the standard of the pre-1992 version of Rule 56 for patents prosecuted after 1992, even though that standard no

---

[151] *Id.* ("Therefore, if the references found by Examiner Willis more closely related to the Halliburton applications than the uncited art, Halliburton did not engage in inequitable conduct."); *id.* at 1443 ("Appellant admits awareness of the withheld references. Appellant's counsel, however, did not consider the references material. … In light of these facts, Mr. Beard's assertion that he did not intend to mislead is objectively reasonable.") (citation omitted).

[152] *See* 37 CFR § 1.56 (1992); *Derrick Mfg. Corp. v. Southwestern Wire Cloth,* 1998 U.S. App. LEXIS 5809 (Fed. Cir. 1998); 6 Donald S. Chisum, *Chisum on Patents,* §19.03[3](b) at 19-166 *et seq.*

[153] *See Pro-Mold Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1577, 37 USPQ2d 1626, 1633 (Fed.Cir.1996) (less relevant prior art not material).

[154] *See Digital Control,* 437 F.3d at 1316.

[155] *Impax Laboratories, Inc. v. Aventis Pharmaceuticals Inc*, 2006 WL 3346151, *8-9 (Fed. Cir. Nov. 20, 2006).

longer exists."[156]  Similarly, "[the 1992 revision to Rule 56] was adopted after public hearings, and exploration of extensive experience as well as the needs and balance of patent examination.  That revision binds the PTO and, absent sound reason, the Administrative Procedure Act requires this court to follow it uniformly, not selectively in different parts of the same opinion."[157]

154.    Several district courts have adopted the approach advocated by Judge Newman:  "For allegations of inequitable conduct occurring after 1992, the PTO regulations further explain that information may be material if it [satisfies the requirements of the 1992 version of Rule 56]."[158]  For patents that were prosecuted after 1992 "the later standard of materiality should apply, which includes a more narrowly defined materiality."[159]

155.    Because neither Chen '90 nor Vaisey is material under either version of Rule 56, it is unnecessary to resolve this controversy in order to determine that Dr. Lee did not commit inequitable conduct.

### a.    Dr. Lee Did Not Know Of the Materiality of Chen '90 and Vaisey

156.    The duty of disclosure cannot be violated unless the person having a duty to disclose actually knows or should have known that the allegedly withheld information is material.[160]  If none of the individuals who have a duty of disclosure were aware of the allegedly withheld information or knew or should have known[161] of its materiality during prosecution of the patent application, then none of them can be found to have violated the duty of disclosure.

157.    "It is not inequitable conduct to omit telling the patent examiner information that the applicant in good faith believes is not material to patentability."[162]

---

[156] *Ferring*, 437 F.3d at 1202 n.3.

[157] *Agfa Corp. v. Creo Products, Inc.*, 451 F.3d 1366, 1384 (Fed. Cir. 2006).

[158] *Applera Corp. v. Micromass UK, Ltd.*, 204 F.Supp.2d 724, 759 (D.Del. 2002).

[159] *Harrah's Entertainment, Inc. v. Station Casinos, Inc.*, 321 F.Supp.2d 1184, 1188 (D. Nev. 2004).

[160] 37 C.F.R. § 1.56 ("…duty to disclose to the Office all information known to that individual to be material to patentability").

[161] *Ferring*, 437 F.3d at 1191.

[162] *Allied Colloids Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1578 (Fed. Cir. 1995).

## 2.    Dr. Lee Had No Intent to Deceive the Patent Office

158.    "Inequitable conduct also requires an intent to deceive.  To satisfy the intent to deceive element of inequitable conduct, 'the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.'"[163]

159.    "Inequitable conduct carries the consequence of permanent unenforceability of the patent claims.  Forfeiture is not favored as a remedy for actions not shown to be culpable."[164] Inequitable conduct therefore requires proof of the independent element of an intent to act inequitably.[165]

160.    "Technical violations of PTO procedures, absent fraud or intentional deception, are not inequitable conduct as would invalidate the patent."[166]

161.    "[I]ntent as an essential predicate to patent unenforceability does not mean that the inventor intended to do what he did in patent prosecution; it means that the inventor intended to deceive or mislead the examiner into granting the patent."[167]

162.    "[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct."[168]

163.    To find an intent to deceive, "the involved conduct, viewed in light of all the evidence, including evidence of good faith, must indicate sufficient culpability to require a finding of intent to deceive."[169]

164.    Inadvertent failure to provide information to the PTO supports a finding of no intent

---

[163] *Impax*, 2006 WL 3346151 at *6 (quoting *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc in relevant part)).

[164] *Tol-O-Matic v. Proma Produkt-Und Mktg. Gesellschaff m. b. H*, 945 F.2d 1546, 1554 (Fed. Cir. 1991).

[165] *See Allied*, 64 F.3d at 1578; *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435 (Fed. Cir. 1991).

[166] *Seiko Epson Corp. v. Nu-Kote Intern., Inc.*, 190 F.3d 1360, 1367 (Fed. Cir. 1999).

[167] *Therma-Tru Corp. v. Peachtree Doors Inc.*, 44 F.3d 988, 995 (Fed. Cir. 1995).

[168] *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001); *The Upjohn Company v. MOVA Pharmaceutical Corp.*, 225 F.3d 1306, 1312 (Fed. Cir. 2000) (citing and-quoting from *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552 (Fed. Cir. 1990)).

[169] *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1189 (Fed. Cir. 1993).

1  to deceive or mislead the patent examiner.[170]

2  165.  "Intent to deceive cannot be inferred simply from the decision to withhold the

3  reference *where the reasons given for the withholding are plausible*."[171]

4  166.  A finding of culpable intent requires consideration of all of the evidence, including

5  evidence indicative of good faith.[172]  "Knowledge alone is not culpable intent."[173]  Intent to deceive

6  the Patent Office cannot be inferred from circumstances merely constituting gross negligence.[174]

7  167.  "In a case involving an omission of a material reference to the PTO, there must be

8  clear and convincing evidence that the applicant made a ***deliberate decision to withhold a known***

9  ***material reference***."[175]

10  168.  Intent to deceive can not be inferred solely from the fact that information was not

11  disclosed; there must be a factual basis for a finding of deceptive intent."[176]  In *Kao Corp.*, the

12  Federal Circuit deferred to a district court's ruling that there was no evidence of deceptive intent,

13  even where there was a "rather glaring failure of the inventors to offer any rationale for the

14  omission."[177]  In other words, even an ***unexplained*** failure to disclose is not sufficient to support a

15  finding or inference of deceptive intent.  Here, in addition to the fact that Chen '90 and Vaisey are

16  immaterial because they are cumulative of art that was before the Examiner, Dr. Lee has provided

17  reasonable explanations for having not submitted those two references to the PTO.  Broadcom has

18  offered ***no*** evidence, analysis, or factual contentions of an affirmative intent on the part of Dr. Lee to

19

20  [170] *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods.*, 21 F.3d 1068, 1073 (Fed.
21  Cir. 1994).

     [171] *Dayco*, 329 F.3d at 1367.

22  [172] *See Hupp v. Siroflex of America, Inc.*, 122 F.3d 1456, 1465 (Fed. Cir. 1997).

23  [173] *Allen Organ Co. v. Kimball International, Inc.*, 839 F.2d 1556, 1568 (Fed. Cir.), *cert. denied*, 488
     U.S. 850 (1988).

24  [174] *See Kingsdown*, 863 F.2d at 876; *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1582 (Fed.
25  Cir. 1991); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 882 F.2d 1556, 1562 (Fed. Cir. 1989).

     [175] *Baxter*, 149 F.3d at 1329 (emphasis added) (citation omitted).

26  [176] *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 1001-1002 (Fed. Cir. 2006) (quoting *Hebert
     v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996)); *Kao Corp v. Unilever United States, Inc.*, 441
27  F.3d 963, 972 (Fed. Cir. 2006); *The Upjohn Company*, 225 F.3d at 1312 (citing and quoting from
     *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996)).
28
     [177] *Kao Corp.*, 441 F.3d at 972.

deceive or mislead the Examiner into allowing the '104 Patent to issue. Moreover, Broadcom has further failed to offer *any* evidence, analysis, or factual contentions to prove more than that Dr. Lee lacked a good faith explanation for failing to disclose Chen '90 and Vaisey to the Examiner during prosecution of the '104 Patent. Dr. Lee was of the opinion that the information contained in Chen '90 was information that was preexisting in the prior art,[178] and that he does not know or recall why he did not disclose Chen '90 to the Examiner.[179] Additionally, Dr. Lee may not have understood the scope and duration of his duty of disclosure. Moreover, Chen '90 would have been cumulative of information already before the Examiner, and hence would not have obligated Dr. Lee to have disclosed it to the Examiner during the prosecution of the '104 Patent. Therefore, there can be no supportable finding of intent to deceive, and therefore, no finding of inequitable conduct.

169. In a case involving the omission of a material reference in the applicant's submissions to the PTO, there must be "clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference."[180]

170. More than a violation of the duty of disclosure is required to prove inequitable conduct. To prove inequitable conduct one must establish by clear and convincing evidence "that material information was intentionally withheld for the purpose of misleading or deceiving the patent examiner."[181] Intent to deceive "cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent."[182]

171. Moreover, "where the only evidence of intent is lack of a good faith explanation for the nondisclosure, [this] cannot constitute clear and convincing evidence sufficient to support a determination of culpable intent."[183] "When the absence of a good faith explanation is the only evidence of intent, however, that evidence alone does not constitute clear and convincing evidence

---

[178] *Id.* at 251:6-254:2.

[179] *Id.* at 323:13-15.

[180] *Digital Control*, 437 F.3d at 1318.

[181] *Allied,* 64 F.3d at 1578.

[182] *Purdue Pharma L.P. v. Endo Pharms., Inc.,* 438 F.3d 1123, 1134 (Fed. Cir. 2006).

[183] *M. Eagles Tool,* 439 F.3d at 1341.

warranting an inference of intent."[184]

## B. BALANCING MATERIALITY AND INTENT

172. "The inequitable conduct analysis is performed in two steps comprising 'first, a determination of whether the withheld reference meets a threshold level of materiality and intent to mislead, and second, a weighing of the materiality and intent in light of all the circumstances to determine whether the applicant's conduct is *so culpable* that the patent should be held unenforceable.'"[185]

173. "If the court finds materiality and intent, it 'must balance the equities to determine whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable.'"[186]

174. On the other hand, if either materiality or intent is not found, then no further analysis need be performed and unenforceability must be denied.[187]

175. A case for inequitable conduct is "doomed" when it is "bereft of evidence of intentional deception."[188]

## C. PROCEDURAL REQUIREMENTS

### 1. Inequitable Conduct Must be Pled with Particularity

176. Under Fed. R. Civ. P. § 9(b), the affirmative defense of inequitable conduct must be pled with particularity.[189] Consequently, Defendants are limited to the allegations stated in their

---

[184] *Id.* at 1341.

[185] *Ferring*, 437 F.3d at 1186 (quoting *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362-1363 (Fed. Cir. 2003)).

[186] *Impax*, 2006 WL 3346151 at *6 (quoting *Monsanto Co. v. Bayer Bioscience N.V.*, 363 F.3d 1235, 1239 (Fed. Cir. 2004)).

[187] *Critikon, Inc. v. Becton Dickinson VascularAccess, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir.2003); *Haliburton*, 925 F.2d at 1439 (because the evidence did not meet "the threshold level of materiality or intent to mislead, we need not weigh the materiality and intent in light of all circumstances to determine whether the [patent owner's] conduct was so culpable that the patent should be unenforceable")

[188] *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357-58 (Fed. Cir. 2003) ("there must be some threshold showing of intent to be balanced; we will not find inequitable conduct on an evidentiary record that is completely devoid of evidence of the patentee's intent to deceive the PTO") (citation omitted).

[189] *See Micro Motion Inc., v. Exac Corp.*, 112 F.R.D. 2, 3 (N. D. Cal. 1985).

pleadings and have waived any other arguments not stated therein.[190]

### 2. The Party Asserting Inequitable Conduct Has the Burden to Prove *Each Element* by Clear and Convincing Evidence

177.    The burden is on the alleged infringer to prove unenforceability by clear and convincing evidence.[191]  In the case of proving inequitable conduct, the alleged infringer must establish by clear and convincing evidence that an individual having a duty of disclosure obligation failed to disclose information that was known or should have been known to have been material to patentability, with intent to deceive or mislead the Examiner.[192]

178.    Both materiality and an actual intent to deceive must be proven by clear and convincing evidence.[193]  Where failure to disclose a reference to the Patent Office is alleged, there must be clear and convincing evidence that a "deliberate decision" was made to withhold the reference, and that the applicant knew the reference to be material.[194]  There must also be a showing that, by such failure to disclose, the applicant intended to deceive the Patent Office.[195]  Once these threshold showings are met, then the Court balances the materiality and intent to determine if the conduct justifies a finding of inequitable conduct.[196]

179.    Given the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive, clear and convincing evidence sufficient to support an

---

[190] *See Wolf v. Reliance Standard Life Ins. Co.,* 71 F.3d 444, 449-450 (1st Cir. 1995).

[191] The clear and convincing evidence standard requires that the evidence produce in the mind of the trier of fact an abiding conviction that the truth of the matter is highly probable.  *See Colorado v. New Mexico,* 467 U.S. 310, 316 (1983).  A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by the preponderance of the evidence standard.  *See Price v. Symsk,* 988 F.2d 1187, 1191 (Fed. Cir. 1993).

[192] *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867 (Fed. Cir. 1988), cert. denied, 490 U.S. 1067 (1989)

[193] *See e.g., Baxter,* 149 F.3d at 1329 (Fed. Cir. 1998); *Avco,* 867 F. Supp. at 94.

[194] *Baxter,* 149 F.3d at 1329.

[195] *Mentor H/S, Inc. v. Medical Device Alliance, Inc.* 244 F.3d 1365, 1377 (Fed. Cir. 2001) (A defendant asserting an inequitable conduct defense must demonstrate by clear and convincing evidence that the applicant or his attorney failed to disclose material information to the PTO, and that the applicant or his attorney did so with intent to deceive the PTO.).

[196] *See e.g., American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1363, *cert. denied,* 469 U.S. 821 (1984).

509929v2

inference of intent is required.[197]

180.    Only if the requisite threshold findings of materiality and intent are made, should the Court weigh the equities to determine whether, in light of all the circumstances, the conduct is so culpable that the patent should not be enforced.[198]

181.    The alleged conduct must not amount merely to the improper performance of, or omission of, an act one ought to have performed.  Rather, clear and convincing evidence must prove that an applicant had the specific intent to accomplish an act that the applicant ought not to have performed, *viz.* misleading or deceiving the Patent Office.  In a case involving nondisclosure of material information, there must be clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference.[199]

Dated:  December 22, 2006

DAY CASEBEER
MADRID & BATCHELDER LLP


By: /s/ Christian E. Mammen

Attorneys for Plaintiff and Counterdefendant
QUALCOMM Incorporated

---

[197] *See Northern Telecom,* 908 F.2d at 939 (Fed. Cir.), *cert. denied,* 498 U.S. 920 (1990).

[198] *See Andrew Corp. v. Gabriel Electronics, Inc.,* 847 F.2d 819, 824 (Fed. Cir.), *cert. denied,* 488 U.S. 927 (1988).

[199] *See Baxter,* 149 F.3d at 1329; *Molins,* 48 F.3d at 1181.