# Exhibit G

ROBERT S. BREWER, JR. (SBN 65294)
JAMES S. MCNEIL (SBN 201663)
MCKENNA LONG & ALDRIDGE LLP
750 B Street, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-5400
Facsimile: (619) 595-5450

WILLIAM F. LEE (admitted *pro hac vice*)
JOHN J. REGAN  (admitted *pro hac vice*)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile:  (617) 526-5000

MARK D. SELWYN (admitted *pro hac vice*)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1117 California Avenue
Palo Alto, CA 94301
Telephone: (650) 858-6000
Facsimile:  (650) 858-6100

Attorneys for Defendant/Counterclaimant
BROADCOM CORPORATION

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM INCORPORATED, <br><br> Plaintiff, <br><br> v. <br><br> BROADCOM CORPORATION, <br><br> Defendant. <br><br>————————————————— <br><br> AND RELATED COUNTERCLAIMS <br> ————————————————— | Case No. 05 CV 01958B (BLM) <br><br> **EXPERT REPORT OF** <br> **CLIFF READER, PH.D.** <br><br> Judge:   Hon. Rudi M. Brewster |

## I.   INTRODUCTION

1.      Counsel for Defendant Broadcom Corporation ("Broadcom") has retained me as an expert in connection with this litigation.  I expect to testify at trial regarding the subject matter set forth in this report if asked about these matters by the Court or the parties' attorneys.

2.      I understand that Plaintiff Qualcomm Incorporated ("Qualcomm") has claimed that Broadcom's products that support the H.264 standard and technical specification infringe Qualcomm's patents 5,452,104 (the '104 patent) and 5,576,767 (the '767 patent).  The H.264 standard is also sometimes known as ISO/IEC MPEG-4, Part 10 and Advanced Video Coding ("AVC").

3.      The purpose of this report is to describe the standards-setting process with emphasis on the development of H.264 and the relevant intellectual property and licensing policies. Specifically, this report examines the intellectual property and licensing policies of the Joint Video Team ("JVT"), which is a joint project between the International Telecommunication Union ("ITU") and the International Organization for Standardization ("ISO")/International Electrotechnical Commission ("IEC") that was responsible for developing and promulgating the H.264 standard.

4.      The opinions outlined below are entirely my own and reflect my independent and expert judgment based upon my past experience and research and the materials that I reviewed in preparing this report, a list of which is attached hereto as Appendix A.

5.      My fees for this report ($375 per hour) are not contingent on any findings herein and I will be paid for my services regardless of the outcome herein.

6.      Based on my review of the relevant landscape, I reach four principal conclusions. *First*, Standards Setting Organizations ("SSOs") use a number of strategies to balance the competing concerns of (1) promoting technological innovation within a standard and (2) limiting claims by holders of Intellectual Property Rights ("IPR").  *Second*, the JVT intended to develop a royalty-free "baseline profile."  Its IPR policy stated that "all technology applied in the baseline profile shall have no IPR, expired IPR, or valid but royalty-free IPR."  In addition, the JVT intended to allow its more advanced profiles to be subject to patent rights, but only if the patent holder agreed either to

1  waive its patent rights or to license those rights on reasonable and non-discriminatory ("RAND")

2  terms. *Third*, to promote its goal of creating a royalty-free baseline profile, the JVT adopted an IPR

3  policy that required the disclosure of "IPR information . . . associated with any standardization

4  proposal" as early as possible during the development of the standard, but, in any event, prior to the

5  final approval of the standard by the JVT's parent organizations. *Fourth,* the JVT's IPR Policy,

6  along with those of its parent organizations, requires members to disclose their IPR associated with

7  the standard and to make such IPR available on at least RAND terms.  In the event a member is

8  unwilling to do so, the JVT is required to reconsider the standard, including redesigning it so as not

9  to conflict with the asserted IPR.

10  **II.    QUALIFICATIONS**

11      7.    I am an independent consultant and have more than thirty years of work experience in

12  the digital imaging and digital video industry.  I received a Bachelor's Degree with a major in

13  Physical Electronics from the University of Liverpool in England in 1970.  I received a Ph.D. from

14  the University of Sussex, England, in 1974.  From 1971-1973, I was a visiting graduate student at

15  the Image Processing Institute, University of Southern California, Los Angeles. My thesis title was

16  "Orthogonal Coding of Still and Moving Pictures."  I was one of the first to perform adaptive block

17  transform coding and the first to apply it to video coding, which was described in my thesis.

18      8.    Following completion of my Ph.D. until approximately 2001, I worked for various

19  companies, including Samsung, Cypress Semiconductor, and Sun Microsystems, designing and

20  developing systems for performing digital imaging and digital video processing.  During this time, I

21  became familiar with various video encoding and decoding standards, including MPEG-1, MPEG-2,

22  and MPEG-4 Part 2.

23      9.    Further, I have fifteen years experience with SSOs.  I started monitoring the effort to

24  standardize MPEG—a video compression technology—in 1989, and started attending the ISO/IEC's

25  Moving Pictures Expert Group ("MPEG") in 1990.  I was the Head of Delegation for the United

26  States to MPEG from 1991-1993.  In that role, I also chaired the subcommittee of the American

27  National Standards Institute ("ANSI"), an SSO in the U.S. that was considering standards for video

28

1   compression.  I also served as Editor-in-Chief of the MPEG-1 standard for video compression.

2   Additionally, I was the co-founder of the MPEG-4 Part 2 standard and chaired the relevant

3   subcommittee from 1993 to 1996.  During that time, the Chairman of the ITU's H.263 committee

4   and I closely collaborated in order to harmonize the ISO/IEC MPEG's and ITU's efforts.  I also

5   served as chair of the subcommittee evaluating implementation complexity for the Digital Audio

6   Broadcasting ("DAB") standard in 1992.

7        10.    With respect to H.264, I have participated as an Invited Expert in the JVT since 2002.

8   As an Invited Expert, I have the rights of an ordinary member of the JVT, such as attending meetings

9   and making submissions.  I am a subscriber to the JVT's email reflector—an email list for

10  subscribers—and attended three JVT meetings in 2002:  (1) July 22-26, 2002, in Klagenfurt, Austria;

11  (2) October 9-17, 2002, in Geneva, Switzerland; and (3) December 5-13, 2002, in Awaji Island,

12  Japan.  Further, I have read all of the contributions and sections of meeting reports related to the

13  major coding tools of H.264, going back to the origins of the work in the 1997 timeframe, or, in

14  some cases, to work from committees that created earlier video compression standards, including

15  H.263 and MPEG-4 Part 2.[1]  I submitted a draft of a history of video compression standards (which,

16  at the JVT, was submission "JVT-D068") to the JVT meeting in Klagenfurt in July 2002 for

17  consideration by JVT members.  I submitted a revised draft of that history of video compression

18  standards to the JVT in October 2002 ("JVT-E066")

19        11.    In addition, I have extensive experience with intellectual property policies and

20  licensing arrangements associated with standards.  Currently, I am the Chairman of the IPR

21  Subgroup of the Audio Video Coding Standard ("AVS") for China.  The group is defining a new

22  approach for licensing and patent pools in association with the development of new standards.  I am

23  also the Director of the AVS Patent Pool, which is in early formation stage.  Additionally,

24  CableLabs hired me to be the technical expert for establishing the MPEG Patent Pool (now called

25  the MPEG-LA), which I worked on from 1993 to 1995.  Also, I wrote a chapter of a book addressing

26

27  ───────────────

[1]  MPEG-4 Part 2 is a standard that was in place prior to MPEG-4 Part 10.

28

1   intellectual property rights and licensing arrangements associated with standards: "Chapter 16:

2   MPEG Patents," *in MPEG and Video Compression Standard*, (Joan L. Mitchell et al. eds, 1997).

3        12.    I have published widely on topics relating to video compression. I currently am

4   drafting a book on the "History of MPEG Video Compression." In addition to the article on MPEG,

5   referenced *supra* at ¶ 11, I wrote an article in *Optical Engineering* entitled "MPEG4: Coding for

6   Content, Interactivity and Universal Accessibility" (1996). A list of publications is found at

7   Appendix B, which contains my best effort to compile a list of all of my publications. It contains

8   what I believe to be a full list for the past ten years.

9        13.    As a result of this experience, I am regularly called upon to provide expert analysis of

10   developments in the digital imaging and digital video industry.

11        14.    My *curriculmum vitae*, including a list of my publications over the past 10 years that I

12   presently am able to identify, is attached hereto as Appendix B.

13   **III.    THE IMPORTANCE OF TECHNOLOGY STANDARDS**

14        15.    For any set of technology products that work together in an application, standards

15   play a crucial role in defining how different parts of a system fit together. The principal goal of such

16   standards is to provide interoperability among products manufactured by different companies.

17   Companies that implement the standard can make products by referencing *only* the standard—and

18   without the need to communicate separately with every other company with whom their products

19   may need to work—and they have a guarantee their products will interoperate with other products

20   that implement the standard. Such products are considered to be "in conformance" with the standard.

21        16.    One common practice is to define a set of specifications—i.e., rules or parameters—

22   that govern how the technology functions as well as the interfaces through which it can access

23   related technologies. These specifications are called "normative requirements." For video and audio

24   coding standards, such requirements specify the format of the coded bitstream and the decoding

25   process. Products that implement a video coding standard—such as H.264—produce bitstreams that

26   can be decoded by any decoder that implements the standard. A standard's specifications instruct

27   companies implementing the standard on what end result they must provide—here, a bitstream that

28

1   conforms to the video compression and coding standards of H.264, and the method for decoding it--

2   but provide the freedom for those companies to decide how to implement the standard, and generally

3   do not require a single implementation of the product.

4   17.   In an economic sense, standards fall within the broad concept of a "public good" that

5   are "non-rivalrous" (numerous individuals can use them at the same time) and "non-excludable" (the

6   standard can be used repeatedly without being consumed).[2]  There is little incentive for a single firm

7   to create a public good because "rival firms would quickly exploit them without paying for them."[3]

8   As a result, the government sometimes steps in to promote standard-setting activity.[4]  Generally, the

9   government is involved in standards concerned with public safety, such as the design of electrical

10  outlets.  In addition, the government is traditionally involved in situations where consumer

11  protection is needed.  For example, U.S. consumers have had the assurance for more than 50 years

12  that any television they buy will be compatible with the National Television System Committee

13  ("NTSC") standard used for analog TV broadcasting.  Now, the same assurance is given for digital

14  broadcasting using the Advanced Television Systems Committee ("ATSC") standard.

15  **IV.   THE INTERSECTION OF STANDARD SETTING BODIES AND INTELLECTUAL
16  PROPERTY RIGHTS**

17  18.   In the United States, private companies often join together either under the auspices

18  of a standard setting organization –a formal SSO, an industry consortium, or a trade association—to

19  develop standards that will move an industry forward.

20  19.   If a standard is developed through an SSO, it is called a *de jure* standard.[5]  Such

21  standards are sometimes called open standards.  Typically, such standards are developed by various

22  companies submitting proposals for inclusion in the standard which are considered by and

23  commented upon by other members of the SSO, with the end result being a compilation of the

24  contributions of many participants.  Examples of open standards include NTSC and ATSC, both of

---

25  [2]   Jonathan E. Nuechterlein and Philip J. Weiser, *Digital Crossroads: American
26  Telecommunications Policy in the Internet Age* 393 (2005).
    [3]   *Id.*
27  [4]   *Id.*
    [5]   *Id.* at 390.

28

EXPERT REPORT OF                         - 6 -                          05 CV 01958
CLIFF READER, PH.D.

**Exhibit G-7**

1  which are described above.  In addition, telephone area codes are open standards.  By way of

2  contrast, a company that believes its proprietary technology can prevail in the free market can forego

3  formal standards-setting and seek to make its technology a *de facto* standard.[6]  Such standards are

4  sometimes called proprietary standards, and an example of a proprietary standard is Microsoft

5  Windows.

6  **V.      THE TREATMENT OF INTELLECTUAL PROPERTY RIGHTS BY SSOS**

7          20.     For an SSO to promote successful standards, it must strike a balance between

8  ensuring that companies can practice the standard without fear of being sued for patent infringement

9  and protecting the investments that companies may have made in proprietary technology.  One way

10  that many SSOs regulate the use of intellectual property rights is by adopting some form of IPR

11  policy that applies to those who are members or experts of the SSO.  The JVT, as well as the

12  ISO/IEC and ITU international standards organizations, have such IPR policies.

13          21.     SSOs adopt a range of "patent disclosure" requirements in their IPR policies.  In

14  theory, such requirements could range from no disclosure, to mandatory disclosure of any and all

15  patents that have any possible relation to the standard.  Like most SSOs, the JVT, the ISO, and the

16  ITU all have patent disclosure rules in their IPR policies that apply to the development of H.264.

17          22.     In addition, many IPR policies state that: (1) if a license for a patent that is essential

18  to implementing the standard cannot be obtained--i.e., the patent holder retains the right of exclusive

19  practice--the standard either must be rewritten to exclude the patented technology or be withdrawn,

20  and (2) if the patent holder is willing to grant a license, the rates, terms and conditions for the license

21  must be "reasonable and non-discriminatory" ("RAND").  The benefits of requiring licensing on

22  RAND terms are that it is often necessary "to keep industry leaders on board, forge an industry

23  consensus behind an official standard, and increase the likelihood that the standard will be adopted

24  widely."[7]  Other SSOs, however, mandate access to patented technology at a royalty-free rate.

25  Many of the fundamental Internet standards, for example, are licensed at royalty-free rates.

26

27  [6]  *Id.*
    [7]  *Id.* at 391.

28

1      23.     In some instances, after the promulgation of a standard, essential patent holders

2  decide to offer predictability in licensing to the marketplace by combining specific, identified patents

3  in a "patent pool" that are licensed in a block.  In the case of H.264 for example, the baseline profile

4  for H.264 ultimately required use of patents on RAND terms.  Sponsoring parties therefore license a

5  group of patents (numbering 130, as of July 1, 2006) through an organization called "MPEG

6  Licensing Authority" (MPEG-LA), which is the primary source of licenses for patents applying to

7  the H.264 standard.  MPEG-LA is not affiliated in any way with the MPEG standardization

8  organization, but it also administers patent pools (that have antitrust clearance) for MPEG-2 Part 1

9  Systems, MPEG-2 Part 2 Video, MPEG-4 Part 2 Video, and other technologies.  I am informed that

10  Qualcomm has not made the patents-in-suit available for license through the MPEG-LA patent pool.

## VI.    BACKGROUND OF THE JVT

12      24.     Video coding relates to the encoding and decoding of video data in order to compress

13  it for purposes of transmission and storage and then decompress it for playback on a device such as a

14  television, portable media player, or cellular phone.  Prior to H.264, different organizations

15  developed several other video coding standards, including H.261, H.263, MPEG-2, and MPEG-4

16  Part 2, that purported to establish specifications that would permit various companies to manufacture

17  devices that would be able to interface with another device in order to transmit, receive, store, and

18  play video.

19      25.     One series of standards, the MPEGx standards, were developed under the supervision

20  of a joint committee of the International Standards Organization ("ISO") and International

21  Electrotechnical Commission ("IEC") known as the Joint Technical Committee 1 ("JTC-1").  The

22  JTC-1's goal is standardization in the field of information technology, and its members are national

23  bodies.  The JTC-1 is organized into subcommittees and working groups that focus on specific areas

24  of technology.  Subcommittee 29 of the JTC-1 addresses "Coding of audio, picture, multimedia and

25  hypermedia information."  Working Group 11 of that subcommittee, also called the Moving Pictures

26  Expert Group ("MPEG"), addresses coding of moving pictures and audio.  Within the ISO/IEC, this

27  group is officially called "ISO/IEC JTC 1/SC 29/WG 11," although externally the group is simply

28

1   called "MPEG." Formally, the official members of MPEG are countries. Each country forms a

2   delegation to MPEG through a process of its own choosing, which in some cases is very informal.

3   In the United States, this process has been delegated to INCITS. Any organization (e.g., private or

4   public corporation, university, government department, etc.) or individual can become a member of

5   INCITS, and become a qualified delegate to attend the international MPEG meetings. The

6   membership is thus open to everyone. Through MPEG, the JTC-1 developed the MPEGx video

7   coding standards (e.g., MPEG-2 and MPEG-4 Part 2) for use in applications such as video storage

8   (e.g., DVD) and broadcasting (e.g., satellite television).

9          26.    Another international organization involved in standard-setting in this area is the

10  International Telecommunication Union ("ITU"). Under the framework of the United Nations, the

11  ITU was established in the 1800s "as an impartial, international organization within which

12  governments and the private sector could work together to coordinate the operation of

13  telecommunication networks and services and advance the development of communications

14  technology."[8]  Among other forms of membership, entities and organizations may join the ITU

15  directly as associates (without becoming accredited through a national standards organization),

16  participate in the preparation of "recommendations" (i.e., standards), and have access to relevant

17  documents. The ITU Telecommunication Standardization Sector ("ITU-T") Study Group 16 focuses

18  on multimedia systems, which in turn has a subdivision for video coding, known as ITU-T Q.6/SG

19  16 or more commonly the Video Coding Experts Group ("VCEG"). Through the aegis of the

20  VCEG, the ITU developed the H.26x series of standards (e.g., H.261, H.263 and H.264) for use in

21  audio-visual communications such as videoconferencing.

22         27.    In December 2001, the ITU, through VCEG, and the ISO/IEC, through MPEG,

23  jointly founded the Joint Video Team ("JVT") with the goal of developing a video coding standard

24  that would improve upon the compression and picture quality provided by prior video coding

25  standards, such as H.263, MPEG-2 and MPEG-4, Part 2.

26

27  ─────────────
    [8] ITU's website at http://www.itu.int/aboutitu/overview/purposes.html.

28
    EXPERT REPORT OF
    CLIFF READER, PH.D.                        - 9 -                              05 CV 01958

                                        Exhibit G-10

28.     The diagram below shows how the JVT is organized.[9]



*The origins of AVC, H.264 and MPEG-4 Part 10*

29.     The JVT has a wide variety of industry participants, including some of the largest players in the computer and telecommunications industries, such as Nokia, Panasonic, Sharp, Microsoft, LG Electronics, Canon, Motorola, Hitachi, Apple Computer, Intel, Philips, Qualcomm, and Broadcom.

30.     Within the United States, administration of non-treaty international standards is conducted by the InterNational Committee for Information Technology Standards ("INCITS"). INCITS is accredited by the American National Standards Institute ("ANSI"), and performs such formal functions as accrediting delegates to international standards meetings such as MPEG and JVT meetings, formulating resolutions on the position of the United States to be presented to the international standards organizations, and developing the vote of the United States for approval of international standards.[10] To participate in international standard-setting organizations, such as MPEG, a participant must first attend the U.S. meetings at INCITS; however, one can attend JVT meetings as a delegate to the ITU, which one can join directly.

---

[9]   As published on the MPEG Industry Forum at http://www.m4if.org/public/documents/vault/m4-out-30035.pdf.
[10]   ANSI is the official U.S. representative to the ISO and, via the U.S. National Committee, the IEC. ANSI coordinates the development and use of voluntary consensus standards in the United States and represents the needs and views of U.S. stakeholders in standardization forums around the globe.

## VII.    THE DEVELOPMENT OF H.264

31.    The immediate precursor to the development of H.264 was the ITU's development and adoption of the H.263 standard, a process which began in approximately 1993. The goal for the H.263 standard was to provide an incremental improvement over the H.261 standard, and the ITU published several iterations of the H.263 standard in the 1990s.

32.    The ITU also established a long-term program of work entitled "H.26L," and its goal was to significantly improve coding efficiency over existing standards. H.26L formally became H.264. A key milestone for development of H.26L was receipt of three proposals in November 1998, including a proposal by Telenor (Norway) that contained many of the basic elements of the final H.264 standard and was adopted as the basis for development of H.264. Many of the features of a proposal by Nokia were also adopted into the final H.264 standard. The H.26L development continued solely within the ITU's VCEG until the formation of the JVT in 2001.

33.    The JVT aimed to create a standard that would be capable of providing good video quality at bit rates that are 50% lower than H.263 or MPEG-4 Part 2. In other words, the goal was to store or transmit video using only half the information required using MPEG-4 Part 2. Ultimately, the H.264 standard came to have several "profiles," which correspond to varying levels of compression and image quality.[11]

34.    To date, the JVT has had twenty meetings which, according to the JVT archives, took place on or about:

    a)    December 5-6, 2001, in Pattaya, Thailand

    b)    January 29 through February 1, 2002, in Geneva, Switzerland

    c)    May 6-10, 2002, in Fairfax, Virginia

    d)    July 22-26, 2002, in Klagenfurt, Austria

---

[11]    There are three profiles of interest in H.264: Baseline, Main and High. The Baseline profile includes a common set of features, most of which are supported by all JVT decoder implementations. Among other features, the Baseline profile is designed for low complexity applications. The Main and High profiles are advanced extensions to the Baseline profile that may be more complex in order to achieve some combination of improved compression or image quality. Within each profile, there are certain "levels." Levels determine the performance, such as frame rate, of the encoded video.

EXPERT REPORT OF
CLIFF READER, PH.D.

- 11 -

05 CV 01958

**Exhibit G-12**

1        e)      October 9-17, 2002, in Geneva, Switzerland

2        f)      December 5-13, 2002, in Awaji Island, Japan

3        g)      March 7-14, 2003, in Pattaya, Thailand

4        h)      May 23-27, 2003, in Geneva, Switzerland

5        i)      September 2-5, 2003, in San Diego, California

6        j)      December 8-12, 2003, in Waikoloa, Hawaii

7        k)      March 15-19, 2004, in Munich, Germany

8        l)      July 17-23, 2004, in Redmond, Washington

9        m)      October 18-22, 2004, in Palma de Mallorca, Spain

10        n)      January 18-21, 2005, in Hong Kong

11        o)      April 16-22, 2005, in Busan, Korea

12        p)      July 24-29, 2005, in Poznan, Poland

13        q)      October 14-21, 2005, in Nice, France

14        r)      January 14-20, 2006, in Bangkok, Thailand

15        s)      March 31 through April 7, 2006, in Geneva, Switzerland

16        t)      July 15-21, 2006, in Klagenfurt, Austria

17      35.    The proceedings at each of these meetings were recorded in detailed meeting

18 reports.[12] The reports include official actions such as advancing draft standards through the various

19 stages of approval, and the disposition of technical contributions made to the meeting, including

20 which contributions were adopted into the draft standard.[13]

21

22

_____

23 [12] MPEG did not physically control access to its meetings or documents, and based on my experience it was not uncommon for individuals who were not accredited to attend MPEG meetings

24 and obtain copies of the documents distributed at those meetings, including contributions. I am not aware of any confidentiality obligation with respect to contributions or other submissions to MPEG.

25 To the contrary, based on my experience, within the MPEG community, it was assumed by many that presentation of a contribution constituted public disclosure of the information contained in that

26 contribution. As a result, often, an organization took the precaution of filing a patent application in the days leading up to a meeting at which the subject matter would be disclosed.

27 [13] The technical contributions made to the standard are publicly-available documents, and not limited to just members of the JVT.

28

36.     In May 2003, the JVT completed its work on the Final Draft International Standard ("FDIS") and soon thereafter referred the FDIS to its parent bodies, the ITU and the ISO/IEC. Subsequently, the ITU published the FDIS as Recommendation No. H.264, and the ISO/IEC published it as International Standard ISO/IEC 14496-10/MPEG-4 AVC (or MPEG-4 Part 10).  The two standards are technically identical.

37.     The JVT did not cease its work on video coding at that time, and, in fact has continued to meet regularly as the H.264 standard continues to evolve.  In particular, the JVT began working on Fidelity Range Extensions (FRExt) to H.264 in 2003 and completed the project in July 2004.  The FRExt are professional extensions to H.264. Earlier this year, the JVT launched a project on Scalable Video Coding, which is now the JVT's most significant—but not its only—project. Scalable Video Coding is an enhancement to H.264; if successful, the project will result in an amendment to H.264.

## VIII.   INTELLECTUAL PROPERTY AND LICENSING POLICIES APPLYING TO THE JVT

38.     The JVT's activities are governed by the "Terms of Reference for Joint Video Team (JVT) Activities" ("JVT Terms of Reference").

39.     According to the JVT Terms of Reference, the JVT's activities were governed by the IPR policies and IPR reporting requirements of the ITU and ISO/IEC.  (JVT Terms of Reference at Section 10, "Patent and Copyright Issues").

40.     Further, the JVT's Internal Operating Rules (contained in Annex 3 of the JVT Terms of Reference) state:

### 3.1    Basic IPR Principles

Regarding Intellectual Property Rights (IPR) for the JVT codec, JVT has agreed to the following basic principles:

- The JVT codec should have a simple royalty free "baseline" profile (both on the encoder and decoder) in order to promote the wide implementation and use of the JVT codec.  All implementations should have such a common baseline profile core, in order to allow minimal interoperability among all JVT codecs.  The above requirement means that all technology applied in the baseline profile shall have no

IPR, expired IPR, or valid but royalty-fee-free IPR (according to Box 2.1 or 2.2.1 of the JVT Patent Disclosure form, as shown below).

- Special, more advanced profiles of the JVT standard may contain patents per Box 2.2 of the JVT Patent Disclosure form (reasonable terms and conditions).

### 3.2    Collection of IPR information during the standardization process

According to the ITU-T and ISO/IEC IPR policy, members/experts are encouraged to disclose as soon as possible IPR information (of their own or anyone else's) associated with any standardization proposal (of their own or anyone else's).  Such information should be provided on a best effort basis.

For collecting such information JVT has decided to use it's own Patent Declaration form – note that this is distinct from the *ITU ISO IEC Patent Statement and Licensing Declaration* that is to be submitted to the ISO Secretary General and ITU TSB Director when the contributed technology becomes the final standard.

Therefore, **JVT requires all technical (algorithmic) proposals include the following:**

"Attached at the end of each technical contribution, **a fully filled-out "JVT Patent Disclosure form"** (as shown below).   At the contribution stage, this form is for information only, and **may be signed by an expert or left unsigned.**  The form **must be included in the contribution to JVT.**

Additionally, **all submitted source code must include a written transfer of copyright** in the form described in section 5 below.

**Note that the submission of the JVT Patent Disclosure form at the proposal stage does not have the same formal status as the final IPR declaration to the ITU TSB and ISO/IEC, which must be done in the approval process for the ITU-T Recommendation and ISO/IEC International Standard."**

Such information provided to the Chair/Rapporteur will be tabulated in a "IPR status list" (e.g. a simple Word table) of the information received.  Information not currently relevant (e.g. if a proposed method was not accepted) will be removed from the "IPR status list" as early as possible.  The "IPR status list" is a living document of the JVT.

41.    Thus, under the policies of the JVT, the author of a technical proposal must submit a JVT Patent Disclosure form along with its proposal.  Additionally, members/experts are encouraged to disclose possible IPR information about which they are aware (either their own or someone else's) as soon as possible, but in any event, they are required to submit a final IPR declaration ("ITS ISO IEC Patent Statement and Licensing Declaration") to the ITU TSB and ISO/IEC during the final approval process by the parent organizations.[14]

---

[14]  This is consistent with the ITU's "Guidelines for Implementation of ITU-T Patent Policy," which state "[a]ny ITU Member State, Sector Member or Associate aware of a patent or pending patent application held by itself or others, which may fully or partly cover elements of the draft

EXPERT REPORT OF
CLIFF READER, PH.D.

05 CV 01958

42.     According to the minutes of the JVT meetings, it appears that the committee chair ordinarily made a statement reminding participants of the IPR policy at the beginning of meetings, and the meeting minutes themselves contained similar reminders.  For example, in the minutes for the JVT's December 2003 meeting, it states:  "In particular, participants are obligated to report IPR of which they are aware that is necessary to implement the draft specification(s) under development and to report on IPR in technical proposal contributions toward the development of such draft specification(s).  Indeed, at each of the JVT meetings I attended, the JVT Rapporteur/Chair Gary Sullivan made statements asking participants to disclose any applicable IPR of which they were aware as soon as possible.

43.     Consistent with these policies, numerous companies filed patent declarations with the JVT, ITU, or ISO/IEC during the development and promulgation of H.264, including Microsoft, Sony, Siemens, Nokia, Thomson, Toshiba, LG Electronics, NEC, Fujitsu, General Instrument, Sharp, IBM, AT&T, Scientific Atlanta, Philips, Lucent, Apple, Mitsubishi, and Broadcom.[15] Several of these companies expressly identified the patents or patent applications that were the subject of their disclosure, including for example, Nokia, Thomson, Sharp, and IBM.

44.     Based on my review of information from the JVT archives, it appears that the JVT Rapporteur/Chair, Gary Sullivan, compiled "IPR Status Reports" that reiterated the disclosure obligations of participants by stating:  *"Anyone* who is aware of anyone having IPR that is necessary to implement our draft standard should make this information known to our group at the *earliest* possible time."  In addition, the IPR Status Reports identified the IPR that had been disclosed as of the time of their drafting.

45.     As set forth above, the JVT's objective was to establish "a simple royalty free 'baseline' profile," with the recognition that more advanced profiles might be subject to various IPR.

---

Recommendation(s) proposed for approval, is requested to disclose such information to the TSB, in no case later than the date scheduled for approval of the Recommendation(s) in accordance with ITU-T Patent Policy."

[15]  Broadcom, in particular, submitted two versions of the ITS ISO IEC Patent Statement and Licensing Declaration – one on December 6, 2002 and one on July 12, 2004.  It is my understanding that the latter declaration was filed on behalf of an entity that Broadcom was in the process of acquiring at that time.

To that end, in the JVT's Patent Disclosure Form, a party was required to indicate either that it did not have IPR "associated with the technical content of the Recommendation/Standard or Contribution" or, if it did have IPR, to explain how it would address its patent rights. Specifically, the JVT required a patent holder to state whether it "is prepared to grant – on the basis of reciprocity for the above Recommendation/Standard":

- "a free license to an unrestricted number of applicants on a worldwide, non-discriminatory basis to manufacture, use and/or sell implementations of the above Recommendation/Standard";

- "a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to manufacture, use and/or sell implementations of the above Recommendation/Standard"; or

- a "royalty-free license" to an unrestricted number of applicants on a worldwide, non-discriminatory basis to manufacture, use and/or sell implementations of the above Recommendation/Standard "on condition that all other patent holders do the same."[16]

46.     Alternatively, if the patent holder was unwilling to grant a license according to any of the above options, it was required to: (a) identify the applicable patent registration/ application number; (b) indicate the portions of the Recommendation/ Standard that are affected; and (c) provide a description of the patent claims covering the Recommendation/Standard.

47.     Under the policies of the ISO and the ITU-T, if a patent holder is not willing either to waive its rights or to license its rights on reasonable and non-discriminatory terms and conditions to make, use, or sell implementations of the standard, then the standard needs to be referred back to the committee for further consideration. This is true even if a patent is discovered after the publication of a standard.[17]

---

[16] Similar language appeared in the ITU and ISO/IEC forms.
[17] ISO/IEC Directive Part 1, § 2.14.3 (4th ed. 2004), states: "Should it be revealed after publication of a document that licenses under patent rights, which appear to cover items included in the document, cannot be obtained under reasonable and non-discriminatory terms and conditions, the document shall be referred back to the relevant committee for further consideration."
The Guidelines for Implementation of ITU-T Patent Policy § 6 (Nov. 2, 2005) state: "ITU-T Patent Policy also applies to situations involving the discovery of patents or pending patent applications that may be required for use of a Recommendation subsequent to its publication or the initial issuance of a patent after publication. Once disclosure is made, the patent holder will be requested to provide the same assurances to the TSB [Telecommunication Standardization Bureau] as are required in situations where patents are known prior to publication of a draft Recommendation.

## IX.   QUALCOMM'S PARTICIPATION IN THE JVT

48.     Qualcomm has participated extensively in the JVT, as well as in the parent organizations and the U.S. bodies that send delegates to the JVT.

49.     I am aware that, prior to the formation of the JVT, Qualcomm representatives participated in MPEG meetings relating to the development of earlier video compression standards, such as MPEG-2 and MPEG-4, Part 2, as well as meetings of the U.S. standards organization, ANSI.

50.     According to the JVT meeting minutes, of the twenty JVT meetings that have taken place as of July 2006, Qualcomm employees have attended at least eight of them.  Specifically:

a)  Qualcomm attended JVT meetings as early as September 2003 in San Diego.  The draft minutes of that meeting state that Qualcomm actively participated at that meeting, including by making an objection: "Qualcomm and Motorola expressed opposition to alteration of the existing level 1."

b)  Qualcomm employee Phoom Sagetong attended the JVT meetings in December 2003, January 2005, and April 2005.

c)  Qualcomm employees Viji Raveendran, Phoom Sagetong and Yuriy Reznik attended the July 2005 JVT meeting in Poznan, Poland.

d)  Qualcomm employee Yuriy Reznik attended the October 2005 JVT meeting in Nice, France.

e)  Qualcomm employees Yiliang Bao and Phoom Sagetong attended the January 2006 JVT meeting in Bangkok, Thailand.

f)  One or more Qualcomm employees were present at the July 2006 JVT meeting in Klagenfurt, Austria.

Based on the meeting minutes, it appears that participants were reminded of the IPR policies at each of these meetings.

If the patent holder is unwilling to license or waive its rights, the Recommendation will need to be revised or withdrawn and its publication suspended.  In such a case, the TSB Director will promptly advise the Study Group responsible for the affected Recommendation so that appropriate action can be taken.  Such action shall include, but may not be limited to, a review of the Recommendation giving consideration to its possible revision by removing the potential conflict or through further examination and clarification of the technical considerations causing the conflict."

51.     Additionally, Qualcomm has made at least five technology proposals to the JVT, including:

    a)   JVT-R087, "Generalized Fine Granularity Scalability" (January 2006), submitted by Qualcomm employees Yiliang Bao and Yan Ye;

    b)   JVT-S066, "Improvements to FGS layer Variable Length Coder" (March 2006), submitted by Qualcomm employees Yiliang Bao and Yan Ye;

    c)   JVT-T086, "Adaptive Variable Length Coding for FGS" (July 2006), submitted by Qualcomm employees Yiliang Bao and Yan Ye;

    d)   JVT-T087, "FGS Complexity Reduction" (July 2006), submitted by Qualcomm employees Yiliang Bao and Yan Ye; and

    e)   JVT-T067, "Modification for grouping of refinement coefficients" (July 2006), submitted by Qualcomm employee Yiliang Bao, jointly with employees of Texas Instruments Japan and Nokia, Inc.

52.     In addition to those technology proposals, Qualcomm employee Yan Ye submitted an additional commentary, JVT-S091 entitled "Verification of JVT-S057," in March 2006.  Qualcomm employee Yiliang Bao also submitted a report, JVT-S011 entitled "AHG Report on Improved FGS coding," for the March 2006 meeting.

53.     In connection with each of its technology proposals, Qualcomm submitted a JVT Patent Disclosure Form stating that it "has granted, pending, or planned patents associated with the technical content of the Recommendation/Standard or Contribution" and that it is "prepared to grant a 'royalty-free' license" to anyone on a worldwide, non-discriminatory basis and on reasonable terms and conditions to manufacture, use and/or sell implementations of the above Recommendation/Standard "on the condition that all other patent holders do the same."[18]  In none of

---

[18]  In connection with Qualcomm's proposal JVT-T086, Qualcomm submitted the JVT Patent Disclosure Form, but, in an apparent oversight, initially neglected to check any of the boxes indicating what rights it was prepared to grant.  Qualcomm appears to have later remedied its omission and submitted a revised version of JVT-T086 in which it agreed to the same licensing terms as it did on the other Patent Disclosure Forms.

1  these forms did Qualcomm identify specific patents or restrict the number or type of patents for

2  which it was willing to provide royalty-free and RAND licensing.

3       54.    In addition, on April 25, 2006, almost three years after the adoption of the H.264

4  standard, over two and half years after first attending a JVT meeting, and almost one year after the

5  adoption of the second version of the standard Qualcomm submitted to the ITU, ISO, and IEC, two

6  versions of the Patent Statement and Licensing Declaration required to be submitted by members of

7  the parent organizations prior to final approval of the standard – one indicating it applies to H.264

8  and the other indicating it applied to MPEG-4 Part 10 (the ISO/IEC's iteration of the H.264

9  standard).  In both, Qualcomm stated that it "believes that it holds granted patents and/or pending

10  applications, the use of which would be required to implement the above ITU-T

11  Recommendation/ISO/IEC International Standard" and that it "is prepared to grant a license to an

12  unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms

13  and conditions to make, use and sell implementations of the above ITU-T

14  Recommendation/ISO/IEC International Standard."  Once again, Qualcomm did not identify the

15  specific patents or applications that it believed relevant.

16  **X.    CONCLUDING REMARKS**

17       55.    Based on my review of the information presently available to me, it is therefore my

18  opinion that, consistent with the overall objective of the ITU and ISO/IEC of developing standards

19  that are accessible to everybody and not subject to potential abuse by a patent holder, the JVT's IPR

20  Policy, along with those of its parent organizations, required members to disclose their IPR

21  associated the standard and to make such IPR available on at least RAND terms.  While many

22  participants in the development of the H.264 standard complied with this requirement by making an

23  appropriate disclosure before the adoption of the H.264 standard, Qualcomm, in spite of its

24  involvement in the development of the standard as early as 2003, failed to make a disclosure until

25  long after the standard had been adopted.  However, having now made such a disclosure, it appears

26  to have committed to making its IPR available to anyone "on a worldwide, non-discriminatory basis

27

28

1   and on reasonable terms and conditions to make, use and sell implementations" of the H.264

2   standard.

3        I understand that discovery is ongoing in this case.  I therefore ask that the Court allow me to

4   adjust or supplement my Report after I have had the opportunity to review deposition testimony or in

5   light of additional documents that may be brought to my attention after submission of this Report.  I

6   also ask that the Court allow me to supplement my analysis in light of any critique of my Report or

7   opinions advanced by another expert on behalf of the plaintiff.

8        To date, I have not prepared any exhibits summarizing opinions or illustrating points made in

9   this Report, but I expect to do so for use at trial in accordance with the Court's orders.  Examples of

10  these visual aids and demonstrative exhibits include, for example, deposition testimony and

11  deposition exhibits, articles, tables, charts, diagrams, photographs, videos and animated or computer

12  generated video.

13

14  Dated: August 10, 2006

15                                              Cliff Reader, Ph.D.

16

17

18

19

20

21

22

23

24

25

26

27

28

## Appendix A

1)   Joint Video Team's (JVT) archives at http://ftp3.itu.int/av-arch/jvt-site/, including, but not limited to:

    a)   Agendas with Meeting Notes

    b)   JVT-R087, "Generalized Fine Granularity Scalability" (January 2006).

    c)   JVT-S066, "Improvements to FGS layer Variable Length Coder" (March 2006).

    d)   JVT-T086, "Adaptive Variable Length Coding for FGS" (July 2006).

    e)   JVT-T087, "FGS Complexity Reduction" (July 2006).

    f)   JVT-S091, "Verification of JVT-S057," (March 2006)

    g)   JVT-S011, "AHG Report on Improved FGS coding." (March 2006).

    h)   PowerPoint by Yiliang Bao and Yan Ye, "JVT'T087, FGS Complexity Reduction" (July 16, 2006).

2)   Terms of Reference for Joint Video Team (JVT) Activities and JVT Patent Disclosure Form at http://www.itu.int/ITU-T/studygroups/com16/jvt/JVTToR.pdf

3)   ISO/IEC JTC 1/SC29 IPR Guidelines, at http://www.itscj.ipsj.or.jp/sc29/29w7ipr.htm

4)   International Organization for Standardization (ISO) website at http://www.iso.org/, including, but not limited to:

    a)   ISO/IEC Directives, Parts 1 and 2 (5th edition 2004), available at www.iso.org/directives

    b)   ISO/IEC Patent Policy at http://isotc.iso.org/livelink/livelink/fetch/2000/2122/3770791/customview.html?func=ll&objId=3770791&objAction=browse

5)   International Telecommunication Union's website at http://www.itu.int/home/index.html, including, but not limited to:

    a)   ITU_T Patents and Software Copyrights Database, at http://www.itu.int/ITU-T/dbase/patent/

    b)   ITU-T Patent Policy, http://www.itu.int/ITU-T/dbase/patent/patent-policy.html

    c)   Guidelines for Implementation of ITU-T Patent Policy (Nov. 2, 2005), http://www.itu.int/ITU-T/dbase/patent/files/glp20051102.pdf

    d)   Joint Video Team page, http://www.itu.int/ITU-T/studygroups/com16/jvt/index.html

6)    MPEG-4 Industry Forum website at http://www.m4if.org/public/documents/vault/m4-out-30035.pdf.

7)    Jonathan E. Nuechterlein and Philip J. Weiser, Digital Crossroads:  American Telecommunications Policy in the Internet Age  (2005).

8)    "Video Coding" by Gary J. Sullivan, Ph.D. found at http://www.calstatela.edu/faculty/fdanesh/Video_Coding_2006.pdf

9)    International Committee for Information Technology Standards (INCITS) website at http://www.incits.org/

10)    Patent Statement and Licensing Declaration form for a common or twin text ITU-T Recommendation | ISO/IEC International Standard, http://www.itu.int/ITU-T/dbase/patent/files/psld-ct.doc

11)    ITU-T Patent Statement and Licensing Declaration Database (as at 10 July 2006), http://www.itu.int/ITU-T/dbase/patent/index.html

12)    ISO IEC JTC-1 Patents Database, http://isotc.iso.org/livelink/livelink/fetch/2000/2122/3770791/JTC1_Patents_database.html?nodeid=3777806&vernum=0

13)    1958QB0043705-1958QB0043711

14)    1958QB0043712-1958QB0043725

15)    1958QB0043726-1958QB0043735

16)    1958QB0121241-1958QB0121244

17)    January 29 – February 1, 2002 Joint Video Team (JVT) of ISO/IEC MPEG & ITU-T VCEG (ISO/IEC JTC1/SC29/WG11 and ITU-T SG16 Q.6) JVT IPR Status Report.

18)    May 6-10, 2002 Joint Video Team (JVT) of ISO/IEC MPEG & ITU-T VCEG (ISO/IEC JTC1/SC29/WG11 and ITU-T SG16 Q.6) JVT IPR Status Report.

19)    July 22-26, 2002 Joint Video Team (JVT) of ISO/IEC MPEG & ITU-T VCEG (ISO/IEC JTC1/SC29/WG11 and ITU-T SG16 Q.6) JVT IPR Status Report.

20)    October 9-17, 2002 Joint Video Team (JVT) of ISO/IEC MPEG & ITU-T VCEG (ISO/IEC JTC1/SC29/WG11 and ITU-T SG16 Q.6) JVT IPR Status Report.

21)    March 7-14, 2003 Joint Video Team (JVT) of ISO/IEC MPEG & ITU-T VCEG (ISO/IEC JTC1/SC29/WG11 and ITU-T SG16 Q.6) JVT IPR Status Report.

22)    Patent Disclosure and Licensing Declaration Forms regarding H.264 submitted by:  UB Video, Inc., Videolocus, Inc., France Telecom, Telefonaktiebloaget L M Ericsson, Nippon Telegraph and Telephone Corporation, Microsoft Corporation, Matsushita Electric Industrial Co., Ltd., Netergy Microelectronics, Inc., Sony Corporation, Siemens, Polycom, Inc., Toshiba Corp., LG Electronics, NEC Corporation, Broadcom Corporation, NTT Mobile Communications Network, Inc., Fujitsu Ltd., Conexant Systems, KDDI Corporation, Fraunhofer_Gesellschaft zur Forderung der angewandten Forschung e V., General

1    Instrument Corp., Victor Company of Japan, Ltd., Mobilygen Corp., AT&T Corp.,
     DemoGraFX, Inc., Scientific-Atlanta, Inc., Philips Electronics, N.V., Lucent Technologies,
2    Inc., Apple Computer Inc., Mitsubishi Electric Corp., Nokia Corp.,  Thomson S.A., Sharp
     Laboratories of America, Inc., Real Networks, Inc., Electronics and Telecommunications
3    Research Institute, International Business Machines Corp., Robert Bosch GmbH, FastVDO
     LLC, Tandberg Telecom As, Sharp Corp., Intel Corp., Dolby Laboratories, Inc., and
4    Qualcomm Inc.

5    23)    Patent Statement and Licensing Declaration for a common text or twin text ITU-T
            Recommendation, submitted by Broadcom Corporation, December 6, 2002.
6
     24)    Patent Statement and Licensing Declaration for a common text or twin text ITU-T
7           Recommendation, submitted by Broadcom Corporation, July 12, 2004.

8    25)    U.S. Patent No. 5,576,767.

9    26)    U.S. Patent No. 5,452,104.

1

## Appendix B:  Curriculum Vita

2

3
Cliff Reader, Ph.D.
P.O. Box 2666,
4
Saratoga, CA., 95070

5
**Professional Experience**

6
**2001 – Present**              **Independent Consultant**

7
Provides technical, business development and intellectual property consulting services in the areas of digital
imaging, digital video and digital audio including consumer audio/video, real-time video processing and display,
8
image, video and audio compression, imaging/video systems architecture, and imaging/video chip architecture.

9
Provides litigation support services including expert witness participation in intellectual property disputes.

10
Adjunct Professor of the Institute of Computing Technology, Consultant to the Chinese Academy of Sciences and
IPR Subgroup Chairman of AVS (Audio Video Coding Standard of China). Director of the AVS patent licensing
11
pool, currently leading formation of the pool.

12
Expert in all major audio-video standards. MPEG audio (Layer I, II, mp3, AAC), Dolby AC3, MPEG video (1, 2, 4),
H.264, Windows Media 9 (VC-9), and AVS.
13

Clients include many major companies in the high-tech and consumer electronics industry. Details are provided
14
below. References available on request.

15
**1999 – 2001.**                **nDSP Corporation**
                               **Vice President Marketing**
16
                               **Acting Vice President Sales (To December 2000)**

17
Responsible for marketing and sales in a startup company providing high-quality video signal processors to TV
manufacturers. Developed product specifications and roadmap. Built and managed sales and marketing team of
18
direct and contractor staff in US and Japan to provide technical sales, sales support, applications engineering,
MARCOM and PR. Established distribution in China, Japan and throughout Far East. Secured first sales as company
19
moved into production phase with design wins in China, Japan and Europe. Initiated and secured major design wins
in emerging Progressive DVD business, with production volumes beginning in 4Q00 at an annualized rate of $3.5M.
20
Established strategic partnership with Pixelworks in LCD chip business. Pixelworks acquired nDSP in 2001.

21
**1997 – 1998.**                **CagEnt Technologies, Inc. (wholly owned by Samsung).**
                               **Vice President Sales, Digital Video Products.**
22

Responsible for a line of PC-based real-time MPEG2 and Dolby Digital encoders. Established distribution
23
agreements for third-party DVD authoring software. Secured OEM contracts for the products. Built the sales
channel worldwide. Built sales to break-even point in 9 months leading to sale of the product line.
24

**1993 – 1997.**                **Samsung Semiconductor Inc., San Jose, CA.**
25
                               **Director of Marketing; Digital Media Products.**
                               **Acting Director of Software Engineering,**
26

Responsible for media processor (MSP) business. Generated complete business plan for sales, licensing,
27
manufacturing, and third-party applications program. Established partnership with Microsoft on the Talisman

28

EXPERT REPORT OF
CLIFF READER, PH.D.                               - 24 -                               05 CV 01958

**Exhibit G-25**

program in which Microsoft developed the RTOS and drivers for MSP and planned to bundle MSP microcode with Windows. Established partnership with IBM for porting of MPEG and MWAVE applications to MSP microcode, and manufacturing license for derivative designs.

Co-founder and Chairman of MPEG4 subcommittee from inception in September 1993 to January 1996. Personally established many of the key principals of the MPEG4 standard, such as object-based coding, software-based standard, downloadable code, hierarchical data structure, hybrid synthetic-natural audio/video coding, etc.

**1990 – 1993.**            **Cypress Semiconductor Inc., San Jose, CA.**
                            **Business Development Manager**

Founding member of new business unit chartered to develop a "video DSP". Co-developed a complete business plan, and personally initiated relationships with Philips, Sun, Apple, and IBM. Chief architect for this early media DSP design, capable of complete MPEG1 decode in real time. (Fully validated by cycle-accurate simulation). Managed R&D team of 10 hardware and software engineers.

Head of US Delegation to MPEG, 1991 to 1992. Chief Editor of the MPEG1 standard. Technical Expert for establishing the MPEGLA Patent Licensing Pool.

**1988 – 1990.**            **Sun Microsystems Inc. Mountain View, CA.**
                            **Program Manager**

Developed requirements and specification for real-time imaging system. Managed a team of 20 engineers to develop the architecture and high-level design. Interfaced with two key customers – Philips Medical Systems and Lockheed. Successfully handed off design to implementation team.

**1975 – 1988**

Positions in Aerospace and Image Processing industry. Details available on request.

## Education

Ph.D., University of Sussex, England. 1974. Thesis – "Orthogonal Transform Coding of Still and Moving Pictures". All research performed in residence at the Image Processing Institute, USC Los Angeles, CA.

B. Engineering with Honors, University of Liverpool, England. 1970.

## Professional Affiliations and Awards

ISO/IEC Certificate of appreciation for development of the MPEG4 standard.
Member SPIE.

## Consulting Experience

<u>Recent Litigation Support</u>

**Technical Expert witness for Plaintiff (AVT, Audio Visual Telecommunications):** *AVT Audio Visual Telecommunications vs. University of British Columbia.*
**Subject:** Expert report and testimony on behalf of AVT in a contract dispute related to mobile video communication including failure to disclose intellectual property.
**Status:** Arbitration hearing in appeals process following adverse ruling to AVT.
**Court:** B.C. International Commercial Arbitration Centre.
**Counsel:** Arvay Finley Barristers, Victoria, BC, Canada.

1   **Technical Expert witness for Defendant (Echostar Communications Corp., and affiliates):** *Tivo Inc. vs. Echostar*
2   *Communications Corp., Echostar DBS Corp., Echostar Technologies Corp ,& EchostarLLC. No. 2-04cv01 DF.*
    **Subject:** Expert report and deposition on behalf of Echostar against assertions of infringement of a patent concerning
    personal video recorders (PVR).
3   **Status:** Pending
    **Court:** US District Court, Eastern District of Texas, Marshall Div.
4   **Counsel:** Morrison & Foerster LLP, San Francisco, CA.

5   **Publications (Partial List)**

6       C Reader, "Intraframe and Interframe Adaptive Transform Coding." SPIE Vol. 66 pp. 108-117 *Efficient
        Transmission of Pictorial Information* (1975).
7
        C Reader, W H Chen, "Local Retransmission of Compressed Imagery Data." SPIE Vol. 149 pp. 196-204,
8       *Applications of Digital Image Processing* (1978).

9       L Hubble, C Reader, "State of the Art in Image Display Systems." SPIE Vol. 199, pp. 2-8, *Advances in Display
        Technology* (1979).
10
        C Reader, W D Flanagan, "Design Considerations for Real-Time Image Processing", SPIE Vol. 180, *Real-Time
11      Signal Processing II* (1979).

12      C Reader, L Hubble, "Trends in Image Display Systems", Proc. IEEE, Vol. 69, No. 5, pp. 606-614, (1981).

13      J Adams, C Patton, C Reader, D Zamora, "Hardware for Geometric Warping", Electronic Imaging, April, 1984.

14      *Digital Image Processing Techniques (Computational Techniques),* Michael P. Ekstrom (Editor), Chapter describing
        hardware for real-time image processing and display systems, Academic Press, 1984, pp. 289-360.
15
        C Reader, et al., "A New Architecture for Real-Time Image Processing." SPIE Vol. 534, pp. 72-78, *Architectures
16      and Algorithms for Digital Image Processing II* (1985).

17      B Thacker, R Rinaldi, C Reader, "Multiwindow Displays of Text, Graphics and Images." SPIE Vol. 757 , pp.104-
        110, *Methods of Handling and Processing Imagery* (1987).
18
        Keynote opening speech at IEEE Conf. on Image Processing, 1994.
19
        C. Reader, "Cornerstone and Hierarchy of MPEG4 Syntax," INTERNATIONAL ORGANIZATION FOR
20      STANDARDIZATION ORGANISATION INTERNATIONALE DE NORMALISATION
        ISO/IEC JTC1/SC29/WG11  CODING OF MOVING PICTURES AND ASSOCIATED AUDIO, MPEG95/316 (24
21      August, 1995).

22      C Reader, "MPEG4: Coding for Content, Interactivity, and Universal Accessibility", Optical Engineering, Vol. 35,
        No. 1 pp. 104-108 (1996).
23
        C Reader, P Schirling, A Puri. MPEG Tutorial paper at IEC – NCF/Infovision '97.
24
        O Avaro, P A Chou, A Eleftheriadis, C Herpel, C Reader, J Signes, "The MPEG4 Systems and Description
25      Languages: a Way Ahead in Audio Visual Information Representation", Signal Processing: Image Communication,
        Vol. 9, No.4, pp.385-431 (1997).
26
        *MPEG Video Compression Standard,* Edited by Mitchell, Pennebaker, Fogg, Le Gall. Chapman & Hall, 1997.
27      Chapter describing the process of establishing the MPEGLA patent pool, Chapter 16, *MPEG Patents,* pp. 357-362

28

EXPERT REPORT OF                          - 26 -                              05 CV 01958
CLIFF READER, PH.D.

C. Reader, "Real-time Multimedia Software Environments," INTERNATIONAL ORGANIZATION FOR STANDARDIZATION ORGANISATION INTERNATIONALE DE NORMALISATION ISO/IEC JTC1/SC29/WG11 CODING OF MOVING PICTURES AND ASSOCIATED AUDIO, MPEG97/2187 (7 April, 1997)

C. Reader, "Proposal for Decoder QoS," INTERNATIONAL ORGANISATION FOR STANDARDISATION ORGANISATION INTERNATIONALE DE NORMALISATION ISO/IEC JTC1/SC29/WG11 CODING OF MOVING PICTURES AND AUDIO, MPEG97/2728 (October 1997)

Sehoon Son, Teruhiko Suzuki, Hiroyuki Katata, Cliff Reader, "The features of Binary shape and Texture Spatial Scalable coding for MPEG-4 version 2," INTERNATIONAL ORGANISATION FOR STANDARDISATION ORGANISATION INTERNATIONALE DE NORMALISATION ISO/IEC JTC1/SC29/WG11 CODING OF MOVING PICTURES AND AUDIO MPEG98/m3764 (Dublin, July 1998)

Chandrajit Bajaj, Eric Petajan, Euee Jang, Cliff Reader, "Integration of Error Resilient M5 Layering Scheme with M1 (Working Draft)," INTERNATIONAL ORGANISATION FOR STANDARDISATION ORGANISATION INTERNATIONALE DE NORMALISATION ISO/IEC JTC1/SC29/WG11 CODING OF MOVING PICTURES AND AUDIO MPEG98/m4172 (October 1998)

Cliff Reader, "Independent Verification of 3DMC M5 Method 2," INTERNATIONAL ORGANISATION FOR STANDARDIZATION ORGANISATION INTERNATIONALE NORMALISATION ISO/IEC JTC1/SC29/WG11 CODING OF MOVING PICTURES AND AUDIO MPEG 99/M4513 (March 1999)

Cliff Reader, JVT-D068, "History of Video Compression (Draft)," Joint Video Team (JVT) of ISO/IEC MPEG & ITU-T VCEG(ISO/IEC JTC1/SC29/WG11 and ITU-T SG16 Q.6) 4th Meeting: Klagenfurt, Austria, 22-26 July, 2002

C Reader, "Origins of the performance of H.264/AVC: an account of the development of H.263 and H.264 coding tools", SPIE Vol. 5909, pp59090W-1-8 *Applications of Digital Image Processing XXVIII* (2005).

C Reader, "AVS Intellectual Property Rights (IPR) Policy, J. Comput. Sci. & Technol., Co. 21, No. 3 (May 2006).

C Reader, "Standards, Patent Pools and Licensing Business Models.

Gao, W. et al., "AVS – The Chinese Next-Generation Video Coding Standard".

**Patents**

US6192073: Methods and apparatus for processing video data. Issued 2001.

US5845112: Method for performing dead-zone quantization in a single processor instruction. Issued 1998.

# Exhibit H

# EXHIBIT
# FILED UNDER SEAL

# Exhibit I

Exhibit I-1



1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10   QUALCOMM INCORPORATED,              05 CV 1958 B (BLM)

11            Plaintiff,                 **DECLARATION OF DR. IAIN RICHARDSON
                                         REGARDING THE EXPERT REPORT OF CLIFF**
12       v.                              **READER, PH.D.**

13   BROADCOM CORPORATION,               **DATE:    SEPTEMBER 1ST, 2006**
                                         **JUDGE:   HONORABLE RUDI M. BREWSTER**
14            Defendant.

15   BROADCOM CORPORATION,

16            Counterclaimant,

17       v.

18   QUALCOMM INCORPORATED,

19            Counterdefendant.

20

21

22

23

24

25

26

27

28                          **Exhibit I-2**

RICHARDSON DECL. RE READER REPORT              CASE NO. 05CV1958 B (BLM)

1   I, Iain Richardson, declare:

2   1.   I make this declaration of my own personal knowledge.  If called to testify as to the

3   truth of the matters stated herein, I could and would do so competently.

4   **I.   QUALIFICATIONS**

5   2.   I received a Doctor of Philosophy degree from The Robert Gordon University in

6   November 1999. The subject of my doctoral studies was compressed video communication. I

7   received a Master of Engineering degree (with merit) from Heriot-Watt University in 1990,

8   specializing in electronics and communications engineering.

9   3.   I joined GEC Marconi Avionics Systems Ltd in 1990 as a Design Engineer. From

10   1990-1993 I worked on the design of digital signal processing systems for military applications.

11   4.   In 1993 I joined The Robert Gordon University as a lecturer. Since then I have taught

12   classes at undergraduate and postgraduate level on communications engineering, signal processing

13   and digital electronic design. My research focus is video compression coding. I direct the Centre for

14   Video Communications, a group of 10 researchers focusing on optimisation of video compression

15   codecs. In 2005 I was awarded the title of Reader.

16   5.   I have published over 50 papers on my video compression coding research.  I am

17   internationally known as an authority on H.264 advanced video coding and for my work on the

18   critical analysis and implementation of new video coding standards.  I have written three books on

19   video compression, including the first book to focus on the H.264 Advanced Video Coding standard.

20   6.   From 1995-2000 I was a Director of a software company specialising in video coding

21   and communications. I have established successful research collaborations and provide consultancy

22   and research services to companies in the UK and US. I am a research degree examiner and a regular

23   reviewer for specialist journals in the field of video compression and image processing.

24   7.   I attach hereto as Exhibit A a current copy of my curriculum vitae.

25   8.   I considered information from a variety of sources in my work.  These sources

26   include documents produced in this litigation, publicly available documents, deposition testimony of

27   Qualcomm employees and third parties and discussion with Kent Baker.

28

RICHARDSON DECL. RE READER REPORT          CASE NO. 05CV1958 B (BLM)

**Exhibit I-3**

1   **II.   RESPONSE TO EXPERT REPORT OF CLIFF READER, PH.D.**

2   9.   I have been asked to assess the Expert Report of Cliff Reader, Ph.D. with respect to

3   Case No. 05 CV 01958B (BLM).

4   10.   I note that Dr. Reader draws conclusions about Qualcomm's involvement in the Joint

5   Video Team (JVT).  The JVT is a joint venture of the International Telecommunication Union's

6   (ITU) Video Coding Experts Group (VCEG) and the International Standards Organization (ISO) and

7   International Electrotechnical Commission's (IEC) Moving Pictures Expert Group (MPEG).  The

8   JVT developed the H.264/AVC standard.

9   11.   The H.264/AVC standard was first published in May 2003.[1] A subsequent version of

10  the standard was published in March 2005.[2] This subsequent version, which is the current version of

11  H.264/AVC, included corrections to the initial version and added support for new Profiles. I shall

12  refer to the current version of the standard as H.264/AVC.

13  **III.   INTELLECTUAL PROPERTY AND LICENSING POLICIES APPLYING TO THE**

14  **JVT**

15  12.   The Intellectual Property Rights (IPR) policy of the Joint Video Team (JVT) is set out

16  in the Terms of Reference for Joint Video Team (JVT) activities.[3]

17  13.   While Annex 3 of the JVT Terms of Reference includes both the goal of a Royalty

18  Free Baseline Profile (sections 3.1 and 3.4 of Annex 3) and a policy on IPR disclosures during the

19  standardization process (section 3.2 of Annex 4), it does not specify any causal relationship between

20  these two sections.

21  14.   Dr. Reader states in Para. 45 of his report that "..the JVT's objective was to establish

22  a simple royalty free baseline profile with the recognition that more advanced profiles might be

23  subject to various IPR. To that end, in the JVT's Patent Disclosure Form, a party was required to

24

---

25  [1] ITU-T Recommendation H.264 / ISO/IEC MPEG-4 Part 10, "Advanced Video Coding for Generic
    Audiovisual Services," Geneva, May 2003, attached hereto as Exhibit B.

26  [2] ITU-T Recommendation H.264 / ISO/IEC MPEG-4 Part 10, "Advanced Video Coding for Generic
    Audiovisual Services," March 2005, attached hereto as Exhibit C.

27

28  [3] Document JVTToR.pdf, "Terms of Reference for Joint Video Team (JVT) Activities," ("JVT
    TOR") available at http://www.itu.int/ITU-T/studygroups/com16/jvt/JVTToR.pdf.  See also
    BCM2_SD3 0425596 – BCM2-SD3 0425610.

RICHARDSON DECL. RE READER REPORT                                    CASE NO. 05CV1958 B(BLM)

2

**Exhibit I-4**

1   indicate either that it did not have IPR... or, if it did have IPR, to explain how it would address its

2   patent rights...." This statement is misleading in a number of ways.

3     15.    First, Dr. Reader does not clearly define the word "party" as used in Para. 45 of his

4   report. I have reviewed an uncertified draft transcript of the deposition testimony of Dr. Gary

5   Sullivan, co-chair of the JVT, taken on August 29, 2006. On page 13 of the draft transcript, Dr.

6   Sullivan states that individuals may participate in the JVT in a number of capacities, including as

7   members or representatives of members of ITU-T SG16, members of the MPEG committee,

8   qualified delegates to MPEG, formal liaison representatives, and invited experts.[4] Therefore,

9   individuals participating in the work of the JVT cannot be assumed to represent their current

10  employer.[5]

11     16.    Furthermore, the words "To that end" in Para. 45 of Dr. Reader's report imply a

12  causal connection between the JVT's stated aim to establish a Royalty Free Baseline Profile and the

13  JVT's policy on collection of IPR information. According to Section 3.2 of Annex 3 of the JVT

14  Terms of Reference,[6] the purpose of collecting IPR information during the standardization process

15  was to meet the requirements of ITU-T and ISO/IEC IPR policy.  Specifically, such information was

16  collected to avoid including technology covered by IPR that were not licensable on RAND or better

17  terms in a published standard. Thus, the JVT's IPR reporting (i.e. the JVT's collection of Patent

18  Disclosure Forms) was "for the technical working group level," and it was reported "just inside of

19  JVT."[7]

20     17.    Section 3.2 of Annex 3 of the JVT Terms of Reference states that "members/experts

21  are encouraged to disclose as soon as possible IPR information (of their own or of anyone else's

22  [sic]) associated with any standardization proposal (of their own or anyone else's). Such information

23

24

---

[4] See Deposition of Gary Sullivan, 8/29/06, 13:17-24 (uncertified).

[5] See, e.g., Deposition of Phoom Sagetong, 8/4/06, 8:1-9 ("Q:  When you attended the JVT meeting in December 2003, were you representing Qualcomm, Incorporated?  A:  No.  Basically I represent U.S.  Q:  Excuse me.  Would you please repeat that?  A:  I represent U.S.  Q:  You represented the United States National Body?  A:  Yeah."

[6] See JVT TOR at 9.

[7] See Deposition of Gary Sullivan, 8/29/06, 40:17-20 (uncertified).

1   should be provided on a best effort basis."[8]  The JVT Patent Disclosure Form also provides that it is

2   "not a legal document" and seeks information "on a best effort, good faith basis."[9]

3        18.    A JVT Patent Disclosure Form is required to be appended to any technical proposal to

4   the JVT, as described in Annex 3 of the JVT Terms of Reference. This form[10] includes the words

5   "The submitter (Patent Holder) has granted, pending, or planned patents associated with the

6   technical content of the Recommendation | Standard or Contribution." In my opinion, these words

7   would in normal practice apply to the **contribution** rather than to the standard as a whole, where this

8   form is appended to a technical proposal.[11]

9        19.    A report on JVT IPR status dated October 2002 states the following:[12] "Our terms of

10   reference states a goal of defining a "baseline profile" of the JVT standard that is royalty-free for all

11   IPR essential to implementations.  Issues surrounding this goal have been under review at the parent-

12   body level.  No statement on whether the baseline profile will be royalty free will be made herein,

13   and it has been recommended that members avoid making statements on whether or not the baseline

14   profile will be royalty free."  The JVT has taken no official position has been taken as to whether the

15   royalty-free baseline was or was not achieved in H.264/AVC.[13]

16        20.    In November 2003, the private organization MPEG-LA issued a press release

17   announcing the terms of a H.264/AVC patent license on behalf of "essential H.264/MPEG-4 AVC

18   patent and patent application holders."[14] These terms did not include the provision of a Royalty Free

19   Baseline Profile.

20

21 [8] JVT TOR at 9.

22 [9] JVT TOR at 12.

   [10] See JVT TOR, 12-15.

23 [11] This is in accord with, for example, the IPR policies of the ISO/IEC.  See "ISO/IEC Patent

24      Policy," available at:
     http://isotc.iso.org/livelink/livelink/fetch/2000/2122/3770791/customview.html?func=ll&objId=37

25      70791&objAction=browse ("The originator of a proposal for a document shall draw the attention
     of the committee to any patent rights of which the originator is aware and considers to cover any

26      item of the proposal.").

27 [12] Document JVT-E137.doc, "JVT IPR Status Report", available at http://ftp3.itu.ch/av-arch/jvt-site/
   [13] See Sullivan Deposition, 34:17-35:4.

28 [14] Press release, "MPEG LA Announces Terms of Joint H.264/MPEG-4 AVC Patent License",
     available at http://www.mpegla.com/news/n_03-11-17_avc.html

RICHARDSON DECL. RE READER REPORT                         CASE NO. 05CV1958 B(BLM)

**Exhibit I-6**

21.     It is my opinion that the JVT did not achieve its goal of creating a royalty-free baseline profile for H.264/AVC.

**IV.     QUALCOMM'S INVOLVEMENT IN H.264 STANDARDIZATION PROCESS**

22.     The involvement of companies and individuals in the H.264/AVC standardization process is recorded in the notes of JVT meetings and in archived contribution documents, publicly available at the following site: http://ftp3.itu.ch/av-arch/jvt-site/.

23.     I have searched the archives of the JVT at the above internet site. I have read the deposition testimony of Qualcomm employees Chris Irvine, Gregory Cobb, Phoom Sagetong, Albert Scott Ludwin, Viji Raveendran, Yiliang Bao, Yuriy Reznik and Yan Ye.  I have also read the deposition testimony of Dr. Gary Sullivan, chair of the JVT.

24.     In a draft meeting report dated December 2002, the JVT reports to the parent bodies of the JVT that "it considers the technical content of its output draft text Study of FCD to be complete and technically frozen."[15] It is my understanding that this means that the technical content of the Baseline, Main and Extended Profiles of the H.264/AVC standard was complete by December 2002.

25.     I have been unable to find any documentary evidence of the involvement of Qualcomm personnel in the H.264/AVC standardization process prior to September 2003, by which time the technical content of the baseline, main and extended profiles was considered to be frozen and the first issue of the H.264/AVC standard had been published. Consistent with these findings, Dr. Sullivan stated that he has no "specific memory" of Qualcomm sending representatives to the JVT from its inception in 2001.[16]

26.     The involvement of Qualcomm employees in JVT activities from September 2003 to December 2005 appears to be minimal, with no technical contribution documents submitted by any Qualcomm employee. This may be contrasted with companies that participated more extensively, such as Nokia or Matsushita. At the Fairfax meeting of the JVT in May 2002, where 168

---

[15] Document JVT-F001.doc, "Draft Report of the 6th JVT Meeting, Awaji Island, Japan, 5-13 December 2002", available at http://ftp3.itu.ch/av-arch/jvt-site/

[16] Sullivan Deposition, 75:4-13.

RICHARDSON DECL. RE READER REPORT                                       CASE NO. 05CV1958 B(BLM)

1  contribution documents were submitted in total, Nokia submitted 12 contribution documents and

2  Matsushita submitted 6 contribution documents.[17] Matsushita and Nokia both appeared on the list of

3  "essential" patent holders claimed by MPEG-LA in November 2003, shortly after the publication of

4  the initial version of the H.264/AVC standard.

5       27.    In my opinion, based on my review of the JVT archives and the deposition testimony

6  noted above, Qualcomm had no significant involvement with the development of the H.264/AVC

7  standard.

8       28.    I am aware that Qualcomm employees have made a number of technology proposals

9  to the JVT since January 2006. In my opinion, all of these proposals relate to a new standard under

10  development by the JVT, commonly known as Scalable Video Coding (SVC).  This conclusion is

11  supported by extensive deposition testimony.[18]

12       29.    Scalable Video Coding (SVC) is described in Annex F of a proposed new edition of

13  the H.264/AVC standard, currently in draft form.[19] Annex F of the proposed draft standard describes

14  SVC as follows:

15      "This Annex specifies SVC. SVC is an extension of the technical specification in clauses 1

16      through 9 and Annexes B through E. A decoder conforming to a profile including

17      specifications of this Annex processes bitstreams according to the specification in this

18      Annex. Parts of the decoding process in this Annex are specified by invoking processes in

19      clauses 1 through 9 and Annexes B through E."

20  Clauses 1 through 9 and Annexes B through E of the draft standard describe the syntax and decoding

21  process set out in the current published version of the H.264/AVC standard. It is my understanding,

22  therefore, that SVC is a new technology that incorporates elements of the current published version

23  of the H.264/AVC standard.  SVC does not alter the substance of the current published version of

24

25

26

27

28

---

[17] Document JVT-C001d3.doc, "Draft report of Fairfax meeting", JVT, May 2002, available at
http://ftp3.itu.ch/av-arch/jvt-site/

[18] See, e.g., Deposition of Yiliang Bao, 8/11/06, 25:1-4, 32:8-15; Deposition of Viji Raveendran,
7/18/06, 55:22-56:7; Deposition of Yan Ye, 7/20/06 10:4-9, 38:25-40:2, 41:9-13; 61:19-22.

[19] Document JVT-S201.doc, "Joint Draft 6", JVT, Geneva, April 2006, available at
http://ftp3.itu.ch/av-arch/jvt-site/

RICHARDSON DECL. RE READER REPORT        6        CASE NO. 05CV1958 B(BLM)

Exhibit I-8

1    the H.264/AVC standard.

2        30.    I am aware that each of the technology proposals made by Qualcomm employees to

3    the JVT in 2006 included a standard JVT Patent Disclosure Form. In my opinion, the Patent

4    Disclosure Forms included with these proposals relate directly to the proposals themselves, which

5    are only relevant to the new SVC technology and are not relevant to the existing published

6    H.264/AVC standard.

7    **V.    QUALCOMM'S PATENT AND LICENSING DECLARATIONS**

8        31.    I understand that, on the JVT patent disclosure forms appended to his SVC

9    contributions, Yiliang Bao checked box 2.2.1, which indicates that the submitter of the disclosure

10   form had patents potentially associated with the technical content of the submission, and that the

11   patent holder agreed to grant a "royalty free" license on the condition that other patent holders do the

12   same. I also understand that this was in error, and that Mr. Bao only checked box 2.2.1 because he

13   was copying earlier forms.[20] Mr. Bao was never authorized by his employer to check box 2.2.1,[21]

14   and he did not ask for clarification of, or approval for, checking that box. I also understand, based

15   on my discussion with Mr. Kent Baker of Qualcomm, that these submissions will be amended so as

16   to check box 2.2, which provides that the patent holder "is prepared to grant – on the basis of

17   reciprocity . . . – a license to an unrestricted number of applicants on a worldwide, non-

18   discriminatory basis and on reasonable terms and conditions to manufacture, use and/or sell

19   implementations of the" standard, and that "[s]uch negotiations are left to the parties concerned and

20   are performed outside the ITU | ISO/IEC." Based on these facts, it is my opinion that the checking

21   of box 2.2.1 is of no significance with respect to Qualcomm's SVC-related patent disclosures.

22       32.    JVT participants are expected to make patent disclosures on a best efforts basis.[22]

23   JVT participants are generally engineers, not attorneys, and JVT participants commonly submit

24

25   [20] See Bao Deposition at 78:5-10 ("Q: Why did you place an "X" in the box next to Item 2.2.1? A:
     I think I just did it like that. Or probably it was -- I saw someone check the box in the previous
26   contribution, so I just did it the same.").

27   [21] See Bao Deposition at 52:1-6 ("Q: Did anyone communicate to you that you should place a
     checkmark next to Item 2.2.1? A: Do you mean whether I was instructed to check 2.2.1? Q:
28   Correct. A: No.").

     [22] See JVT TOR at 12.

RICHARDSON DECL. RE READER REPORT                              CASE NO. 05CV1958 B(BLM)

388190_3

**Exhibit I-9**

1   patent disclosure forms along with their technical submissions without receiving approval from their

2   employer.[23]

3       33.     I also understand that Qualcomm submitted two Patent Statement and Licensing

4   Declarations to the ITU-T, ISO and IEC in April 2006, stating that it "believes that it holds granted

5   patents and/or pending applications, the use of which would be required to implement

6   [Recommendation H.264]" and that Qualcomm did not list specific patents in this declaration.

7       34.     In my opinion, it is normal or established practice for a company to declare that it

8   believes it holds patents, the use of which would be required to implement an ITU-T, ISO or IEC

9   Recommendation or Standard, without listing specific patents.

10       35.     For example, Matsushita Electric Industrial Co. Ltd. made a declaration on October 8,

11   2002 to the ITU-T with respect to ITU-T Recommendation H.264, citing provision 2.2 of the ITU-T

12   Patent Policy, namely that "the patent holder is not prepared to waive his rights but would be willing

13   to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and

14   conditions." No specific patents are listed in this declaration.[24]

15       36.     In my opinion, it is normal or established practice for a company to identify and

16   disclose patents that may be necessary for implementation of a standard such as H.264/AVC, after

17   the date of first publication of the standard.

18       37.     For example, a list of patents covered by the MPEG-LA patent portfolio license dated

19   November 2005 cites 3 patents held by Matsushita Electric Industrial Co. Ltd which were claimed to

20   be essential to the H.264/AVC standard.[25] A revised version of this list, dated August 2006, cites a

21   total of 11 patents held by Matsushita Electric Industrial Co. Ltd.[26] These 11 patents include the 3

22   patents listed in the earlier version of the document together with 8 newly-cited patents. US patent

23   6,608,939 is present in the 2006 document but not in the 2005 document. This patent is claimed to

24   

25   

---

[23] See Sullivan Deposition, 44:4-18

[24] Document www.itu.int/itudoc/itu-t/**patents**/database/pat-list.pdf

[25] Document titled "AVC Attachment 1", dated November 1st 2005, downloaded from www.mpegla.com in December 2005, attached hereto as Exhibit D.

[26] Document titled "AVC Attachment 1", dated August 1st 2006, downloaded from www.mpegla.com in August 2006, attached hereto as Exhibit E.

RICHARDSON DECL. RE READER REPORT          CASE NO. 05CV1958 B(BLM)

1  be "essential" to a number of sections of the H.264/AVC standard including sections that apply to

2  the Baseline and Main Profiles of H.264/AVC.[27]

3      38.      Therefore, in my opinion, Qualcomm's actions in connection with its Patent

4  Statement and Licensing Declarations regarding its patents as they relate to H.264/AVC, including

5  the timing of the making of such declarations and the absence of the listing of specific patents, was

6  within the normal or established practice for such declarations.

7  **VI.    CONCLUDING REMARKS**

8      39.      It was not possible for the JVT to guarantee that all potentially relevant IPR be

9  identified before the H.264/AVC standard was published.  To best facilitate IPR disclosure, the JVT

10  adopted a best efforts, good faith policy that "was not necessarily considered legally binding,"[28] and

11  that encouraged participants to disclose all IPR of which they were aware without obtaining their

12  employer's approval.  The JVT's IPR policy was not directly due to the unsuccessful goal of

13  achieving a royalty-free baseline.

14      40.      I have found no evidence of Qualcomm involvement in the JVT prior to the first

15  publication of H.264/AVC.  Indeed, Qualcomm was not significantly involved in the JVT until 2006,

16  and then its involvement has been limited to the SVC standardization project, not the H.264/AVC

17  standard.  Therefore, it is my opinion that Qualcomm did not meaningfully participate in the

18  development of the H.264/AVC standard, and Qualcomm did not violate any of JVT's or ITU-T's

19  rules or expectations regarding the disclosure of intellectual property rights.  Dr. Reader's statement

20  in paragraph 55 of his report that "Qualcomm, in spite of its involvement in the development of the

21  standard as early as 2003, failed to make a disclosure until long after the standard had been adopted"

22  is of no significance and contains an incorrect assumption.

23      41.      I understand that discovery is ongoing in this case. I ask that the Court allow me to

24  adjust or supplement my Report in the light of additional facts or documents that may be brought to

25  my attention after submission of this Report.

26

27  ―――――――――

[27] Document titled "AVC Patent Portfolio License Cross-Reference Chart", dated 1st August 2006,
     downloaded from www.mpegla.com in August 2006, attached hereto as Exhibit F.

28  [28] Sullivan Deposition at 41:23-24.

RICHARDSON DECL. RE READER REPORT                                   CASE NO. 05CV1958 B(BLM)

388190_3

**Exhibit I-11**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Signed this 1st day of September, 2006.

Iain Richardson

_____

Iain Richardson

# Exhibit J

# EXHIBIT
# FILED UNDER SEAL

# Exhibit K

**From:** Mammen, Chris E. [mailto:CMammen@daycasebeer.com]
**Sent:** Thursday, January 04, 2007 8:34 PM
**To:** Saxton, Kate; Tompros, Louis
**Cc:** Folmer, Anna
**Subject:** 1958: Garudadri deposition CANCELLED

Kate and Louis,

As might have been predicted from the scope of our proffer of Mr. Garudadri's proposed trial testimony, we have determined that it will not be necessary to call Mr. Garudadri at trial.  We are therefore withdrawing him from our witness list, and will not be tendering him for deposition tomorrow.

Please let me know if you have any questions.

Best,

Chris

```
*****************************************************************
Confidentiality Notice
This message is being sent by or on behalf of a lawyer.  It is
intended exclusively for the individual or entity to which it is
addressed.  This communication may contain information that
is proprietary, privileged or confidential or otherwise legally
exempt from disclosure.  If you are not the named addressee,
you are not authorized to read, print, retain, copy or
disseminate this message or any part of it.  If you have
received this message in error, please notify the sender
immediately by email and delete all copies of the message.
*****************************************************************
```

Exhibit K-2

# Exhibit L

Exhibit L-1



```
 1                  UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF CALIFORNIA

 3

 4  QUALCOMM, INC.,              ) Case No. 05CV1958-B(BLM)
                                 )
 5             Plaintiff,        ) San Diego, California
                                 )
 6  vs.                          ) Thursday,
                                 ) January 18, 2007
 7  BROADCOM CORPORATION,        ) 9:00 a.m.
                                 )
 8             Defendant.        )
    _____) VOLUME VII
 9

10                     TRANSCRIPT OF TRIAL
             BEFORE THE HONORABLE RUDI M. BREWSTER
11           UNITED STATES DISTRICT JUDGE, and a jury

12  APPEARANCES:

13  For the Plaintiff:          JAMES R. BATCHELDER, ESQ.
                                CRAIG CASEBEER, ESQ.
14                              LEE PATCH, ESQ.
                                BRADLEY A. WAUGH, ESQ.
15                              ADAM A. BIER, ESQ.
                                BRADLEY A. WAUGH, ESQ.
16                              JAIDEEP VENKATESAN, ESQ.
                                Day Casebeer Madrid &
17                                Batchelder, LLP
                                20300 Stevens Creek Boulevard
18                              Suite 400
                                Cupertino, California 95014
19                              (408) 873-0110

20
                                STANLEY YOUNG, ESQ.
21                              Heller, Ehrman, LLP
                                275 Middlefield Road
22                              Menlo Park, California  94025
                                (650) 324-7000
23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
```

**Exhibit L-2**                                Echo Reporting, Inc.

VII-92

1 and through ad hoc group, each met between sessions.

2          MR. YOUNG:  Just to clarify --

3          MR. REGAN:  Excuse me.  And the way in which they

4 dealt with one another was by e-mail distribution list.

5          THE COURT:  Yeah.  That breaks it down.

6          MR. YOUNG:  But there's no evidence that any e-

7 mail was actually sent to this list.  This is just a list of

8 e-mail --

9          MR. REGAN:  No, your Honor.

10          MR. YOUNG:  -- addresses.  There's no evidence of

11 anything being sent.  But as to this particular document,

12 the particular question before your Honor right now is

13 whether this document comes into evidence.  Mr. Regan is

14 correct, Mr. Sullivan testified about general categories of

15 documents, but not about this one.  There is no foundation

16 as to this one.  And the witness's tape they're about to

17 play specifically says that he has never seen this document

18 before and does not know what it is.  So this document

19 should not come into evidence.

20          THE COURT:  Who said that, the guy with the e-mail

21 address?

22          MR. YOUNG:  No.  Mr. Ludwin, who is going to be

23 the next video witness put on by --

24          THE COURT:  Who is he?

25          MR. REGAN:  Who is a 30(b)(6) witness for Qualcomm

# Exhibit M



```
 1                UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3

 4 QUALCOMM, INC.,              ) Case No. 05CV1958-B(BLM)
                                )
 5          Plaintiff,          ) San Diego, California
                                )
 6 vs.                          ) Wednesday,
                                ) January 24, 2007
 7 BROADCOM CORPORATION,        ) 4:30 p.m.
                                )
 8          Defendant.          )
   _____)

 9

10            TRANSCRIPT OF IN-CHAMBERS PROCEEDINGS
           BEFORE THE HONORABLE RUDI M. BREWSTER
11              UNITED STATES DISTRICT JUDGE

12 APPEARANCES:

13 For the Plaintiff:          CRAIG CASEBEER, ESQ.
                               CHRISTIAN E. MAMMEN, ESQ.
14                             RUCHIKA AGRAWAL, ESQ.
                               Day Casebeer Madrid &
15                                Batchelder, LLP
                               20300 Stevens Creek Boulevard
16                             Suite 400
                               Cupertino, California 95014
17                             (408) 873-0110

18

                               STANLEY YOUNG, ESQ.
19                             Heller, Ehrman, LLP
                               275 Middlefield Road
20                             Menlo Park, California  94025
                               (650) 324-7000

21

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.
```

Echo Reporting, Inc.

**Exhibit M-2**

46

1   these folks overseas, if you put that on this chip and run

2   it, all right, and sell it to a customer and the customer

3   operates it, all right, that would be, under their theory,

4   an infringing use of the --

5           THE COURT:  Not because of the software, but

6   because of the chip.

7           MR. REGAN:  Precisely.

8           MR. MAMMEN:  That's not right, your Honor.

9           MR. REGAN:  And the current status --

10          THE COURT:  Huh?

11          MR. REGAN:  -- of things --

12          MR. MAMMEN:  That's not completely right.

13          MR. REGAN:  And the current status of things is we

14  have the software over here and we've got the chip over

15  here, and the chips are for sale in cell phones.

16          THE COURT:  Okay.

17          MR. REGAN:  Broadband -- Broadcom has tested this

18  third-party software with these chips, okay, but it's not

19  offering them together for sale, which is why we think the

20  2152 and 23 -- 2133 shouldn't be in this case at all.

21          What they're saying is, because you used the

22  software to see if your chips would work with it, that

23  that's enough to constitute an infringing use.

24          THE COURT:  Of the chip.

25          MR. MAMMEN:  Of the software.  No.

Echo Reporting, Inc.

**Exhibit M-3**

53

1  evidence that we are selling them.  All right.

2          MR. MAMMEN:  They're offering for sale.

3          MR. REGAN:  But I mean, nobody is --

4          THE COURT:  Okay.  But you're using.  If you put

5  them together, that's where -- if you're using it in

6  the shop to test it, that just seems to me like that's just

7  a one-time deal.  Once you test it and it runs, that's the

8  last of your testing.  From then on, you're going to market

9  them with or without the software.  And if you market it

10 with the software, that's selling.  But using -- I don't

11 know -- I don't understanding using more than once to test.

12          MR. MAMMEN:  Even one use is an act of

13 infringement.

14          THE COURT:  So what's the penalty for that?

15 What's the royalty for testing it one time?  What's that?

16          MR. REGAN:  This is why -- this is why I -- this

17 is really a JMOL argument that we're having here.  All

18 right.  And there are two pieces of it.  All right.  And the

19 Court -- you know, where the Court is taking JMOL under

20 advisement.  So we don't start rulings on this tonight.

21          But one issue is whether the use of this software

22 in the design phase to determine the compatibility and the

23 knitting together and all the things that have to go with

24 you put software with a semi-conductor, whether that can

25 constitute an act of infringement under what I would view to

# Exhibit N



```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA


 3

 4  QUALCOMM, INC.,              ) Case No. 05CV1958-B(BLM)
                                 )
 5          Plaintiff,           ) San Diego, California
                                 )
 6  vs.                          ) Thursday,
                                 ) January 25, 2007
 7  BROADCOM CORPORATION,        ) 9:00 a.m.
                                 )
 8          Defendant.           )
                                 ) VOLUME IX
 9  _____

10                  TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE RUDI M. BREWSTER
11         UNITED STATES DISTRICT JUDGE, and a jury

12  APPEARANCES:

13  For the Plaintiff:        JAMES R. BATCHELDER, ESQ.
                              CRAIG CASEBEER, ESQ.
14                            LEE PATCH, ESQ.
                              BRADLEY A. WAUGH, ESQ.
15                            ADAM A. BIER, ESQ.
                              CHRISTIAN E. MAMMEN, ESQ.
16                            Day Casebeer Madrid &
                                Batchelder, LLP
17                            20300 Stevens Creek Boulevard
                              Suite 400
18                            Cupertino, California 95014
                              (408) 873-0110
19

20                            STANLEY YOUNG, ESQ.
                              Heller Ehrman, LLP
21                            275 Middlefield Road
                              Menlo Park, California  94025
22                            (650) 324-7000

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
```

Exhibit N-2

Echo Reporting, Inc.

IX-125

1  this disclosure saying "We'll license our patents."  That

2  was before the chair of the JVT.

3        Now, Broadcom's counsel pointed to the fact that

4  Viji Raveendran received E-mails, 25 of them.  She didn't

5  send any of them.  She didn't participate.  She didn't

6  attend a meeting.  She didn't vote.  Somebody sent her E-

7  mails.  And she said yesterday "How did your E-mail get on

8  the list?  Did you put it on?"  "No.  I know a guy who I

9  worked with on an MPEG committee, had nothing to do with

10 JVT, who I worked with and respected my credentials."

11       She was good at what she did, and she believes

12 that her name was volunteered by him, which apparently

13 happens in standards body.  So her name was put on a list on

14 an E-mail reflector as they call it, just, you know, a group

15 address, and on that address E-mails are blasted out, and

16 they accumulated in her E-mail account.

17       Is that active participation that triggers some

18 obligation to disclose IP?  No.  There's no evidence that

19 Qualcomm participated in JVT prior to this being frozen or

20 prior to the standard being approved and published.

21       Now, another version of the standard was published

22 later.  But as Doctor Richardson explained yesterday, that

23 was a typo cleanup, had nothing to do with substance, and it

24 had nothing to do with the transforms that are at issue in

25 this case.  So don't be misled by that either.

# Exhibit O

**SignOnSanDiego.com**
THE SAN DIEGO UNION-TRIBUNE

 PRINTTHIS

# Qualcomm loses its patent-rights case

### Broadcom sees win for 'H.264' industry

**By Kathryn Balint and David Washburn**
UNION-TRIBUNE STAFF WRITERS

**January 27, 2007**

After just six hours of deliberating, a federal jury found yesterday that chip maker Broadcom did not infringe on two patents held by San Diego-based Qualcomm and determined in two advisory votes that Qualcomm had withheld key information from a standards-making body and the patent office.

Qualcomm, which accused Irvine-based Broadcom of infringing on two video-compression patents, was seeking $8.3 million in damages for one of the patents. It did not seek any damages for the other patent.



The San Diego jury's unanimous decision is a win for manufacturers that comply with the same video-compression standard as that used by Broadcom.

Qualcomm had argued that one of the two patents at issue was incorporated into the H.264 industry standard used in millions of consumer devices, such as high-definition DVD players and Apple video iPods.

Union-Tribune file photo
San Diego-based Qualcomm lost a round in federal court yesterday against Southern California chip-making rival Broadcom.

"We're grateful for the jury's verdict – a resounding victory for Broadcom," said David Rosmann, vice president of intellectual property litigation for the company. "This is a victory not just for Broadcom, but for the entire H.264 industry."

Qualcomm had little to lose in the case but everything to win.

If it had prevailed in its patent-infringement claims, it potentially could have asked courts to ban products that used the industry standard or sought royalty payments from their manufacturers.

Yesterday's decision does not affect Qualcomm's core business of licensing cell phone technology.

A loss for Broadcom, however, could have resulted in the ban of some of its chips and could have cost the company possibly hundreds of millions of dollars in future royalty payments.

The U.S. District Court case was just one of seven lawsuits between the two companies scheduled for trial this year.

**Exhibit O-2**

SignOnSanDiego.com > News > Business -- Qualcomm loses its patent-rights case          Page 2 of 3

"There certainly was a significant upside potential for us, but it was all upside, no downside," said Qualcomm executive vice president and general counsel Lou Lupin. "For Broadcom, it was all downside, no upside. It probably won't have any impact on us one way or the other. It's just the latest round in a series of battles."

The speed with which the nine-member jury returned the verdict was stunning, particularly for a case that involved more than 40 hours of testimony and evidence akin to a graduate-level college course on video compression.

Jury foreman David Ingraham, a Carmel Valley resident and retired vice president of finance and planning for McGraw-Hill, said the quick verdict came about because each jury member entered deliberations with a strong understanding of the evidence.

"I'm not going to say we were all electrical engineers, because we aren't," Ingraham said. "But people listened carefully to the testimony and took good notes – and it came down overwhelmingly on one side."

The jury did find that the two Qualcomm patents in question in the case were valid, a loss to Broadcom, which had argued otherwise.

One of the biggest blows to Qualcomm came in the form of advisory votes, sought by the judge, in which the jury questioned Qualcomm's integrity.

In one advisory vote, the jury found "clear and convincing evidence" that Qualcomm had withheld previous scientific studies on video-compression from the U.S. Patent and Trademark Office when applying for one of the patents in question. The jury's advisory vote said that the patent is "unenforceable due to Qualcomm's inequitable conduct in the patent application process."

In the second advisory vote, the jury found that Qualcomm had waived its right to enforce both of the patents in the case, because it had failed to inform a standards-making group that it held patents it thought were key to the H.264 standard that was in development. The standard was developed in 2003 by a group of companies to provide better-quality high-definition video.

The votes on those two issues will be taken under advisement by U.S. District Judge Rudi Brewster, who is presiding over the case in federal court in downtown San Diego and who will ultimately decide those questions.

Qualcomm's Lupin said the company was disappointed with the verdict, particularly in the advisory votes that Qualcomm had not been forthright with the patent office and the standards-making body.

"We feel very strongly that our conduct in front of the standards body and the patent body is always candid and in compliance with the rules," he said.

Lupin said it's too early to say if Qualcomm will appeal yesterday's decision, because Brewster still must rule on the two advisory votes.

For Broadcom, the decision could give the maker of semiconductors more clout in the larger feud between the two chip-making giants.

**Exhibit O-3**

SignOnSanDiego.com > News > Business -- Qualcomm loses its patent-rights case          Page 3 of 3

Michael Cohen, director of research for San Diego-based Pacific American Securities, said he believed after closing arguments that Qualcomm's patents had been infringed.

"This should be looked at that Broadcom did a good job of defending itself from Qualcomm's retaliation to Broadcom's initial attacks," Cohen said. "I think it's very notable how fast the jury came back. It's highly unusual for a jury to come back on something this complicated on the same day they started deliberating. I think it means their minds largely were made up going in."

In the long run, he said, it gives Qualcomm less leverage in its ongoing battle with Broadcom over how much Broadcom should pay to license Qualcomm's wireless technology that is key to cell phones.

Broadcom attorney Bob Brewer said he was very optimistic when the jury returned a verdict on the same day deliberations began.

Juror Aimee Lee Cheek said she expected days of deliberation, given the complicated evidence and obscure technology involved.

"I hope the attorneys don't feel that we didn't give them due consideration," said the 70-year-old historian. "It did seem very fast – but we know it is a very important issue and took it very seriously."

Cheek, who lives in the College Area, said none of the jurors walked into the jury room with their minds made up, but came to a quick consensus after reading their notes to one another and following the jury foreman's lead through the jury instructions.

Financial analyst Steve Re said he thought Qualcomm had proven its case, but that the verdict didn't surprise him.

"When I left, I had the sense that the rapport that (Broadcom lead attorney William) Lee had with the jury was just a much, much stronger one than (Qualcomm lead attorney James) Batchelder's," said Re, president of Quality Growth Management in Rancho Santa Fe.

---

▪Kathryn Balint: (619) 293-2848; **kathryn.balint@uniontrib.com**

**Find this article at:**
http://www.signonsandiego.com/news/business/20070127-9999-1b27verdict.html

☐ Check the box to include the list of links referenced in the article.

Exhibit O-4

# Exhibit P

**WILMERHALE**

February 7, 2007

Louis W. Tompros

+1 617 526 6348 (t)
+1 617 526 5000 (f)
louis.tompros@wilmerhale.com

**By Facsimile and First Class Mail**

Lee Patch, Esq.
Day Casebeer Madrid & Batchelder LLP
20300 Stevens Creek Blvd.
Suite 400
Cupertino, CA  95014

Re: *Qualcomm, Inc. v. Broadcom Corporation*, 05-CV-1958 B (BLM)

Dear Lee:

I write to follow up on our telephone conversation of February 1, 2007, concerning the twenty-one emails produced to Broadcom on January 24, 2007, during the last day of testimony at trial. Qualcomm did not notify Broadcom of these e-mails until  their existence was disclosed during Ms. Raveendran's cross-examination on January 24, 2007.

During our discussions, you stated that Qualcomm believes that there was no Broadcom request for production to which the twenty-one emails are responsive.  You also asked that Broadcom identify the requests for production that it believes call for the twenty-one emails from the JVT email reflector to Ms. Raveendran.  During our conversation, Ms. Saxton identified one such request:

- **Request for Production No. 93 (issued July 14, 2006):** All documents referring to or evidencing any participation by Qualcomm in the proceedings of the JVT, the ISO, the IEC, and/or the ITU-T.

In addition to the request identified by Ms. Saxton, Broadcom  believes that at least the following Broadcom requests for production called for the withheld twenty-one emails:

- **Request for Production No. 49 (issued January 23, 2006):** All documents given to or received from a standards setting body or group that concern any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent, including without limitation communications, proposals, presentations, agreements, commitments, or contracts to or from such bodies.

- **Request for Production No. 50 (issued January 23, 2006):** All documents concerning any Qualcomm membership, participation, interaction, and/or involvement in setting any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent.  This request also covers all proposed or potential standards, whether or not actually adopted.

Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, Massachusetts 02109

Baltimore    Beijing    Berlin    Boston    Brussels    London    New York    Oxford    Palo Alto    Waltham    Washington

Exhibit P-2

WILMERHALE

Lee Patch, Esq.
February 7, 2007
Page 2

- **Request for Production No. 81** (issued January 23, 2006):  To the extent not produced in response to other Broadcom document requests, all documents constituting, concerning, or relating to any Topic noticed in a Rule 30(b)(6) deposition notice. [Topic No. 11 of Broadcom's 30(b)(6) Notice No. 1 (May 23, 2006), is:  Qualcomm's knowledge regarding the development and promulgation of the H.264 standard, and any actions taken [by] Qualcomm or any of its principals, employees, or representatives as a result of such knowledge.]

- **Request for Production No. 89** (issued July 14, 2006):  All documents constituting, referring to, or evidencing any submission by Qualcomm to the JVT, the ISO, the IEC, and/or the ITU-T.

During our conversation, you also explained how the twenty-one emails came into the possession of Qualcomm's legal team.  As I understood your explanation, on January 14, 2007, attorneys for Qualcomm learned of an archive of emails belonging to Viji Raveendran.  Ms. Raveendran had maintained this email archive apart from Qualcomm's main email system.

On January 14, 2007, Qualcomm attorneys ran a search through this archive for emails from the address "AVC_CE," which is the address for one of the JVT email reflectors.  That search resulted in the identification of the twenty-one emails that Qualcomm produced on January 24, 2007.  Mr. Young did not know about this search when he represented to the Court, on January 18, 2007, that there was no evidence of any email from the JVT to Ms. Raveendran, a representation that has since been withdrawn.  You did not identify which or how many of the other attorneys representing Qualcomm knew of the twenty-one emails prior to Ms. Raveendran's testimony on January 24, 2007.

We understand from your statements that no other searches, either manual or by keyword, have been performed on Ms. Raveendran's archive, and no other emails from Ms. Raveendran's archive have been reviewed or produced in connection with this litigation.  Qualcomm's attorneys have not asked the other Qualcomm employees connected to this litigation, including but not limited to those who testified at the trial or by deposition, whether they, like Ms. Raveendran, maintain email archives.

Please let me know if there is any additional relevant information that I have left out, or if any part of my description of events is inaccurate.

USIDOCS 6056412v1

WILMERHALE

Lee Patch, Esq.
February 7, 2007
Page 3

Very truly yours,

Louis W. Tompros

cc:  Stanley Young, Esq.

**Exhibit P-4**

# Exhibit Q

DAY CASEBEER
MADRID & BATCHELDER LLP

20300 Stevens Creek Blvd., Suite 400                                          Adam Arthur Bier
Cupertino, CA  95014                                                         (408) 342-4554
Telephone: (408) 873-0110                                           abier@daycasebeer.com
Facsimile:  (408) 873-0220

February 16, 2007

VIA FACSIMILE & U.S. MAIL

Louis Tompros, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109

**RE: QUALCOMM v. Broadcom, S.D. Cal. Case No. 05-cv-1958 B (BLM)**

Dear Louis:

I write in response to your letter to Lee Patch of February 7, 2007 concerning the twenty-one emails received by Viji Raveendran from the avc_ce@ient.rwth-aachen.de email reflector ("avc_ce reflector") that QUALCOMM discovered and produced during trial.  As explained earlier in our meet and confer, QUALCOMM voluntarily produced the emails during trial in the interest of expeditiousness. We continue to believe that QUALCOMM performed a reasonable search of QUALCOMM's documents in response to Broadcom's Requests for Production and that the twenty-one unsolicited emails received by Ms. Raveendran from individuals on the avc_ce reflector are not responsive to any valid discovery obligation or commitment.

QUALCOMM disputes your contentions that it had a duty to produce the emails pursuant to the requests for production that you identified in your February 7 letter.  None of the emails in question was authored by or included content from or relating to Ms. Raveendran or any other QUALCOMM employee.  None of the emails was addressed specifically to Ms. Raveendran or any other QUALCOMM employee.  None of the emails was authored by a JVT, MPEG, ISO/IEC or ITU-T representative, and since the source of the emails appears to be a German university (avc_ce@ient.rwth-aachen.de), there is no evidence of any affiliation with those standards setting organizations.  None of the emails relates to QUALCOMM's patents-in-suit or QUALCOMM participation in setting the H.264 standard.

As a preliminary matter, in its written objections and responses dated February 24, 2006 (Responses to First Set of Requests for Production) and August 16, 2006 (Responses to Second Set of Requests for Production), QUALCOMM properly objected to each request for production enumerated in your letter, and either refused to produce any documents based on those objections or agreed to produce

02/16/07   16:02 FAX 408 873 0220          DAY CASEBEER                                ☑003/005

DAY CASEBEER
MADRID & BATCHELDER LLP

Louis Tompros, Esq.
February 16, 2007
Page 2

a reasonable, narrowed class of documents in response to such requests. Having received QUALCOMM's objections, Broadcom never moved to compel or otherwise challenged QUALCOMM's written responses to these requests. Accordingly, pursuant to the 30-day rule for discovery motions, set forth in paragraph 6 of the Court's February 17, 2006 Case Management Conference Order Regulating Discovery and Other Pretrial Proceedings, Broadcom's time to challenge QUALCOMM's timely-served discovery responses and the scope of QUALCOMM's commitment to produce documents expired long ago. The proper analysis, therefore, is whether the emails are within the scope of any of the categories of documents which QUALCOMM agreed to produce. They are not. As set forth below, incorporating by reference the objections previously stated,[1] the twenty-one emails are plainly outside the scope of QUALCOMM's discovery obligations.

- Request for Production No. 49. QUALCOMM agreed to produce "non-privileged documents that were given to or received from standards-setting bodies in connection with the ISO/IEC MPEG-4 Part 10 standard, and which relate to the QUALCOMM Patents-in-Suit." The twenty-one emails fall outside the scope of this category for numerous reasons. First, they, unlike technical proposals, policy documents, or meeting notes, were neither given to nor received from a standards-setting body, but were instead simply a discussion thread among individuals who may or may not have been participants in such a body. More importantly, none of the emails relates to either of the two QUALCOMM Patents-in-Suit. Even under the request as propounded by Broadcom, the request covers only documents that pertain to the '104 or '767 Patents ("QUALCOMM Patents" in the request is a defined term, limited to those two patents). Because the emails make no mention of either of the two patents, and indeed contain no discussion of any patents or intellectual property rights at all, let alone with respect to QUALCOMM's patents, the emails cannot reasonably be said to "pertain in any way" to the QUALCOMM Patents-in-Suit and therefore cannot be responsive to this request.

- Request for Production No. 50. QUALCOMM agreed to produce "non-privileged documents that were given to or received from standards-setting body responsible for the ISO/IEC MPEG-4 Part 10 standard, and which concern any QUALCOMM participation in setting the ISO/IEC MPEG-4 Part 10 standard. As explained above, the emails were not received from a standards-setting body. We understand that Broadcom may contend that Ms. Raveendran's mere passive receipt of unsolicited emails on this mass-email distribution

---

[1] QUALCOMM Incorporated's Response to Broadcom Corporation's First Set of Requests for Production of Documents and Things (Nos. 1-88), dated February 24, 2006 and QUALCOMM Incorporated's Response to Broadcom Corporation's Second Set of Requests for Production of Documents and Things (Nos. 89-115), dated August 16, 2006.

DAY CASEBEER
MADRID & BATCHELDER LLP

Louis Tompros, Esq.
February 16, 2007
Page 3

list constitutes "participation." We strongly disagree. A rule that a person is deemed to "participate" in every organization that sends her unsolicited email would lead to overbroad, untenable and absurd results. They also cannot be said to concern any QUALCOMM participation in setting the H.264 standard, since they were neither written by or about QUALCOMM (and indeed make no mention of QUALCOMM or its employees whatsoever except in computer-generated email headers), and do not concern activities constituting the "setting" of the standard such as voting or submission of technical proposals for inclusion in the standard. At most, the emails relate to an evaluation of the performance of the standard in comparison to the MPEG-2 and MPEG-4 standards.

- Request for Production No. 81. QUALCOMM refused to produce any documents in response to this improper request, which sought, in violation of Rule 34's requirement that requested documents be described with reasonable particularity, to incorporate by reference the topics of Broadcom's Rule 30(b)(6) deposition notices . Broadcom had the right during discovery to propound specific requests for production relating to the topics of noticed 30(b)(6) depositions, either pursuant to Rule 30(b)(5) or pursuant to Rule 34. Indeed, a number of the requests in Broadcom's Second Set of Requests for Production, which issued after Broadcom's 30(b)(6) Notice No. 5 [H.264 Participation], appear to have been made for this purpose. Broadcom cannot now, after having declined to seek to compel a response to this request during discovery, invoke the request as a "catch-all" for all documents it thinks may in some abstract and distant way relate to the testimony of QUALCOMM's 30(b)(6) witnesses.

- Request for Production No. 89. Broadcom's request seeks "all documents constituting, referring to, or evidencing any submission by QUALCOMM to the JVT, the ISO, the IEC, and/or the ITU-T." Nothing in the twenty-one emails remotely falls within this subject. Moreover, QUALCOMM's agreement to produce (never contested by Broadcom) is narrower: "non-privileged...documents constituting any submission by QUALCOMM to the JVT, if any, which can be located after a reasonable search." None of the emails can reasonably be said to constitute a submission by QUALCOMM; indeed, they cannot plausibly be said to constitute a submission by anyone. Moreover, as discussed below, the evidence indicates that the avc_ce reflector was established and maintained by MPEG, not JVT.

- Request for Production No. 93. Broadcom's request seeks "all documents referring to or evidencing any participation by QUALCOMM in the proceedings of the JVT, the ISO, the IEC and/or the ITU-T." QUALCOMM agreed to produce "non-privileged...documents describing QUALCOMM's participation in the JVT, if any, which can be located after a reasonable search." None of the emails can reasonably be said to describe QUALCOMM's

DAY CASEBEER
MADRID & BATCHELDER LLP

Louis Tompros, Esq.
February 16, 2007
Page 4

participation in the JVT, since none were authored by QUALCOMM personnel, nor do they
contain any mention whatsoever of QUALCOMM or its agents or employees, save for
computer-generated email headers specific to and seen only by each recipient. The passive
receipt of unsolicited emails sent to an MPEG distribution list to which the recipient, who
regularly received and ignored large volumes of unsolicited emails from many sources, did
not voluntarily subscribe, without the transmission of communications back to the
distribution list or its participants, cannot constitute "participation in the JVT" under any fair
or reasonable reading of that term.

In addition, I believe you mischaracterize the avc_ce reflector when you refer to it as a "JVT email
reflector[]." As indicated in various JVT Meeting Notes, the reflector was set up and maintained
under the auspices of MPEG, not JVT.[2]

Finally, contrary to the implications in your penultimate paragraph, QUALCOMM has at all times
conducted reasonably diligent searches for all categories of documents that it has agreed to produce,
including searches of email archives reasonably likely to contain such documents.

Very truly yours,

DAY CASEBEER
MADRID & BATCHELDER LLP

Adam Arthur Bier

AAB:sr

cc:    Stanley Young, Esq.

---

[2] *See, e.g.,* PX_895.17; PX_137.15.

594897                            Exhibit Q-5

# Exhibit R

**Exhibit R-1**

DLA Piper US LLP
401 B Street, Suite 1700
San Diego, California  92101-4297
www.dlapiper.com

Kathryn B. Riley
kathryn.riley@dlapiper.com
T  619.699.2842
F  619.699.2701

March 2, 2007
*VIA EMAIL*

Elizabeth I. Rogers
Wilmer Cutler Pickering Hale and Dorr LLP
1117 California Avenue
Palo Alto, CA 94304

Re:  Qualcomm v. Broadcom (1392)

Dear Liz:

We recently became aware of the enclosed document (QNITC 1093705-06) that was previously produced by Qualcomm in the Nokia litigation, but appears to have not been produced in the 1392 case.  We have determined this document could be viewed as responsive to Broadcom's Document Request No. 51 because it discusses both an industry standard and refers to "power control" patents.  Although it is not clear whether this document actually relates to a patent-in-suit, out of an abundance of caution, we have decided to produce it.  We also believe the document may be irrelevant to the issues currently pending in the 1392 case because it clearly relates to WCDMA and not to GSM or GERAN.  Again however, out of an abundance of caution, we have decided to produce it and reserve Qualcomm's right to object to its admission on relevance grounds.

Our search for any additional responsive documents is continuing and we expect to complete any additional production next week.

Finally, we are preparing a supplemental privilege log that identifies a number of additional privileged and work product documents.  We expect to provide a supplemental privilege log next week as well.

Very truly yours,

**DLA Piper US LLP**

Kathryn B. Riley
Attorney

Admitted to practice in California

KBR:grg

336110-000103

Exhibit R-2

# Exhibit S

WILMERHALE

March 5, 2007

**By Facsimile and First Class Mail**

Louis W. Tompros

+1 617 526 6348 (t)
+1 617 526 5000 (f)
louis.tompros@wilmerhale.com

Adam Arthur Bier, Esq.
Day Casebeer Madrid & Batchelder LLP
20300 Stevens Creek Blvd.
Suite 400
Cupertino, CA  95014

Re: *Qualcomm Inc. v. Broadcom Corporation*, Civil Action No. 05-CV-1958 B (BLM)

Dear Adam:

I write in response to your letter of February 16, 2007, concerning Qualcomm's failure to produce during discovery twenty-one emails received by Viji Raveendran from the avc_ce email reflector from September 2002 through March 2003.

Broadcom disagrees with your conclusion that the twenty-one emails were "not responsive to any valid discovery obligation or commitment" (Feb. 16 Ltr. at 1) under the broad standard of Rule 26, which requires the production of "[r]elevant information." Broadcom believes that Qualcomm failed to conduct a reasonable search for documents in response to Broadcom's requests for production, based on Qualcomm's failure to locate and produce the Raveendran emails during discovery, and the representations of Qualcomm's counsel concerning the circumstances of Qualcomm's identification and collection of these emails during trial.

The primary argument that you have advanced in your letter in defense of Qualcomm's failure to produce the emails during discovery is that, while the emails may have been responsive to Broadcom's requests as written, Qualcomm objected to those requests and withheld the emails on the basis of its objections. This justification fails for at least three reasons.

*First*, counsel for Qualcomm expressly represented that the first time that it learned of the twenty-one emails was on January 14, 2007, while preparing Ms. Raveendran to testify at trial. It is therefore impossible for Qualcomm to have intentionally withheld the emails on the basis of its previously-stated objections, because Qualcomm's counsel claims never to have known about the emails at the time that it made those objections during discovery.

A party served with a request for production of documents may object to production of a part of the documents that would be responsive to the request – but "the part shall be specified" in the party's objections. Fed. R. Civ. P. 34. This is a mandatory provision. Qualcomm did not specify that it was withholding emails received from a JVT email reflector because of its stated objections. Without any identification of the withheld documents, Broadcom had no basis on which to bring a motion to compel – which it certainly would have done. It is not proper to make broad objections, not disclose the categories of documents being withheld, and then

WilmerHale

Page 2

produce only certain narrower categories of documents. Moreover, Qualcomm *could not* have specified that it was withholding the twenty-one emails, because it claims not to have known about them until January 14, 2007 – in the middle of trial.

*Second*, Qualcomm argued to the Court that the relevant analysis regarding these emails was the scope of Broadcom's requests for production, not Qualcomm's objections. Qualcomm put Broadcom's requests for production at issue, by claiming that the documents were not responsive to any of Broadcom's requests for production:

> Although Broadcom argues that an adverse inference should be drawn from the production of these emails at trial, Broadcom has not pointed to any request for production that called for these emails.

(Qualcomm Incorporated's Post-Trial Reply Brief Concerning Waiver and Inequitable Conduct, Feb. 6, 2007, at 1-2 n.5 (citation omitted).)[1] This is quite different from relying on objections to a request for production that seeks certain documents. Your February 16 letter was the first and only time that Qualcomm has ever claimed that the documents might be responsive to Broadcom's requests but protected by Qualcomm's objections.

*Third*, and contrary to the position in your letter, the twenty-one emails *are* undoubtedly within the scope of the categories of documents which Qualcomm agreed to produce. Your claim that the documents are not responsive to each of the individual requests rests on fundamental factual errors:

- You claim that "[n]one of the emails was authored by a JVT, MPEG, ISO/IEC or ITU-T representative." (Feb. 16 Ltr. at 1.) This is simply wrong. *Many of the emails are written by Gary Sullivan – the Chair of the Joint Video Team.* (See, e.g., DX-5844 (email from Gary Sullivan with subject "[avc_ce] RE: [*jvt-experts*] New HD test sequences" (emphasis added)).) An email authored by the JVT Chair is plainly an email authored by a JVT representative.

- You claim further that "there is no evidence of any affiliation with those standard setting organizations" – the JVT, MPEG, ISO/IEC or ITU-T. (Feb. 16 Ltr. at 1.) *But the emails themselves repeatedly refer to the "JVT," "MPEG," "VCEG," and the "ITU."* (See, e.g., DX-5844 (referring to "jvt-experts"); *id.* ("MPEG members may login . . . with usual MPEG password. For ITU VCEG members, people at UH have installed a 'vceg' login.").) Moreover, the very title of the listserv – "avc_ce" – indicates that it concerns "AVC," the "Advanced Video Coding" H.264 standard developed by the JVT. Finally, as you admit in your letter, "the reflector was set up

---

[1] In fact, this statement in Qualcomm's Reply Brief was wrong at the time it was made. Ms. Saxton identified one such request for production (Request No. 93) during the telephone conversation on February 1, 2007 between you, me, Ms. Saxton, Mr. Patch, and Mr. Young. (*See* Feb. 7 Ltr. at 1.)

Exhibit S-3

WILMERHALE

Page 3

and maintained *under the auspices of MPEG*." (Feb. 16 Ltr. at 4 (emphasis added).) The fact that MPEG maintained the email reflector is clear "evidence of affiliation" with MPEG.

Moreover, even if one were to accept the propriety of Qualcomm's objections, the categories of documents that Qualcomm agreed to produce encompass the twenty-one withheld emails:

- **Request for Production No. 49.** Qualcomm agreed to produce "non-privileged documents that were given to *or received from* standards-setting bodies in connection with the ISO/IEC MPEG-4 Part 10 standard, and which relate to the QUALCOMM Patents-in-Suit" (emphasis added). An email from the chair of the Joint Video Team to a working-group email list with the title "avc_ce" is clearly a document "received from [a] standard-setting bod[y] in connection with the ISO/IEC MPEG-4 Part 10 standard." You claim that the withheld emails "cannot reasonably be said to 'pertain in any way'" to the Qualcomm patents-in-suit because they "make no mention of either of the two patents, and indeed contain no discussion of any patents or intellectual property rights at all." (Feb. 16 Ltr. at 2.) This assertion flies in the face of reason. Under this logic, no documents relating to the development of the H.264 standard would be relevant because none of them mention either of the patents-in-suit. The withheld emails do "pertain" and "relate to" the Qualcomm patents-in-suit, because they address the use of motion compensation and transforms, and, more specifically, "*AdaptiveBlockTransforms*," in H.264. (*See, e.g.*, DX-5845 at 1958QB0960045.) As you recall, the '104 patent, which Qualcomm asserted against the H.264 standard, relates to adaptive block size transforms. It is not necessary for the emails to single out patents by patent number; it is enough that they relate to the same field of art as the patents-in-suit, the scopes of which were being broadly asserted by Qualcomm. The withheld documents "relate to" the patents-in-suit under Rule 26(b)(1), and they should have been produced in response to this request.

- **Request for Production No. 50.** Qualcomm agreed to produce "non-privileged documents that were given to *or received from* standards-setting body responsible for the ISO/IEC MPEG-4 Part 10 standard, and which concern any QUALCOMM participation in setting the ISO/IEC MPEG-4 Part 10 standard" (emphasis added). As discussed above, the withheld emails were received from the JVT, which developed H.264. As you concede, the emails – which were sent before the H.264 standard was finalized – "relate to an evaluation of the performance of" the draft version of the H.264 in comparison to other standards. (Feb. 16 Ltr. at 3.) The emails therefore concern the process of developing and setting the H.264 standard. The fact that a Qualcomm employee was on a JVT email listserv while the JVT was developing the H.264 standard is strong evidence of Qualcomm's participation in the JVT. Broadcom was clearly entitled to timely discovery of these emails as

Exhibit S-4

WILMERHALE

Page 4

evidence of such participation, whether or no Qualcomm agrees with Broadcom's position.

- **Request for Production No. 93.** Qualcomm agreed to produce "non-privileged . . . documents describing QUALCOMM's participation in the JVT, if any, which can be located after a reasonable search." As you acknowledge, the "computer generated email headers" indicate that a Qualcomm employee received these emails. (Feb. 16 Ltr. at 4.) The emails – taken together with their headers – therefore "describe" some degree of participation by Qualcomm in the JVT. They should have been produced much earlier.

Your contention that Qualcomm "has at all times conducted reasonably diligent searches for all categories of documents that it has agreed to produce" is troubling. (Feb. 16 Ltr. at 4.) Mr. Patch represented in our telephone conversation that Qualcomm only learned that Ms. Raveendran kept a separate email archive during the course of the trial. It was incumbent upon Qualcomm *during fact discovery* to investigate and locate the email archive of any Qualcomm employee that attended JVT meetings, that was deposed in this litigation, and that Broadcom had alleged participated in the JVT prior to September 2003. This clearly was not done. Qualcomm should have investigated whether Ms. Raveendran had any such email archive before it claimed before the Court – both orally and in its Motion for Judgment as a Matter of Law – that no email was ever received by Ms. Raveendran. (*See* Tr. 1/18 at 91:13-14, 92:6-7 ("there are no e-mails"); Qualcomm's Motion for Judgment as a Matter of Law Pursuant to Rule 52(c), at 11 ("[T]here is no evidence that Ms. Raveendran ever received an email from this email list.").) Possession or custody of "[r]elevant information" is the test for production under Rule 26(b)(1), not whether the custodian authored, responded to, or otherwise provided content to documents in their possession.

In addition to Qualcomm's failure to inquire about Ms. Raveendran's email archive until trial, Mr. Patch stated that Qualcomm has not asked the other Qualcomm employees connected to this litigation whether they also maintain email archives and whether they have emails that contain information relating to the JVT or H.264. Qualcomm could not reasonably claim that there were no emails in any employee's email archive encompassed by Broadcom's discovery requests, unless it had made this inquiry and performed a search. The failure to locate and search such email archives was highly improper and prejudicial to Broadcom.[2]

Broadcom requests that Qualcomm immediately search for and produce responsive documents in the email archives of Ms. Raveendran and any other Qualcomm employee who has ever been

---

[2] Moreover, Broadcom is particularly concerned with Qualcomm's lack of diligence in discovery given the continuing litigation between the parties in other matters, including matters pending before this Court, the Central District of California, the District of New Jersey, and the International Trade Commission. For example, in the 05-CV-1392 action also pending before this Court, Qualcomm stated just last week (less than three weeks before trial) that it has discovered and will produce additional documents (including emails) that should have been produced in response to Broadcom's discovery requests.

Exhibit S-5

WILMERHALE

Page 5

involved in any way in standard-setting for video compression (whether or not as an actual participant at a standard-setting meetings), dated between January 1, 2000 and December 31, 2004. The employees whose emails, both current and archived, that Qualcomm should search should include (but not be limited to): Yiliang Bao, Hyujune Chung, James Determan, Harinath Garudadri, A. Chris Irvine, A. Scott Ludwin, Viji Raveendran, Yuriy Reznick, Phoom Sagetong, Thomas Rouse, Ed Tiedemann, and Yan Ye. At a minimum, Qualcomm should search for and review documents containing the terms "JVT," "Joint Video Team," "AVC," "Advanced Video Coding," "H.264," "H264," "MPEG-4 Part 10," "MPEG4 Part 10," and "Gary Sullivan." Broadcom reserves the right to identify additional Qualcomm employees and/or search terms after it has the opportunity to review documents produced by Qualcomm.

Broadcom requests that Qualcomm conduct these searches and produce resulting documents responsive to any of Broadcom's discovery requests by Thursday, March 15, 2007. Please confirm by the close of business Wednesday, March 7, 2007, that Qualcomm agrees to comply with this request.

Finally, Broadcom continues to reserve its right to pursue sanctions, including but not limited to attorneys' fees, additional discovery, and other relief, for Qualcomm's failure to produce any withheld emails that were not timely provided in discovery in this litigation.

Very truly yours,

Louis W. Tompros

cc:     Stanley Young, Esq.

# Exhibit T

# EXHIBIT
# FILED UNDER SEAL

# Exhibit U

WILMERHALE

March 5, 2007

Mark D. Selwyn

+1 650 858 6031 (t)
+1 650 858 6100 (f)
mark.selwyn@wilmerhale.com

**VIA EMAIL & U.S. MAIL**

Kathryn Riley, Esq.
DLA Piper US LLP
401 B Street, Suite 1700
San Diego, CA 92101

Re:   Qualcomm v. Broadcom, San Diego, Case No. 05-cv-1392

Dear Katie:

I am writing to respond to your letter of last Friday to Liz Rogers.

We must take issue with your attempt to minimize the relevance of this new document. The document is highly relevant to various of the equitable defenses pleaded by Broadcom and on which Broadcom has sought discovery from the outset.

We are in the process of determining what additional discovery we may require in light of the contents of this new document. At a minimum, we request that Qualcomm produce any testimony provided by any Qualcomm witness (or anyone else) related to this new document or its subject. Please let me know if there is any reason Qualcomm cannot or will not produce any such testimony by tomorrow.

Sincerely yours,

Mark D. Selwyn

MDS:rm

Exhibit U-2

# Exhibit V

Exhibit V-1

# EXHIBIT
# FILED UNDER SEAL

# Exhibit W

WILMERHALE

March 6, 2007

Mark D. Selwyn

+1 650 858 6031 (t)
+1 650 858 6100 (f)
mark.selwyn@wilmerhale.com

**VIA EMAIL & U.S. MAIL**

Kathryn Riley, Esq.
DLA Piper US LLP
401 B Street, Suite 1700
San Diego, CA 92101

Re:   Qualcomm v. Broadcom, San Diego, Case No. 05-cv-1392

Dear Katie:

Further to my letters of yesterday, we have discovered another highly relevant Qualcomm document that appears to have been produced to Nokia but not to us. The document has the Bates number QNITC0018989, and is referenced in the November 29, 2006 deposition of Edward Tiedemann.

Please produce the document. In addition, if there is any testimony regarding this document other than Mr. Tiedemann's, we request that it be produced. Please let me know if there is any reason Qualcomm cannot or will not produce this document and any such testimony by tomorrow.

Broadcom reserves its right to seek additional relief from the Court.

Sincerely yours,

Mark D. Selwyn

MDS:rm

# Exhibit X

Exhibit X-1



DLA Piper US LLP
401 B Street, Suite 1700
San Diego, California 92101-4297
www.dlapiper.com

Kathryn B. Riley
kathryn.riley@dlapiper.com
T  619.699.2842
F  619.764.6692

March 6, 2007
*VIA E-MAIL AND US MAIL*

Mark D. Selwyn, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
1117 California Avenue
Palo Alto, CA 94304

**Re:    Qualcomm v. Broadcom, USDC-Case No. 05-CV-1392**

Dear Mark:

I am writing to respond to (1) your letter of yesterday regarding my March 2, 2007 letter to Liz Rogers, (2) your letter of yesterday regarding QNITC0986122-123 and QNITC1087922, and (3) Mr. Tompros's letter of yesterday to me regarding QBN01297385-0297393.

As John Allcock told Bill Lee last week and I told Liz Rogers on Friday, we are actively investigating what, if any, documents need to be produced and we plan to make any additional production later this week.

Sincerely,

**DLA Piper US LLP**

Kathryn B. Riley
Associate

Admitted to practice in California

KBR:pg

SD\1684891.1

*Exhibit X-2*

# Exhibit Y

WILMERHALE

March 6, 2007

Mark D. Selwyn

+1 650 858 6031 (t)
+1 650 858 6100 (f)
mark.selwyn@wilmerhale.com

**VIA EMAIL & U.S. MAIL**

Kathryn Riley, Esq.
DLA Piper US LLP
401 B Street, Suite 1700
San Diego, CA 92101

Re:    Qualcomm v. Broadcom, San Diego, Case No. 05-cv-1392

Dear Katie:

I am writing to respond to your letter of this afternoon.

The letters that Louis Tompros and I have sent you since yesterday specify, by Bates number, four documents that we believe Qualcomm has not produced in this case. I understand that Qualcomm is "actively investigating" what additional production is required, but that "investigation" does not justify further delay in the production of the specified documents. There is no reason that these documents, and any relevant testimony related to them, cannot be sent to us immediately.

Sincerely yours,

Mark D. Selwyn

MDS:rm

Wilmer Cutler Pickering Hale and Dorr LLP, 1117 California Avenue, Palo Alto, California 94304

Baltimore    Beijing    Berlin    Boston    Brussels    London    New York    Oxford    Palo Alto    Waltham    Washington

Exhibit Y-2

# Exhibit Z

# DAY CASEBEER
## MADRID & BATCHELDER LLP

20300 Stevens Creek Blvd., Suite 400
Cupertino, CA  95014
Telephone: (408) 873-0110
Facsimile:  (408) 873-0220

Adam Arthur Bier
(408) 342-4554
abier@daycasebeer.com

March 7, 2007

VIA FACSIMILE & U.S. MAIL

Louis Tompros, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109

RE: QUALCOMM v. Broadcom, S.D. Cal. Case No. 05-cv-1958 B (BLM)

Dear Louis:

We are in receipt of your letter of March 5, 2007 concerning the avc_ce emails.

For the reasons discussed at length previously, we disagree with each of your arguments concerning the responsiveness of those emails and believe your negative characterization of QUALCOMM's compliance with its discovery obligation to be wholly without merit.  Your only new argument, that QUALCOMM was somehow obligated to identify each document which was being withheld from production (or, paradoxically, being excluded from searches) on the basis of our objections depends on an illogical misreading of the relevant Rule. Fed. R. Civ. P. 34(b) requires that, "if objection is made to a part of an item *or category*, the part shall be specified..." By objecting to the categories set forth in Broadcom's requests for production and then stating a subset of each that QUALCOMM would agree to produce, QUALCOMM plainly specified the part or parts of each category for which QUALCOMM was not searching, and which QUALCOMM would therefore not produce. Broadcom was fully on notice of what would not be included in QUALCOMM's searches and production, and it was incumbent upon Broadcom to meet and confer and timely move under Rule 37 to compel further production to the extent it was not satisfied.  As to the requests at issue, it chose to do neither.

Your request for completely new and patently overbroad discovery—plainly beyond the scope of anything propounded during the appropriate period before trial—cannot on any basis be justified now, more than a month after trial has concluded.

**Exhibit Z-2**

609625_1

**DAY CASEBEER**
**MADRID & BATCHELDER LLP**

Louis Tompros, Esq.
March 7, 2007
Page 2

Nevertheless, in the interest of putting this matter definitively to rest, QUALCOMM will conduct searches of all current and archived emails of Yiliang Bao, Chris Irvine, Scott Ludwin, Viji Raveendran, and Phoom Sagetong (the only individuals whom either party called as witnesses at trial to testify about QUALCOMM's participation—actual or alleged—in the JVT) during the period of his or her employment at QUALCOMM that were sent or received between January 1, 2000 and December 31, 2004. As you request, QUALCOMM will conduct these searches using the terms "JVT," "Joint Video Team," "AVC," "Advanced Video Coding," "H.264," "H264," "MPEG-4 Part 10," "MPEG4 Part 10," and "Gary Sullivan" and will produce all non-privileged resulting documents that have not already been produced containing any of those terms.

Because we have not yet commenced these searches, and do not yet know the volume of results we will obtain, I cannot commit at this juncture to a specific time by which any production will be complete. We will, however, endeavor to finish this process as promptly as is practical.

Very truly yours,

**DAY CASEBEER**
**MADRID & BATCHELDER LLP**

Adam Arthur Bier

AAB:sr

**Exhibit Z-3**

609625_1

# Exhibit AA



DLA Piper US LLP
401 B Street, Suite 1700
San Diego, California  92101-4297
www.dlapiper.com

Kathryn B. Riley
kathryn.riley@dlapiper.com
T  619.699.2842
F  619.764.6692

March 7, 2007
*VIA EMAIL*

Mark D. Selwyn
Wilmer Cutler Pickering Hale and Dorr LLP
1117 California Avenue
Palo Alto, CA 94304

Re:     QUALCOMM v Broadcom (1392)

Dear Mark:

As I explained in my March 2, 2007 letter to Liz Rogers, QUALCOMM recently became aware of certain documents that were previously produced by QUALCOMM in the Nokia litigation, but appear to not have been produced to Broadcom.  We believe that the only document request these documents could be responsive to is Broadcom's Request for Production No. 51.  QUALCOMM objected to RFP No. 51 at the time and agreed to produce responsive, non-privileged documents "concerning any investigation or analysis of 802.11, CDMA, WCDMA, CDMA 2000, or the GSM/GPRS/EDGE families of standards, which investigation or analysis concerns the QUALCOMM Patents-in-Suit."  The documents referenced in your March 5, 2007 letter to me and in Mr. Tompros's March 5 letter to me are not responsive to RFP No. 51 because they do not refer to the Patents-in-Suit.   If you believe these documents are responsive to any other Broadcom Request for Production please let me know.

Moreover, Broadcom has repeatedly objected to QUALCOMM calling its expert, Mr. Holleman, at trial. Documents QNITC0986122-123 and QNITC1087922 are not responsive to Broadcom's document requests, but are exhibits to Mr. Tiedemann's deposition in the Nokia ITC case.  QUALCOMM's expert, Mr. Holleman, relies on this deposition in his expert report.  If Broadcom agrees to withdraw its objections to QUALCOMM calling Mr. Holleman at trial then QUALCOMM will produce them on that basis.

Very truly yours,

DLA Piper US LLP

Kathryn B. Riley
Attorney

Admitted to practice in California

SD\1685007.1
336110-103

Exhibit AA-2

# Exhibit BB

WILMERHALE

March 7, 2007

**VIA PDF**

Kate Saxton

+1 617 526 6253 (t)
+1 617 526 5000 (f)
kate.saxton@wilmerhale.com

Kathryn B. Riley
DLA Piper US LLP
401 B Street, Suite 1700
San Diego, California  92101-4297

Re:   *Qualcomm Inc. v. Broadcom Corporation*, Civil Action No. 05-CV-1392 (BLM)

Dear Katie:

Further to Mark Selwyn's letters of March 5 and March 6, 2007, we learned today that many more highly relevant deposition transcripts of Qualcomm witnesses related to Qualcomm's ongoing litigation with Nokia exist that have not been produced to us.

Please immediately produce the following deposition transcripts:

    Derek Aberle – January 16, 2007

    Derek Aberle – February 21, 2007

    Steve Altman – January 26, 2007

    Steve Altman – February 26, 2007

    Tracey Altmann – December 14, 2006

    Neils Anderson – January 5, 2007

    Kent Baker – January 6, 2007

    Alain Benabent – January 12, 2007

    George Bermann – January 25, 2007

    Marvin Blecker – December 20, 2006

    Kenneth Bolvin – November 20, 2006

    Brian Butler – November 20, 2006

    Chienchung Chang – December 12, 2006

Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, Massachusetts 02109

Baltimore     Beijing     Berlin     Boston     Brussels     London     New York     Oxford     Palo Alto     Waltham     Washington

Exhibit BB-2

WILMERHALE

Kathryn B. Riley
March 7, 2007
Page 2

Steve Ciccarelli – November 8, 2006

Gregory Cobb – December 20, 2006

Reinhard Eiberger – November 10, 2006

Michael Hartog – December 13, 2006

Robert Herman – February 26, 2007

Richard Holleman – January 22, 2007

James Hutchison – December 15, 2006

Richard Kerr – November 28, 2006

Wayshing Lee – November 30, 2006

Louis Lupin – February 23, 2007

Anindya Majumder – January 10, 2007

Susanna Martikainen – December 18, 2006

Roger Martin – November 16, 2006

Roger Martin – November 17, 2006

Russell Ben Miller – December 21, 2006

Taher Nabulsi – December 7, 2006

David Phakdy – January 11, 2007

Gene Ratliffe – January 24, 2007

Nigel Robinson – December 16, 2007

Kim Simelius – December 13, 2006

David Teece – January 22, 2007

Edward Tiedemann – February 20, 2007

**Exhibit BB-3**

Kathryn B. Riley
March 7, 2007
Page 3

WILMERHALE

Sergio Verdu – January 29, 2007

Sergio Verdu – January 30, 2007

Charles Wheatley – January 24, 2007

Serge Willenegger – February 23, 2007

David Williams – February 23, 2007

Nathaniel Wilson – December 2, 2006

Karyn Womach – December 13, 2006

Moreover, to the extent any of the above witnesses have submitted witness statements in the ongoing litigation between Qualcomm and Nokia before the International Trade Commission (Investigation No. 337-TA-578, *In the Matter of Certain Mobile Telephone Handsets, Wireless Communication Devices and Components Thereof*), please immediately produce any such witness statements.

We will also be requesting the exhibits to certain of these depositions, to the extent that they have not already been produced. In order to make the production as efficient as possible, we will request those by exhibit number as we review the transcripts, rather than asking you to produce them all now.

If Qualcomm refuses to produce any of the above materials, please inform me by close of business tomorrow, March 8, 2007.

In addition, Broadcom reserves the right to seek additional relief from the Court.

Very truly yours,

Kate Saxton

**Exhibit BB-4**

# Exhibit CC

Exhibit CC-1



DLA Piper US LLP
401 B Street, Suite 1700
San Diego, California  92101-4297
www.dlapiper.com

Kathryn B. Riley
kathryn.riley@dlapiper.com
T  619.699.2842
F  619.764.6692

March 7, 2007
*VIA EMAIL*

Kate Selwyn
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

Re:     QUALCOMM v Broadcom (1392)

Dear Kate:

This letter responds to your letter of March 7, 2007 seeking production of 42 depositions from the Nokia ITC case less than two weeks before our trial.  All of these depositions took place after the close of fact discovery in our case.

Broadcom has been aware of the Nokia ITC trial for some time.  Indeed, in January Broadcom asked QUALCOMM to produce the QUALCOMM inventors' depositions from the Nokia ITC case to Broadcom, but did not request any other depositions.  And QUALCOMM did.  QUALCOMM agreed to produce those limited depositions over its objections regarding the timeliness and appropriateness of the request. Broadcom has provided no explanation of the relevance of these depositions or why Broadcom waited until now to request them.  Please explain why you believe QUALCOMM is obligated to produce these 42 depositions at this time.

Very truly yours,

**DLA Piper US LLP**

*Kathryn B. Riley*
Kathryn B. Riley
Attorney

Admitted to practice in California

SD\1685185.1
336110-103

Exhibit CC-2

# Exhibit DD

## Seares, Carrie

| | |
|---|---|
| **From:** | Riley, Kathryn [Kathryn.Riley@dlapiper.com] |
| **Sent:** | Friday, March 09, 2007 12:46 PM |
| **To:** | Saxton, Kate |
| **Cc:** | Rogers, Elizabeth |
| **Subject:** | RE: Qualcomm v. Broadcom (05-1392) |

Hi Kate,

QUALCOMM incorporates Broadcom's request for Nigel Robinson's deposition in the Konia ITC case into the letter I sent you last night regarding the 42 other depositions you recently requested.

On another topic, where are we at on the Pretrial Order?

Thanks,
Katie

---

**From:** Saxton, Kate [mailto:Kate.Saxton@wilmerhale.com]
**Sent:** Friday, March 09, 2007 5:19 AM
**To:** Riley, Kathryn
**Cc:** Rogers, Elizabeth
**Subject:** Qualcomm v. Broadcom (05-1392)

Katie-

I wanted to follow up on the email from Liz Rogers last night regarding the December 16, 2006 deposition of Nigel Robinson. This deposition is highly relevant to Broadcom's claims and defenses in this litigation and is certainly responsive in this litigation. Please produce today, via PFD, this deposition. If Qualcomm refuses to do so, please inform me promptly.

Best,

Kate

Kate Saxton
WilmerHale
60 State Street
Boston, MA 02109 USA
617-526-6253 (t)
617-526-5000 (f)
kate.saxton@wilmerhale.com

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately -- by replying to this message or by sending an email to postmaster@wilmerhale.com -- and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

Please consider the environment before printing this email.

**Exhibit DD-2**

The information contained in this email may be confidential and/or legally privileged. It has been sent fo the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communicatio in error, please contact the sender by reply email and destroy all copies of the original message. To contact our email administrator directly, send to postmaster@dlapiper.com

Thank you.

**Exhibit DD-3**

# Exhibit EE

**Pogran, Judith**

| | |
|---|---|
| **From:** | Saxton, Kate |
| **Sent:** | Sunday, June 17, 2007 8:59 PM |
| **To:** | Tompros, Louis |
| **Subject:** | FW: Qualcomm v. Broadcom (05-1958) |

**From:** Saxton, Kate
**Sent:** Friday, March 30, 2007 12:58 PM
**To:** 'Bier, Adam Arthur'
**Cc:** Patch, Lee
**Subject:** RE: Qualcomm v. Broadcom (05-1958)

Adam and Lee-

Thank you for getting back to me regarding this issue.

We are understandably very concerned about the progress of Qualcomm's searches regarding additional email. As you are aware, Broadcom first learned about the existence of the additional email during Ms. Raveendran's cross-examination on January 24, 2007, the last day of trial in this matter. These additional emails are relevant, at least, to Broadcom's defense of waiver, and were certainly responsive to several Broadcom requests for production.   Since learning about these emails on January 24, 2007, Broadcom has been actively and diligently pursuing the existence and production of any additional emails or documents. Despite its efforts, Broadcom has not received any additional production, any indication of the volume of additional emails or documents, or when it can expect to receive production of any additional emails or documents.  This is unacceptable.

As you are also aware, the Court has scheduled a further hearing regarding the appropriate remedy for Qualcomm's waiver of its rights to enforce the patents-in-suit for May 2, 2007, with all papers to be filed by April 25, 2007.  Qualcomm has proposed that its papers be filed by April 18, 2007, with Broadcom's reply filed by April 25, 2007.  (See March 30, 2007 email from Mr. Young to Mr. Regan and Ms. Saxton).   It is therefore imperative that Broadcom receive any additional emails or other documents sufficiently in advance of submission of its papers and the May 2, 2007 hearing.  To that end, Broadcom expects that Qualcomm will complete its search and production by Friday, April 6, 2007.  If Qualcomm is unwilling to do so, please inform me immediately, as Broadcom will seek the assistance of the Court.

Thank you for your attention to this matter.

Best,

Kate
-----Original Message-----
**From:** Bier, Adam Arthur [mailto:abier@daycasebeer.com]
**Sent:** Friday, March 30, 2007 12:58 PM
**To:** Saxton, Kate
**Cc:** Patch, Lee
**Subject:** RE: Qualcomm v. Broadcom (05-1958)

Hi Kate,

Sorry for the delay in responding.  We don't have any new information to report yet, but we'll get back to you as soon as we do. You can expect to hear from Lee Patch, who is spearheading this effort, as I've been called away

to work on another matter.

Best,
Adam

---

**From:** Saxton, Kate [mailto:Kate.Saxton@wilmerhale.com]
**Sent:** Thursday, March 29, 2007 1:54 PM
**To:** Bier, Adam Arthur
**Subject:** RE: Qualcomm v. Broadcom (05-1958)

Hi Adam-

Could you please provide me an update on the status of the below request?

Thanks,

Kate
-----Original Message-----
**From:** Saxton, Kate
**Sent:** Monday, March 26, 2007 11:11 AM
**To:** 'abier@daycasebeer.com'
**Subject:** Qualcomm v. Broadcom (05-1958)

Hi Adam-

I just wanted to check in and see if you had a further update regarding the ongoing hard drive searches in the above matter?  If you could please let me know the current status, I would appreciate it. Thanks so much.

Best,

Kate


Kate Saxton
WilmerHale
60 State Street
Boston, MA 02109 USA
617-526-6253 (t)
617-526-5000 (f)
kate.saxton@wilmerhale.com

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately – by replying to this message or by sending an email to postmaster@wilmerhale.com – and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.


*************************************************************
Confidentiality Notice
This message is being sent by or on behalf of a lawyer.  It is
intended exclusively for the individual or entity to which it is
addressed.  This communication may contain information that
is proprietary, privileged or confidential or otherwise legally
exempt from disclosure.  If you are not the named addressee,
you are not authorized to read, print, retain, copy or
disseminate this message or any part of it.  If you have

**Exhibit EE-3**

6/18/2007

received this message in error, please notify the sender
immediately by email and delete all copies of the message.
*****************************************************************

# Exhibit FF

DAY CASEBEER
MADRID & BATCHELDER LLP

20300 Stevens Creek Blvd., Suite 400
Cupertino, CA  95014
Telephone: (408) 873-0110
Facsimile:  (408) 873-0220

James R. Batchelder
(408) 342-4565
jbatchelder@daycasebeer.com

April 9, 2007

VIA HAND DELIVERY

Honorable Rudi M. Brewster
United States District Court, Southern District
940 Front Street, Ctrm. 2, 4th Floor
San Diego, CA  92101

Re:     *QUALCOMM Incorporated v. Broadcom Corporation*
        Case No. 05-CV-1958 B (BLM)

Your Honor:

We write to inform you of recently-discovered electronic documents that appear to be
inconsistent with arguments that we made at trial, and at the post-trial hearing, regarding
Broadcom's affirmative defense of waiver.

As the Court is aware, during trial of this case QUALCOMM discovered 21 emails on a
QUALCOMM witness' laptop computer which had not been previously produced.  We learned
that those emails had been sent to that computer via a group email alias related to the Joint Video
Team ("JVT"), which is the standards body that promulgated the H.264 video compression
standard central to the Court's opinion regarding waiver.  After trial Broadcom requested, and
QUALCOMM voluntarily agreed, to run specified electronic word searches for additional JVT
related information.

Those searches have now been completed, and a substantial number of electronic documents
were collected that matched the agreed-upon search criteria.  We are in the process of privilege-
reviewing, Bates-stamping and copying the recently-discovered documents for production to
Broadcom, and we have committed to Broadcom that we will complete that production this
week.  Our preliminary review of these documents has revealed facts that appear to be
inconsistent with certain arguments that we made on QUALCOMM's behalf at trial and in the
equitable hearing following trial.

Professionally and personally, I apologize to the Court and Broadcom for not having discovered
these documents sooner and for asserting positions that we would not have taken had we known
of the existence of these documents.  In appearing on QUALCOMM's behalf before this Court
on many cases over many years, we always have aspired to hold ourselves to the highest ethical
standard, insisting on complete candor and professional behavior at all times.  In this case, we

**Exhibit FF-2**

Honorable Rudi M. Brewster
April 9, 2007
Page 2

presented our arguments in good faith and certainly would not have knowingly presented argument that we believed to be contrary to fact.

We are currently scheduled to meet with the Court on May 2 to discuss the Court's Order To Show Cause in connection with its opinion regarding waiver, but we also are available to meet with the Court on any earlier date to discuss these issues.

Very truly yours,

DAY CASEBEER
MADRID & BATCHELDER LLP

James R. Batchelder

JRB:jmn

cc:    William F. Lee, Esq.
       Stanley Young, Esq.

**Exhibit FF-3**

# Exhibit GG

DAY CASEBEER
MADRID & BATCHELDER LLP

20300 Stevens Creek Blvd., Suite 400          James R. Batchelder
Cupertino, CA  95014                          (408) 342-4565
Telephone: (408) 873-0110                     jbatchelder@daycasebeer.com
Facsimile:  (408) 873-0220

April 12, 2007

VIA OVERNIGHT DELIVERY

Kate Saxton
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109

Re:   *QUALCOMM Incorporated v. Broadcom Corporation*
      Case No. 05cv1958 B (BLM)

Dear Kate:

Pursuant to the parties' agreement, please find enclosed QUALCOMM Incorporated's production documents bearing Bates Numbers 1958QB0959839 to 1958QB1045207.

Although a substantial portion of these documents fall outside of the scope of production resulting from the parties' discovery pleadings and meet-and-confer negotiations, we are producing *all* non-privileged e-mails and attachments on the computers of four previously identified QUALCOMM employees that are dated between 2000 and 2004, and that contain at least one of the following terms: JVT; Joint Video Team; AVC; Advanced Video Coding; H.264; H264; MPEG-4 Part 10; MPEG4 Part 10; and Gary Sullivan.  The fifth agreed-upon custodian, Yiliang Bao, was not a QUALCOMM employee in the relevant time frame.

We are producing with this letter approximately 90% of the documents, totaling 14,623 documents and 85,369 pages, for delivery on Friday, April 13th.  We will produce the remaining documents tomorrow for delivery on the following day.  Please do not hesitate to call if there are any questions regarding this production.

Best regards,

DAY CASEBEER
MADRID & BATCHELDER LLP

James R. Batchelder
Enclosures

cc:   William Lee, Esq. (via U.S. mail w/o enclosures)
      Stanley Young, Esq. (via U.S. mail w/o enclosures)

644081_1

**Exhibit GG-2**

# Exhibit HH

**From:** Leung, Kevin [mailto:kleung@daycasebeer.com]
**Sent:** Wednesday, April 25, 2007 2:31 PM
**To:** Saxton, Kate
**Subject:** QUALCOMM v. Broadcom, S.D. Cal. 05cv1958

Dear Kate:

Per your discussion with Jim today, I have listed below the new custodians that we are currently searching:

James Determan;
Harinath Garudadri;
Richard Lane;
Jennifer McCarthy;
Micky Minhas;
Steve Morley;
George Pappas;
John Ratzel;
Tom Rouse;
Amnon Silberger;
Anne-lise Thieblemont;
Kadayam Thyagarajan;
Ed Tiedemann;
Kent Walker;
Yan Ye; and
Jay Yun.

Also, please note that Hyujune Chung and Yuriy Reznick are not on this list because they were not QUALCOMM employees prior to 2005.

If you have any questions, please feel free to contact me.

Best,

Kevin

*Kevin K. Leung*
Day Casebeer Madrid & Batchelder LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014
Direct Line (408) 342-4589
Fax (408) 873-0220
kleung@daycasebeer.com


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Exhibit HH-2

6/18/2007

Confidentiality Notice
This message is being sent by or on behalf of a lawyer.  It is
intended exclusively for the individual or entity to which it is
addressed.  This communication may contain information that
is proprietary, privileged or confidential or otherwise legally
exempt from disclosure.  If you are not the named addressee,
you are not authorized to read, print, retain, copy or
disseminate this message or any part of it.  If you have
received this message in error, please notify the sender
immediately by email and delete all copies of the message.
*********************************************************************

**Exhibit HH-3**

6/18/2007

# Exhibit II

Exhibit II-1



DLA Piper US LLP
401 B Street, Suite 1700
San Diego, California  92101-4297
www.dlapiper.com

TimothyS. Blackford
tim.blackford@dlapiper.com
T   619.699.2986
F   619.764.6686

June 14, 2007

*VIA UPS OVERNIGHT*

Kate Saxton, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
60 State Street
Boston, MA  02109

Re:   QUALCOMM Incorporated v. Broadcom Corporation
      Case No. 05-cv-1958 B (BLM)

Dear Kate:

Please find enclosed QUALCOMM Incorporated's production documents bearing Bates
Numbers 1958QB1196390 – 1958QB1291940.

Produced herein are non-privileged e-mails and attachments on the computers of certain
QUALCOMM employees that are dated between 2000 and 2004, and that contain at least one
of the following terms:  JVT; Joint Video Team; AVC; Advanced Video Coding; H.264; H264;
MPEG-4 Part 10; MPEG4 Part 10; and Gary Sullivan.  The enclosed documents are produced
from the electronic files of the following custodians:  Jason Bremner, Mark Frankel, Paul
Jacobs, Sanjay Jha, Tom Kilpatrick, Louis Lupin, Roger Martin, Alex Rogers, and Gil Sih.

Also produced herein are non-privileged hard copy documents of certain QUALCOMM
employees.  A hard copy document search was conducted for all post-trial custodians, and a
good faith effort was made to locate documents dated between 2001 and 2004 and which
contained at least one of the following terms:  JVT; Joint Video Team; AVC; Advanced Video
Coding; H.264; H264; MPEG-4 Part 10; MPEG4 Part 10; and Gary Sullivan.  Documents were
located for some of the post-trial custodians, and the enclosed documents are produced from
the files of the following individuals:  Jae Choi, James Determan, Mark Frankel, Harinath
Garudadri, Chris Irvine, Sanjay Jha, A. Scott Ludwin, George Pappas, Viji Raveendran, Tom
Rouse, Gil Sih, Amnon Silberger, Ed Tiedemann, Kent Walker, Yan Ye, and Jay Yun.

We are currently assessing some documents for attorney-client privilege that would otherwise
fall within the above parameters.  Once we have concluded our privilege determinations for this
production, we will produce those documents that we conclude are non-privileged and will also
provide you with an updated privilege log.

Exhibit II-2



Kate Saxton, Esq.
June 14, 2007
Page Two

Please let me know if you have any questions regarding this production.

Very truly yours,

**DLA Piper US LLP**

Timothy S. Blackford

TSB:db
Enclosures
cc:     Bill Boggs, Esq. (w/o enclosures)
        Brian Foster, Esq. (w/o enclosures)
        James Batchelder, Esq. (w/o enclosures)
        Lee Patch, Esq. (w/o enclosures)
        Stanley Young, Esq. (w/o enclosures

SD\1747230.1

Exhibit II-3

# Exhibit JJ

# Eudora (e-mail client)

From Wikipedia, the free encyclopedia

**Eudora** is an e-mail client used on the Apple
Macintosh and Microsoft Windows operating systems.
It also supports several palmtop computing platforms,
including Newton and the Palm OS. The software was
named after Eudora Welty because of her short story
"Why I Live at the P.O." (http://art-
bin.com/art/or_weltypostoff.html)[1]



**Eudora**

| | |
|---|---|
| **Developer:** | Qualcomm |
| **Latest release:** | 7.1 (Windows), 6.2.4 (Mac OS) / October 11, 2006 |
| **OS:** | Windows, Mac OS, Mac OS X |
| **Genre:** | E-mail |
| **License:** | Adware, payware, Light |
| **Website:** | www.eudora.com (http://www.eudora.com/) |

(http://www.eudora.com/presskit/backgrounder.html#name) Eudora was developed by Steve Dorner in
1988 as a part of his studies at the University of Illinois at Urbana-Champaign and was acquired by
Qualcomm in 1991.

## Contents

- 1 History
  - 1.1 Problems for international users
  - 1.2 Open sourcing
- 2 References
- 3 See also
- 4 External links

# History

Eudora pioneered the concept of an always-present folder list pane. Originally distributed freely, it was
commercialized and offered in a Light (freeware) and Pro (commercial) product. It is now distributed in
three modes: adware, payware (removes ads), and the classic "Light" mode.

**Exhibit JJ-2**

Eudora (6.0.1) added support for Bayesian filtering of spam with a feature called *SpamWatch*. Eudora (6.2) added a scam watch feature that flags suspicious links within e-mails in an attempt to thwart phishing. Eudora (7.0) added Ultra-Fast Search, which finds any emails using single or multiple criteria in seconds.

Eudora has support for 'Stationery', a standard message or reply prepared ahead of time to a common question. Eudora stores e-mails in the mbox format, which uses plain text files instead of a database, as Microsoft Outlook does. This allows the user to back up portions of their e-mail correspondence without backing up the entire database. Text files are also much safer than databases, in that should disk corruption occur, most of the mail is likely to be unaffected, and any that is damaged can usually be recovered.

Eudora supports the POP3, IMAP and SMTP protocols. Eudora also has support for SSL and S/MIME authentication, allowing users to sign or encrypt email communications for greatest security.

At one time, Eudora also offered a webmail version at eudoramail.com. This service was run by Lycos as part of Mailcity, later renamed Lycos Mail. As of 2006, Eudoramail addresses for users still work (and are redirected to Lycos Mail accounts), but new users cannot sign up for the service.

## Problems for international users

Despite the Internet Mail Consortium (IMC) recommendation[2] (http://www.imc.org/mail-i18n.html) that all email programs must be able to display and create mail using UTF-8, Eudora has the dubious "distinction" of being the only major mail client left in the market that does not support it. Users of languages that are covered by ISO8859-1 may profit from the freeware plugin UTF8ISO (http://www.windharp.de/software/utf8iso.htm), which decodes many UTF-8 characters to ISO8859-1 ones which can be handled by Eudora. Another solution for Windows users is using a freeware converter MIME-Proxy[3] (http://www.lamaiziere.net/mp_pagen.html) that converts between a chosen, locally used character set and the charset of the e-mail. This program has the advantage that it is not limited to ISO-8859-1 on the user's end.

## Open sourcing

On October 11, 2006, Qualcomm announced [1] that future versions of Eudora would be based on the same technology platform as Mozilla Thunderbird and be open source. The current codename for this project is "*Penelope*" [2].

# References

- "[appletalk] Re: PopMail+GatorBox+MacTCP (http://groups.google.com/group/comp.archives/msg/e3bcb4c240c5827e?dmode=source&hl=en)", comp.archives, Jul. 9, 1990. USENET posting with Steve Dorner's announcement of Eudora.

1. ^ http://www.qualcomm.com/press/releases/2006/061011_project_collaboration_mozilla.html
2. ^ http://wiki.mozilla.org/Penelope

# See also

Exhibit JJ-3

- Comparison of e-mail clients

## External links

- Eudora (http://www.eudora.com/)

Retrieved from "http://en.wikipedia.org/wiki/Eudora_%28e-mail_client%29"

Categories: Articles with unsourced statements since February 2007 | All articles with unsourced statements | Mac OS e-mail clients | Mac OS X e-mail clients | Windows e-mail clients

- This page was last modified 03:42, 22 May 2007.
- All text is available under the terms of the GNU Free Documentation License. (See **Copyrights** for details.) Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a US-registered 501(c)(3) tax-deductible nonprofit charity.

**Exhibit JJ-4**

# Exhibit KK

# EXHIBIT
# FILED UNDER SEAL

# Exhibit LL

Exhibit LL-1

EXHIBIT
FILED UNDER SEAL

# Exhibit MM

# EXHIBIT
# FILED UNDER SEAL

# Exhibit NN

# EXHIBIT
# FILED UNDER SEAL

# Exhibit OO

# EXHIBIT
# FILED UNDER SEAL

# Exhibit PP

# EXHIBIT
# FILED UNDER SEAL

# Exhibit QQ

# AMERICAN COLLEGE OF TRIAL LAWYERS



## *Code of Pretrial Conduct*

Approved by the Board of Regents
October 2002

Copyright 2002
American College of Trial Lawyers
All Rights Reserved

**Exhibit QQ-2**

# Table of Contents

|  |  | Page |
|---|---|---|
| Preamble | | 1 |
| 1. | Scheduling | 2 |
| 2. | Service of Process, Pleadings, and Proposed Orders | 3 |
| 3. | Written Submissions to a Court | 3 |
| 4. | Communication with Adversaries | 3 |
| 5. | Discovery Practice | 4 |
| 6. | Motion Practice | 7 |
| 7. | Communication with Nonparty Witnesses | 7 |
| 8. | Communication with the Court | 8 |
| 9. | Settlement and Alternative Dispute Resolution | 9 |
| 10. | Pretrial Conferences | 10 |
| 11. | Communication with Consultants and Expert Witnesses | 11 |
| 12. | Scope of the Code of Pretrial Conduct | 11 |

*Code of Pretrial Conduct*

# Introduction

The American College of Trial Lawyers recently adopted this Code of Pretrial Conduct as a companion to the Code of Trial Conduct first adopted in 1956.

Like the Code of Trial Conduct, this new Pretrial Code is part of a continuing effort to promote professionalism and courtesy among trial lawyers during all stages of litigation. It supplements existing rules of professional conduct, local court rules, and rules of procedure, and provides guidance to trial lawyers on proper conduct in pretrial proceedings. And, like the Code of Trial Conduct, this Code expresses only minimum standards.

As Chief Justice, a former trial lawyer, and an Honorary Fellow of the College, it is a pleasure to commend the Code to the trial bar, law schools, and judiciary of our nation.

*William H. Rehnquist,*
*Chief Justice of the United States*

*May 2003*

*Code of Pretrial Conduct*

# Preamble

The American College of Trial Lawyers seeks to promote professionalism and courtesy among trial lawyers. In light of recent widespread abuse of pretrial procedures, the College presents this Code of Pretrial Conduct, as a companion piece to its Code of Trial Conduct.

This Code is primarily applicable to civil cases and is not intended to supplant any local rules, procedural rules, or rules of professional conduct. Instead, it should merely supplement those rules, providing guidance to trial lawyers on proper professional conduct in handling discovery, motion practice, and other pretrial matters.

While trial lawyers owe undivided allegiance to their clients, they also owe important duties to the judicial system, to their colleagues, and to the public. Only by fulfilling these duties can trial lawyers help to ensure the proper administration of justice.

In pretrial proceedings, a trial lawyer owes opposing counsel duties of courtesy, candor, and cooperation in scheduling, serving papers, communicating in writing and in speech, conducting discovery, designating expert witnesses, and seeking to resolve cases without litigation.

Trial lawyers owe similar duties of courtesy, candor, and cooperation to judges during the pretrial stage. These duties include preserving judges' time by seeking to resolve disputes without court involvement, promptly communicating with judges about significant developments, and following all judicial directives. Further, trial lawyers should scrupulously protect the judiciary's dignity and independence by avoiding inappropriate informality and ex parte communications.

Finally, during pretrial proceedings, trial lawyers should exhibit courtesy, candor, and cooperation in dealing with the public and participating in the legal system. These duties extend to all aspects of a trial lawyer's pretrial interaction with nonclients, including opposing parties, nonparty witnesses, expert witnesses, and consultants.

In fulfilling these duties, of course, trial lawyers must act in a manner consistent with their clients' legal interests. But trial lawyers can protect those interests while still applying the highest standards of professionalism. And by doing so, they can generate respect from the public that they serve.

In furtherance of the concepts expressed above, the American College of Trial Lawyers suggests the following minimum standards for lawyers' pretrial conduct.

# Standards For Pretrial Conduct

**1.    Scheduling**

   (a)   Scheduling a Pretrial Event

      (1)   Before noticing or scheduling a deposition, hearing, or other pretrial event, a lawyer should consult and work with opposing counsel to accommodate the needs and reasonable requests of all witnesses and participating lawyers. In scheduling a pretrial event, lawyers should strive to agree upon a mutually convenient time and place, seeking to minimize travel expense and to allow adequate time for preparation.

      (2)   Depositions, hearings, and other pretrial events should be scheduled early enough during the pretrial phase to avoid the difficult scheduling problems that often result from last-minute requests.

   (b)   Rescheduling a Pretrial Event

      (1)   If a lawyer needs to reschedule a deposition or other pretrial event, the lawyer should give prompt notice to all other counsel, explaining the conflict or other compelling reason for rescheduling.

      (2)   A lawyer who receives a reasonable request for rescheduling should strive to accommodate the request.

      (3)   If the conflict or other reason for rescheduling is later resolved or eliminated, then the lawyer who rescheduled the event should give notice as soon as practicable to all other counsel. The lawyers should then decide which of the two possible schedules is more convenient.

   (c)   Seeking and Granting Extensions of Time

      (1)   Courts expect lawyers to grant other lawyers' requests for reasonable extensions of time to respond to discovery, pretrial motions, and other pretrial matters. Opposing such requests wastes resources and needlessly inconveniences courts, which are likely to grant such requests, even if opposed. Lawyers should explain these principles to their clients and should insist on adhering to them, unless the clients' legitimate interests will be adversely affected.

      (2)   A lawyer should request an extension only when additional time is actually needed, and never merely for purposes of delay. In requesting an extension of time, a lawyer should explain to opposing counsel the reasons for the request.

      (3)   A lawyer who receives a reasonable request for extension — especially an initial request — should grant the request unless it is clearly inconsistent with the legitimate interests of the lawyer's client.

*Code of Pretrial Conduct*

**2**

## 2.    Service of Process, Pleadings, and Proposed Orders

(a)    The timing, manner, and place of serving process should not be calculated to disadvantage or embarrass the party being served.

(b)    Unless applicable procedural rules require otherwise, papers should not be filed in a court before being delivered to opposing counsel. For example, if papers are hand-delivered or faxed to the court, then they should be hand-delivered or faxed to opposing counsel on the same day and at about the same time.

(c)    Papers should not be served in a manner deliberately designed to shorten an opponent's time for response or to take other unfair advantage of an opponent. This may include service:

(1)    when the opponent is known to be absent from the office;
(2)    late on a Friday afternoon;
(3)    the day before a secular or religious holiday;
(4)    shortly before a hearing; or
(5)    when the timing of service does not afford the opponent adequate time to respond to the paper or to prepare for the relevant pretrial event.

(d)    Even if service by mail to opposing counsel does not technically violate the rules, such service sometimes prejudices the opposing party. If such prejudice is likely, then service should be made by hand or by facsimile, followed, if the applicable rules so require, by service by mail.

(e)    Except when expressly ordered by a court, a proposed order on any substantive matter should not be delivered to the court without assurance that tendering counsel has complied with paragraph 6(e) of this Code.

## 3.    Written Submissions to a Court

(a)    Written briefs and memoranda should not refer to or rely on facts that are not properly a part of the record. A lawyer may, however, present historical, economic, or sociological data if the applicable rules of evidence support the data's admissibility.

(b)    Neither written submissions nor oral presentations should disparage the integrity, intelligence, morals, ethics, or personal behavior of an adversary unless such matters are directly relevant under the controlling substantive law.

(c)    When legal opinions are highlighted and presented to the court, identical highlighting should be included on copies of the opinions furnished to opposing counsel.

## 4.    Communication with Adversaries

(a)    In their practice, lawyers should remember that their role is to zealously advance the legitimate interests of their clients, while maintaining appropriate standards of civility and decorum. In dealing with others, counsel should not reflect any ill feelings that clients may have toward their

adversaries. Lawyers should treat all other lawyers, all parties, and all witnesses courteously, not only in court, but also in other written and oral communication. Lawyers should refrain from acting upon or manifesting bias or prejudice toward any person based upon race, sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status.

(b)     Lawyers should avoid hostile, demeaning, or humiliating words in written and oral communication with adversaries.

(c)     Letters intended only to make a record should be used sparingly and only when thought to be necessary under all the circumstances. Letters should not be written to ascribe to an adversary a position that he or she has not taken or to create a "record" of events that have not occurred.

(d)     Unless specifically permitted or invited by the court, letters between counsel should not be sent to judges.

(e)     Lawyers should strictly adhere to all express promises to and agreements with opposing counsel, whether oral or in writing, and should adhere in good faith to all agreements implied by the circumstances or by local custom.

(f)     When practicable, lawyers should agree to reasonable requests for the waiver of procedural formalities.

## 5.     Discovery Practice

(a)     Discovery in General

In discovery, as in all other professional matters, a lawyer's conduct should be honest, fair, and courteous. In general, a lawyer should adhere to the following guidelines in conducting all forms of discovery:

(1)     A lawyer should strictly follow all applicable rules in drafting and responding to written discovery and in conducting depositions.

(2)     A lawyer should conduct discovery to elicit relevant facts and evidence, and not for an improper purpose, such as to harass, intimidate, or unduly burden another party or a witness.

(3)     A lawyer should respond to written discovery in a reasonable manner and should not interpret requests in a strained or unduly restrictive way in an effort to avoid responding to them or to conceal relevant, nonprivileged information.

(4)     Objections to interrogatories, document requests, and requests for admissions should be made in good faith and should be adequately explained and limited.

(5)     When a discovery dispute arises, opposing lawyers should attempt to resolve the dispute by working cooperatively together. Lawyers should refrain from filing motions to compel or for sanctions unless they have genuinely tried, but failed, to resolve the dispute through all reasonable avenues of compromise and resolution.

(6)  Lawyers should claim a privilege only under appropriate circumstances. They should not assert a privilege solely to withhold or suppress nonprivileged information or to limit or delay their response.

(7)  Requests for additional time to respond to discovery should be made as far in advance of the due date as reasonably possible and should not be used for tactical or strategic reasons.

(8)  Unless there are compelling reasons to deny a request for additional time to respond to discovery, an opposing lawyer should grant the request without necessitating court intervention. Compelling reasons to deny such a request exist only if the client's legitimate interests would be materially prejudiced by the proposed delay.

(b)  Interrogatories

(1)  Lawyers should avoid "boilerplate" interrogatories. Instead, they should carefully tailor interrogatories to elicit information that is relevant to the issues in the pending case or that is otherwise necessary to discover or understand those issues.

(2)  Lawyers should not assert objections solely to avoid answering an appropriate interrogatory. If only part of an interrogatory is objectionable, then the responding lawyer should object only to that part and should answer the remainder of the interrogatory.

(c)  Document Requests

(1)  Lawyers should carefully tailor document requests to obtain documents that are relevant to the issues in the pending case or that are otherwise necessary to discover or understand those issues.

(2)  Lawyers should not assert objections solely to avoid producing relevant documents. If only part of a request is objectionable, then the responding lawyer should object only to that part and should timely produce all documents responsive to the remainder of the request.

(3)  In responding to document requests, lawyers should make reasonable accommodations for review and copying by opposing counsel. Documents being produced should be organized in a manner consistent with the applicable rules of procedure. A group of documents should never be arranged in a manner calculated to hide or obscure the existence of particular documents or discoverable information.

(4)  If any responsive documents are withheld, then at the time of production, the producing lawyer should give notice of that fact and should explain the reason for withholding them. The producing lawyer should timely provide, in accordance with applicable rule, a log of all documents withheld, including, for each document: (a) its date; (b) the author's name; (c) a general description; (d) the addressee, if any; (e) its current location; (f) the basis

for withholding it; and (g) any other information that may be required by applicable rules of procedure.

(d) Requests for Admissions

    (1) Lawyers should use requests for admissions only to ascertain the truth of matters within the scope of the pending case. Such requests should be carefully drafted to inquire only about matters of fact or opinion or the application of law to fact, including the genuineness of any documents properly described in the requests.

    (2) Lawyers should not assert objections solely to avoid admitting or denying an appropriate request. If only part of a request is objectionable, then the responding lawyer should object only to that part and should admit or deny the remainder of the request or set forth in detail the reasons why the answering party cannot truthfully admit or deny the request.

(e) Depositions

    (1) Lawyers should limit depositions to those that are necessary to develop the claims or defenses in the pending case or to perpetuate relevant testimony.

    (2) In appearing for depositions, lawyers should arrive punctually at the time and place stated in the notice or subpoena or agreed upon by counsel. If a lawyer is unavoidably delayed, other participating lawyers should be promptly notified, should be told the reason for the delay, and should be advised when to expect the delayed lawyer's arrival.

    (3) If a scheduled deposition must unavoidably be cancelled, the other participating lawyers should be notified as soon as possible and should be told the reason for the cancellation. The canceling lawyer should promptly seek to reschedule the deposition in a way that will minimize any inconvenience and expense caused by the cancellation.

    (4) During a deposition, lawyers should conduct themselves with decorum and should never verbally abuse or harass the witness or unnecessarily prolong the deposition.

    (5) During a deposition, lawyers should strictly limit objections to those allowed by the applicable rules. In general, lawyers should object only to preserve the record, to assert a valid privilege, or to protect the witness from unfair, ambiguous, or abusive questioning. Objections should not be used to obstruct questioning, to improperly communicate with the witness, or to disrupt the search for facts or evidence germane to the case.

(f) Exceptions to the General Guidelines Regarding Discovery

    (1) A lawyer who has attempted to comply with these guidelines is justified in setting a hearing or deposition without agreement from opposing counsel if opposing counsel fails or refuses to promptly accept or reject a time offered for the hearing or deposition.

*Code of Pretrial Conduct*

**6**

(2)    If opposing counsel raises an unreasonable number of calendar conflicts, a lawyer is justified in setting a hearing or deposition without agreement from opposing counsel.

(3)    If opposing counsel has consistently failed to comply with these guidelines, a lawyer is justified in setting a hearing or deposition without agreement from opposing counsel.

(4)    When an action involves so many lawyers that compliance with these guidelines appears to be impracticable, a lawyer should nonetheless make a good-faith attempt to comply with their terms to the extent practicable.

(5)    If a case involves an extraordinary remedy and the time associated with a scheduling agreement could harm a client's case, then a lawyer is justified in setting a hearing or deposition without agreement from opposing counsel, giving notice as prescribed in paragraph 8(b) of this Code.

## 6.   Motion Practice

(a)    Before setting a motion for hearing, a lawyer should make a reasonable effort to resolve the issue without involving the court.

(b)    A lawyer who has no valid objection to an opponent's proposed motion should promptly make this position known to opposing counsel. Depending on the nature of the motion, such candor will enable opposing counsel either to file an unopposed motion or to avoid filing a motion altogether.

(c)    If, after opposing a motion, a lawyer recognizes that the movant's position is correct based on the facts or the law, then the lawyer should promptly advise opposing counsel and the court of this change in position. Such candor will prevent the court and opposing counsel from participating in an unnecessary hearing and from addressing issues unnecessarily.

(d)    After a hearing, the lawyer charged with preparing the proposed order should draft it promptly, striving to fairly and accurately articulate the court's ruling. The lawyer should submit the proposed order in compliance with the court's instructions. If no specific schedule is imposed by the court, the lawyer should strive either to tender a copy to opposing counsel, in accordance with paragraph 6(e), below, no later than the following day, excluding Saturdays, Sundays, and legal holidays, or to inform opposing counsel when he or she may expect such a tender.

(e)    Before submitting a proposed order to a court, a lawyer should provide a copy to opposing counsel, who should promptly voice any objections. If the lawyers cannot resolve all objections, then the drafting lawyer should promptly submit the proposed order to the court, stating any unresolved objections.

## 7.   Communication with Nonparty Witnesses

(a)    In dealing with a nonparty who is a witness or potential witness, a lawyer must: (1) be truthful about the material facts and the applicable law; (2) disclose his or her interest or role in the

*Code of Pretrial Conduct*

Exhibit QQ-11

pending matter; (3) correct any misunderstanding expressed by the nonparty; (4) treat the nonparty courteously; and (5) avoid unnecessarily embarrassing, inconveniencing, or burdening the nonparty.

(b)　　If a lawyer knows that a nonparty witness is represented by counsel in the pending matter, then the lawyer should not contact the witness without permission from that counsel.

(c)　　If a lawyer knows that a nonparty witness is an employee or agent of an organization represented by counsel in the pending matter, then the lawyer should scrupulously follow the rules of the applicable jurisdiction governing such contacts. Absent such rules, the lawyer should not contact the witness without permission from that counsel if: (1) the witness has the power to compromise or settle; (2) the witness regularly consults with the organization's lawyers; (3) the witness's acts may be imputed to the organization for liability purposes; or (4) the witness's statements would bind the organization.

(d)　　Lawyers should show courtesy and civility to all nonparty witnesses.

(e)　　A lawyer should not obstruct another party's access to a nonparty witness or induce a nonparty witness to evade or ignore process.

(f)　　A lawyer should not issue a subpoena to a nonparty witness except to compel, for a proper purpose, the witness's appearance at a deposition, hearing, or trial or to obtain necessary documents in the witness's possession.

(g)　　If a lawyer issues a deposition subpoena for a nonparty witness, then the lawyer should simultaneously send all counsel in the pending matter a notice of the deposition and a copy of the subpoena.

(h)　　If a lawyer obtains documents through a deposition subpoena, the lawyer should, as soon as reasonably practicable, make copies of the documents available to all counsel at their expense, even if the deposition itself is cancelled or adjourned after the documents are produced.

## 8.　Communication with the Court

(a)　　A lawyer should make no attempt to obtain an advantage in a pending case through ex parte communication with the presiding judge. A lawyer must avoid such communication on any substantive matter and on any matter that could reasonably be perceived as a substantive matter. Ex parte communication of this type is detrimental to the administration of justice and reflects adversely on the entire legal profession. Therefore, when a lawyer informally communicates with a court, the highest degree of professionalism is demanded.

(b)　　Even if the applicable law permits an ex parte communication with the court under certain circumstances, a lawyer — before approaching the court — should promptly and diligently attempt to notify opposing counsel, if known, and if not, the opposing party directly unless there is a bona fide emergency that threatens to materially prejudice the client's rights if regular notice is given. When giving such notice, the lawyer should advise the opponent of the basis for seeking immediate relief and should make reasonable efforts to accommodate the opponent's schedule so that the party affected may be represented.

(c)     For communications with the court that are related to a pending case, a lawyer should provide opposing counsel with copies of all written communications and should notify opposing counsel of all oral communications.

(d)     Any proposed order containing findings of fact or conclusions of law should be provided to opposing counsel for comment and objection before being submitted to the court. Local rules often govern whether other types of proposed orders must be provided to opposing counsel before submission to the court. In general, however, routine orders that merely reflect a particular ruling need not be provided to opposing counsel in advance. Similarly, if the contents of an order would be entitled to no deference on review, then the proposed order generally need not be furnished to opposing counsel in advance. Once an order has been submitted, there should be no ex parte communication with the court regarding the entry or the contents of the order.

(e)     A lawyer should always show courtesy to and respect for a presiding judge. While a lawyer may be cordial in communicating with a presiding judge in court or in chambers, the lawyer should never exhibit inappropriate informality.

(f)     A lawyer should avoid taking any action that is or appears to be calculated to gain any special personal consideration or favor from a presiding judge in a pending case.

## 9.     Settlement and Alternative Dispute Resolution

(a)     Lawyers should educate their clients early in the legal process about various methods of resolving disputes without trial, including mediation, arbitration, and neutral case evaluation.

(b)     Lawyers should advise clients of the benefits of settlement, including savings to the client, greater control over the process and the result, and a more expeditious resolution of the dispute. The lawyer and the client should work together in formulating a settlement strategy designed to accomplish the client's realistic goals and expectations.

(c)     At the earliest practicable time, a lawyer should provide the client with a realistic assessment of the potential outcome of the case so that the client may effectively assess various approaches to resolving the dispute. As new information is obtained during the pretrial phase, the lawyer should revise the assessment as necessary.

(d)     When enough is known about the case to make settlement negotiations meaningful, a lawyer should explore settlement with the client and opposing counsel.

(e)     Throughout the representation of a client in a case, the lawyer should pursue the possibility of settlement and should use all reasonable measures to engage opposing counsel in the settlement process.

(f)     A lawyer should enter into settlement negotiations in good faith, should make proposals that are designed to achieve a resolution, and should recommend reasonable compromises consistent with the client's best interests.

(g)     When requested by opposing counsel and authorized by the client, a lawyer should informally provide documents and other information that will promote and expedite settlement efforts.

(h)     A lawyer should never make settlement proposals that are designed to antagonize or further polarize the parties.

(i)     A lawyer should never engage in settlement negotiations for the purpose of delaying discovery or gaining an unfair advantage.

(j)     In participating in settlement negotiations and alternative methods of resolving disputes, lawyers should practice the same courtesy, candor, and cooperation expected of them during other pretrial proceedings.

## 10.   Pretrial Conferences

(a)     A lawyer should carefully read and comply with an order setting pretrial deadlines or scheduling a pretrial conference. The lawyer should complete any required statement in full, seeking to reach agreement with opposing counsel when possible and thus to limit the issues to be addressed before and during trial.

(b)     In advance of a final pretrial conference, it is desirable for discovery to be completed, for discovery responses to be supplemented, for discovery exhibits to be furnished, for evidentiary depositions to be concluded, and for settlement negotiations to be exhausted.

(c)     A lawyer should determine in advance of a pretrial conference the trial judge's custom and practices in conducting such conferences.

(d)     A lawyer should satisfy all directives of the court set forth in the order setting a pretrial conference and should consult and comply with all local rules and with any specific requirements of the trial judge.

(e)     Before the initial pretrial conference, a lawyer should ascertain the client's willingness to participate in alternative dispute resolution.

(f)     Unless unavoidable circumstances prevent it, a lawyer representing a party at a pretrial conference should be thoroughly familiar with each aspect of the case, including the pleadings, the evidence, and all potential procedural and evidentiary issues.

(g)     Unless unavoidable circumstances prevent it, the pretrial conference should be attended by a lawyer who will actually try the case, and, in any event, by a lawyer who is familiar with the case.

(h)     A lawyer should alert the court as soon as practicable to scheduling conflicts and travel considerations of clients, experts, and other essential witnesses.

(i)     If stipulations are possible for uncontested matters, a lawyer should propose specific stipulations and work with opposing counsel to obtain an agreement in advance of the pretrial conference.

(j)     At or before a final pretrial conference, a lawyer should alert the court to the need for any pretrial rulings or hearings on matters such as motions in limine and Daubert-type motions on expert-witness qualifications or expert testimony.

(k)     At the final pretrial conference, a lawyer should be prepared to advise the court of the status of settlement negotiations and the likelihood of settlement before trial.

(l)     During the final pretrial conference, a lawyer should confirm the trial judge's practices in the voir dire of potential jurors, the exercise of peremptory strikes, and the selection of replacement jurors.

## 11.   Communication with Consultants and Expert Witnesses

(a)     In retaining consultants for expert opinions, a lawyer should be familiar with the qualifications necessary for an expert witness to give opinion evidence at trial, as set forth in the Daubert decision in federal court and in state-court opinions establishing similar guidelines.

(b)     In retaining an expert witness, a lawyer should respect the integrity of the expert's professional practices and procedures, and should refrain from asking or encouraging the expert to violate the integrity of those practices and procedures for purposes of the particular matter for which the expert has been retained.

(c)     In general, an expert must be qualified based on the expert's specialized knowledge or expertise going beyond the general knowledge of lay persons. In retaining an expert witness, a lawyer should provide the expert with information that is believed to be relevant and material to the subject matter of the expert's proposed written report.

(d)     In retaining an expert witness, a lawyer should respect the expert's integrity, knowledge, conclusions, and opinions. A retained expert should be fairly compensated for all work on behalf of the client. But a lawyer must not make compensation, or the amount of compensation, contingent in any way upon the substance of the expert's opinions or written report or upon the outcome of the matter for which the expert has been retained.

(e)     A lawyer should not purposefully delay designating an expert witness or delivering an expert's report in an effort to postpone a trial setting or to preclude the taking of the expert's deposition at a reasonable time before trial.

## 12.   Scope of the Code of Pretrial Conduct

This Code of Pretrial Conduct is intended to provide guidance for a lawyer's professional conduct except to the extent that any applicable law, code, rules of procedure, or rules of professional conduct in a particular jurisdiction require or permit otherwise. It is merely a guide for trial lawyers and should not give rise to any claim, create a presumption that a legal duty has been breached, or form the basis for disciplinary proceedings or sanctions not called for under the controlling law.

# Exhibit RR

**SignOnSanDiego.com**
THE SAN DIEGO UNION-TRIBUNE

🖨 PRINT THIS

**More Business news**
# Qualcomm argues it shouldn't have to pay

## Broadcom wants fees covered in court case

**By Kathryn Balint**
UNION-TRIBUNE STAFF WRITER

**June 13, 2007**

Qualcomm said in court papers filed yesterday that it should not have to pay rival Broadcom's legal fees in a court case in which Qualcomm is accused of failing to turn over 35,000 documents.

San Diego-based Qualcomm said that there would have to be clear and convincing evidence of bad faith, intentional misconduct or frivolous or hopeless litigation in order for a judge to require payment of Broadcom's legal fees.

"We acknowledge that we did not find and produce documents that we should have found and produced," said Bill Sailer, senior vice president and legal counsel for Qualcomm. "But, under the law, that's not enough to make for an exceptional case. The standard rule in the United States and in California is that you don't get your attorneys' fees paid if you win a lawsuit except in specific cases called exceptional cases."

The case began with a patent-infringement claim that Qualcomm, a maker of cell-phone chips and a developer of wireless technology, filed in 2005 against chipmaker Broadcom. Broadcom won the case in January when a San Diego federal jury found that the Irvine company's chips – used in such devices as the Apple video iPod, TV set-top boxes and high-definition DVRs – had not infringed on two of Qualcomm's video-compression patents.

On the last day of trial, Broadcom attorneys became incensed when Qualcomm turned up 21 e-mails that it had failed to produce in the discovery phase of the litigation. Since then, Broadcom says that Qualcomm has discovered more than 35,000 e-mails and other electronic documents – a total of 226,638 printed pages pertinent to the case.

In light of the discovery, Broadcom filed a motion last month asking that Qualcomm be ordered to pay Broadcom's legal fees, among other things. Broadcom said in its court papers that witnesses and attorneys for Qualcomm "presented false and misleading sworn testimony and legal arguments" that can be refuted by the recently discovered documents.

Qualcomm attorney Sailer said yesterday that at least one-third of the 35,000 documents were duplicate e-mails sent to multiple people at one time and that others were documents unrelated to the case. In addition, Sailer said that Broadcom noted only 130 of the documents in its court filings.

"What they're trying to do is ride this document issue into something more than it actually is," Sailer said. "We're an ethical company. It was a mistake in this case. It was inadvertent. It was not intentional."

Both Qualcomm's general counsel and its outside lead attorney on the case sent letters of apology to the judge in April for the failure to find the documents and turn them over to Broadcom before the trial.

**Exhibit RR-2**

U.S. District Judge Rudi Brewster is scheduled to consider the issue of legal fees on June 25.

He also will consider what remedy, if any, to impose on Qualcomm for failure to disclose its intellectual property to a standards-making body.

In that same patent case, Qualcomm was found by the judge and the jury to have waived its rights to enforce two video compression patents against Broadcom because of its failure to alert the standards group.

In other court papers filed yesterday, Qualcomm asked the judge to take no further action against the company. Broadcom has asked the judge to bar Qualcomm from enforcing the two patents against all companies that make products that comply with the advanced video compression standard.

Sailer said that, under the judge's finding, Qualcomm is already barred from enforcing the two patents against Broadcom.

"What Broadcom is doing is asking for an additional remedy," Sailer said. "They got a remedy. They're not entitled to anything more."

---

■Kathryn Balint: (619) 293-2848; **kathryn.balint@uniontrib.com**

**Find this article at:**
http://www.signonsandiego.com/news/business/20070613-9999-1b13qcom.html

☐ Check the box to include the list of links referenced in the article.

**Exhibit RR-3**