# EXHIBIT A

ORIGINAL

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF CALIFORNIA

3

4   QUALCOMM, INC. et al.,      )   Case No. 05CV1392-B (BLM)
                                )
5            Plaintiffs,        )   San Diego, California
    vs.                         )
6                               )   Tuesday,
    BROADCOM CORPORATION,       )   December 5, 2006
7                               )   9:45 a.m.
             Defendant.         )
8   _____)

9

10                  TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE RUDI M. BREWSTER
11                 UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiffs:         JAMES R. BATCHELDER, ESQ.
                                BRADLEY A. WAUGH, ESQ.
14                              LEE PATCH, ESQ.
                                LOUIS TOMPROS, ESQ.
15                              Day, Casebeer, Madrid and
                                 Batchelder
16                              20300 Stevens Creek Boulevard
                                Suite 400
17                              Cupertino, California  95014
                                (408) 843-0110
18

19                              STANLEY YOUNG, ESQ.
                                Heller Ehrman, LLP
20                              4350 La Jolla Village Drive
                                Seventh Floor
21                              San Diego, California 92122
                                (858) 450-8400
22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.



EXHIBIT _A_ PAGE _3_

1      Now, the important dates, I think, are up there on

2  the screen.  December 2002.  It's uncontested both experts

3  who are testifying or who are prepared to testify on the JVT

4  issues say that the technical aspects were fixed in December

5  2002.  They were included in a release in May 2003.

6      Now, there are minutes whose province is a little

7  uncertain, but there are minutes that say that Qualcomm

8  people attended starting in September 2003 and going into

9  2005.  Obviously, there was notice as of this lawsuit being

10 filed in 2005 of October that these claims were being made.

11 And in 2006, it wasn't until then that there were proposals

12 being made by Qualcomm employees and disclosure forms filed.

13     Now, your Honor referred to the rules of these

14 organizations, and I would refer your Honor to page nine of

15 the booklet, Slide 9, which summarizes those rules.  And

16 those rules --

17          THE COURT:  Which booklet are you talking about?

18          MR. YOUNG:  It's the book you have there in front

19 of you.

20          THE COURT:  This one here?

21          MR. YOUNG:  Yes, your Honor.  Page nine of that

22 summarizes the applicable rules.  And we've referred there

23 to the rules of both the JVT itself and of the parent

24 organizations.  And in summary, there is encouragement and

25 suggestion and requesting of the disclosure of patents that

EXHIBIT___A___PAGE___4___

26

1  relate to the standard proposal, but the only requirements,

2  the only things that the rule said the party has to -- has

3  to, must and is required to submit the disclosure is with

4  respect to a proposal that is made.

5        Now, those proposals from Qualcomm employees did

6  not come until 2006.  However, the standard that we're

7  talking about here was finalized and hasn't been changed

8  since its publication in May 2003, and it was actually

9  finalized in December 2002.

10        Now, go to Slide 10, please.

11        There is a cite from the Rambus (phonetic) case

12  which both parties cited -- this quote did not get its way

13  into the briefing, though -- which is that the policy, in

14  order to provide a basis for a disclosure duty, has to

15  clearly define what, when, how --

16        THE COURT:  Let me just stop you.  Before we get

17  into -- I'm not ready to dance yet.  I'm still at the

18  introductions phase.

19        MR. YOUNG:  Understood, your Honor.

20        THE COURT:  I want to know a little more about

21  these obligations, precadations, benefits, assumptions.  I

22  want to know the -- what's written in the nature of bylaws

23  as to how this organization is going to function.  In other

24  words, if there is an organization of private companies that

25  come together to work together to set up standardization

Echo Reporting, Inc.


EXHIBIT A PAGE 5

28

1 page nine of that document, which is part of Annex 3 which

2 starts on page eight.  If you go to page nine --

3            THE COURT:  I'm on page nine.

4            MR. YOUNG:  All right.  Under paragraph 3.2, there

5 is a section entitled, "Collection of IPR Intellectual

6 Property Rights Information During the Standardization

7 Process."

8            THE COURT:  Yeah.

9            MR. YOUNG:  That is the key selection or portion

10 of this terms of reference cited by both parties.  And what

11 it says, starting in the first line is:

12            "According to the ITU-T and ISOIEC

13            IPR policy" -- those are the two parent

14            organizations we referred to earlier --

15            "members/experts are encouraged" --

16            encouraged, not required -- "are

17            encouraged to disclose as soon as

18            possible IPR information of their own or

19            anyone else's associated with any

20            standardization proposal of their own or

21            anyone else's.  Such information is to

22            be provided on a best effort basis."

23            And I think it's uncontested -- the experts have

24 testified to this, and one of the parent body rules actually

25 says this.  There's no requirement that you actually have a


EXHIBIT ___A___ PAGE ___6___

29

1  patent search, that a company look through all of its

2  patents in order to determine whether it has one that

3  applies to the standard being discussed.

4          So if encouragement --

5          THE COURT:  But if they know -- but if they know

6  about it, they're encouraged to share it.

7          MR. YOUNG:  Correct.  It's encouragement.  Now,

8  that's important -- that's an important word because in the

9  second paragraph of that segment -- of that section, it goes

10  on to say, for collecting such information, there's a form,

11  and that's attached to the back of the terms of reference.

12          In the third paragraph, it says, therefore, JVT

13  requires -- note the word "require" there.  We've switched

14  now from encouraged to require.  JVT requires all technical

15  algorithmic proposals include the following.  And then it

16  describes the filling out of the form that is required at

17  that time for disclosure when a technical algorithmic

18  proposal is to be made.

19          Now, that's a very important issue under the

20  Rambus case because it's the rules of the organization that

21  govern, and it's the rules of the organization that people

22  who come to the meetings read in order to determine what

23  their obligations are.

24          What Broadcom wants to do without giving us

25  notice, by the way -- and I do want to go back to the issue

Echo Reporting, Inc.


EXHIBIT __A__ PAGE __4__

1 important to Qualcomm to have a standard so it can plug in

2 and sell whatever it wants and make a lot of money.  Either

3 one of those facts, if proven, would constitute the defense

4 of implied license.  The defense of implied license doesn't

5 import the concept of paying royalties.  What it imports is

6 that someone has agreed to give, in effect, a royalty

7 prelicense by not -- by not enforcing their patent or saying

8 that it doesn't apply.  That's what the legal doctrine says.

9 Okay.

10          THE COURT:  So there is such a thing as a royalty-

11 free license.

12          MR. REGAN:  There is.

13          THE COURT:  Okay.

14          MR. REGAN:  All right.

15          THE COURT:  But why didn't you plead it?

16          MR. REGAN:  We didn't plead it because we didn't

17 understand at that time that that information was out there.

18 This whole issue of the --

19          THE COURT:  Then why did you plead waiver?

20          MR. REGAN:  Well, we pleaded waiver because we

21 knew at the time that Qualcomm didn't send us any letter

22 before the lawsuit and that these patents had been out there

23 for quite a while.  We didn't make the connection to the

24 standards organization until while in discovery.  And Mr.

25 Young said --



EXHIBIT  A  PAGE  8

129

1  coached them and pepped them up and gave them the pep talks

2  and always was kind of encouraging them to -- to play ball

3  and don't be a mole in this outfit, be a contributing

4  helpful member.  You know, I -- I can assume that he would

5  give you some pretty good pep talks like a football coach at

6  halftime.  But the fact is you're asking me to find in

7  equity that I should create a duty out of the fact that

8  they're coaxed, for years they're coaxed to do it, and the

9  coaxing creates the duty and equity to throw their case out.

10         MR. REGAN:  What I'm asking you -- I did not

11 cross-move for summary judgment.  What I'm asking --

12         THE COURT:  I know that.

13         MR. REGAN:  What I'm asking you to do, your

14 Honor --

15         THE COURT:  I know you didn't.  You want an issue

16 of fact.  I'm aware of that.

17         MR. REGAN:  Yes.

18         THE COURT:  I'm aware of that.

19         MR. REGAN:  And I --

20         THE COURT:  However, if -- if there's a duty, then

21 you got something to have an issue of fact over.  What's the

22 sense in deciding a fact issue if there is no duty to

23 harness it to and drive it into the sunset?

24         MR. REGAN:  But whether there is or isn't a duty

25 in this case, given the fact that it's based on conducts of

Echo Reporting, Inc.



EXHIBIT ___A___ PAGE ___9___

130

1 the standard-setting organizations, underlying that is a

2 factual question.  All the things we've been talking about

3 here for several hours, those are facts.  Those facts have

4 to be evaluated, and then a conclusion has to be reached

5 about whether there's a duty or not.

6            What you're doing is under a light that's -- under

7 a standard in which the evidence is supposed to be viewed in

8 the light most favorable to Broadcom, you're making an

9 assessment -- you're sitting as you would after hearing

10 evidence in an equity trial, and making a determination that

11 there is no duty.  You may make that decision ultimately,

12 but I suggest to you, your Honor, respectfully, that that's

13 not your province at the moment on a summary judgment

14 record, that your province on the summary judgment record is

15 to take everything I've said, credit the facts the way I see

16 them, and say is there no dispute of fact here, no genuine

17 dispute of a material fact such that they get summary

18 judgment.

19            I don't think under Seletex and all the Ninth

20 Circuit cases you can do that because the facts that underly

21 whether there's a duty or not -- and it's best indicated by

22 the length of our conversation today -- is that.  You're

23 really making a bench ruling, not on a trial record but on

24 information that has come to you on a summary judgment

25 standard, and I think that -- that the standard for summary

EXHIBIT __A__ PAGE __10__

1       As I set forth earlier --

2       THE COURT:  Well, he just -- did you hear what Mr.

3 Regan was describing about that upper rectangular box?

4       MR. REGAN:  And remember what three point two

5 says.  It talks about the disclosure of intellectual

6 property of your own or of anyone else's that bears on

7 standardization questions.

8       She's smack in the middle of the whole

9 standardization process.  What could be more central than

10 coding efficiency?  The whole point is to compress those

11 pixels more and more and to only pick out what isn't

12 redundant.

13       THE COURT:  Well, let's bring this motion to a

14 head.  I'm going to -- I'm going to limit the theory which

15 is pled as waiver, and that's what you have.  And you can do

16 what you -- everything that you want to do under these other

17 titles, they're all -- they're also relevant on waiver.  So

18 sometimes under-burdening the camel is better than over-

19 burdening the camel.

20       I was just at lunch talking to a couple of

21 appellate justices, and they were bemoaning the fact that --

22 that lawyers don't -- refuse to understand how important it

23 is to not obfuscate the point they want the justice to read

24 and understand because they insist on weighing their

25 submittals instead of counting them, and they deliver piles

EXHIBIT ___A___ PAGE __11__

209

1 of stuff to the justices, and they say, "Now, in this stack,

2 Judges, there's something that you want to read, but never

3 mind asking us where it is." They say "Half the time we

4 can't even find it." And that's not the way to win a point

5 with anybody, let alone a judge. How about a jury? You're

6 going to try this case with a jury, and sometimes you can

7 make more points with fewer theories and shots and arguments

8 than -- I'll never forget that case where the pro per

9 represented himself. On his first argument for final

10 argument -- he was the plaintiff -- he argued for about 45

11 minutes. It was a -- it was a discrimination in employment.

12 He was a member of a union, sued his union, and there were

13 two lawyers representing the union, and they argued for two

14 and a half hours for the defense, and when he finished, I

15 said, "Mr. Moanie, you may close. You're the plaintiff.

16 You get to go last." He said, "You mean I get to argue

17 again?" I said, "That's right. You're the Plaintiff." So

18 he stood up and he walked around his table and looked at the

19 jury and looked at them for a second, and he said "They know

20 what this case is all about," and he sat down, got a verdict

21 of $120,000.

22     MR. REGAN: They ought to teach that in trial

23 advocacy.

24     THE COURT: Well, you know, sometimes better is

25 less than more. So let's go with waiver, I'm going to deny



EXHIBIT __A__ PAGE __12__

210

1 summary judgment on that affirmative defense, and we have a

2 couple more motions.

3          MR. REGAN:  Mr. Steinberg is going to speak for us

4 on those.

5          THE COURT:  It's time for a recess.

6      (Proceedings recessed briefly.)

7          THE COURT:  All right.  Now, 1958 patent,

8 Broadcom's motion for summary judgment of non-infringement.

9          MR. BATCHELDER:  Which patent, your Honor?

10          THE COURT:  1958.

11          MR. BATCHELDER:  That's the case number.

12          THE COURT:  I'm sorry.  I beg your pardon.  It's

13 104 patent.

14          MR. BATCHELDER:  One zero four?

15          THE COURT:  Yeah.

16          MR. STEINBERG:  Thank you, your Honor.

17          THE COURT:  Okay.

18          MR. STEINBERG:  You ready, your Honor?

19          THE COURT:  Yes, I am.

20          MR. STEINBERG:  So I guess the -- the 104 --

21          THE COURT:  Now, let me just get some

22 housekeeping.  We got to quit at 5:00, and I can -- I'm

23 available -- I've checked with my calendar with my staff.

24 I'm available at 2:15 for the afternoon of this Thursday

25 if -- if that is good for everybody, this Thursday at 2:15,

Echo Reporting, Inc.



EXHIBIT ___A___ PAGE __13__

216

1 number two after 9:00 o'clock.

2            All right.  That takes care of that.  Are there

3 any other housekeeping things we need to decide today?

4            MR. REGAN:  None that come to mind, your Honor.

5            THE COURT:  Okay.  Well, then let's be in recess,

6 right?  Okay.  Let's be in recess until Monday, the 18th of

7 December.

8       (Proceedings concluded.)

9

10

11

12

13

14            I certify that the foregoing is a correct

15 transcript from the electronic sound recording of the

16 proceedings in the above-entitled matter.

17

18 _____      _____
   Transcriber                      Date  12-6-06

19

20 FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

21

22 _____
   L.L. Francisco, President
23 Echo Reporting, Inc.

24

25

                                      Echo Reporting, Inc.



EXHIBIT __A__ PAGE __14__

# EXHIBIT B

# EXHIBIT B FILED UNDER SEAL

# EXHIBIT C

# EXHIBIT C FILED UNDER SEAL

# EXHIBIT D

# EXHIBIT D FILED UNDER SEAL

# EXHIBIT E

# CERTIFIED COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

-----------------------------X

QUALCOMM INCORPORATED,

      Plaintiff,

v.                 05 CV 1958 B (BLM)

BROADCOM CORPORATION,

      Defendant.

-----------------------------X

BROADCOM CORPORATION,

      Counterclaimant,

v.

QUALCOMM INCORPORATED,

      Counterdefendant.

-----------------------------X

ORAL DEPOSITION OF GARY SULLIVAN
Taken on behalf of the Plaintiff and Counterdefendant
August 29, 2006

    BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of GARY SULLIVAN, was taken before, Karen M. Kane, a Certified Shorthand Reporter, #3072, and a Notary Public for the State of Washington, on August 29, 2006, commencing at the hour of 10:28 a.m., the proceedings being reported at the Redmond Marriott Town Center, 7401 164th Avenue Northeast, Redmond, Washington.



## David Feldman
### W o r l d w i d e

From File to Trial.

805 Third Avenue, 8th Floor
New York, NY 10022
(800) 642-1099

600 Anton Boulevard, 11th Floor
Costa Mesa, CA 92626
(866) DFW-1380

EXHIBIT ___E___ PAGE _51_

GARY SULLIVAN

16

| | | |
|---|---|---|
| 1 | 10:46 | A.    I guess that's -- that's most of it -- reporting on |
| 2 | 10:46 | activities, coordinating a distribution of documents -- |
| 3 | 10:46 | that's mostly it. |
| 4 | 10:46 | Q.    What were your responsibilities with respect to |
| 5 | 10:46 | intellectual property rights? |
| 6 | 10:46 | MR. ROBERTSON:  Objection; leading. |
| 7 | 10:46 | A.    There are intellectual property rights policies |
| 8 | 10:46 | that apply in the organization, and one of my |
| 9 | 10:46 | responsibilities is to remind people of what those are and |
| 10 | 10:46 | help them locate the information about that and encourage |
| 11 | 10:47 | people to follow those policies, check to the extent I can on |
| 12 | 10:47 | whether they're following those policies. |
| 13 | 10:47 | Q.    (BY MR. REGAN) Mr. Sullivan, who is allowed to |
| 14 | 10:47 | participate in the JVT? |
| 15 | 10:47 | A.    The JVT, since it's a joint organization of MPEG |
| 16 | 10:47 | and VCEG, within the JVT -- anyone who is qualified to |
| 17 | 10:47 | participate in either one of those organizations is also |
| 18 | 10:47 | allowed to qualify -- is also considered qualified to |
| 19 | 10:47 | participate in the JVT. |
| 20 | 10:47 | So, anyone who is a member of -- or representative |
| 21 | 10:48 | of a member of an organization that belongs to the ITU-T |
| 22 | 10:48 | Study Group 16 or is a member of MPEG -- or a person who is a |
| 23 | 10:48 | qualified delegate to MPEG and anyone who is a formal liaison |
| 24 | 10:48 | representative to MPEG or VCEG and, also, the members of the |
| 25 | 10:48 | management team of JVT can invite specific people to attend |

EXHIBIT ___E___ PAGE ___J2___

GARY SULLIVAN

17

| 1 | 10:48 | the meetings, and we do sometimes invite experts to attend |
| 2 | 10:48 | the meetings. |
| 3 | 10:48 | Q.    And who were the members of the management team of |
| 4 | 10:48 | the JVT? |
| 5 | 10:48 | A.    Up until about a year ago, I was the primary |
| 6 | 10:48 | chairman and there were two subchairmen, one appointed by |
| 7 | 10:49 | VCEG and one appointed by MPEG.  One of those is Thomas |
| 8 | 10:49 | Wiegand, who works for a government research institution in |
| 9 | 10:49 | Germany named Fraunhofer HHI; and the other one is Ajay |
| 10 | 10:49 | Luthra, who works for Motorola. |
| 11 | 10:49 | Q.    And which of those individuals was appointed by |
| 12 | 10:49 | MPEG and which by VCEG? |
| 13 | 10:49 | A.    Ajay was appointed by MPEG and Thomas was appointed |
| 14 | 10:49 | by VCEG. |
| 15 | 10:49 | Q.    How has the management team changed over the last |
| 16 | 10:49 | year? |
| 17 | 10:49 | A.    We started a new extension project on the standard |
| 18 | 10:49 | called scalable video coding extensions and when we embarked |
| 19 | 10:49 | on that, we added one more member to the JVT management team. |
| 20 | 10:49 | He is an equal status co-chair with me now.  So, we have two |
| 21 | 10:50 | co-chairs and two vice-cochairs; and that person is |
| 22 | 10:50 | Jens-Rainer Ohm of the Aachen University of Germany. |
| 23 | 10:50 | Q.    A-a-c-h-e-n? |
| 24 | 10:50 | A.    Yes. |
| 25 | 10:50 | Q.    Now, you use the phrase, I believe, "member |

DAVID FELDMAN WORLDWIDE, INC.
600 ANTON BOULEVARD, 11TH FLOOR, COSTA MESA, CALIFORNIA 92626  (866) 339-1380

EXHIBIT ___E___ PAGE _53_

18

| | | |
|---|---|---|
| 1 | 10:50 | organizations"? |
| 2 | 10:50 | A.    Yes. |
| 3 | 10:50 | Q.    By that, did you mean corporations that join as a |
| 4 | 10:50 | company and they are employees for designees that attend as |
| 5 | 10:50 | representatives? |
| 6 | 10:50 | MR. ROBERTSON:  Objection; leading. |
| 7 | 10:50 | A.    Yes.  In the ITU there are several classes of |
| 8 | 10:50 | members.  Most -- most of our participants are representing |
| 9 | 10:50 | what we call sector members, which is a scientific or |
| 10 | 10:51 | industrial organization, I think they call it.  Most of them |
| 11 | 10:51 | are companies like Microsoft.  We also have some people who |
| 12 | 10:51 | have other classes of membership, but that's -- that's the |
| 13 | 10:51 | most common. |
| 14 | 10:51 | The ITU is part of the United Nations and, so, |
| 15 | 10:51 | governments are also members and people can come as a |
| 16 | 10:51 | representative of the member nation.  And there is also a |
| 17 | 10:51 | class -- a lower class of membership called an associate, and |
| 18 | 10:51 | people sometimes represent associate members. |
| 19 | 10:51 | Q.    (BY MR. REGAN) Do companies that are member |
| 20 | 10:51 | organizations pay dues? |
| 21 | 10:51 | A.    Yes. |
| 22 | 10:51 | Q.    And what are the benefits or privileges that |
| 23 | 10:51 | companies receive as member organizations of the JVT? |
| 24 | 10:52 | MR. ROBERTSON:  Objection; foundation. |
| 25 | | A.    Well, being a member gives you the right to |

EXHIBIT __E__ PAGE __54__

GARY SULLIVAN

19

| | | |
|---|---|---|
| 1 | 10:52 | participate in meetings and to access documents inside the |
| 2 | 10:52 | standards body.  I guess those are the main ones I can think |
| 3 | 10:52 | of. |
| 4 | 10:52 | Q.    (BY MR. REGAN) How are documents within the |
| 5 | 10:52 | standards body accessed? |
| 6 | 10:52 | A.    In the JVT we have a Web site.  All of our |
| 7 | 10:52 | documents -- or virtually all of our documents are electronic |
| 8 | 10:52 | and we put all the documents on the Web site.  Nearly all of |
| 9 | 10:53 | them in the JVT we make publicly available without a |
| 10 | 10:53 | password, but we do protect a few of them with a password; |
| 11 | 10:53 | and in some of the parent bodies, the documents are protected |
| 12 | 10:53 | by passwords. |
| 13 | 10:53 | Q.    Is Broadcom Corporation a member organization of |
| 14 | 10:53 | the JVT? |
| 15 | 10:53 | A.    Well, the JVT itself doesn't have members, member |
| 16 | 10:53 | organizations.  I believe Broadcom is a sector member of the |
| 17 | 10:53 | ITU-T. |
| 18 | 10:53 | Q.    Is Qualcomm Corporation -- or excuse me.  Is |
| 19 | 10:53 | Qualcomm, Incorporated, a member organization of the ITU? |
| 20 | 10:53 | MR. ROBERTSON:  Objection; calls for speculation. |
| 21 | 10:53 | A.    I believe it is a sector member of the ITU-T. |
| 22 | 10:54 | Q.    (BY MR. REGAN) So, Qualcomm and Broadcom hold the |
| 23 | 10:54 | same member status within the ITU? |
| 24 | 10:54 | A.    Yes, I think so. |
| 25 | | Q.    Can you identify from memory what the Web site is |

EXHIBIT ___ PAGE ___

20

1    10:54        for the JVT documents that are publicly accessible?

2    10:54            A.    Yes.   Right now the site link is

3    10:54        http://ftp3.itu.int/av-arch/jvt-experts.

4    10:55            Q.    And are there any other JVT sites apart from that

5    10:55        one that are publicly accessible?

6    10:55            A.    There is a site where the person who coordinates

7    10:55        our software development puts the draft versions of the

8    10:55        software.

9    10:55            Q.    Can you identify that by memory?

10   10:55            A.    I don't remember the name of that --

11   10:55            Q.    Okay.

12   10:55            A.    -- the address of that site offhand.

13   10:55            Q.    Do you recall any portion of the address?

14   10:55            A.    It's -- it's an HHI, I think.   It's a Karsten

15   10:55        Suehring page at HHI.   I think it has -- well, that's about

16   10:55        all I remember.   It's in Germany.

17   10:55            Q.    All right.   HHI is the Heinrich-Hertz Institute?

18   10:55            A.    Yes.

19   10:55            Q.    And what is Karsten's last name?   How do you spell

20   10:55        it?

21   10:56            A.    We usually spell it S-u-e-h-r-i-n-g.   I think they

22   10:56        use accents when they spell it in Europe.   I don't remember

23   10:56        exactly how they spell it.

24   10:56            Q.    For a company like Qualcomm or Broadcom to join the

25                  ITU, what apart from paying dues is the requirement?



EXHIBIT ___E___ PAGE __56__

```
1                              CERTIFICATE

2

3            I,  Karen  M.  Kane,  do  hereby  certify  that

4     pursuant  to  the  Rules  of  Civil  Procedure,  the  witness

5     named  herein  appeared  before  me  at  the  time  and  place

6     set  forth  in  the  caption  herein;  that  at  the  said

7     time  and  place,  I  reported  in  stenotype  all  testimony

8     adduced  and  other  oral  proceedings  had  in  the

9     foregoing  matter;  and  that  the  foregoing  transcript

10    pages  constitute  a  full,  true  and  correct  record  of

11    such  testimony  adduced  and  oral  proceeding  had  and  of

12    the  whole  thereof.

13

14           IN  WITNESS  HEREOF,  I  have  hereunto  set  my

15    hand  this 6th   day  of September , 2006.

16

17

18

19                                    12-31-07
                                      _____
20    Karen  M.  Kane                 Commission  Expiration

21

22

23

24

25
```

# EXHIBIT F

DAY CASEBEER
MADRID & BATCHELDER LLP

20300 Stevens Creek Blvd., Suite 400
Cupertino, CA  95014
Telephone: (408) 873-0110
Facsimile:  (408) 873-0220

Adam Arthur Bier
(408) 342-4554
abier@daycasebeer.com

February 16, 2007

VIA FACSIMILE & U.S. MAIL

Louis Tompros, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109

**RE: QUALCOMM v. Broadcom, S.D. Cal. Case No. 05-cv-1958 B (BLM)**

Dear Louis:

I write in response to your letter to Lee Patch of February 7, 2007 concerning the twenty-one emails received by Viji Raveendran from the avc_ce@ient.rwth-aachen.de email reflector ("avc_ce reflector") that QUALCOMM discovered and produced during trial.  As explained earlier in our meet and confer, QUALCOMM voluntarily produced the emails during trial in the interest of expeditiousness.  We continue to believe that QUALCOMM performed a reasonable search of QUALCOMM's documents in response to Broadcom's Requests for Production and that the twenty-one unsolicited emails received by Ms. Raveendran from individuals on the avc_ce reflector are not responsive to any valid discovery obligation or commitment.

QUALCOMM disputes your contentions that it had a duty to produce the emails pursuant to the requests for production that you identified in your February 7 letter.  None of the emails in question was authored by or included content from or relating to Ms. Raveendran or any other QUALCOMM employee.  None of the emails was addressed specifically to Ms. Raveendran or any other QUALCOMM employee.  None of the emails was authored by a JVT, MPEG, ISO/IEC or ITU-T representative, and since the source of the emails appears to be a German university (avc_ce@ient.rwth-aachen.de), there is no evidence of any affiliation with those standards setting organizations.  None of the emails relates to QUALCOMM's patents-in-suit or QUALCOMM participation in setting the H.264 standard.

As a preliminary matter, in its written objections and responses dated February 24, 2006 (Responses to First Set of Requests for Production) and August 16, 2006 (Responses to Second Set of Requests for Production), QUALCOMM properly objected to each request for production enumerated in your letter, and either refused to produce any documents based on those objections or agreed to produce

594897

DAY CASEBEER
MADRID & BATCHELDER LLP

Louis Tompros, Esq.
February 16, 2007
Page 2

a reasonable, narrowed class of documents in response to such requests.  Having received QUALCOMM's objections, Broadcom never moved to compel or otherwise challenged QUALCOMM's written responses to these requests.  Accordingly, pursuant to the 30-day rule for discovery motions, set forth in paragraph 6 of the Court's February 17, 2006 Case Management Conference Order Regulating Discovery and Other Pretrial Proceedings, Broadcom's time to challenge QUALCOMM's timely-served discovery responses and the scope of QUALCOMM's commitment to produce documents expired long ago. The proper analysis, therefore, is whether the emails are within the scope of any of the categories of documents which QUALCOMM agreed to produce.  They are not.  As set forth below, incorporating by reference the objections previously stated,[1] the twenty-one emails are plainly outside the scope of QUALCOMM's discovery obligations.

- Request for Production No. 49.  QUALCOMM agreed to produce "non-privileged documents that were given to or received from standards-setting bodies in connection with the ISO/IEC MPEG-4 Part 10 standard, and which relate to the QUALCOMM Patents-in-Suit."  The twenty-one emails fall outside the scope of this category for numerous reasons.  First, they, unlike technical proposals, policy documents, or meeting notes, were neither given to nor received from a standards-setting body, but were instead simply a discussion thread among individuals who may or may not have been  participants in such a body. More importantly, none of the emails relates to either of the two QUALCOMM Patents-in-Suit.  Even under the request as propounded by Broadcom, the request covers only documents that pertain to the '104 or '767 Patents ("QUALCOMM Patents" in the request is a defined term, limited to those two patents).  Because the emails make no mention of either of the two patents, and indeed contain no discussion of any patents or intellectual property rights at all, let alone with respect to QUALCOMM's patents, the emails cannot reasonably be said to "pertain in any way" to the QUALCOMM Patents-in-Suit and therefore cannot be responsive to this request.

- Request for Production No. 50. QUALCOMM agreed to produce "non-privileged documents that were given to or received from standards-setting body responsible for the ISO/IEC MPEG-4 Part 10 standard, and which concern any QUALCOMM participation in setting the ISO/IEC MPEG-4 Part 10 standard.  As explained above, the emails were not received from a standards-setting body.  We understand that Broadcom may contend that Ms. Raveendran's mere passive receipt of unsolicited emails on this mass-email distribution

---

[1] QUALCOMM Incorporated's Response to Broadcom Corporation's First Set of Requests for Production of Documents and Things (Nos. 1-88), dated February 24, 2006 and QUALCOMM Incorporated's Response to Broadcom Corporation's Second Set of Requests for Production of Documents and Things (Nos. 89-115), dated August 16, 2006.

594897

DAY CASEBEER
MADRID & BATCHELDER LLP

Louis Tompros, Esq.
February 16, 2007
Page 3

list constitutes "participation." We strongly disagree. A rule that a person is deemed to "participate" in every organization that sends her unsolicited email would lead to overbroad, untenable and absurd results. They also cannot be said to concern any QUALCOMM participation in setting the H.264 standard, since they were neither written by or about QUALCOMM (and indeed make no mention of QUALCOMM or its employees whatsoever except in computer-generated email headers), and do not concern activities constituting the "setting" of the standard such as voting or submission of technical proposals for inclusion in the standard. At most, the emails relate to an evaluation of the performance of the standard in comparison to the MPEG-2 and MPEG-4 standards.

- Request for Production No. 81. QUALCOMM refused to produce any documents in response to this improper request, which sought, in violation of Rule 34's requirement that requested documents be described with reasonable particularity, to incorporate by reference the topics of Broadcom's Rule 30(b)(6) deposition notices . Broadcom had the right during discovery to propound specific requests for production relating to the topics of noticed 30(b)(6) depositions, either pursuant to Rule 30(b)(5) or pursuant to Rule 34. Indeed, a number of the requests in Broadcom's Second Set of Requests for Production, which issued after Broadcom's 30(b)(6) Notice No. 5 [H.264 Participation], appear to have been made for this purpose. Broadcom cannot now, after having declined to seek to compel a response to this request during discovery, invoke the request as a "catch-all" for all documents it thinks may in some abstract and distant way relate to the testimony of QUALCOMM's 30(b)(6) witnesses.

- Request for Production No. 89. Broadcom's request seeks "all documents constituting, referring to, or evidencing any submission by QUALCOMM to the JVT, the ISO, the IEC, and/or the ITU-T." Nothing in the twenty-one emails remotely falls within this subject. Moreover, QUALCOMM's agreement to produce (never contested by Broadcom) is narrower: "non-privileged…documents constituting any submission by QUALCOMM to the JVT, if any, which can be located after a reasonable search." None of the emails can reasonably be said to constitute a submission by QUALCOMM; indeed, they cannot plausibly be said to constitute a submission by anyone. Moreover, as discussed below, the evidence indicates that the avc_ce reflector was established and maintained by MPEG, not JVT.

- Request for Production No. 93. Broadcom's request seeks "all documents referring to or evidencing any participation by QUALCOMM in the proceedings of the JVT, the ISO, the IEC and/or the ITU-T." QUALCOMM agreed to produce "non-privileged…documents describing QUALCOMM's participation in the JVT, if any, which can be located after a reasonable search." None of the emails can reasonably be said to describe QUALCOMM's

594897

EXHIBIT __F__ PAGE __60__

DAY CASEBEER
MADRID & BATCHELDER LLP

Louis Tompros, Esq.
February 16, 2007
Page 4

participation in the JVT, since none were authored by QUALCOMM personnel, nor do they contain any mention whatsoever of QUALCOMM or its agents or employees, save for computer-generated email headers specific to and seen only by each recipient.  The passive receipt of unsolicited emails sent to an MPEG distribution list to which the recipient, who regularly received and ignored large volumes of unsolicited emails from many sources, did not voluntarily subscribe, without the transmission of communications back to the distribution list or its participants, cannot constitute "participation in the JVT" under any fair or reasonable reading of that term.

In addition, I believe you mischaracterize the avc_ce reflector when you refer to it as a "JVT email reflector[]."  As indicated in various JVT Meeting Notes, the reflector was set up and maintained under the auspices of MPEG, not JVT.[2]

Finally, contrary to the implications in your penultimate paragraph, QUALCOMM has at all times conducted reasonably diligent searches for all categories of documents that it has agreed to produce, including searches of email archives reasonably likely to contain such documents.

Very truly yours,

DAY CASEBEER
MADRID & BATCHELDER LLP

Adam Arthur Bier

AAB:sr

cc:     Stanley Young, Esq.

---

[2] *See, e.g.,* PX_895.17; PX_137.15.

EXHIBIT ___F___ PAGE _61_

# EXHIBIT G

ORIGINAL

```
 1                  UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3

 4 QUALCOMM, INC.,              ) Case No. 05CV1958-B(BLM)
                                )
 5          Plaintiff,          ) San Diego, California
                                )
 6 vs.                          ) Wednesday
                                ) January 24, 2007
 7 BROADCOM CORPORATION,        ) 9:00 a.m.
                                )
 8          Defendant.          ) VOLUME VIII
   _____)

 9

10                     TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE RUDI M. BREWSTER
11         UNITED STATES DISTRICT JUDGE, and a jury

12 APPEARANCES:

13 For the Plaintiff:          JAMES R. BATCHELDER, ESQ.
                               CRAIG CASEBEER, ESQ.
14                             LEE PATCH, ESQ.
                               BRADLEY A. WAUGH, ESQ.
15                             ADAM A. BIER, ESQ.
                               BRADLEY A. WAUGH, ESQ.
16                             CHRISTIAN E. MAMMEN, ESQ.
                               Day Casebeer Madrid &
17                                Batchelder, LLP
                               20300 Stevens Creek Boulevard
18                             Suite 400
                               Cupertino, California 95014
19                             (408) 873-0110

20
                               STANLEY YOUNG, ESQ.
21                             Heller, Ehrman, LLP
                               275 Middlefield Road
22                             Menlo Park, California  94025
                               (650) 324-7000
23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.
```

Echo Reporting, Inc.



EXHIBIT __G__ PAGE __62__

VIII-45

1        THE WITNESS:  This -- it's highlighted.

2        MR. PATCH:  It's about a third of the way down in

3 the center column, your Honor.  You can see -- I'll

4 highlight it on the screen.

5        THE WITNESS:  Viji@qualcomm.com.  It's highlighted

6 there.  That's why it was easy to pick up.

7        MR. PATCH:  In the center column, your Honor,

8 perhaps one third of the way down.  It reads

9 Vigi@qualcomm.com.

10        THE COURT:  Maybe I'm on the wrong page.  And the

11 next page, does that page say Annex B?

12        MR. PATCH:  Annex A, your Honor.  I'm sorry.

13        THE COURT:  Okay.  It helps to be on the right

14 page.  Now you said where?

15        MR. PATCH:  In the center column.

16        THE COURT:  Okay.

17        MR. PATCH:  Approximately one third of the way

18 down.

19        THE COURT:  Okay.

20        MR. PATCH:  Viji@ --

21        THE COURT:  I see.  I see.  Thank you.

22        MR. PATCH:  And that's now highlighted on the big

23 screen.

24        THE COURT:  Okay.  Thank you.

25 //

EXHIBIT ___G___ PAGE ___63___

VIII-46

1 BY MR. PATCH:

2 Q    Ms. Raveendran, did you place your e-mail address on

3 this list?

4 A    No.

5 Q    Do you have any understanding as to how it is that your

6 e-mail address appears on such a list?

7 A    The list is pretty vast.  From what I can see is

8 because Vittorio Baroncini is the first author, he knew me

9 as a -- as someone who is trained in compression artifacts

10 and an expert viewer.  So because the primary goal of this

11 ad hoc was to evaluate compression technologies, he probably

12 added my name.  Chairs can do that.  Chairs of ad hoc groups

13 can add people to their list.

14 Q    Did you ever send mail to this e-mail list?

15 A    No.

16 Q    Do you have any knowledge of having read mail that came

17 back to you from this e-mail list?

18 A    No, not that I can recall.

19 Q    There's another name on this list I'd like to point out

20 on the first column near the bottom.  The name of

21 SteveGordon@Sandvideo.com.  Do you see that?

22 A    Yes.

23 Q    Do you know a SteveGordon@SandVideo.com?

24 A    No.

25 Q    You were in the courtroom earlier this morning when

Echo Reporting, Inc.

EXHIBIT ___G___ PAGE ___64___

1 Doctor Sagetong testified, were you not?

2 A    Yes.

3 Q    And do you recall that he testified that he had

4 downloaded copies of JVT documents onto a Qualcomm server so

5 that he could study them more easily?

6 A    He said that.

7 Q    Prior to today, had you ever been aware of the fact

8 that those documents exist on a Qualcomm server?

9 A    No.  I don't know about that at all.

10          MR. PATCH:  No further questions, your Honor.

11          THE COURT:  Very well.  Cross examine.

12          MR. LEE:  Are we on okay?

13          THE COURT:  Yes.

14          MR. LEE:  Okay.  May I proceed, your Honor?

15          THE COURT:  Yes.

16                    CROSS EXAMINATION

17 BY MR. LEE:

18 Q    Ms. Raveendran, you provided the jury some testimony

19 this morning about events that were occurring in 2001,

20 correct?

21 A    Yes.

22 Q    Now, let's see what you said in your deposition.  You

23 recall having your deposition taken in this case?

24 A    Yes.

25 Q    And you were asked some questions, and you provided

EXHIBIT ___G___ PAGE ___65___

VIII-52

1  process this morning and Christine Irvine's testimony,

2  correct?

3  A    No, I don't agree with that.  I didn't say that.

4  Q    Now, let's go to your involvement on the ad hoc

5  membership list.  You do know Gary Sullivan, correct?

6  A    I know him as the chair of JVT now.

7  Q    And the JVT meeting you attended was chaired or co-

8  chaired by him, correct?

9  A    The one I attended in July 2005, he was co-chairing

10 that JVT session, yes.

11 Q    And you were there when he began the meeting, correct?

12 A    No.  I walked in in the middle of the session.

13 Q    Did you miss the introduction and the description about

14 the disclosure of patents?

15 A    Probably.  I don't recall.

16 Q    Now, Mr. Patch -- let me go to a slightly different

17 subject.  Mr. Patch asked you about the list of ad hoc

18 members attached to a JVT document in December 2002.

19 Remember that?

20 A    Yes.

21 Q    Now, Mr. Sullivan -- Doctor Sullivan testified in this

22 case that the way people get on that list is they sign up.

23 Did you know that?

24 A    I don't know what he testified.

25 Q    Did you know that he testified that once you sign up or

EXHIBIT __G__ PAGE __66__

VIII-53

1   once you're on the list, you get mailings along with

2   everybody else on issues concerning that ad hoc committee?

3   Did you know that?

4           MR. PATCH:  Your Honor, this is a

5   mischaracterization of the testimony.  I object.

6           THE COURT:  Well, you have me at a disadvantage

7   there.  I --

8           MR. LEE:  I'll rephrase it, your Honor.

9           THE COURT:  I'm trying to remember the details of

10  what he said on that.

11          MR. LEE:  I'll rephrase it.

12  BY MR. LEE:

13  Q    Did you receive mailings as a -- as -- strike that.

14       Did you receive mailings from the ad hoc committee

15  identified in this exhibit?

16  A    During the preparation for this testimony, there were

17  some e-mails pulled out of my e-mail box.  E-mail archive.

18  Q    Were they produced to Broadcom?

19  A    I don't know.

20  Q    All right.  But during the preparation for your

21  testimony in this case, e-mails to you as a result of your

22  being on this list were pulled out of your e-mail box,

23  correct?

24  A    Yes.

25  Q    Now, this isn't the only time you were listed on the

EXHIBIT ___ PAGE ___

VIII-216

1      I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4

5 _Shawn Musser/Indian Trails___ 1-25-07_____

6 Transcriber _(Carol Colville)_ Date

7 FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

8 _L. L. Francisco_____

9 L. L. FRANCISCO, President
Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Echo Reporting, Inc.

EXHIBIT __G__ PAGE __68__

# EXHIBIT H



1  ROBERT S. BREWER, JR. (SBN 65294)
   JAMES S. MCNEIL (SBN 201663)
2  MCKENNA LONG & ALDRIDGE LLP
   750 B Street, Suite 3300
3  San Diego, CA 92101
   Telephone: (619) 595-5400
4  Facsimile: (619) 595-5450

5  WILLIAM F. LEE (admitted *pro hac vice*)
   JOHN J. REGAN (admitted *pro hac vice*)
6  WILMER CUTLER PICKERING
     HALE AND DORR LLP
7  60 State Street
   Boston, MA 02109
8  Telephone: (617) 526-6000
   Facsimile: (617) 526-5000
9
   MARK D. SELWYN (admitted *pro hac vice*)
10 WILMER CUTLER PICKERING
     HALE AND DORR LLP
11 1117 California Avenue
   Palo Alto, CA 94301
12 Telephone: (650) 858-6000
   Facsimile: (650) 858-6100
13
   Attorneys for Defendant/Counterclaimant
14 BROADCOM CORPORATION

15

16              UNITED STATES DISTRICT COURT

17            SOUTHERN DISTRICT OF CALIFORNIA

18
   QUALCOMM INCORPORATED,          )  Case No. 05 CV 01958B (BLM)
19                                 )
                Plaintiff,         )  **EXPERT REPORT OF**
20                                 )  **CLIFF READER, PH.D.**
        v.                         )
21                                 )  Judge:  Hon. Rudi M. Brewster
   BROADCOM CORPORATION,           )
22                                 )
                Defendant.         )
23 _____  )
                                   )
24 AND RELATED COUNTERCLAIMS       )
                                   )
25
26
27
28
   EXPERT REPORT OF                    - 1 -                05 CV 01958
   CLIFF READER, Ph.D.

# I.    INTRODUCTION

1.    Counsel for Defendant Broadcom Corporation ("Broadcom") has retained me as an expert in connection with this litigation. I expect to testify at trial regarding the subject matter set forth in this report if asked about these matters by the Court or the parties' attorneys.

2.    I understand that Plaintiff Qualcomm Incorporated ("Qualcomm") has claimed that Broadcom's products that support the H.264 standard and technical specification infringe Qualcomm's patents 5,452,104 (the '104 patent) and 5,576,767 (the '767 patent). The H.264 standard is also sometimes known as ISO/IEC MPEG-4, Part 10 and Advanced Video Coding ("AVC").

3.    The purpose of this report is to describe the standards-setting process with emphasis on the development of H.264 and the relevant intellectual property and licensing policies. Specifically, this report examines the intellectual property and licensing policies of the Joint Video Team ("JVT"), which is a joint project between the International Telecommunication Union ("ITU") and the International Organization for Standardization ("ISO")/International Electrotechnical Commission ("IEC") that was responsible for developing and promulgating the H.264 standard.

4.    The opinions outlined below are entirely my own and reflect my independent and expert judgment based upon my past experience and research and the materials that I reviewed in preparing this report, a list of which is attached hereto as Appendix A.

5.    My fees for this report ($375 per hour) are not contingent on any findings herein and I will be paid for my services regardless of the outcome herein.

6.    Based on my review of the relevant landscape, I reach four principal conclusions. *First*, Standards Setting Organizations ("SSOs") use a number of strategies to balance the competing concerns of (1) promoting technological innovation within a standard and (2) limiting claims by holders of Intellectual Property Rights ("IPR"). *Second*, the JVT intended to develop a royalty-free "baseline profile." Its IPR policy stated that "all technology applied in the baseline profile shall have no IPR, expired IPR, or valid but royalty-free IPR." In addition, the JVT intended to allow its more advanced profiles to be subject to patent rights, but only if the patent holder agreed either to

EXPERT REPORT OF
CLIFF READER, Ph.D.                                   - 2 -                                          05 CV 01958

1  waive its patent rights or to license those rights on reasonable and non-discriminatory ("RAND")
2  terms. *Third*, to promote its goal of creating a royalty-free baseline profile, the JVT adopted an IPR
3  policy that required the disclosure of "IPR information . . . associated with any standardization
4  proposal" as early as possible during the development of the standard, but, in any event, prior to the
5  final approval of the standard by the JVT's parent organizations. *Fourth*, the JVT's IPR Policy,
6  along with those of its parent organizations, requires members to disclose their IPR associated with
7  the standard and to make such IPR available on at least RAND terms. In the event a member is
8  unwilling to do so, the JVT is required to reconsider the standard, including redesigning it so as not
9  to conflict with the asserted IPR.

10  **II.    QUALIFICATIONS**

11      7.    I am an independent consultant and have more than thirty years of work experience in
12  the digital imaging and digital video industry. I received a Bachelor's Degree with a major in
13  Physical Electronics from the University of Liverpool in England in 1970. I received a Ph.D. from
14  the University of Sussex, England, in 1974. From 1971-1973, I was a visiting graduate student at
15  the Image Processing Institute, University of Southern California, Los Angeles. My thesis title was
16  "Orthogonal Coding of Still and Moving Pictures." I was one of the first to perform adaptive block
17  transform coding and the first to apply it to video coding, which was described in my thesis.

18      8.    Following completion of my Ph.D. until approximately 2001, I worked for various
19  companies, including Samsung, Cypress Semiconductor, and Sun Microsystems, designing and
20  developing systems for performing digital imaging and digital video processing. During this time, I
21  became familiar with various video encoding and decoding standards, including MPEG-1, MPEG-2,
22  and MPEG-4 Part 2.

23      9.    Further, I have fifteen years experience with SSOs. I started monitoring the effort to
24  standardize MPEG—a video compression technology—in 1989, and started attending the ISO/IEC's
25  Moving Pictures Expert Group ("MPEG") in 1990. I was the Head of Delegation for the United
26  States to MPEG from 1991-1993. In that role, I also chaired the subcommittee of the American
27  National Standards Institute ("ANSI"), an SSO in the U.S. that was considering standards for video
28

EXPERT REPORT OF                                    - 3 -                                    05 CV 01958
CLIFF READER, PH.D.

1    compression. I also served as Editor-in-Chief of the MPEG-1 standard for video compression.

2    Additionally, I was the co-founder of the MPEG-4 Part 2 standard and chaired the relevant

3    subcommittee from 1993 to 1996. During that time, the Chairman of the ITU's H.263 committee

4    and I closely collaborated in order to harmonize the ISO/IEC MPEG's and ITU's efforts. I also

5    served as chair of the subcommittee evaluating implementation complexity for the Digital Audio

6    Broadcasting ("DAB") standard in 1992.

7        10.    With respect to H.264, I have participated as an Invited Expert in the JVT since 2002.

8    As an Invited Expert, I have the rights of an ordinary member of the JVT, such as attending meetings

9    and making submissions. I am a subscriber to the JVT's email reflector—an email list for

10   subscribers—and attended three JVT meetings in 2002: (1) July 22-26, 2002, in Klagenfurt, Austria;

11   (2) October 9-17, 2002, in Geneva, Switzerland; and (3) December 5-13, 2002, in Awaji Island,

12   Japan. Further, I have read all of the contributions and sections of meeting reports related to the

13   major coding tools of H.264, going back to the origins of the work in the 1997 timeframe, or, in

14   some cases, to work from committees that created earlier video compression standards, including

15   H.263 and MPEG-4 Part 2.[1] I submitted a draft of a history of video compression standards (which,

16   at the JVT, was submission "JVT-D068") to the JVT meeting in Klagenfurt in July 2002 for

17   consideration by JVT members. I submitted a revised draft of that history of video compression

18   standards to the JVT in October 2002 ("JVT-E066")

19       11.    In addition, I have extensive experience with intellectual property policies and

20   licensing arrangements associated with standards. Currently, I am the Chairman of the IPR

21   Subgroup of the Audio Video Coding Standard ("AVS") for China. The group is defining a new

22   approach for licensing and patent pools in association with the development of new standards. I am

23   also the Director of the AVS Patent Pool, which is in early formation stage. Additionally,

24   CableLabs hired me to be the technical expert for establishing the MPEG Patent Pool (now called

25   the MPEG-LA), which I worked on from 1993 to 1995. Also, I wrote a chapter of a book addressing

26

27   ──────────────

28   [1]  MPEG-4 Part 2 is a standard that was in place prior to MPEG-4 Part 10.

EXPERT REPORT OF                              -4-                              05 CV 01958
CLIFF READER, Ph.D.

1    intellectual property rights and licensing arrangements associated with standards: "Chapter 16:

2    MPEG Patents," *in MPEG and Video Compression Standard*, (Joan L. Mitchell et al. eds, 1997).

3          12.     I have published widely on topics relating to video compression. I currently am

4    drafting a book on the "History of MPEG Video Compression." In addition to the article on MPEG,

5    referenced *supra* at ¶ 11, I wrote an article in *Optical Engineering* entitled "MPEG4: Coding for

6    Content, Interactivity and Universal Accessibility" (1996). A list of publications is found at

7    Appendix B, which contains my best effort to compile a list of all of my publications. It contains

8    what I believe to be a full list for the past ten years.

9          13.     As a result of this experience, I am regularly called upon to provide expert analysis of

10    developments in the digital imaging and digital video industry.

11          14.     My *curriculmum vitae*, including a list of my publications over the past 10 years that I

12    presently am able to identify, is attached hereto as Appendix B.

13   **III.**     **THE IMPORTANCE OF TECHNOLOGY STANDARDS**

14          15.     For any set of technology products that work together in an application, standards

15    play a crucial role in defining how different parts of a system fit together. The principal goal of such

16    standards is to provide interoperability among products manufactured by different companies.

17    Companies that implement the standard can make products by referencing *only* the standard—and

18    without the need to communicate separately with every other company with whom their products

19    may need to work—and they have a guarantee their products will interoperate with other products

20    that implement the standard. Such products are considered to be "in conformance" with the standard.

21          16.     One common practice is to define a set of specifications—i.e., rules or parameters—

22    that govern how the technology functions as well as the interfaces through which it can access

23    related technologies. These specifications are called "normative requirements." For video and audio

24    coding standards, such requirements specify the format of the coded bitstream and the decoding

25    process. Products that implement a video coding standard—such as H.264—produce bitstreams that

26    can be decoded by any decoder that implements the standard. A standard's specifications instruct

27    companies implementing the standard on what end result they must provide—here, a bitstream that

28

EXPERT REPORT OF                 - 5 -                    05 CV 01958
CLIFF READER, Ph.D.

conforms to the video compression and coding standards of H.264, and the method for decoding it--but provide the freedom for those companies to decide how to implement the standard, and generally do not require a single implementation of the product.

17.     In an economic sense, standards fall within the broad concept of a "public good" that are "non-rivalrous" (numerous individuals can use them at the same time) and "non-excludable" (the standard can be used repeatedly without being consumed).[2] There is little incentive for a single firm to create a public good because "rival firms would quickly exploit them without paying for them."[3] As a result, the government sometimes steps in to promote standard-setting activity.[4] Generally, the government is involved in standards concerned with public safety, such as the design of electrical outlets. In addition, the government is traditionally involved in situations where consumer protection is needed. For example, U.S. consumers have had the assurance for more than 50 years that any television they buy will be compatible with the National Television System Committee ("NTSC") standard used for analog TV broadcasting. Now, the same assurance is given for digital broadcasting using the Advanced Television Systems Committee ("ATSC") standard.

## IV.   THE INTERSECTION OF STANDARD SETTING BODIES AND INTELLECTUAL PROPERTY RIGHTS

18.     In the United States, private companies often join together either under the auspices of a standard setting organization –a formal SSO, an industry consortium, or a trade association—to develop standards that will move an industry forward.

19.     If a standard is developed through an SSO, it is called a *de jure* standard.[5] Such standards are sometimes called open standards. Typically, such standards are developed by various companies submitting proposals for inclusion in the standard which are considered by and commented upon by other members of the SSO, with the end result being a compilation of the contributions of many participants. Examples of open standards include NTSC and ATSC, both of

---

[2]   Jonathan E. Nuechterlein and Philip J. Weiser, *Digital Crossroads: American Telecommunications Policy in the Internet Age* 393 (2005).
[3]   *Id.*
[4]   *Id.*
[5]   *Id.* at 390.

EXPERT REPORT OF                          - 6 -                         05 CV 01958
CLIFF READER, PH.D.

which are described above. In addition, telephone area codes are open standards. By way of contrast, a company that believes its proprietary technology can prevail in the free market can forego formal standards-setting and seek to make its technology a *de facto* standard.[6] Such standards are sometimes called proprietary standards, and an example of a proprietary standard is Microsoft Windows.

## V.   THE TREATMENT OF INTELLECTUAL PROPERTY RIGHTS BY SSOS

20.    For an SSO to promote successful standards, it must strike a balance between ensuring that companies can practice the standard without fear of being sued for patent infringement and protecting the investments that companies may have made in proprietary technology. One way that many SSOs regulate the use of intellectual property rights is by adopting some form of IPR policy that applies to those who are members or experts of the SSO. The JVT, as well as the ISO/IEC and ITU international standards organizations, have such IPR policies.

21.    SSOs adopt a range of "patent disclosure" requirements in their IPR policies. In theory, such requirements could range from no disclosure, to mandatory disclosure of any and all patents that have any possible relation to the standard. Like most SSOs, the JVT, the ISO, and the ITU all have patent disclosure rules in their IPR policies that apply to the development of H.264.

22.    In addition, many IPR policies state that: (1) if a license for a patent that is essential to implementing the standard cannot be obtained--i.e., the patent holder retains the right of exclusive practice--the standard either must be rewritten to exclude the patented technology or be withdrawn, and (2) if the patent holder is willing to grant a license, the rates, terms and conditions for the license must be "reasonable and non-discriminatory" ("RAND"). The benefits of requiring licensing on RAND terms are that it is often necessary "to keep industry leaders on board, forge an industry consensus behind an official standard, and increase the likelihood that the standard will be adopted widely."[7] Other SSOs, however, mandate access to patented technology at a royalty-free rate. Many of the fundamental Internet standards, for example, are licensed at royalty-free rates.

---

[6] *Id.*
[7] *Id.* at 391.

EXPERT REPORT OF
CLIFF READER, Ph.D.

-7-

05 CV 01958

23. In some instances, after the promulgation of a standard, essential patent holders decide to offer predictability in licensing to the marketplace by combining specific, identified patents in a "patent pool" that are licensed in a block. In the case of H.264 for example, the baseline profile for H.264 ultimately required use of patents on RAND terms. Sponsoring parties therefore license a group of patents (numbering 130, as of July 1, 2006) through an organization called "MPEG Licensing Authority" (MPEG-LA), which is the primary source of licenses for patents applying to the H.264 standard. MPEG-LA is not affiliated in any way with the MPEG standardization organization, but it also administers patent pools (that have antitrust clearance) for MPEG-2 Part 1 Systems, MPEG-2 Part 2 Video, MPEG-4 Part 2 Video, and other technologies. I am informed that Qualcomm has not made the patents-in-suit available for license through the MPEG-LA patent pool.

## VI. BACKGROUND OF THE JVT

24. Video coding relates to the encoding and decoding of video data in order to compress it for purposes of transmission and storage and then decompress it for playback on a device such as a television, portable media player, or cellular phone. Prior to H.264, different organizations developed several other video coding standards, including H.261, H.263, MPEG-2, and MPEG-4 Part 2, that purported to establish specifications that would permit various companies to manufacture devices that would be able to interface with another device in order to transmit, receive, store, and play video.

25. One series of standards, the MPEGx standards, were developed under the supervision of a joint committee of the International Standards Organization ("ISO") and International Electrotechnical Commission ("IEC") known as the Joint Technical Committee 1 ("JTC-1"). The JTC-1's goal is standardization in the field of information technology, and its members are national bodies. The JTC-1 is organized into subcommittees and working groups that focus on specific areas of technology. Subcommittee 29 of the JTC-1 addresses "Coding of audio, picture, multimedia and hypermedia information." Working Group 11 of that subcommittee, also called the Moving Pictures Expert Group ("MPEG"), addresses coding of moving pictures and audio. Within the ISO/IEC, this group is officially called "ISO/IEC JTC 1/SC 29/WG 11," although externally the group is simply

called "MPEG." Formally, the official members of MPEG are countries. Each country forms a delegation to MPEG through a process of its own choosing, which in some cases is very informal. In the United States, this process has been delegated to INCITS. Any organization (e.g., private or public corporation, university, government department, etc.) or individual can become a member of INCITS, and become a qualified delegate to attend the international MPEG meetings. The membership is thus open to everyone. Through MPEG, the JTC-1 developed the MPEGx video coding standards (e.g., MPEG-2 and MPEG-4 Part 2) for use in applications such as video storage (e.g., DVD) and broadcasting (e.g., satellite television).

26. Another international organization involved in standard-setting in this area is the International Telecommunication Union ("ITU"). Under the framework of the United Nations, the ITU was established in the 1800s "as an impartial, international organization within which governments and the private sector could work together to coordinate the operation of telecommunication networks and services and advance the development of communications technology."[8] Among other forms of membership, entities and organizations may join the ITU directly as associates (without becoming accredited through a national standards organization), participate in the preparation of "recommendations" (i.e., standards), and have access to relevant documents. The ITU Telecommunication Standardization Sector ("ITU-T") Study Group 16 focuses on multimedia systems, which in turn has a subdivision for video coding, known as ITU-T Q.6/SG 16 or more commonly the Video Coding Experts Group ("VCEG"). Through the aegis of the VCEG, the ITU developed the H.26x series of standards (e.g., H.261, H.263 and H.264) for use in audio-visual communications such as videoconferencing.

27. In December 2001, the ITU, through VCEG, and the ISO/IEC, through MPEG, jointly founded the Joint Video Team ("JVT") with the goal of developing a video coding standard that would improve upon the compression and picture quality provided by prior video coding standards, such as H.263, MPEG-2 and MPEG-4, Part 2.

---

[8]  ITU's website at http://www.itu.int/aboutitu/overview/purposes.html.

EXPERT REPORT OF
CLIFF READER, PH.D.

- 9 -

05 CV 01958

28.   The diagram below shows how the JVT is organized.[9]



*The origins of AVC, H.264 and MPEG-4 Part 10*

29.   The JVT has a wide variety of industry participants, including some of the largest players in the computer and telecommunications industries, such as Nokia, Panasonic, Sharp, Microsoft, LG Electronics, Canon, Motorola, Hitachi, Apple Computer, Intel, Philips, Qualcomm, and Broadcom.

30.   Within the United States, administration of non-treaty international standards is conducted by the InterNational Committee for Information Technology Standards ("INCITS"). INCITS is accredited by the American National Standards Institute ("ANSI"), and performs such formal functions as accrediting delegates to international standards meetings such as MPEG and JVT meetings, formulating resolutions on the position of the United States to be presented to the international standards organizations, and developing the vote of the United States for approval of international standards.[10]  To participate in international standard-setting organizations, such as MPEG, a participant must first attend the U.S. meetings at INCITS; however, one can attend JVT meetings as a delegate to the ITU, which one can join directly.

---

[9]   As published on the MPEG Industry Forum at http://www.m4if.org/public/documents/vault/m4-out-30035.pdf.
[10]   ANSI is the official U.S. representative to the ISO and, via the U.S. National Committee, the IEC. ANSI coordinates the development and use of voluntary consensus standards in the United States and represents the needs and views of U.S. stakeholders in standardization forums around the globe.

EXPERT REPORT OF
CLIFF READER, Ph.D.

- 10 -

05 CV 01958

## VII. THE DEVELOPMENT OF H.264

31.     The immediate precursor to the development of H.264 was the ITU's development and adoption of the H.263 standard, a process which began in approximately 1993. The goal for the H.263 standard was to provide an incremental improvement over the H.261 standard, and the ITU published several iterations of the H.263 standard in the 1990s.

32.     The ITU also established a long-term program of work entitled "H.26L," and its goal was to significantly improve coding efficiency over existing standards. H.26L formally became H.264. A key milestone for development of H.26L was receipt of three proposals in November 1998, including a proposal by Telenor (Norway) that contained many of the basic elements of the final H.264 standard and was adopted as the basis for development of H.264. Many of the features of a proposal by Nokia were also adopted into the final H.264 standard. The H.26L development continued solely within the ITU's VCEG until the formation of the JVT in 2001.

33.     The JVT aimed to create a standard that would be capable of providing good video quality at bit rates that are 50% lower than H.263 or MPEG-4 Part 2. In other words, the goal was to store or transmit video using only half the information required using MPEG-4 Part 2. Ultimately, the H.264 standard came to have several "profiles," which correspond to varying levels of compression and image quality.[11]

34.     To date, the JVT has had twenty meetings which, according to the JVT archives, took place on or about:

a)     December 5-6, 2001, in Pattaya, Thailand

b)     January 29 through February 1, 2002, in Geneva, Switzerland

c)     May 6-10, 2002, in Fairfax, Virginia

d)     July 22-26, 2002, in Klagenfurt, Austria

---

[11]   There are three profiles of interest in H.264: Baseline, Main and High. The Baseline profile includes a common set of features, most of which are supported by all JVT decoder implementations. Among other features, the Baseline profile is designed for low complexity applications. The Main and High profiles are advanced extensions to the Baseline profile that may be more complex in order to achieve some combination of improved compression or image quality. Within each profile, there are certain "levels." Levels determine the performance, such as frame rate, of the encoded video.

EXPERT REPORT OF
CLIFF READER, Ph.D.

- 11 -

05 CV 01958

| | | |
|---|---|---|
| e) | October 9-17, 2002, in Geneva, Switzerland |
| f) | December 5-13, 2002, in Awaji Island, Japan |
| g) | March 7-14, 2003, in Pattaya, Thailand |
| h) | May 23-27, 2003, in Geneva, Switzerland |
| i) | September 2-5, 2003, in San Diego, California |
| j) | December 8-12, 2003, in Waikoloa, Hawaii |
| k) | March 15-19, 2004, in Munich, Germany |
| l) | July 17-23, 2004, in Redmond, Washington |
| m) | October 18-22, 2004, in Palma de Mallorca, Spain |
| n) | January 18-21, 2005, in Hong Kong |
| o) | April 16-22, 2005, in Busan, Korea |
| p) | July 24-29, 2005, in Poznan, Poland |
| q) | October 14-21, 2005, in Nice, France |
| r) | January 14-20, 2006, in Bangkok, Thailand |
| s) | March 31 through April 7, 2006, in Geneva, Switzerland |
| t) | July 15-21, 2006, in Klagenfurt, Austria |

35.     The proceedings at each of these meetings were recorded in detailed meeting reports.[12] The reports include official actions such as advancing draft standards through the various stages of approval, and the disposition of technical contributions made to the meeting, including which contributions were adopted into the draft standard.[13]

---

[12]  MPEG did not physically control access to its meetings or documents, and based on my experience it was not uncommon for individuals who were not accredited to attend MPEG meetings and obtain copies of the documents distributed at those meetings, including contributions. I am not aware of any confidentiality obligation with respect to contributions or other submissions to MPEG. To the contrary, based on my experience, within the MPEG community, it was assumed by many that presentation of a contribution constituted public disclosure of the information contained in that contribution. As a result, often, an organization took the precaution of filing a patent application in the days leading up to a meeting at which the subject matter would be disclosed.

[13]  The technical contributions made to the standard are publicly-available documents, and not limited to just members of the JVT.

EXPERT REPORT OF
CLIFF READER, PH.D.

- 12 -

05 CV 01958

36.     In May 2003, the JVT completed its work on the Final Draft International Standard ("FDIS") and soon thereafter referred the FDIS to its parent bodies, the ITU and the ISO/IEC. Subsequently, the ITU published the FDIS as Recommendation No. H.264, and the ISO/IEC published it as International Standard ISO/IEC 14496-10/MPEG-4 AVC (or MPEG-4 Part 10). The two standards are technically identical.

37.     The JVT did not cease its work on video coding at that time, and, in fact has continued to meet regularly as the H.264 standard continues to evolve. In particular, the JVT began working on Fidelity Range Extensions (FRExt) to H.264 in 2003 and completed the project in July 2004. The FRExt are professional extensions to H.264. Earlier this year, the JVT launched a project on Scalable Video Coding, which is now the JVT's most significant—but not its only—project. Scalable Video Coding is an enhancement to H.264; if successful, the project will result in an amendment to H.264.

## VIII.   INTELLECTUAL PROPERTY AND LICENSING POLICIES APPLYING TO THE JVT

38.     The JVT's activities are governed by the "Terms of Reference for Joint Video Team (JVT) Activities" ("JVT Terms of Reference").

39.     According to the JVT Terms of Reference, the JVT's activities were governed by the IPR policies and IPR reporting requirements of the ITU and ISO/IEC. (JVT Terms of Reference at Section 10, "Patent and Copyright Issues").

40.     Further, the JVT's Internal Operating Rules (contained in Annex 3 of the JVT Terms of Reference) state:

### 3.1   Basic IPR Principles

Regarding Intellectual Property Rights (IPR) for the JVT codec, JVT has agreed to the following basic principles:

- The JVT codec should have a simple royalty free "baseline" profile (both on the encoder and decoder) in order to promote the wide implementation and use of the JVT codec. All implementations should have such a common baseline profile core, in order to allow minimal interoperability among all JVT codecs. The above requirement means that all technology applied in the baseline profile shall have no

EXPERT REPORT OF
CLIFF READER, PH.D.

- 13 -

05 CV 01958

IPR, expired IPR, or valid but royalty-fee-free IPR (according to Box 2.1 or 2.2.1 of the JVT Patent Disclosure form, as shown below).

- Special, more advanced profiles of the JVT standard may contain patents per Box 2.2 of the JVT Patent Disclosure form (reasonable terms and conditions).

### 3.2    Collection of IPR information during the standardization process

According to the ITU-T and ISO/IEC IPR policy, members/experts are encouraged to disclose as soon as possible IPR information (of their own or anyone else's) associated with any standardization proposal (of their own or anyone else's).  Such information should be provided on a best effort basis.

For collecting such information JVT has decided to use it's own Patent Declaration form – note that this is distinct from the *ITU ISO IEC Patent Statement and Licensing Declaration* that is to be submitted to the ISO Secretary General and ITU TSB Director when the contributed technology becomes the final standard.

Therefore, **JVT requires all technical (algorithmic) proposals include the following:**

"Attached at the end of each technical contribution, **a fully filled-out "JVT Patent Disclosure form"** (as shown below).   At the contribution stage, this form is for information only, and **may be signed by an expert or left unsigned**.  The form **must be included in the contribution to JVT.**

Additionally, **all submitted source code must include a written transfer of copyright** in the form described in section 5 below.

**Note that the submission of the JVT Patent Disclosure form at the proposal stage does not have the same formal status as the final IPR declaration to the ITU TSB and ISO/IEC, which must be done in the approval process for the ITU-T Recommendation and ISO/IEC International Standard."**

Such information provided to the Chair/Rapporteur will be tabulated in a "IPR status list" (e.g. a simple Word table) of the information received.  Information not currently relevant (e.g. if a proposed method was not accepted) will be removed from the "IPR status list" as early as possible.  The "IPR status list" is a living document of the JVT.

41.    Thus, under the policies of the JVT, the author of a technical proposal must submit a JVT Patent Disclosure form along with its proposal.  Additionally, members/experts are encouraged to disclose possible IPR information about which they are aware (either their own or someone else's) as soon as possible, but in any event, they are required to submit a final IPR declaration ("ITS ISO IEC Patent Statement and Licensing Declaration") to the ITU TSB and ISO/IEC during the final approval process by the parent organizations.[14]

---

[14]   This is consistent with the ITU's "Guidelines for Implementation of ITU-T Patent Policy," which state "[a]ny ITU Member State, Sector Member or Associate aware of a patent or pending patent application held by itself or others, which may fully or partly cover elements of the draft

EXPERT REPORT OF
CLIFF READER, Ph.D.

- 14 -

05 CV 01958

EXHIBIT ___11___ PAGE ___82___

42. According to the minutes of the JVT meetings, it appears that the committee chair ordinarily made a statement reminding participants of the IPR policy at the beginning of meetings, and the meeting minutes themselves contained similar reminders. For example, in the minutes for the JVT's December 2003 meeting, it states: "In particular, participants are obligated to report IPR of which they are aware that is necessary to implement the draft specification(s) under development and to report on IPR in technical proposal contributions toward the development of such draft specification(s). Indeed, at each of the JVT meetings I attended, the JVT Rapporteur/Chair Gary Sullivan made statements asking participants to disclose any applicable IPR of which they were aware as soon as possible.

43. Consistent with these policies, numerous companies filed patent declarations with the JVT, ITU, or ISO/IEC during the development and promulgation of H.264, including Microsoft, Sony, Siemens, Nokia, Thomson, Toshiba, LG Electronics, NEC, Fujitsu, General Instrument, Sharp, IBM, AT&T, Scientific Atlanta, Philips, Lucent, Apple, Mitsubishi, and Broadcom.[15] Several of these companies expressly identified the patents or patent applications that were the subject of their disclosure, including for example, Nokia, Thomson, Sharp, and IBM.

44. Based on my review of information from the JVT archives, it appears that the JVT Rapporteur/Chair, Gary Sullivan, compiled "IPR Status Reports" that reiterated the disclosure obligations of participants by stating: "*Anyone* who is aware of anyone having IPR that is necessary to implement our draft standard should make this information known to our group at the *earliest possible time.*" In addition, the IPR Status Reports identified the IPR that had been disclosed as of the time of their drafting.

45. As set forth above, the JVT's objective was to establish "a simple royalty free 'baseline' profile," with the recognition that more advanced profiles might be subject to various IPR.

---

Recommendation(s) proposed for approval, is requested to disclose such information to the TSB, in no case later than the date scheduled for approval of the Recommendation(s) in accordance with ITU-T Patent Policy."

[15] Broadcom, in particular, submitted two versions of the ITS ISO IEC Patent Statement and Licensing Declaration – one on December 6, 2002 and one on July 12, 2004. It is my understanding that the latter declaration was filed on behalf of an entity that Broadcom was in the process of acquiring at that time.

EXPERT REPORT OF
CLIFF READER, PH.D.

- 15 -

05 CV 01958

1   To that end, in the JVT's Patent Disclosure Form, a party was required to indicate either that it did

2   not have IPR "associated with the technical content of the Recommendation/Standard or

3   Contribution" or, if it did have IPR, to explain how it would address its patent rights. Specifically,

4   the JVT required a patent holder to state whether it "is prepared to grant – on the basis of reciprocity

5   for the above Recommendation/Standard":

6       • "a <u>free</u> license to an unrestricted number of applicants on a worldwide, non-
7         discriminatory basis to manufacture, use and/or sell implementations of the above
          Recommendation/Standard";

8       • "a license to an unrestricted number of applicants on a worldwide, non-discriminatory
         basis and on reasonable terms and conditions to manufacture, use and/or sell
9         implementations of the above Recommendation/Standard"; or

10      • a "royalty-<u>free</u> license" to an unrestricted number of applicants on a worldwide, non-
         discriminatory basis to manufacture, use and/or sell implementations of the above
11         Recommendation/Standard "on condition that all other patent holders do the same."[16]

12

13     46.    Alternatively, if the patent holder was unwilling to grant a license according to any of

   the above options, it was required to: (a) identify the applicable patent registration/ application

14   number; (b) indicate the portions of the Recommendation/ Standard that are affected; and (c) provide

15   a description of the patent claims covering the Recommendation/Standard.

16     47.    Under the policies of the ISO and the ITU-T, if a patent holder is not willing either to

17   waive its rights or to license its rights on reasonable and non-discriminatory terms and conditions to

18   make, use, or sell implementations of the standard, then the standard needs to be referred back to the

19   committee for further consideration. This is true even if a patent is discovered after the publication

20   of a standard.[17]

21

22   ————————————

   [16] Similar language appeared in the ITU and ISO/IEC forms.
23   [17] ISO/IEC Directive Part 1, § 2.14.3 (4th ed. 2004), states: "Should it be revealed after publication
   of a document that licenses under patent rights, which appear to cover items included in the
24   document, cannot be obtained under reasonable and non-discriminatory terms and conditions, the
   document shall be referred back to the relevant committee for further consideration."
25   The Guidelines for Implementation of ITU-T Patent Policy § 6 (Nov. 2, 2005) state: "ITU-T Patent
   Policy also applies to situations involving the discovery of patents or pending patent applications
26   that may be required for use of a Recommendation subsequent to its publication or the initial
   issuance of a patent after publication. Once disclosure is made, the patent holder will be requested
27   to provide the same assurances to the TSB [Telecommunication Standardization Bureau] as are
   required in situations where patents are known prior to publication of a draft Recommendation."

28

EXPERT REPORT OF
CLIFF READER, PH.D.
                   - 16 -                 05 CV 01958

## IX.    QUALCOMM'S PARTICIPATION IN THE JVT

48.    Qualcomm has participated extensively in the JVT, as well as in the parent organizations and the U.S. bodies that send delegates to the JVT.

49.    I am aware that, prior to the formation of the JVT, Qualcomm representatives participated in MPEG meetings relating to the development of earlier video compression standards, such as MPEG-2 and MPEG-4, Part 2, as well as meetings of the U.S. standards organization, ANSI.

50.    According to the JVT meeting minutes, of the twenty JVT meetings that have taken place as of July 2006, Qualcomm employees have attended at least eight of them.  Specifically:

a)    Qualcomm attended JVT meetings as early as September 2003 in San Diego.  The draft minutes of that meeting state that Qualcomm actively participated at that meeting, including by making an objection: "Qualcomm and Motorola expressed opposition to alteration of the existing level 1."

b)    Qualcomm employee Phoom Sagetong attended the JVT meetings in December 2003, January 2005, and April 2005.

c)    Qualcomm employees Viji Raveendran, Phoom Sagetong and Yuriy Reznik attended the July 2005 JVT meeting in Poznan, Poland.

d)    Qualcomm employee Yuriy Reznik attended the October 2005 JVT meeting in Nice, France.

e)    Qualcomm employees Yiliang Bao and Phoom Sagetong attended the January 2006 JVT meeting in Bangkok, Thailand.

f)    One or more Qualcomm employees were present at the July 2006 JVT meeting in Klagenfurt, Austria.

Based on the meeting minutes, it appears that participants were reminded of the IPR policies at each of these meetings.

If the patent holder is unwilling to license or waive its rights, the Recommendation will need to be revised or withdrawn and its publication suspended.  In such a case, the TSB Director will promptly advise the Study Group responsible for the affected Recommendation so that appropriate action can be taken.  Such action shall include, but may not be limited to, a review of the Recommendation giving consideration to its possible revision by removing the potential conflict or through further examination and clarification of the technical considerations causing the conflict."

EXPERT REPORT OF
CLIFF READER, Ph.D.

- 17 -

05 CV 01958

51. Additionally, Qualcomm has made at least five technology proposals to the JVT, including:

    a) JVT-R087, "Generalized Fine Granularity Scalability" (January 2006), submitted by Qualcomm employees Yiliang Bao and Yan Ye;

    b) JVT-S066, "Improvements to FGS layer Variable Length Coder" (March 2006), submitted by Qualcomm employees Yiliang Bao and Yan Ye;

    c) JVT-T086, "Adaptive Variable Length Coding for FGS" (July 2006), submitted by Qualcomm employees Yiliang Bao and Yan Ye;

    d) JVT-T087, "FGS Complexity Reduction" (July 2006), submitted by Qualcomm employees Yiliang Bao and Yan Ye; and

    e) JVT-T067, "Modification for grouping of refinement coefficients" (July 2006), submitted by Qualcomm employee Yiliang Bao, jointly with employees of Texas Instruments Japan and Nokia, Inc.

52. In addition to those technology proposals, Qualcomm employee Yan Ye submitted an additional commentary, JVT-S091 entitled "Verification of JVT-S057," in March 2006. Qualcomm employee Yiliang Bao also submitted a report, JVT-S011 entitled "AHG Report on Improved FGS coding," for the March 2006 meeting.

53. In connection with each of its technology proposals, Qualcomm submitted a JVT Patent Disclosure Form stating that it "has granted, pending, or planned patents associated with the technical content of the Recommendation/Standard or Contribution" and that it is "prepared to grant a 'royalty-free' license" to anyone on a worldwide, non-discriminatory basis and on reasonable terms and conditions to manufacture, use and/or sell implementations of the above Recommendation/Standard "on the condition that all other patent holders do the same."[18] In none of

---

[18] In connection with Qualcomm's proposal JVT-T086, Qualcomm submitted the JVT Patent Disclosure Form, but, in an apparent oversight, initially neglected to check any of the boxes indicating what rights it was prepared to grant. Qualcomm appears to have later remedied its omission and submitted a revised version of JVT-T086 in which it agreed to the same licensing terms as it did on the other Patent Disclosure Forms.

1 these forms did Qualcomm identify specific patents or restrict the number or type of patents for

2 which it was willing to provide royalty-free and RAND licensing.

3        54.    In addition, on April 25, 2006, almost three years after the adoption of the H.264

4 standard, over two and half years after first attending a JVT meeting, and almost one year after the

5 adoption of the second version of the standard Qualcomm submitted to the ITU, ISO, and IEC, two

6 versions of the Patent Statement and Licensing Declaration required to be submitted by members of

7 the parent organizations prior to final approval of the standard – one indicating it applies to H.264

8 and the other indicating it applied to MPEG-4 Part 10 (the ISO/IEC's iteration of the H.264

9 standard). In both, Qualcomm stated that it "believes that it holds granted patents and/or pending

10 applications, the use of which would be required to implement the above ITU-T

11 Recommendation/ISO/IEC International Standard" and that it "is prepared to grant a license to an

12 unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms

13 and conditions to make, use and sell implementations of the above ITU-T

14 Recommendation/ISO/IEC International Standard." Once again, Qualcomm did not identify the

15 specific patents or applications that it believed relevant.

16 **X.    CONCLUDING REMARKS**

17        55.    Based on my review of the information presently available to me, it is therefore my

18 opinion that, consistent with the overall objective of the ITU and ISO/IEC of developing standards

19 that are accessible to everybody and not subject to potential abuse by a patent holder, the JVT's IPR

20 Policy, along with those of its parent organizations, required members to disclose their IPR

21 associated the standard and to make such IPR available on at least RAND terms. While many

22 participants in the development of the H.264 standard complied with this requirement by making an

23 appropriate disclosure before the adoption of the H.264 standard, Qualcomm, in spite of its

24 involvement in the development of the standard as early as 2003, failed to make a disclosure until

25 long after the standard had been adopted. However, having now made such a disclosure, it appears

26 to have committed to making its IPR available to anyone "on a worldwide, non-discriminatory basis

27

28



EXHIBIT __H__ PAGE __87__

1  and on reasonable terms and conditions to make, use and sell implementations" of the H.264

2  standard.

3       I understand that discovery is ongoing in this case. I therefore ask that the Court allow me to

4  adjust or supplement my Report after I have had the opportunity to review deposition testimony or in

5  light of additional documents that may be brought to my attention after submission of this Report. I

6  also ask that the Court allow me to supplement my analysis in light of any critique of my Report or

7  opinions advanced by another expert on behalf of the plaintiff.

8       To date, I have not prepared any exhibits summarizing opinions or illustrating points made in

9  this Report, but I expect to do so for use at trial in accordance with the Court's orders. Examples of

10  these visual aids and demonstrative exhibits include, for example, deposition testimony and

11  deposition exhibits, articles, tables, charts, diagrams, photographs, videos and animated or computer

12  generated video.

13

14  Dated: August 10, 2006

                                   Cliff Reader, Ph.D.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXPERT REPORT OF
CLIFF READER, PH.D.

            - 20 -

                             05 CV 01958

# EXHIBIT I

WILMERHALE

July 14, 2006

**By Facsimile and UPS**

Kate Saxton

+1 617 526 6253 (t)
+1 617 526 5000 (f)
kate.saxton@wilmerhale.com

Kevin Leung, Esq.
Day Casebeer Madrid & Batchelder LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014

Re:     *Qualcomm Inc. v. Broadcom Corp.*, Civil Action No. 05 CV 1958 (BLM)

Dear Kevin:

I write concerning Broadcom ("Broadcom") Corporation's Rule 30(b)(6) Deposition, Notice No. 1, Topic Nos. 10 and 11, which seek, among other things, Qualcomm ("Qualcomm") Incorporated's participation in the JVT and development of the H.264 Standard.

Qualcomm designated Chris Irvine as its witness in response to Broadcom's Notice No. 1, Topics 10 and 11. Upon examination of Ms. Irvine, it was apparent that, despite Qualcomm's representations that Ms. Irvine was the person most knowledgeable regarding Qualcomm's participation in the JVT and development of the H.264 Standard, Ms. Irvine was wholly unprepared to act as a witness. For example:

- Ms. Irvine was unfamiliar with the JVT and testified (erroneously) that she believed that the JVT was composed of the JPEG and MPEG standards bodies. (Deposition of A. Chris Irvine ("Irvine Dep.") at 22-23.)

- Ms. Irvine further testified that she was not familiar with the VCEG, one of the two standards bodies that comprise the JVT. (*Id.*)

- Ms. Irvine testified (again, erroneously) that Qualcomm was not a member of the JVT and further testified that Qualcomm was not aware of any Qualcomm employee attending any JVT meetings or paying dues to the JVT. (*Id.* at 24-29.)

- Ms. Irvine testified (erroneously) that Qualcomm had not hosted any JVT meetings. (*Id.* at 29.)

- Ms. Irvine testified (erroneously) that Qualcomm had not made any submissions to the JVT. (*Id.* at 31.)

EXHIBIT ___1___ PAGE __81__

**WILMERHALE**

Kevin Leung, Esq.
July 14, 2006
Page 2

Moreover, when asked what she had done to prepare for this deposition, Ms. Irvine testified that:

- She saw Broadcom's Rule 30(b)(6) Notice for the first time the day before her deposition. (*Id.* at 38.)

- Other than counsel for Qualcomm, she spoke with no one regarding Qualcomm's participation in the JVT or regarding Qualcomm's involvement in promulgation of the H.264 Standard. (*Id.* at 38-39.)

- That, other than Broadcom's Notice, she reviewed no documents in preparation for her deposition on Topic Nos. 10 and 11. (*Id.* at 39-40.)

Indeed, Ms. Irvine testified that, other than speaking with counsel for Qualcomm the day before her deposition, she did nothing to prepare for her deposition other than fly from Oregon to San Francisco. (*Id.* at 39.) In short, Ms. Irvine did nothing to investigate the subjects on which she was designated to testify or to otherwise prepare herself to carry out Qualcomm's Rule 30(b)(6) obligations.

Qualcomm's conduct regarding Ms. Irvine's preparation for Broadcom's Rule 30(b)(6) deposition is improper and does not satisfy Qualcomm's obligations under the Federal Rules of Civil Procedure. It is well-settled law that Rule 30(b)(6) requires Qualcomm to provide an educated, knowledgeable witness regarding Broadcom's Rule 30(b)(6) notice. Indeed, Rule 30(b)(6) requires Qualcomm to make a "conscious, good-faith endeavor to designate the persons having knowledge of the matters sought by" Broadcom. *Calzaturficio S.C.A.R.P.A. S.P.A. v. Fabiano Shoe Company, Inc.*, 201 F.R.D. 33, 36 (D. Mass. 2001) (citation omitted). Moreover, Qualcomm is obligated to "prepare the designated witness to be able to provide *meaningful information* about any designated areas of inquiry." *Id.* (emphasis added); *see also Sprint Communications Co. v. TheGlobe.com, Inc.*, No. 05-2433-JWLDJW, 2006 WL 931549, at *2 (D. Kan. April 10, 2006) (Rule 30(b)(6) "requires persons to review all matters known or reasonably available to [the corporation] in preparation for the 30(b)(6) deposition."); *Concerned Citizens of Belle Haven v. The Belle Haven Club*, 223 F.R.D. 39, 44 (D. Conn. 2004) (Rule 30(b)(6) imposes "an affirmative obligation to educate [the witness] as to the matters regarding the corporation").

Further, courts have explicitly stated that the obligation of a Rule 30(b)(6) witness to be knowledgeable and, to the extent they are not knowledgeable, to conduct a reasonable investigation on the subjects on which they are designated is "necessary in order to make the deposition *a meaningful one* and to *prevent 'sandbagging'* of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before trial." *Berwind Property Group, Inc. v. Environmental Management Group, Inc.*, 233 F.R.D. 62, 65 (D. Mass.

EXHIBIT  \  PAGE  9()

Kevin Leung, Esq.
July 14, 2006
Page 3

WILMERHALE

2005); *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp.2d 479, 487 (D. Md. 2005) (same); *Twenthieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, No. 01 CIV 3016 (AGS)(HB), 2002 WL 1835939, at * 3 (S.D.N.Y. Aug. 8, 2002) (same). Moreover, inadequate preparation of a Rule 30(b)(6) can provide the basis for sanctions based on the "lack of good faith, prejudice to the opposing side, and disruption of the proceedings." *See, e.g., Black Horse Lane Assoc., L.P. v. Dow Chemical Corp.*, 228 F.3d 275, 303 (3d Cir. 2005).

In producing Ms. Irvine in response to Topic Nos. 10 and 11, Qualcomm has failed to comply with its obligations under Rule 30(b)(6). Broadcom has been severely prejudiced by Qualcomm's actions. Broadcom has incurred significant expense preparing for and traveling to the deposition that it might not otherwise have incurred. In addition, with the close of fact discovery just a month off, Broadcom essentially must start from scratch in its efforts to obtain information from Qualcomm regarding its participation in the H.264 standard-setting process.

To avoid further prejudice, therefore, Broadcom requests that Qualcomm immediately provide a knowledgeable, educated witness regarding Topic Nos. 10 and 11. Further, Broadcom requests that Qualcomm provide, on or before July 24, 2006, a knowledgeable, educated witness for Broadcom's Rule 30(b)(6) Notice No. 5: H.264 Standards Participation. If Qualcomm refuses to provide a witness(es) as requested, please inform me immediately, so that Broadcom may seek the assistance of the Court.

Finally, because of this most improper conduct, Broadcom reserves its right to seek sanctions regarding Qualcomm's failure to provide an appropriate witness regarding Topic Nos. 10 and 11 of Notice No. 1, including but not limited to, recovery of Broadcom's expenses for attorney time spent deposing Ms. Irvine, attorney time spent preparing for a second deposition on Topics No. 10 and 11, and travel associated with a second deposition on Topics No. 10 and 11.

Please do not hesitate to contact me with any questions regarding this matter.

Very truly yours,

*Kate Saxton*

Kate Saxton

cc: James Batchelder (via facsimile and UPS)
    Barry Tucker (via facsimile and UPS)

EXHIBIT ___1___ PAGE __91__

# EXHIBIT J



**QUALCOMM Incorporated**

**Press Release**

5775 Morehouse Drive
San Diego, CA 92121-1714
(858) 587-1121

www.qualcomm.com

## Thomson and QUALCOMM Restructure Technicolor Digital Cinema Joint Venture

AUGUST 21, 2003 — Paris, France; Burbank and San Diego, CA, August 21, 2003 – In a strategic step to more effectively serve the needs of the emerging digital cinema industry, Thomson (Euronext Paris; 18453; NYSE: TMS), the worldwide leader in video technologies, products and services and QUALCOMM Incorporated (Nasdaq: QCOM), today announced that QUALCOMM has sold its equity interest in Technicolor Digital Cinema (TDC) to Thomson, the parent company of Technicolor, a move that results in sole Thomson ownership of the venture. Financial terms of the sale were not disclosed.

The agreement allows both entities to leverage Technicolor Digital Cinema's successful systems and service model while enabling each to focus on their respective core businesses - Technicolor in servicing the digital cinema needs of its customers and QUALCOMM in developing and producing innovative digital cinema technology and systems. The transaction is also consistent with Thomson's commitment to support content owners and network operators globally as they evaluate and embrace digital technologies.

"Many of the objectives of forming the joint venture company in 2000 have been met," said Gary Garland, Vice President and General Manager of the QUALCOMM Digital Media Division. "With the combination of Technicolor's service legacy to the entertainment industry and QUALCOMM's technical expertise in digital cinema enabling technologies, we hoped to move digital cinema forward by providing both systems and services specific to the digital cinema space. We have done that, and we've done it exceptionally well."

As part of the restructuring, Technicolor will acquire exclusive rights to manufacture, sell and service the multi-screen Theatre Management System (TMS) designed by QUALCOMM under the Technicolor Digital Cinema umbrella. In turn, QUALCOMM will continue to develop and market core digital cinema products and technologies, including decoder modules, encoders and conditional access systems (CAS) that are based on its ABSolute™ compression and decryption technology.

"This is a positive move that provides customers the freedom to independently select a service provider and a technology architecture that best fits their needs," said Dave Elliott, President of Technicolor Entertainment Services and Chief Executive Officer of Technicolor Digital Cinema. "Our intent has always been to offer the industry options. By restructuring the

EXHIBIT ___J___ PAGE __92__

joint venture, we expand customer choice while at the same time restoring Technicolor's legacy to serve multiple architectures and enhancing QUALCOMM's ability to market their advanced digital cinema technologies."

Technicolor and QUALCOMM will continue to work closely together as QUALCOMM digital cinema technologies and products emerge, including ABSolute image compression technology and advanced security architecture as well as QUALCOMM's digital cinema decoder modules, encoder systems, and conditional access equipment for the industry. Technicolor Digital Cinema will continue to provide and support these technologies and products, but will also offer other technologies to meet industry demand and requirements.

Since launching in 2000, Technicolor Digital Cinema has evolved to offer the industry's most comprehensive set of digital cinema services and solutions, including compression, encryption, distribution, storage, and scheduling/playback as well as in-theatre management systems, maintenance and support. Technicolor Digital Cinema has installed and maintained digital cinema delivery technology and equipment through QUALCOMM-designed Auditorium Management Systems in nearly 40 theatres worldwide for first-run showings of digital movies. To date, Technicolor Digital Cinema has processed, packaged, delivered and downloaded 42 motion picture titles for a total of more than 50,000 showings to commercial audiences, including four titles that were released using the world's first end-to-end encryption approach, provided by QUALCOMM's technology. Recent encrypted digital cinema releases include Finding Nemo, Pirates of the Caribbean, X Men 2 and Spy Kids 3.

Thomson and Technicolor Digital Cinema will continue to work with content owners toward advancing the digital cinema evolution by developing robust systems, support services and industry standards in anticipation of the widespread adoption of this new medium. QUALCOMM will continue to develop and provide advanced digital cinema technologies and products to meet industry requirements on an open-systems basis to OEM's, service providers and end-users.

**About Thomson**
**Thomson** (Euronext Paris: 18453; NYSE: TMS) provides a wide range of video (and enabling) technologies, systems, finished products and services to consumers and professionals in the entertainment and media industries. To advance and enable the digital media transition, Thomson has four principal divisions: Content and Networks, Consumer Products, Components, and Licensing. The company distributes its products under the Technicolor, Grass Valley, THOMSON and RCA brand names. For more information:http://www.thomson.net/

**Technicolor Entertainment Services (TES)**, part of Thomson's Content and Networks division, is the number one processor of motion picture film worldwide and a leading provider of creative/post-production, cinema distribution and digital cinema services. With facilities worldwide, TES service lines include:

- Technicolor Release Print Services processes and prints 16/35/65/70 mm formats, dailies, answer prints, intermediates, and trailers.
- Technicolor Creative Services provides production, post-production and post post-production services ranging from film and audio restoration and preservation, in both analog and digital formats, to DVD compression and authoring, VOD encoding, to episodic television and commercial advertising completion.
- Technicolor Cinema Distribution Services provides high-quality distribution and logistics management services for motion picture release prints and advertising collateral through state-of-the-art technologies and an efficient distribution pipeline.

**About QUALCOMM**

QUALCOMM Incorporated (www.qualcomm.com) is a leader in developing and delivering innovative digital wireless communications products and services based on the Company's CDMA digital technology. Headquartered in San Diego, Calif., QUALCOMM is included in theS&P500 Index and is a 2003 FORTUNE 500® company traded on The Nasdaq Stock Market® under the ticker symbol QCOM.

Except for the historical information contained herein, this news release contains forward-looking statements that are subject to risks and uncertainties, including the Company's ability to successfully design and have manufactured digital cinema products on a timely and profitable basis, the extent and speed to which digital cinema technology is deployed, change in economic conditions of the various markets the Company serves, as well as the other risks detailed from time to time in the Company's SEC reports, including the report on Form 10-K for the year ended September 30, 2002, and most recent Form 10-Q.

###

QUALCOMM is a registered trademark of QUALCOMM Incorporated. ABSolute is a trademark of QUALCOMM Incorporated. All other trademarks are property of their respective owners.

QUALCOMM Contacts:
Christine Trimble
Tel: (858) 651-3628
Email: publicrelations@qualcomm.com

**Technicolor Media Relations**
Dana Banks
Tel: (805) 383-3223
Dana.banks@thomson.net

**Financial Dynamics**
Lorie Lichtlen/ Aurélie Gasnier
Tel: 33 1 47 03 68 10

EXHIBIT ___J___ PAGE ___94___

**Thomson Investor Relations**
Pierre Villadary
Tel : 33.1.41.86.6888
Pierre.villadary@thomson.net

# EXHIBIT K

# EXHIBIT K FILED UNDER SEAL

# EXHIBIT L

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4  QUALCOMM, INC.,              ) Case No. 05CV1958-B(BLM)
                                )
5          Plaintiff,           ) San Diego, California
                                )
6  vs.                          ) Wednesday
                                ) January 10, 2007
7  BROADCOM CORPORATION,        ) 9:00 a.m.
                                )
8          Defendant.           ) VOLUME II
   _____)
9

10                  TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE RUDI M. BREWSTER
11      UNITED STATES DISTRICT JUDGE, and a jury

12 APPEARANCES:

13 For the Plaintiff:          CRAIG H. CASEBEER, ESQ.
                               JAMES R. BATCHELDER, ESQ.
14                             CHRISTIAN E. MAMMEN, ESQ.
                               LEE PATCH, ESQ.
15                             Day Casebeer Madrid &
                                 Batchelder, LLP
16                             20300 Stevens Creek Boulevard
                               Suite 400
17                             Cupertino, California 95014
                               (408) 873-0110
18

19                             STANLEY YOUNG, ESQ.
                               Heller, Ehrman, LLP
20                             275 Middlefield Road
                               Menlo Park, California  94025
21                             (650) 324-7000

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

                                    Echo Reporting, Inc.


EXHIBIT____ PAGE____

1 looking forward in wireless and communications.  Further,

2 there were several other people from Linkabit who would like

3 to start over again, in a sense.  And so after a three-month

4 period, I decided to form the company.

5 Q     And when you founded Qualcomm, was it a big company?

6 A     It was seven people plus one secretary.

7 Q     Okay.  I'd like to display JAC-2.

8       I'm showing you a picture of a portion of a strip mall

9 with a liquor store here.  Do you recognize this building?

10 A    Yes.  When we started, we managed to stay in the home

11 office for several weeks, did rent space in a building

12 that's just adjacent to this particular building.  Looks

13 very much the same.  So this was the view looking down from

14 our second-story office.

15 Q    This was the view of your building?

16 A    Yes, uh-huh.

17 Q    And so your first office was in a strip mall?

18 A    Yes, it was.

19 Q    All right.  Well, can you summarize for the jury at a

20 high level how Qualcomm came to grow from this strip mall

21 location to the company that it is today.

22 A    Well, when we started, we really didn't have any

23 specific products.  We were interested in communications, in

24 digital communications and wireless.  Over the first several

25 months, we did come up with some ideas for products that

EXHIBIT___L___ PAGE___107___

1 have pretty much kept us busy ever since, in particular a

2 product called Omnitracks, which is a satellite

3 communication system, now in about 600,000 trucks around the

4 world.  And CDMA is probably the area for which we're best

5 known, code division multiple axis, the technology used in

6 the second and third generations of cellular phones.

7 Q    I'm going to hold up two phones that I showed to the

8 jury yesterday.  In my right hand is the -- what's known, I

9 think, as a brick phone because it's shaped in size much

10 like a brick.  And then in my left hand is a very modern-day

11 cell phone.  I'm wondering if you can summarize for the

12 jury, again at a high level, what are some of the Qualcomm

13 innovations that have helped phones evolve from this brick

14 phone into this more modern-day phone.

15 A    Well, first of all, when the cell phone first started,

16 often called a car phone, they were very large.  They used

17 basically FM for the communications, an analog transmission

18 capability.  As it began to grow, the industry recognized

19 that they needed to get more users, more subscribers in a

20 given amount of radio spectrum, which is somewhat limited.

21 And so they began to look at the use of digital technology.

22      The second generation was digital.  Some laboratories

23 around the world looked at code division multiple axis for

24 that digital technology but could not solve the problems

25 with it, and so generally settled on the use of -- and I

EXHIBIT___|___ PAGE___\O9

II-8

1  won't get into the details -- time division multiple axis,

2  TDMA.

3      We came up with the idea of using CDMA, managed to

4  solve a number of the problems that others had encountered

5  and weren't able to move ahead, and therefore were able to

6  introduce that into the industry.  The advantage was that it

7  allows many more subscribers to be used in a given amount of

8  spectrum and provides a much higher quality of voice

9  communications, more reliable handoffs as one moves between

10 cell towers.  And so it had very good technical advantages.

11     However, we continued to work on that.  The cell

12 phones, as you know, have moved now beyond just providing

13 voice communications to providing a whole range of other

14 activities.  And so the industry looked at how to move from

15 second generation to what they now call third generation,

16 which covers both the ability to have voice communications,

17 but also data communications, for example, connections to

18 the internet.

19     And so we continued a large level of effort of

20 technology development to add capabilities, for example,

21 global positioning system, the ability for a cell phone to

22 exactly locate where it is in case there's an emergency.

23 When you press 911, the safety people know just where that

24 phone is located and can dispatch the proper people to you.

25 The ability to have a very reliable connection, data

Echo Reporting, Inc.

EXHIBIT __L__ PAGE __110__

II-9

1 connection to the internet, we added those capabilities as

2 part of the third generation.

3     And indeed, as most companies around the world looked

4 at how to handle third generation, this ability to have both

5 voice and data, they've all moved to code division multiple

6 axis, to CDMA.

7     Additionally, as you know, many phones have cameras on

8 them now.  In addition to that, phones are having

9 camcorders, the ability to take movies.  It's important not

10 only to be able to take them, but now to send them back to

11 other locations.  And so the receiving and sending of videos

12 as well as audio and music.  The latest announcements have

13 to do with the ability to receive television over a cell

14 phone.

15     And so we have worked continually to add these

16 capabilities.  Not everybody wants all the capabilities.

17 Some use certain capabilities.  Others use a different set.

18 But, in fact, we provide and make the cell phone more and

19 more valuable.  There are currently over two billion

20 subscribers of cell phones around the world.

21 Q    To what extent has Qualcomm innovation affected system

22 capacity for cell phones and cell phone systems?

23 A    That was one of the reasons that the industry waited

24 and adopted CDMA partially in the second generation and

25 entirely in the third generation.  Initially, we were

Echo Reporting, Inc.

EXHIBIT ¹ ⁄ ___ PAGE ⟍ ⟍ ⟍

1 claiming that we obtained about 10 to 20 times as many

2 subscribers in a given amount of radio spectrum using CDMA

3 as compared to analog.

4      As we've now gone to third generation and continued to

5 develop that capability, we're now getting to the range of

6 30 times as many subscribers.  It's a much more efficient

7 use of spectrum, which is always, again, something in very

8 short supply.

9 Q    What about voice quality of the call?  Has Qualcomm

10 done anything to affect that?

11 A    The CDMA technology does provide very good voice

12 quality.  The conversion of voice to a digital signal is

13 called vocoding, voice coding and decoding.  We've done a

14 lot of work on the vocoders to allow one to obtain much

15 higher quality speech in a smaller number of bits per

16 second, a small amount of capacity required.

17 Q    And what about the number of dropped calls?

18 A    A key aspect of anyone -- anyone who uses cell phones

19 is very sensitive to it, is whether a call was dropped while

20 you're making use of the phone, while you have a

21 conversation ongoing.  Part of those drops are due to moving

22 from one -- the region of one cell tower to another cell

23 tower.  With CDMA, we introduced the technology uniquely of

24 being able to keep a connection to one tower, add a

25 connection to the second tower so that you have both towers

EXHIBIT ___ PAGE ___

II-11

1  connected, and then as you move closer to the second one,

2  drop the first one, so there's a much more continuous

3  connection, therefore more reliable.

4  Q    Does Qualcomm sell software that go into phones?

5  A    Yes.  When we first started the company, we -- in order

6  to show that CDMA could be made commercial, we had to

7  develop the phones and the infrastructure.  The first phone

8  required a van to drive it around.  It was obviously just a

9  demonstration type of item, but it showed that CDMA would

10 work.  And then we had to develop the chips that would

11 incorporate the CDMA technology and the software to support

12 that that then go into commercial-sized phones.

13      Over time, we sold the phone division and the

14 infrastructure division and focused in on the chip part of

15 the business.  I might note, though, that it's interesting

16 that the first commercial CDMA system was actually in Hong

17 Kong.  It started operation in 1995.  And shortly thereafter

18 in South Korea.  And in both systems, phones were

19 manufactured here in San Diego and shipped to Hong Kong,

20 shipped to South Korea.  So a little bit different than the

21 situation we're normally used to.

22      In any case, we have continued to very much focus in on

23 the chip business, the software business.  And as we

24 innovate, we add those capabilities into the chips.

25 Q    So if I buy a phone like this from L.G. or a phone from

EXHIBIT __L__  PAGE __113__

1 Verizon, a Qualcomm chip will be in here if it's a CDMA

2 phone?

3 A    Generally, there will be a Qualcomm chip in that phone

4 on CDMA.   There are other manufacturers of chips, so that

5 there is competition, but we work very hard to have very

6 good quality chips and software and pricing, and so we do

7 have a very good share of the market, but by no means the

8 total market.

9 Q    And a modern-day cell phone like this, what role do

10 Qualcomm chips and software play inside this phone?

11 A    If you looked inside the phone, there's one chip that

12 you might think of as a digital chip.   In fact, on that one

13 chip these days, you have all the various communications

14 functions.   You have this global positioning system

15 capability I mentioned earlier.   You would find one or two

16 computers on that same chip as modules on that chip.   In

17 fact, we're now getting to the point where one of those

18 computers is about the power -- the computing power of a

19 super computer of less than a decade ago.   So a tremendous

20 amount of computing power going on that same chip.

21      And other functions, such as supporting the displays

22 that are going to what are called three-dimensional displays

23 on that chip, digital signal processors, these are used

24 also, for example, for handling the video encoding and

25 decoding, the broadcast T.V. reception, a full range of

1 capabilities.

2     And finally, there is also local area connectivity, the

3 ability to have a cell phone connect to other devices that

4 might be close to it, Blue Tooth capability or what's called

5 Y-FI capabilities.

6 Q     You just mentioned, if I understood, that the computing

7 power of these chips has increased over time.  What's

8 happened to the size of the chips over time?

9 A     Well, it's interesting.  There's an observation by

10 Gordon Moore called Moore's law which estimated many, many

11 years ago that the number of transistors that you can fit on

12 a piece of silicon, commercial-sized piece of silicon, that

13 they would roughly double every two years.  And that indeed

14 has gone on for many generations, many such doublings.  And

15 so we get to the point now where there are large numbers of

16 transistors capable on the chip, and we still probably have

17 a few more generations of that doubling to occur.  That has

18 allowed us to put just this great functionality on the chip

19 in the phone.

20     There's also a radio part of a phone, and we're getting

21 to the point now where in one package one has the digital

22 parts that I've just mentioned, the computing, the

23 communications, but also now the R.F. in that same package

24 and memory.  And so more and more of these chips that are

25 delivered have a significant function, much of the

EXHIBIT __L__ PAGE __115__

II-14

1 functionality of the phone built in.

2 Q    Has Qualcomm ever encountered any skepticism from the

3 industry about whether its technologies would work or work

4 well?

5 A    Well, early on, as I mentioned previously, many

6 laboratories, companies around the world, had looked at the

7 use of code division multiple axis CDMA and just ran into

8 problems that they weren't able to solve.  When we claimed

9 we had solved them, people were skeptical.  We brought a

10 large group of industry people here to San Diego for a

11 demonstration -- actually, the first one was in November of

12 1989 with this fan-sized phone -- and showed that we had

13 solved many of the problems.  People were still skeptical.

14      In '91 we brought everybody back.  We had developed the

15 chips and had commercial-sized phones and infrastructure.

16 People were still skeptical.  Many claimed that yes, it may

17 work in laboratories, it may work in a smaller city, but

18 would not handle large numbers of subscribers.

19      Indeed, there were one, then two professors at Stanford

20 University that were often published as saying that the CDMA

21 claims we made violated the laws of physics.  And so there

22 were a lot of skeptics, a lot of resistance.  I think

23 anytime you try to do something new, try to make changes in

24 the way things are being done, particularly in an industry

25 as important and large as communications, that people hold

EXHIBIT ___ PAGE ___

1  back.

2      So we did run into a great deal of skepticism.  With

3  regard to the professors at Stanford, the two professors

4  that were highly skeptical, I often joke that the CDMA now

5  works entirely around the world, except within a 15-mile

6  radius of Stanford.

7  Q    Now, you mentioned a few moments ago that modern-day

8  cell phones like this are starting to take up features

9  Qualcomm helped to develop of a camcorder capability or

10 video capability.  How did Qualcomm first become involved in

11 video capability in connection with cell phones?

12 A    Well, actually, the history with video goes well back

13 in Qualcomm's history.  In the late 1980s, a few years after

14 we started the company, there was a bid for proposals from

15 the Defense Advanced Research Projects Agency for proposals

16 on high-definition T.V.  So this was the late '80s.  There

17 was a lot of concern at that time in the country that Japan

18 was moving ahead rapidly with HDTV, in fact, beginning to

19 get into commercial operation, that the U.S. was falling

20 behind, that the future in both communications and computing

21 might go to that country that indeed was successful with

22 HDTV.

23     And so DARPA, the Defense Advanced Research Projects

24 Agency put out a request for proposals.  As I recall, there

25 were about 130 teams of companies that responded to that,

EXHIBIT___/___ PAGE___\\\__

1  plus Qualcomm by itself, and there were three awards made.

2  Qualcomm received one of those three awards.  And so we were

3  still a fairly small company.  We began to work on some

4  innovative approaches.

5      The approach we had proposed involved both the digital

6  coding of the video, encoding and decoding of the video, and

7  digital transmission.  For example, in Japan at the time,

8  they were using analog transmission.  So this was a

9  different approach.

10     And so we moved ahead with that, came up with a number

11 of innovations on how do you compress the video, expand it

12 back out again, therefore be able to transmit it to an HDTV

13 set.  And that work continued.

14     At some point, the FCC, the Federal Communications

15 Commission, asked for bids for commercial systems, but the

16 White House at the time put on a constraint that if you had

17 any Government support, you could not make such a proposal

18 to the FCC, so we were not able to.  Actually, it turned out

19 that a spinoff from my first company, Linkabit, which had

20 then gone to General Instrument, proposed an all digital

21 commercial system to the FCC.  That is the direction that

22 the FCC went.

23     So it began to have more commercial emphasis, and the

24 DARPA support dropped back.  We, however, felt that it was

25 important to continue the work.  We had some very good

EXHIBIT __L__  PAGE __118__

1 approaches on the digital technology for HDTV, and we kept

2 that work going.  We thought over time it might be usable in

3 movie theaters, something we called digital cinema, where

4 one might be able to have -- rather than celluoid film and

5 light shining through it, be able to have images done in a

6 digital fashion, and therefore have higher quality and

7 retain that quality over many showings.

8        At some point we also began to think that -- again, we

9 were working on cell phones -- that at some point it would

10 become an interesting technology for the cell phone as well.

11 Q    You mentioned that digital cinema project.  Were any

12 movies ever released through that project?

13 A    Yes.  Actually, we set up a joint venture with

14 Technicolor to work on that to popularize the technology.

15 They bought several equipments from us for showing movies,

16 and there was a movie "Oceans Eleven" shown here in Mission

17 Valley using our technology.  So it was kind of fun to go

18 down to a movie theater and see that technology actually in

19 use.  It was also shown, of course, in many other cities.

20        The industry, however, first of all, the theaters, the

21 exhibitors, were going through some financial hard times,

22 would have trouble paying for the digital projectors as

23 opposed to film projectors.  And the studies were concerned

24 about, if they put up the money, what kind of return would

25 they get.  And so the whole area began to slow down as far

EXHIBIT __L__  PAGE __119__

II-48

DIRECT EXAMINATION

1

2  BY MR. PATCH:

3  Q    Perhaps, Doctor Lee, you could find a place off to the

4  side for your binders so that we can see you rather than

5  that mountain of paper we've provided you.

6       And would you please start by introducing yourself to

7  the jury.

8  A    My name is Chong Lee.  I was born in 1958.  I'm married

9  with three boys.

10 Q    Can you generally describe what your involvement is

11 with the patents that are the subject matter of this

12 lawsuit.

13 A    I'm an inventor of one of the patents and co-inventor

14 of the other patent.

15 Q    Where do you live, Doctor Lee?

16 A    In San Diego, a neighborhood called Scripps Ranch.

17 Q    Were you born here in the United States?

18 A    No.

19 Q    How is it that you came to the United States?

20 A    I was born in Seoul, Korea.  My father passed away when

21 I was around 13, and my mother decided to immigrate to the

22 U.S., thinking there's a better job opportunity for her.

23 About a year later, myself and my brother followed her and

24 immigrated to U.S. in 1975.

25 Q    When you arrived in the United States, what were your

EXHIBIT ___L___ PAGE ___120___

II-167

1 A    I did not have that knowledge back then to make that

2 determination.

3 Q    All right.  Let me ask you --

4 A    It's all hindsight.

5 Q    Let me ask you a few questions about the 767 patent, if

6 I could.  If you turn to Tab 3 in the notebook, you'll find

7 a 767 patent.

8 A    Which tab?  I'm sorry.

9        THE COURT:  Tab 3.

10       MR. LEE:  Tab 3, Plaintiff's Exhibit 3, your

11 Honor, already in evidence.

12 BY MR. LEE:

13 Q    Do you have that before you?

14 A    The 767, yes.

15 Q    Now, this -- this patent concerns interframe video

16 compression, motion prediction, motion prediction done by

17 comparing blocks of pixel data, correct?

18 A    So, interframe video compression --

19 Q    And all those concepts -- I'm sorry, go ahead.

20 A    Yes.  It's the interframe video compression scheme that

21 I proposed and granted a patent on.

22 Q    And those concepts, interframe compression, motion

23 prediction, motion prediction on blocks of data, they were

24 all concepts that had been developed before you began your

25 work, correct?

EXHIBIT __L__   PAGE __121__

II-168

1  A     That's prior art.

2  Q     Now, you had a co-inventor on this one, Donald Pian

3  (phonetic), correct?

4  A     That's correct.

5  Q     And he worked with you on this project, correct?

6  A     He worked with me on the Darpa project.

7  Q     Now, you know that Mr. Pian is developing H.264

8  products today?

9  A     No, I did not know that.

10 Q     Well, did you know that he's testified that's what he's

11 doing?

12 A     I'm not sure if I knew that.

13 Q     Well, you know he doesn't work for Qualcomm, correct?

14 A     That's correct.

15 Q     Did you know he testified he was developing H.264

16 products for another company?

17 A     Yeah, I did not know the exact nature of his work

18 recently.

19 Q     It sounds right, right?

20 A     I mean, it's possible.

21 Q     Has anybody told him that the work he's doing infringes

22 your 104 patent?

23 A     I'm not sure if anyone told him, you know, the exact

24 words.

25 Q     Now, going back specifically to the 767 patent, you

Echo Reporting, Inc.

EXHIBIT ___L___ PAGE 122

II-238

1        I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4

5 _Sharon Parker Jordan Reilly_      _1-11-07_____
  Transcriber  _Carol Abbott_           Date

6

7 FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

8

9 _L. L. Francisco_____
  L.L. FRANCISCO, President

10 Echo Reporting, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                      Echo Reporting, Inc.

EXHIBIT __L__  PAGE __123__