# Exhibit A



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM, INC., | ) Case No. 05CV1958-B(BLM) |
|          Plaintiff, | ) San Diego, California |
| vs. | ) Monday, |
| | ) June 25, 2007 |
| BROADCOM CORPORATION, | ) 9:00 a.m. |
|          Defendant. | ) |

TRANSCRIPT OF ORDER TO SHOW CAUSE/MOTION HEARING
BEFORE THE HONORABLE RUDI M. BREWSTER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JAMES BATCHELDER, ESQ. |
| | WILLIAM S. BOGGS, ESQ. |
| | BRIAN FOSTER, ESQ. |
| | Day Casebeer Madrid & |
| |    Batchelder, LLP |
| | 20300 Stevens Creek Boulevard |
| | Suite 400 |
| | Cupertino, California 95014 |
| | (408) 873-0110 |
| For the Defendant: | VINITA FERRERA, ESQ. |
| | WILLIAM F. LEE, ESQ. |
| | JOHN J. REGAN, ESQ. |
| | KATE SAXTON, ESQ. |
| | Wilmer, Cutler, Pickering, |
| |  Hale & Dorr, LLP |
| | 60 State Street |
| | Boston, Massachusetts 02109 |
| | (617) 526-6453 |
| Transcript Ordered by: | TIMOTHY S. BLACKFORD, ESQ. |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

ii

1  APPEARANCES (Cont'd):

2  For the Defendants:          ROBERT BREWER, ESQ.
                                JAMES McNEILL, ESQ.
3                               McKenna, Long & Aldridge, LLP
                                750 B Street, Suite 3300
4                               San Diego, California 92101
                                (619) 595-5400
5

6  Court Recorder:             George Perrault
                               United States District Court
7                              940 Front Street
                               San Diego, California 92101
8
   Transcriber:                Shonna Mowrer, Carol Abbott
9                              Echo Reporting, Inc.
                               6336 Greenwich Drive
10                             Suite B
                               San Diego, California 92122
11                             (858) 453-7590

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

**Exhibit A-2**

1

1    <u>SAN DIEGO, CALIFORNIA  MONDAY, JUNE 25, 2007  9:00 AM</u>

2                        --oOo--

3         (Call to order of the Court.)

4              THE CLERK:  Number 1 on calendar, 2005CV1958,

5    Qualcomm, Incorporated versus Broadcom Corporation for an

6    order to show cause hearing and motion hearing.

7              THE COURT:  Good morning, counsel.

8              ALL:  Good morning, your Honor.

9              THE COURT:  Would counsel please make their

10   appearances.

11             MR. BOGGS:  William Boggs and Brian Foster for

12   Qualcomm, your Honor.

13             THE COURT:  Foster.  Foster.  Alex, do you have

14   Foster here?

15             THE CLERK:  Foster?

16             THE COURT:  Brian Foster.  I don't see him.  Brian

17   Foster.  All right.  I've marked him up.

18             Thank you, Counsel.

19             MR. BOGGS:  Your Honor, and Mr. Jim Batchelder is

20   also here on behalf of Qualcomm.

21             THE COURT:  Very well.

22             MR. BATCHELDER:  Good morning, your Honor.

23             THE COURT:  Good morning.

24             MR. LEE:  Your Honor, William Lee, Jack Regan,

25   Vinita Ferrera and Kate Saxton of Wilmer, Hale for Broadcom.

Exhibit A-3

2

1  And with us are Bob Brewster and Jim McNeill from McKenna,

2  Long.

3          MR. REGAN:  Good morning, your Honor.

4          THE COURT:  Good morning.

5          Now, the way they have this calendar, it's not

6  broken out very well, so I have to find everybody.  I have

7  Mr. Lee, I have Mr. Beal, and then you gave me three or four

8  other names.

9          MR. LEE:  Mr. Regan.

10          THE COURT:  Regan.  Just a second.  Yes, I have

11  Mr. Regan.

12          MR. LEE:  Ms. Ferrera.

13          THE COURT:  I have Ms. Ferrera.

14          MR. LEE:  Ms. Saxton.

15          THE COURT:  Saxton.  I have Ms. Saxton.

16          MR. LEE:  And I think -- do you have Mr. Brewer

17  and Mr. McNeill?

18          THE COURT:  I have Mr. Brewer.

19          MR. LEE:  I think that's it.

20          THE COURT:  And Mr. McNeill, you said?

21          MR. LEE:  Yes, your Honor.

22          THE COURT:  Yes, I have Mr. McNeill too.  Thank

23  you very much.

24          We are here this morning on two matters.  We have

25  the matter of completing the handling of the waiver issue by

**Exhibit A-4**

3

1  the Court deciding the relief that will be awarded for that

2  cause of action, and then we have the motion brought by the

3  Defendants for a finding of exceptional case.

4      Before we get into those two substantive issues, I

5  have a procedural question.  Since the Court last issued a

6  finding and an order in this case, there was extensive --

7  has been extensive ongoing -- what counsel have referred to

8  as rolling discovery.  And the last work that I have read on

9  this case indicated that there's still ongoing further

10 discovery going on.

11     So I'm curious, is discovery now done or is it

12 still ongoing?  What's the status of the discovery?

13     MR. LEE:  Your Honor, if I could I address that?

14     THE COURT:  Yes, please.

15     MR. LEE:  The discovery that's been ongoing, your

16 Honor, is the discovery that resulted from the events on the

17 last day of trial, the 21 e-mails.  And after the jury's

18 verdict came in, we asked Qualcomm's then counsel to make a

19 further inquiry because we were concerned --

20     THE COURT:  I'm aware of that, and I'm aware that

21 there's been an extensive amount of discovery.  However, the

22 last thing I read is that there's still more ongoing.

23     MR. LEE:  There is still more coming.

24     THE COURT:  So my question is, what's the present

25 status?

4

1          MR. LEE:  As far as we know, your Honor, a lot has

2 been produced, and there's more coming.

3          MR. BOGGS:  Your Honor, I think I can speak to the

4 status.  Their papers point out whatever it is is the

5 current volume of pages, something over 300,000 pages of --

6 additional electronic pages have been produced since they

7 made a written demand on March the 5th.  And I believe the

8 first of those productions started April 13th.  On March the

9 7th, Qualcomm responded to their March 5th request of that.

10         THE COURT:  I'm aware of all that.  But I was told

11 that there's still more going.

12         MR. BOGGS:  I think there's about 1,000 pages of

13 materials that are being cleared as to whether or not it's

14 attorney/client privilege.  But I'm informed that, except

15 for that 1,000 pages, everything else has been completed and

16 been produced.

17         THE COURT:  Is that your understanding as well?

18         MR. LEE:  Yeah.  I know nothing other than what

19 Mr. Boggs tells me about the production.  That's what he

20 told me.

21         THE COURT:  All right.  So -- thank you.

22         MR. BOGGS:  Your Honor, I guess I can add, because

23 it kind of goes to the heart of what you're asking, is when

24 I first became involved in the case and called Mr. Lee to

25 tell him I was going to be the lead counsel on April 27th or

Exhibit A-6

5

1  29th, at that time I asked him -- because I told him -- he

2  knew there was more documents coming.  I said, I've got to

3  get up to speed.  Do you want to postpone this.  I need to

4  get up to speed.  More documents are coming.

5          He explained what his trial schedule was, but

6  basically said they understood that they were going to file

7  their papers in the middle of the document production, and

8  that was okay with them, and they did want to go forward.

9  And we negotiated and agreed that even though more documents

10 were coming, that we would be here on this day at this time.

11         THE COURT:  Thank you.

12         Now, what's the position of the Defendants with

13 respect to the place of the discovery on the case?  We

14 have -- we have a case that was tried, a verdict was

15 rendered, judgment was rendered.  And then there's been

16 post-trial discovery.  It's not clear to the Court.  What's

17 the context of that discovery in terms of the issues of the

18 case?

19         MR. LEE:  Your Honor may recall that when the

20 issue arose on the last day of trial, there were two issues

21 that your Honor addressed.  One was, haven't we addressed

22 the remainder of the trial.  What was going to be produced,

23 and would I be able to re-call the witness and examine her.

24 And then your Honor said separately that you would reserve

25 on a sanctions motion until after the trial.

6

1        When the verdict came in, you asked me whether the

2 verdict would affect whether we pursue that motion or not,

3 and I said that we would -- we asked for a little time to

4 think about it.

5        We have pursued that motion.  Your Honor referred

6 it to the magistrate judge.  It's been filed.  I can clarify

7 one thing, your Honor.  We asked for these other documents

8 on February the 1st, not March the 6th.  And on February 1st

9 and March -- the first week of March, there were

10 negotiations between Qualcomm's then counsel and our office

11 where we were being told this is all not relevant.  There's

12 nothing anyway.

13        So what's happened is, really beginning the day

14 after the events that occurred in your courtroom, and having

15 in mind the fact that we had to address the trial -- your

16 Honor may recall you had to re-call the witness, and we

17 examined her on the 21 e-mails.  But there was still the

18 issue of the sanctions motion.

19        So we then pursued the discovery, all of which

20 goes -- relevant to that sanctions motion.  It's on a

21 different time frame.  It occurred on July the 10th before

22 the magistrate judge.  And when Mr. Boggs became involved,

23 what I said to him is, let's go ahead with the hearing on

24 the issue of remedy for waiver.  Let's go ahead with the

25 hearing on exceptional case.

7

1          The fact that we don't have all of your documents

2 does not preclude us from making our argument on exceptional

3 case.  We'll have plenty to make the argument.  And then

4 whatever else there is, we'll address the sanctions motion.

5          So I think the idea now, your Honor, is there are

6 three things, two before your Honor, one before the

7 magistrate judge.  The discovery will be completed, which is

8 relevant to the sanctions motion and will be fully addressed

9 at that time.

10          THE COURT:  All right.  I take it from your answer

11 that the context or the place for this additional discovery

12 is going to be in the context of the motion for sanctions in

13 the magistrate court.

14          MR. LEE:  Yes.  The additional discovery that's

15 going to occur.  But the discovery that's occurred through

16 today, through the briefing before your Honor is relevant to

17 both of the motions before your Honor, and I think both of

18 us are prepared to address it.

19          What Mr. Boggs and I discussed was, he was

20 concerned, since he was getting into the case, that we not

21 address at the eleventh hour documents that he was rolling

22 out to us.  And so we agreed upon basically a cutoff date,

23 that we would address documents that had been produced by

24 such and such date.  We have described the total amount.

25 But I understood at the time that he was going to continue

Exhibit A-9

8

1  to produce documents.

2         MR. BOGGS:  That's correct, your Honor.  And it is

3  true that they have brought their exceptional case motion

4  based on the newly produced documents.  They've made

5  basically the same type of arguments that they're making to

6  you in the exceptional case motion, asking for an

7  exceptional case finding and an award of all of their

8  attorney's fees.  They've made almost all the same arguments

9  in their sanctions motion, which is in front of the

10 magistrate judge.

11        I noted in a footnote, I think, in our exceptional

12 case final brief with you that you may want to give some

13 consideration -- and she may as well -- as to coordination

14 between the courts so there isn't a waste of judicial effort

15 and time.  Because it's all the same facts and many of the

16 same arguments.

17        As they pointed out to me in a letter, in their

18 brief maybe to you, they say they're asking for a certain

19 kind of relief here for their exceptional case, all of their

20 attorney's fees.  They're asking basically from Judge Major

21 a whole host of additional things that they deem they can

22 get through a sanctions motion, but not through an

23 exceptional case motion.

24        So they're saying the relation is different, but

25 the underlying conduct that they accuse Qualcomm and its

**Exhibit A-10**

9

1   attorneys of is the same conduct, same documents.

2          THE COURT:  I understand.

3          MR. LEE:  And your Honor, that's close to right,

4   but not completely.  Because the question of waiver of

5   defense and the manner in which it is adjudicated -- in

6   fact, there's one on that defense -- is relevant to the

7   exceptional case motion before your Honor.

8          The arguments that Qualcomm made, your Honor will

9   recall we spent an evening in your chambers arguing

10  extensively about the burden of proof on the waiver issue

11  and what type of claim it was and what level of scienter

12  Qualcomm had to have in order for us to prevail.

13         Those issues which are relevant to both the

14  motions before your Honor today are not relevant to the

15  sanctions motion.  And we've been very clear.  In the

16  exceptional case motion, we believe we're entitled to

17  recovery our fees in the case.  The relief that we're asking

18  for in the sanctions motion is not duplicative of that.  It

19  is in addition to that, but not duplicative in any way.

20         THE COURT:  All right.  Now, in these hearings

21  this morning, the hearings with respect to the relief for

22  the waiver that's been found and also for the exceptional

23  case issue, the Defendant has the burden of proof in both

24  cases by clear and convincing evidence.

25         I would suggest that you proceed first and advise

**Exhibit A-11**

10

1   the Court and counsel how much time you expect to use.

2   Counsel will have additional time -- an equal amount of time

3   to respond to your position.  I think it's better to have

4   you allege before they attempt to deny something you haven't

5   yet alleged.

6          MR. LEE:  Yes.

7          THE COURT:  So you -- I want you to proceed first.

8          MR. LEE:  We will, your Honor.  I'm not sure that

9   we have the burden of proof on a remedy.  We had the burden

10  of proof on proving waiver, and now it's just a question of

11  what remedy your Honor could order on the first motion.

12  Because your Honor has always rendered --

13         THE COURT:  The first motion being the waiver

14  issue?

15         MR. LEE:  Yes.  But I --

16         THE COURT:  I regard you as having the burden of

17  proof on remedy as well as liability.

18         MR. LEE:  Well, your Honor, I'm prepared to argue

19  them together.  Because I think the legal issues on the

20  waiver issue are quite narrow, which I can get to very

21  quickly.  Then I think the question of both the exceptional

22  case and whether you go beyond holding the patent

23  unenforceable collapse, and they relate to the conduct

24  during the course before the trial, during the trial and

25  after the trial.

**Exhibit A-12**

11

1          And so what I would propose to do is argue those

2    facts to your Honor, and then reach the conclusion or argue

3    the conclusions for both of them.

4          THE COURT:  That's fine.  Whatever approach you

5    want to take.  I want you to proceed first, and they can

6    respond to you.

7          MR. LEE:  That's fine.

8          THE COURT:  Since you have the burden.  Whatever

9    time you need, you may feel free to take.  And you'll have

10   equal time.

11         MR. LEE:  Okay.

12         MR. BOGGS:  Your Honor, I do view that there are

13   two very separate issues before the Court.

14         THE COURT:  Clearly.

15         MR. BOGGS:  One that you have ordered, order to

16   show cause to Qualcomm why a further remedy shouldn't be

17   imposed.  And if counsel has the burden on that, that's

18   fine.  But I view that as a very discrete set of issues and

19   would hope that I can respond before he moves into his

20   argument on his motion, the exceptional case motion, where

21   he clearly has had the burden, and he does have that burden.

22         THE COURT:  I'm agreeable with that.  Why don't

23   you bifurcate your presentation.

24         MR. LEE:  Your Honor, I would not like to proceed

25   that way because the facts -- the question on the remedy --

12

1  first I should say, I'm not sure that I have the burden, but

2  I'm happy to go first.   But there are really two issues on

3  the waiver.

4           THE COURT:   Well, now, let me -- just a minute.

5  You don't think you have the burden on the remedy for

6  waiver, and Mr. Boggs seems to think that he has the burden

7  on waiver.   Why am I arguing with you?   You both seem to

8  agree that you want to give Mr. Boggs the burden.

9           MR. LEE:   Well, your Honor --

10          THE COURT:   If you both feel that way, feel free.

11          MR. BOGGS:   I don't know if I have the burden,

12  your Honor, but I know this.   You ordered me to be here to

13  show cause why the remedy shouldn't be ordered, and I am

14  prepared to go first, and I'd like to go first.   And I'd

15  like to do that issue first.

16          If counsel then wants to respond within the

17  confines of what you ordered us to be here to speak about,

18  circumstances of Qualcomm's not disclosing to the JVT and

19  the materiality of the information that wasn't disclosed,

20  then you can weigh the evidence to decide whether or not

21  there should be an additional remedy.   We'll do that.

22          Then when that's done -- see, here's why I want to

23  keep them separate.   His second motion -- let's make no

24  mistake.   He's made a motion for exceptional case finding

25  where he's arguing to the Court that by clear and convincing

13

1  evidence, that he has the burden of showing the witness has

2  lied.  It's all litigation misconduct.  Witnesses lied,

3  counsels conspired and concealed and hid from the Court and

4  from Broadcom 300,000 documents, and that a cover-up

5  occurred in the middle of the trial and since the trial.

6         That, your Honor -- litigation misconduct is very

7  separate and different than what you ordered, your Honor,

8  which I say we should go first on, which is what happened

9  before the JVT.  And the reason he wants to lump them

10 together -- I just want the Court to know.  He wants to put

11 all this together and smear my client and influence your

12 thinking on whether there should be a remedy by mitigation

13 conduct that I want to deal with separately.

14         MR. LEE:  You know, your Honor --

15         MR. BOGGS:  And I'm happy to go first.

16         THE COURT:  Just a moment.  Just a moment.  A

17 couple of administrative things.  Would each of you put

18 these traveling microphones on so that the record will be

19 easier to read.

20         When you walk around and you stand and you're away

21 from the microphone, it's difficult to get you on the tape.

22 And it'll be helpful to everybody if you'll wear those.  If

23 you've never done it before, we'll show you how to turn them

24 on.

25         MR. BOGGS:  This one is a little different than

14

1 what I've been using.  I'll put this in my lapel.

2           THE COURT:  Clip it on your tie.

3           MR. BOGGS:  Hopefully you can regular the volume

4 so if I start talking too loud, I'm not blasting.

5           THE COURT:  We can do that.

6           MR. LEE:  Your Honor --

7           THE COURT:  Let me -- let me -- gentlemen,

8 let's -- don't worry too much about the size of the ping

9 pong table.  I regard the burden of proof on remedy for

10 waiver to be the Plaintiff's burden.  I did issue an OSC.

11 That's a matter of bringing the matter here.  That does not

12 alter what under the law are burdens of proof.

13           However, if you both wish to have Qualcomm proceed

14 first with the waiver remedy, I have no objection to that.

15 I'm going to treat the case where the burden lies as I see

16 it.  And I don't care which of you approaches the issue

17 first.

18           Now, with respect to -- with respect to

19 transferability of some of the fact issues, you can argue

20 how it's partitioned and only applicable to one of the

21 issues and not the other.  However, to the extent that the

22 evidence is relevant to both, it's going to be considered

23 with both.

24           And much of the conduct that constituted the

25 waiver is going to be involved in the exceptional case

*Echo Reporting, Inc.*

**Exhibit A-16**

15

1  analysis.

2        MR. LEE:  And I'm prepared to go first, your

3  Honor, and address the facts that go to both and address

4  both motions.  And I'm pleased to do that.  I think your

5  Honor -- I was here for the trial.  Your Honor was here for

6  the trial.  What Mr. Boggs says about our claim isn't quite

7  true.  There is litigation misconduct allegation.

8        THE COURT:  Let me be clear about one thing.

9  Let's be careful how we use the terms "true" and "correct."

10 His comments may not be correct, but whether they're true or

11 not -- the question right now is whether they're correct or

12 not.

13       MR. LEE:  Fair enough.

14       THE COURT:  And there's a certain -- there's a

15 certain intonation with the word "truth" and "falsity" which

16 may not be present if you're speaking about correctness and

17 incorrectness.

18       MR. LEE:  Well, actually, I once was cross-

19 examining before your Honor and asked someone whether it was

20 true, and you told me to ask whether it was correct.  And I

21 remember that.  We'll talk about what's correct and not

22 correct as we go along.

23       THE COURT:  There may come a time when you want to

24 speak about truth and falsity.  There may come a time.  I'm

25 not saying that.  But in this instance, when you say that

*Echo Reporting, Inc.*

**Exhibit A-17**

16

1  what somebody who is a total strange to this case comes in

2  and says, let's be careful how we --

3        MR. LEE:  I think that's fair.  Your Honor, I

4  think we should be very careful about talking about what

5  happened during the trial and after the trial.  And I think

6  that both the remedy on the waiver issue as well as the

7  exceptional case arise from a common set of facts.  I'd like

8  to address those facts with your Honor and then identify the

9  conclusions that we think that should bring us to on both

10 motions.

11       THE COURT:  I think that's the burden -- that's

12 the way the thing should go.

13       MR. BOGGS:  Your Honor, I understand.  I should go

14 first on the order to show cause.

15       THE COURT:  No, I'm not going to -- I'm going to

16 impose the burden, and the party with the burden is going to

17 speak first.  You can respond, and you'll have equal time.

18 All right.  Let's proceed.

19       MR. LEE:  Your Honor, proceeding to both motions.

20 The issues before the Court today are, we believe,

21 extraordinarily important.  The issues, of course, concern

22 the remedy that Broadcom as a prevailing party on waiver

23 should receive.

24       But there is much more at stake.  This is not, as

25 Qualcomm has urged your Honor in its papers, a question of

17

1  innocent oversight, common mistake or an everyday litigation

2  occurrence, which is the manner in which the papers have

3  described the events.

4       Instead, what your Honor will see is a case in

5  which 46,000 e-mails totaling more than 332,000 pages that

6  go to the heart of one of the issues which was tried to your

7  Honor were not produced and have only been produced as a

8  result of our diligent effort post-trial and frankly a

9  threat to come to your Honor if they had not been produced.

10      Now, your Honor, those documents would never have

11 been uncovered but for two questions asked on cross

12 examination and the efforts to pursue the documents after

13 those questions were answered on cross examination.

14      Among the documents, your Honor, that have been

15 produced, your Honor may recall Viji Raveendran, who was the

16 witness who was called in rebuttal by Qualcomm on the last

17 day of the trial.  She also had testified in her deposition

18 about involvement in the JVT.

19      There are 3,000 e-mails that have now been

20 produced to Viji Raveendran.  And as we will show your

21 Honor, they discuss the e-mail reflector list which your

22 Honor had inquired about at the side bar, JVT meetings,

23 reports on JVT meetings sent to her by a consultant,

24 notwithstanding the fact that she denied that she had ever

25 received that report.

18

1          Among those documents also, your Honor, were a

2     thousand e-mails that went to Christine Irvine.  Christine

3     Irvine, your Honor may recall, was the 30(b)(6) witness who

4     testified on behalf of Qualcomm about their involvement in

5     the JVT.  She testified that Qualcomm had not participated

6     in the JVT.  There are 1,000 documents that discuss the JVT

7     which were sent to her.

8          Now, your Honor, to address at the outset the

9     question of whether this case is ordinary and this is just a

10    commonplace litigation occurrence, nothing, we believe,

11    demonstrates more clearly that this is an extraordinary set

12    of circumstances than letter from Mr. Batchelder and Mr.

13    Lupin to your Honor.

14         And I'm going to show your Honor the chronology

15    that led to those letters because it was not a one-month

16    effort on our part to obtain the documents, but, in fact, it

17    was a two-month effort and an effort by Qualcomm to deny the

18    documents to us.

19         The letters to your Honor from both Mr. Lupin and

20    Mr. Batchelder demonstrate just how extraordinary the case

21    is.  To have both lead trial counsel and general counsel say

22    that the documents that have been -- that have been

23    discovered basically demonstrate the positions taken at

24    trial and arguments made at trial were inconsistent with the

25    documents that have been produced is an extraordinary event.

19

1          And to quote Mr. Batchelder, the bottom of the

2     third paragraph, "Our preliminary review of these documents

3     has revealed facts that appear to be inconsistent with

4     certain arguments that we made on Qualcomm's behalf at trial

5     and in the equitable hearing following the trial."

6          And I'm going to show your Honor that Mr.

7     Batchelder was correct, and there's a reason that this

8     letter was sent.

9          Now, your Honor, this is just not a case of one

10    party got the jury verdict, the case is over, no harm, no

11    foul.  We would suggest this case goes to the nature of our

12    obligations as lawyers who appear before your Honor who are

13    admitted generally or on a pro hac vice basis to appear

14    before your Honor, our obligations when we're undertaking

15    discovery, our obligations when we're presenting witnesses

16    at trial, our obligations when we're making arguments to the

17    Court.

18          It is also -- it also goes to the core of our

19    obligations as lawyers admitted to practice before the Bar

20    to do the best we can to comply with our obligations to

21    present correct and accurate testimony and evidence.  And

22    even more so, your Honor, it goes to the obligation to

23    present a correct and accurate case to the nine jurors who

24    gave up a substantial part of their January to be here with

25    us.

Exhibit A-21

20

1          In fact, your Honor, you'll find that some of them

2 have remained interested enough -- the jury foreperson is in

3 the room today to see what has happened with the case as it

4 proceeds.

5          What I've done, your Honor, to take -- to

6 demonstrate that this is really an extraordinary and

7 exceptional case is to prepare a few simple chronologies,

8 chronologies which will, we believe, demonstrate that the

9 case is exceptional.

10          Each of those chronologies will address a series

11 of issues, but the issues we will address are the following.

12          First, what -- whether Qualcomm's participation in

13 the JVT was an issue during discovery, something that's been

14 addressed in the papers.

15          Second, what did Qualcomm expressly represent to

16 Broadcom, to the Court and to the jury about its

17 participation and nonparticipation?  What did it say?

18          Third, what happened on January 24th, 2007, when

19 it turned out or it was revealed on cross examination that

20 there, in fact, were documents in Qualcomm's possession, but

21 not produced to Broadcom?

22          Fourth, what do the documents show now about

23 Qualcomm's actual participation in the JVT?  What is the

24 correct picture of Qualcomm's participation in the JVT?

25          Fifth, what do these documents now show about what

1  Qualcomm knew about the IPR policy of the JVT, something

2  that was discussed at length with your Honor, and about the

3  relevance of its own patents to the work of the JVT?

4          And last, what did Qualcomm do after January 24,

5  2007?  Did it -- as Qualcomm represents, did it immediately

6  and voluntarily disclose the documents and inaccuracies or

7  did something else occur?

8          Now, if I were to take those in order, your Honor,

9  what I'd like to do is put up -- I have a hard board with

10 each of the chronologies which I'll put up on the easel and

11 then bring up on the screen the actual documents or the

12 actual testimony that supports each of the entries, if

13 that's al right with your Honor.

14         THE COURT:  Very well.

15         MR. LEE:  Okay.  Put up the first board.

16         Your Honor, we have a notebook for your Honor.

17 Many of these are keyed to the tab numbers that we

18 identified in the papers we've filed.  To make it a little

19 bit easier, we have a notebook that we can get to quickly.

20         THE COURT:  I have a book here.  It says "Bench

21 Book," but there's no date on it.  Is this the one?

22         MR. LEE:  I don't think so.  Not ours.

23         THE COURT:  No.  Thank you.  I take it counsel has

24 a copy?

25         MR. LEE:  I think -- Mr. Boggs, do you have a

22

1  copy?

2          MR. BOGGS:  Yes.  I was just handed one.

3          MR. LEE:  So your Honor, what I've put on the

4  easel and what is on the screen right now is the series of

5  events which we believe will demonstrate to the Court that

6  the question of whether --

7          THE COURT:  Turn it back up.

8          I just wondered which is easier to read.  You're

9  using the small one.  Is it the same as the large one?

10         MR. LEE:  It's the same as the large, but what

11 I'll do is take the large one down to show you the actual

12 entries.  We might be able to give your Honor a hard copy.

13 Is that --

14         THE COURT:  I think I -- don't I have that in this

15 notebook that you gave me?

16     (Pause.)

17         MR. LEE:  We don't have an extra of this.  I can

18 give you mine.  It has no notes on it, so it's not -- okay.

19         Now, your Honor, the first question which is

20 raised by the parties' briefing is, was this question of

21 participation of the JVT really an issue in the case.  And

22 Qualcomm has raised that issue.  And I think, your Honor, if

23 we go through -- and I'll do this very quickly.  The

24 chronology of events through September of '06, your Honor

25 will see that, in fact, it was clearly an issue.

Exhibit A-24

23

1          Going way back to the complaint, the complaint

2     itself alleged that Broadcom's products practice H.264.

3     That was in October 2005.  That's at Tab 1.

4          On -- we can pass those.  Go to the next one, if

5     we could.

6          On January 23, 2006, Broadcom filed a set of

7     interrogatories, your Honor, that specifically asked for any

8     documents concerning any Qualcomm membership, participation,

9     interaction and/or involvement in setting any standard

10    relating to the processing of digital video signals that

11    pertained in any way to any Qualcomm patent.

12         So a year before the trial occurred, at the outset

13    of discovery, that specific request was made.  Two months

14    later, on March 10th, 2006, Qualcomm served its initial

15    disclosure.  And in Qualcomm's initial disclosures, Qualcomm

16    asserted that Broadcom's products infringe because they

17    practice H.264.  And your Honor will recall that that was

18    the heart of the proof at trial.

19         Given those disclosures, what happens?  May 23rd,

20    2006.  Can we bring up the 30(b)(6) deposition notice.  On

21    May 23rd, 2006, we file a 30(b)(6) notice that asks for --

22    one of the topics, your Honor, was the attendance or

23    participation by any Qualcomm principal, employee or

24    representative at any H.264 standards committee meeting.

25    And that's on the screen now.

**Exhibit A-25**

24

 1          Now, this becomes important, your Honor, because

 2   you'll find that in the late-produced documents, at the

 3   outset of the JVT, Qualcomm had a consultant that it

 4   retained who was attending JVT meetings and sending status

 5   reports on a continuing basis, including to Viji Raveendran

 6   and Chris Irvine at the very outset of the JVT.

 7          Now, there are a series of events that occur, your

 8   Honor, that are in the notebooks.  I'm not going to bring

 9   each of them up, but to show you that it was quite clear to

10   the parties that the JVT was an issue, on July 11, 2006,

11   Broadcom deposed Qualcomm's Chris Irvine.  We showed her

12   testimony during the course of the trial.  She testified

13   that Qualcomm had not participated in any JVT meeting.

14          On July 12th, we issued another 30(b)(6) directed

15   specifically to H.264.  On July 18th, we deposed Viji

16   Raveendran.  And we'll show you some of her testimony later,

17   but for instance, she was specifically asked about a JVT

18   meeting in Geneva, Switzerland.  She was asked if he

19   attended, and she was asked if he got a report, and she said

20   no.

21          The late -- that was all critically part of

22   Qualcomm's argument.  Your Honor may recall that Qualcomm's

23   argument was, yes, the JVT was working, but Qualcomm didn't

24   become involved until September of 2003.  And by the time

25   Qualcomm became involved, the standard was frozen so it had

25

1  no participation that would result in a waiver.

2        There was a -- can we bring up that demonstrative

3  that was used in Qualcomm's opening.  Let me just take a

4  minute to remind your Honor, this demonstrative was used in

5  opening, it was used during examination, and it was the

6  heart of the defense that Qualcomm offered on JVT.

7        And to remind the Court what Qualcomm said in

8  opening -- and we'll show you the opening and closing and in

9  evidence -- is the JVT was formed in 2001.  Between 2001 and

10  May of 2003, all these companies participated.  And

11  Broadcom's name was on that list.

12        It then -- Qualcomm then said H.264 was frozen in

13  December 2002.  It was standard -- it was approved and

14  published in May of 2003, and Qualcomm didn't become

15  involved until the fall of 2003.  And the argument made to

16  the jury, the argument made to your Honor on summary

17  judgment we'll demonstrate, the evidence produced all was

18  directed at demonstrating that during this entire period of

19  time, Qualcomm had no participation.

20        All of this discovery that we sought was going to

21  this issue.  And of these 40,000 e-mails and these 300,000

22  documents, the overwhelming majority of them all involved

23  Qualcomm, and they all are in this period, entirely within

24  this period.

25        Now, your Honor, we didn't know that at the time.

**Exhibit A-27**

26

1  We didn't know it when we appeared before your Honor to

2  argue summary judgment.  But it's not because we weren't

3  trying.  We took Viji Raveendran's deposition.  We took the

4  deposition of Chong Lee, another Qualcomm employee, and

5  asked him about his participation.  We took the deposition

6  of Mr. Sagetong.  And your Honor may recall, he testified on

7  the last day of the trial as well.  We took Yuri Resnick's

8  deposition.

9        All of these folks were asked about JVT

10  participation.  But perhaps more importantly, even if

11  Qualcomm was not -- was confused or it wasn't clear to them

12  that H.264 and the JVT were of critical importance to the

13  case, we submitted an expert report on August 10th, 2006

14  from someone who participated in the standard setting

15  process that explained our JVT defense.

16        Now, Qualcomm says he didn't use the word

17  "waiver."  Well, he didn't use the word "waiver."  He's not

18  a lawyer.  He was a scientist who participated in the JVT,

19  explained the disclosure policies, explained what people

20  did.

21        And in fact, there were more depositions after

22  that report was filed.  Ying Bao (phonetic), who also

23  testified on rebuttal, a replacement 30(b)(6) witness, a man

24  named James Detterman, and then Gary Sullivan, who your

25  Honor will recall was the chairman of the JVT.  And your

27

1 Honor watched him in videotape, as did the jury.

2           Critically, your Honor, on September 1, 2006,

3 Doctor Richardson, their expert, filed a separate rebuttal

4 expert report.  That report was entirely directed to

5 responding to Cliff Reeder (phonetic) and to our defense

6 that Qualcomm's participation in the JVT should preclude

7 them from pursuing this patent claim.

8           After we received this discovery, but without the

9 benefit of all the documents, we amended our interrogatory

10 responses and explained the JVT defense.  So there is -- if

11 your Honor looks at this crowded chart which describes what

12 occurred during discovery, you'll see that during the period

13 of one year, 13 months -- not quite one year -- the question

14 of Qualcomm's participation in the JVT when it occurred, who

15 participated, what they knew, what they disclosed was

16 clearly an issue.

17           In fact, as your Honor will see when Doctor

18 Richardson filed his report, he said there are no documents

19 indicating that Qualcomm participated in the period that

20 Qualcomm said it didn't participate.

21           So to take the first issue, your Honor, we would

22 suggest that this chronology, all of which is supported by

23 the documents given your Honor and filed with our motion,

24 demonstrates that everybody knew that this issue was in play

25 and that this issue was important.

28

1          So with that, your Honor, the question becomes,

2    before January 24th, 2007, what did Qualcomm say about its

3    participation in the JVT?  Let me bring up that board.

4          And now, your Honor, I am going to take the time

5    to go through each of these different representations that

6    was made.  The representations were made in 30(b)(6)

7    depositions --

8          MR. BOGGS:  Counsel, excuse me.  Do you have a

9    hard copy for us of that?

10         MR. LEE:  Sure.

11         MR. BOGGS:  That would help my eyes.  Thanks.

12         THE COURT:  If you're going to be giving a series

13   of them, why don't you give them all of the series that

14   you're going to be using.

15         MR. LEE:  Now, your Honor, having in mind

16   Qualcomm's -- the critical period of time between the time

17   the JVT was created and the fall of 2003, that was what the

18   fight was about.  Did Qualcomm participate during that

19   period of time.

20         And I am going to take the time, your Honor, to go

21   through and look at what Qualcomm said in 30(b)(6)

22   depositions, in non30(b)(6) depositions, in written

23   submissions to your Honor on summary judgment, in the

24   contentions filing before trial, in opening argument, during

25   the evidence, at side bar, in JMOL and in post-trial.

29

1        And the post-trial is important, your Honor,

2  because the post-trial -- can I have another copy of that

3  one?  I'll give your Honor my copy.  We'll get some more

4  copies.

5        So if we start chronologically, your Honor, July

6  11th, 2006 was the first representation made by Qualcomm

7  about participation in the JVT.  And this was the deposition

8  testimony of Chris Irvine in her 30(b)(6) deposition.  And

9  what she said -- she first said:

10        "Q    Is Qualcomm a member of the JVT?

11        A    No, Qualcomm is not."

12        And then if we go on, she was asked whether

13  Qualcomm -- go to the next portion.  It's the portion --

14  yeah.  If we could just have a minute, your Honor.

15        I'm sorry, your Honor.  So here's the

16  representation in a 30(b)(6) deposition.

17        "Q    Has Qualcomm ever attended any

18        meeting of the JVT?

19        Answer by the 30(b)(6) witness:

20        "A    Qualcomm is not aware of any

21        attendance to any JVT meeting.

22        Q    Has Qualcomm ever hosted any

23        meeting of the JVT?

24        A    Qualcomm is not aware of hosting

25        the JVT meeting."

Exhibit A-31

30

1        Now, I will show your Honor in a few minutes that

2    the documents produced at the January 24th demonstrate that

3    both of those were incorrect.

4        Now, her testimony was sufficiently -- she lacked

5    sufficient recollection that we did ask for a further

6    witness to do the work that a 30(b)(6) witness was supposed

7    to do.  And I'll show you in a minute what he said.

8        On July 18th, we took the deposition of Viji

9    Raveendran.  Her testimony is before your Honor, and she was

10   asked about specific meetings, which I'll come back to in a

11   minute, and whether Qualcomm attended and, importantly,

12   whether she received minutes summarizing those meetings.

13   And we're going to be able to show your Honor that she, in

14   fact, did receive those minutes from the outset of the JVT.

15       Now, on August 17th, 2006, Qualcomm produced a

16   second 30(b)(6) witness because we said the first one had

17   not done the work that a 30(b)(6) witness should do to

18   prepare themselves.  And this witness in the materials that

19   are before your Honor said Qualcomm did participate, but not

20   until after the fall of 2003.  So entirely consistent with

21   the chart that was used in opening.

22       Then what happens?  On September 1, 2006, Doctor

23   Richardson files his expert report, and he's specifically

24   addressing Qualcomm's participation in the JVT and whether

25   Qualcomm did anything that could result in a waiver or other

31

1   relinquishments of its rights.

2          What does he say?  He says in his expert report

3   that he, quote, has been unable to find any documentary

4   evidence of the involvement of Qualcomm personnel in the JVT

5   prior to 2003.

6          Now --

7          THE COURT:   September?

8          MR. LEE:   September 2003.

9          Now, your Honor, our ability to cross-examine him

10  on this report surely would have been enhanced if we had

11  those 30,000 e-mails.  But he represented in his report that

12  he had made an effort to determine whether there were

13  documents, documents reflecting participation in the JVT

14  before September 2003, and he was unable to find any.

15         So what we have so far is a 30(b)(6) witness who

16  is to be prepared and presented as a 30(b)(6) witness, Viji

17  Raveendran who testified on rebuttal for Qualcomm, a second

18  30(b)(6) witness and the expert all testifying that there's

19  no participation for September 2003.  And critically, there

20  are no documents.

21         Now, with that record, what does Qualcomm do?  On

22  November 6th, 2006, Qualcomm files a summary judgment

23  motion.  And the quote, which is in the materials that we've

24  submitted to your Honor, is this.  Quote, "Qualcomm

25  employees never participated in any form in the JVT until

Exhibit A-33

32

1  after the H.264 standard was released," end of quote, in May

2  2003.

3          They also state explicitly, quote, "There is no

4  evidence that Qualcomm attended any of the JVT meetings

5  between December 2001 and May 2003."  And expressly, quote,

6  "There is no e-mail correspondence or other means of working

7  with the JVT to develop the standard."

8          Well, your Honor, your Honor may recall that we

9  responded to that.  And in fact, when your Honor came out

10 and tentatively had decided to allow that motion, Mr. Regan

11 argued at length, and at the end of the day, your Honor

12 granted it in part and denied it in part, but let the waiver

13 portion go to trial.

14         These representations could -- they're not

15 correct.  They're 30 -- well, let's take less than 30,000.

16 Even allowing for duplicates, there are tens of thousands of

17 e-mails to people very high up in Qualcomm, not just

18 engineers -- and I'll show your Honor that they go up to the

19 very top or near the top of Qualcomm -- that are completely

20 inconsistent with these representations made to your Honor

21 which got us within a hair's breath of summary judgment.

22 But your Honor granted summary judgment in part, denied it

23 in part, and we began to get ready for trial.

24         On December 4th, 2006, Qualcomm files a rebuttal

25 memorandum of contentions in law and fact.  That's on under

33

1 your Honor's rule.  And in it they say expressly -- and

2 we've given your Honor a copy -- we did not participate in

3 the JVT prior to May 2003.

4          It then argues on that day, during the summary

5 judgment hearing, that it didn't participate until then, and

6 critically that there was no evidence from which a

7 reasonable jury could find that they did.

8          What happens once the trial starts?  Well, your

9 Honor, again these materials are in your -- in the briefs

10 we've given you.  But first, on January 9th, 2007, Qualcomm

11 used the frozen chart that I showed you a minute ago, the

12 graphic, to argue that it did not participate until the fall

13 of 2003, after which point the technical content of H.264

14 was frozen.

15          And this is -- the argument is much longer.  It's

16 in the materials we've cited to your Honor.  But they were

17 100-percent clear to the jury.  They said, here's when it

18 started.  Here's all the companies who participated.  They

19 even called us out and said, you'll see Broadcom did

20 participate.  Here's when it was frozen.  Here's when it was

21 published.  Here's when we began our formal involvement.

22          Now, as your Honor knows, in between January 9th

23 and January 24th, there was a side bar.  I offered a

24 document that fell within this period of time which was from

25 what was called a reflector list, an e-mail list, people who

**Exhibit A-35**

34

1 are listed on the back.  And your Honor -- when we offered

2 it, your Honor asked this question at the side bar.  And in

3 fact, your Honor recites it in your waiver decision.  Your

4 Honor said, "Are there any" -- the first question was to me.

5 "Is this the only e-mail?"

6         And we said, "Yes."  And then you said, "Are there

7 any other e-mails to this address?"  And the explicit

8 representation was, "There are no other e-mails."  Your

9 Honor allowed the document to go in, but that was the state

10 of the record.

11         Now, on January 24th, three very important things

12 happened.  First, in the morning, Qualcomm files a JMOL

13 motion.  And I'm going to put this up on the screen, your

14 Honor, and highlight the portion of the motion because if

15 your Honor has this date in mind, January 24th, Qualcomm now

16 has represented to all of us that no later than January 14th

17 it had the documents.  They hadn't been produced.  They

18 hadn't been given to the Court or us, but they had them.

19         But on the morning of January 24th, Qualcomm filed

20 a JMOL motion and said, it is undisputed that Qualcomm did

21 not participate in the development of the H.264 standard

22 prior to its release in May 2003.

23         And if we go to the next page.  Broadcom failed to

24 show --

25         THE COURT:  Can you blow that up?

35

1          MR. LEE:  Sure.

2          THE COURT:  I don't know where you are.

3          MR. LEE:  Could we have the lines one through

4   seven blown up.

5          The first portion, your Honor, refers to the one

6   document that we offered in evidence.  Then they say, to

7   support their JMOL motion, Broadcom failed to show, one,

8   that Ms. Raveendran ever received a single e-mail related to

9   this list, that anyone on this list ever communicated

10  regarding the H.264 standard, and that the e-mail list in

11  question was even a JVT list at all.

12         If we had had the 40,000 documents, we could have

13  put -- we could have demonstrated that that simply was

14  inaccurate.  It just wasn't correct.  That's the first thing

15  that happened on January 24th.

16         The second thing that happened is, Qualcomm called

17  three rebuttal witnesses.  Now, these rebuttal witnesses not

18  only presented evidence to the jury, but to your Honor,

19  because you were the fact-finder on this issue.  Ms.

20  Raveendran, Mr. Bao, Mr. Sagetong.

21         Now, I'd ask your Honor to pause on that for a

22  minute.  These are three witnesses specifically to address

23  the waiver issue.  And each of them was asked when their

24  participation in the JVT began.  And as the excerpts that we

25  provided your Honor from the trial testimony demonstrate,

Exhibit A-37

36

1  they were provided to your Honor and the jury all to

2  demonstrate that there was no participation until May of

3  2003.

4         In fact, the latter two, Mr. Bao and Mr. Sagetong,

5  testified that they didn't begin until 2005 and 2006.  So

6  there is evidence put on the stand in this courtroom before

7  the jury which was intended to create the impression -- not

8  the impression.  It was intended to communicate through

9  facts that these are the people from Qualcomm who

10 participated in the JVT.

11        These are the people who can tell you about

12 Qualcomm's participation.  And they didn't start until after

13 2003, and two of them didn't start until 2005, 2006.

14        Now, a question that we'll come to in a few

15 minutes is, how can you put those three witnesses on the

16 stand and make the inquiry -- the inquiry that you need to

17 make to offer evidence that Qualcomm wasn't participating

18 before those three witnesses and not discovery the 40,000

19 documents.

20        The third thing that happens which is important, I

21 won't belabor.  But you know the third thing that's

22 important is, we wouldn't be here on this motion today but

23 for the fact that we asked on cross examination, did you

24 have any e-mails, and she said, I had e-mails on my hard

25 drive.  I gave them to the lawyers.  I gave them about two

Exhibit A-38

37

1  weeks ago.

2       If we hadn't asked that question, no one ever

3  would have known about these 40,000 e-mails and about

4  Qualcomm's extensive involvement in the JVT.

5       Now, your Honor, a lot of Qualcomm's briefing has

6  been no harm, no foul.  But if we could just pause for a

7  minute.  When this case goes up on appeal is Qualcomm going

8  to attack your Honor's waiver finding and the jury's

9  noninfringement finding solely on what was before the Court

10  in the trial record?  My bet is yes.

11       Yet there are literally tens of thousands of

12  documents that would support Broadcom's position that were

13  never produced.  And that question that we asked, whether we

14  stumbled into it or what, we got there.  And that brings us

15  to where we are today.

16       Now, notwithstanding that, notwithstanding that

17  revelation, in its closing argument, Qualcomm said again, we

18  didn't participate into the fall of 2003.  Now, we had the

19  21 e-mails now to Viji Raveendran, but that's all.

20       Then your Honor will recall that after the verdict

21  came in, you entered an order requiring us to brief post-

22  trial.  And when we briefed, Qualcomm said it again.  Quote,

23  "Qualcomm was not a JVT participant prior to release of the

24  H.264 standard in May 2003."

25       Then we had an argument before your Honor, and

38

1   Qualcomm argued it again.  We are not a participant.  You

2   were not a participant before May of 2003.

3           So the argument from the beginning to the end was,

4   we didn't -- we weren't involved before May of 2003.  These

5   documents, the overwhelming majority are between, your

6   Honor, 2002 -- early 2002 and May of 2003.

7           You could have -- they could not have given this

8   testimony or this testimony.  This expert could not have

9   made this representation.  They could have not represented

10  this to your Honor in summary judgment.  They could not have

11  made any of these arguments at trial if those documents had

12  been produced.

13          And your Honor, I say this case is exceptional not

14  just to characterize it as it is under Section 285, but if

15  your Honor realizes or recalls that we were within a hair's

16  breath of summary judgment, we were within a side bar

17  conference of the one document that we've been able to get

18  from third parties not coming into evidence.  We were within

19  just a couple evidentiary rulings, summary judgment rulings

20  by your Honor, from never knowing that all this was simply

21  not true.

22          And when Mr. Batchelder and Mr. Lupin generally

23  characterized statements as being inaccurate or inconsistent

24  with the documents then produced, this is what we're talking

25  about.  For whatever wordsmithing and word parsing people

**Exhibit A-40**

39

1  are doing, no one will tell your Honor today that the

2  representation made to you and the jury that there was no

3  involvement before May 2003 was anything other than

4  incorrect.

5          Now, let me get the next time line for your Honor.

6  The next time line, your Honor, goes to January 24th, 2007.

7          The January 24th one.

8          The third time line, your Honor, is --

9          THE COURT:  Do you have that for the --

10         MR. LEE:  Yes.  We can put it up on the screen as

11  well.

12         THE COURT:  That's not the one.

13         MR. LEE:  The third time line, your Honor, focuses

14  on these events in January.  And I'm not going to repeat

15  what we've talked about before, but I think we can

16  demonstrate to your Honor a set of facts.  And the

17  circumstantial inferences that your Honor draws from the

18  facts are important.

19         But if we go back to January 4th, 2007, there was

20  a deposition for a Qualcomm employee who we believe

21  participated in the JVT named Hari Garadadri (phonetic).

22  His deposition was scheduled, and on the evening of January

23  4th, Qualcomm wrote to us and said, we're canceling the

24  deposition.  We're not going to call him at trial.

25         On January 14th, having in mind the events we just

40

1  talked about with your Honor, Qualcomm learned of the 21

2  e-mails that had been sent from the JVT list and received by

3  Viji Raveendran.  But as I said, not produced, not

4  disclosed.

5          On January 18th, we have the side bar where

6  Qualcomm represents there were no e-mails sent to the JVT

7  list.  On January 24th, we have the series of events that

8  occurred on January 24th as I've described them, and on

9  January 25th, the closing.

10          I identify the January 4th cancellation of the

11 deposition for a reason.

12          Can we bring up Tab 120 from the materials filed

13 with the court.

14          Your Honor, this is one of the documents that has

15 been produced after the jury verdict.  And it's from the

16 very witness whose deposition was canceled.  It is sent to

17 Mr. Detterman (phonetic), who is by all accounts a very high

18 ranking official.  It is dated September 3, 2003.

19          And your Honor will recall that there was some

20 debate for a while about whether Qualcomm had participated

21 in the September 2003 JVT meeting, and then we produced the

22 shirt that said, "Sponsored by Qualcomm."

23          But had we known what we now know today, there is

24 much more.  This is the witness whose deposition was

25 canceled on the eve of trial reporting on the San Diego

41

1  meeting of September 2, 2003.  And if we could go down to

2  the substance, look at what he is reporting.  He's reporting

3  a discussing with Donald Pane (phonetic).  Mr. Pane, your

4  Honor will recall, was one of the inventors.  He was one of

5  the inventors of the 767 patent.

6          THE COURT:  Is that Pane or --

7          MR. LEE:  Pane.  Pane.  I think it's misspelled in

8  this.  There are a couple other misspellings.  But there's

9  no doubt that it's -- it's the inventor of the 767.

10          And what they're saying is, this -- what they're

11  saying goes right to the heart of the issues that were

12  tried.  Qualcomm has IPR, intellectual property rights, in

13  this going back to 1992 and QDM days.

14          Initial results look very good, but when all the

15  changes in reference S/W were integrated, no one could make

16  the ABS DCT work well.  That's the adaptive block size DCT

17  that we spent three weeks on.

18          I guess no one had vested interest and/or could

19  not figure out the secret sauce from QDM.  Eventually, they

20  dropped it and used variable block size only for motion.

21  So --

22          THE COURT:  What is QDM?

23          MR. LEE:  Qualcomm.  Qualcomm Digital Media.  It's

24  a portion of Qualcomm, your Honor.

25          So this document, produced as part of the late

*Echo Reporting, Inc.*

**Exhibit A-43**

42

1 production, would have certainly contradicted the testimony

2 that they didn't participate at the meeting.  It also went

3 directly to the questions we asked about what happened when

4 Qualcomm tried to develop this ABS DCT technology.

5 And your Honor may recall, I asked about seven

6 witnesses in a row, so what happened to it, and everybody

7 pleaded ignorance.  No one knew what happened to the

8 technology.  Well, the person whose deposition was canceled

9 knew, and he described it right in the course of the JVT.

10 So that's what happens in January, your Honor.

11 That's the third time line.  Now let's look at what the

12 documents actually disclose about Qualcomm's participation

13 in the JVT.  And your Honor, we have submitted to your Honor

14 approximately 120 different documents -- 130 different

15 documents.  I can tell your Honor, these are not all the

16 documents.  We've picked out ones that will basically --

17 yeah, would you get them for me.  There it is.  Take this.

18 Now, your Honor, I've just put a portion of them

19 on the screen, but they're in the notebooks that were

20 submitted to your Honor as part of the motion.

21 Back in January 2002, Qualcomm retained a

22 consultant we now know named Jordan -- I'm going to

23 mispronounce his name, but I think it's Salivik (phonetic).

24 He began attending JVT meetings.  And he prepared summaries

25 of the details of the JVT meetings.

**Exhibit A-44**

43

1        And for instance -- I'm going to put one on the

2   screen right now.  This is the meeting that occurred in

3   Geneva.  And what he did is, he went to these meetings --

4   it's not clear whether he disclosed at the meetings that he

5   was retained by Qualcomm or not -- and then he prepared

6   extensive reports on what occurred at the meetings.

7        Now, who is he sending them to?  Could we go to

8   the top.  Among other people, Chris Irvine.  In fact, your

9   Honor, in the tabs we've given to you, after Chris Irvine

10  gets this report of the meeting, what does she do?  She

11  sends it to Viji Raveendran.

12       And in the deposition excerpts -- in the

13  deposition excerpts that we've given your Honor, Viji

14  Raveendran was asked this question.  Did you get a report on

15  the meeting in Geneva in February 2002?  The answer is no.

16       This is -- the consultant's report to Ms.

17  Raveendran -- to Ms. Irvine and others, and it's then

18  forwarded on to Viji Raveendran.

19       Now, could I bring up -- I'm going to bring up

20  something that's not on the chronology.  Could I have Tab 7.

21       I'm now going to show your Honor another document,

22  this one dated February 25, 2002.  And I'd like your Honor

23  to have in mind Chris Irvine's 30(b)(6) testimony that there

24  was no participation in the JVT.  This is Chris Irvine

25  sending an e-mail to Viji Raveendran in February 2002.

**Exhibit A-45**

44

1  We're now 15 months in advance of the time Qualcomm says it

2  didn't participate.  And what does she say?  These are my

3  notes on the last JVT conference.  In fact --

4          THE COURT:  Phone conference.

5          MR. LEE:  Phone conference.

6          In fact, your Honor, if we go to Tab 8, to the

7  next document, Chris Irvine and Viji Raveendran actually e-

8  mailed each other about meeting at Starbucks before going to

9  a meeting.

10          Now, Qualcomm says, well, there wasn't a JVT

11  meeting in February of 2002 in California, but as your Honor

12  learned from the evidence and from Doctor Sullivan, most of

13  the work was done in the committees that were headed by

14  different people.  And in fact, as we learned, one of the

15  important committees was right here in California that dealt

16  with some of this motion estimation material.

17          So here, your Honor, are the two people Qualcomm

18  produced at 30(b)(6) and at trial to say they had no

19  involvement.  They're meeting at Starbucks so they can go to

20  a JVT meeting.  Pretty darn important stuff if we're going

21  to deal with Qualcomm's defense to the waiver of claim.

22          Let me go now to Tab 57, which is on the chart.

23  This is a document that's dated May 2002.  So we're just a

24  few months later, your Honor, and still a year in advance

25  from the time when Qualcomm says it participated.  And this

45

1 is describing the attendance by two other folks, including

2 Jay Yuen (phonetic) at an MPEG meeting.  And then Jay Yuen

3 writes on May 8th, 2002:

4           "Okay.  Back to the meeting.  I've

5           attended some JVT meetings and saw some

6           demo as did Amnon (phonetic).  They were

7           evaluating certain features for CODECs,

8           and they had two monitors displaying" --

9           It just won't sit up there quite right.

10          "They had two monitors displaying

11          two compressed side by side."

12          The point, your Honor, is this.  Qualcomm never

13 disclosed that these two gentlemen participated in JVT

14 meetings.  Their e-mail indicating their participation is

15 inconsistent with all of the 30(b)(6), all the discovery

16 representations, Doctor Richardson's report, the summary

17 judgment representations and the arguments made at trial.

18          Now, Qualcomm was not just monitoring, your Honor,

19 and sitting idling -- sitting idly by.

20          Could we have Exhibit MM.

21          Exhibit MM, your Honor, occurs on April 30, 2002.

22 And this is another of the later produced documents.  And

23 Exhibit MM indicates that Qualcomm is having a discussion

24 within Qualcomm about supporting the proposals that are

25 being offered at the JVT meeting.

46

1          So now we're at April 2002.

2          THE COURT:  Can you blow that up?

3          MR. LEE:  Yes.  So this is from Nicoli Moon

4  (phonetic) within Qualcomm.  It's sent to several other

5  Qualcomm folks.  And your Honor will see -- if you look at

6  the CC line, your Honor is going to start seeing on all of

7  these e-mails e-mail lists, video dot coding, which is a way

8  to get it to a whole bunch of people.  And in fact, your

9  Honor will see that Viji Raveendran is one of the architects

10  of all of these lists to make sure that people get it around

11  to everybody.

12          So now we're in April 2002.  And they're

13  discussing an actual proposal made by Packet Video and

14  Thompson, and they're deciding whether they should put their

15  name -- our name on this proposal or just provide verbal

16  support.

17          So this concept that Qualcomm didn't participate

18  is simply not accurate.  They're getting reports, they're

19  getting proposals, they had people going to the meeting,

20  they're listening in, and they're making decisions about

21  whether they should vote or not vote, support or not

22  support.

23          And in fact, if we want to go to Exhibit NN, you

24  will see, your Honor, that Qualcomm actually made a

25  conscious decision.  Let's blow it up.  We're now into June

47

1 2002.  And if we pause here, this is now from Jay Yuen, who

2 we now know attended the meetings, but also Chris Irvine and

3 others to Viji Raveendran and to Mr. Detterman.  Your Honor

4 will see he's the other person who testified in deposition

5 they weren't involved.

6         Now we're in June 2002.  And below is an e-mail

7 ballot.  A ballot is one of the things that Doctor Sullivan

8 described that folks got to vote on for L-3.1.  It calls for

9 an ad hoc, I think it's intended to be, group to collect and

10 generate consensus on U.S. comments on JVT, CD committee

11 draft.  By not replying to this e-mail, we agreed to the

12 formation of the AHG, ad hoc group.

13        So they're actually being asked whether they're

14 going to support the formation of the ad hoc group to

15 comment upon the JVT committee draft.  And by not replying,

16 which is in fact what occurred, they didn't.  They voted

17 affirmatively.

18        Now, they did more, your Honor.

19        Could I have Tab 18, Exhibit A.

20        One of the questions your Honor will recall was,

21 well, even if we were there, we didn't know what the

22 disclosure policies were of the JVT.  There was Doctor

23 Sullivan's testimony, your Honor, that at the beginning of

24 every meeting, he made disclosures.  Your Honor addressed

25 the testimony of the Qualcomm witnesses that were -- that

Exhibit A-49

48

1 were called.

2          This is an e-mail now in March of 2002 from the

3 consultant and Chris Irvine to Viji Raveendran and others,

4 including Mr. Detterman.  And what do they say?

5                    "Last night, I exchanged e-mails

6               with Gary Sullivan, chair of the JVT,

7               mainly to verify the deadline for the

8               submissions to the Fairfax meeting."

9          Then, your Honor, we go right to the heart of what

10 that whole trial was about in January.  As we know, the ABT,

11 adaptive block transforms, is already an area of active

12 investigation.  The general rule is that people wanting to

13 demo video quality should look at common condition

14 descriptions and core experiment definitions.

15          Now, I'll show you on the next chart, your Honor,

16 that they not only have these conversations with Doctor

17 Sullivan about making submissions, they actually had

18 information about the patent disclosure policies of the JVT.

19          Now, in fact, your Honor, the documents that have

20 been produced indicate just how interested Qualcomm was and

21 what was going on at the JVT.  It wasn't standing by waiting

22 to see what happened.

23          Could I have Tab 99.

24          This is another e-mail produced as part of this

25 supplemental production dated October 29, 2002.  This is now

49

1  coming from Sanjay Jaw (phonetic), which everyone will tell

2  your Honor is one of the highest ranking officials at

3  Qualcomm.

4           THE COURT:  Who?

5           MR. LEE:  Sanjay Jaw.  At the top.  And he says to

6  Mr. Walker, I am on board.  Let's discuss how we can try to

7  do this.  What is he talking about?  Mr. Walker tells him in

8  October of 2002, quote:

9           "At yesterday's meeting, there

10          seemed to be consensus that JVT was

11          going to be the dominant technology in

12          the not-too-distant future.  I tend to

13          agree with that conclusion with one

14          possible caveat.  The MPEG licensing

15          terms are onerous.  JVT is infected with

16          the same bunch of evil folks."

17          So we have people interested at the highest levels

18  of the company.  And in fact, as a result -- could I have

19  Tab 108 -- Tab 100.

20          As a result of Sanjay Jaw's report to Mr. Walker,

21  Mr. Walker sends an e-mail to Viji Raveendran and others in

22  November, and he says on November 1, 2002:

23          "I had a chat with Sanjay today.

24          He is very interested in the status of

25          the JVT.  He would like you to pull

*Echo Reporting, Inc.*

**Exhibit A-51**

50

1          together a presentation about it."

2          All during the period when Qualcomm claimed that

3   it had no participation.  What do we then find?

4          Can I have Tab 103.

5          This is from the late-produced documents, your

6   Honor, months before Qualcomm claims it was participating.

7   It's dated November 6, 2002, and it is a status presentation

8   for senior management at Qualcomm about what's going on at

9   the JVT.

10          THE COURT:  What is QT&V?

11          MR. LEE:  Qualcomm -- I'm not sure what it

12   precisely stands for.  It's a digital media group, your

13   Honor.  And if your Honor goes through it, it will show

14   you -- it will describe an update on all that was occurring

15   at the JVT.

16          But your Honor will recall that one of the key

17   infringement issues was whether there were differences

18   between integer transform in the DCT.  This presentation

19   made in 2002 -- could I have the first line highlighted --

20   says actually precisely what -- it almost is a duplicate of

21   the portion of Doctor Richardson's book that we relied upon

22   in cross-examining him.

23          Though resembling H.263 and MPEG-4, there are

24   differences.  Transform, four-by-four integer approximation

25   for DCT.  Doctor Richardson had a series of differences

51

1  listed.   This was sitting in Qualcomm's own files during the

2  whole trial, never produced to us.

3          And in fact, your Honor, as a result of this --

4  could I have Tab 105.   What does Qualcomm do?   It prepares a

5  draft video CODEC strategy options for Qualcomm dated

6  November 7, '02.   And part of that strategy -- we go to the

7  bottom of the first page -- is current state of video CODEC

8  and projected trends.

9          And if you go to the top of the next page, one of

10 the specific things that is a part of their strategy is

11 what's going on at H.264 and just what is the time line for

12 JVT standardization.

13         Now, the documents that I've put on the chronology

14 and this half a dozen other documents that I've shown your

15 Honor that occurs all in this period of time are

16 literally -- I've shown your Honor perhaps 12 documents out

17 of 20,000, all of which are going back and forth between

18 Qualcomm's employees, back and forth between sometimes the

19 JVT, back and forth between the consultant, all during this

20 period where Qualcomm represented unequivocally that there

21 was no involvement.

22         But if you look at those 20,000, your Honor, the

23 next chronology deals with the documents that have now been

24 produced that shows that Qualcomm knew about the IPR

25 policies.

*Echo Reporting, Inc.*

Exhibit A-53

52

1           Your Honor, these documents which I've quoted here

2    are particularly important.  Because it's not only -- your

3    Honor will recall the question is, did Qualcomm know what

4    Doctor Sullivan was saying at the beginning of each meeting?

5    Did they understand that they had an obligation to disclose?

6           And Doctor Bao and Doctor Sagetong were put up

7    there to say, well, we really didn't understand that there

8    was this obligation.  These documents have got it, and they

9    have it in the context where they're specifically

10   considering -- specifically considering whether Qualcomm's

11   patents have any relevance to the adaptive block size

12   discussions that are going on.

13          So way back in March of 2002, way back then, a

14   Qualcomm employees reviewed the H.264 draft.  Why?  To

15   decide where our ABS DCT will fit in the JVT scenario.  And

16   your Honor will see this is a report of activities for the

17   last six months.  And --

18          THE COURT:  Can you blow that up?

19          MR. LEE:  Sure.

20          And this Qualcomm employee -- now, I can't

21   identify the employee for you because we don't have the

22   deposition discovery -- says that among his accomplishments

23   are developing, implementing and testing a new adaptive

24   block size algorithm placed on a human vision model.

25          Then if we go a little bit further down:

53

1          "Since our group is actively

2      involved in the ITU MPEG and SMPTE

3      standards meetings, we are looking into

4      proposing some of the features of our

5      ABS DCT compression algorithm to one of

6      these standard bodies.

7          "I had the task of compiling

8      details of MPEG, JVT and ABS DCT

9      compression features.  I reviewed the

10     JVT draft and prepared a spreadsheet

11     detailing the aspects of these

12     algorithms.  We haven't had a chance to

13     discuss this yet.  The purpose behind

14     this is for us to decide where our ABS

15     DCT intra and interframe algorithms will

16     fit in the JVT scenario."

17         So way back -- you know, going both to the waiver

18  issue and noninfringement, these guys are way back in early

19  2002 trying to decide whether the patents, like the 104

20  patent -- what is the relevance of what's going on at the

21  JVT.

22         Now, as we consider this -- could I have first Tab

23  3.

24         Your Honor, this Tab 3 are the meeting minutes

25  that Qualcomm's employee, Qualcomm's consultant prepared for

Exhibit A-55

54

1  the meeting in Geneva.  And what your Honor will see, if we

2  go to page 102, 8783 -- so this is a meeting that's chaired

3  by Doctor Sullivan.  Now, I'd ask your Honor again to have

4  in mind the testimony Qualcomm put on the stand that said

5  they didn't know anything about the IPR policy.

6        This is their consultant who in early 2002 says,

7  quote:

8              "The group was informed about JVT's

9         patent policy.  The IPR status was

10        reviewed.  The known patent holders for

11        the JVT project were mentioned.  The

12        question regarding the support of a

13        royalty-free baseline was asked."

14        Could Qualcomm have put on the stand those

15 witnesses and made the argument to the jury that they didn't

16 know what the JVT patent policy was and they didn't know

17 what Doctor Sullivan said before May of 2003 if we had had

18 that document?  I think the answer is no.

19        Now, your Honor, actually what happens is, they

20 know about the patent policy.  I just showed you that they

21 have an employee reviewing the JVT to see where their IPR

22 will fit.

23        If we go to Tab 20.

24        And they continue to pursue this.  So there is not

25 only -- not only, your Honor, are they participating to see

55

1  what happens to the JVT, but they're in there reviewing

2  recent proposals, reading them, and deciding -- and

3  comparing them to their patent.

4          Now, Qualcomm says in its papers, well, you know,

5  there was some disagreement among Qualcomm's engineers.

6  Some thought their patents covered it.  Some thought their

7  patents didn't.

8          Well, the answer is, I would have loved to have

9  known that either way because for those who thought it

10 didn't cover it, it would have been great proof of

11 noninfringement.  For those who thought it did, it would

12 have been great proof that they consciously waived their

13 rights.  Somehow, either way it would have helped Broadcom.

14         But your Honor, they are really into the details.

15 They're looking at the proposal to add transforms.  And

16 they're saying, hey, wait a minute.  Everything they're

17 adding are all integer transforms that mimic the DCT.

18         You remember all that proof about, oh, you know,

19 an integer transform is just a type of DCT.  They're not

20 really different.  No one thought that they were different.

21 Qualcomm -- this is what Qualcomm said way back then.

22         Let's go down further.

23         So what does Qualcomm say, your Honor?  And this

24 would have been really relevant.  They say, gee, our

25 original patents mention only the DCT.  That's the 104

56

1 patent, among others, almost exclusively.  Should we extend

2 our patents to include all transforms and all data types

3 like residuals.

4          Now, wouldn't the Court and the jury -- and

5 Broadcom for sure would have liked to have known in 2002 --

6 Qualcomm looked at the JVT, said they're all integer

7 transforms, that our patents just deal with DCTs.  Let's

8 talk about extending our patents to cover all transforms.

9          What's their conclusions?  Early 2002.  We should

10 go to all JVT meetings, at least for the time being to be on

11 top of their work with the ABT.

12          THE COURT:  What is ABT?

13          MR. LEE:  Adaptive block transform.

14          THE COURT:  Okay.

15          MR. LEE:  Mr. Regan reminds me it's 10:30.  I

16 don't know if your Honor wants me to --

17          THE COURT:  I do want to take a recess at 10:30.

18          MR. LEE:  Sure.

19          THE COURT:  We'll be in recess for 15 minutes.

20      (Proceedings recessed briefly.)

21          THE COURT:  All right.  Mr. Lee, you may proceed.

22          MR. LEE:  Your Honor, let me cover one point that

23 I was reminded by Mr. Regan that I may not have sufficiently

24 emphasized, and then I'll come back to the chronology.

25          And your Honor, I know we're going through this

**Exhibit A-58**

57

1 sort of brick by brick, document by document, but I would

2 suggest that in order to get a sense of the magnitude of

3 what's occurred and how central it was to the issues that we

4 tried, the issues we argued to your Honor at the summary

5 judgment, the issues we argued to the jury, you can only get

6 a sense by going through them.  And that's what I'm trying

7 to do.

8          Now, the one point that I may have gone past too

9 quickly is this.  There is no dispute that these 21 e-mails

10 that were produced on the last day of trial were in the

11 possession of Qualcomm's lawyers on January 14th.  There's

12 also no dispute that they were in Qualcomm's possession,

13 your Honor, when your Honor asked at the side bar, are there

14 any other e-mails.  And there were, by my memory, four

15 Qualcomm lawyers from two different firms standing there

16 when Mr. Young represented the answer was no.

17          We still hadn't seen them when that representation

18 was made.  Qualcomm had those documents on January 14th, and

19 they had them at the time that they filed the JMOL motion

20 representing there were no e-mails.  They put on the direct

21 examination of Viji Raveendran.  They put on the direct

22 examination of Bao and Sagetong.

23          Now, your Honor, there is no way you could have

24 made those representations or put that testimony on if we

25 had put those in our hands.  There's no way you would have.

**Exhibit A-59**

58

1 If you add to those 21 the other 30,000, there certainly is

2 no way.

3        And what does Qualcomm say?  They say, well, we

4 looked at the documents, and we decided they weren't

5 responsive.  And they say, we can't tell you any more

6 because it's attorney/client privilege.  Well, you can't put

7 your attorney's conduct in issue and then say, but we can't

8 explain it to you because it's privileged.

9        Whatever the explanation, they thought this to be

10 material enough to ask Ms. Raveendran questions about

11 whether she had read them or sent.  They're very carefully

12 crafted questions.  And the truth of the matter is, your

13 Honor, it was only these carefully crafted questions, as we

14 listened, that caused us to ask on cross whether she, in

15 fact, had received any.

16        Now, let me go back to this chronology, which is

17 the fifth of chronologies.  And this is the chronology of

18 Qualcomm's knowledge about the IPR policies of the JVT and

19 its consideration of its own patents.

20        And I break this chronology out from all of the

21 others, your Honor, because these e-mails went to the heart

22 of both issues in the case.  They went absolutely to the

23 heart of whether an integer transform and a DCT are the same

24 or different.  And Qualcomm is talking about that.

25        So maybe they could say, we didn't find you

59

1  documents that related to the JVT.  We didn't -- that was a

2  mistake.  How is it that you miss documents that compare the

3  integer transform of the DC- -- of the H.264 standard to

4  your DCT and don't produce them?  How is it you put an

5  expert witness on the stand to say, it's incontrovertible --

6  Doctor Richardson's quote -- they're the same, and you don't

7  produce those documents.

8         So if we went now and -- again, taking your Honor

9  through so your Honor can see the detail with which Qualcomm

10  was talking about this all during this period when they

11  claimed previously not to have been involved.

12         Can we have Tab 86.  Can we blow it up.

13         This is Viji Raveendran communicating directly to

14  the consultant.  We're now in July of 2002.  "Hi, Jordan.:

15  And the second sentence.  "About patent reviews for JVT and

16  studying ABT with respect to our patent.  It was decided

17  that we would like a summary of various aspects of ABT and

18  JVT."

19         Now, this is the witness, Ms. Raveendran, who

20  testified under oath that she learned about the JVT from

21  reading some literature.  She really didn't get involved in

22  any way until after 2003.  And as to the 104 patent, she

23  really didn't know anything about it.  She was walking by

24  someone's desk and saw it on the person's desk.

25         Well, what we now know is, back in July of 2002,

60

1   she's writing a consultant saying, tell me about patent

2   reviews at the JVT.  We're studying the adaptive block

3   transform patent.  That's the 104 patent.  And we want a

4   summary so we can do our study.

5           Can we go to Tab 101.

6           She continues with her work.

7           Can we have it blown up.

8           And now she's e-mailing in November of 2002, and

9   she's e-mailing to Mr. Walker and some others.  "A quick

10  note, yes.  This is not yet a complete list as Jay

11  clarified.  Also, the contributions that did not make it

12  into JVT's baseline profile.  Viji."  What is she talking

13  about?  She's talking about the patents that other folks

14  have described to the JVT.

15          As your Honor recalls the testimony from

16  Qualcomm's witnesses before May of 2003, we had no idea who

17  was submitting what to the JVT and what was going on.  Your

18  Honor, they had a list of the patent statements submitted by

19  other parties back in November of 2002.  You could never

20  have given that testimony if that document was around.

21          Now, one thing Qualcomm says is, well, your Honor,

22  these witnesses were first-time witnesses.  Witnesses make

23  mistakes.  I'm going to come to the number of people who

24  have had to make a mistake all in the same direction at the

25  end.  But first, as counsel, we have an obligation to do an

61

1 investigation before we make representations to the Court.

2        When we produce a 30(b)(6) witness, we have an

3 obligation and the witness has an obligation.  When we make

4 a representation to the Court on summary judgment for JMOL,

5 we have an obligation.  These statements directly

6 contradicted the representations that were made.

7        And in fact, your Honor, if I could go to Tab 102.

8 Qualcomm, in November of 2002, is having a discussion

9 involving Ms. Raveendran.  And you'll see the JVT slides.

10 And you'll remember, your Honor, we showed you that Power

11 Point presentation that was dated early November of 2002.

12        So what are they talking about?  Well, one thing,

13 didn't we kind of conclude they are not infringing our ABS

14 DCT?  This is way back in 2002, and one of the Qualcomm

15 engineers paraphrases, "For one thing, didn't we kind of

16 conclude that the JVT isn't infringing the 104 patent?"  I

17 mean, how on earth could that not be relevant to the trial

18 that we had, and how could it not have had a profound impact

19 upon the nine people who sat in the box.

20        Now, it goes on.  Qualcomm actually continued to

21 monitor the patent filings by the people who were living by

22 the rules of the JVT.  And they identified them.

23        Could I have Tab 106.

24        What did they do, your Honor?  All part of this

25 process of figuring what the patent disclosure requirements

62

1  were, what other people were doing, whether they had

2  something to offer.  They identified the intellectual

3  property rights holders as of December 2002 for each part of

4  MPEG.  Then they specifically say, for JVT, only 12

5  companies submitted patent statements.

6          Remember their witnesses who got on the last day

7  and said, well, we don't know what other companies did.  And

8  they cross-examined Mr. Sullivan -- Doctor Sullivan and

9  argued to your Honor and the jury, well, you know, Doctor

10 Sullivan can only identify one company that submitted a

11 patent statement.

12         Well, you could never have asked those questions

13 if you knew that in your own files, you were actually

14 monitoring the filings for all the companies that were

15 complying with the JVT requirements.

16         And after getting those, they continued to examine

17 whether they had some patent rights that required disclosure

18 or could cover the standard.

19         Could I have Tab 109.

20         As a result of their internal meeting in November,

21 they prepare something called -- they meet in December, and

22 they have something called meeting goals.  And the meeting

23 goals are, ABT, is there a potential IPR issue, licensing

24 issues, MPEG-LA, JVT IPR group?  Can we get on it?  IPR

25 holder list, ones who disclose their IPR.  And it goes on.

63

1       They were not only attending meetings, your Honor,

2 contrary to what they said, they were not only getting

3 reports from their paid consultants, contrary to what they

4 said, they were taking that information and devising a

5 strategy to maximize, as you might, your IPR. And what were

6 they considering? What's required by disclosure, what are

7 the other folks doing, what do we have, and what can we do

8 with it. All critically relevant to the question of waiver.

9       Could I have Tab 116.

10       Viji Raveendran is intimately involved in this

11 effort. Your Honor, you'll see in a couple of minutes that,

12 in fact, what happened is Sanjay Jaw at one point, at a

13 point before Qualcomm claimed it was involved, asked her to

14 become -- asked her to make this JVT project her full-time

15 job.

16       So in February 2003, she's monitoring what the

17 other companies are doing.

18       Can we have 117.

19       In March of 2003, she's reporting on her task, and

20 her task is IPR investigation, JVT and ABS DCT, claims

21 analysis and filing extensions, new patents, 32 days. Well,

22 we would like to have an opportunity to argue that. If the

23 104 patent covered the JVT's implementation of H.264, you

24 sure didn't need to file a new patent. Not produced either.

25       And again, your Honor, this doesn't just go to JVT

Exhibit A-65

64

1  participation.  This goes to the heart of what is it that

2  this 104 patent covers.

3          Can I have -- sorry.  Can I have Tab 118.

4          Your Honor, now we're in April 2003.  Now we're a

5  month before they claim that they were involved.  And if

6  your Honor has in mind that date, May 2003, when they claim

7  they're going to be involved, this may help.  They are

8  having biweekly meetings, and Viji Raveendran and others are

9  involved.

10         Can we move it up a little bit now.

11         One of the things to be addressed in Viji's

12 meetings are progress on digital cinema patents versus the

13 JVT standard, the very issue we talked about.

14         And then if we went to Tab 120, as we saw right

15 during this same period of time, Mr. Garadadri, whose

16 deposition was canceled on the eve of trial, is talking

17 about the JVT looking at -- could we bring it up towards the

18 bottom -- specifically looking at adaptive block size for

19 the transform.

20         Indeed, your Honor -- can I have Tab 98 -- at this

21 San Diego meeting, which we were only able to get close to

22 say they were at because we produced the T-shirt that said

23 "Sponsored by Qualcomm," these late-produced -- 1098, I

24 think it is.  Oh, that's right.  These late-produced

25 documents show that at the meeting -- can we bring it up to

65

1  the bottom -- they're meeting with one of the inventors of

2  the 767 patent, at the very JVT meeting they said they

3  didn't attend or sponsor.  And the inventor says that the

4  ABS DCT was considered for H.264 and dropped later because

5  there wasn't anyone to make -- to work an H.264 reference

6  software.

7            Now, how could it possibly be in a case where,

8  from the outset, the accusation was by processing H.264 we

9  infringe these patents?  One of them, the 767 patent, was

10  described in an e-mail that your Honor cited in your waiver

11  opinion as essential.  How could it possibly not be relevant

12  or of substantial interest to everybody that's been in the

13  courtroom that the inventor said that it was considered and

14  it was dropped.

15            Now, your Honor, what you've seen or I hope we

16  have successfully communicated to you is, from these 30,000

17  or so e-mails, every single -- you know, the heart of

18  Qualcomm's argument to you throughout the case and the heart

19  of Qualcomm's argument to the jury is inconsistent with

20  literally tens of thousands of e-mails.  And it's

21  inconsistent with e-mails that went to the very witnesses

22  that Qualcomm put up there.

23            Qualcomm wants you to believe that Viji Raveendran

24  erred in her deposition, Viji Raveendran erred at trial,

25  Chris Irvine erred in her 30(b)(6) deposition, Mr. Detterman

*Echo Reporting, Inc.*

**Exhibit A-67**

66

1  erred in his 30(b)(6) deposition, Mr. Ludwin (phonetic)

2  erred in his 30(b)(6) deposition, Qualcomm erred in its

3  representation at summary judgment and its contentions of

4  law and its opening statement and the evidence at trial in

5  presenting Sagetong, Bao and Raveendran, in closing, and

6  then making the post-trial representations to your Honor.

7          Now, mistakes do happen, but that is a series of

8  coincidences that we suggest just can't be.  It cannot be

9  that all of those people erred in precisely the same way,

10 that none of them remembered any of these 40,000 e-mails.

11         Now, the last chronology, your Honor, goes

12 directly to something that Mr. Boggs said, which is -- and

13 said in his papers.  As soon as Qualcomm knew, it

14 voluntarily disclosed and apologized to the Court in Mr.

15 Lupin and Mr. Batchelder's letter.  That is not accurate,

16 your Honor.  We had to be relentless.  And Ms. Saxton was

17 the person pursuing it from the most part from the time that

18 those e-mails were produced.

19         And I'm going to show you a chronology which will

20 demonstrate that it was only because we on March -- March

21 5th -- let me make sure I get the right date.  March 30th,

22 we sent them an e-mail that said, look, this has been two

23 months, and you haven't produced a thing.  What's going on?

24 We know you have something.  If you don't produce it, we're

25 going to go see your Honor.

**Exhibit A-68**

67

1        Here is the true chronology, the accurate

2   chronology that goes all the way through.  We didn't let

3   this go after those 21 e-mails came out.  We knew -- we

4   suspected and we now know that those 21 e-mails were only

5   the tip of the iceberg.  We called and asked for an

6   explanation.  In fact, when the jury verdict came back, we

7   were discussing this with Qualcomm.

8        On February 7th, Qualcomm's first response was,

9   these aren't responsive.  These documents weren't called

10  for.  You've now seen them, your Honor.  They talk about

11  everything that this jury sat through for a month.  And

12  their first -- their first response was, we're not going to

13  give you anything else because they're not responsive to any

14  document request.

15       So we went back and dutifully identified five

16  document requests which we put in the papers before your

17  Honor that said, here they are.  They ask for your

18  participation in the JVT, they ask for communications with

19  the JVT, they ask for consideration of the IPR policy.

20  Nothing.

21       We have the argument before your Honor of February

22  9th.  The argument is still the same.  The argument is still

23  the same.  There is no mea culpa.  There is no, oh, we've

24  got lots of other documents.  It's still the same.  Nothing

25  before May of 2003.

Exhibit A-69

68

1       We keep pressing.  They write back to us and say,

2 we have no discovery obligation or commitment.  We had no

3 discovery obligation or commitment to produce the 21 e-

4 mails.

5       Now, this is what we're confronting in this period

6 before the time Mr. Boggs referred to.  How can it be that a

7 lawyer an ask, did you ever send an e-mail, did you ever

8 read an e-mail, and then tell us that they had no obligation

9 to produce e-mails that were sent to her.  This was just --

10 quite honestly, your Honor, we were getting stonewalled, and

11 we thought we were.

12       On March 5th, we made a specific request.  We

13 said, all right, let's see if we can work this out.  We want

14 you to search your e-mail archives for certain Qualcomm

15 standards participants, and we'll give you specific terms.

16 And that will make it a little bit easier to do.  Qualcomm's

17 response is not to produce.

18       Now, we're almost two months after they got those

19 e-mails on January 14th, and we haven't gotten word one

20 about there being more.  What does Qualcomm say?  Qualcomm

21 says, your request is overbroad, and it's unilaterally --

22 and decides a search for just five people.

23       They tell us that on March 7th.  We keep writing

24 every week saying, so what's going on?  On March 30th, your

25 Honor, that's when we say, if you don't give us the

**Exhibit A-70**

69

1 documents, we're going to go to court.  And then the letter

2 to your Honor occur and the production occurs.

3        Now, one significant thing has happened after

4 that, your Honor.  We now learn for the first time on June

5 14th that we're not just talking about e-mails.  There are a

6 whole bunch of hard copy documents, some of which go to the

7 very 30(b)(6) witnesses and the very people who testified,

8 which weren't produced either.

9        The total now is 35,000 documents.  Are there some

10 duplicates in there?  Sure.  But are there tens of thousands

11 of documents that go to the heart of this case?  Yes.

12        Now, all of the chronology that I've just gone

13 through, your Honor, is relevant to both issues.  It's

14 relevant first to the question of what the remedy should be

15 on waiver.  And let me address that very briefly first.

16        The question of -- the question of whether -- what

17 remedy should be granted was addressed in your Honor's

18 order.  And the first question is, should it be -- should

19 the patent be unenforceable as to anybody implementing

20 H.264.  And we say the answer is yes.  The patent should be

21 unenforceable against anybody who is implementing H.264.

22 And your Honor, there is no doubt that Qualcomm understood

23 that this was, in fact, what Broadcom was asking for.

24        Can we bring up Docket Number 477 at 2.  It's on

25 page 28.

*Echo Reporting, Inc.*

**Exhibit A-71**

70

1        While we bring that up, your Honor -- we've got it

2 up.  Qualcomm understood that Broadcom was asking for remedy

3 that rendered the patent unenforceable against everyone.

4 Now, your Honor, this -- I go back to the beginning.  Your

5 Honor will recall the discussion about does a clear and

6 convincing evidence standard apply.  And the question was,

7 is this analogous to inequitable conduct?  Is there a level

8 of culpability that is implicated?

9        If there is, if there's a level of culpability

10 required and you have to have done something bad before

11 you're going to have waived, then the standard should be

12 clear and convincing.

13       Qualcomm knew, in arguing the burden of proof

14 issue to your Honor that we were alleging that the patents

15 were unenforceable not just against Broadcom, but against

16 the rest of the world.  Their analogy, your Honor, is it's

17 inequitable conduct.

18       Now, what does Qualcomm say to you?  They really

19 say three things.  First they say, well, Broadcom has won

20 already.  It doesn't need the additional remedy.  Well, your

21 Honor, when we go up on appeal, in addition to the very

22 complicated questions about what happens with all this new

23 material, my bet is Qualcomm is going to challenge both the

24 noninfringement finding and the waiver finding.  And we need

25 them both.  Either of them is sufficient for us to win, and

71

1  both of them are important.  And the remedy on the waiver

2  finding is therefore independently important.

3          Secondly, they say, well, you only asserted this

4  as an affirmative defense.  And since it's an affirmative

5  defense, you can't get affirmative relief.  They don't cite

6  any case for that, your Honor, because that's not accurate.

7          In the patent area, if you assert a defense of

8  inequitable conduct and you're successful, the patent is

9  unenforceable as to the world.  And we've cited cases like

10 the Dow Chemical case to your Honor which explicitly says

11 so.  Whether inequitable conduct is an affirmative defense

12 or a counter-claim, the remedy is that the patent's

13 unenforceable as to the rest of the world.

14         The third thing that Qualcomm says is, Broadcom

15 has brought an unfair competition complaint against Qualcomm

16 in Orange County, and it can get additional relief there.

17 It's a nonsequitur, your Honor.  The Orange County complaint

18 is based upon a whole host of activities that we now know

19 about involving Qualcomm and standards organizations and a

20 whole host of activities that resulted in the nondisclosure

21 of patents that Qualcomm now claims are essential to the

22 standards.

23         It's a different state law claim.  It has some

24 facts that overlap or are in common.  And to the extent that

25 the relief could overlap, we're not going to ask for relief

Exhibit A-73

72

1   there that we get here.  So I think, your Honor, the

2   question of whether the patents should be unenforceable as

3   to the world is answered by your Honor's adoption of the

4   clear and convincing standard, the reason that your Honor

5   did it, the fact there's a level of culpability.

6         Your Honor said in your waiver decision that the

7   precise remedy would be termed in part by culpable conduct

8   of the party waiving.  All of that would say that one of the

9   right remedies is, at a minimum, to have the patent

10  unenforceable as to anybody practicing the standard.

11        It would be really, really unfair for Qualcomm to

12  be able to take that 104 patent in the face of all this and

13  go out and sue Apple tomorrow saying that they infringe the

14  104 patent and it's enforceable.

15        Now, we do as for more relief, your Honor.  And

16  the additional relief we ask for is quite focused.  And we

17  ask the court to require Qualcomm to tell the JVT just what

18  it did and didn't do and just what this Court found.

19        That is only fair.  All of this, the waiver -- the

20  waiver defense, the issues that arise from waiver all arise

21  from this question.  What would have happened if Qualcomm

22  had disclosed early on that it claimed it had a patent that

23  covered H.264.

24        Our additional relief is just an effort to set the

25  public record straight.  It's not nothing.  You know, I know

73

1 this is your Honor's -- this is a decision for your Honor,

2 and you will protect the integrity of the court and the

3 process much better than I.  But when you have a case that's

4 tried for a month, it's hotly contested, and it turns out

5 the representations that were made were inaccurate and

6 there's a host of documents to demonstrate it, it's not

7 enough to say, we're sorry, they were inaccurate.

8          The public record still stands as it stands, and

9 it shouldn't stand that way.  And I think that -- we think

10 that your Honor's finding on waiver and the facts you found

11 clearly and convincing to get there and your Honor's factual

12 findings on Qualcomm's conduct involving JVT on the two

13 motions that were before you is information that the

14 standard body ought to have, and it will help to set the

15 record straight.

16          Now, the same set of facts go to the exceptional

17 case, which is governed by Section 285.  Let me say these

18 things, your Honor.  DLA's papers suggest that your Honor

19 has to find intentional misconduct or bad faith.  The

20 standard for Section 285 is broader than that.  And I'd like

21 to give you a copy of a decision, a Federal Circuit

22 decision.  It's at 279 F.2d 1002.  It's a 2002 decision.

23 Epcon Gas (phonetic).

24          And your Honor, this goes to the argument that

25 Qualcomm has made, your Honor, that you have to find that --

Exhibit A-75

74

1  Qualcomm's basic argument is, mistakes happen.  Broadcom can

2  only prevail if your Honor finds direct proof of intentional

3  or bad-faith conduct.

4          Well, there are two problems with that argument

5  legally.  The first is, if you found bad faith, that would

6  be enough.  If you found intentional misconduct, that would

7  be enough.  But litigation misconduct and unfairness in

8  imposing our fees upon us is enough to make the case

9  exceptional.  That's the first thing that's wrong is they've

10 overstated the standard, and they've tried to cabin it into

11 one that has only one of the bases.

12         The second problem is, your Honor knows from your

13 time in the court and your experience before that proving

14 intent to do something is very infrequently proved by a

15 smoking gun.  It's proved by circumstantial evidence, a

16 disciplined walk through the sequence of events, and the

17 conclusions that can be drawn from that.

18         And the law in this area is no different.  The

19 standard, as the Baldamotti (phonetic) case which we cited

20 to your Honor says is, would it be grossly unjust to require

21 that Broadcom bear its fees in having tried this case in

22 light of what your Honor now knows.  And that question can

23 be educated by whether there's litigation misconduct,

24 whether there's bad faith, whether there's intentional

25 misconduct.

Exhibit A-76

75

1              In this case, your Honor, we would suggest that it

2    doesn't matter which of the standards your Honor focuses

3    upon.  And we ask you to focus on this.  This is a case in

4    which, from the outset, every single person knew that H.264

5    was in play.  They put it in play.  This was a case in which

6    we repeatedly asked for the details of their participation

7    in H.264 and the JVT, having had them put it in play.

8              This was a case in which everybody knew that the

9    question of what the IPR policy of the JVT was was critical.

10   We took Doctor Sullivan's deposition.  This was a case in

11   which everyone knew that whether an integer transfer and a

12   DCT were the same or different was in play, and everybody

13   knew so.

14             This was a case in which people understood that

15   when you produce 30(b)(6) witnesses, you had an obligation

16   to produce someone who made the inquiry and to testify

17   truthfully.

18             Now, your Honor, with all of -- this is not just a

19   question of my passing through the door and your saying to

20   me, you got anybody who knows about this, let me see them.

21   These are affirmative obligations that the rules of the

22   court impose upon parties.  And this party, Qualcomm,

23   started this lawsuit.  And they started it by saying H.264

24   infringes.

25             So the question, your Honor, is would it be

76

1 grossly unjust to require Broadcom to pay its fees when it

2 was within a hair's breath of losing summary judgment on a

3 waiver claim that I would suggest to your Honor we probably

4 will get summary judgment on now.

5          Would it be fair to have Broadcom incur its fees

6 and bear its own fees to obtain and defend a noninfringement

7 verdict when Qualcomm had hundreds of documents going to

8 whether a DCT and integer transform were the same.

9          Would it be fair, your Honor, for Broadcom to bear

10 its fees in this case where Qualcomm indisputably knew on

11 January 14th that it had e-mails from Raveendran that

12 Raveendran received from the JVT and didn't give them and

13 left it to us to stumble into it on cross examination.

14          The answer, we suggest, your Honor, is no.  This

15 is an exceptional case.  Mr. Lupin and Mr. Batchelder's

16 letters demonstrate that.  I have not seen letters like that

17 in my 30 years.

18          But the thing that really, your Honor, I think

19 demonstrates the case is exceptional and that there is a

20 degree of credibility are these facts.  We are officers of

21 the court.  And Qualcomm is a party using and calling upon

22 the resources of the court.  That imposes obligations on

23 them.  It imposes obligations to investigate, to investigate

24 fully.  It imposes obligations to make representations on

25 whether you've made that investigation.  It imposes

77

1 obligations to respond to the other party.

2          That didn't happen here.  And the best proof, your

3 Honor, that this is not your this-happens-every-day type of

4 case is this.  Can it really be that Viji Raveendran at her

5 deposition, Viji Raveendran at trial, Chris Irvine at her

6 deposition, Mr. Detterman at his deposition, Iain Richardson

7 in his report and in his deposition and at trial, Qualcomm

8 at summary judgment, pretrial, opening, evidence, closing,

9 post-trial all could have missed 40,000 documents that would

10 have undermined the very representations they made to the

11 Court?

12          As I said, your Honor, at the outset, we think

13 this is serious stuff.  It's not something that we bring

14 halfway to the Court.  But it is very serious when one party

15 comes within a summary judgment argument and two questions

16 on cross examination of never allowing the Court, the jury

17 or the public to have sunshine on what actually happened.

18 That is an exceptional case and justifies the award of our

19 fees.

20          THE COURT:  Thank you, Mr. Lee.

21          Do you want to have a break at any time, or are

22 you prepared to go?

23          MR. BOGGS:  No.  I think I'm ready to go.

24          THE COURT:  Very well.

25          MR. BOGGS:  Your Honor, just let me start where he

78

1  just ended and then move to a lot of other topics that I

2  want to cover.  He just ended and asked, would this be

3  grossly unjust for Broadcom to have to assume its own

4  attorney's fees.  What he didn't tell you and I'm going to

5  show you, as I proceed later through what I have to say,

6  these documents in no way mean there wasn't going to be a

7  trial, there was going to be a trial.  These documents in no

8  way mean that there were not triable issues of fact.  There

9  were.

10         These documents may be relevant, and they were to

11  issues that were tried.  Some of these documents are helpful

12  to Broadcom.  Counsel has pointed them out.  Many of these

13  documents would have been helpful to Qualcomm.  He hasn't

14  pointed those out.  I will.

15         So to say it would be grossly unjust for Broadcom

16  to have to assume all of its attorney's fees for litigation

17  that was brought, ultimately yes was lost, and suggest

18  implicitly that had these documents been produced, there

19  wouldn't have been a trial and they wouldn't have incurred

20  these costs, that's just wrong.  They would have.

21         Counsel just handed me just at the end a case that

22  I do not believe is cited in their papers.  I believe he

23  handed it up to your Honor.  The Epcon Gas Systems case.

24  I've only had a chance to look at it briefly.  I think it

25  says right on the second to the last page, page number 12 on

**Exhibit A-80**

79

1 my copy in the upper right corner, exactly why this is not

2 an exceptional case, even assuming all of the arguments that

3 counsel just made.

4          And I direct your attention to the page second to

5 the last.  They gave us a case that goes through page 13.

6          THE COURT:  Do you have page nine?

7          MR. BOGGS:  Maybe they gave you a different

8 citation page.  On my page, it appears on 1035 of the

9 opinion, what I want --

10          THE COURT:  Is it the last page of the opinion?

11          MR. BOGGS:  Yes.  Just before you see some

12 information -- just before it says, affirmed in part,

13 reversed in part.

14          THE COURT:  Well, it's -- it's on 1035, starting

15 with, "Evidence of direct infringement," comma, "basing its

16 allegations."

17          MR. BOGGS:  The last paragraph on the left of

18 what's on the board here, your Honor.  "Assuming arguendo."

19          THE COURT:  "Assuming arguendo."  I got it.

20          MR. BOGGS:  Let me read that.

21              "Assuming arguendo that Bauer

22              (phonetic) is correct" -- that's the

23              party charging that the other side had

24              not done an adequate investigation --

25              "that Bauer is correct that Epcon failed

**Exhibit A-81**

80

1    to perform an adequate investigation

2    prior to filing the complaint, this fact

3    does not mandate a finding that this

4    case is exceptional or that Bauer is

5    entitled to any attorney's fees.  Given

6    the availability of other remedies for

7    the lack of such investigation, e.g.

8    under Federal Rule of Civil Procedure

9    11, the District Court's decision was

10    well within its discretion."

11   So let me stop the quote there.  A lot of what I'm

12 going to say is going to go to the point that what counsel

13 is talking about -- and this is why I said at the beginning

14 that the facts and the circumstances that he made all these

15 arguments about of what occurred, he's put all of those in

16 front of Judge Major in a sanctions motion, a Rule 11 type

17 motion.  If they're proper to be brought, that's where they

18 belong, not in an exceptional case motion.

19   Before I get into some prepared remarks, let me

20 just address two big-picture topics.  There's two issues

21 before the Court, remedies that I want to address first,

22 exceptional case that I will address second.

23   Point number one is, Broadcom has just been

24 arguing for well over an hour, maybe longer than -- an hour

25 and a half to two hours to point out to the Court in all

Exhibit A-82

81

1  these exhibits they put up there something we conceded in

2  our papers.  It's in our papers.  It's not an issue.  And

3  that is that at the trial and in papers filed with the

4  Court, Qualcomm and its counsel argued an erroneous position

5  that there was no attendance or involvement with the JVT

6  prior to December of '03.

7          We've acknowledged in our papers Qualcomm got that

8  wrong.  Qualcomm's counsel got that wrong.  In all of this

9  argument that you've just heard with all of this evidence

10 that you have just heard, what you did not hear is any

11 evidence that shows that Qualcomm actually tried to

12 influence the standard.  There's no evidence that he put up

13 that they actually voted.

14         There was some consideration in some evidence they

15 were considering whether or not to verbally support

16 somebody.  Yes, there's evidence that they monitored.  Yes,

17 there's evidence that they considered do we have IPR in the

18 standard, do we not, do we want to put our IPR in the

19 standard or do we not.  There's no evidence that they ever

20 did.

21         And the evidence of what they concluded about

22 their IPR is, it was not in the standard.  And I'll show you

23 that e-mail.  He put it up for about a split second and

24 moved on.

25         So they don't show influence, they don't show

**Exhibit A-83**

82

1 submission.  Yes, they show monitoring, yes, they show

2 participation, yes, they come to the conclusion correctly,

3 which we admit to, Qualcomm should not have asserted, among

4 other positions asserted at trial, that there was no

5 participation prior to a certain date.  They got that wrong.

6          Qualcomm had plenty of other good triable

7 arguments and issues that they did try to you, the best of

8 which I think is the one that you focused on in your

9 opinion, which is how did the other members conduct

10 themselves with respect to these rules.

11          There is absolutely nothing in the evidence

12 counsel just put up in front of you that shows that Qualcomm

13 concluded from how the other parties were acting that there

14 was a mandatory rule.  All he put up was evidence that

15 Qualcomm was looking to see what were people submitting so

16 they can do what every one of these companies better be

17 doing or their shareholders are going to sue them, which is

18 figure out who might have IPR, who are we going to have to

19 license from, what should be our business plans.

20          So in terms of what I'm going to show you in a

21 moment is, any culpability of the conduct of Qualcomm in

22 front of the JVT such that you should issue a remedy, he

23 hasn't put up any of that.  All he has done is appropriately

24 show Qualcomm's counsel and Qualcomm got it wrong by saying

25 they had no participation before a certain date.  But

Exhibit A-84

83

1  they've shown nothing that shows trying to influence the

2  standard.

3        The second point was, all of this might be of some

4  interest if this was a negligence claim.  But they're

5  claiming in their exceptional conduct motion intentional

6  misconduct.  He skates over this at the very end, his

7  officer of the court speech.  Read their papers.  They're

8  saying something much stronger, which I assume they assume

9  they must have to prove and the law says they must have to

10 prove.  It's not litigation misconduct.  It's intentional

11 misconduct.  It's perjury by witnesses.  It's suborning of

12 perjury by respected attorneys.  That's what they're

13 charging.  That's what they haven't even come close to

14 proving.

15       He says there's an obligation of counsel to be

16 correct.  Absolutely right.  Counsel for Broadcom, I'm going

17 to show you he just got some things wrong.  As a quick

18 example, he put up an e-mail where somebody says, we're

19 going to go to Starbucks and then go to the JVT meeting.  He

20 knows that's not right or he should know that's not right

21 because he knows that there was -- don't put it up.

22       MR. LEE:  Honestly, I didn't say that.  I said

23 that they went to a JVT subcommittee meeting.

24       MR. BOGGS:  No.

25       THE COURT:  Let --

84

1          MR. BOGGS:  Whether it's a subcommittee meeting or

2    not, they don't go to a JVT meeting.

3          THE COURT:  Don't interrupt.

4          MR. BOGGS:  So I'm not going to stand here and

5    accuse Mr. Lee.  That's one of several examples we'll see in

6    a moment of what he got wrong.  I'm not going to accuse him

7    of doing something intentionally or deceitful or to mislead

8    the Court.  This happens all the time.  That's what happened

9    to Jim Batchelder.  That's what happened to Qualcomm at the

10   trial.  It happens in every case.

11         Some side gets their version of the facts wrong.

12   The jury is there to sort it out.  And that happens.  That

13   does not mean somebody acted intentionally or that somebody

14   committed perjury.

15         All right.  I've got that off my chest, your

16   Honor.  Now I want to get to what I really want to talk

17   about, which is the remedies matter.  And I do want to put

18   up a couple of slides to help you focus on this issue of

19   remedies.  So let's put up Slide Number 1.

20         You ordered Qualcomm to be here, me to be here on

21   their behalf to address the issue that's on the board.  Let

22   me hand up to your Honor -- does counsel have a copy? -- the

23   slide show in hard copy that we're going to go through.

24         Your order to show cause was for Qualcomm to show

25   cause why the Court should not decree what you had described

**Exhibit A-86**

1  above that as a remedy for waiver.  You outlined, what is

2  the relevant inquiry.  In that context, the Court here

3  considers with respect to waiver the extent of the

4  materiality of the omitted information, meaning what was not

5  disclosed to the JVT.  And you said, I also want to know

6  about the circumstances surrounding the omissions in

7  connection with the proceedings in the JVT.

8          So that's why I said even before we got started,

9  these motions are very different.  This issue, this order to

10 show cause, focuses on Qualcomm's conduct with respect to

11 the JVT, how culpable was it, how bad was it.  Or did they

12 just fail to disclose something you had found that they

13 failed to disclose.

14         Really what your question is is, did Qualcomm lie

15 in the weeds, try to influence the standard, believe they

16 had their stuff in the standard, their IPR in the standard,

17 and then not saying anything?  I want to talk about that,

18 because the evidence is going to show they did not try to

19 influence the standard.  They believed at the end of the day

20 -- even though one time they considered maybe we've got it

21 in there, maybe we don't, they decided right at the time

22 before and after this standard was adopted that they didn't

23 believe they had any IPR.  And so they aren't culpable.

24         And so you said, well, what about the range of

25 remedies.  It appears to the Court that the remedy should

86

1 not be automatic, but should be fashioned to give a fair,

2 just and equitable response reflective of the offending

3 conduct, meaning the conduct, hey, you didn't disclose.  I

4 find you should have disclosed.  Theoretical remedies that

5 appear vary from total unenforceability of the patents to no

6 sanction of any kind.

7         Let's go to Slide 2.  Here's our position.  Or

8 here are the questions I'm going to go through to explain

9 our position why no further remedy is appropriate or

10 necessary.

11         I want to talk about how the remedies are limited

12 by the Federal Rules of Civil Procedure.  I'm going to talk

13 about what remedies does Broadcom want, why are none of the

14 Broadcom proposed remedies appropriate, why do the equities,

15 which is what you said in your order you want to hear about

16 to assess culpability or offending conduct, why they weigh

17 against any further remedy that Broadcom -- that Qualcomm

18 can't enforce its patents against Broadcom, and why would

19 any additional remedy be unfair to Qualcomm.

20         So let's go to the next slide.

21         Okay.  How are the remedies limited by the Federal

22 Rules of Civil Procedure and Broadcom's pleadings?

23         Let's go to the next slide.

24         Here, the answer is what did Broadcom plead.  He

25 argues a moment ago that in some paper late in the day, just

**Exhibit A-88**

87

1  before trial, Qualcomm says, well, Broadcom says they want

2  unenforceability as to the whole world.  Well, let's go back

3  and look at Broadcom's answer, Slide 80.

4          Here is the answer that Broadcom -- actually, it's

5  the amended answer that Broadcom filed just before trial

6  started.  Third affirmative defense is for waiver.  And it

7  doesn't ask for anything other than unenforceability against

8  Broadcom because of waiver or other applicable equitable

9  documents.  He only allowed them to go to trial on a waiver.

10          Let's go to -- back to the slide we had just

11  before.

12          So what did Broadcom plead?  Well, Broadcom didn't

13  ask for affirmative relief in its affirmative defense.  The

14  Federal Rules 8 and 13 would not permit that in any event.

15  The Court knows that Federal Rule 8(c) describes an

16  affirmative defense.  It's simply an avoidance of the

17  Plaintiff's claim.

18          The Court knows that the Rule 13(c) describes a

19  counterclaim as a claim for affirmative relief.  We've cited

20  a case in our papers to you, the Ford Motor Company case.

21  So not only do the Federal Rules define what you can get or

22  not get if you go for an affirmative defense versus a

23  counterclaim -- let's go to Slide 15.

24          There's the Ford Motor Company case cited in our

25  papers on this issue:

88

1              "A defendant also does not offer

2         any authority to support its arguments

3         that its final counterclaim, waiver and

4         abandonment can form the basis of an

5         affirmative claim for relief.  The court

6         finds it cannot be a basis upon which

7         defendants may be granted affirmative

8         relief.  See Federal Rule of Civil

9         Procedure 8(c) listing waiver as an

10        affirmative defense."

11             So where all you have is a waiver playing a

12   defense, you can't ask for affirmative relief.

13             Now go back to the last slide.  So the third point

14   is, all of the relief Broadcom asked for in its answer and

15   its counterclaim was limited to Broadcom.  We looked at the

16   affirmative defense a moment ago, that third affirmative

17   defense.  I want to show you that same amended answer and

18   counterclaim they filed just before trial, and I want to go

19   to Slide 83, which shows what they prayed for.

20             Here's what they prayed for in paragraph (d).

21   Declare that one or more of the claims of the Qualcomm

22   patents are invalid, void or unenforceable against Broadcom.

23   What's the point?  The point is, nowhere in their answer in

24   their counterclaims in their prayer do they ask for relief

25   reading as unenforceable against the whole world, only as to

Exhibit A-90

89

1 Broadcom.

2         Broadcom has achieved that result, your Honor.

3 That's exactly what the infringement -- the finding of no

4 infringement, the verdict on behalf of Broadcom results in.

5         Broadcom has argued in its papers that the Court's

6 equitable powers are vast, that you can do whatever you

7 want.  Well, your powers are vast, your Honor, but they are

8 limited by the Rules of -- Federal Rules of Civil Procedure

9 and cases like the Ford case.  I think they're inviting

10 error if they ask you for remedies based only on an

11 affirmative defense.

12         You could almost treat this as if there -- think

13 of it as if you hadn't even gone to trial on the waiver.

14 You had the choice to delay the waiver portion of the case,

15 have the jury try infringement, see if they came back with a

16 ruling of no infringement, let it go up on appeal.  If that

17 was sustained, what's the result?  There would be no issue

18 about issuing a remedy on a waiver trial that hadn't even

19 occurred.  That was your discretion to have that.  Why

20 should the result be any different?  Why should Broadcom get

21 any more than it was entitled to simply by winning?

22         I want to go to Slide 5.

23         So why is no further remedy appropriate or

24 necessary?  Well, we've just talked about how the remedies

25 are limited by the rules and by their own pleadings.  Let's

Exhibit A-91

90

1  see.  Well, what does Broadcom ask you for?

2          Let's go to Slide 6.

3          Well, Item Number 1 is their first example of

4  over-reaching.  They want more than they prayed for, more

5  than the rules allow them because they want unenforceability

6  against any H.264-compliant product.  They're not entitled

7  to that under the law, under the rules, by their own request

8  for relief.

9          All the next two, three and four are ones they

10 didn't pray for at all.  They all come out of a case I'm

11 going to talk to you about in a moment called the Dell case

12 cited in their papers.  They far exceed even what you

13 suggested as a remedy in your order to show cause.

14         Why do they want these additional things?  He

15 references the Orange County case, and he says, well, that

16 case against Qualcomm asks for a different relief.  I'm

17 going to suggest to you, your Honor, just as they did with

18 the letters of apologies sent to you and Broadcom that he's

19 referred to, which occurred within weeks in their Orange

20 County complaint, just as your waiver decision was barely

21 hot off the presses and it found its way into their Orange

22 County complaint filed within two weeks, I think their

23 motives are suspect here for wanting items beyond what they

24 asked for, beyond what the law allows them, such as letters

25 to the JVT and notifying parties.  They want all of that,

**Exhibit A-92**

91

1  your Honor.  They're going to try to put it into evidence in

2  another piece of litigation where they're suing my client in

3  part for the same alleged wrongful conduct in front of the

4  JVT.

5          I want to go back to the slide that we've been

6  working on, Slide Number 7, I think.

7          So we've talked about Bullet Point 1, Bullet Point

8  2, so now we're on to, why are none of Broadcom's proposed

9  remedies appropriate?  In their papers filed with you, they

10 relied upon some analogies.  Counsel really went over this

11 again somewhat this morning.

12         And they say, well, when you have inequitable

13 conduct, you can get unenforceability.  Well, they lost

14 their inequitable conduct.  You found against them in your

15 opinion.  And further, that's much different than waiver.

16 Waiver doesn't require any culpable conduct.  Your OSC said,

17 I want to know about Qualcomm's culpable conduct.  There's

18 been no finding on that so far.  You simply found a failure

19 to disclose.  Nobody -- you didn't have to make culpability

20 findings, and that's why you're inquiring into it now.

21         Waiver is much different than inequitable conduct.

22 Inequitable estoppel, they lost that at the summary

23 judgment.  You threw that one out.  It requires a misleading

24 statement and reliance.  There's no reliance.  There was no

25 misleading statement to Broadcom.

92

1        And further, that's an intent.  That's something

2   far more than a waiver, which is a knowing relinquishment of

3   a right.  Patent issues wasn't even pled.  That requires

4   showing of proper exploitation of a patent by violation of

5   anti-trust laws.

6        I think you know this because I think we put it in

7   our papers.  Broadcom sued Qualcomm in New Jersey in an

8   anti-trust case.  They've lost that.  They didn't plead it

9   here, and they've lost that in another context at the

10  pleading stage.  Yes, it's up on appeal, but those aren't --

11  those things that they analogize to listed at the bottom of

12  that slide are not in this case, or if they were, they were

13  lost.

14       So waiver is -- these are faulty analogies.  These

15  are not a basis for you to stretch and impose a remedy where

16  all they have done is prevailed upon a waiver defense.

17       They cited in support, in addition to these faulty

18  analogies, the case of _Dell_, which cites in their papers.

19       Go to Slide 9.

20       The _Dell_ -- the _Dell_ case, it's really a consent

21  order.  It's not even a case.  They consented to a

22  settlement agreement where unenforceability was part of what

23  was consented to.  But that's not legal authority, legal

24  precedent for your finding of waiver leading to a finding

25  of -- a remedy of unenforceability.

93

1          Even more important in <u>Dell</u>, if you look at the

2    culpability of their conduct, they did affirmatively cast a

3    vote to adopt the standard.  They did affirmatively certify

4    they had no IPR in the standard.  Neither of those are in

5    this case.  He hasn't put up any evidence of that.  It

6    didn't happen.

7          Dell made no offer to license on Frand terms.  You

8    know -- and we'll look at the evidence in a moment --

9    Qualcomm did that twice.  They did it way back in 2001

10   before the JVT even started meeting in front of MPEG, and

11   then they did it after they realized in 2005, after they had

12   consulted with experts that they did have a basis to sue, at

13   least in part Broadcom on the standard, they did send in

14   2006 a Frand offer.  Well, Dell never did that.

15         So Qualcomm, even if your order is correct that

16   they waived when they should have spoken, eventually got it

17   right.  So that's not culpable conduct, your Honor.  That's

18   a company trying to do the right thing.

19         Finally, the FTC found very serious and far-

20   reaching anti-competitive effects of what Dell had done.

21   There's been no such finding here.

22         Let's go to Slide 10.

23         We're on the fourth bullet point of why no further

24   remedy is appropriate or is necessary.  Your order to show

25   cause said, must weigh the equities in deciding -- assuming

94

1 I have the power to do anything, which I'm suggesting to

2 your Honor you don't, but even if you did, let's weigh the

3 equities.  That's what you said.  I want to know about the

4 circumstances of what happened before the JVT, and I want to

5 know about the materiality of what you didn't speak up and

6 talk about for the JVT Qualcomm.

7          So we'll got to Slide 11.

8          The first one I'm going to talk about is the JVT

9 written rules.  But I'm eventually going to go right down

10 through this list.  Because all of these things relate to

11 the circumstances and the materiality of the nondisclosure

12 to the JVT.  That's what you've asked us to talk about as to

13 a remedy.

14          And I want to talk about the conduct of the other

15 members and what Qualcomm would have been seeing about

16 Qualcomm's lack of knowledge, had it had any IPR back at

17 those times, 2002 and 2003, as shown by the very documents

18 counsel put up in front of you.  That while they considered

19 whether they should put IPR into the standard, that there's

20 no influence of that.  I want to talk about that 2001 MPEG

21 disclosure, which I mentioned a moment ago, the 20606 Frand

22 disclosure.

23          And finally, I want to talk about how there's been

24 no harm to Broadcom or any others from the nondisclosure.

25 That's largely because Qualcomm has offered Frand disclosure

95

1  terms, fair, reasonable and nondiscriminatory.  And as to

2  Broadcom, they won.  They're not going to get sued again.

3          So the first one we want to talk about is the JVT

4  written rules.  I think we may have another slide that

5  yellows that.  I'm not sure.  If not, let's go to -- go to

6  Slide 86.  What is this?  This is a slide from -- of a page

7  out of your order, page 17.  The issue is, if Qualcomm -- if

8  you're going to look and assess Qualcomm's culpability back

9  at the time it didn't disclose what it interestingly now

10  know didn't think it had, you'd say, well, what were the

11  rules?  What are the JVT rules that they're supposed to be

12  following?

13          Your Honor, you correctly wrote that, similar to

14  Rambus, the JVT IPR policy and guidelines provided no

15  express requirement to disclose patents unless a member

16  submits a technical proposal.

17          So what's my point?  My point is a simple one,

18  that if you're assessing Qualcomm's state of mind or

19  culpability for not disclosing, hey, come on, we're talking

20  about written rules that don't require it unless you submit

21  a technical proposal.

22          We all know Qualcomm did not submit a technical

23  proposal, which, by the way, was one of the arguments in

24  addition to the no participation argument.  This was a main

25  argument that Qualcomm made back at the trial.

*Echo Reporting, Inc.*

**Exhibit A-97**

96

1        The Court, however, found a rule -- unwritten rule
2 that is beyond these written rules, and that's why you made
3 your order as you did.  So how offending is Qualcomm's
4 conduct, I'm asking, for not following a precatory rule?

5        Mr. Foster reminds me that when I'm saying that
6 Qualcomm did not submit a written proposal, and that all
7 times speaking before the proposal, before the standard was
8 adopted, Mr. Lee has pointed out that's May of '03.
9 Qualcomm at no time submitted a technical proposal before
10 May of '03.

11       All right.  So go back to that slide we had just a
12 moment ago.

13       The written rules.  That's what they are.  That's
14 a fact.  That's a circumstance you can consider in deciding,
15 hey, was Qualcomm doing something really egregiously wrong
16 by not following the written rules?  Even assuming the
17 Court's order is correct that there's some other rules to be
18 followed.

19       Let's go to the next one, the conduct of the JVT
20 participants.  And what do I mean here?  I mean, what if
21 you're Qualcomm and you're watching what others are doing.
22 What conclusions are you drawing as to whether there's some
23 set of rules different than these written rules?

24       And your order actually sets forth nicely what the
25 evidence was at trial and what you found.  And so I want to

Exhibit A-98

97

1  go to Slide 88.  And in here, you said the issue before the

2  Court is whether the JVT participants treated the IPR policy

3  as imposing a duty of disclosure.

4         Mr. Sullivan testified -- that's the JVT chair --

5  at trial that JVT participants sometimes submitted

6  disclosures without an accompanying technical proposal.

7         Further down he testified, and people can and

8  sometimes have submitted a disclaimer form, disclosure form.

9  Further down on line nine, "I think we've had a couple of

10 occasions where someone would submit a patent disclosure."

11 I thought I had a laser pointer.  Here we go.

12         Line 12, he further testified the JVT participants

13 sometimes submitted disclosures directly to the JVT before

14 filing formal disclosures with the JVT parent bodies.  And

15 then Doctor Bao -- Sagetong's testimony was quoted by you.

16 After reviewing hundreds of JVT documents, Qualcomm's own

17 Sagetong admitted to reviewing at least one.

18         So what is my point, your Honor?  My point is is

19 that the evidence that was submitted at the trial, it

20 consisted of 500 technical submissions.  That's what Mr. Lee

21 and Mr. Batchelder -- one of them put that into evidence.

22 There were 500 technical submissions.  There was only one or

23 at best a few forms submitted without a technical

24 submission.

25         So if you're sitting there and you're Qualcomm and

98

1  you're doing what Mr. Lee points out these documents now

2  show Qualcomm was doing, it's looking to see what are the

3  other folks doing.

4          Are they ever submitting their disclosures without

5  a technical proposal?  You'd say, oh, not really.  I only

6  see one, maybe a couple.  Five hundred.

7          Mr. Sullivan, the JVT chair, as you recall -- and

8  you mentioned this in your order -- he would remind

9  participants of the written rules.  Well, we've looked at

10  the written rules.  As you correctly found, the written

11  rules don't require mandatory submission, only

12  encouragement.

13          He would exhort people to follow them.  He would

14  ask if anyone has anything to report.  At the summary

15  judgment hearing on December the 5th in this matter, I think

16  you absolutely correctly described that as a good pep talk.

17          Now -- so your Honor, here's Qualcomm trying to

18  decide theoretically, do I have to submit, do I not have to

19  submit, is there some unwritten rule out there?  That's what

20  you're trying to decide as to what would they come to as a

21  conclusion.  And they're seeing that almost all of these

22  people are submitting them only when they submit a technical

23  proposal.

24          You made a very interesting observation, your

25  Honor, at the December 5th hearing.  You gave Mr. Regan an

99

1  assumed hypothetical.

2          Let's go to Slide 87.

3          This is the December 5, 2006 hearing where you and

4  Mr. Regan are going back and forth as to what Rambus means,

5  are you going to have a trial on waiver or not.  And you're

6  giving him some pretty favorable assumptions.  And you say,

7  isn't there an equal -- isn't there an equal inference that

8  the evidence that everyone is supporting it -- everyone is

9  turning in their IPR.  Everyone is cooperating 100-percent,

10 which we just saw isn't the way the facts are.  Isn't there

11 an inference that you could draw from that, not that they

12 feel obligated to do it, but they're happy to do it because

13 they want to do it to make sure they get these standards

14 because it's good for business.

15         I say, you hit the nail on the head.  That is a

16 more than equal inference if you consider that 100-percent

17 isn't the facts in the case.  It's 500 proposals, only one

18 or a few submitted without -- so far more than an equal

19 inference as you're sitting there as Qualcomm is there's no

20 other rules.  You only have to submit your disclosure form

21 if you've submitted a technical proposal.

22         All right.  We're back to our main Slide 11.

23         So we're now down to Topic 3.  Qualcomm's lack of

24 knowledge of IPR.  Why is that an important circumstance, a

25 fact for you to consider in deciding whether or not Qualcomm

100

1   should be further punished by some remedy beyond simply

2   having lost the case?

3         THE COURT:  Would this be a good point to

4   interrupt you before you start on that point?

5         MR. BOGGS:  Yes.

6         THE COURT:  Let's be in recess until 2:00 p.m.

7      (Proceedings were recessed to reconvene.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit A-102**

101

<u>AFTERNOON SESSION</u>

--oOo--

1   THE CLERK:  Please be seated.

2   THE COURT:  Your point that you were going to make
this time was to lack of knowledge of the IPR.

3   MR. BOGGS:  That's exactly where I was.  Thank
you, your Honor.

4   And all of this, as the blue title bar suggests,
is to assist the Court in weighing the equities as to
whether or not there should be a further remedy and looking
at what you asked us to look at in your OSC, which is what
are the circumstances and the materiality of the
nondisclosure.

5   So our third point is, well, what do these new
documents show, now that they're out in the open and
everybody has them, about what Qualcomm's mental state was
back at the time they're alleged of hiding in the weeds by
Broadcom.

6   Broadcom claims that Qualcomm's engineers
considered back then whether or not they had IPR in the
standard.  And that's true.  And we admitted that in our
papers.  The new documents show engineers looking at the
standard, looking at Qualcomm's patents and giving
consideration.  Do we have it or we do not.

7   And if you go to -- so there's no issue about the

Exhibit A-103

102

1  fact they were considering it.

2        You go to Slide 90.  Here's one of the documents

3  that I think Mr. Lee put up from Qualcomm where the

4  engineers are saying, monitoring ABT is of importance, since

5  there may be patent infringements.  Issue related to ABS

6  DCT.

7        So this is an example of the engineers doing just

8  exactly what I said.  What he didn't focus on, though, is,

9  well, what did those engineers conclude for purposes of you

10 assessing whether they developed some belief they had

11 knowledge, sat in the weeds, didn't disclose.

12       Well, we find the answer to what did they conclude

13 in two e-mails that Broadcom put in front of you, but only

14 for a microsecond.  So I'm going to put them in there in

15 slow motion.  Let's look at Slide 91.

16       Here's a Jay Yuen e-mail.  So this is in the year

17 2002.  So remember, JVT was formed in December of '01, so

18 we're almost a year later.  They've been considering whether

19 or not their IPR would be infringed by the almost developed

20 standard because it gets finalized in December of '02.

21       And they say, well, one thing.  Didn't we kind of

22 conclude that they are not infringing our ABS DCT?  So

23 certainly not a conclusion that they were.  And at best, a

24 nonconclusion.  So now I want to go to Slide 92, which we

25 fast-forward in time.  I'll represent this document, I

Exhibit A-104

103

1 believe is -- not only do I believe, it is September 25,

2 '03.  This is an e-mail that Mr. Lee put up.  It's from Hari

3 Garadadri.  So it's a Qualcomm engineer, September 25, '03,

4 almost a year after the e-mail we just looked at.

5          This, by the way, is in our brief.  It's an

6 exhibit -- if it's not in our brief, it's in their brief.

7 Exhibit A, Tab 123.  I think that's their brief.  But they

8 don't highlight what its key point is.  Here is a conclusion

9 by Qualcomm in September of '03.  We have no IPR in any of

10 the video CODECs.

11          And so why is that important at this point?  Not

12 for purposes of whether or not you should find a waiver.

13 It's for purposes of you assessing, was Qualcomm laying in

14 the weeds, was Qualcomm sitting there hiding something from

15 the JVT, knowing they had it.  And the answer is, absolutely

16 not.  And so how can that be culpable conduct?

17          So in the 300,000 pages that they have pointed to

18 the volume of, which is more excessive -- and we'll look at

19 this in a little bit -- than the real volume because we've

20 got to de-dupe all of those.  In all of that evidence that

21 now is out in the open, there's no conclusion by Qualcomm

22 back in 2002 or 2003 that it believed it had anything to

23 disclose.

24          I'll wait for your Honor to catch up before I go

25 to the next point.

**Exhibit A-105**

104

1          Can you go to page two of that.

2          It's on page two of the e-mail is what Mr. Foster

3  wants to remind me.   Okay.

4          THE COURT:   Of 123?

5          MR. BOGGS:   Yes.   Go to the next slide, please,

6  which is Slide -- should be a slide back.   It's Slide 11.

7          Okay.   So now we're down to my next point.   What

8  are the facts and circumstances?   What was Qualcomm's

9  conduct as shown by these new documents of whether or not it

10  was trying to influence the standard before its adoption in

11  May of '03.   In all 300,000 pages, your Honor, contrary to

12  what Broadcom now contends, there really is no evidence of

13  any effort to influence the standard before its adoption.

14          What is the evidence?   The evidence is that

15  Qualcomm was monitoring what was going on.   Let me show you

16  as an example -- it's our Slide 93.   Here is an Amnon

17  Silberger (phonetic) e-mail, Friday, April 26, 2002, where

18  he's talking about the JVT effort moving toward a committed

19  draft in May of '02.   No indication they're even looking at

20  DC applications.

21          Here's the point I want to look at.   We should

22  monitor this from a distance.   Absolutely correct.   Mr. Lee

23  is right, the new documents show, contrary to the positions

24  that Qualcomm thought at the time of the trial was correct,

25  that earlier than December of '03, they were monitoring and

**Exhibit A-106**

105

1 they were attending.

2        But as I'm going to show you, the evidence that
3 Mr. Lee put up that he suggests shows they actively tried to
4 influence the standard by voting or providing verbal
5 support, that none of that happened.

6        So let's look at that evidence.  What did Broadcom
7 put up just a moment ago to argue that somehow Qualcomm
8 influenced the standard?

9        Go to Slide 55.

10        They put this up.  They called it Exhibit MM.
11 This is September 30, 2002, subject, simple profile for JVT
12 CODEC.  And they put this up to I think imply that Qualcomm
13 actually then -- at a JVT meeting actually provided verbal
14 support at the next JVT meeting.

15        They had 300,000 pages of e-mails.  There is no
16 support in the e-mails that any such verbal support was
17 given.  Yes, they considered it.  They did not do it.
18 Broadcom has the minutes, the written official minutes.
19 They put -- I think they put them in evidence in trial.  The
20 minutes of the meeting show Qualcomm provided no verbal
21 support behind this proposal or any other proposal.

22        So yes, there's evidence, a lot of it, that wasn't
23 present before to show that there was involvement, there was
24 monitoring, there was consideration.  But what it shows is
25 no action.

**Exhibit A-107**

106

1          So if you're assessing whether somebody was laying

2    in the weeds, the evidence is no action was taken to

3    influence the standard.

4          Broadcom says, well, if we had just had these

5    documents before trial, we could have showed more

6    involvement.   Yeah, that's correct.   That doesn't get them

7    to the waiver ruling by itself.   But what they could not

8    have shown during the trial is any influence.   It's not in

9    these documents.

10         And I suggest and submit that if Jim Batchelder,

11   Qualcomm's lawyer, had had these documents, Broadcom

12   wouldn't have been able to say, well, look, there's more

13   participation because I'm going to submit to you, your

14   Honor, Mr. Batchelder wouldn't have made that position.   He

15   would not have taken that position.   The document is

16   refuted.   He did not have the documents.   Lawyers can make

17   mistakes.   It's not intentional.

18         What other evidence does Broadcom put up for your

19   Honor as to Qualcomm influencing the standard?   They put up

20   an exhibit they called NN.   I don't have their exact

21   reference, but we have it as Slide 56.

22         MR. LEE:   The Saxton declaration NN.

23         MR. BOGGS:   Okay.   This is our Slide 56.   It's in

24   the binder for your Honor.   It's also in our brief.   This is

25   pretty egregious for them to stand here and say that this

107

1  shows -- as they wrote in their brief, this shows that

2  Qualcomm voted on a JVT proposal.

3          Let's go to the second page.  But before you do,

4  highlight the date so we see the date.  It's from Mr. Yuen

5  to some people.  Can you expand the "To" and "From" up

6  there?

7          June 11, 2002, Yuen to -- it's Viji Raveendran and

8  Amnon Silberger.

9          Now, I need to have you go to the second page so

10 the Court can see how this developed.

11         This starts by Pete Churling (phonetic) from --

12 he's the chair of INCITS, L3.1.

13         And now expand this section a little bit so the

14 Court can see what that's all about.

15         What they're sending out here is a ballot to

16 approve the formation of an ad hoc group.  Is this an ad hoc

17 JVT group, your Honor?  No.  This is some outfit called

18 INCITS, International Committee for Information Technology

19 Standards.  INCITS has a technical committee they call the

20 L3.1 committee.  It's on audio and picture coding.

21         What is L3.1?  Is that a working group of the JVT?

22 Absolutely not.  It's a working group on MPEG development.

23 MPEG is not the JVT.  The vote was not to approve a JVT

24 proposal.  The vote was to approve membership of an ad hoc

25 committee.

*Echo Reporting, Inc.*

**Exhibit A-109**

108

1       The purpose of the ad hoc group, of another

2 standards group, INCITS and national group -- we've got to

3 go back to the first page.  Blow that up.

4       MR. LEE:  Your Honor, I know you said not to

5 interrupt, but I want to lodge an objection, if I could.

6 There's nothing in the record to support any of these

7 factual assertions.  These are documents in the hands of

8 Qualcomm.

9       THE COURT:  Well, I think you've been using these

10 same documents.

11       MR. LEE:  Yeah.  And all I've been doing is

12 referring to documents.  I'm just making my objection, your

13 Honor, that there's nothing in the record to support any of

14 these facts at all, and we've had no opportunity to discover

15 whether they're true or not because the documents weren't

16 produced.

17       THE COURT:  Well, all I'm saying is, you're

18 using -- he -- you're both using company records, and you're

19 drawing inferences from them.  You're reading them.  And I

20 don't see much difference with what he's doing.  It's what

21 you were doing.

22       MR. LEE:  Well, the difference is, your Honor, I

23 didn't have the people available to me.  They're not my

24 client's documents.  You know, just what these mean or don't

25 mean.

*Echo Reporting, Inc.*

**Exhibit A-110**

109

1          MR. BOGGS:  My point --

2          MR. LEE:  That's a pretty big difference

3   because --

4          THE COURT:  Well, all right.  But let's proceed.

5   Let's don't object.  You can -- you're going to get a chance

6   to respond, of course.  You know that.

7          MR. LEE:  Okay.

8          THE COURT:  And so you can point these things out.

9          MR. BOGGS:  My point, your Honor, is this document

10  speaks for itself.  It's an e-mail ballot for L3.1, USNB for

11  MPEG -- everybody knows MPEG is not JVT.  It calls for an ad

12  hoc group that collects and generates a census on U.S.

13  comments for a JVT committee draft.

14          So at best, this is approving the formation of

15  some other standards group ad hoc committee that may or may

16  not develop a consensus on various JVT proposals.  But

17  Broadcom represented to the Court that this was evidence

18  that Qualcomm voted on a JVT proposal.  It's not a JVT

19  proposal.  It's not even JVT speaking.  It's setting up an

20  ad hoc committee for a different group.

21          So what did Qualcomm really decide about whether

22  or not to influence the standard?  I want to go to another

23  slide, Slide 94.  Expand -- is this the first page so we can

24  see what this document is.

25          Silberger, Turatzel (phonetic), JVT, ABS

**Exhibit A-111**

110

1 submission, March 26, 2002.  And counsel correctly pointed

2 out that in this document, there's consideration and

3 questions where Qualcomm is deciding, should they submit a

4 proposal -- this is March of '02.  There's an upcoming May

5 '02 JVT meeting.  Qualcomm is thinking about, should we

6 submit a technical proposal at the May '02 meeting.

7         Now if you can highlight -- here's what the

8 consideration resulted in.  Considering the complexities,

9 the size and the very minimal documentation and the

10 software, blah blah blah, we -- this is a low-quality four,

11 colon, two, colon, zero -- it seems practically impossible

12 to achieve meaningful results in the short time we have.

13         Nowhere in the evidence is there any evidence that

14 a proposal, a technical proposal was submitted.  Counsel is

15 not going to get up and say that it was.  The reason, among

16 other reasons, it never was submitted is they determined

17 they didn't have time.  Practically impossible.  What's all

18 that important to?  This bullet point.  Qualcomm is not

19 laying in the weeds trying to affect the standard.

20 Considering whether they should, deciding that they

21 shouldn't.

22         This is actually a good illustration of Broadcom

23 taking a position right here which is incorrect.  They --

24 I'm not going to say they're doing it knowingly.  I'm not

25 going to say they're trying to mislead you about it.

**Exhibit A-112**

111

1  Lawyers make mistakes.  Broadcom now has the evidence.  I'd

2  say they're asserting something incorrect from the evidence.

3        Jim Batchelder, he didn't have the evidence.  They

4  say he asserted erroneous positions.  I say and concede,

5  yes, some of the positions he asserted were erroneous.  I

6  submit that had the documents been found, he wouldn't have

7  taken those positions.  Lawyers can make mistakes.

8        So on this slide, as a wrap-up on this, there's no

9  effort to influence the standard.  Mr. Lee has made much of

10 the fact that, yeah, now there's a lot of evidence of

11 participation, meaning involvement, meaning monitoring,

12 meaning considering whether to do this or do that, should we

13 give verbal support or should we not.

14        He says that all equals culpable conduct such that

15 you ought to punish Qualcomm with a further remedy.  I say

16 no way.  I say you have to ask the question, well, what does

17 this involvement consist of.

18        Well, monitoring the activities of JVT is just

19 exactly what all the other companies were doing.

20 Formulating a business plan for the H.264 standard and

21 products that you might want to have that practice that

22 standard, well, that resulted in what Qualcomm did tell the

23 Court and did tell the jury about at the trial, which is the

24 post-December '03 conduct to work with JVT on extensions.

25        Qualcomm did assess its IPR against the standard,

Exhibit A-113

112

1  as we saw a moment ago, concluded it didn't have any IPR in

2  the standard.  Qualcomm took no activity to shape the

3  standard, no submissions of any IPR before May of '03.  So

4  the conclusion is, there simply is no hiding in the weeds

5  based on any effort to influence the standard before its

6  adoption.

7        Let me now go to the next bullet point, the 2001

8  MPEG disclosure.  There's no IPR concealment.  If you

9  consider the culpability of Qualcomm for not having

10 disclosed through the JVT as you found they didn't, and you

11 want to say, well, there was something awful going on here,

12 you need to consider, well, wait a minute, what did they do

13 before the JVT was even formed.  They disclosed their IPR

14 with a technical proposal.

15       Let's go to Slide 23.

16       Here it is.  Subject -- this is back in '01.  Here

17 is the proposal.  Go to page 26, Slide 26.  T2enty-four, I

18 mean.  Twenty-four.  I think you had it.  Qualcomm offering

19 on Frand licensing terms.

20       So if you look at what they did in '01, they told

21 the world about what they believed they had then for a

22 proposal they made at that time.

23       Now let's fast-forward to what happens after that.

24 Let's go back to the main Slide 11 first.  2006 Frand

25 disclosure.

113

1          So way back here five years earlier, they made a

2   disclosure.  The period of time in between, they did not

3   before the standard was adopted.  Why?  Because they

4   believed they didn't have any IPR.  Why?  Because the

5   written rules don't require you to.  Why?  Because the

6   conduct of 500 other people was you only submit if you

7   submit a technical proposal.

8          Well, what are they doing in 2006?  Well, in 2005,

9   as the Court and everybody knows, the hired experts, they

10  decided they had IPR, at least some.  Not as to -- that went

11  to trial.  It was only as to the 104 patent and only as to

12  Claim 59.  But here they did what the rules require.  They

13  said, let's make a Frand -- let's make a disclosure.  Let's

14  make an offer, a Frand offer.  If we've got any IPR, we're

15  willing to license it on Frand terms.

16         So let's go to Slide 25.  Here is that proposal.

17  Do you have a date you can highlight?  I represent this is

18  in April of '06.  Go to the next page because it's more

19  important anyway.  It's Slide 26.

20         Here is the Frand proposal offer in 2006.

21  Prepared to grand a license unrestricted Frand terms.

22         So what are these rules of the JVT and its current

23  bodies where, if a patent -- if a company wakes up and later

24  realizes it has IPR and it hadn't disclosed it, what do the

25  rules say you're supposed to do?  Exactly this.  That's why

Exhibit A-115

114

1 they have this form.  It cures any nondisclosure.  It avoids

2 any need for the standards body to go back and do a do-over,

3 do a design-around.

4          The main point of these rules of disclosure is

5 really to make sure that people who are unwilling to license

6 on Frand terms do tell you what their patents are.  And for

7 everybody else in the world, as long as you're willing to do

8 a Frand license, they'll go forward and they'll adopt a

9 standard that has the best possible technology in the world.

10 Because everybody can practice it, everybody can enter into

11 a fair and reasonable license.

12          Let's go back to Slide 11.

13          So we're down to the last bullet point or item

14 here.  No harm to Broadcom or others from the nondisclosure.

15 What are the facts?  The facts, your Honor, are that

16 Broadcom has paid nothing to Qualcomm for any license on

17 anything.  They reached an impasse, as I understand it, and

18 that resulted in the lawsuit.  But Broadcom paid nothing.

19          THE COURT:  I'm sorry.  You said the recent

20 impasse.  Did they try and license something?

21          MR. BOGGS:  Well, I think they had negotiations,

22 and because they couldn't reach agreement --

23          THE COURT:  Is that your understanding?

24          MR. BOGGS:  That's my understanding.  A lawsuit

25 was filed.

115

1       THE COURT:  That Qualcomm contacted them and tried

2 to get a license agreement?

3       MR. BOGGS:  I don't know all of those facts, your

4 Honor.

5       THE COURT:  Do you know any of them?

6       MR. BOGGS:  Not in detail.

7       THE COURT:  Well, how about generally?

8       MR. BOGGS:  I know -- I believe that it's --

9       THE COURT:  Because I understood from the

10 evidence -- maybe I'm wrong -- that there was no

11 communication at all except the filing of the lawsuit.  Now,

12 which is it?  Mr. --

13       MR. BATCHELDER:  I can say that there certainly

14 were licensing communications between Qualcomm and Broadcom

15 before the lawsuit.

16       THE COURT:  Thank you.

17       MR. BOGGS:  Thank you.

18       THE COURT:  Is that right, Mr. Lee?

19       MR. LEE:  Yes.  Your Honor, the evidence that your

20 Honor addressed was, were there any discussions about the

21 104 patent, the 767 patent before the lawsuit was filed.

22       THE COURT:  Between Qualcomm and Broadcom.

23       MR. LEE:  And Broadcom.  And there was -- I think

24 the evidence was there were not discussions specifically

25 about those.

**Exhibit A-117**

116

1          MR. BATCHELDER:  There were portfolio discussions,

2   your Honor.

3          MR. LEE:  That's what the evidence -- that's what

4   everybody focused on.  There were portfolio discussions.  No

5   one ever denied it.  But the question of whether there were

6   discussions about licensing these patents, everybody was

7   unequivocal and in unanimity that there were not.

8          THE COURT:  That's where I got my idea.  Okay.  I

9   understand.  Thank you.

10         MR. BOGGS:  So any harm to Broadcom?  Broadcom has

11  been paid nothing.  Qualcomm has taken nothing from

12  Broadcom.  Has Broadcom relied on Qualcomm's nondisclosure?

13  We've got testimony from the chairman, Sin Reli (phonetic)

14  that's already in the record, as I understand it.  No.  The

15  equitable estoppel theory didn't even go to trial.  You

16  threw that out.

17         Broadcom, your Honor, is fully protected by the

18  results of this trial.  They cannot be sued by Qualcomm.

19  They have a verdict of noninfringement.  They can practice

20  this standard --

21         THE COURT:  Are you representing by that that this

22  is a final judgment.  There's going to be no appeal of

23  anything?

24         MR. BOGGS:  I'm not making any representation.  If

25  that judgment goes up and it's sustained on appeal, they're

Exhibit A-118

117

1 fully protected.  If it's reversed on appeal, then they

2 ought to pay up.  That's exactly correct.

3          THE COURT:  I just want to understand what you

4 said.

5          MR. BOGGS:  So let's talk about others.  Is there

6 any harm from others from Qualcomm's nondisclosure?  The

7 others, if that verdict, that judgment of noninfringement

8 stands, they have the same collateral estoppel on

9 noninfringement if all they are doing is merely practicing

10 the H.264 standard.

11          So there's no need, as Mr. Lee -- as I heard him

12 say, for any further remedy for purposes of an appeal.  This

13 record just goes up.  And you don't need to add another

14 punishment on top, do something for the Court of Appeal.

15          The issues you properly framed in the OSC are,

16 based on this record as embellished by these additionally

17 produced documents, is there any really bad culpable conduct

18 of Qualcomm such that it should be punished.

19          Since there's no harm to Broadcom or others from

20 Qualcomm's nondisclosure, and since Broadcom is fully

21 protected, since the others are fully protected by this

22 infringement verdict, if it's correct, there's no need for

23 another remedy.

24          So let's go to Slide 11.

25          THE COURT:  I'm sorry.  Just -- I want to

118

1   understand what you said.  You said if a firm -- there's

2   protection to whom?  Broadcom.

3              MR. BOGGS:  Broadcom and others.

4              THE COURT:  What other?  What are you talking

5   about?

6              MR. BOGGS:  Well, anybody else out there, they're

7   going to pick up this judgment, I assume, at least to the

8   extent of its -- of what was included and say they are

9   protected by collateral estoppel.  I'm assuming they're

10  going to say that.

11             THE COURT:  Well, when you said they all would be

12  protected, I was wondering what -- I understand they might

13  say that, but they could say the moon is blue cheese too.

14  That doesn't make it blue cheese.  Are you saying that this

15  judgment, if affirmed, would grant unenforceability

16  internationally to anybody that complies with H.264?

17             MR. BOGGS:  I think I'm saying only as -- and

18  really, this is good you're asking this because it raises

19  the reasons why a judge -- why a further remedy would be

20  unfair to Qualcomm.

21             Let me go to that slide, because it really has to

22  do with -- it's really the last -- go to the next -- why no

23  further remedy is appropriate or necessary is why would any

24  additional remedy be unfair to Qualcomm.

25             What I'm saying, your Honor, is the jury's verdict

119

1 has created a safe harbor for the practice of the H.264

2 standard.   To the extent Qualcomm still has potentially

3 valuable IPR that goes beyond the mere practice of that

4 standard, then that IPR shouldn't be affected.

5          If you rendered the patents totally enforceable,

6 just totally enforceable as to others, that would be unfair

7 to Qualcomm to the extent that it has IPR that goes beyond

8 the mere practice of the standard.

9          And in fact, at the trial, the Qualcomm expert

10 said the 767 patent, the theory of infringement wasn't even

11 based on the H.264 standard.   And as to the 104 patent, it

12 was only Claim 59.

13          So let me go to Slide 14 to wrap this section up.

14          I've been arguing for your Honor that there's no

15 further remedy that is appropriate or necessary.   That's the

16 issue this OSC raised.   And I have urged you to consider

17 that the scope of the relief is limited by the Federal Rules

18 in Broadcom's pleadings.   The remedies proposed by Broadcom

19 far exceed that, are unnecessary because Broadcom for sure

20 has the protection that it needs.

21          All of those equities that we went over on that

22 other slide about now what do the rules -- the written rules

23 provide, what does Qualcomm understand those rules based on

24 the conduct of others, did they try to influence the

25 standard, all of those things are equities that weigh

120

1  against any further remedy because contrary to the conduct

2  of that company Dell that we looked at where they were

3  certifying they had no IPR, they were actively proposing and

4  trying to influence the standard.  Qualcomm does none of

5  that.  And finally, that no further remedy, as I just said,

6  would be fair to Qualcomm.

7         So your Honor, I would like to now turn to -- let

8  me just say, all of that has to do with conduct of Qualcomm

9  before the JVT.  That is what your OSC order asked us to

10 talk about as to whether there should be a remedy.

11        Mr. Lee, through Broadcom's motion for exceptional

12 case, he's put before the Court a different issue.  That is,

13 what about the litigation -- alleged litigation and

14 misconduct.  He says that deems a finding for an exceptional

15 case, meaning that he gets all of his attorney's fees.  I

16 want to turn to that topic.

17        If I could have the lights, please.

18        Let me just set the stage a little bit by

19 reviewing what I understand Broadcom says has occurred.  And

20 why do I believe this is what they said?  Well, this is what

21 they said in their papers.  They said that Qualcomm and its

22 attorneys intentionally concealed -- intentionally concealed

23 over 300,000 pages of electronic documents held by over

24 almost 30 employees at Qualcomm.

25        They say in their papers and strongly infer that

Exhibit A-122

121

1  they believe that Qualcomm's witnesses, at least three

2  Qualcomm engineers committed perjury.  They further say --

3  and you heard it this morning -- well, Qualcomm and its

4  attorneys then attempted to cover up the existence of 21

5  e-mails found on one employee's computer.  And then after

6  that, to try to conceal all these 300,000 documents by -- I

7  guess he's saying not moving as quickly as he wanted

8  Qualcomm to move after February 7th.

9         In a nutshell -- and I'm going to go over this in

10 detail -- what do I say occurred?  I say Qualcomm and its

11 attorneys did not locate 300,000 pages.  That number far

12 exceeds what the real volume is.  And we'll talk about that

13 in a moment because a whole bunch of those are duplicates,

14 et cetera.

15        What I say occurred is that Qualcomm -- its own

16 production back during the course of the litigation exceeded

17 that 300,000 pages by a huge amount.  Two million pages of

18 electronic documents were put into the hands of Broadcom,

19 and they know it because it happened before the close of

20 discovery.

21        I say the failure to collect was not a result of a

22 plot to intentionally conceal anything.  It was a breakdown

23 between the company and its lawyers, that under the

24 circumstance that I'm going to explain to you, that it's

25 totally implausible for them to suggest that Qualcomm's

Exhibit A-123

122

1  attorneys and Qualcomm would know what to conceal or how to

2  conceal that staggering amount of documents on a topic that

3  I will show you, contrary to what he said this morning, a

4  theory of waiver was not even yet in the case during the

5  summer when all this document production was going on and

6  these depositions were being taken.

7          So I'm going to be arguing to you it's

8  preposterous to suggest that Qualcomm knew what Broadcom

9  hadn't yet told Qualcomm.  I'm going to show you -- I'm

10 going to show you a statement by Mr. Regan in December of

11 '03 where he tells you in the summary judgment hearing that

12 the first time Broadcom connected the dots on this -- the

13 importance of this JVT participation stuff is in August,

14 after the depositions of some of these people that they're

15 accusing of lying.

16         So in a nutshell, what they're saying is is the

17 Qualcomm witnesses and the Qualcomm lawyers knew what to

18 hide, knew what the importance of it was, knew what to lie

19 about well before Broadcom did.  That, I suggest, is

20 preposterous.

21         THE COURT:  You say August what year?

22         MR. BOGGS:  August of '06 is when the depositions

23 of these people were taken -- in July of '06.  In December

24 of '06 -- and I'll show you this in a little bit -- Mr.

25 Regan tells you at the December hearing that it's not until

**Exhibit A-124**

123

1  the August deposition of Mr. Sullivan, the JVT chairman,

2  does Broadcom begin to understand its theory of waiver.

3           And then I'm going to show you in a little bit

4  here how they don't even tell Qualcomm at that time -- well,

5  they say, well, we were asking some discovery questions.

6  That's true.  We're going to look at that.  When they

7  amended in September their supplemental interrogatories,

8  even then they don't connect this nondisclosure to their

9  waiver theory.  I'll show you exactly what they did connect

10 it to.  It's all the equitable theories you threw out at

11 summary judgment, equitable estoppel, unclean hands, implied

12 license.

13          And it's really not, I submit to your Honor, until

14 December of '06 when the summary judgment hearing occurs

15 that Broadcom -- I've read all those transcripts, looked at

16 all these interrogatories -- that Broadcom for the first

17 time connects this nondisclosure theory to a waiver theory.

18          And above all else, your Honor, does that excuse

19 Qualcomm for not having found these documents?  No way.  No

20 way, Jose.  All I'm submitting is, they're claiming this is

21 intentional.  They're claiming this is something heinous,

22 and I'm saying, impossible.  They have -- I'm going to talk

23 about the burden of proof.

24          This is a case where they say they want it deemed

25 exceptional.  That says a lot.  That says this is something

Exhibit A-125

124

1  so far out of the ordinary.  Because you know, the normal

2  rule is, the winner pays -- the loser pays their own

3  attorney's fees.  Well, the patent law has a narrow

4  exception for exceptional -- for patent cases where they can

5  be deemed exceptional.  I think the law is clear.  We cite

6  the cases in our brief.  There has to be a showing of

7  intentional misconduct, intentional bad faith.

8           The size of the document production that didn't

9  occur is going -- is simply not sufficient evidence for you

10 to find that this was intentional.  The cases show or say --

11 and we cite Waner vs. Ford Motor Company (phonetic) cited by

12 Broadcom, page three of its opening brief.  Has to be

13 engaged in litigation misconduct, vexatious, unjustified and

14 otherwise bad-faith litigation, a frivolous suit.  I'm going

15 to show you how this lawsuit is not frivolous, even when you

16 take all these documents into account.

17          The mere failure to collect and product these

18 documents, no matter how large the pile, the giving of

19 incorrect testimony, that does not constitute intentional

20 misconduct based on the record in front of you.

21          They have to prove intentional misconduct.  They

22 cite no cases to the contrary.  The case they handed you

23 this morning, I've already read out of it.  That just says

24 it goes to a sanctions hearing.  They're asking for an

25 exceptional case finding.  That's different.

125

1       We cite some cases, the <u>Right Height Corporation</u>

2  (phonetic) case, the <u>National Presco Industry</u> (phonetic)

3  case, all at page five of our brief.  It has to be

4  intentional.

5       You have enormous discretion.   Even in cases, as

6  we pointed out in our brief, where -- where inequitable

7  conduct is found, that doesn't always equal an exceptional

8  case finding.

9       So what is Broadcom's burden of proof to obtain

10 this exceptional case finding to get all of its attorney's

11 fees.  They have the burden of proof to show bad faith,

12 intentional misconduct, frivolous litigation by clear and

13 convincing evidence.

14      We cite the <u>Machinery Corporation</u> -- <u>Corp of</u>

15 <u>America</u> case, page five in our brief.  I don't think that's

16 in dispute.  I have not heard Mr. Lee say he doesn't have

17 this burden by clear and convincing evidence.

18      You tell the juries all the time when you read

19 that jury instruction about what clear and convincing is.

20 An abiding conviction that the truth of a fact is highly

21 probable.  Right?  Not as tough as a beyond a reasonable

22 doubt, but certainly tougher than preponderance of the

23 evidence.

24      So contrary to the characterization that he gave

25 the issue this morning, the issue is not did they not get

Exhibit A-127

126

1   some documents they should have.  We've conceded they should

2   have gotten the documents.  Not that the documents -- the

3   issue isn't whether the documents are inconsistent with a no

4   participation before December 2003.  We concede some of

5   the -- that the documents are inconsistent with that

6   position.  We've conceded that.  But that's not the issue.

7   That is not sufficient for you to find intentional

8   misconduct.

9        They are telling you on this record that they want

10  you to find the fact of perjury and intentional misconduct

11  by an abiding conviction that the truth of those facts is

12  highly probable.

13       We're going to go through that evidence and show

14  they've got their facts wrong once again.  They got the

15  facts right that there's a lot of documents and early

16  participation than Qualcomm thought, that those documents

17  should have been turned over, but they do not have by clear

18  and convincing evidence that this was an intentional coverup

19  at a point in time when the theory wasn't even in the case.

20       So I'm going to be suggesting, as we talk about

21  this, that they haven't met their burden.  They're not even

22  close.  They've got suspicions.  The volume of documents is

23  big.  The subject matter of some of the documents is very

24  relevant to what the underlying case was about.  Some of

25  those documents would have helped Broadcom.  Many of those

**Exhibit A-128**

127

1  documents would have helped Qualcomm.

2         Those documents, for example, about no IPR in the

3  standard, I can assure the Court if I had been standing here

4  arguing that waiver trial to you, I would have been arguing,

5  look at this evidence.  How can you find we waive something

6  we didn't even think we had.  What's the duty to speak?

7         I'm going to talk about this later, but I think a

8  lot of what's going on in this motion is like they're over-

9  reaching in the other motion.  They have another lawsuit

10  going against Qualcomm up in Orange County.  Their motives

11  are suspect, I think, your Honor.

12         I want to put up Slide 28 to show you what I now

13  want to talk about.

14         Broadcom contends intentional failure to collect

15  and product documents.  That's -- how equals an exceptional

16  case finding, how that there were intentional erroneous

17  positions.  Perjury, coverup, alleged coverup after trial,

18  waiver.  These are all the things he went through.  Maybe

19  not the exact order, but I want to hit them head on.

20         As to the first one, a failure to collect and

21  product documents, as I've been saying, Qualcomm has

22  acknowledged that they failed to collect and produce a lot

23  of documents they should have collected during discovery.

24  There is an April 9th letter you've seen.  It's to you and

25  to Broadcom.  Qualcomm, Qualcomm's lawyers, they've

Exhibit A-129

128

1  apologized for that.  They've said that some of those

2  documents are inconsistent with this position they took,

3  that there was no early participation in JVT.

4        The failure to collect these documents is not

5  because of intentional misconduct.  It may be failure.  It

6  may be grounds for an appropriate sanction.  That's in

7  another motion, your Honor.  The motion before you is

8  intentional misconduct, a request for all of their

9  attorney's fees.  They cannot meet the burden of proof.

10        I want to give some context to this failure to

11  collect and to produce the documents.  What are the real

12  facts?  They have two different document requests by

13  Broadcom starting in early 2006.  The first set of document

14  requests was for a total number of 88 document requests.

15  Three of those related to JVT issues.  The other 85 related

16  to infringement, damages and other issues.  Objections were

17  made.  Responses were given.  No motion to compel.

18        A second set of document requests were sent

19  totaling 28.  So now the total is 106.  Six related to JVT

20  issues, but 22 others related to infringement, damages and

21  other issues.  Objections and responses.

22        So of a total of 116 requests, this issue that

23  they say is so central to the case, only nine of 116 related

24  to JVT issues, 107 related to other issues.

25        So that's some of the context in which this

**Exhibit A-130**

129

1  failure occurs.  Does it excuse the failure to find the
2  documents?  No.  I think it helps explain it, though.
3         The volume of documents not produced is greatly
4  exaggerated.  They say 300,000.  Why is that true?  There's
5  a huge amount of duplication.  There's very broad search
6  terms that they asked Qualcomm to use when searching after
7  trial.  Qualcomm agreed.  Terms like this.  One term is AVC.
8  That's Alpha Victor Charlie, advanced video coding.
9         That combination of letters could come up in any
10 context.  Produced lots of extraneous documents.  Just H --
11 here's another H.264.  That's the standard.  This document
12 search they've asked us to go through has produced articles,
13 job applications.  Lots of stuff is in this pile of 300,000
14 pages.
15        So first of all, a huge amount of duplication.
16 Second of all, very broad search terms used after trial.
17 Third of all, not reviewed for responsiveness to their
18 discovery request.  If you it their search term, we sent it
19 to them.  They wanted it, they've got it.  Are there 300,000
20 documents that are all relevant to this JVT issue that he
21 only told you of 130 documents in his papers?  Absolutely
22 not.
23        Why is any of this important?  Well, I think it
24 shows they're over-reaching.  I mean, they're trying to make
25 it look bigger than it is.  Broadcom knows that they have

*Echo Reporting, Inc.*

**Exhibit A-131**

130

1 insufficient circumstantial evidence to show an intentional

2 and purposeful failure to find these documents as opposed to

3 an inadvertent failure.

4          What are the facts and circumstances that show

5 that Qualcomm was acting in good faith and not acting in bad

6 faith or with intent to conceal all of these documents?

7 Well, again, I want to put in context.  They make it sound

8 like Qualcomm made no effort to look for documents.

9          So the first point, the first contextual point is,

10 well, what is the volume of documents Qualcomm did produce

11 back at that time?  Well, it's over two million pages of

12 electronic documents.  That's almost 190,000 documents.

13 They're talking now here about something over 40,000 have

14 been recently produced.

15          Of those two million pages, tens of thousands were

16 e-mails and attachments.  So don't be misled by counsel's

17 comments in their briefs that there were no e-mails and

18 attachments produced earlier.  Tens of thousands of the two

19 million are.

20          Qualcomm, I submit, your Honor, exerted a

21 significant effort to collect and produce two million

22 documents.  I agree.  The effort was inadequate.  They

23 didn't get all the documents.  But it's absolutely

24 misleading for them to suggest that that's what they're

25 trying to do, that there was no effort.

**Exhibit A-132**

131

1        Just to put it into visual context, let's look at

2   Slide 16.  This is going to help show, I hope, two million,

3   140,000 pages of documents by simple math that I hope is a

4   correct -- and I'm not here as an expert.  Counsel can

5   object to this, but this is argument.  But if you multiply

6   those pages by the thickness of a page and you get that many

7   inches divided by a foot, you get how many feet tall, that

8   many pages of documents that were produced.  It's two

9   Imperial -- the Darth Vader buildings.  It's two of those

10  standing tall.  That's how many pages Qualcomm found and did

11  produce.

12        MR. LEE:  We have no objection to the analogy, as

13  long as it also applies to the 400,000 pages that came out

14  later.

15        MR. BOGGS:  I'm going to show him another slide in

16  a moment that may answer that question.  So you can --

17        THE COURT:  Can I ask you this question?  Of these

18  two million, did any of them have anything to do with JVT?

19        MR. BOGGS:  Yes.  As a matter of fact, they talked

20  about Ying Bao, B-A-O, last name, Bao.  Or maybe I have it

21  B-O-A.  Somebody tell me.  B-A-O.  He's a gentleman who they

22  deposed and who testified that he became involved I think

23  starting in December of 2003.  The standard was adopted in

24  May of '03, so he's later in time.

25        And as you heard the testimony at trial, what he

*Echo Reporting, Inc.*

**Exhibit A-133**

132

1 did was he went on the JVT website.  He downloaded all of

2 the JVT's earlier-in-time documents.  It must have been one

3 of the clues they had that there must be more documents

4 because it looks like this guy has been involved all this

5 time.  Well, he hadn't.  He was doing this to catch up and

6 understand what had preceded his coming on board.

7          So how many hundreds of pages or thousands of

8 pages of JVT documents that produced to them, but a ton.

9 All these JVT minutes.  If they didn't get them off JVT's

10 website, they got them through the production to our

11 production of Mr. Bao's documents.

12          THE COURT:  And he did that in 2003?

13          MR. BOGGS:  He did that in -- he came on board, if

14 my recollection is correct, in December of '03, downloaded

15 off the JVT website earlier in time, meaning 2002, 2001 JVT

16 documents.

17          THE COURT:  When did he do that?

18          MR. BOGGS:  In December of '03.

19          THE COURT:  That's what I thought you said.

20          MR. BOGGS:  Yes.  Okay.  So --

21          MR. LEE:  The record actually is, your Honor,

22 February '04 is when he did the downloading, is what the

23 evidence was.

24          MR. REGAN:  Yeah.  If you want to take a look,

25 it's --

**Exhibit A-134**

133

1          MR. BOGGS:  February '04.  I stand corrected.

2          THE COURT:  '04.

3          MR. BOGGS:  I thought it was December of '03.  A

4  few months later.

5          Let me go back to the slide we had on a moment

6  ago.

7          The point that I'm making by the two million

8  documents, your Honor, is simply Qualcomm exerted a

9  significant effort.  Broadcom had all of those documents.

10 What are those documents about?  Well, they're technical

11 matters related to the patents, they're contracts, they're

12 agreements, they're licenses, they're pricing, they're

13 communications, they're e-mails, they're organizational

14 charts.  They're all that kind of stuff.

15         It was a huge effort.  But you know what?  I

16 agree, it wasn't good enough.  Not because of an intentional

17 coverup, but it wasn't good enough.  More should have been

18 produced.  More has now been produced.

19         By comparison, now let's look at Slide 17.  Here

20 is what was the pre-discovery production of pages.  Here's

21 the post-production discovery of pages, 332,000 pages.  Our

22 document people tell you at least a third of those are

23 duplicate pages.

24         But you know, I don't want to overstate this, your

25 Honor.  Two hundred thousand pages of documents that didn't

Exhibit A-135

134

1  get produced, even if a whole bunch of those are not

2  responsive to the -- technically to the discovery request,

3  it's still a whole bunch of documents.  I just want to make

4  a simple point that you've got to keep this in perspective.

5  The perspective is, a lot of documents were found, a lot of

6  documents were turned over.  And yes, a lot of documents,

7  but nowhere near as many, were found after the fact and have

8  now been turned over.

9             Let me go back to the earlier slide.

10            Broadcom, I think, makes an incorrect assertion in

11  their brief.

12            Let's go to Slide 51.

13            Broadcom writes to you that Qualcomm did not

14  search the local e-mail archives of any of its employees.

15  If by that they're saying that Qualcomm didn't search for

16  e-mails on employer -- employee computers, well, that's just

17  flat out wrong.  We just talked about that.

18            Qualcomm produced 2.1 million pages, and Broadcom

19  knows many of those are e-mails.  Hundreds of thousands of

20  e-mails and attachments to e-mails, and they're collected

21  off of employer computer hard drives.

22            If they're saying by this statement -- didn't

23  search the local e-mail archives of any of the employees, if

24  they're trying to say, well, they didn't search an e-mail

25  archive and they mean a central repository, well, that's

**Exhibit A-136**

135

1 flat out misleading.  This company, Broadcom, in all of this

2 litigation against my client, Qualcomm, has taken enumerable

3 multiple custodial depositions in other cases.  They know

4 there's such -- there's no such central repository.

5          So any way you interpret this sentence, your

6 Honor, I think it's an erroneous position, an erroneous

7 position taken by counsel.

8          Do I think that's intentional?  Do I think that's

9 purposefully misleading?  No.  No more than do I think the

10 mistakes that Jim Batchelder may have made were intentional

11 or misleading.

12          Let me go back to the main slide.

13          Let me -- Broadcom cites to a case called Farber

14 in their paper, their reply brief on this motion,

15 exceptional case motion at page three for the proposition

16 that this case should be deemed an exceptional case.

17          Well, the Farber case didn't even involve

18 exceptional case allegations.  And what happened -- just to

19 put in context, what happened in Farber, F-A-R-B-E-R, is in

20 stark contrast to what happened here.  There, the document

21 production was a mere 666 pages.  That was in response to

22 200 requests for production.  Here, the document production

23 Qualcomm did make of two million pages was in response to

24 116 requests for production.

25          So what's my point?  Again, Broadcom is

Exhibit A-137

136

1 overstating the failure of what wasn't found and produced to

2 imply that the effort to collect was somehow misleading,

3 two, was intentional.  And it wasn't.  Does it excused

4 Qualcomm's failure to capture these specific e-mails?  No.

5          Let me go to a different point, a second point

6 that I want to make, which is all the times -- I'll just

7 point up there to number two.  But all this time -- I'm

8 still on the failure to collect and product documents.  All

9 the time that that's going on -- and this is something Mr.

10 Lee talked about this morning -- I said Broadcom's theory of

11 waiver wasn't yet in the case.  He said this morning it was.

12          We have a time line.  Let me show your Honor Slide

13 20.  Here's, again, context for -- were these documents that

14 were not found, were they in a circumstance of everybody

15 focusing upon a waiver theory and everybody focusing upon

16 that's in the case at this point.  The answer alleged

17 general waiver.  The people who allegedly lied in their

18 depositions are deposed in July.  Raveendran is in July.

19 Irvine is in July.  Ludwin is in early August.  Sullivan

20 right here is August 6th.  He's the JVT fellow.

21          Broadcom amends its interrogatory answer to add

22 implied license, equitable estoppel and unclean hands as

23 defenses.  It says nothing about waiver here.  It does say

24 something here, after discovery has closed, to suggest,

25 uh-oh, your activities at the JVT are important to this

137

1 case.

2         Well, all the documents and document requests and

3 required times to produce have already occurred.  Here on

4 the motion for summary judgment, I want to put up what Mr.

5 Regan said.  Slide 18.

6         In response to Mr. Lee's assertion, well, we had

7 asked for these kinds of documents in discovery, yeah, I

8 agree with that.  But here's Mr. Regan arguing to you on

9 December 5, 2006 where the debate is going on, should a

10 waiver theory even be allowed to go forward.  He says, but

11 the plea of waiver at the time was connected with general

12 lack of assertion by Qualcomm of these patents for a period

13 of time.

14         It was not connected to what occurred or more

15 appropriately did not occur in the standard setting body

16 organizations.  That came to light in the course of

17 discovery, in particular Mr. Sullivan's deposition, which

18 happened in the August time period late in August.

19         Does any of this excuse Qualcomm's not finding the

20 documents?  No.  It's an effort to put it all into context,

21 your Honor.  This was an infringement case, involved lots of

22 issues.  They had a few requests for production about JVT

23 activities, but they didn't connect the dots about all of

24 this until late.

25         I submit that Qualcomm and its lawyers didn't

138

1 connect the dots until even later.  But it's not evidence of

2 intentional misconduct, purposeful coverup, perjury by

3 witnesses who are testifying before this Mr. Sullivan is

4 even deposed.

5        Let me move on.  Broadcom has accused Qualcomm

6 of -- go back to that main slide.  Broadcom has accused

7 Qualcomm of hiding behind the attorney/client privilege and

8 not explaining the details of this inadequate document

9 search.  I want to just make two points in response to that.

10 We're here today on this record.  He suggest Qualcomm has

11 put into issue the performance of its lawyers.  No, it

12 hasn't.  We didn't bring this motion.  They brought this

13 motion.

14        They're saying the performance of the lawyers

15 constitutes intentional misconduct.  They cite a case in

16 their brief that's just flat out wrong, the Hamilton case.

17 You can read what we say about it, but it does not stand for

18 the proposition that when you aren't the one putting into

19 issue the conduct of your lawyers, if you say I can stand

20 here and say -- I can stand here and say I deny that they

21 acted in intentional and bad-faith ways.  That doesn't mean

22 I've waived the attorney/client privilege.

23        Broadcom forgets they have the burden of proof on

24 this issue of an intentional bad-faith failure to find these

25 documents because this was such a hot issue in the case,

**Exhibit A-140**

139

1  they say.  They have the burden of proof.  The burden of

2  proof on this record right now, not without -- not going and

3  saying they need -- you know, they told Judge Major -- I

4  don't know if you know this, but they told Judge Major in

5  the papers in front of her, stop the music.  Don't enter a

6  judgment.  We want to depose lawyers.  We want to start

7  taking depositions of Mr. Batchelder, Mr. Patch, all these

8  people.  We want to depose Qualcomm.  We want to get all

9  these facts.

10        But wait a minute.  They brought this motion on

11  this record at this time telling you, the Court, that they

12  have sufficient evidence on this record of clear and

13  convincing evidence of intentional misconduct.  They didn't

14  move to reopen the discovery before they brought this

15  motion.  They didn't move to reopen discovery before they

16  brought the sanctions motion.  They have the burden of

17  proof.  They have nothing but suspicions.

18        So let me just conclude this whole topic, number

19  one, about the failure to collect, introduce documents.  You

20  have two competing explanations, your Honor, intentional

21  concealment or, at best, an unreasonable or inadequate or

22  even negligent search.

23        I suggest at most it's the latter.  They have to

24  prove it was intentional by clear and convincing evidence.

25  They haven't even come close.  That test must be highly

*Echo Reporting, Inc.*

**Exhibit A-141**

140

1 probable.  They've failed to make that showing.

2          Let me go to Topic Number 2, erroneous positions

3 asserted by Qualcomm.  Let me just put up one of the

4 documents that they say -- they say that there was no

5 involvement in JVT position.  They say that Mr. Batchelder

6 and Qualcomm asserted repeatedly in papers, before your

7 Honor, before the jury, that there was no involvement in the

8 JVT before December of '03.

9          I've already -- I said at the very beginning when

10 I first stood up -- and Mr. Batchelder and Mr. Lupin have

11 said in letters, you know what?  They're right.  The

12 documents show that that position was inaccurate.  Why?

13 Because some employees did attend JVT meetings earlier than

14 December of '03.  They did have a consultant who did attend

15 some meetings.  Some of their employees attended some

16 meetings.

17          Let's put up Slide 27 so we see exactly what the

18 facts are.

19          There were eight JVT meetings before December of

20 '03.  The facts are clear.  Qualcomm did attend, through a

21 consultant or their own employees, four out of the eight.

22 There's no question about that.

23          THE COURT:  Is this an exhibit on your brief?

24          MR. BOGGS:  This is in the notebook that we've

25 handed to you this morning, your Honor.  Slide Number 27.

*Echo Reporting, Inc.*

**Exhibit A-142**

141

1           THE COURT:  Tab 27?

2           MR. BOGGS:  Before -- I said December.  Before

3  September of '03.

4           THE COURT:  Tab 27?

5           MR. BOGGS:  Slide 27.

6           THE COURT:  Slide 27 of what?  Is this in my

7  handout?

8           MR. BOGGS:  Could we have another binder?

9           THE COURT:  I have Qualcomm slides and documents.

10 What tab?

11          MR. BOGGS:  It's not a tab.  I think the slides

12 are numbered in the --

13          THE COURT:  Oh, numbered?  Numbered?  Page number?

14          MR. BOGGS:  Twenty-seven.  So there's a

15 miscellaneous slides tab, your Honor.  And go in the upper

16 right corner of the slides is a number.  Almost at the very

17 end.

18          THE COURT:  I have page 27.

19          MR. BOGGS:  Yep.  Go back to the slide.

20          So I'm talking about Topic 2.  Did Qualcomm

21 intentionally take or advance erroneous positions at trial.

22 One of the arguments that Broadcom has made is that Qualcomm

23 erroneously took the position that it didn't try to actively

24 influence the standing.  Well, we just spent a lot of time

25 in that earlier slide show on that very point.

*Echo Reporting, Inc.*

**Exhibit A-143**

142

1          Broadcom is wrong.  Any position Qualcomm took at

2    the trial is still correct today.  Qualcomm did not actively

3    attempt to influence the standard.  We've been over that.

4    No vote, no actual activity of verbal support.  Broadcom is

5    simply wrong.  The standard was adopted in May of '03.

6    Qualcomm did nothing before that standard was adopted in

7    '03.

8          The documents show, as we said before, some

9    consideration, but no votes, no substantive discussions

10   between Qualcomm and JVT about the standard, no technical

11   contributions.  None of that before May of '03.

12         So what is the evidence that Broadcom is putting

13   before you today -- Broadcom today to say Qualcomm made

14   efforts?  Well, we looked at it.  It was that Slide MM and

15   NN, verbal support and the thing we went over about voting

16   on the JVT proposal when it was simply voting for an ad hoc

17   group.  Those are the only evidence that they put in front

18   of you.

19         So my point is simple, your Honor.  To the extent

20   that this company Broadcom is accusing Qualcomm of

21   intentionally taking a false position at trial that they

22   didn't actively try to influence the standard, they've got

23   that wrong.  There still is no evidence before May of '03

24   that Qualcomm tried to actively influence the standard.

25         THE COURT:  Which bullet are you talking about

*Echo Reporting, Inc.*

**Exhibit A-144**

143

1  now, Bullet Number 2?

2          MR. BOGGS:  What?  Still on Bullet Point Number 2.

3          So let me go to the next bullet point.  What is

4  the truth?  What is the evidence regarding whether there was

5  perjury by the witnesses?  That means purposeful false

6  testimony.  That's what they say.  I say innocent failures

7  of recollection.

8          What are the points I want to make?  I want to

9  concede to you, as we have in the papers, that some Qualcomm

10 witnesses made some mistakes in their testimony.

11         The second point is, Broadcom accuses witnesses of

12 making mistakes in their testimony which they didn't make.

13 So they're right as to some of the allegations about the

14 mistakes.  They're wrong as to others.  And I'll show you

15 those.

16         As to the mistakes that Qualcomm witnesses did

17 make, they've wrongly accused those witnesses of perjury, of

18 knowing what to lie about in July and August about JVT

19 issues when Broadcom itself hasn't figured it out until

20 August, after the depositions were over, as evidence that

21 these people were smart enough to know what they should lie

22 about.  I don't think so, your Honor.

23         So who's the first witness that they accuse of

24 this?  Christine Irvine.  She was an engineer at Qualcomm.

25 At one time she headed up this project called Digital

**Exhibit A-145**

144

1  Cinema.   Yep, she was designated by Qualcomm as a 30(b)(6)

2  witness on a topic having to do with Qualcomm's involvement

3  in the JVT.

4          They falsely accused her of perjury.  She didn't

5  commit perjury.  She did make some mistakes in her

6  testimony, but they've pointed out some she didn't make.

7          Let me show you Slide 57.  This is one they talked

8  about this morning.  They say in their brief that she

9  falsely testified Qualcomm was not a member of the JVT.

10 See, that's out of their brief.

11         So let me just focus upon that.  Well, what did

12 Ms. Irvine say.  Let's go to your order.  Slide 58.  She did

13 testify, is Qualcomm a member of the JVT?  No, Qualcomm is

14 not.  Is Qualcomm a member of the JVT?  Very, very specific

15 question asked of an engineer.

16         What is the truth?  Qualcomm was not a member of

17 the JVT.  That testimony is correct.  How do I know that's

18 correct?  Their witness, Mr. Sullivan, Doctor Sullivan --

19 I'm not sure if he's a doctor -- the head of the JVT, he

20 testified technically the JVT doesn't have members.

21         Let's put up Slide 59.

22         What does he say here?  The JVT, since it's a

23 joint organization of MPEG and DCEG within the JVT, anyone

24 who is qualified to participate in any one of those

25 organizations is also allowed -- is also allowed to qualify,

**Exhibit A-146**

145

1  is considered qualified to participate in any JVT.

2           So anyone who is a member of or representative of

3  a member of an organization that belongs to ITU, T Study

4  Group or is a member -- is a person who is a qualified

5  delegate, they can go to JVT meetings.

6           Look up here.  Is Broadcom Corporation a member

7  organization of the JVT?  Well, the JVT itself doesn't have

8  members.  So when they ask Ms. Irvine a very specific

9  question, is Qualcomm a member of the JVT, she says no.

10 She's right.  A member of the MPEG, maybe a member of ITU,

11 but not a member of the JVT.

12          There's a lot of parent groups forming sub-groups.

13 You've seen all these names, the alphabet soup, your Honor.

14 You're going to have -- engineer a question.  You better

15 define your terms before you accuse someone of perjury.  You

16 better check your facts.  I think she got it technically

17 correct.

18          We'll go to a second point they accuse her of.

19 They accuse her of perjury because she was not aware of any

20 JVT meetings Qualcomm had attended.  Well, she was a

21 designated 30(b)(6) witness.  She was wrong.  She got that

22 wrong.  She should have known the answer.  She didn't.  Was

23 it perjury?  No way.  Was it refreshed memory because all of

24 these documents hadn't been found?  Absolutely.

25          Had she even ever attended a JVT meeting herself?

*Echo Reporting, Inc.*

**Exhibit A-147**

146

1  No.  We've now got all the documents.  She never went

2  through a JVT meeting.  She simply got it wrong.

3          Is the fact that she wasn't prepared for her

4  30(b)(6) testimony the morning news because of these new

5  documents?  No way.

6          Let's go to Slide 60.

7          This is a letter of July 14th, 2006 from

8  Broadcom's lawyers in this court to their Qualcomm lawyers

9  after Ms. Irvine testified.  And right here they're saying,

10  when asked what she had done to prepare for the deposition,

11  she testified that, saw the notice for the first time.

12  Other than counsel, she spoke to no one.  And she hadn't

13  reviewed any documents in preparation for her deposition.

14          So they were not misled in any way back at the

15  time of her deposition about the fact that, as to some

16  facts, she didn't have them correct.

17          They accuse Qualcomm in their brief, your Honor,

18  of misleading you and misleading the jury by putting her

19  testimony into the trial.  You may remember, but if not, I'm

20  going to remind you, Qualcomm didn't put her testimony on at

21  trial.  Broadcom did.  I'm not saying they don't have the

22  right to do that.  I'm not saying that Mr. Lee didn't have

23  the right to do exactly what he did as a very good lawyer.

24  He put on her testimony and then contradicted it with later

25  Qualcomm's witnesses' testimony.

147

1          But we're way past that.  We're now where he's

2   writing in his brief to you -- and you'll see it if you

3   haven't already when you read it.  He's saying that Qualcomm

4   proffered this false testimony to this Court.  Did no such

5   thing.  Broadcom read out of that lady's deposition at

6   trial, not Qualcomm.

7          Let me go to -- go back to the main slide.  Still

8   on erroneous positions -- I'm sorry -- on perjury by

9   Qualcomm witnesses.  Another witness they accuse of

10  committing perjury is Mr. Ludwin.  He was the replacement

11  30(b)(6) witness.

12         To the extent they are claiming he was poorly

13  prepared, I'm not going to quarrel with that.  He also

14  hadn't seen these newly produced documents.  He got some

15  things wrong.  But they're accusing him, at least in their

16  brief, of getting things wrong he didn't get wrong.

17         Broadcom is saying that he testified falsely by

18  saying that December 2003 was Qualcomm's first participation

19  in any formal JVT meeting.  Look at Slide 61.  Said he

20  offered false testimony claiming that.  So that's their

21  allegation.

22         Now I want to go to his actual deposition to show

23  you that he corrected his testimony.

24         Go to Slide 62.  Does it say page 50 on it?  No.

25  That is page 50.

**Exhibit A-149**

148

1          All right.  Prior to December '03, apart from a

2   meeting attendance, did any Qualcomm employees participate

3   in any way in the proceedings of the Joint Video Team?  So

4   that's from the earlier page 50.

5          So here we are directing your attention to the

6   first page.  You see the fourth line down, notation, ninth

7   meeting, San Diego, September 2005.  So this is --

8          THE COURT:  I'm sorry.  I'm lost.  I'm on page --

9   I'm on line 25 of some page, and I'm on line 14 of some

10  page.

11         MR. BOGGS:  I apologize.

12         THE COURT:  And there's two questions back to

13  back.  I don't know what we're doing.

14         MR. BOGGS:  Right.  This was the earlier question

15  where he had testified incorrectly about anybody prior to

16  December 3, did anybody participate in any way.

17         THE COURT:  And what was his answer?

18         MR. BOGGS:  I believe he said no.  So later in the

19  deposition, they give him an opportunity to correct that

20  testimony, and they're directing him to an exhibit that

21  relates to the September 9th meeting.

22         "Q    And you referred earlier to the

23              meeting of the JVT in San Diego at which

24              Qualcomm may have sponsored an event.

25              Do you recall testifying about that?

*Echo Reporting, Inc.*

**Exhibit A-150**

149

1          A     Yes, I do.

2          Q     Was that the JVT meeting in San

3     Diego from September to which you were

4     referring?

5          A     Yes, it is."

6          My point is, that is the same meeting that is

7     referred to in this document.

8          THE COURT:  I'm partially -- well, I can see

9     there's two subjects talked about there, but it doesn't seem

10    to me like that's a correction of the testimony up above.

11         MR. BOGGS:  Can you pull this down.

12         "Q     Is the social event Harbor Cruise

13         the event to which you were referring

14         previously in your testimony?

15         A     Yes."

16         So --

17         THE COURT:  I don't see a prior testimony about a

18    social event.

19         MR. BOGGS:  Well, and I apologize, your Honor.

20         THE COURT:  About a social event.  I don't --

21         MR. BOGGS:  I apologize.  We just haven't given

22    you enough of the testimony.  But the point is simple.  They

23    were -- they have been accusing this person of falsely

24    saying that in December '03, that was Qualcomm's first

25    participation.

**Exhibit A-151**

150

1    They later give him an opportunity in the

2    deposition.  And if we haven't submitted that deposition to

3    you -- but I believe we have.  It's in our briefing papers.

4    You will see that he corrects that testimony and makes it

5    clear that it's really September.

6         And my point is just a simple one.  Don't accuse

7    somebody who later corrects their testimony and gets it

8    right of perjury because they got it wrong in the first

9    instance.  And it's -- I don't want to spend any more time

10   on it because I don't have it clearly up in front of you.

11        Let me go to -- go back to that earlier slide.

12        Let me go to another person who is Ms. Raveendran,

13   Viji Raveendran, another person that they have accused of

14   perjury.  In their brief, they accuse her of perjury because

15   she misremembers the date she first heard of the JVT.  She

16   said it was 2003.

17        We have conceded she made a mistake.  She should

18   have remembered that it was in early 2002 or 2001.  She got

19   the date wrong.  What she did get right, but they still

20   accuse her of perjury about, is she said she learned about

21   it from press releases or trade journals.

22        Well, put up Slide 64.

23        Here is a December 2001 press -- MPEG press

24   release.  She didn't commit perjury when she said that she

25   learned -- first learned about this JVT.  It was formed.

151

1 But the trial evidence is in December of '01, here's an MPEG

2 press release -- highlight this yellow -- proving the Joint

3 Video team.

4          MR. LEE:  Your Honor, this is way beyond --

5 there's no evidence that she ever saw this.

6          MR. BOGGS:  Your Honor, they didn't put anything

7 in front of her.  She's in her deposition.  The question

8 that they're accusing her of perjury about is simple.  When

9 did you first learn of JVT and how did you learn of it?  She

10 gets the date wrong by at best a year, maybe a year and a

11 half.  Events she's testifying about that are three to four

12 years old.  They accuse her in their brief of not getting

13 correct how she learned about it.

14          They have offered no evidence to support that

15 contention that she could not have learned about it through

16 trade journals or press releases.  This is a press release.

17 There is evidence that there were -- it's in the public

18 record.  This is off a public website.   There's evidence in

19 the record.

20          THE COURT:  This is the one she said she saw in

21 2003 or 2004.

22          MR. BOGGS:  They never asked --

23          MR. LEE:  Right, your Honor.  We asked for a

24 proffer that that's a fact that she would testify to.

25          THE COURT:  Let's don't argue it.  I want to hear

Exhibit A-153

152

1  from you one at a time.  I understand what the problem is.

2           MR. BOGGS:  All right.  Your Honor, let me go to

3  another point that they put up today accusing Qualcomm of

4  not remembering that there was a JVT meeting that they

5  allegedly went to in February 26, '02.  And they put up an

6  e-mail that talks about stopping at Starbucks on the way to

7  this JVT meeting.

8           Put up Slide 67.

9           This is what they showed you this morning.  I

10  don't know if you remember it.  This is Viji talking about

11  Chris Irvine is going to go to the JVT meeting and will be

12  driving tomorrow.  We will meet at Starbucks.

13           Broadcom knows, your Honor, that there is no JVT

14  meeting.  Chris Irvine may have referred to it as a JVT

15  meeting.  It's a fact in the record there is no JVT meeting

16  in late February of '02.

17           They have the evidence.  They've already put it in

18  in front of your Honor.  They've asked these witnesses about

19  it.  There was a Geneva meeting in January 29 to February

20  1st of '02, before this.  There's later a May meeting of the

21  JVT in 2002.  There simply is no JVT meeting.  But they've

22  accused Qualcomm of lying or purposefully misleading by

23  saying that they went to this meeting and they testified

24  they didn't go to this meeting.  So there simply is no

25  meeting.

**Exhibit A-154**

153

1        So if you're going to accuse someone of perjury,

2   you better check the facts.   They have the facts.   There is

3   no meeting about this time.

4        So can I explain what she's referring to?   Well, I

5   can show you a document that they now have that they should

6   look at that might explain what she was referring to.

7        Put up Slide 68.

8        Right around that time -- here's a SEMTI

9   (phonetic) meeting.   This is a blowup of the beginning of

10  this document.   This is -- this is not JVT.   This is a

11  different organization.   They were having a meeting at that

12  time.

13       A much more plausible explanation than perjury

14  about attending a JVT meeting is Ms. Irvine, in that e-mail

15  we looked at a moment ago, miscalled -- misnamed the

16  meeting.   Counsel got up and said, well, I was referring to

17  a JVT sub-group meeting.   There's no evidence of a JVT sub-

18  group meeting.   The only meeting is a SEMTI meeting.

19       All right.   That's enough on Viji, your Honor.

20  There's more -- there's more we talk about in our brief,

21  more evidence where they have accused her of purposefully

22  not remembering things that she should have remembered

23  because look at all these e-mails.

24       Remember -- this is in the record.   On the day

25  that counsel has reminded you of, January 24th, 2007, this

**Exhibit A-155**

154

1 year, the second to the last day of the trial when she comes

2 to court and testifies about the 21 e-mails, one of the

3 questions that one of the lawyers asked her elicited a

4 response from her.  She says, I have 10 years -- 10 years of

5 e-mails on my computer.

6         So they're -- I guess I'll call it they're picking

7 on this lady, your Honor, who by the way, at the time of her

8 deposition, she's about to have a baby.  So they're accusing

9 this lady when she's about to have a baby of knowing what to

10 lie about having to do with JVT participation that Mr. Regan

11 says they didn't connect the dots about until the next

12 month.  And they didn't tell Qualcomm about even in

13 September, they didn't tell them about until December when

14 you had that hearing that's related to waiver.

15         She has 10 years of e-mails, and they -- I forget

16 the number.  He quoted some number to you, well, she had

17 this many e-mails relating to JVT.  She must -- how could

18 she not remember these events.  Well, she's got 10 years of

19 e-mails.  I can't even begin to think how many e-mails that

20 is.

21         They put up -- it's in their brief.  I can't

22 remember, quite frankly, if they put it up today as an

23 example of, come on, she knows all about JVT, that she has

24 on her resume -- put up Slide 71.

25         It is true -- that's not 71, is it?  72.  72.

155

1      Here's a part of her resume right here.  Listed
2 with this alphabet soup of standard organizational names as
3 part of her background is JVT.  Part of this ITU, ISO.
4 What's so terrible about that?  She testified truthfully at
5 the trial and in her deposition that from some point after
6 the standard was adopted, she did become heavily involved in
7 the extensions.  That's the posted option period.  It's not
8 improper to put it on here.

9      Does that mean she should be remembering in July
10 of '06 when she's deposed events of '01 and '02 when she
11 hasn't had the documents put in front of her to remember?  I
12 say no.  I say -- I do say exactly what he said.  Innocent
13 misrecollection.  Should have been prepared better, but not
14 evidence of her purposefully misleading anybody.

15      I want to go to the next topic.  Let's go back to
16 the main slide.

17      There is more in our brief, your Honor, about this
18 claim of perjury.  It doesn't happen.  Let's go to this
19 alleged coverup of the 21 e-mails.  Broadcom makes much of
20 this.  They make very serious charges about Mr. Batchelder
21 and his firm.

22      I want to look at a time line that we've prepared
23 for you that will help me recap what occurred.  Slide 29.
24 It's a busy slide.  It has a lot on it.  You have a copy of
25 this.  It's in your book up there.  Slide -- page 29 in the

**Exhibit A-157**

156

1 upper right corner.

2          The first event, there's no disagreement on this.

3 They have been told about these events after the trial in a

4 telephone conversation they had with Mr. Lee Patch.  That's

5 how they know on January 14th, in her trial preparation, 21

6 e-mails were discovered.

7          A side bar occurred on January 18th.  Their

8 assertion to you is that because Stan Young, one of the

9 attorneys, a Heller attorney from Qualcomm, represented to

10 you -- and he did --

11          THE COURT:  You say from -- you mean for Qualcomm?

12          MR. BOGGS:  For Qualcomm.

13          THE COURT:  For Qualcomm.

14          MR. BOGGS:  For Qualcomm, a Qualcomm attorney.  He

15 represented to you that -- when there was this fight over

16 whether or not the e-mail address document gets into

17 evidence, he said -- because I've read the record.  Well, no

18 e-mails were received by Ms. Raveendran.  He said that to

19 you.

20          Their argument this morning and in their papers

21 is, well, there were other people on January 18th at the

22 side bar, including Mr. Batchelder and Mr. Casebeer and Mr.

23 Young from the Heller firm.  And they are asserting that

24 somehow the Qualcomm attorneys acted improperly because they

25 didn't speak up and say, wait a minute, don't say that.  We

**Exhibit A-158**

157

1  know about these e-mails.

2          Here's what happened, your Honor.  And I can have

3  Mr. Batchelder represent this to you as an officer of the

4  court.  But you know what?  They're just waiting to pounce

5  on me and say, there's been a waiver of the privilege.  Now

6  we want to take a bunch of depositions.

7          Here's a two-law firm lawyer team working up a

8  complicated case involving lots of issues.  They're very

9  compartmentalized.  The facts are, Jim Batchelder standing

10 at side bar does not know of the existence of those 21

11 e-mails.  Mr. Stan Young who made the statement to you that

12 there were no such e-mails doesn't know of them at all, and

13 he wrote a letter about that, and I don't think they're

14 challenging that.

15         And Mr. Craig Casebeer does not know at the time

16 he's standing at side bar about those e-mails.  And you

17 know, can you fault trial teams from two different law firms

18 for being too compartmentalized.  The left hand doesn't know

19 what the right hand is doing?  Yeah, you can do that.

20         Do they get to take depositions to develop all of

21 that?  I say no.  They are here right now on this record

22 accusing these people of knowing of the existence of those

23 e-mails standing at side bar and keeping silent.  That did

24 not happen.

25         If you want Jim Batchelder right here right now to

Exhibit A-159

158

1  make an officer of the court representation to you, I'll

2  have him do that.  But what I'm worried about is this good

3  capable trial lawyer sitting to my left is going to say,

4  ah-ha, waive the attorney/client privilege.  I do not want

5  to waive any attorney/client privilege or any -- probably

6  not even that.  It would be work product.

7         But if you need that, I will have Mr. Batchelder

8  make that representation about his state of knowledge and

9  his partner's.  They simply did not know.  Somebody can

10 argue, somebody -- you can admonish him in the future, you

11 better know what your trial team is representing.  They

12 simply did not know on January 18th that that statement was

13 incorrect.

14        And you know, he'll tell you, his state of mind,

15 he didn't know until the time Viji is on the stand on the

16 24th, if you look at that time line.  And I skipped forward

17 to the 18th.  They've raised questions about, well, what

18 happens from January 14th to January 18th?  They're learned

19 about on the 14th by some Casebeer lawyers preparing Viji.

20 Unfortunate.  Lawyers are not talking among the trial team.

21 Information is not shared.

22        Between the 14th and the 24th -- I'm skipping

23 ahead to the 24th when Viji takes the stand.  They're

24 saying, well, why aren't the e-mails turned over between the

25 14th and the 24th?  They know the answer.  They don't need

159

1  any lawyer, officer of the court representation or any

2  depositions.

3       They were told on February 7th, I believe it is,

4  in a phone call -- you can call it a meet and confer that

5  they had with Mr. Lee Patch, why aren't these e-mails being

6  turned over?  Or why weren't they turned over in that 10-day

7  period, and why aren't they -- he answers, we deem that

8  these e-mails were not responsive to your discovery request

9  as narrowed by our objections.

10      These folks engage in a war of letters about these

11  21 e-mails starting on February 7th.  And the Heller letter

12  is really a letter of acknowledgment or apology and a

13  statement that he doesn't know about the 21 e-mails on

14  February 8th.

15      Qualcomm's letter back on February 16th responds

16  to Broadcom's letter about the 21 e-mails.  In that letter

17  written by Adam Bier, B-I-E-R -- this letter is in the

18  binders.  It's part of what you have up there.  You'll see

19  it when you go through all of this.

20           THE COURT:  What page is that?

21           MR. BOGGS:  Which what?

22           THE COURT:  What page is that?

23           MR. BOGGS:  It's not in that binder, your Honor, I

24  don't believe.  It's in the binders that are part of the

25  trial briefs.

*Echo Reporting, Inc.*

**Exhibit A-161**

160

1       And while I'm talking, if somebody can get me a

2  cite for it, that'll help.

3       MR. FOSTER:  Your Honor, it's Exhibit Q to the

4  reply brief.

5       MR. BOGGS:  Q to the reply brief, Qualcomm's reply

6  brief.  A reply brief or opposition brief.

7       MR. FOSTER:  Reply brief.

8       MR. BOGGS:  To the reply brief.

9       THE COURT:  Letter of who?

10      MR. BOGGS:  Adam Bier.  It was referred to on that

11 time line in front of you as the letter of February 16th.

12 There's four letters that go back and forth on this topic,

13 your Honor.

14      THE COURT:  I don't have a February 16 -- oh,

15 February 16.  I see it.

16      MR. BOGGS:  Yeah.  See, the first letter -- and

17 this will be in the binders of exhibits -- is the Broadcom

18 letter, February 7th.  And it's saying about a meet and

19 confer phone call which I misspoke a moment ago and said it

20 was February 7th.  The phone call was on February 1st.  Lee

21 Patch of Jim Batchelder's office is saying on February 1st,

22 we didn't deem that those 21 e-mails were responsive to your

23 discovery request.  February 7th is saying, how can that be.

24      February 16th is Qualcomm's letter back to Adam

25 Bier.  Adam Bier is not taking a frivolous position.  He is

Exhibit A-162

161

1   a former law clerk of Magistrate James Stiven.  You can read

2   these letters.  These are like so many other discovery

3   letters that you see.  One side says, we asked for it.  The

4   other side says, you didn't ask for it.  Here's the reasons

5   why.  We narrowed our discovery request.  Reasonable minds

6   can differ as you read those letters.

7          My point is, these letters are not frivolous.  A

8   former law clerk of Jim Stiven did not take a frivolous

9   position.  Broadcom is up there calling this a coverup.

10  It's not a coverup.

11         What happened from January 14th until January

12  24th, when Viji Raveendran takes the stand, is an exercise

13  of judgment by trial counsel in the heat of battle when they

14  learn of 21 e-mails that are on this lady's hard drive, and

15  the exercise of judgment is they're not responsive.  And

16  they defend that judgment in these letters that I'm

17  referring you to that you should read.

18         Would everybody have made the same judgment?  That

19  isn't the question.  The question is, did they intentionally

20  and in bad faith withhold those from the other side and from

21  your Honor.  And you know the most compelling evidence, your

22  Honor, of why -- why they did not?  It would have been so

23  simple to do that.  They didn't put Viji Raveendran on the

24  stand on January 24th.  Qualcomm, Mr. Batchelder re-called

25  her -- didn't re-call her -- called her as a witness.  They

*Echo Reporting, Inc.*

**Exhibit A-163**

162

1 played her deposition.

2        If this was a plot to keep from the Court and the

3 jury and Broadcom from ever knowing of the existence of 21

4 e-mails, the easiest, simplest way to execute that plot is,

5 you don't put her on the witness stand.  Nobody ever runs

6 the risk that they learn of 21 e-mails.

7        The second easiest thing to do if you're as low in

8 this as they're portraying these lawyers and Qualcomm, put

9 her on the witness stand, and when he comes up with the most

10 obvious cross-examination question in the world, did you get

11 any e-mails?  No.  She didn't give that answer.  She

12 testified truthfully.  As a matter of fact she went more

13 than testified truthfully.  She volunteered without even

14 being asked how the e-mails had been found 10 days before.

15        So do they have highly probable evidence that well

16 respected lawyers, some who have practiced for 20 years,

17 intentionally hid evidence from this Court about that under

18 circumstances where they are the ones who put her on the

19 stand where she testifies truthfully to the question, did

20 you get e-mails?  They don't have that kind of evidence,

21 your Honor.

22        I think their motives for bringing this kind of an

23 outrageous charge about what happens in the heat of battle,

24 when trial counsel are making difficult decisions, exercises

25 of judgment, I think it's suspect.  They have another

163

1  lawsuit going.  They're looking for every advantage that

2  they can get.

3          They call it a carefully crafted direct

4  examination.  If you want deceive the Court and you want to

5  deceive the jury, you don't have any examination at all.

6  You just don't bring her.  Then they could stand up and

7  argue they don't have any evidence that she got any e-mails.

8  They could have made that argument.

9          They brought her.  They brought her for their own

10  strategic reasons.  We can argue whether that was smart or

11  not smart, but it certainly proves they weren't trying to

12  hide anything.  She didn't lie.  When she was asked, she

13  told the truth.

14          So we've talked about what he talked about, the

15  period of time January 14th up until what happened at side

16  bar on January 18th.  We've now talked about from January

17  14th all the way up to January 24th, when she gets on the

18  stand.  The e-mails are revealed.

19          The other thing they talked about -- and it's on

20  this time line -- is on -- I don't see it on this time line.

21  Do we have another time line, 29?  Slide 29.  I want to talk

22  about the JMOL.  What am I missing, January 24.

23          MR. FOSTER:  The third entry, 1/24.

24          MR. BOGGS:  All right.  The problem when you only

25  wear one contact lens.

164

1          THE COURT:  The JMOL --

2          MR. BOGGS:  Right there.  Yep.

3          THE COURT:  -- is the third one down.

4          MR. BOGGS:  Big as life.  My nose on my face.  I

5    can't see it.  January 24th.  They say, well, how can

6    this -- here are the facts.  Before Viji gets on the stand,

7    before anybody gets on the stand, this document is file-

8    stamped.  It's filed first thing in the morning.  It's a

9    brief written by a trial team that was as in the dark about

10   the existence of those e-mails as Mr. Batchelder and Mr.

11   Casebeer were when they were standing at wherever the side

12   bar was.

13         THE COURT:  How many -- how many blind people did

14   you have on that team?

15         MR. BOGGS:  Well, not me, but they had a number

16   of --

17         THE COURT:  You had people getting -- discovering

18   e-mails on 1/14, you had other people writing JMOL brief,

19   you had other people talking to the Court at side bar, and

20   you had other people arguing the handling of the cross

21   examination?

22         MR. BOGGS:  You're absolutely correct.

23         THE COURT:  Everybody communicating with nobody?

24         MR. BOGGS:  Well, the evidence would suggest there

25   was no good communication among the Day, Casebeer people

165

1 internally within their camp or even with the Heller law

2 firm.  And I'm not disputing that.

3          What I am disputing is whether there was

4 intentional, purposeful attempt to deceive this Court and a

5 jury.  And I'm saying no way, Jose, because it would have

6 been so easy, so easy.

7          Because what happens right after this statement is

8 made on January 24th, first thing in the morning in this

9 brief?  You go through the whole trial day.  The next day is

10 the 25th.  I understand argument is on the 25th.  So

11 Wednesday is the 24th.  Thursday is the 25th.  I understand

12 you had no proceedings in this court on the 26th.

13          There is a discovery of error in that brief over

14 the weekend.  The next court day, Monday, January 29th, you

15 received a letter -- Broadcom got that letter -- noting the

16 mistake in the brief and the mistaken statement at side bar.

17 The mistakes in the brief are retracted, and the statements

18 at side bar are retracted.

19          Do we have that as an exhibit to put up on the

20 board?  January 29?

21          Okay.  This is in the briefing papers as Exhibit D

22 to -- they have it in their briefing papers.  Broadcom's

23 briefing papers contains this letter I'm talking about to

24 the Court three court days after.  It's Exhibit D to their

25 moving papers for exceptional case.

166

1          So was a mistake made in that brief?  You bet
2    there was.  Was it owned up to and retracted almost
3    immediately?  At three court days later.  It is evidence of
4    a mix-up.  Call it a screw-up.  Call it miscommunications on
5    the trial team.  But your Honor, I say you cannot call that
6    brief, when it's retracted -- there was no way it was going
7    to mislead the Court because it's for a JMOL hearing that
8    hadn't even occurred yet.  So you get a corrected brief
9    before there's ever a hearing.

10          THE COURT:  The case was argued on the 25th?

11          MR. BOGGS:  The closing arguments was on the 25th.

12          THE COURT:  Jury deliberated on the 26th?

13          MR. BOGGS:  Jury is deliberating.  They're not
14    reading that brief.

15          THE COURT:  They reached a verdict on the 26th?

16          MR. BOGGS:  I'll have to defer to counsel.

17          MR. LEE:  That's correct.

18          MR. BOGGS:  Okay.  But that brief is to your Honor
19    for a hearing on a matter that hadn't been heard yet, and a
20    new brief gets submitted that's corrected.

21          THE COURT:  The correction was made on the 29th.
22    That was after the verdict had been recorded.

23          MR. BOGGS:  After the verdict.  But it is in no
24    way addressing the verdict.  Because the jury, as I read the
25    transcript -- the jury is not being misled about anything

*Echo Reporting, Inc.*

**Exhibit A-168**

167

1 having to do with the 21 e-mails.  They've seen them.  I

2 mean, here's another point, I guess, in all of this, your

3 Honor, is all of these document nonproduction issues, if

4 anything could have worked to the benefit of Broadcom and

5 the detriment of Qualcomm more than to have your Qualcomm

6 almost last witness severely impeached -- because they do

7 put her on the stand.  She does tell the truth.  And in

8 front of the jury and you, the Qualcomm lawyers and Qualcomm

9 loses credibility over what they thought were the true

10 facts, the true facts they thought were minimal

11 participation before December of '03.  And they got that

12 wrong.  And it blew up in front of them because here's an e-

13 mail.  They lost credibility.  They lost the case.

14          You know, hindsight is a wonderful thing.  Easy

15 for me because I wasn't involved to stand here and say,

16 well, huh, too bad Qualcomm didn't find all these documents,

17 turn them over to these guys, never take any of those

18 positions.  They didn't even need to assert this minimal

19 participation theory because a far better argument is their

20 theory -- not their theory, the facts, as all these

21 documents show.  No active effort to influence the standing.

22 No technical submission.  Written rules don't require a

23 disclosure unless there's a technical submission.

24          What's the conduct of the other 500 people?  Well,

25 they're all doing what we think the rules are.  Technical

**Exhibit A-169**

168

1 submission?  Okay.  You've got to turn something in.  No

2 technical submission, you don't.  That's what almost all of

3 the 500 have done except one or a few.

4          Your Honor, I want to go to the next topic.  Let's

5 go back to that earlier slide of topics.  Alleged coverup

6 after trial.  What are the facts about that?  I mean, as I

7 listened to counsel -- as I listened to counsel, there's an

8 issue about whether Qualcomm moved quickly enough after the

9 trial, after the verdict in response to some alleged request

10 to look for e-mails on February -- February 7th in a phone

11 call.  Because I don't know of any letter.

12          You go back to this time line -- go to Slide 75.

13 That doesn't look right.  Is that 75?  Go back to 29.

14          Mr. Lee has said that there was some earlier

15 demand for a search for documents.  Well, here's a letter of

16 February 7th.  I don't think it's in there.  If this is as

17 important as they are saying it is, that they're demanding a

18 search for documents, I say the first time that happened, at

19 least based on the written record -- and these guys know how

20 to write letters, especially about things they think is

21 important -- is February the 5th.  It's in that letter.

22 You'll see that.  It's in the briefing papers.  March 5th.

23 I misspoke.  I'm sorry, your Honor.

24          What's going on in here is a discussion of whether

25 these 21 e-mails were responsive or not to the discovery

169

1  request.   That discussion is still going on in this Broadcom

2  letter of the 5th.   But this is the first written letter

3  that I'm aware of.   I'll be glad to look at any other

4  letter.   But you know what?   Here's what I think is

5  important.   If Qualcomm, in fact, didn't respond as quickly

6  as they claim, they certainly responded two days after they

7  got a written request.   And they said, we'll search.

8          And an enormous search has now occurred from March

9  the 7th all the way up to June 15th, the last entry on that

10  time line.   An enormous search.   The search has gone beyond

11  what they even asked for.   As he pointed out this morning, I

12  had him go search for hard copy documents, not just soft --

13  e-mail documents.

14          And I just think they're making a gray over-

15  reaching argument to contend that after the trial, there's

16  some ongoing effort to cover up the existence of other

17  documents by referring to this -- a discussion that's going

18  on about the responsiveness of 21 e-mails.   And the first

19  written document ever demanding them is on the 5th.

20          Your Honor, they made a -- I'm going to go to

21  another topic.   Go back to the main slide of points.

22  They've made an argument in their brief and slightly made

23  this argument this morning, that the mere finding by you of

24  waiver makes this an exceptional case that shifts the

25  attorneys' fees obligation.   Well, your waiver finding is

*Echo Reporting, Inc.*

Exhibit A-171

170

1 not equivalent or analogous to a determination of

2 inequitable conduct before the PTO.  We talked about that.

3 We looked at that earlier.  Inequitable conduct is something

4 that was thrown out in this case.  That requires intent to

5 deceive.  Waiver does not.

6        The Federal Circuit, your Honor, has recognized

7 that even a finding of inequitable conduct does not

8 necessarily result in an exceptional case determination and

9 an award of attorney's fees.  Cases on that are cited in our

10 brief. The Federal Circuit has pointed that out.  So, they

11 first say, well, waiver makes this an exceptional case, then

12 make an argument on some public benefit theory that that

13 makes this an exceptional case.

14        Well, they lost their inequitable conduct claim,

15 and in the Federal Circuit -- there's cases in our brief --

16 the Federal Circuit rejected Broadcom's public good theory

17 in a case called J.P. Stevens Co.  It's at 822 F.2d, 1047.

18 We have a slide that has the sound bite out fo this, slide

19 95.  They're just making an erroneous legal proposition.

20 You'll find this when -- that doesn't look like -- yes, this

21 is.

22        In that case, they're speaking, "Moreover the

23 statute, exceptional case does not contemplate that a

24 prevailing alleged infringer should be treated as a private

25 attorney general for invalidating a fraudulent patent.

*Echo Reporting, Inc.*

**Exhibit A-172**

171

1  Rather, its purpose is to provide discretion where it would

2  be grossly unjust that the winner be left to bear the burden

3  of his own counsel which prevailing litigants normally

4  bear."

5          So, this private attorney general theory is a

6  theory that both because we invalidated the patents -- first

7  of all, they lost on inequitable conduct, so they haven't

8  invalidated the patents.  But, even if you had, that theory

9  of public good is not a basis, the Federal Circuit says, for

10 a finding of exceptional case.

11         Here, as you recall, Qualcomm fully complied with

12 the parent body of rules to protect the public by its offer

13 of fran (phonetic) licensing in 2006.  The public good is

14 well-protected.  Qualcomm will offer fran licenses.

15         Let's go to the bullet-point slide, and I think

16 I'm just about on the last, if not on the last bullet point.

17 They make an allegation this lawsuit was frivolous.  I

18 earlier, when I first got up, I argued that their argument

19 that this case didn't need to be tried, that this case would

20 go away by summary judgment motion, that of all these

21 documents that have been revealed, this court and Broadcom

22 wouldn't have been forced to endure the time and expense of

23 trial.  I said that is just specious, your Honor.  Your

24 order makes clear that this case required a trial on the

25 numerous factual issues that go way beyond the extent of

Exhibit A-173

172

1  Qualcomm's participation at the JVT.

2            I want to show you of the issues.  You wrote about

3  them in your order.  Let's go to slide 76.  That doesn't

4  look like the part -- I want to find the part that says,

5  "whether the participants in JVT."  Is that on that page?

6            THE COURT:  It looks to me like part of the jury

7  instructions.

8            MR. BOGGS:  What do you have in slide 77?  No.

9  Your Honor, let me -- they can look for it.  Let me just

10  read to you out of your order.  These are two of the issues

11  of fact that in no way would have gone away because of these

12  new papers.  Here's one of the issues of fact that you tried

13  in the waiver trial.  "Whether the participants in JVT as a

14  whole considered the standard setting body to impose such a

15  duty to disclose relevant patents even if the duty to

16  disclose is not expressly stated in the written policies of

17  the standard setting body."

18            That was your way of saying we've got to look at

19  the conduct of these other members.  That's a question of

20  fact.  All of these 300,000 pages of documents that they

21  keep talking about, they, in no way, make that triable issue

22  of fact go away about those other participants, and I've

23  been arguing, in fact, what these new documents show is

24  Qualcomm had a much better position, because these documents

25  show, as your court order shows, Qualcomm, if it observed

Exhibit A-174

173

1  what the other 500 people are doing, they're only submitting

2  their disclosures if they'd made a technical submission.

3       The other question of fact that you talked about

4  in your order is, "Whether Qualcomm had knowledge that the

5  104 and 767 patents may reasonably be essential to the

6  practice of the H.264 standard while it was a member of the

7  JVT."

8       So -- so, that's an issue we've been talking about

9  today.  What did Qualcomm understand and consider as to the

10 essentiality of its patents to the standard.  You correctly

11 said that's an issue of fact.  You've got that absolutely

12 correct.

13      All these documents, all these 300,000 documents,

14 they don't resolve that issue of fact in favor of Broadcom.

15 As a matter of fact, this is the one I said earlier that,

16 had I been here and I had these facts that we now see in the

17 record, I think we could have convinced your Honor that

18 there's no unwritten duty to disclose when the company that

19 you're asking to disclose thinks we don't have any IPR.

20 That's what Qualcomm had concluded at that time.

21      So, that issue of fact, what did Qualcomm know

22 about its own patents and their relationship to the

23 standard.  That was a hot issue of fact, it doesn't go away.

24 Certainly, we're going to have a waiver trial.  You know who

25 really recognized early on and he convinced your Honor about

*Echo Reporting, Inc.*

**Exhibit A-175**

174

1 all these issues of fact, and particularly the issue of fact

2 about conduct of members, is Mr. Regan.  He argued to your

3 Honor at the summary judgment hearing.

4        Look at slide 78 that I'm going to put up here.

5 Here he is.  And he was -- he was right, but in a different

6 way.  He says, "But, whether there is or isn't a duty in

7 this case, given the fact that it's based on conducts of the

8 standard-setting organization.  Underlying that is a factual

9 question.  All the things we've been talking about here for

10 several hours, these are facts.  Those facts have to be

11 evaluated, and then, a conclusion has to be reached about

12 whether there's a duty or not.  All these new documents,

13 they don't remove that question of fact that he pointed out

14 and convinced your Honor with back on December 5th as to why

15 you had to have a trial.

16        Your Honor, I'm going to skip some remarks that I

17 was going to make about whether or not the 767 patent was

18 even -- whether that issue about that patent, whether the

19 issue that was tried about that patent, even related to the

20 standard.  It didn't.  So, all these new documents about

21 participation, the simple point is Qualcomm would have and

22 could have, and still could, had we not yet had a trial, go

23 forward o an infringement case on the 767 patent.

24 Qualcomm's expert didn't attach that at all to the standard,

25 the H.264 standard.  He alleged that the Broadcom product

**Exhibit A-176**

175

1  software design infringed the 767 patent.  That's Doctor Ian

2  Richardson.

3       And as to the 104 patent, the allegation was is

4  that Broadcom infringed that patent based on numerous patent

5  claims, only one of which was asserted to be essential to

6  the H.264, claim 59.  And so, as to the other 104 encoder

7  claims 3, 4, 5, 7 and 13, they were not being argued that

8  they were essential to the standard.  So, all of these

9  documents that they're talking about that now show more

10 participation than Qualcomm understood, all these documents

11 that now show Qualcomm at the earlier point in time didn't

12 think practicing the standard would in infringe its patents,

13 they don't mean that they're still wouldn't be an

14 infringement trial or a waiver trial.  There absolutely

15 would have.  There were other issues that are unaffected by

16 those documents that were tried and should have been tried.

17       Let me just wrap up this way, your Honor.

18 Broadcom has brought an extraordinary motion for an

19 exceptional case finding.  They've also brought a motion for

20 sanctions.  At the end of the trial, Mr. Lee asked you to

21 immediately hear his sanction motion.  You said, no, I've

22 got another trial starting, bring it down the road.

23       In the meantime, what happened was they made a

24 request that Qualcomm look for documents.  Qualcomm found

25 documents, and now we've got a lot of documents.  He has

**Exhibit A-177**

176

1 taken the fact of all those documents that were not produced

2 before, should have been produced before, and inflated that

3 into an argument that it shows intentional and perjurious

4 misconduct -- an exceptional case finding.

5        I don't think, on this record, it requires clear

6 and convincing evidence, highly probable facts of perjury or

7 intentional misconduct that you can make that finding.  It

8 is simply not there.  Mistakes were made.  Documents should

9 have been produced.  They have a sanctions motion before

10 Judge Major that properly belongs in front of Judge Major.

11 We're prepared to talk to her or you, because, as I said

12 before, many, if not all of the same underlying facts -- and

13 that's what they're going to talk to Judge Major about.

14        They're going to talk about whether or not there

15 should have bene a trial.  They've put some of that in these

16 papers and that's why I've been talking about it here.

17 There, they're not going to be presumably saying it's

18 intentional.  There, they're just going to say, hey, there

19 was a violation of the discovery rules, whether it's under

20 Rule 11 or just under the rules.  They're going to say some

21 redress should occur because of that.

22        And you know what I'm going to tell Judge Major,

23 or you, if you decide to hear this motion, as maybe you

24 should since you've already heard all this argument today --

25 otherwise, we're going to go through it all a second time

**Exhibit A-178**

177

1 with Judge Major on July 10th -- is, and I've said this in

2 our papers to her, we're prepared to talk to the Court about

3 a reasonable and meaningful sanction for that violation of

4 the discovery rules.

5          What I'm telling your Honor at this time and this

6 place, is there is not evidence in this record by a clear

7 and convincing burden of proof showing that intentional

8 misconduct for efforts to deceive the Court occurred.  You

9 started out the hearing correctly by saying that is

10 Broadcom's burden, not Qualcomm's.  They have failed to meet

11 that burden on this record, your Honor.

12          THE COURT:  Thank you, Mr. Boggs.  Do you have a

13 response, Mr. --

14          MR. LEE:  I do.

15          THE COURT:  How much time do you think you're

16 going to want?

17          MR. LEE:  Probably a half hour or so, your Honor.

18          THE COURT:  A half hour?

19          MR. LEE:  Yeah.

20          THE COURT:  Let's take a ten-minute recess.

21     (Proceedings recessed briefly.)

22          THE COURT:  All right, Mr. Lee, you may proceed.

23          MR. LEE:  Thank you, your Honor.  Your Honor, Mr.

24 Boggs began his argument by saying that he had something

25 that he wanted to get off his chest, and I have to confess,

178

1   your Honor, I do, too, and I want to get it off my chest at

2   the outset as well.

3           I took your Honor's admonition at the outset of

4   this argument quite seriously, being precise about the

5   difference between being incorrect and being untrue or not

6   true.  And I think your Honor knows -- we spent all of

7   January together -- we, on behalf of Broadcom, did our

8   darndest to be extremely precise, extremely careful, and not

9   to misrepresent or mislead.  When I closed to this jury, I

10  remember standing right here and saying that, in my rebuttal

11  closing, I don't really understand it, but there's been

12  constant accusations that Broadcom is misrepresenting and

13  misleading you, words that I didn't use in my opening

14  argument today.  And then, today, what do we hear?  Broadcom

15  is outrageous, preposterous, misleading, misrepresenting,

16  specious, and our motives are suspect.

17          Your Honor, those are extraordinary allegations

18  and assertions for Qualcomm to make against Broadcom and us

19  as counsel, who've been here throughout the case, when it's

20  Qualcomm that withheld 21 documents in the middle of a

21  trial.  It's Qualcomm who represented they didn't exist.

22  And when we stood up at that sidebar, my best memory is that

23  Mr. Lee Patch, on January 18th, was right there with us, and

24  he is the person who put Vege Rivejeron (phonetic) on on

25  January 24th, and at a sidebar after the issue arose, your

179

1 Honor asked him about those and he said he knew about them.

2 And Mr. Boggs didn't mention Mr. Patch at all, and there's a

3 reason.   He is the person who got the e-mails on the 14th.

4 He is the person who prepared Rivejeron.   He's stood at the

5 sidebar when Stan Young made that representation, and he is

6 the person who put her on.   Now, Mr. Boggs said I asked the

7 most obvious cross --

8           MR. BOGGS:   Your Honor, this may be the only time

9 I interrupt.   There's no issue as to who was there.   There

10 is a transcript.   Your court reporter made a transcript of

11 who was at sidebar.

12           THE COURT:   Well, he's referring to more than

13 that.   He's talking about Mr. Patch being the one that, (a)

14 found the e-mails on the 14th, (b) prepared Ms. Rivejeron

15 for her testimony thereafter.

16           MR. LEE:   That's right.   On all of --

17           THE COURT:   So, his point is that that man had to

18 have known about the --

19           MR. BOGGS:   Right, and Mr. Patch has conceded that

20 people from his office prepared her, but he just said that I

21 say -- is not according to the transcript -- he just said

22 Mr. Patch was at the sidebar.   The transcript does not show

23 Mr. Patch being at the sidebar.

24           MR. LEE:   Your Honor, this is the problem with Mr.

25 Boggs not having been at the trial.

180

1          MR. BOGGS:  Well, I read the transcript.

2          MR. LEE:  As your Honor knows, when we went to the

3  sidebar, the court reporter didn't take down everybody who

4  went to the sidebar.  The reporter only took down the people

5  who spoke.  And many times, Qualcomm had four or five people

6  arrive at that sidebar, including at these critical

7  junctures, Mr. Young, Mr. Patch.  And in fact, on January

8  24th, Mr. Patch says he knew about those e-mails on the very

9  day he put Vege Rivejeron on the stand.  And the person

10  who's calling us suggesting we're misleading, we're

11  misrepresenting, is someone who just admitted to your Honor

12  that they failed to produce a quantity of documents that is

13  equal to almost 20 percent of the total volume of documents

14  produced in this case, 20 percent, and I'll represent to

15  your Honor that, if you went through them, it's about 40

16  percent of the documents go to the issues that we tried.

17          Now, Mr. Boggs says, well, they have suspect

18  motives.  This is all about other cases, and Broadcom lost

19  its anti-trust case.  Now, your Honor, Qualcomm does this

20  everywhere when we go into a case.  Here's what's happened.

21  There have been three trials between the parties.  Your

22  Honor knows there've been many cases.  Broadcom has won all

23  three trials, two to juries, one to the ITC, all three

24  trials.  Every single patent claim that Qualcomm brought

25  against Broadcom has been dismissed, including those that

181

1 your Honor dismissed in March.

2        There are no ulterior motives here.  There are two

3 major companies.  There is important litigation.  It's being

4 fought out intensely.  But, from our end, it's being fought

5 out fairly.  And in all these cases, you will not hear an

6 accusation that failed to produce 20 percent of the

7 documents.

8        Now, let me go -- I'm going to take the two issues

9 and break them down.  Let me go to the waiver issue first.

10 And I'm going to show you that Mr. Boggs has made arguments

11 to you that are inconsistent with the arguments that were

12 made at trial.  You know, if you change -- if new counsel

13 comes in and changes the issue, yeah, for sure you can make

14 a different argument.  But, you can't do that, not after

15 there's been a trial, a jury verdict and your Honor's

16 decided an issue.

17        We're not here on a motion to reconsider your

18 Honor's finding of waiver, which your Honor found by clear

19 and convincing evidence.  That is the same decision the jury

20 reached on the same burden of proof.  We are here to decide

21 what should the remedy be.

22        Now, let me clear up one thing right away.  We

23 didn't ask -- Mr. Boggs said that we asked your Honor to

24 find the 104 patent unenforceable against the world.  We

25 said we want the 104 patent unenforceable against any H.264

182

1  compliant products.  We, in fact, your Honor, took the very

2  remedy that your Honor suggested at Page 33 of your order,

3  and it is tailored, it is tailored to the fact that these

4  folks, Qualcomm, filed a complaint and said everything

5  that's H.264 compliant infringes.  They could have said,

6  we're just focusing on Broadcom.  We'll examine the Broadcom

7  product.  We'll compare the Broadcom product claims.  That's

8  not what they did, not in the pretrial, not at trial.

9           They said instead, anybody who practices H.264

10 infringes the patent, and Doctor Richardson's testimony goes

11 far beyond claim 59.  Let me show you two or three examples.

12 Could I have the chart with the express representations made

13 by Qualcomm?  This is the chart that is labeled Qualcomm's

14 alleged lack of participation in the JVT.  And we'll bring

15 it up on the screen.

16          THE COURT:  Is that one of Qualcomm's charts?

17          MR. LEE:  That's one of our charts, your Honor,

18 that we gave you earlier today.  It has the title at the

19 top, Qualcomm's alleged lack of participation in JVT.  Now,

20 Mr. Boggs restates the issue and says, well, the issue was,

21 did Qualcomm try to influence the JVT.  That wasn't the

22 issue we tried.  And in fact, Mr. Boggs said at the end

23 that, if he had been here, he had a better issue to try,

24 well, that's fine.  But, he wasn't here and we were.

25          What Qualcomm said -- if your Honor remembers the

183

1  issue, an issue you decided, was there an IPR policy?  Did

2  it require disclosure?  Did Qualcomm know about it?  Did

3  they fail to disclose?  That's in your Honor's waiver

4  opinion, and you found that we had proved that by clear and

5  convincing evidence.

6          The response by Qualcomm was not, oh, we didn't

7  try to influence the standard.  The response was, if you

8  look at November 6th, 2006, it captures it the best.

9  Qualcomm employees never participated in any form in the JVT

10  until after the H.264 standard was released.  If you take

11  the blow-up off, your Honor, that was the issue that we

12  tried.  It was the issue that was discovered, the issue that

13  was argued at summary judgment, the issue in the pretrial,

14  the issue at trial.

15          Now, Mr. Boggs makes what I think is a remarkable,

16  really, truly remarkable assertion that, while Broadcom

17  hadn't precisely articulated its waiver argument when these

18  witnesses were deposed, and therefore, the answers might

19  have been different, well, your Honor, the truth doesn't --

20  and I'm now using the word intentionally -- the truth

21  doesn't depend on what -- how the evidence is characterized

22  or packaged as a specific defense.

23          The questions were, did you go to a meeting, did

24  you participate in a meeting?  Is Mr. Boggs really

25  suggesting that these witnesses would have answered

**Exhibit A-185**

184

1  differently if they'd thought waiver was an issue?  Of

2  course not.  These people are asked factual questions, and

3  to show you how Qualcomm turns this on its head, the only

4  reason that we didn't get there sooner is that we had to go

5  to third parties like Doctor Sullivan and to experts like

6  Doctor Reeder to put it all together, we would have put it

7  together a lot sooner if they had produced these 300,000

8  documents.

9        So, the two points they make, which are at the

10 heart of their argument on waiver and on exceptional case,

11 were the witnesses didn't know what the issue was.  So what?

12 They were asked questions.  They were supposed to tell the

13 truth, and their answers were, as Mr. Boggs says,

14 inaccurate.

15       Now, a second one -- Mr. Boggs says, our effort to

16 analogize waiver to something like inequitable conduct is --

17 I think I've got it right, a flawed and misleading analogy

18 was his argument.  Well, your Honor, the reason you adopted

19 the clear and convincing evidence standard is because

20 Qualcomm made just that analogy for you, and I'm going to

21 hand your Honor -- your Honor will recall, we started having

22 this discussion in your chambers late one evening, and we

23 went back and forth on what the burden of proof was, and

24 then your Honor asked for some briefing on it, and both

25 briefed the issue.  And in fact, at that point in time, I

**Exhibit A-186**

185

1 was arguing for a lower burden of proof saying that it was

2 like equitable estoppel.

3          Here is Qualcomm's brief.  And your Honor, you

4 will see two things in Qualcomm's brief.  There is

5 absolutely no mistake that Qualcomm understand that Broadcom

6 is asking for relief that extends beyond Broadcom.  And

7 second, Qualcomm itself says, your Honor, there should be a

8 higher burden of proof because this is like inequitable

9 conduct.  And that is what brought your Honor to the -- your

10 Honor will recall, in the jury instruction that you quoted

11 in your order, your Honor went through and had the

12 intentional and knowing waiver language, and had the

13 culpability language, and had the burden of proof language,

14 it's because Qualcomm analogized this inequitable conduct,

15 precisely the failed analogy, the failed analogy that

16 Mr. Boggs accuses me of offering as misleading, it was

17 Qualcomm's analogy.

18          Now, Qualcomm says, well, but look at the

19 affirmative defense.  Your affirmative defense asks you only

20 to find the patent unenforceable as to Broadcom, your Honor.

21 Well, we did what I think most careful lawyers try to do.

22 In the prayers for relief, we asked, your Honor, for such

23 other and further relief, after you decide the claims, as

24 your Honor would deem just and proper.  And you're now --

25 your Honor is now sitting as a court in equity, and the

186

1 Supreme Court's now 35-year-old case in <u>Lemon v. Kurtzman</u>,

2 which is at 411 U.S. 192, says that inequity, as nowhere

3 else, courts eschew rigid absolutes and look to the

4 practical realities and necessities inescapably involved in

5 reconciling competing interests, notwithstanding -- and it

6 goes on.

7        Your Honor has a request from us to enter such

8 other and further relief as your Honor would deem just and

9 proper.  The relief we've asked for, which includes really

10 just two components, finding the 104 patent unenforceable as

11 to anyone or any H.264 compliant product.

12        Your Honor, that is one of the remedies your Honor

13 suggested before your Honor ever got to see any of the

14 documents that ever were produced.  Your Honor made that

15 suggestion after you reviewed all the waiver findings and

16 the events leading to the 21 documents.  If anything, the

17 evidence of culpability that would lead to a waiver that's

18 not total unenforceability, but tailored to H.264 is more

19 important.

20        Mr. Boggs also represented that, you know, yes,

21 Qualcomm did participate, but there's no indication that

22 they really knew about the IPR policies.  Not correct.  Can

23 I have Tab 3 brought up?  At Tab 3, your Honor, are the

24 Geneva meeting minutes prepared by the consultant that

25 Qualcomm hired and, incidentally, never disclosed during the

**Exhibit A-188**

187

1  course of discovery.  When we asked for the people who

2  participated, this professor was never disclosed, even

3  though he was out attending meetings religiously and sending

4  meeting minutes back to Qualcomm.

5          Now, at Tab 3, in the materials we've given your

6  Honor, he sends meeting minutes to Chris Irvine, and they're

7  then forwarded onto Vege Rivejeron.  And at Page 1028783,

8  this is a part we identified for your Honor earlier.  At the

9  very first meeting, he reports that Doctor Sullivan has

10 informed people about the patent policy.  The IPR status was

11 reviewed, and the known patent holders were mentioned.

12         Now, there's even more than this in this early

13 document that was -- could I have Page 1028818.  I think

14 even one more.  Right.  I'm sorry, 8818.  Your Honor, in

15 this document, never produced before, in a case where you

16 hotly contested whether there was a JVT disclosure

17 requirement, these meeting minutes, sent to Qualcomm 15

18 months before they said they participated, say, "Please send

19 to Gary Sullivan."

20         What's the requirement?  It's the requirement,

21 your Honor, that you found -- and it's a predicate of your

22 waiver finding -- anyone with knowledge of any patent --

23 notice, your Honor, it doesn't say anyone who's trying to

24 influence the standard.  It's Mr. Boggs' effort to recast

25 the issue so that the non-disclosure and the documents

188

 1  withheld seem less important.  Anyone with knowledge of any

 2  patent affecting the use of JVT work, of their own or any

 3  other entity third parties, is strongly encouraged to submit

 4  this form as well.  This information will be maintained as

 5  the living list by JVT during the progress of their work on

 6  a best efforts basis, and the form goes on.

 7          Now, Qualcomm now makes what I think is truly an

 8  extraordinary argument.  They say, well, your Honor, really,

 9  what happened is, to the extent we knew about this, we

10  didn't think we had any IPR, we didn't have any patent

11  rights in the standard.

12          So, how did this lawsuit get filed in October

13  2005?  In 2003, after two years of work now, according to

14  Mr. Boggs, Qualcomm concludes that it doesn't have any

15  patents to cover the standard.  That 104 patent's been out

16  there for a while.  Yet, they can pass Rule 11 and file a

17  complaint that says, just because we practice H.264, we're

18  infringing?  No.

19          Now, your Honor, on these issues, Mr. Boggs has

20  given more evidence today about what happened at Qualcomm in

21  2001 and 2002 than all of Qualcomm has for three years.

22          I have no way to test whether that's right or not.

23  But, I cannot accept it on behalf of my client.  It is

24  fundamentally unfair, it really is a misuse of the process

25  to say that you can have an issue that's in play, that you

**Exhibit A-190**

189

1  can fail to produce 20 percent of the documents, and then,

2  new counsel can come in and say, no harm, no foul.  Let me

3  tell you what those documents really mean, even though you

4  never had any discovery.  That is not the way I would

5  suggest our system is supposed to work.

6          Has Broadcom been harmed?  It has, your Honor.

7  Broadcom has been harmed because it had to defend this case,

8  it had to try these issues on behalf of itself and anybody

9  else who was making an H.264-compliant product.  And your

10 Honor, if you step back from all of the lengthy argument the

11 two of us have given you today and just ask what the parties

12 are asking you, and this goes to both motions, on the one

13 hand, Qualcomm apparently says there will be an appeal and

14 we're going to appeal these non-infringement determinations

15 and these waiver determinations on the record that was

16 before the jury, to see if the jury's verdict is supported.

17 But, of course, Broadcom, you won't get to use these 300,000

18 documents, many of which would have supported your case.

19          It's irrelevant, your Honor, that some of them

20 might have helped Qualcomm.  These are Qualcomm documents.

21 And to the extent that Qualcomm has documents that

22 contradict its position at trial, they have a special

23 meaning.  What's going to happen when it would go up on

24 appeal.  The second is, why does Qualcomm want your Honor

25 not to have the waiver finding extend to other H.264

*Echo Reporting, Inc.*

**Exhibit A-191**

190

1 compliant products?  Why?

2          Mr. Boggs says, well, because -- he says it

3 doesn't matter because the infringement, non-infringement --

4 protects you.  The answer is they want to go out and tell

5 other people who are making H-264-compliant products, yeah,

6 we had this trial that infringement determination is going

7 to get overturned.  Take a license from us.  We're the 800-

8 pound gorilla.  That's not the way the system is supposed to

9 work.

10          And then, lastly, your Honor, we have been

11 damaged.  We've gone through this lengthy trial, lengthy

12 Markman proceedings, lengthy summary judgment proceedings,

13 and, at the end, we got a verdict that protects Broadcom or

14 absolves Broadcom on two different bases, both independent,

15 even though Qualcomm had thousands of documents not produced

16 that went directly to that issue.

17          Now, let me talk a little bit about this

18 exceptional case.  I'm not the U.S. Attorney and never will

19 be.  So, we haven't brought in information charging anybody

20 with perjury.  We haven't charged anybody with 18 U.S.C.

21 1001 crime.  We have said this is an exceptional case.  And

22 when your Honor looks at the cases we've cited, they talk

23 about different ways a case can be exceptional.

24          It can be intentional bad faith conduct.  But, it

25 also can be litigation misconduct, whether intentional or

**Exhibit A-192**

191

1 not, and it also can be simply a result that is just unjust.

2 The J.P. Stevens case, which Mr. Boggs cited to you,

3 actually found that the -- found the case was exceptional.

4 And your Honor, if we step back and think about the

5 exceptional case requirements, J.P. Stevens was a case in

6 which there was inequitable conduct.

7           Qualcomm told you that inequitable conduct and

8 waiver should be treated the same.  Qualcomm told you that

9 the level of culpability is the same.  Qualcomm told you,

10 and your Honor charged the jury, and in your own opinion,

11 adopted the principle that there has to be an intentional

12 and knowing waiver of your rights.  In that circumstance, in

13 fact, the level of intent and culpability, which your Honor

14 required in your jury charge and in your own opinion, is at

15 least as high, if not higher, than inequitable conduct.

16           Inequitable conduct, your Honor remembers, you can

17 balance materiality and intent.  If it's really material,

18 intent can be lower.  You didn't allow for anything like

19 that.  If a case can be exceptional for inequitable conduct

20 in that balancing situation, it certainly can be exceptional

21 in the waiver situation as charged by your jury.

22           And in fact, can we bring up Docket number 477

23 at 1.  "Qualcomm itself has described a finding of waiver as

24 exceptional."  And again, this is another place where

25 Qualcomm is trying to change the game and the rules.

*Echo Reporting, Inc.*

**Exhibit A-193**

192

1        Unlike the affirmative defenses of estoppel and
2   laches, courts and well-known legal treatises have
3   consistently held that waiver is disfavored and should only
4   be found in exceptional circumstances.   Your Honor has found
5   waiver.   There are exceptional circumstances, and that's
6   what's required.   Perjury, perjury, perjury is Mr. Boggs'
7   word.   Intentional, intentional, intentional, is Mr. Boggs'
8   word.
9        Our argument to you is, there was litigation
10  misconduct and, more importantly, it would be grossly unjust
11  for Broadcom to have to -- for Broadcom to assume and pay
12  all of its own legal fees.   And let me give you just three
13  quick examples.
14       Mr. Boggs said, it was so easy.   We just wouldn't
15  call Vege Rivejeron, or if she was called, she could have
16  lied.   Well, your Honor, again, this is a problem with
17  someone not being here.
18       Your Honor will recall there was a progression.
19  Vege Rivejeron, Bau, Sageton (phonetic), and each of them
20  laid out a set of facts that was designed to prove this
21  proposition.   There was no participation until May 2003.
22  Two of then, Bau and Sageton, didn't participate until after
23  May of 2003.   That could only have left the nine people in
24  the box with the impression that, yeah, Qualcomm's right,
25  they don't participate.

**Exhibit A-194**

193

1          Why did Rivejeron have to testify, because we had

2  that one document, the document that Qualcomm objected to at

3  a time when it already had the 14 e-mails, the 21 e-mails.

4  Have that in mind, your Honor.  Qualcomm objected to the one

5  document we've gotten from a third party that proved that

6  she had communications with the JVT at a time when they had

7  those 21 e-mails.  They had to put her on the stand to

8  testify, and she did, about that one e-mail.  And do you

9  remember what she said?  "I knew the professor.  He was a

10 really nice guy who lots of people -- he probably put my

11 name on there."  That's what she said.  They called her to

12 rebut that one argument.  That was not an accident.  That

13 was something that was intentionally done to communicate to

14 your Honor and the jury that the representation about

15 participation in the JVT was in fact correct, when it was

16 incorrect and they knew it was incorrect.

17         A second example.  The Starbucks e-mail.  And I

18 objected and I probably shouldn't have, and just let Mr.

19 Boggs go on.  When I argued to your Honor this morning, what

20 I said about the Starbucks e-mail is, you'll recall that

21 Doctor Sullivan said that the work of the JVT was done in

22 many committees, and those committees met and then reported

23 back at the big meetings.  In fact, he said, during the

24 course of the year, there would be many committee meetings,

25 which people would participate in and then come back and

*Echo Reporting, Inc.*

**Exhibit A-195**

194

1   report at the big meetings.

2          Now, what do we have?  We have an e-mail between

3   Irvine to 30(b)(6), and Rivejeron, who really was in charge

4   fo the project, and it says, "re: JVT meeting."  And then,

5   it says, "Chris is going to the JVT meeting tomorrow."

6   Mr. Boggs gave really what is -- I have no idea where it

7   comes from, because I haven't had a chance to depose these

8   folks on these e-mails -- the idea that, well, it was the

9   meeting of someone else.

10          Well, what do we know?  We know that Sullivan said

11  that much of the work was done in committees.  We know that

12  some of those committees exist in the United States, indeed,

13  right here in California.  We know that the e-mail says JVT

14  meeting, and we know that's it's Rivejeron and Irvine.  And

15  your Honor, most importantly, we know that that e-mail is

16  100-percent inconsistent with her sworn testimony.

17          Now, it's not like someone corrected their

18  testimony when they found out.  When Qualcomm found out

19  about these 21 e-mails, no one went back and corrected

20  Rivejeron's testimony.  They just let it stand there.  And

21  Mr. Boggs says that I asked the most obvious question in the

22  world on cross examination when I asked about those

23  documents.  I don't think so.  I know a few things, but I

24  know that asking a witness on the last day of trial whether

25  they have documents that I've never seen before can be like

**Exhibit A-196**

195

1 sticking my head in the noose, because I don't know what

2 those documents are, and I'm pretty darn sure -- asking for

3 them.  If they wanted to put them in, your Honor would have

4 let them put them in.

5          So, I thought about it before I let it rip.  But,

6 it was important.  And it was important because of the

7 manner in which Mr. Patch asked those questions.

8          Now, is this a difficult issue?  The answer is

9 yes.  I said at the outset that we do not bring this

10 lightly.  When your Honor asked me at the close of the

11 evidence whether I wanted some time to think about it, I

12 said that I did.  I was not certain until these documents

13 came pouring in and we had a chance to review them.

14          But, this case, both under Section 285 and under

15 waiver, is exceptional.  It's exceptional for all of the

16 reasons that we say it is.  It's exceptional for the conduct

17 pretrial, the conduct during the trial.  It's truly

18 exceptional for the events in January.  And it would be

19 unjust for Broadcom to bear its own fees in that event.

20          Now, might there be some other relief?  Yes.  And

21 that's what we've asked for Magistrate Judge Major and I'm

22 sure she'll give it her careful consideration.  But, it is

23 additional relief.

24          Now, your Honor, I'm going to put up as the last

25 thing a Wall Street Journal article that appeared the day

196

1 after the verdict.  And I think this will indicate, your

2 Honor, why it is so important for the Court and for the

3 litigants to address the question of, does Broadcom bear

4 it's own fees.  And that's what Section 285 is about.

5          And Mr. Lupin, one of the lawyers who has entered

6 an appearance in this case, on the day after the verdict

7 said -- if we could have the top part blown up.  "There

8 certainly was a significant upside potential for us, but it

9 was all upside and no downside," said Qualcomm executive

10 vice president and general counsel, Lou Lupin.  "For

11 Broadcom, it was all downside, no upside.  It probably won't

12 have any impact on us one way or another."

13          Well, your Honor, for whatever reason these events

14 occurred, whatever explanation there is for the 21 e-mails,

15 whatever explanation there is for Rivejeron's testimony,

16 whatever explanation there is for Irvine's testimony,

17 whatever explanation there is for Ludwig's testimony,

18 whatever explanation there is for Detmer's testimony,

19 whatever explanation there is for the findings, all of which

20 Qualcomm now concedes, are not correct.  That kind of

21 behavior is likely to occur when one party walks in thinking

22 it's all upside, there's no downside.  If we lose, we lose.

23 And so, Broadcom has had to pay for its legal fees.

24          The exceptional case doctrine in patent cases is

25 intended to prevent this from happening.  It's to deal with

Exhibit A-198

197

1  circumstances where people think that it's all upside and no

2  downside.  And it's to deal with circumstances where people

3  haven't played by the rules.

4        Now, can I tell you whether Mr. Boggs'

5  representations about what Day, Casebeer and Hellerman

6  (phonetic) were doing are accurate or not?  I can't, your

7  Honor.  They're the ones who've now described what the

8  conduct of the parties are.  As your Honor considers the

9  question of whether we have proved this case by clear and

10 convincing evidence, you have to take it in the context that

11 they've asserted the attorney/client privilege.  There is

12 not a single declaration from any of these people, lawyers

13 or witnesses.  Have you gotten a single declaration from

14 Rivejeron, from Irvine, from Detmer, from Ian Richardson, or

15 from any lawyer that supports anything that Mr. Boggs said?

16 The answer is no.

17        In that circumstance, your Honor, this case is

18 exceptional, and as I said at the outset, nothing makes it

19 clearer than the letters that were sent to your Honor after

20 we pressed for the documents.  Thank you.

21        THE COURT:  Thank you, Mr. Lee, and thank you,

22 counsel.  The Court will have the matter under submission.

23 I'll have an order out as soon as I'm able.  Thank you both

24 for all your help.  Court's in recess.

25        (Proceedings concluded.)

*Echo Reporting, Inc.*

**Exhibit A-199**

198

1        I certify that the foregoing is a correct

2  transcript from the electronic sound recording of the

3  proceedings in the above-entitled matter.

4

5  _____          6-27-07
   Transcriber                          Date
6

7  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

8

9  L.L. FRANCISCO, President
   Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

**Exhibit A-200**