1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| QUALCOMM INCORPORATED, | ) | Civil No: 05-CV-1958-B(BLM) |
| Plaintiff, | ) | |
| v. | ) | **ORDER ON REMEDY FOR** |
| | ) | **FINDING OF WAIVER** |
| BROADCOM CORPORATION, | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| | ) | |

## I.    INTRODUCTION

On March 21, 2007, this Court entered an Order (1) finding in favor of Defendant Broadcom Corporation ("Broadcom") and against Plaintiff Qualcomm Incorporated ("Qualcomm") on Broadcom's Third Affirmative Defense that U.S. Patent Nos. 5,452,104 (Pl's Trial Ex. 1) ("the '104 patent") and 5,576,767 (Pl's Trial Ex. 3) ("the '767 patent") are unenforceable due to waiver; and (2) setting hearing on an Order to Show Cause as to what the appropriate remedy for Qualcomm's waiver should be.  (Doc. No. 528 at 2.)

Following hearing on the Order to Show Cause and careful consideration of relevant court and deposition transcripts, declarations, and other documents submitted by both parties, the Court hereby issues the following remedy for Qualcomm's waiver: that the '104 and '767 patents, their continuations, continuations-in-part, divisions, reissues, or any other dependent or derivative patents of either patent, shall be and are hereby ordered unenforceable.

## II.   BACKGROUND

Qualcomm filed the present suit against Broadcom for patent infringement of the '104 and '767 patents on October 14, 2005, based on Broadcom's manufacture, sale, and offers to sell H.264-compliant products.  (Doc. No. 1.)  Broadcom filed its First Amended Answer and Counterclaims on December 8, 2006, in which it alleged (1) a counterclaim that the '104 patent is unenforceable due to inequitable conduct; and (2) a Third Affirmative Defense that the '104 and '767 patents are unenforceable due to waiver.  (Doc. No. 370.)

A jury trial was held on the legal issues from January 9, 2007, to January 26, 2007. The jury unanimously returned a verdict (1) in favor of Broadcom and against Qualcomm of non-infringement of the '104 and '767 patents; and (2) in favor of Qualcomm and against Broadcom for non-obviousness of the '104 and '767 patents.  (Doc. No. 499.)  The jury also unanimously returned an advisory verdict on the equitable issues: (1) finding by clear and convincing evidence in favor of Broadcom and against Qualcomm that the '104 patent is unenforceable due to inequitable conduct; and (2) finding by clear and convincing evidence in favor of Broadcom and against Qualcomm that the '104 and '767 patents are unenforceable due to waiver.  (Id. at 14.)

The Court held an evidentiary hearing on the equitable issues of inequitable conduct and waiver on February 9, 2007.  On March 21, 2007, the Court entered an Order: (1) finding in favor of Qualcomm and against Broadcom on Broadcom's counterclaim of

2

inequitable conduct as to the '104 patent; (2) finding in favor of Broadcom and against Qualcomm on Broadcom's affirmative defense that the '104 and '767 patents are unenforceable due to waiver based on Qualcomm's conduct before the Joint Video Team ("JVT"), the standards-setting body that created the H.264 standard; and (3) setting hearing on an Order to Show Cause as to what the appropriate remedy for Qualcomm's waiver should be.  (Doc. No. 528 at 2.)  The Court conducted a hearing on its Order to Show Cause on June 25, 2007.

After the verdict was entered, Broadcom again demanded discovery of Qualcomm's records that previously had been concealed, but whose possible existence was only revealed during Broadcom's cross-examination of Qualcomm witness Viji Raveendran on one of the last days of trial.  Thereafter, after over three more months of denials, refusals, and opposition, Qualcomm reversed its position, allegedly to avoid further dispute over the matter, and produced on April 13, 2007, over 110,000 pages of emails, company correspondence, and memoranda, and on May 15, 2007, over 120,000 more pages, some of which have now been filed with the Court, none of which have been disputed by Qualcomm.

## III.   DISCUSSION

### A.   STANDARD OF LAW

As the Court found in its March 21 Order, Broadcom has the burden of proving its affirmative defense of waiver and remedy therefor by clear and convincing evidence. (Doc. No. 528 at 13.)

A district court may in its discretion hold a patent unenforceable in considering an affirmative defense of inequitable conduct by inventors and/or their agents before the United States Patent and Trademark Office ("PTO"), but the remedy depends on equitable considerations arising from the circumstances involved.  See Refac Int'l, Ltd. v. Lotus Dev. Corp., 81 F.3d 1576, 1581, 1585 (affirming a finding of unenforceability based on an

1   inequitable conduct affirmative defense and holding that a "district court must . . . weigh

2   the threshold findings of materiality and intent in light of all the circumstances to determine

3   whether they warrant a conclusion" of inequitable conduct).

4        As the Court stated in its Order finding waiver, "[i]n that context, the Court here

5   considers with respect to waiver the extent of the materiality of the omitted information and

6   the circumstances surrounding [Qualcomm's] omissions in connection with the proceedings

7   in the JVT."  (Doc. No. 528 at 33.)  While the Court is still unable to find, nor have the

8   parties presented, case guidance for an equitable remedy to a finding of waiver by a

9   patentee or assignee as an affirmative defense, it appears to the Court, as it stated in its

10  Order, that "the remedy should not be automatic, but should be fashioned to give a fair,

11  just, and equitable response reflective of [Qualcomm's] offending conduct."  (Id.)

12       The Court has not found a patent decision assessing the remedy for a finding of

13  waiver based upon conduct of silence in the face of a duty to speak.  The Rambus case, in

14  which the Federal Circuit established the obligation to speak, did not involve a remedy for

15  a breach of that obligation, because the party which allegedly violated the rule had not

16  possessed intellectual property rights that read on or directly applied to the activities of the

17  standards development process.  See Rambus Inc. v. Infineon Techs. AG, 318 F.3d 1081,

18  1102 - 05 (Fed. Cir. 2003).  Therefore, this Court, by analogy to the available remedies for

19  redressing inequitable conduct before the United States Patent and Trademark Office

20  ("PTO"), holds that the remedy available here may vary from no remedy to declaring the

21  involved patents totally unenforceable.

22       Qualcomm argues that Broadcom may not have any remedies beyond itself, because

23  it raised the waiver issue only by a separate affirmative defense and not by a counterclaim

24  or cross-claim.  This contention is without merit.  The Federal Circuit has upheld the

25  unenforceability of a patent to the world due to inequitable conduct before the PTO even

26  when pled as an affirmative defense by the defendant.  See McKesson Info. Solutions, Inc.

27  v. Bridge Med., Inc., 487 F.3d 897, 908, 926 (Fed. Cir. 2007); Semiconductor Energy Lab.

28                                        4                          05-CV-1958-B (BLM)

Co., Ltd. v. Samsung Elecs. Co., Ltd., 204 F.3d 1368, 1372, 1378 (Fed. Cir. 2000); Refac Int'l, Ltd. v. Lotus Dev. Corp., 81 F.3d 1576, 1578, 1585 (Fed. Cir. 1996).  Therefore, the Court finds that it may award remedy for a waiver affirmative defense beyond unenforceability only as to Broadcom.

B.    **ANALYSIS**

1.    **Overview of the Joint Video Team ("JVT"), related standards organizations, their Intellectual Property Rights ("IPR") Policy and Guidelines, and Qualcomm**

In late 2001, the joint project JVT was launched by two parent standards bodies: (1) the Video Coding Experts Group ("VCEG") of the International Telecommunication Union Telecommunication Standardization Sector ("ITU-T") and (2) the Moving Picture Experts Group ("MPEG") of the International Organization for Standardization ("ISO") / International Electrotechnical Commission ("IEC").  (Def's Trial Ex. 5163 (JVT Terms of Reference ["ToR"]); Trial Tr., 267, Jan. 17, 2007.)

The JVT was created to enhance standard video coding performance in the face of limited bandwith or storage capacity.[1]  As a joint project, the JVT would be able to more efficiently produce a single "technically aligned, fully interoperable" standard that would offer "the best possible technical performance under the practical constraints of being implementable on various platforms and for various applications."  (JVT ToR at 1.)

According to the JVT ToR, JVT meetings are "open to, and contributions accepted from, all parties qualified for participation in meetings according to the rules of either parent body."  (JVT ToR at 3.)  As sector members of the ITU-T, Qualcomm and Broadcom can "influence a great variety" of the activities of the Telecommunication

---

[1] See Press Release, ITU-T, ITU-T and ISO/IEC to produce next generation video coding standard: Joint Video Team to Deliver Quality Improvement (Feb. 8, 2002), http://www.itu.int/ITU-T/news/jvtpro.html.

05-CV-1958-B (BLM)

Standardization Sector, including the JVT, by "presenting [their] views" and "participating actively."[2]   Qualcomm and Broadcom must annually pay a minimum of 31,800 Swiss Francs (approximately $26,500) to enjoy the benefits of Sector Membership in the ITU-T, but may annually pay up to 2,544,000 Swiss Francs (approximately $2,4119,000), with higher contributions correlating to a higher class of sector member.[3]

The American National Standards Institute ("ANSI") is the United States' representative member in both the ISO and IEC, as the national body most representative of standardization and electrotechnical standardization, respectively, in the United States.[4]   As Company Members of ANSI, Qualcomm and Broadcom enjoy the privilege of "active participation in ANSI and its programs," including the ISO and IEC and by extension the JVT, by paying annual dues ranging from $750 to $25,000 depending on their global sales revenue.[5]

---

[2]  See ITU-T Membership, http://www.itu.int/ITU-T/membership/sector.html (last visited Jul. 17, 2007); ITU Global Directory, http://www.itu.int/cgi-bin/htsh/mm/scripts/mm.list?_search=SEC&_languageid=1 (last visited Aug. 6, 2007).

[3]  See How to join as a Sector Member, http://www.itu.int/ITU-T/membership/join-sector.html (last visited Aug. 6, 2007).

[4]  See Member bodies, http://www.iso.org/iso/en/aboutiso/isomembers/MemberList.MemberSummary?MEMBERCODE=10 (last visited Jul. 17, 2007); Members of the IEC, http://www.iec.ch/cgi-bin/procgi.pl/www/iecwww.p?wwwlang=e&wwwprog=membrs3.p (last updated Jul. 18, 2007); Overview of the ISO System, http://www.iso.org/iso/en/aboutiso/introduction/index.html (last modified Sept. 12, 2006); IEC Membership, http://www.iec.ch/about/members-e.htm (last visited Aug. 6, 2007).

[5]  See ANSI Membership Roster, https://eseries.ansi.org/Source/directory/Search.cfm (last visited Jul. 17, 2007); ANSI Membership - A Value Proposition, http://www.ansi.org/membership/overview/overview.aspx?menuid=2 (last visited Aug. 6, 2007); ANSI Company Membership Application, http://publicaa.ansi.org/sites/apdl/Documents/Membership/ANSI%20Member-Company-

Qualcomm has paid hundreds of thousands of dollars to ANSI and the ITU-T to reap the benefits of membership, including the entitlement to actively participate in the JVT and the creation of the H.264 standard.  These standards organizations pool resources to efficiently create universal technology standards for the benefit of (1) the world through the advancement of technology and (2) companies worldwide such as Qualcomm through greater cross-platform product compatibility and therefore revenue.

According to the JVT ToR, the JVT "progress[es] in compliance with the Intellectual Property Rights ("IPR") policies and IPR reporting requirements and procedures of both [parent] organisations [sic]" regarding patent and copyright issues. (JVT ToR at 4.)  More specifically, the JVT collects IPR information during the standardization process as follows:

> According to the ITU-T and ISO/IEC IPR policy, members/experts are encouraged to disclose as soon as possible IPR information (of their own or anyone else's) associated with any standardization proposal (of their own or anyone else's).  Such information should be provided on a best effort basis.

> For collecting such information, JVT has decided to use it's [sic] own Patent Declaration form – note that this is distinct from the *ITU ISO IEC Patent Statement and Licensing Declaration* that is to be submitted to the ISO Secretary General and ITU TSB Director when the contributed technology becomes part of the final standard.

(JVT ToR at 9.)  This language applies to Qualcomm, as a member of the ITU-T and participant in the JVT.

In the sample Patent Disclosure Form included in the ToR, the JVT reiterates:

> JVT requires that all technical contributions be accompanied with this form. *Anyone* with knowledge of any patent affecting the use of JVT work, of their own or of any other entity ("third parties"), is strongly encouraged to submit this form as well.

(JVT ToR at 12.)  The JVT explains that form submissions should be made on "a best effort, good faith basis," as "[t]he intent is that the JVT experts should know in advance of any patent issues with particular proposals or techniques, so that these may be addressed

2006.pdf (last visited Aug. 6, 2007).

well before final approval." (Id.)  If the submitter has a patent "associated with the technical content" of the standard being created by the JVT, the submitter must indicate on the form whether it will: (1) grant royalty-free licenses to practice the patent; (2) grant licenses "on a worldwide, non-discriminatory basis and on reasonable terms and conditions"; (3) grant royalty-free licenses on the condition that all other patent holders do the same; or (4) not grant any of the aforementioned licenses, in which case the standard will be designed so as not to cover the patent.  (JVT ToR at 13.)

As for the "ITU ISO IEC Patent Statement and Licensing Declaration" that must be submitted separately to the ITU and ISO before final approval of the standard being created by the JVT, "any party participating in the work of the ITU, ISO or IEC should" alert these bodies to the existence of patents "embodied fully or partly" in a standard under consideration.[6]  Patent holders submitting this form to the ITU and ISO have similar licensing options as offered by the JVT form above: they must (1) grant royalty-free licenses to practice their patent; (2) grant licenses "on a non-discriminatory basis on reasonable terms and conditions"; or (3) not grant any of the aforementioned licenses, in which case the standard will be designed so as not to cover the patent.[7]  This language also applies to Qualcomm, as a "party participating in the work of the ITU, ISO or IEC" by way of the JVT.

As held by this Court in its March 21 Order and described in more detail below, (1) waiver of patent rights must be shown by clear and convincing evidence; (2) JVT participants treated the JVT IPR policies as imposing a duty to disclose patents that reasonably may be essential to practice the H.264 standard; (3) the '104 and '767 patents reasonably may be essential to practice the H.264 standard; (4) Qualcomm participated in

---

[6]  Common Patent Policy for the ITU-T/ITU-R/ISO/IEC,
http://www.itu.int/ITU-T/dbase/patent/patent-policy.html (last visited Aug. 6, 2007).

[7]  See id.

the JVT as early as January 2002; (5) Qualcomm had knowledge that the '104 and '767 patents reasonably might be essential to practice the H.264 standard; and (6) therefore, Qualcomm had a duty to disclose the '104 and '767 patents to the JVT.

However, instead of disclosing the '104 and '767 patents to the JVT and offering to license them royalty-free or under non-discriminatory, reasonable terms during the development phase of the JVT work on the H.264 standard, Qualcomm closely monitored and participated in the development of the H.264 standard, all the while concealing the existence of at least two patents it believed were likely to be essential to the practice of the standard, until after the development was completed and the standard was published internationally. Then, without any prior letter, email, telephone call, or even a smoke signal, let alone attempt to license Broadcom, Qualcomm filed the instant lawsuit against Broadcom for infringement of the '104 and '767 patents, seeking damages and permanent injunction against Broadcom based on its development and manufacture of H.264 compliant products. Qualcomm sought to unfairly benefit from having subverted the standards-making process of the JVT and, as the Court found in its March 21 Order, waived its right to enforce the patents-in-suit.

**2.      The Court FINDS by clear and convincing evidence that
Qualcomm participated in the JVT as early as January 2002**

In the Court's March 21 Order finding in favor of Broadcom on its affirmative defense of waiver, the Court had already found by clear and convincing evidence that Qualcomm participated in the JVT as early as September 2002. (Doc. No. 528 at 22.) However, with the new evidence produced by Qualcomm post-trial, the Court **FINDS** well beyond clear and convincing evidence that Qualcomm participated in the JVT as early as January 2002, well before the release of the H.264 standard in May 2003. The evidence unequivocally contradicts Qualcomm's assertions at summary judgment, during trial, and at the post-trial hearing on waiver and inequitable conduct that it did not participate in the

1  JVT until after May 2003.

2       As early as January 2002, Qualcomm hired an outside consultant, Jordan Isailovic,

3  to attend JVT meetings on Qualcomm's behalf and to send reports to Qualcomm

4  summarizing the progress of the JVT.  For example, after ostensibly attending a JVT

5  meeting in Geneva, Switzerland that took place from January 29 to February 1, 2002, Mr.

6  Isailovic sent an email to three Qualcomm employees, including Qualcomm's initial Rule

7  30(b)(6) witness Christine Irvine, on February 11, 2002, with the subject heading "JVT

8  Geneva Report," stating the following:

9          The Report on the JVT Geneva Meeting is included as an attachment.  As you
           can see, the Report has many details.  I hope that you and your team can get a
10         good idea about JVT . . .

11         If you or any member of your team needs any of the documents mentioned in
           the Report, please let me know and I will get it.
12
    (Doc. 543-2, Ex. A, Tab 3 at 24, Tab 4 74.)
13
         Two days later on February 13, 2002, Ms. Irvine forwarded Mr. Isailovic's email to
14
    six other Qualcomm employees, including Qualcomm trial witness and senior staff
15
    engineering manager Viji Raveendran and Qualcomm deposition witness James Determan.
16
    (Id., Tab 5 at 77.)  On February 25, 2002, Ms. Irvine forwarded by email over three pages
17
    of notes she took on her most recent JVT phone conference to fellow Qualcomm
18
    employees Raveendran and Jay Yun.  (Id., Tab 7 at 83.)  The next day on February 26,
19
    2002, Ms. Raveendran sent an email to two Qualcomm employees with the subject heading
20
    "JVT mtg tomorrow" that stated, "Chris is going to the JVT mtg. and will be driving
21
    tomorrow."  (Id., Tab 8 at 88.)
22
         On March 5, 2002, Qualcomm consultant Isailovic sent an email to five Qualcomm
23
    employees, Ms. Irvine, Ms. Raveendran, Mr. Determan, John Ratzel, and Amnon Silberger
24
    with the subject heading "Requested Documents and Info" that stated in part as follows:
25
         John, Chris at all [sic],
26
         Here is the response to list of documents and info you requested today:
27

28                                          10                        05-CV-1958-B (BLM)

1       1.  JVT, sw for the TML 9.x . . .
       2.  MPEG Web site: . . .

2       3.  JVT, ABT example document: See the attachment . . .
       4.  Contact information for the Thomson JVT expert who has software for the

3       H.26L [working name for the standard that became H.264]: . . .

4      Let me know if you need anything else.

5      Jordan

6 (Id., Tab 9 at 90 - 91.)  The following day on March 6, 2002, Mr. Isailovic sent another

7 email to Qualcomm colleagues Irvine, Ratzel, Raveendran, Silberger, Determan, and Steve

8 Morley, with the subject heading "JVT/H26L" and an attached file "jm17.zip" that stated:

9      This may be the latest version (evaluable [sic]) . . .

10      PS: Chris, please forward this to the rest of the group; I don't have all
      addresses.

11 (Id., Tab 10 at 94.)

12      Post-trial, Qualcomm produced at least 118 additional emails discussing the work of

13 the JVT sent between (1) Qualcomm employees, including Ms. Irvine, Ms. Raveendran,

14 and Mr. Determan; (2) Qualcomm consultant Isailovic; and/or (3) a Qualcomm email list

15 "dc-system-eng" dated from March 11, 2002, to  July 22, 2004.  (Id., Tabs 12 - 129.)  One

16 hundred seven of these emails were sent before the H.264 standard was released in May

17 2003.  (Id., Tabs 12 - 118.)

18      Not only did Qualcomm consultant Isailovic attend JVT meetings as early as

19 January 2002, Qualcomm employees have been attending JVT meetings "for a while"

20 before April 2002, well before the H.264 standard was released in May 2003.  Qualcomm

21 employee Amnon Silberger wrote an email to four other Qualcomm employees, including

22 Mr. Yun, on April 30, 2002, which stated:

23      We have been attending these standard body meetings for a while now.

24      These are the MPEG/JVT/JPEG meetings and the SMPTE meetings.  To ease
      the load, all the system engineers in our group rotate in attending these

25      (Chris, Jay, Viji, Jim Determan and myself).

26 (Id., Tab 44 at 306.)  Messrs. Yun and Silberger attended the May 2002 JVT meeting in

27 Fairfax, Virginia.  On May 8, 2002, Mr. Yun sent a three-page meeting report email to

28                    11

eight Qualcomm employees, including Ms. Irvine, Ms. Raveendran, Mr. Determan, and Mr. Silberger, with the subject header "WG11 (MPEG Fairfax - day 3)" that stated explicitly, "I've attended some JVT meetings and saw some demo (so did Amnon)." (Id., Tab 57 at 361.)

Furthermore, Qualcomm voted on ballots affecting JVT as early as June 2002. On June 11, 2002, Mr. Yun wrote an email to Ms. Irvine, Ms. Raveendran, Mr. Silberger, and Mr. Determan stating the following:

> Below is an email ballot for L3.1 (USNB [United States National Body] for MPEG). It calls for an ad hog [sic] group to collect and generate comments on US comments on JVT CD (Committee Draft). By not replying to this email, we agree to the formation of the AHG [ad hoc group].

(Id., Tab 70 at 415.) Mr. Yun sent another email to those same four Qualcomm employees the same day, stating:

> One more email ballot from L3.1.

> This has two questions, the first one approves the REGISTRATION of JVT CD and the second one approves the CD with a conditional disapprove, which means that the USNB has some comments that it wishes to be reflected.

> I don't see any reason we should disagree with the two questions. We need not do anything to do so. Let me know if any of you want to investigate this further and discuss.

(Id., Tab 71 at 419.)

Qualcomm's post-trial production of documents directly and unequivocally exposes as blatantly false Qualcomm's steadfast assertions at summary judgment, during trial, and at the post-trial hearing on waiver and inequitable conduct that it did not participate in the JVT until after May 2003. The Court **FINDS** well beyond clear and convincing evidence that Qualcomm participated in the JVT from as early as January 2002, even earlier than the Court originally found in its March 21 Order and, more importantly, well before the JVT released the H.264 standard in May 2003. Participation does not require submission of proposals, speeches, objections or leadership roles. The Court finds Qualcomm's involvement to be vigorous participation -- a difference appears to the Court to be the

motive for participation -- i.e., to insulate its IPR from the work of the JVT so as to preserve it for unilateral enforcement if that became possible after the H.264 standard was settled upon.

> **3.    The Court FINDS by clear and convincing evidence that Qualcomm was aware as early as August 2002 that JVT participants treated the JVT IPR policies as imposing a duty to disclose patents that reasonably may be essential to the H.264 standard**

In the Court's March 21 Order finding in favor of Broadcom on its affirmative defense of waiver, the Court found by clear and convincing evidence that JVT participants treated the JVT IPR policies as imposing a duty to disclose patents that reasonably may be essential to the H.264 standard.  With the new evidence produced by Qualcomm post-trial, the Court now **FINDS** by clear and convincing additional evidence that Qualcomm was aware of this treatment by JVT participants as early as August 2002.

In August 2002, Qualcomm consultant Isailovic forwarded an email to Qualcomm employees Ratzel, Determan, Irvine, Raveendran, Silberger, and Yun with the subject heading "Fwd: [jvt-ipr] Re: Face-to-Face JVT IPR Meeting."  (Doc. No. 543-2, Ex. A, Tab 92 at 529.)  The body of the forwarded email stated in pertinent part:

> The future licensing terms [for H.264 / MPEG-4 AVC] will be defined by the holders of essential patents; at this time it is unknown who are these patent holders, so this needs to be determined first.  The question is how.  In my understanding, the objective is to invite "potential holders of essential patents" to the face-to face-meeting [sic] to discuss this issue.  Therefore in my understanding the most important agenda point is the procedure to identify essential patent holders in an objective manner.

(Id., Tab 92 at 530 - 31.)

Then in September 2002, Mr. Isailovic forwarded another email to Qualcomm employees Morley, Ratzel, Determan, Irvine, Raveendran, Silberger, and Yun with the subject heading "Fwd: [jvt-ipr] Call for H.264 / MPEG-4 AVC [Advanced Video Coding]

patents."  (Doc. No. 543-2, Ex. A, Tab 94 at 545.)  The body of the forwarded email stated in pertinent part:

> This is to let you (as you may have noticed already that MPEG LA is calling for essential MPEG-4 AVC/H.264 patents, with the aim to come to a joint license soon.

(Id., Tab 94 at 546.)

One month later in October 2002, Mr. Isailovic forwarded an email to Qualcomm employees Ratzel, Raveendran, Determan, Irvine, Silberger, and Yun, which Ms. Raveendran in turn forwarded to two other Qualcomm employees with the subject heading "Fwd: [jvt-ipr] Confirmation of JVT IPR meeting in Geneva."  (Doc. No. 543-2, Ex. A, Tab 97 at 567.)  In the body of her email, Ms. Raveendran wrote, "FYI.  Some information on licensing issues and IPR in JVT."  (Id.)  The body of the forwarded email listed a suggested agenda for the JVT-IPR meeting open to all JVT and IPR experts at the Geneva JVT conference, which included (1) an "(ongoing) determination of essential patent holders" and (2) the "expected process once essential patent holders are identified."  (Id., Tab 97 at 568.)  These three emails demonstrate that Qualcomm was aware as early as August 2002 that the JVT was actively attempting to identify holders of patents essential to the H.264 standard.

Later, in September 2003, Qualcomm employee Harinath Garudadri wrote an email to another Qualcomm employee and a Qualcomm email list "multimedia.all" with his "notes from the first day of the JVT meeting."  (Id., Tab 120 at 682.)  One of Mr. Garudadri's bullet points was:

> IPR policies of [JVT parent body] VCEG and ITU.  Gary said **formal notification was required**.  List of IPR holders for H.264/AVC is in Appendix F of MPEG doc and ITU-T web site.  Each contribution has the IPR statements at the end.

(Id.) (emphasis added.)  JVT chairman Gary Sullivan confirmed at trial that he delineated the IPR policy of the JVT at the beginning of every JVT meeting, and from Garudadri's email, Qualcomm was aware at least by September 2003 that formal IPR notification was

14

1   consistently requested of all IPR holders even if they did not make technical proposals.

2   (Trial Tr., 43 - 44, Jan. 18, 2007.)  Since, as established above, Qualcomm had been

3   attending JVT meetings as early as January 2002 in which Mr. Sullivan routinely repeated

4   this IPR policy at each meeting, the Court concludes that Qualcomm was well aware of the

5   policy even earlier than that.

6           Furthermore, amongst the documents Qualcomm produced post-trial was Philips

7   International's June 21, 2002, letter to the ISO International Technology Task Force

8   accompanying its JVT Patent Disclosure form, which made it clear that Philips treated the

9   JVT's IPR policies as imposing a duty to disclose.  (Doc. No. 543-2, Ex. A, Tab 74.)

10  Under the subject heading "Re: JVT," Philips wrote:

11          In response to the RFTI [Request for Technical Information] made at the
            MPEG meeting May 6-10, 2002 we submit in the **required** JVT Patent
12          Disclosure Form, a list of Philips' patents which have been deemed necessary
            for the implementation of MPEG2 Video, and which have been **deemed**
13          **necessary for the implementation of the JVT Baseline and/or Main**
            **Profiles**.
14
            Philips has made the listed patents available for implementation of the
15          MPEG2 Video standard, in accordance with ISO IPR rules, on reasonable and
            non-discriminatory terms.  To be consistent and to avoid discriminating
16          against licensees under the MPEG2 Video standards, Philips is again
            prepared to make these patents available under reasonable and non-
17          discriminatory terms for the JVT Baseline and Main Profiles.

18  (Id., Tab 74 at 435) (emphasis added.)  From this, Qualcomm was aware that JVT

19  participant Philips viewed the JVT Patent Disclosure Form as "required" for patents

20  "deemed necessary for the implementation of the JVT Baseline and/or Main Profiles."

21  Qualcomm was further aware that Philips was prepared to license its patents for the JVT

22  standard "[t]o be consistent" with "[JVT parent] ISO IPR rules."

23          Later in this letter, expressing concern that "the JVT will not be in a position to take

24  an informed decision on the feasibility of a royalty-free Baseline Profile," Philips stated

25          Video compression technology has attracted wide interest in the electronics
            industry for quite some years.  As a consequence many patents and patent
26          applications exist in many countries of the world covering not only the basics
            of compression technology, but also many varieties within such compression
27          schemes.

28                                          15                          05-CV-1958-B (BLM)

> To our mind it is an illusion to assume[] that it would be possible to ensure a royalty free JVT Baseline Profile by the evaluation effort based on the patents now being submitted. First, there is a very substantial risk that the submitted list of patents is not complete. Second, an effort, undertaken to avoid the use of patent rights that are not available under royalty-free conditions, could well result in the use of other not yet identified patent rights. Both issues place at the end the so defined JVT Standard in an even much worse position when patents of not-involved companies start playing a role.

(Id., Tab 74 at 435 - 36.)  From this, Qualcomm was aware of the concern of JVT participant Philips that the H.264 standard would practice patents that had not yet been disclosed to the JVT and offered for licensing under royalty-free or reasonable and non-discriminatory terms.

Furthermore, Philips closed its letter by stating, "In the interests of transparency Philips is copying this letter to members of the JVT Group, many of whom are licensees under the MPEG2 Video patents, in order to demonstrate Philips [sic] continued commitment to transparency and non-discrimination in the licensing of IPR on standards." (Id., Tab 74 at 436.)  Therefore, while it is not apparent when Qualcomm received the copy of Philips' letter, since Philips copied the letter to all JVT members, the Court concludes that Qualcomm probably received a copy not long after it was sent on June 21, 2002.

The Court already found by clear and convincing evidence in its March 21 Order that JVT participants treated the JVT IPR policy as imposing a duty of disclosure for patents that reasonably might be necessary to practice the H.264 standard.  Now, considering the new evidence produced late by Qualcomm post-trial, the Court **FINDS** by additional clear and convincing evidence that Qualcomm was aware of this treatment as early as August 2002.

     **4.**       **The Court FINDS by clear and convincing evidence that Qualcomm had knowledge by early March 2002 that its Adaptive Block Size Transform ("ABT") related patents, including the '104 and '767 patents, reasonably might be necessary to practice the**

05-CV-1958-B (BLM)

**H.264 standard**

In the Court's March 21 Order finding in favor of Broadcom on its affirmative defense of waiver, the Court found by clear and convincing evidence that Qualcomm had knowledge that the '104 and '767 patents might reasonably be necessary to practice to H.264 standard as early as 2002 and July 2005 respectively.  (Doc. No. 528 at 27.)  With Qualcomm's post-trial production of additional documents, the Court now **FINDS** by additional clear and convincing evidence that Qualcomm had knowledge as early as March 2002 that its ABT related patents, including the '104 and '767 patents, reasonably might be necessary to practice the H.264 standard.

Qualcomm's own witness Chong Lee, an inventor of both the '104 and '767 patents, testified at trial that the '104 and '767 patents related to ABT technology.  Mr. Lee testified that his May 1992 paper "Intraframe Compression of HDTV Images Based on Adaptive Block Size Discrete Cosine Transform" described the '104 patent invention.  (Trial Tr., 94, Jan. 10, 2007.)  He stated that the paper "discusses the technology involved in both 104 and -- 104 that included ABS DCT [Adaptive Block Size Discrete Cosine Transform] and DQT [Differential Quadtree Transform]" and reiterated that the '104 patent describes "intraframe compression."  (Id. at 70, 94.)

In contrast, Mr. Lee specified that the '767 patent describes "interframe compression."  (Trial Tr., 70, Jan. 10, 2007.)  Mr. Lee testified:

> I approached the problem [addressed in the '767 patent] by using multiple block sizes in an adaptive fashion to solve the problem of obtaining both quality and efficiency of the [video interframe] compression.

(Id. at 107 - 08.)  When asked whether the '767 patent approach was similar to ABS DCT, Mr. Lee responded:

> Yes.  Exactly.  Just like we were describing ABS DCT as adaptive block size technique that involves transforms on different block sizes, **this technique involves adaptive block sizes** by applying what's called motion compensation, looking for similarities in large blocks versus small blocks.

(Id) (emphasis added.)

Qualcomm recognized as early as March 2002 that its ABT related patents might be reasonably necessary to practice the H.264 standard.  A report entitled "Report of activities for the last six months" and dated March 6, 2002, that was produced from Qualcomm's records stated:

> Since our group is actively involved in the ITU, MPEG, and SMPTE standards meetings, we are looking into proposing some of the features of **our ABSDCT compression algorithm** to one of these standard bodies.  I had the task of compiling the details of MPEG, JVT (Joint Video Team) and ABSDCT compression features.  I reviewed the JVT draft and prepared a spreadsheet detailing the aspects of these algorithms.  We haven't had a chance to discus [sic] this yet.  The purpose behind this is for us to decide **whether our ABSDCT Intra and interframe algorithms will fit in the JVT scenario**.

(Doc. No. 543-2, Ex.A, Tab 11 at 96.)  As stated above, the '104 patent deals with intraframe video compression, while the '767 patent deals with interframe video compression.  From this report, Qualcomm demonstrates its awareness of the connection between these patents and the H.264 standard being developed by the JVT.

On March 26, 2002, Qualcomm engineer Silberger sent an email to three Qualcomm employees, including Ms. Irvine and Jay Yun, with the subject heading "JVT ABS submission," which stated:

> For several days now, Jay and myself have been looking at ways to incorporate **our ABS** into H.26L [another name for H.264] for submission in the JVT May Meeting.

(Doc. No. 543-2, Ex. A, Tab 17 at 122) (emphasis added.)  Clearly, Mr. Silberger is here acknowledging that Qualcomm's adaptive block size technology is so related to the work being done in the JVT that it should be offered for incorporation into the developing H.264 standard.

The next day on March 27, 2002, Mr. Yun responded to Mr. Silberger's email, stating:

> After discussing JVT ideas with Amnon, I remembered that there were some recent proposals that have to do with **variable block sizes**.  I re-read those proposals, Jordan's report and **our patents** and come up with the following observations.

(Id., Tab 20 at 131) (emphasis added.)  Addressing JVT proposals already made by others

to add an 8x8 transform, a 16x16 transform, and a 2x2 transform, Mr. Yun wrote:

> 1. [. . .] They are all integer transforms that mimic DCT.  With these, perhaps we can recommend **our variable block size scheme** that is different than the proposal which only uses fixed-size sub-blocks for the entire 16x16 block (i.e., you can only have all 8x8s, all 4x4s, all 8x4s or all 4x8s, etc.)? . . .
>
> But Jordans' report says that this adaptive block-size ideas will not be included in the baseline but in some high quality applications, so we may be able to prove that there is a significant gain in quality by using out [sic] scheme.

(Id.) (emphasis added.)  Mr. Yun continued:

> 2. **Our original patents mention DCT almost exclusively** and says that it is for "pixel data."  Should we "extend" our patents to include all transforms and all data types (like residuals)?
>
> 3. We should go to all JVT meetings at least for the time being to be on top of their work on ABT, which Jordan says is brand new.
>
> 4. Similar to ideas in 1, we can use **our interframe ABS patent** and then either recommend BSA [sic ABS] for motion block size assignment/representation and/or attach or block JVT's scheme for using variable block size for motion estimation (they use fixed size sub-blocks, though).

(Id., Tab 20 at 131 - 32) (emphases added.)  Both the '104 and '767 patents mention DCTs

multiple times: in the claim language and repeatedly throughout every section of the '104

patent, and in the description of preferred embodiments in the '767 patent.  ('104 patent;

'767 patent.)  Furthermore, as Mr. Lee explained at trial, the '767 patent describes

interframe compression using adaptive block sizes.

Then, in July 2002, Ms. Raveendran sent an email to Qualcomm JVT consultant

Isailovic, in which she wrote:

> **About patent reviews for JVT and studying ABT with respect to our patent**, it was decided that we would like a summary of various aspects of ABT in JVT.  There are a lot of details and if you can help narrow down the focus, that would be a good start.

(Id., Tab 86 at 504) (emphasis added.)

A few months later in November 2002, Qualcomm engineer Yun wrote an email

with the subject heading "JVT slides," stating that "monitoring ABT is of importance since

1   there may be **patent infringement issues related to ABSDCT**." (Id., Tab 102 at 600)

2   (emphasis added.)  Qualcomm engineer Silberger responded to Mr. Yun's email on the

3   same day, carbon copying Ms. Raveendran and writing, "One thing, didn't we kind of

4   conclude that they are not infringing our ABSDCT?" (Id., Tab 102 at 599.)  This email

5   exchange makes it clear that, prior to November 2002, Qualcomm had already given

6   consideration to whether the H.264 standard in development would infringe Qualcomm's

7   ABS DCT patents, which include the '104 and '767 patents.  This is further confirmed by

8   the December 2002 document entitled "JVT 12/9-14/02 meeting goals, prioritized list," in

9   which the item "ABT" is followed by the question, "Is there a **potential IPR issue with**

10  **ABSDCT**?" (Id., Tab 109 at 635) (emphasis added.)

11          Then, in April 2003, Qualcomm employee Tom Kilpatrick sent an email to Viji

12  Raveendran and another Qualcomm employee addressing a new "bi-weekly working

13  engineering meeting." (Id., Tab 118 at 673.)  Mr. Kilpatrick wrote, "One of the things to

14  be addressed in Viji's meetings are progress on **Digital Cinema patents** vs JVT standard."

15  (Id.) (emphasis added.)  Qualcomm's outside expert Dr. Iain Richardson testified at trial

16  that Qualcomm designed a product implementing an audio compression system, the QDEC-

17  1000, based on the '104 patent.  (Trial Tr., 126 - 27, Jan. 11, 2007.)  Qualcomm employee

18  Irvine then confirmed through deposition testimony at trial that the QDEC-1000 was sold

19  to "Technical or Digital Cinema." (Trial Tr., 84 - 85, Jan. 18, 2007.)  Therefore,

20  Qaulcomm knew of a link between the '104 patent and the H.264 standard and set up bi-

21  weekly meetings to "address" the issue in April 2003.

22          This newly discovered evidence augments the already convincing evidence

23  explicitly naming the '104 and '767 patents that the Court discussed in its March 21 Order,

24  indicating Qualcomm's knowledge of a link between those patents and the H.264 standard.

25  Therefore, the Court **FINDS** by additional clear and convincing evidence that Qualcomm

26  had knowledge that the '104 and '767 patents reasonably might be necessary to practice the

27  H.264 standard as early as March 2002, well before the JVT released the H.264 standard in

28                                          20                      05-CV-1958-B (BLM)

1   May 2003.

2        At no time before the H.264 standard was initially published as adopted did

3   Qualcomm reveal to the JVT or its parent bodies Qualcomm's IPR, specifically the '104

4   and '767 patents.

5

6        **5.    The Court FINDS by clear and convincing evidence that**

7                **Qualcomm intentionally organized a plan of action to shield the**

8                **'104 and '767 patents from consideration by the JVT with the**

9                **anticipation that (1) the resulting H.264 standard would infringe**

10               **those patents and (2) Qualcomm would then have the opportunity**

11               **to become an indispensable licensor to anyone in the world seeking**

12               **to produce H.264-compliant products**

13       The Court has already found above and in its March 21 Order that Qualcomm

14  waived its rights to enforce the '104 and '767 patents against Broadcom by its silence when

15  it had a duty to speak before the JVT.  However, faced with the additional evidence

16  produced post-trial by Qualcomm, the Court concludes that the conduct of Qualcomm's

17  employees before trial, and its employees and hired witnesses during pre-trial, trial, and

18  post-trial outlines misconduct even more extensive than the Court previously found in its

19  March 21 Order.

20       Merely the reiteration of the chronology of events above and below tells the story of

21  the gravity of the conduct.  The facts speak for themselves.  The totality of the

22  circumstances leads the Court to conclude by clear and convincing evidence that

23  Qualcomm intentionally organized a plan of action to shield the '104 and '767 patents from

24  consideration by the JVT with the anticipation that (1) the resulting H.264 standard would

25  infringe those patents and (2) Qualcomm would then have an opportunity to be an

26  indispensable licensor to anyone in the world seeking to produce an H.264-compliant

27  product.

28

05-CV-1958-B (BLM)

1    The track of this conduct following the adoption of the H.264 standard exposes

2  aggravated litigation abuse.  This abuse commenced with Qualcomm's abrupt

3  commencement of suit, then continued (1) in discovery through Qualcomm's constant

4  stonewalling, concealment, and repeated misrepresentations concerning existing corporate

5  documentary evidence that would have revealed the fullness of the corporate plan; and (2)

6  in trial through Qualcomm's presentation of numerous witnesses who steadfastly testified

7  falsely denying even awareness, let alone participation in the JVT project and through the

8  actions of Qualcomm's lead and co-counsel up to the time Qualcomm substituted new lead

9  counsel, who adamantly denied the obvious and then, when the truth was discovered and

10  exposed by the document production, sequentially contended denial of relevance,

11  justification, mistake, and finally non-awareness.

12    **a.    Misconduct of Qualcomm, its employees, and its witnesses**

13    The Court **FINDS** by clear and convincing evidence that Qualcomm, its employees,

14  and its witnesses actively organized and/or participated in a plan to profit heavily by (1)

15  wrongfully concealing the patents-in-suit while participating in the JVT and then (2)

16  actively hiding this concealment from the Court, the jury, and opposing counsel during the

17  present litigation.

18    **(1)    Misconduct before the JVT**

19    As established above, there is clear and convincing evidence that Qualcomm was

20  aware of its duty to disclose the '104 and '767 patents to the JVT as early as 2002, well

21  before the H.264 standard was published in May 2003.  However, it was not until April 25,

22  2006, six months after the commencement of this lawsuit, that Qualcomm filed an IPR

23  disclosure form with the ITU-T and ISO/IEC regarding the H.264 standard, declaring that

24  Qualcomm "holds granted patents and/or pending applications, the use of which would be

25  required to implement" the H.264 standard.  (Pl's Trial Ex. 36 at 3 - 4.)  Even this

26  disclosure did not identify any specific patent, let alone the '104 and '767 patents.

27    The Court **FINDS** by clear and convincing evidence that Qualcomm and its

28                                          22                        05-CV-1958-B (BLM)

employees orchestrated a plan to ignore Qualcomm's duty to disclose these patents to the

JVT, in order to become an indispensable licensor of the H.264 standard.  Qualcomm

employee Yun sent an email in March 2002 to Qualcomm colleagues Silberger, Ratzel, and

Irvine, discussing the transform proposals before the JVT.  (Doc. No. 543-2, Ex. A, Tab

20.)  In it, Mr. Yun suggested "extending" Qualcomm's patents in order to cover the

standard being developed by the JVT:

> Our original patents mention DCT [discrete cosine transform] almost
> exclusively and says that it is for "pixel data".  Should we "extend" our
> patents to include all transforms and all data types (like residuals)?

(Doc. No. 543-2, Ex. A, Tab 20 at 131.)  He then advocated monitoring the JVT and its

work in relation to Qualcomm's patents:

> We should go to all JVT meeting at least for the time being to be on top of
> their work on ABT [adaptive block-size transform], which Jordan [Isailovic]
> says is brand new.

(Id.)

One month later in April 2002, Qualcomm engineer Silberger sent an email to

Qualcomm colleagues Determan, Irvine, Raveendran, Yun, and Ratzel.  (Doc. No. 543-2,

Tab 38.)  In it, he advocated "monitoring" the JVT "from a distance":

> The JVT effort is mostly done for the physical layer, and going towards a
> committed draft in May.  There is no indication that they are even looking at
> DC [Digital Cinema] applications.  New technical suggestions are dealing
> mostly with better efficiency (reduced complexity) and file formats.  We
> should monitor this from a distance.

(Id., Tab 38 at 273.)  Later, under the heading "Recommendations," Mr. Silberger advised

increasing Qualcomm's monitoring of the JVT and refraining from making any

submissions, which would include any potential patent disclosures, to JVT parent body

MPEG:

> We should be monitoring MPEG meetings, especially regarding DC testings,
> and also sample the JVT and JPEG activities.  We may pull in some other
> groups within Qualcomm to participate, since both H.26L [working name for
> what later became the H.264 standard] and JPEG2000 may both be promising
> for low date [sic] rates.  At this point, I don't see the need for submitting
> anything to MPEG.

1   (Id., Tab 38 at 274.)  Mr. Silberger then explicitly recommended "consider[ing] efficient

2   ways for lobbying our technology in the appropriate forums."  (Id.)

3         Later, in July 2002, Qualcomm engineer Raveendran sent an email to Qualcomm

4   consultant Isailovic stating, "About patent reviews for JVT and studying ABT with respect

5   to our patent, it was decided that we would like a summary of various aspects of ABT in

6   JVT."  (Id., Tab 86 at 504.)  From Ms. Raveendran's use of the phrase "it was decided," the

7   Court concludes that Qualcomm held meetings to decide strategy as to how to monitor the

8   JVT with respect to Qualcomm's patents.  Ms. Raveendran then conceded to Mr. Isailovic,

9   "There are a lot of details and if you can help narrow down the focus, that would be a good

10  start."  (Id.)

11        This monitoring and reporting on the activities of the JVT with respect to

12  Qualcomm's patents without disclosure of these patents continued through the release of

13  the H.264 standard in May 2003 and Qualcomm's filing of this patent infringement suit in

14  October 2005 against Broadcom as to the '104 and '767 patents.  (Doc. No. 543-2, Ex. A.)

15  Qualcomm filed this suit (1) based on the theory that the patents-in-suit cover the H.264

16  standard and therefore Broadcom's H.264-compliant products and (2) long before any

17  disclosure of these two patents to the JVT or its parent organizations and without any offer

18  to license its patents to Broadcom or to JVT members.  In combination with the above

19  evidence presented to the Court as to Qualcomm's participation in the JVT and

20  Qualcomm's knowledge that the '104 and '767 patents reasonably might be necessary to

21  practice the H.264 standard, the Court **FINDS** by clear and convincing evidence that

22  Qualcomm and its employees organized and attempted to execute a plan to actively conceal

23  its patents from the JVT in order to later become an indispensable licensor to those

24  practicing the H.264 standard.  This plan, of course, deprived the JVT of the opportunity to

25  attempt to design around the '104 and '767 patents in developing the H.264 standard.

26                    **(2)      Misconduct during the present litigation**

27        The Court's finding as to Qualcomm's wrongful conduct is further supported by

28                                        24                    05-CV-1958-B (BLM)

1   evidence of widespread and undeniable misconduct of Qualcomm, its employees, and its

2   witnesses throughout the present litigation, including during discovery, pre-trial motions-

3   practice, trial, and post-trial proceedings.

4                              **(a)     Christine Irvine**

5            For example, staff engineer Christine Irvine, Qualcomm's original Federal Rule of

6   Civil Procedure 30(b)(6) witness testified at trial through her July 6, 2006, deposition that

7   Qualcomm did not attend any JVT meetings:

8        Q      Are you the person at Qualcomm most knowledgeable about
                attendance or participation by any Qualcomm principal, employee or
9               representative at any H.264 standards committee meetings?
         A      I believe I am.
10       Q      Are you the person at Qualcomm most knowledgeable about
                Qualcomm's knowledge regarding the development of the H.264
11              standard?
         A      I believe I am.
12       Q      And are you the person at Qualcomm most knowledgeable about any
                actions taken by Qualcomm or any of its principals, employees or
13              representatives as a result of Qualcomm's knowledge regarding the
                development of the standard?
14       A      I believe I am.
         Q      Is Qualcomm a member of the JVT?
15       A      No, Qualcomm is not.
         Q      Has Qualcomm ever attended any meetings of the JVT?
16       A      Qualcomm is not aware of any attendance to any JVT meetings.
         Q      Has Qualcomm ever hosted any meeting of the JVT?
17       A      Qualcomm's not aware of hosting a JVT meeting.
         Q      Okay.  Has Qualcomm made any submissions to the JVT?
18       A      No, Qualcomm has not made any submissions to the JVT that
                Qualcomm is aware of.
19       Q      When did Qualcomm first become aware of the development of the
                H.264 standard?
20       A      Approximately 2001 in trade journals.

21   (Trial Tr., 79 - 81, Jan. 18, 2007.)

22           The falsity of Ms. Irvine's testimony is now revealed as blatant.  As detailed above

23   at length, Qualcomm produced over one hundred emails post-trial related to Qualcomm's

24   participation in the JVT and attendance of JVT meetings, the vast majority of which were

25   received or sent by Ms. Irvine.  (Doc. No. 543-2, Ex. A.)  For example, in February 2002,

26   Ms. Irvine received by email Qualcomm consultant Isailovic's report on the

27   January/February 2002 JVT meeting in Geneva, which Mr. Isailovic also sent to

28                                         25

Qualcomm employees Ratzel and Silberger.  (Doc. No. 543-2, Ex. A, Tab 4 at 74.)  Two

days later, Ms. Irvine forwarded Mr. Isailovic's report to six Qualcomm employees,

including Ms. Raveendran, Mr. Determan, Mr. Silberger, and Mr. Yun.  (Id., Tab 5.)  In

May 2002, Ms. Irvine received a three-page report on the May 2002 JVT meeting in

Fairfax from Qualcomm colleague Yun, which was also sent to other Qualcomm

employees including Amnon Silberger, Mr. Ratzel, and Ms. Raveendran.  (Id., Tab 57 at

361 - 63.)  In that email, Mr. Yun explicitly stated, "I've attended some JVT meetings and

saw some demo (so did Amnon)."  (Id., Tab 57 at 361.)

### (b)    James Determan

Similar to Ms. Irvine, Qualcomm employee James Determan gave deposition

testimony that is belied by the documents Qualcomm produced post-trial.  In his August

2006 deposition, Mr. Determan testified that he did not know if Qualcomm was a member

of the JVT and that he did not believe he was personally a member of the JVT:

> Q      Do you know if Qualcomm is a member of the JVT?
> MR. LEUNG:          Objection.  Calls for speculation.
> THE WITNESS:      I do not know.
> BY MS. HUNT:
> Q      Are you personally a member of the JVT?
> A      I do not believe so.

(Doc. No. 543-2, Ex. S at 27.)

However, in conflict with this testimony, Mr. Determan received an email in January

2004 from Qualcomm colleague Laura Chiu with the subject title "FW: JVT Membership

Renewal."  (Doc. No. 543-2, Ex. A, Tab 128 at 727.)  In that email, which was also sent to

five other Qualcomm employees including Viji Raveendran, Amnon Silberger, Rick Kane,

and Seyfullah Oguz, Ms. Chiu wrote:

> Please let me know if you are still interested in being a **JVT member**.

> Rick, would it be ok to make Viji the principal?  I will be processing payment
> for MediaFLO members: Viji, Amnon and Seyfullah.

(Id.) (emphasis added.)  Attached to the end of Ms. Chiu's email was a forwarded email

with the same subject heading.  In that forwarded email thread, Ms. Chiu first wrote to

1  Parthenia Purcell, Associate Manager of Membership Services for the Information

2  Technology Industry Council ("ITIC"):

3      When you have the chance, please send me the invoices for **JVT**
        **membership** renewal for Viji Raveendrand [sic] (Principal), Amnon
4      Silberger (Alternate), and an application for Seyfullah Oguz (new member).

5  (Id., Tab 128 at 730) (emphasis added.)  Ms. Purcell forwarded Ms. Chiu's request to add

6  new member Qualcomm employee Oguz to Lynn Barra, Associate Director of Information

7  Technology Industry Standards Operations, who replied to Ms. Chiu as follows:

8      Prior to making any changes to the **Qualcomm membership**, we would like
        to verify the information we have on file with you.  Below is the current
9      member information we have in our database.

10     Rick Kane - principal ($800)

11     Amnon Silberger - alternate (free, included with principal membership)

12     Hari Garudadri - additional alternate ($800)

13     **Jim Determan** - additional alternate ($800)

14     Viji Raveendran - additional alternate ($800)

15  (Id., Tab 128 at 728) (emphases added.)

16      Moreover, Mr. Determan received many of the emails discussed above, which

17  included JVT meeting reports from Qualcomm employees and consultant Isailovic as well

18  as discussion of Qualcomm monitoring of the JVT.  Therefore, the Court can only conclude

19  that, at the time of Mr. Determan's August 2006 deposition, he was fully aware that (1)

20  Qualcomm was heavily involved with the JVT since as early as January 2002 and (2) as

21  recently as 2004, Qualcomm was still a paying member of the JVT and so was Mr.

22  Determan as a Qualcomm representative.

23      Mr. Determan also testified in his August 2006 deposition that he did not recall ever

24  attending a JVT meeting nor was he aware of any Qualcomm employee attending any:

25     Q      Have you ever attended any meeting of the JVT?
        A      Not that I recall.
26     Q      Do you know of any Qualcomm employees that have attended JVT
               meetings?
27     MR. LEUNG:        Objection.  Calls for speculation.

28
                                        27

1    THE WITNESS:     Not that I'm aware.

2    (Doc. No. 543-2, Ex. S at 27.)  However, Qualcomm's post-trial production of documents

3    reveals that, not only was Mr. Determan aware that Qualcomm employees had attended

4    JVT meetings, but Mr. Determan probably attended some himself.

5         Qualcomm employee Silberger wrote in an April 2002 email:

6         We have been attending these standard body meetings for a while now.
          There are the MPEG/JVT/JPEG meetings and the SMPTE meetings.  To ease
7         the load, all the system engineers in our group rotate in attending these
          (Chris, Jay, Viji, Jim Determan and myself.)
8
     (Doc. No. 543-2, Ex. A, Tab 44 at 306.)  Mr. Determan also received five emails from
9
     Qualcomm colleagues Yun and Silberger with daily reports from their attendance of the
10
     May 2002 JVT meeting in Fairfax, Virginia.  (Id., Tabs 56 - 60.)
11
          Mr. Determan then testified at his August 2006 deposition that he did not know
12
     when any JVT meetings took place nor did he recall ever hearing reports of any JVT
13
     meetings:
14
          Q    Do you know when any of the JVT meetings took place?
15        A    No.
          Q    Have you ever heard any reports, whether via email or written report
16             or any discussion, of what occurred at any JVT meeting?
          A    Not that I recall.
17
     (Doc. No. 543-2, Ex. S at 29.)  However, in contrast to this testimony, as stated above, Mr.
18
     Determan received multiple reports of the May 2002 JVT meeting in Fairfax.  (Doc. No.
19
     543-2, Ex. A, Tabs 56 - 60.)  He also "rotated" attending MPEG/JVT/JPEG and SMPTE
20
     standard body meetings with the other engineers in his group, Mr. Silberger, Mr. Yun, Ms.
21
     Raveendran, and Ms. Irvine.  (Id., Tab 44 at 206.)  Furthermore, in February 2002, he
22
     received Qualcomm consultant Isailovic's report of the January 2002 JVT meeting in
23
     Geneva forwarded to him by Qualcomm colleague Irvine.  (Id., Tab 5.)
24

25                      **(c)    Viji Raveendran**

26        In addition to her colleagues Ms. Irvine and Mr. Determan, Qualcomm trial witness

27

28                                28                        05-CV-1958-B (BLM)

and senior staff engineering manager Viji Raveendran also gave testimony at deposition and trial that was later blatantly contradicted by Qualcomm's post-trial document production.  Ms. Raveendran testified in her July 2006 deposition that she did not even learn of the JVT until 2003 through journals and publications:

> Q.      [] Referring only to the Joint Video Team that developed the H.264
>          standard, when did you first learn of the Joint Video Team that
>          developed the H.264 standard?
> A.      Somewhere in the 2003 time frame.
> Q.      How did you learn of it?
> A.      Through literature.
> Q.      What literature?
> A.      Basically journals and video processing related --
> THE REPORTER:   Related what?
> THE WITNESS:      Journals and publications, basically publications.

(Doc. No. 543-2, Ex. P at 36 - 37.)

However, the evidence produced by Qualcomm post-trial reveals that Ms. Raveendran knew of the JVT as early as February 2002 through reports on JVT meetings from Qualcomm consultant Isailovic, not through "journals and publications" in "the 2003 time frame" as she testified.  Qualcomm produced post-trial almost one hundred emails and JVT meeting reports Ms. Raveendran either received or sent in 2002 addressing JVT's work and its relation to Qualcomm.  (Id., Tabs 5 - 111.)  For example, in February 2002, Ms. Raveendran received Qualcomm consultant Isailovic's report on the January 2002 JVT Meeting in Geneva in an email forwarded by Qualcomm colleague Irvine.  (Doc. No. 543-2, Tab 5.)  Furthermore, Ms. Raveendran sent many emails herself to other Qualcomm employees regarding the JVT, including her February 2002 email to Mr. Yun and Ms. Irvine, in which she says, "Chris is going to the JVT mtg. and will be driving tomorrow. We will meet at Starbucks off Jefferson Rd. exit on I-78 (off of I-5) at 11:30 a.m."  (Id., Tab 8 at 88.)

Later in her deposition, Ms. Raveendran testified that she did not know of nor did she receive a report of the JVT meeting (1) in January 2002 in Geneva, Switzerland; (2) in May 2002 in Fairfax, Virginia; (3) in August 2002 in Klagenfurt, Austria; (4) in October

29

2002 in Geneva, Switzerland; (5) in December 2002 in Awaji Island, Japan; and (6) in September 2003 in San Diego, California. (Id. at 41 - 44.) In direct contradiction to her testimony, Qualcomm's post-trial production of documents reveal that Ms. Raveendran did in fact receive (1) a report of the January 2002 JVT meeting in Geneva (Doc. No. 543-2, Tab 5); (2) many emails discussing and reporting on the May 2002 JVT meeting in Fairfax, including at least one sent by Ms. Raveendran herself (Id., Tabs 18, 22, 25, 32, 35, 36, 41, 56 - 61); (3) emails discussing the August 2002 JVT meeting in Klagenfurt, including ones forwarding documents registered for the Klagenfurt meeting "[p]er your request, Viji" and forwarding lists of Klagenfurt meeting registrants under "Viji, [t]his is for you" (Id., Tabs 54, 69, 80 at 468, 82, 84 at 492); (4) emails discussing the October 2002 JVT meeting in Geneva, including one from Ms. Raveendran herself (Tabs 54, 97); (5) an email mentioning the December 2002 JVT meeting on Awaji Island (Doc. No. 100); and (6) an email mentioning the September 2003 JVT meeting in San Diego (Doc. No. 123).

Later in her July 2006 deposition, Ms. Raveendran testified that she did not know of any JVT IPR policy:

> Q.    Does the JVT have a policy regulating intellectual property rights?
> A.    I don't know of that.

(Doc. No. 543-2, Ex. P at 76.) However, again, documents produced by Qualcomm post-trial tell a different story. Ms. Raveendran forwarded an email to two Qualcomm colleagues in October 2002 with the subject heading "Fwd: [jvt-ipr] Confirmation of JVT IPR meeting in Geneva." (Doc. No. 543-2, Ex. A, Tab 97 at 567.) In that email, she wrote, "FYI. Some information on licensing issues and IPR in JVT." (Id.) The forwarded email included a suggested meeting agenda:

> 1) short summary of the IPR status in JVT
> 2) potential licensing models, examples and wishes: MPEG-4, other
> 3) (ongoing) determination of essential patent holders
> 4) expected process once essential patent holders are identified
> 5) involvement of licensees and the role of this "JVT-IPR group"

(Id., Tab 97 at 568.) Therefore, Ms. Raveendran was aware that the JVT wanted to identify

1    "essential patent holders" and was developing licensing models to regulate IPR.

2         Then in November 2002, Ms. Raveendran wrote an email to three Qualcomm

3    employees, including Mr. Yun and Mr. Silberger, in which she wrote, "Attached is the

4    Patent list Statement on MPEG.  Part 10 covers JVT (under AVC, that's how JVT is

5    referred to in MPEG world)."  (Id., Tab 101 at 590.)  Jay Yun then sent out an email in

6    response to a question as to the completeness of Ms. Raveendran's list:

7         Initially JVT set out to come up with a royalty-free baseline profile.  Many
          submitted their technologies knowing that this is going to be the case, or
8         some even withheld their submissions into the Baseline profile because they
          didn't want to submit as royalty-free.  And then over time it became evidence
9         that royalty free baseline is not going to be possible.  Some patents are carry
          over from MPEG-2 and 4.  So now, some want to re-define the baseline
10        profile and make sure all who didn't submit technologies before b/c they
          thought they couldn't would be allowed to submit again.  A big mess.
11
12   (Id., Tab 101 at 589.)  Ms. Raveendran then clarified Mr. Yun's response in her own email:

13        A quick note: yes, this is not a complete list as Jay clarified.  Also, the
          contributions that did not make it into JVT's baseline profile (due to royalty
14        issues), are now incorporated into the "Common" profile.

15   (Id., Tab 101 at 588.)  Therefore, in contradiction to her deposition testimony, Ms.

16   Raveendran was clearly aware of how the JVT was organizing its IPR into various profiles

17   and licensing schemes and did "know of" the JVT's policy regarding its IPR.

18        Furthermore, Ms. Raveendran's trial testimony is directly rebutted by Qualcomm's

19   post-trial production of documents.  She testified that Qualcomm did not get involved in the

20   JVT until "much later" after the JVT was formed in late 2001:

21        Q    Was Qualcomm involved with JVT at that time [when the JVT was
               formed in 2001]?
22        A    No, we were not.
          Q    Did Qualcomm ever become involved with JVT?
23        A    Much later, when -- I mean, my -- my participation has been -- I don't
               know who else participated in Qualcomm recently, but -- is that much
24             later when the scalable video coding effort got merged into JVT -- the
               scalable video coding was a different standard that MPEG was
25             working on, and when they -- when that work item got moved to JVT,
               that's when we started participating.

26   (Trial Tr., 40 - 41, Jan. 24, 2007.)  However, as demonstrated by Mr. Isailovic's report on

27   the January 2002 JVT meeting in Geneva, which was forwarded to Ms. Raveendran in

28                                              31

February 2002, Qualcomm was involved in the JVT as early as January 2002, which Ms.

Raveendran was well aware of when she testified at trial.  (Doc. No. 543-2, Tab 5.)

At trial, Ms. Raveendran also testified that her only personal involvement with the

JVT was attending one JVT meeting in July 2005 in Poland:

> Q    Did you have any personal involvement with JVT?
> A    I attended one of their meetings when they were working on the
>      scalable video coding effort.  Scalable video coding is to enable
>      different quality levels and different display levels of recorded video,
>      depending on the display sizes, for example.
>      So that was a new technology that the group was working on, and my
>      interest was more in the sense of how robust that technology is to
>      errors.  Because in a wireless scenario, there are errors that will cut up
>      the data, and how robust is that data.  So that was my involvement.

(Trial Tr., 41, Jan. 24, 2007.)  However, as is made abundantly clear by Qualcomm's post-

trial document production described above, that was far from the extent of Ms.

Raveendran's involvement with the JVT.  The documentary email evidence shows that Ms.

Raveendran was in fact integrally involved with Qualcomm's intense monitoring of the

JVT since as early as February 2002: sending JVT reports, receiving JVT reports, and

acting as a liaison between Qualcomm and consultant Isailovic who attended JVT meetings

on Qualcomm's behalf.

### b.    Misconduct of Qualcomm counsel

### (1)    Misconduct during discovery

The Court **FINDS** by clear and convincing evidence that Qualcomm counsel

participated in an organized program of litigation misconduct and concealment throughout

discovery, trial, and post-trial before new counsel took over lead role in the case on April

27, 2007.

On October 14, 2005, Qualcomm counsel filed a Complaint on behalf of Qualcomm

alleging Broadcom's infringement of the '104 and '767 patents based on Broadcom's

manufacture, sale, and offers to sell H.264-compliant products, requesting preliminary and

permanent injunction and damages.  (Doc. No. 1.)  On January 23, 2006, Broadcom

submitted its First Set of Requests for the Production of Documents and Things (Nos. 1 - 88), in which it requested "[a]ll documents concerning Qualcomm membership, participation, interaction, and/or involvement in setting any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent." (Doc. No. 543-2, Ex. V at 17.)  Qualcomm counsel submitted in Qualcomm's Response to Broadcom's request on February 24, 2006, the following response:

> QUALCOMM will produce responsive non-privileged documents that were given to or received from standards-setting body responsible for the ISO/IEC MPEG-4 Part 10 standard, and which concern any QUALCOMM participation in setting the ISO/IEC MPEG-4 Part 10 standard, following the entry of, and pursuant to the terms of, a mutually agreed-upon protective order.

(Doc. No. 543-2, Ex. W at 44.)  This response deflected the request as though it only addressed the MPEG-4 Part 10 standard and completely concealed Qualcomm's extensive involvement with the JVT and the H.264 standard.

On January 23, 2006, Broadcom also submitted Request for Production No. 49 requesting "[a]ll documents given to or received from a standards setting body or group that concern any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent, including without limitation communications, proposals, presentations, agreements, commitments, or contracts to or from such bodies."  (Doc. No. 543-2, Ex. E at 1.)  Later on July 14, 2006, Broadcom submitted Request for Production No. 93 requesting "[a]ll documents referring to or evidencing any participation by Qualcomm in the proceedings of the JVT, the ISO, the IEC, and/or the ITU-T."  (Id.) Despite these requests, Qualcomm counsel produced none of the over two hundred thousand pages of emails and electronic documents concerning the JVT and the H.264 standard, which were clearly within the scope of the requests, and that were finally produced four months post-trial.

On January 23, 2006, Broadcom submitted its First Set of Interrogatories Under Fed. R. Civ. P. 33 (Nos. 1-16), in which it listed as Interrogatory No. 13:

1
2
3
4

> Please identify and describe in detail Qualcomm's membership, participation, interaction, and/or involvement in setting any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm patent [. . .] This interrogatory includes without limitation any MPEG [Moving Pictures Working Group] video processing standard, and expressly includes H.264.

5
6
7
8
9

(Doc. No. 565-2, Ex. C at 15.)  Broadcom further asks in this same interrogatory for "the nature, purpose, effect, and sum and substance of Qualcomm's participation and/or involvement," "the identity of each Person who participated or was involved on behalf of Qualcomm," and the "relevance" and "identity" of any Qualcomm patent "related to such standard."  (Id. at 15 - 16.)

10
11
12
13
14

The Court quotes the verbatim response submitted by Qualcomm counsel to Interrogatory No. 13 in Qualcomm's Fourth Supplemental Response to Broadcom's First Set of Interrogatories (Nos. 1-16), pages 33 - 35, dated September 5, 2006, because it demonstrates vividly the stonewalling denial and diversions of requests for evidence repeatedly directed to Qualcomm:

15
16

> QUALCOMM refers to and incorporates by reference each of the foregoing general objections as though each is set forth fully herein, including privilege and work product.

17
18

> QUALCOMM further objects to the definition of "identify" to the extent it renders the interrogatories overly broad, unduly burdensome and/or would require QUALCOMM to provide information that is not within its possession, custody, and control and/or cannot be identified or located with a reasonably diligent search.

19
20
21
22

> QUALCOMM objects to the purported requirement that it respond "in detail" as vague, ambiguous, unduly burdensome, overly broad, and requiring information not within its possession, custody, or control. In particular, it is unclear how much detail is requested, and QUALCOMM will respond only to the extent information is explicitly requested.

23

> QUALCOMM objects to the term "Qualcomm Patent" as vague and ambiguous, and instead will refer to the "QUALCOMM Patents-in-Suit."

24
25
26

> QUALCOMM objects to the definition of "Person" to the extent that its definition is circular with respect to "Entity" and "entities." "Person" is defined to include any "legal entity," "government entity," and "business entity." "Entity" is defined to include "natural persons." QUALCOMM will construe "Person" in accordance with its reasonable ordinary meaning.

27
28

> QUALCOMM objects to the phrase "any standard relating to the

processing of digital video signals" as vague and ambiguous. QUALCOMM further objects to the defined terms "standard" or "standards" as vague, ambiguous, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence; and to the defined terms "MPEG video processing" as vague, ambiguous, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. QUALCOMM will construe those terms as stated in the general objections.

QUALCOMM objects to the term "relevance" as vague, overly broad, and neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

QUALCOMM objects to the purported requirement that it respond as to the time period(s) at issue as vague, ambiguous, overly broad, unduly burdensome, and requiring information not within its possession, custody, or control.

QUALCOMM objects to the phrase "nature, purpose, effect, and sum and substance" as vague, ambiguous, overly broad, unduly burdensome, and requiring information not within its possession, custody, or control.

QUALCOMM objects to the phrase "participation and/or involvement" as vague, ambiguous, overly broad, and unduly burdensome.

QUALCOMM objects to the phrase "membership, participation, interaction, and/or involvement" as vague, ambiguous, overly broad, and unduly burdensome because the phrase "membership . . . in setting any standard" is impossible to parse.

QUALCOMM objects to the purported requirement that it identify "each" person, to the extent it calls for information that is not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the purported requirement that it respond as to "standards raised but never adopted" as vague and to the extent it calls for information not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the purported requirement that it identify the particular standard(s) that resulted from Qualcomm's involvement, to extent it calls for information that is not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the phrase "relevance" in interrogatory 13(I) as vague, ambiguous, overly broad, unduly burdensome, calling for information that is not within QUALCOMM's possession, custody, and control and/or cannot be identified or located with a reasonably diligent search, and neither relevant to any claim or defense at issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. In particular, the basis for determining relevance is unclear, the interrogatory

potentially requires a response that is virtually unlimited in scope, and it is unclear as to the entities from whose perspective relevance is to be determined.

QUALCOMM objects to the term "related" as vague, ambiguous, overly broad, and unduly burdensome, and neither relevant to any claim or defense at issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the general and specific objections set forth herein, QUALCOMM responds as follows.  Beyond passive monitoring, QUALCOMM participated in ISO/IEC JTC1/SC29 WG11 of MPEG. The time period at issue includes 2001. The nature of QUALCOMM's participation includes the contribution of two proposals with document numbers 7340 and 7341. The author of these proposals was A. Chris Irvine.

QUALCOMM contributed four proposals to the JVT in 2006. One each during the January and April meetings, and two during the July meeting. The authors of these proposals were Yiliang Bao and Yan Ye. During the April 2006 meeting of the JVT, QUALCOMM also contributed a verification of an earlier proposal by LG.

QUALCOMM's investigation concerning this interrogatory is ongoing and QUALCOMM reserves the right to supplement its response to this interrogatory as warranted by its investigation.

On March 10, 2006, Qualcomm counsel submitted its Initial Disclosure of Asserted Claims and Accused Products Relating to the '767 and '104 Patents, in which it listed as Accused Broadcom Products those products that "conform to, comply with, and/or support H.264." (Doc. 565-2, Ex. A at 1.)  At that point, Qualcomm apparently was very much aware of the relevance of the H.264 standard.

On May 23, 2006, Broadcom submitted its Notice of Rule 30(b)(6) Deposition to Qualcomm, [Notice No. 1: Qualcomm's Products, Processes, and Instrumentalities], in which it notices topics for 30(b)(6) deposition, including:

The attendance or participation by any Qualcomm principal, employee, or representative at any H.264 standards committee meetings, including, but not limited to, the dates, locations and agendas of such meetings, notes taken at such meetings, membership of any Qualcomm principal, employee, or representative in any H.264 standards committees, and any actions taken by Qualcomm or any of its principals, employees, or representatives as a result of such meetings.

(Doc. No. 565-2, Ex. D at vii.)  In July 2006, Qualcomm's preferred Rule 30(b)(6) witness Christine Irvine falsely testified at deposition as described above in Section III-B-5-a-(2)-(a) that Qualcomm was not a member of the JVT; Qualcomm was not aware of any

36

1  attendance of JVT meetings; and that nobody at Qualcomm sought to become involved in

2  the development of the H.264 standard.  (Doc. No. 543-2, Ex. Q at 30, 34, 40.)

3          On July 12, 2006, Broadcom filed an additional Rule 30(b)(6) notice specifically

4  addressing the JVT in its Notice of Rule 30(b)(6) Deposition to Qualcomm, [Notice No. 5:

5  H.264 Participation].  (Def's Binder, 06-25-07 Hr'g, Tab 6.)  Qualcomm's subsequent Rule

6  30(b)(6) witness Scott Ludwin testified at his August 2006 deposition that he had never

7  heard any discussion nor seen documentation of Qualcomm membership in the JVT:

8
9      Q.      I take it further you haven't seen any written documentation of
               Qualcomm's membership in the JVT.
       MR. LEUNG:         Objection; lacks foundation.
10     THE WITNESS:       I've never been at any discussions with respect to the
                          membership in JVT or seen any documents if they do
11                        exist.

12  (Doc. No. 543-2, Ex. R at 26.)  He also testified that he did not know whether any

13  Qualcomm employees were JVT members:

14     Q.      [. . .] [D]o you know whether any Qualcomm employees are currently
               members of the JVT?
15     MR. LEUNG:         Objection; vague and ambiguous.
       THE WITNESS:       I don't know.  Again I'm not familiar with the
16                        membership structure of the JVT and your attendance in
                          those particular organizations.
17
   (Def's Binder, 06-25-07 Hr'g, Tab 13 at 26 - 27.)   He later testified in the same deposition
18
   that December 2003 was Qualcomm's first participation in the JVT:
19
       Q.      [. . .] So did any Qualcomm employee prior to December, 2003
20             participate in any JVT activity?
       A.      I believe that December of 2003 was our first participation in any
21             formal JVT meeting.  I believe Qualcomm sponsored an event, a JVT
               event when that organization met in San Diego [in September 2003].
22             I'm not certain – I don't know if anyone from Qualcomm actually
               went to that event.  That is the only participation that I know of any
23             Qualcomm company employee in any JVT activity.

24  (Ex. 565-3, Ex. H at 51.)

25          On August 16, 2006, Qualcomm counsel submitted Qualcomm's Response to

26  Broadcom's Second Set of Requests for Production of Documents and Things (Nos. 89-

27  115).  (Doc. No. 543-2, Ex. X.)  Qualcomm there stated:

28
                                        37                      05-CV-1958-B (BLM)

1
2

> QUALCOMM will produce non-privileged relevant and responsive documents describing QUALCOMM's participation in the JVT, if any, which can be located after a reasonable search.

3  (Id. at 12.)  As is clear to the Court now, Qualcomm failed to produce even one of the over

4  two hundred thousand pages of emails, memoranda, and electronic documents related to

5  Qualcomm's participation in the JVT, which were finally produced after trial.  But

6  Qualcomm's assurance of performing a "reasonable search" represents that Qualcomm was

7  acting in good faith to produce discovery.

8         On September 5, 2006, Qualcomm counsel then submitted Qualcomm's First

9  Supplemental Response to Broadcom's Second Set of Interrogatories (Nos. 17-29), in

10  which Qualcomm represented that the first JVT meeting attended by a Qualcomm

11  employee was by Phoom Sagetong in December 2003.  (Doc. No. 543-2, Ex. Y at 12.)

12  Qualcomm listed Mr. Sagetong as attending eight JVT meetings from December 2003 to

13  January 2006 and asserted that the only other Qualcomm employees to attend JVT

14  meetings were: (1) Yuriy Reznick, who attended the July 2005 and October 2005 meetings;

15  (2) Ms. Raveendran, who attended the July 2005 meeting; and (3) Yiliang Bao, who

16  attended three meetings from January 2006 to July 2006.  (Id. at 12 - 13.)  As shown in

17  great detail hereabove, these supplemental responses were calculatedly misleading and

18  totally false in the context of their denial of any attendance of a JVT meeting by any

19  Qualcomm representative prior to December 2003.

20         Qualcomm counsel's discovery responses demonstrate that they were able to locate

21  with alacrity company records from December 2003 forward and find four or more

22  Qualcomm employees participating in proceedings of the JVT.  Yet inexplicably, they were

23  unable to find over 200,000 pages of relevant emails, memoranda, and other company

24  documents, hundreds of pages of which explicitly document massive participation in JVT

25  proceedings since at least January 2002.  These examples of Qualcomm counsel's

26  indefensible discovery conduct belie counsel's later implied protestation of having been

27  "kept in the dark" by their client.

28

38

**(2)      Misconduct during motions practice**

The gross litigation misconduct by Qualcomm counsel continued through motions practice before the Court.

On September 1, 2006, Qualcomm counsel submitted a Declaration of Dr. Iain Richardson in support of Qualcomm's Motion for Summary Adjudication of no waiver, in which Dr. Richardson declared under penalty of perjury in pertinent part:

> I have been unable to find any documentary evidence of the involvement of Qualcomm personnel in the H.264/AVC [Advanced Video Coding] standardization process prior to September 2003, by which time the technical content of the baseline, main and extended profiles was considered to be frozen and the first issue of the H.264/AVC standard had been published.

(Doc. No. 543-2, Ex. T at 5) (footnote omitted.)  Dr. Richardson continued:

> The involvement of Qualcomm employees in JVT activities from September 2003 to December 2005 appears to be minimal, with no technical contribution documents submitted by any Qualcomm employee.

(Id. at 5.)  Dr. Richardson then concluded:

> Indeed, Qualcomm was not significantly involved in the JVT until 2006, and then its involvement has been limited to the SVC [Scalable Video Coding] standardization project, not the H.264/AVC standard.  Therefore, it is my opinion that Qualcomm did not meaningfully participate in the development of the H.264/AVC standard, and Qualcomm did not violate any of JVT's or ITU-T's rules or expectations regarding the disclosure of intellectual property rights.

(Id. at 9.)  Here, even Qualcomm's scientific expert Dr. Iain Richardson, who was qualified as an expert in video compression technology and who testified at trial that Broadcom's H.254-compliant products infringed the '104 and '767 patents, was used by Qualcomm counsel to step out of his field of expertise and sign a declaration vouching for the absence of any corporate records regarding Qualcomm's participation in the JVT.

Qualcomm counsel then filed this Richardson declaration on November 6, 2006, as Exhibit 15 to the Declaration of Kyle S. Robertson in Support of Qualcomm Incorporated's Motion for Summary Adjudication regarding Broadcom's defenses of equitable estoppel, implied license, fraud, unclean hands, breach of contract, laches, and waiver.  (Doc. No. 168.)

05-CV-1958-B (BLM)

1    On November 6, 2006, Qualcomm counsel filed Qualcomm's Motion for Summary

2 Adjudication as to Broadcom's defenses including waiver (Doc. No. 165), to be heard by

3 the Court on December 5, 2006.  In the Introduction of the opening brief, Qualcomm

4 counsel argued as follows: "The facts are undisputed: QUALCOMM employees never

5 participated, in any form, in the JVT until *after* the H.264 standard was already released."

6 (Doc. No. 543-2, Ex. Z at 1.)  Qualcomm counsel continued, "There is no evidence that any

7 QUALCOMM participant knew of the applicability of the patents-in-suit to the H.264

8 standard prior to the initiation of this lawsuit."  (Id.)

9    Qualcomm counsel then argued emphatically in the body of Qualcomm's opening

10 brief for summary adjudication, as summarized in the chart below:

| Section title of Qualcomm's brief | Arguments made by Qualcomm counsel |
|---|---|
| JVT Practices and Procedures and QUALCOMM's Participation | The evidence is undisputed that QUALCOMM was not involved, in any manner, with the work of the JVT leading up to this release of the H.264 standard in May of 2003.  There is no evidence that QUALCOMM attended any of the JVT meetings between December, 2001 and May, 2003.  Until September of 2003, no QUALCOMM employee ever attended a meeting of the JVT.  There is also no evidence that QUALCOMM employees engaged in any email correspondence or other means for working with the JVT to develop the standard.

(Doc. No. 543-2, Ex. Z at 4) (citations omitted.)

The first recorded instance of a named QUALCOMM employee attending a meeting of the JVT occurs with Phoom Sagetong in December, 2003 [. . .] Between 2003 and 2005, Mr. Sagetong was the only QUALCOMM employee to attend a meeting of the JVT.

(Id.) (citations omitted.)

QUALCOMM never submitted a JVT patent disclosure form related to the baseline H.264 profile because QUALCOMM never participated in the JVT meetings where that standard was created [. . .] In April 2006, QUALCOMM declared that it had patents it believed were "required to implement" the H.264 standard, and that it was prepared to license any such patents on a "worldwide, non-discriminatory basis and on reasonable terms and conditions." |

40

| | |
|---|---|
| | (Id. at 7) (citations omitted.) |
| It Is Undisputed that QUALCOMM Did Not Make a Misleading Communication | There is no evidence that any QUALCOMM employee was a JVT participant prior to September, 2003, and therefore there is no reasonable basis for Broadcom to assert that QUALCOMM had a duty to disclose the patents-in-suit prior to this point in time.  There is no evidence of any particular QUALCOMM employee attending a meeting of the JVT prior to Phoom Sagetong, in December, 2003.<br><br>(Doc. No. 543-2, Ex. Z at 10) (citations omitted.)<br><br>It is undisputed that none of the QUALCOMM employees attending JVT meetings knew of the potential applicability of the patents-in-suit to the H.264 standard [. . .] [N]one of them [Qualcomm employees] can be accused of making any misleading statements or engaging in any misleading omissions.<br><br>(Id.) (citations omitted.)<br><br>The relevant H.264 standard had already been in place and the technical content of the standard established when the attendees in question, QUALCOMM engineers, attended their first meeting of the JVT.<br><br>(Id. at 10.) |
| Broadcom's Claim Of Fraud Is Insufficient As A Matter Of Law | [T]here is no evidence showing the requirements of scienter and intent to defraud, as none of the QUALCOMM employees attending JVT meetings knew of these patents.<br><br>(Doc. No. 543-2, Ex. Z at 15.) |
| Broadcom's Claim Of Unclean Hands Is Insufficient As A Matter Of Law | QUALCOMM employees participating in the JVT acted in good faith at all times[.]<br><br>(Doc. No. 543-2, Ex. Z at 16.) |

In conjunction with the Motion for Summary Adjudication, Qualcomm counsel also filed a supporting Statement of Undisputed Facts, in which it listed as undisputed fact:

10.  Qualcomm was not involved with the work of the JVT leading up to the release of the H.264 standard in May of 2003.

11.  Qualcomm had no influence or effect on the technical content of the H.264 standard prior to its publication in May 2003.

41

1    (Doc. No. 543-2, Ex. AA at 2) (citations omitted.)

2        Then, on November 27, 2006, Qualcomm counsel filed their reply brief in support of

3    Qualcomm's Motion for Summary Adjudication, in which they addressed the appearance

4    of Qualcomm employee Raveendran's email address in an email list for a JVT ad hoc

5    group:

6        It does not show that Raveendran ever received any JVT documents or JVT
         information of any sort, let alone anything covering the relevant parts of the
7        H.264 standard.  The document thus does not contradict Raveendran's
         testimony that she did not receive information related to JVT meetings, and
8        did not know of JVT meetings or have any involvement with the JVT prior to
         her participation in the SVC project.  The document also provides no
9        evidence regarding what emails were allegedly sent to the "avc_ce" email
         list, whether Raveendran was actually on this list or received any emails, and
10       whether she viewed and understood any emails that actually support the
         elements of the defenses Broadcom has to prove, including that
11       QUALCOMM understood at the time that either of the patents-in-suit may
         relate to the H.264 standard.  In short, this document, even if admissible
12       (which it is not), fails to support *any* reasonable inference for Broadcom and
         does not contradict Broadcom's own expert when he agreed that
13       "QUALCOMM had not influence or effect on the technical content of the
         H.264 standard prior to its publication in May 2003."

14   (Doc. No. 543-2, Ex. CC at 6 - 7) (footnote and citations omitted.)  Later, in a section

15   entitled "It Is Undisputed That No QUALCOMM Employee Knew Of The Applicability of

16   The Patents-In-Suit To The H.264 Standard Prior To This Lawsuit," Qualcomm counsel

17   argued:

18       All Raveendran stated [in her deposition] was "I have seen the front page [of
19       the '104 patent], I haven't seen the entire document."  This testimony does
         not show that Raveendran was familiar with the technical details of the H.264
20       standard or with the relevance of the '104 Patent to the H.264 standard.  It
         falls far short of establishing that Raveendran "knew of the applicability of
21       the patents-in-suit to the H.264 standard," only showing that Raveendran
         never read the '104 Patent.

22   (Doc. No. 543-2, Ex. CC at 9) (footnote and citation omitted.)

23       The lynchpin of Qualcomm's adamant and determined motions and arguments for

24   summary adjudication was the claim that Broadcom had no evidence of JVT participation.

25   Not surprising.  Every attempt to obtain evidence, which as it came later to be revealed was

26   voluminous and dispositive, had been repelled by Qualcomm by its steadfast denial of the

27

28                                           42                        05-CV-1958-B (BLM)

existence of any evidence and the false denials of all factual allegations, both in its

witnesses' depositions and in its discovery responses.  To then urge upon the Court that

Broadcom had no evidence to support its position demonstrates the reason for calculated

orchestration of a deliberate plan to conceal evidence in the case.

On November 19, 2006, Qualcomm counsel filed Qualcomm's Motion in Limine to

Exclude Evidence Relating to Qualcomm's Participation in the JVT, the Timing of its

Disclosures, and the Testimony of Cliff Reader, or, in the Alternative, for Adjudication of

Broadcom's Equitable Defenses in a Bench Trial, in which they again argued:

> Broadcom has conducted extensive discovery relating to QUALCOMM's alleged involvement in the JVT, apparently in an effort to claim that QUALCOMM had some obligation to disclose, prior to filing the present action in October 2005, that it had patents required to implement the H.264 standard [. . .]

> It is undisputed that QUALCOMM did not become involved at all in the JVT's proceedings until after the JVT had finalized the H.264 technical specifications, and Broadcom's expert, Dr. Reader, admitted that QUALCOMM had "no influence or effect on the technical content of the H.264 standard prior to its publication in May 2003." [. . .]  There is no evidence that QUALCOMM attended any of the JVT meetings between December 2001 and May 2003.  In fact the first QUALCOMM participation did not occur until September 2003.

(Doc. No. 543-2, Ex. EE at 2) (footnotes omitted.)  These two paragraphs contain nothing

but false statements.

On the same day, Qualcomm counsel filed Qualcomm's Memorandum of

Contentions of Fact and Law, in which they similarly asserted under the section entitled

"QUALCOMM's Lack of Involvement in H.264 Standardization Process":

> 66.  There is no evidence of any involvement of QUALCOMM personnel in the H.264/AVC standardization process prior to September 2003, by which time the technical content of the baseline, main and extended profiles was considered to be frozen and the first issue of the H.264/AVC Standard had been published.

> 67.  QUALCOMM employees had only minimal involvement in JVT activities from September 2003 to December 2005, with no technical contribution documents submitted by any QUALCOMM employee.

> 68.  QUALCOMM had no significant involvement with the development of the H.264/AVC Standard.

(Doc. No. 543-2, Ex. BB at 16 - 17.)  Qualcomm counsel then filed Qualcomm's Rebuttal Memorandum of Contentions of Fact and Law on December 4, 2006, in which they asserted:

> 31.  QUALCOMM was not a JVT participant leading up to the release of the H.264 standard when it was technically fixed in December 2003 or when it was officially released in May 2003 [. . .]
>
> 32.  Broadcom's allegation that QUALCOMM was involved with the JVT prior to the development and release of the standard is based solely on the appearance of the e-mail address of QUALCOMM employee Viji Raveendran on an e-mail list for the Ad Hoc Group on AVC verification tests [. . .]  Broadcom offers no other evidence of participation in the JVT by Ms. Raveendran or any other employee as early as December 2002.
>
> 33.  Ms. Raveendran was not involved in any standards development projects relating to the H.264 standard, nor did she recall receiving submissions or documents related to the standard.  Raveendran did not receive information related to the JVT meetings or know of JVT meetings prior to her participation in a separate JVT project, the scalable video coding project, unrelated to the patents in suit or to this litigation.
>
> 34.  Broadcom's only other allegation with respect to QUALCOMM participation in the JVT occurs long after the standard was technically fixed and officially released: the apparent sponsorship of a JVT meeting by QUALCOMM and alleged and unverified recording of a single objection made by QUALCOMM to a proposed change in the profile in September 2003, and the appearance of QUALCOMM employee Phoom Sagetong in JVT meetings between December 2003 and in 2004.
>
> 35.  None of these allegations show that QUALCOMM participated in the JVT when the H.264 standard was developed and approved.  QUALCOMM's only involvement in the JVT was as part of the unrelated SVC project, and it began in 2005.  Mr. Sagetong attended the JVT meetings on behalf of the United States National Body and not as a representative of QUALCOMM.

(Doc. No. 543-2, Ex. DD at 8 - 9.)

Qualcomm's motion for summary adjudication was denied on December 5, 2006. As detailed in previous sections of this Order, all of these assertions of no participation that were made and re-made by Qualcomm counsel during motions practice for the present litigation were proven patently false by documents produced by Qualcomm only after a jury trial was held, after a verdict was reached, after a post-trial hearing on the equitable issues was held, and after a finding was made by the Court as to these equitable issues.

44

And certainly the statement that "Broadcom has conducted extensive discovery relating to Qualcomm's alleged involvement in the JVT . . ." is particularly ironic, since Broadcom's repeated requests were uniformly denied on the stated ground that there was nothing to produce.

### (3)   Misconduct during trial

Qualcomm counsel continued to vigorously argue during trial that Qualcomm did not participate in the JVT until well after the H.264 standard was published in May 2003. Qualcomm counsel stated in his opening statement:

> Later, in May of '03, the standard is approved and published.  And then Qualcomm, in the fall of 2003, it begins to participate not in JVT because it's done.  H.264 is approved and published.  Qualcomm begins to participate in what are called professional extensions, things that sit on top of the standard, additional improvements.

(Trial Tr., 107, Jan. 9, 2007.)

Then at side bar on January 18, 2007, Qualcomm counsel, in an attempt to keep out of evidence a list of email addresses for a JVT ad hoc group that included the email address of Qualcomm employee Raveendran, represented to the Court, "Actually, there are no emails -- there are no emails."  (Trial Tr., 91, Jan. 18, 2007.)  He further stated, "there's no evidence that any e-mail was actually sent to this list.  This is just a list of e-mail . . . addresses.  There's no evidence of anything being sent."  (Trial Tr., 92, Jan. 18, 2007.) These statements were made four days after Qualcomm counsel, while preparing Ms. Raveendran for her testimony, had stripped over fifty pages of emails regarding the JVT from her email archives.

Six days later on the morning of January 24, 2007, one of the last days of trial, Qualcomm counsel filed Qualcomm's Motion for Judgment as a Matter of Law  ("JMOL") Pursuant to Rule 52(c), in which they argued:

> Broadcom failed to show (1) that Ms. Raveendran ever received a single email related to this list, (2) that anyone on this list ever communicated regarding the H.264 standard, and (3) that the email list in question was even

1      a JVT list at all.

2  (Doc. No. 479 at 11.)

3      However, later that very same morning, in direct opposition to Counsel's

4  representations at side bar and Qualcomm's argument in its JMOL, Ms. Raveendran

5  testified as follows:

6      Q [by Broadcom counsel]:  Did you receive mailings from the [JVT] ad hoc
              committee identified in this exhibit?
7      A:      During the preparation for this testimony, there were some e-mails
              pulled out of my e-mail box.  E-mail archive.
8      Q:      Were they produced to Broadcom?
       A:      I don't know.
9
10 (Trial Tr., 53, Jan. 24, 2007.)  These emails had not yet been produced to the Court or

11 Broadcom, and, immediately addressing this issue at side bar later on January 24,

12 Qualcomm counsel still argued to the Court,

13     [I]t's not clear to me [the emails are] responsive to anything.  So that's
       something that needs to be determined before they would be produced . . . I'm
       talking about whether they were actually requested in discovery.
14
15 (Trial Tr., 83, Jan. 24, 2007.)  Counsel continued,

16     I'm simply representing I haven't seen [the emails], and [whether Broadcom
       requested them] hasn't been determined.

17 (Id. at 84.)

18     Qualcomm counsel apparently determined that the emails were in fact responsive,

19 because they produced the emails to Broadcom over the lunch recess on January 24, and

20 Ms. Raveendran was brought back to court to testify about them.  Before Broadcom

21 counsel was able to question Ms. Raveendran about the emails, Qualcomm counsel voiced

22 an objection to the Court out of the presence of the jury in pertinent part as follows:

23     There's nothing wrong with the way in which this production has taken place,
       your Honor.  There's been no wrongdoing on the part of Qualcomm in the
24     way in which these have been provided.

25 (Trial Tr., 193 - 94, Jan. 24, 2007.)

26     After trial, on February 1, 2007, Qualcomm counsel finally admitted by telephone to

27 Broadcom that "on January 14, 2007, attorneys for Qualcomm learned of an archive of

28
                                    46                          05-CV-1958-B (BLM)

emails [sent to this email list for the JVT ad hoc group] belonging to Viji Raveendran."
(Doc. No. 543-2, Ex. E at 2.)  Therefore, on January 14, four days before Qualcomm
counsel argued to the Court that "there are no emails" and eight days before Qualcomm
counsel argued that Broadcom had failed to prove "[Ms.] Raveendran had ever received a
single email related to this list" in Qualcomm's JMOL, Qualcomm attorneys already knew
that there were in fact emails and had pulled them from Ms. Raveendran's email archive.

It is clear to the Court now, despite the attempts made by Qualcomm to minimize the
significance of these twenty-one emails, that they were just the "tip of the iceberg," that
over two hundred thousand more pages of emails and electronic documents were produced
post-trial that indisputably demonstrate that Qualcomm participated in the JVT from as
early as January 2002, that Qualcomm witnesses Irvine, Raveendran, Determan, and other
engineers were all aware of and a part of this participation, and that Qualcomm knowingly
attempted in trial to continue the concealment of evidence.  None of these emails or
electronic documents were produced in discovery as requested by Broadcom in multiple
requests for production and interrogatories.

### (4)     Misconduct post-trial

Shortly after trial on January 29, 2007, Qualcomm counsel filed an Amended JMOL
Pursuant to Rule 52(c) backtracking on their original assertion that Ms. Raveendran had not
received any emails sent to the JVT ad hoc group email list.  (Doc. No. 491 at 11.)
Qualcomm counsel also sent a letter of apology to the Court on January 29, 2007, admitting
that Qualcomm counsel's argument at sidebar on January 18 and Qualcomm's arguments in
its original JMOL were "incorrect" as to the alleged non-existence of any emails sent to
Ms. Raveendran through the ad hoc group email list.  (Doc. No. 543-2, Ex. D.)

Nevertheless, Qualcomm counsel continued to assert no participation in the JVT in
its February 2, 2007, Post-Trial Brief Concerning Waiver and Inequitable Conduct.  (Doc.
No. 503.)  In a section entitled "QUALCOMM Did Not Participate In The Development Of

The H.264 Standard Prior To The Publication of That Standard In May 2003," Qualcomm

counsel argued:

> QUALCOMM did not attend JVT meetings and did not participate in the development of the H.264 standard prior to May 2003. The first evidence of any JVT participation on behalf of QUALCOMM is the September 2003 JVT meeting minutes, four months after the H.264 standard's publication.

(Id. at 4 - 5) (footnotes omitted.) Citing Ms. Raveendran's testimony that she "never

attended any JVT-related meeting until July 2005," Qualcomm counsel asserted:

> The passive and involuntary receipt of unsolicited and unread emails, without more, did not make QUALCOMM a "member" of the JVT and could not create any duty of disclosure under its rules.

(Id. at 5.) Then, in a section entitled "No QUALCOMM Participant Was Aware Of The

Potential Application Of The Patents-In-Suit To The H.264 Standard During The Relevant

Time Period," Qualcomm counsel further asserted:

> Prior to July 2005, the QUALCOMM employees who participated in the JVT had no awareness that the patents-in-suit might apply to the H.264 standard . . . Because no QUALCOMM employee ever actually compared the claims of the patents to the standard, QUALCOMM did not know that the patents-in-suit read on the standard, and could not have "knowingly violated" any disclosure duty.

(Id. at 6) (footnote omitted.)

Qualcomm counsel then ironically stated in their post-trial brief that

"[s]tandards-setting misconduct is a serious charge, suggesting sophisticated foul play."

(Id.) The Court completely agrees with this statement and finds that Qualcomm's standard-

setting misconduct with the JVT was indeed "serious" and suggests extremely sophisticated

foul play on the part of Qualcomm and its employees. At the post-trial evidentiary hearing

on the equitable issues of inequitable conduct and waiver, Qualcomm counsel continued to

vigorously argue no participation and no foul play. The Court ultimately found in favor of

Broadcom and against Qualcomm that Qualcomm had indeed waived its patent rights as to

the '104 and '767 patents in its March 21, 2007 Order. (Doc. No. 528.)

Furthermore, in a letter to Broadcom dated February 8, 2007, Qualcomm counsel

asserted that, while perhaps "there was some fleeting mention of emails in my presence,"

he was somehow "not cognizant that the emails from Ms. Raveendran's archive had been

identified" when he flatly asserted to the Court at sidebar on January 18 that no such emails

existed:

> [S]ince the issue of my knowledge [of the twenty-one emails produced on
> January 24] has been raised, I should add that I cannot completely exclude
> the possibility that, during those times that I was in the Day Casebeer firm's
> trial preparation suites rather than my own firm's, there was some fleeting
> mention of emails in my presence.  What I can say with certainty now is that,
> when I told the Court on January 18, 2007 that there was no such emails in
> evidence, I was not cognizant that the emails from Ms. Raveendran's archive
> had been identified.

(Doc. No. 543-2, Ex. F at 1.)

As stated above, these twenty-one emails were just a hint of the over two hundred

thousand pages of emails and electronic documents that were finally produced four months

after trial containing direct evidence that multiple representatives of Qualcomm

participated in the JVT from the beginning, and that multiple Qualcomm witnesses knew of

this participation even as they testified to the contrary at deposition and trial.  However,

before this production occurred and even after the discovery of the twenty-one emails in

Ms. Raveendran's email archive, Qualcomm counsel continued to insist that they had

conducted a reasonable search for responsive documents during discovery and that the

twenty-one emails were not responsive because they were irrelevant.  Qualcomm counsel

wrote in a letter to Broadcom on February 16, 2007:

> As explained earlier in our meet and confer, QUALCOMM voluntarily
> produced the [twenty-one] emails during trial in the interest of
> expeditiousness.  We continue to believe that QUALCOMM performed a
> reasonable search of QUALCOMM's documents in response to Broadcom's
> Requests for Production and that the twenty-one unsolicited emails received
> by Ms. Raveendran from individuals on the avc_ce reflector are not
> responsive to any valid discovery obligation or commitment.

(Doc. No. 543-2, Ex. G at 1.)  Qualcomm counsel made these assertions all the while

acknowledging: (1) Broadcom's July 14, 2006, Request for Production No. 93 requesting

"[a]ll documents referring to or evidencing any participation by Qualcomm in the

proceedings of the JVT, the ISO, the IEC, and/or the ITU-T"; (2) Broadcom's January 23,

49

2006, Request for Production No. 49 requesting "[a]ll documents given to or received from a standards setting body or group that concern any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent, including without limitation communications, proposals, presentations, agreements, commitments, or contracts to or from such bodies"; and (3) Broadcom's January 23, 2006, Request for Production No. 50 requesting "[a]ll documents concerning any Qualcomm membership, participation, interaction, and/or involvement in setting any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent." (Id., Ex. E at 1.)

Correctly rejecting Qualcomm counsel's continuing insistence that Qualcomm had already conducted a reasonable search for responsive documents with negative result, Broadcom requested in a March 5, 2007 letter that Qualcomm perform searches for nine key phrases in the email archives of twelve key Qualcomm employees:

> Broadcom requests that Qualcomm immediately search for and produce responsive documents in the email archives of Ms. Raveendran and any other Qualcomm employee who has ever been involved in any way in standard-setting for video compression (whether or not as an actual participant at a standard-setting meeting), dated between January 1, 2000 and December 31, 2004.

(Doc. No. 543-2, Ex. H at 4 - 5.)  In response to this letter, Qualcomm counsel continued to defend Qualcomm's discovery conduct and object to Broadcom's request for further discovery in a March 7, 2007, reply as follows:

> For the reasons discussed at length previously, we disagree with each of your arguments concerning the responsiveness of those emails and believe your negative characterization of QUALCOMM's compliance with its discovery obligation to be wholly without merit . . .

> Your request for completely new and patently overbroad discovery–plainly beyond the scope of anything propounded during the appropriate period before trial--cannot on any basis be justified now, more than a month after trial has concluded.

(Id., Ex. I at 1.)  Nevertheless, upon Broadcom's threat to involve the Court, Qualcomm agreed to search the email archives of Qualcomm witnesses Raveendran, Bao, Irvine,

Ludwin, and Sagetong for the search terms "JVT," "Joint Video Team," "AVC,"
"Advanced Video Coding," "H.264," "H264," "MPEG-4 Part 10," "MPEG4 Part 10," and
"Gary Sullivan." (Id., Ex. I at 2.) The Court finds it incredible that Qualcomm never
conducted such an obvious search for these key terms in the email archives of these key
Qualcomm witnesses during the many months of discovery that occurred before trial, since
Broadcom clearly had requested all of it and more.

One month later on April 6, 2007, Qualcomm counsel informed Broadcom through
email that this search had produced "a large volume that numbers in the thousands" of
responsive documents, which clearly indicate to the Court Qualcomm's participation in the
JVT. (Doc. No. 543-2, Ex. J at 1.) It was only then that the Court received any notice of
this post-trial production of documents in a letter addressed to the Court directly from
Qualcomm lead trial counsel on April 9, 2007. (Doc. No. 543-2, Ex. K.) In that letter,
Counsel stated that Qualcomm had discovered "a substantial number of electronic
documents" that "appear to be inconsistent with arguments that we made at trial, and at the
post-trial hearing, regarding Broadcom's affirmative defense of waiver." (Id. at 1.)
Counsel then apologized to the Court "[p]rofessionally and personally . . . for asserting
positions that we would not have taken had we known of the existence of these
documents." (Id.) However, Counsel insisted that "we presented our arguments in good
faith and certainly would not have knowingly presented argument that we believed to be
contrary to fact." (Id. at 1 - 2.)

That same day, the Court received a separate letter of apology directly from
Qualcomm's General Counsel and Executive Vice President Louis Lupin, in which Mr.
Lupin conveyed "[his] regret and apologies regarding the circumstances described in
[Qualcomm lead trial counsel's April 9 letter]." (Doc. No. 543-2, Ex. L at 1.) Mr. Lupin
claimed that "QUALCOMM takes its obligations to the Court, opposing parties, and the
community seriously, and will take all necessary steps to live up to the high expectations
QUALCOMM has always set for itself." (Id.) However, in an interview with the San

05-CV-1958-B (BLM)

Diego Union-Tribune about this post-trial production, Mr. Lupin reportedly stated that these newly discovered documents "'on the whole' bolstered Qualcomm's arguments during trial" and that "'[w]e kind of hurt ourselves' by not finding them before trial." Kathryn Balint, Another face-off in patent battles, THE SAN DIEGO UNION-TRIBUNE, May 31, 2007, at C1.  The Court finds, in sharp disagreement to Mr. Lupin's characterization of the new evidence, that the documents in fact fully bolstered Broadcom's waiver arguments and completely refuted Qualcomm's waiver defenses at trial.

Qualcomm General Counsel Lupin made an illuminating statement as to Qualcomm's "nothing-to-lose" mentality in filing this patent infringement suit against Broadcom.  According to a January 27, 2007, article in the San Diego Union-Tribune following the jury verdict of no infringement, Mr. Lupin characterized the case as follows:

> There certainly was a significant upside potential for us, but it was all upside, no downside. . . . For Broadcom, it was all downside, no upside.  It probably won't have any impact on us one way or the other.  It's just the latest round in a series of battles.

(Doc. No. 543-2, Ex. Q at 2.)  Indeed, if Qualcomm is correct in its contention that its '104 and '767 patents are infringed by the H.264 standard, it would be in a lone position to extract licenses from all companies producing H.264-compliant products, a considerable "upside" opportunity for Qualcomm's bottom line.

IV.    **CONCLUSION**

In light of all of the above evidence finally revealed, the eventual collapse of Qualcomm's concealment efforts exposes the carefully orchestrated plan and the deadly determination of Qualcomm to achieve its goal of holding hostage the entire industry desiring to practice the H.264 standard by insulating its IPR from the JVT so that the JVT would lose the opportunity to mitigate, if not to avoid, Qualcomm's IPR in the development of the H.264 standard.  Broadcom, ignorant of the existence of the '104 and '767 patents, designed and is in the process of manufacturing numerous H.264-compliant

1    products.

2          The Federal Circuit has held that unenforceability of a patent due to inequitable

3    conduct before the PTO extends to continuations and reissues of the original patent.  See

4    Afga Corp. v. Creo Prods. Inc., 451 F.3d 1366, 1379 (Fed. Cir. 2006); Hewlett-Packard,

5    882 F.2d at 1563; Hoffman-La Roche v. Lemmon Co., 906 F.2d 684, 688 - 89 (Fed. Cir.

6    1990).  While divisions of the original patent may not be unenforceable "where the claims

7    are subsequently separated from those tainted by inequitable conduct . . . and where the

8    issued claims have no relation to the omitted prior art," Baxter Int'l, Inc. v. McGaw, Inc.,

9    149 F.3d 1321, 1332 (Fed. Cir. 1998), by analogizing misconduct before a standards setting

10   body resulting in waiver to misconduct before the PTO resulting in inequitable conduct,

11   this Court finds all claims of the '104 and '767 patents tainted by Qualcomm's waiver and

12   that any divisional, continuation, continuation-in-part, or reissue application of either patent

13   would be similarly tainted.

14         Therefore, under the totality of evidence produced both before and after the jury

15   verdict, by reason of Qualcomm's intentional and persistent insulation of their directly

16   related IPR from the activities and the analyses of the JVT when they were obligated to

17   reveal it, this Court **FINDS**, pursuant to Rambus, that Qualcomm has waived its rights to

18   enforce the '104 and '767 patents and their continuations, continuations-in-part, divisions,

19   reissues, or any other derivatives of either patent.

20   //
21   //
22   //
23   //
24   //
25   //
26   //

27         This type of conduct was the direct focus and basis for the rule of law set out clearly

28                                   53                        05-CV-1958-B (BLM)

1   in January 2003 in <u>Rambus</u>, in which the Federal Circuit sets out the disclosure duty for

2   patents that read on or apply directly to the activities of the standards-setting process.  <u>See</u>

3   <u>Rambus</u>, 318 F.3d at 1096 - 1102.  The facts of this case demonstrate the importance of the

4   <u>Rambus</u> decision to the success of the industry standards protocols that have been

5   achieving significant benefits for businesses and consumers globally.

6          Judgment will be entered concurrently with this Order.

7

8

9          **IT IS SO ORDERED**

10

11  DATED:  August 6, 2007

12
                                            Hon. Rudi M. Brewster
13                                          United States Senior District Court Judge

14

15
    cc:  Hon. Barbara Lynn Major
16         United States Magistrate Judge

17
           All Counsel of Record
18

19

20

21

22

23

24

25

26

27

28
                              54                           05-CV-1958-B (BLM)