E-FILED

SHARTSIS FRIESE LLP
JOEL ZELDIN (Bar #51874)
FRANK A. CIALONE (Bar #172816)
One Maritime Plaza, Eighteenth Floor
San Francisco, CA  94111
Telephone:  (415) 421-6500
Facsimile:  (415) 421-2922
Email:  jzeldin@sflaw.com

Attorneys for Non-Parties
JAMES R. BATCHELDER, CRAIG H. CASEBEER,
CHRISTIAN E. MAMMEN, RUCHIKA AGRAWAL, KEVIN
K. LEUNG, HOWARD T. LOO, WILLIAM P. NELSON,
RYAN SCHER, VICTORIA Q. SMITH, BRADLEY A.
WAUGH, AND ROY V. ZEMLICKA

KERR & WAGSTAFFE LLP
H. SINCLAIR KERR, JR. (Bar #61713)
JAMES M. WAGSTAFFE (Bar #95535)
ADRIAN J. SAWYER (Bar #203712)
100 Spear Street, Suite 1800
San Francisco, CA 94105-1528
Telephone:  (415) 371-8500
Facsimile:  (415) 371-0500
Email:  kerr@kerrwagstaffe.com

Attorneys for Non-Party LEE PATCH

CHAPMAN POPIK & WHITE LLP
MERRI A. BALDWIN (Bar #141957)
650 California Street, 19th Floor
San Francisco, CA 94108
Telephone:  (415) 352-3000
Facsimile:  (415) 352-3030
Email:  mbaldwin@chapop.com

Attorneys for Non-Party ADAM BIER

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM INCORPORATED,<br><br>　　　　　　Plaintiff,<br>　　v.<br><br>BROADCOM CORPORATION,<br><br>　　　　　　Defendant.<br><br>AND RELATED COUNTERCLAIMS. | Case No.  05CV1958-B (BLM)<br><br>**INDIVIDUAL DAY CASEBEER ATTORNEYS' RESPONSE TO AUGUST 13, 2007 ORDER TO SHOW CAUSE**<br><br>Date:　　　October 12, 2007<br>Time:　　　9:30 a.m.<br>Dept.　　　Courtroom A<br>Judge:　　Magistrate Judge Barbara L. Major |

*SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................ 1

II.   FACTUAL BACKGROUND ......................................................................... 4

    A.    Initial Phase of Litigation and Discovery (October 2005 through May 2006) ................................................................................................ 4

    B.    Second Phase of Litigation and Discovery (June through August 2006) .............. 6

    C.    Trial Preparation And Pre-Trial Motions ...................................... 9

    D.    The Trial .......................................................................................... 10

    E.    Initial Post-Trial Proceedings (Through March 21, 2007) .................... 12

    F.    Discovery Of Additional Documents After Trial ................................ 14

    G.    Broadcom's Motions For Attorney's Fees And Sanctions .................... 14

III.  THE RESPONDING ATTORNEYS ARE CONSTRAINED BY THE DUTY OF CONFIDENTIALITY AND THE ATTORNEY-CLIENT PRIVILEGE ........................ 16

    A.    California Law Requires Attorneys to Comply With the Client's Assertion of Privilege Even When Threatened with Sanctions ........................... 16

    B.    The Court Has Ruled That the Self-Defense Exception to the Attorney-Client Privilege Does Not Apply but That the Attorneys May Introduce Evidence Which Would Be Protected Under the Work Product Doctrine .......... 18

    C.    The Responding Attorneys Should Not Be Sanctioned For Conduct Or Events They Cannot Fully Explain Due To Their Duty Of Confidentiality ........ 18

        1.    Sanctioning Individual Attorneys Who Are Legally Constrained From Responding Fully To The OSC Would Violate Due Process ......... 18

        2.    The Court Should Not Draw Inferences Against The Responding Attorneys Based On QUALCOMM's Assertion Of Its Privilege ............. 20

IV.   THE AUGUST 6 ORDER IS NOT COLLATERAL ESTOPPEL AS TO THE INDIVIDUAL RESPONDING ATTORNEYS ............................................................... 21

V.    THE RESPONDING ATTORNEYS DID NOT VIOLATE A COURT ORDER AND SHOULD NOT BE SANCTIONED UNDER RULE 37 ........................................ 22

    A.    The Responding Attorneys Assume That the OSC is Proceeding Under Rule 37 .......................................................................................... 22

    B.    Rule 37(b) Does Not Support Sanctions Here ................................... 23

        1.    The Responding Attorneys Complied With The Court's Orders .............. 23

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- i -

**TABLE OF CONTENTS**
(continued)

Page

2.  None Of The Orders Herein Is A Legally Proper Basis For Sanctions .............................................................................. 24

C.  Rule 37(c) Does Not Provide For Sanctions Against Counsel ............................. 26

VI.  SANCTIONS ARE NOT WARRANTED UNDER ANY OTHER APPLICABLE STANDARD .......................................................................................................... 26

A.  Sanctions Under Rule 26(g)(3) Are Not Warranted ........................................... 26

1.  The Declarations Demonstrate A Reasonable Inquiry, To The Extent That The Responding Attorneys Can Discuss Their Efforts Without Violating QUALCOMM's Privilege ......................................... 27

2.  QUALCOMM's Objections Do Not Warrant Sanctions ......................... 28

3.  The Responding Attorneys Appropriately Sought To Narrow Document Requests, And Did Not Act With An Improper Purpose ........ 29

B.  The Court Should Not Invoke Its Inherent Authority To Sanction The Responding Attorneys ....................................................................................... 29

1.  Inherent Powers Sanctions Must Be Based on Bad-Faith Conduct, Not Negligence or Even Recklessness .................................................... 30

2.  Inherent Powers Sanctions May Not Be Based on Conduct of Others ..................................................................................................... 31

3.  Inherent Powers Sanctions Must be Based on at Least Clear and Convincing Evidence ............................................................................. 31

4.  Punitive Sanctions Require Heightened Due Process, Including the Presumption of Innocence and Proof Beyond a Reasonable Doubt ........ 32

5.  Non-Monetary Sanctions In The Nature Of Attorney Discipline Must Be Based On Clear And Convincing Evidence ............................... 33

C.  Rule 11 Does Not Apply ..................................................................................... 34

VII.  THE COURT MUST CONSIDER THE RESPONDING ATTORNEYS INDIVIDUALLY, AND SHOULD CONCLUDE FROM THAT CONSIDERATION THAT NONE IS SUBJECT TO SANCTIONS ............................... 35

A.  The Responding Attorneys Each had Particular Areas of Responsibility ............. 35

B.  The Responding Attorneys Who Were Not Identified By Name in the OSC (Ryan Scher, Ruchika Agrawal, Howard Loo, William Nelson) ......................... 37

C.  Associates Named In The OSC Who Had Little Or No Involvement With Events Referenced In The August 6 Order (Brad Waugh, Victoria Smith, Roy Zemlicka) .................................................................................................... 38

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

Case No.
05CV1958-B (BLM)

RESPONDING ATTORNEYS' RESPONSE TO
AUGUST 13, 2007 ORDER TO SHOW CAUSE

1

**TABLE OF CONTENTS**
(continued)

2

Page

3    D.    James Batchelder.................................................................................. 40

4    E.    Craig Casebeer .................................................................................... 42

5    F.    Chris Mammen....................................................................................... 45

6    G.    Kevin Leung........................................................................................... 47

7    H.    Adam Bier ............................................................................................. 51

8    I.    Lee Patch................................................................................................ 53

9 VIII.    CONCLUSION............................................................................................ 57

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

Case No.
05CV1958-B (BLM)

RESPONDING ATTORNEYS' RESPONSE TO
AUGUST 13, 2007 ORDER TO SHOW CAUSE

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

**Page(s)**

4    *Advisory Committee Note*, 97 F.R.D. 165 .......................................................................... 34

5    *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115 ........................................................................ 31

6    *Apex Oil Co. v. Belcher Co. of N.Y.*, 855 F.2d 1009 ........................................................ 26

7    *Avionic Co. v. General Dynamics Corp.*, 957 F.2d 555 .................................................... 24

8    *Balcar v. Bell and Associates LLC*, 295 F.Supp.2d 635 .................................................. 31

9    *Barber v. Miller*, 146 F.3d 707 ........................................................................................ 35

10   *Bergeson v. Dilworth*, 749 F.Supp. 1555 ....................................................................... 27

11   *Big Top USA Inc. v. Wittern Group*, 183 F.R.D. 331 ...................................................... 25

12   *Blonder-Tongue Laboratories v. University of Illinois Foundation*, 402 U.S. 313 .......... 21

13   *Buster v. Greisen*, 104 F.3d 1186 (9th Cir.), cert. denied ............................................... 35

14   *Chambers v. NASCO, Inc.*, 501 U.S. 32 ........................................................................ 30

15   *Chaves v. M/V Medina Star*, 47 F.3d 153 ...................................................................... 31

16   *In re Cochener*, 360 B.R. 542 ........................................................................................ 31

17   *In re DeVille*, 361 F.3d 539 ............................................................................................ 22

18   *Eaton v. Siemens*, 2007 U.S.Dist. LEXIS 58621 ........................................................... 20

19   *F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*, 244 F.3d
     1128 ................................................................................................................................. 32

20   *Emerald River Development, Inc.*, 244 F.3d 1128 ........................................................... 32

21   *Fair Housing of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2001), *cert. den* ..................... 24

22   *Fjelstad v. American Honda Motor Co.*, 762 F.2d 1334 ................................................. 25

23   *Geders v. United States*, 425 U.S. 80 ............................................................................ 20

24   *Hathcock v. Navistar International Trans. Corp.*, 53 F.3d 36 ......................................... 25

25   *Helfand v. Gerson*, 105 F.3d 530 ................................................................................... 29

26   *In re Heritage Bond Litigation*, 223 F.R.D. 527 ............................................................. 24

27   *Hurd v. Ralphs Grocery Co.*, 824 F.2d 806 .................................................................... 27

28

Shartsis Friese LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    *In re Keegan Management Co. Sec. Litigation*, 78 F.3d 431 ............................................. 30

2    *Lasar v. Ford Motor Co.*, 399 F.3d 1101 .......................................................................... 32

3    *Leon v. IDX System Corp.*, 464 F.3d 951 .......................................................................... 30

4    *M/V American Queen v. San Diego Marine Construction Corp.*, 708 F.2d 1483 ............ 21

5    *Macias v. McGrath*, 439 F.3d 1141 ................................................................................... 32

6    *Mackler Products, Inc. v. Cohen*, 146 F.3d 126 ............................................................... 32

7    *Martin v. Brown*, 63 F.3d 1252 ................................................................................... 22, 31

8    *Maynard v. Nguyen*, 332 F.3d 462 ...................................................................... 24, 26, 30, 31

9    *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208 ............................................................... 20

10    *Oliveri v. Thompson*, 803 F.2d 1265 ............................................................................... 31

11    *Phinney v. Paulshock*, 181 F.R.D. 185 ............................................................................. 28

12    *Primus Automobile Finance Services v. Batarse*, 115 F.3d 644 ............................... 30, 31

13    *Qantum Communic'ns. Corp. v. Star Broad. Inc.*, 473 F.Supp.2d 1249 ......................... 31

14    *R.W. International Corp. v. Welch Foods, Inc.*, 937 F.2d 11 ........................................... 24

15    *Rabb v. Amatex, Corp.*, 769 F.2d 996 ............................................................................. 25

16    *Roadway Express, Inc. v. Piper*, 447 U.S. 752 .......................................................... 29, 30

17    *Salahuddin v. Harris*, 782 F.2d 1127 .............................................................................. 25

18    *Salman v. Rose*, 104 F.Supp.2d 1255 .............................................................................. 35

19    *Schoffstall v. Henderson*, 223 F.3d 818 (8th Cir. 2000) ................................................. 25

20    *Scholastic Inc. v. Stouffer*, 221 F.Supp.2d 425 .............................................................. 31

21    *Shepherd v. AM. Broad. Co.*, 62 F.3d 1469 ............................................................... 25, 31

22    *Somascan Plaza, Inc. v. Siemens Medical System, Inc.*, 187 F.R.D. 34 .......................... 25

23    *In re Tutu Wells Contamination Litigation*, 120 F.3d 368 .............................................. 22

24    *Under Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383
      F.3d 1337 ......................................................................................................................... 20

25    *In re Vargas*, 723 F.2d 1461 ........................................................................................... 20

26    *In re Western Die Casting Co.*, 106 B.R. 645 ................................................................. 34

27    *Wyatt v. Terhune*, 315 F.3d 1108 .................................................................................... 21

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

*Zaldivar v. Los Angeles*, 780 F.2d 823 ............................................................ 34

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 ............................................ 28

## STATE CASES

*Dixon v. State Bar*, 32 Cal.3d 728 ................................................................... 17

*Kroll & Tract v. Paris & Paris*, 72 Cal.App.4th 1537 ................................... 19

*Loube v. Loube*, 64 Cal.App.4th 421 .............................................................. 21

*McDermott, Will & Emery v. Superior Court*, 83 Cal.App.4th 378 ........... 18, 19

*Solin v. O'Melveny & Myers*, 89 Cal.App.4th 451 ......................................... 19

## FEDERAL STATUTES

Fed. R. Civ. P. 11 ........................................................................................ 34, 35

Fed.R.Civ.P. 26 ........................................................................................... 23, 26

Fed.R.Civ.P. 34 ................................................................................................. 29

Fed.R.Civ.P. 37 ........................................................................................... 25, 26

## STATE STATUTES

*Cal. Bus. & Prof. Code §6068(e)* .................................................................... 16

*Cal. Evid. Code §958* ...................................................................................... 17

## MISCELLANEOUS

7 J. Moore, *et al.*, *Moore's Federal Practice* ¶37.04 at 37.76 .......................... 26

*California Practice Guide: Federal Procedure Before Trial* at ¶11:265 ........ 23

*California Practice Guide: Federal Procedure Before Trial* at ¶11:2392 ...... 29

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   This brief augments the Declarations submitted in response to the Court's August 13,

2   2007 Order to Show Cause (the "OSC") by the following individuals, all of whom are or were

3   partners or associates at Day Casebeer Madrid & Batchelder, LLP ("Day Casebeer"):   Craig

4   Casebeer, Jim Batchelder, Lee Patch, Christian Mammen, Ruchika Agrawal, Adam Bier, Kevin

5   Leung, Howard T. Loo, William Nelson, Ryan Scher, Victoria Smith, Bradley Waugh, and Roy

6   Zemlicka (collectively, the "Responding Attorneys").

7   **I.      INTRODUCTION**

8   The Court has directed attorneys named or described in the OSC to appear and show cause

9   why they should not be sanctioned.  The OSC expressly referenced Judge Brewster's Order on

10  Remedy for Finding of Waiver dated August 6, 2007 (the "August 6 Order").  That Order made

11  generalized and collective findings of misconduct on the part of counsel, without determining the

12  responsibility or culpability of any particular attorney.  That is the subject of these proceedings.

13  The career and reputation of each of the Responding Attorneys are at stake -- people

14  ranging from young attorneys whose careers are just starting to older attorneys who have

15  practiced for decades with unblemished records and reputations.  It is critical, then, that this Court

16  base its judgment on an individualized and particularized determination as to the conduct,

17  knowledge and intent of each individual who is subject to the OSC.  Respectfully, the Court

18  cannot rely on findings and conclusions in the August 6 Order, findings and conclusions drawn

19  from a significantly less complete record -- indeed, a record that did not include any direct

20  evidence of the knowledge, intent, and in many instances the actions of any individual attorney.

21  Nor may the Court judge the Responding Attorneys in hindsight based on facts that emerged only

22  after trial.  The Court, which now has an evidentiary record before it that Judge Brewster did not

23  have, must look to that record to determine what each individual knew, believed, and did at the

24  time in question.  Due process and basic fairness to individuals whose careers and reputations are

25  on the line require no less.

26  Each of the Responding Attorneys is fully cognizant of his or her duty – the duty of every

27  attorney, as an officer of the Court – to deal with the Court and opposing counsel honestly and

28  truthfully.  This Court, no doubt, intends to determine as to each Respondent Attorney, if that

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1

1   duty of candor and truthfulness has been fulfilled. In the final analysis, it is the knowledge and

2   intent of the individual attorney, at the time in question, determined separately as to each

3   attorney, that must be resolved in order to assess whether that attorney has engaged in

4   sanctionable conduct. In this regard, undoubtedly the most significant question is whether the

5   existence of JVT-related emails or other documents that pre-dated September 2003 was known by

6   any Responding Attorney to exist prior to the trial of this case. As to each of the Responding

7   Attorneys, the answer to that question is no. The record does not contain any evidence of

8   intentional concealment by any of the Responding Attorneys.

9   This brief and the accompanying Declarations are the Responding Attorneys' first

10  opportunity to tell their story. Each Responding Attorney has submitted a detailed Declaration

11  addressing his or her conduct in relation to the events discussed in the August 6 Order. Certain of

12  them, however, are in an extraordinarily difficult position. Depending on his or her role in the

13  case, the attorney may have had privileged communications that bear directly on the issues raised

14  by the OSC. As QUALCOMM's former counsel, these attorneys are ethically and legally bound

15  to respect QUALCOMM's right to attorney-client confidentiality, particularly now that the Court

16  has determined that the self-defense exception to the attorney-client privilege does not apply.

17  After a number of communications on this subject, QUALCOMM has declined to waive the

18  privilege (*Zeldin Dec.*, ¶ 2), which is QUALCOMM's right. Subject to those constraints, each

19  individual Responding Attorney addresses his or her personal participation in the events cited in

20  the August 6 Order.

21  Even constrained by the attorney-client privilege, the Declarations submitted herewith

22  establish certain critical, overarching facts, including:

23  • Until after trial, none of the Responding Attorneys knew or believed that
        QUALCOMM had attended the Joint Video Team ("JVT") meetings before the H.264
24      standard was adopted in May 2003, or was otherwise involved in the development of
        the H.264 standard.
25

26  • Until March 2007, more than six weeks after trial ended, none of the Responding
        Attorneys knew of or suspected the existence of the nearly 200,000 pages of
        documents produced by QUALCOMM after trial, which showed QUALCOMM's
27      involvement in the JVT prior to the adoption of the H.264 standard.

28  • In drafting discovery responses in this matter, none of the Responding Attorneys acted

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 2 -

with the purpose of avoiding production of documents or information showing QUALCOMM's involvement in the JVT before the adoption of the H.264 standard.

Unquestionably, some Responding Attorneys made statements or filed papers asserting that QUALCOMM was not involved in the JVT during the development of the H.264 standard, and the mass of documents discovered and produced after trial demonstrated that these statements were not correct. But as their Declarations make clear, the attorneys who made those statements believed they were true at the time, and they were not aware of any evidence that called those statements into question.

The Responding Attorneys deeply regret the events that have brought them, the Court, and the parties to this point. They have tried in their Declarations to be as complete and forthcoming as possible, subject to their duty to honor QUALCOMM's assertion of the attorney-client privilege. Even though the self-defense exception has been found to be inapplicable, so that the Responding Attorneys are precluded by their ethical duties from offering evidence on the content of their communications with QUALCOMM, their Declarations provide crucial information and confirm the absence of knowing or willful misconduct. Where warranted, individual Responding Attorneys acknowledge and take responsibility for their errors. The Responding Attorneys explain how those errors occurred in order to show that they acted in good faith, without an intent to conceal evidence or otherwise obstruct the judicial process, and that sanctions are not warranted. However, they have also attempted to explain why certain of their conduct cited in the August 6 Order was proper and correct, and they will demonstrate that some of the criticisms in the August 6 Order, when viewed in the context of facts that were not before the District Court at that time, are unwarranted. Among other things, no Responding Attorney knew at the time that the testimony of any witness was false or that QUALCOMM was in possession of numerous documents showing involvement in the JVT prior to finalization of the H.264 standard. The suggestion that the Responding Attorneys participated in a knowing and intentional cover-up of those documents is without factual basis.

This brief provides a chronological summary of the relevant events in this case, all of which are addressed in much greater detail in the accompanying Declarations. The brief then

- 3 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1  discusses the applicable law, including the restrictions imposed on the Responding Attorneys by

2  their duty of confidentiality to their former client, the due process implications of the former

3  client's assertion of its privilege, and the legal standards for imposing sanctions. Finally, the brief

4  discusses the individual Responding Attorneys and why, in light of their conduct, knowledge, and

5  state of mind as detailed in the Declarations, the Court should not sanction them.

6  **II.    FACTUAL BACKGROUND**

7      Set forth below is a chronological summary of the key events. The Declarations of the

8  Responding Attorneys address the issues raised in the August 6 Order in great detail from the

9  perspective of each declarant. The Responding Attorneys request that the Court read the

10  Batchelder Declaration for background before the other Declarations.

11      **A.    Initial Phase of Litigation and Discovery (October 2005 through May 2006)**

12      QUALCOMM filed this action on October 14, 2005, alleging that certain Broadcom

13  products which implemented a standard known as H.264 infringed two QUALCOMM patents

14  concerning video compression technology. In its Answer, Broadcom generally asserted a set of

15  equitable defenses, including waiver, without identifying the JVT or any other specific item.

16      In January 2006, Broadcom served its First Set of Interrogatories. Interrogatory No. 13

17  called for QUALCOMM to describe its participation in setting standards relating to the

18  processing of digital video signals and relating to QUALCOMM's patents. On

19  February 24, 2006, QUALCOMM responded that its investigation had produced no responsive

20  information. *Ex. Zeldin-1.* QUALCOMM supplemented that response on several occasions,

21  including after QUALCOMM's counsel learned that QUALCOMM employees had attended JVT

22  meetings and were otherwise involved with the JVT from September 2003 on (*i.e.*, after the

23  publication of the H.264 standard). *Ex. Zeldin-3.* As discussed throughout the Declarations, none

24  of the Responding Attorneys knew until after trial that QUALCOMM had been involved in the

25  JVT prior to September 2003, with two minor exceptions that were disclosed during pretrial

26  discovery. *Mammen Dec.*, ¶ 36; *Leung Dec.*, ¶ 22.

27      Broadcom also served its First Set of Requests for Production in January 2006. Request

28  No. 49 sought "all documents given to or received from a standards setting body or group that

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 4 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   concerned any standard relating to the processing of digital video signals that pertains in any way

2   to [either patent-in-suit]..." *Mammen Dec.*, ¶ 28.  Request No. 50 sought documents concerning

3   QUALCOMM's participation or involvement in standards or standards-setting bodies that were

4   related to processing digital video signals and to the patents-in-suit.  In response to each request,

5   QUALCOMM asserted objections and stated that it would provide a specified subset of the

6   requested documents.  For example, the response to Request No. 50 stated:

7   QUALCOMM will produce responsive non-privileged documents
    that were given to or received from standards-setting body [sic]
8   responsible for the ISO/IEC MPEG-4 Part 10 standard, and which
    concern any QUALCOMM participation in setting the ISO/TEC
9   MPEG-4 Part 10 standard, following entry of, and pursuant to the
    terms of, a mutually agreed-upon protective order.
10

11  *August 6 Order at 33.*  The August 6 Order states that this response "deflected the request as

12  though it only addressed the MPEG-4 Part 10 standard and completely concealed Qualcomm's

13  extensive involvement with the JVT and the H.264 standard." *Id. at 33*.  Respectfully, the

14  Responding Attorneys submit that this was a misunderstanding on the Court's part.  "MPEG-4

15  Part 10" and "H.264" are entirely synonymous, as the Chairman of the JVT and as Broadcom's

16  Chairman testified. *See Mammen Dec.*, ¶ 27; *Leung Dec.*, ¶ 15.  The purpose of the response

17  quoted above was to alert Broadcom that QUALCOMM would limit the scope of production to

18  the particular technology and the particular standard at issue in the case. *Mammen Dec.*, ¶ 27.

19  Broadcom did not meet-and-confer to express any concern about these responses (to the best of

20  the Responding Attorneys' knowledge and recollections), did not file a motion to compel, and did

21  not in any other way suggest that the responses were inappropriately narrow. *See, e.g., Mammen*

22  *Dec.*, ¶ 27(e).

23      From February 2006 until May 2, 2006, discovery remained essentially dormant, while the

24  parties disputed the protective order.  Despite this lengthy pause, the parties did not seek an

25  extension of the discovery cut-off, and the trial date remained unchanged.  The parties therefore

26  launched into a compressed deposition and discovery schedule, which ultimately included the

27  production of over 1.75 million pages of documents as well as the depositions of over 60 fact

28  witnesses between May and early September 2006.

Case No.                            RESPONDING ATTORNEYS' RESPONSE TO
05CV1958-B (BLM)                    AUGUST 13, 2007 ORDER TO SHOW CAUSE

**B.**    **Second Phase of Litigation and Discovery (June through August 2006)**

On June 2, 2006, QUALCOMM supplemented its response to Interrogatory No. 13 to state that it had "participated in ISO/IEC JTC1/SC29 WG11 of MPEG" in 2001. QUALCOMM stated that the "nature of QUALCOMM's participation includes the submission of two contributions with document numbers 7340 and 7341 authored by A. Chris Irvine." *Ex. Zeldin-2.*

Irvine was scheduled to be deposed on July 11, 2006 both individually and as a Rule 30(b)(6) witness on the following topics:

> "10.    The attendance or participation by any Qualcomm principal, employee representative at any H.264 standards committee meetings. . . " and "any actions taken by QC . . . as a result of such meetings."
>
> "11.    Qualcomm's knowledge regarding the development and promulgation of the H.264 standard. . ."

*Ex. Zeldin-4.*    In late June 2006, QUALCOMM located approximately 400,000 pages of documents on a QUALCOMM server that a QUALCOMM employee had downloaded from a publicly available website maintained by the JVT. QUALCOMM's counsel notified Broadcom's counsel about these documents on July 5, 2006, and offered to postpone the upcoming deposition of Irvine, which was scheduled to be taken six days later. QUALCOMM's counsel had not yet reviewed the recently-located documents.    Broadcom declined the offer to reschedule the deposition.    Responding Attorney Leung met with Irvine for six hours to prepare for her deposition (*Leung Dec., ¶10*), and the deposition went forward as scheduled.

On July 11, 2006, Irvine repeatedly testified, in her 30(b)(6) capacity, that QUALCOMM had never been involved in the JVT:

> Q.    So no one at QUALCOMM sought to become involved in the development of the H.264 standard.
>
> A.    This is correct.
>
> Q.    And no one at QUALCOMM attended any standards meetings.
>
> A.    No, not that QUALCOMM's aware of.
>
> * * *
>
> Q.    If you had -- if you wanted to know about the work of the JVT from 2003 to the present, who would you ask?

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 6 -

1    MR. LEUNG:  Objection; improper hypothetical.

2    THE WITNESS:  I don't know.  I don't know of anybody that was doing anything
     with it.  I know of no name to even go talk to about it.

3

4    *Ex. Zeldin-5 at 40:13-18; 117:10-17.*[1]  Responding Attorney Kevin Leung, who defended Irvine's

5    deposition, believed these statements were true when Irvine made them.  *Leung Dec., ¶10.*

6    However, Broadcom's counsel impeached Irvine with some of the 400,000 pages of documents

7    from the JVT website, which Leung had not yet reviewed.   Those documents showed that

8    QUALCOMM had participated in the JVT in September 2003 and thereafter, after the H.264

9    standard was published.  *Leung Dec., ¶ 9.*   Although it was not known to QUALCOMM's

10   counsel at the time, the publicly available documents also showed that QUALCOMM employee

11   Viji Raveendran was included on an email mailing list, the "avc_ce reflector," maintained by an

12   *ad hoc* subgroup of the JVT, in December 2002.   Because the documents contradicted Irvine's

13   testimony and indicated that she was not adequately prepared to testify as a 30(b)(6) witness,

14   QUALCOMM agreed to designate a new 30(b)(6) witness to replace her. *Leung Dec., ¶ 10.*

15   On July 18, 2006, Raveendran testified at deposition that she had attended one JVT

16   meeting, which occurred in 2005 and concerned Scalable Video Coding, not H.264.  She testified

17   that she first heard of the JVT in 2003, from trade journals:

18   Q.    . . . Referring only to the Joint Video Team that developed the H.264
           standard, when did you first learn of the Joint Video Team that developed
19         the H.264 standard?

20   A.    Somewhere in the 2003 time frame.

21   Q.    How did you learn of it?

22   A.    Through literature.

23   Q.    What literature?

24

[1]    The excerpts of the confidential depositions of Christine Irvine and other QUALCOMM
25   witnesses quoted herein are either set forth in full in the August 6 Order, summarized therein, or
     similar in substance and content to the testimony set forth in that Order.  For that reason, the
26   Responding Attorneys have not redacted those statements from this brief or from their
     declarations.  In a telephone call on October 2, 2007, QUALCOMM's counsel, William Boggs,
27   acknowledged that it was appropriate to consider any testimony reflected in the August 6 Order
     no longer as being confidential under the Protective Order. *Zeldin Dec., ¶4.*
28

- 7 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    A.    Basically journal papers and video processing related –

2    THE REPORTER: Related what?

3    THE WITNESS: Journals and publications, basically publications.

* * *

Q.    … Would you agree with me that Qualcomm's participation in standard setting encompasses activities not described in this paragraph [referring to QUALCOMM's First Supplemental Response to Interrogatory No. 13]?

A.    In general terms, yes, but with respect to video compression -- with respect to video compression the participation has only been recent.

Q.    When you say "only been recent," do you mean in --

A.    Not in 2001 time frame.

Q.    But later in 2005 and 2006?

A.    Yes.

*Ex. Zeldin-6 at 36:24-37:11; 117:14-24.* Raveendran further testified that she did not know of or receive reports of JVT meetings that took place in 2002 or 2003. *Id. at 40-42*; *see August 6 Order at 29-30* (discussing that deposition testimony, and post-trial evidence that the Court concluded contradicted it). Attorney Lee Patch defended Raveendran's deposition. *Patch Dec., ¶22.* Patch was not aware of the evidence that contradicted Raveendran's testimony, and he believed that her testimony was true at the time. *Id., ¶ 22.*

On July 31, 2006, QUALCOMM again supplemented its response to Broadcom's Interrogatory No. 13, to state that QUALCOMM had contributed four proposals to the JVT in 2006. *Ex. Zeldin-2.* Then, on August 16, 2006, QUALCOMM responded to Broadcom's Interrogatory No. 19, which had been served in July, by identifying QUALCOMM employees who made submissions or attended JVT meetings. *Ex. Zeldin-7.* All of this JVT-related activity post-dated adoption of the H.264 standard.

On August 17, 2006, QUALCOMM employee Scott Ludwin testified at deposition as a 30(b)(6) witness, replacing Irvine. Ludwin had also been deposed in his individual capacity, on August 3. Ludwin was the head of QUALCOMM's Multimedia Development and Standardization Group (the "Standardization Group"). He testified that he was responsible for

- 8 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    assigning "which QUALCOMM employees attend which international standards organizations,"

2    including the JVT.    *Ex. Leung-6 at 13.*    He testified that QUALCOMM's response to

3    Interrogatory No. 19 represented "a complete list of all JVT and VCEG meetings attended by any

4    Qualcomm employee" except for some minor (and, here, irrelevant) corrections. *Id. at 29-30.* As

5    for Raveendran, Ludwin testified that "I think she attended once, so it's not like she has a lot of

6    history or knowledge of really what goes on in that group." *Id. at 45:1-4.* Ludwin also testified

7    that the Digital Cinema Group (a QUALCOMM group that had been involved in this area of

8    technology but had since been disbanded) "had no interest in what the JVT was doing and

9    specifically ignored what they were doing." *Id. at 96:2-3.* (As the name of the Digital Cinema

10   Group implies, this group was interested in commercial movie theaters, not the consumer

11   electronic devices as small as cell phones with which H.264 was concerned.) Responding

12   Attorney Kevin Leung had met with Ludwin for four hours to prepare for his 30(b)(6) testimony.

13   *Leung Dec., ¶11.* When Leung defended the deposition and signed the response to Interrogatory

14   No. 19, he believed that the testimony was accurate and that the response reflected the entirety of

15   QUALCOMM's involvement with the JVT. *Id.*

16          During July and August 2006, QUALCOMM searched for and produced additional

17   documents concerning its post-H.264 involvement in the JVT. Leung, who handled day-to-day

18   discovery issues, identified the people likely to have responsive documents, based on documents

19   from the JVT website, Ludwin's deposition testimony, and his own communications with

20   QUALCOMM (the content of which is privileged). He produced the responsive documents that

21   QUALCOMM provided from those people's archives. *Leung Dec., ¶ 23.* In this regard, it is

22   important to recognize that the Responding Attorneys relied on QUALCOMM to conduct

23   physical and electronic searches. <u>The Responding Attorneys did not have direct access to</u>

24   <u>QUALCOMM's files or electronic archives</u>, although they worked with QUALCOMM to

25   identify categories and potential custodians of responsive documents. *E.g., Leung Dec., ¶ 14;*

26   *Mammen Dec., ¶14.*

27          **C.     Trial Preparation And Pre-Trial Motions**

28          Fact discovery closed on August 14, 2006, although the parties continued to resolve and

- 9 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

complete open items.   The parties then had just four months for expert discovery, summary judgment, pre-trial memoranda and motions, and trial preparation.   On November 6, 2006, QUALCOMM filed its Motion for Summary Adjudication (prepared by Heller Ehrman) on the waiver defense.  The motion included the assertion that QUALCOMM was not involved in the JVT prior to adoption of the H.264 standard.  That assertion was later proven incorrect – but, "only after a jury trial was held, after a verdict was reached, after a post-trial hearing on the equitable issues was held, and after a finding was made by the Court as to these equitable issues." *August 6 Order at 44:21-27*.  The Responding Attorneys believed those assertions were true until well after trial.  As a result, the same assertions were adapted from the Motion for Summary Adjudication for inclusion in other documents, including a Motion *in limine* filed on November 19, 2006. *See Zemlicka Dec.,* ¶¶ 18-23.

The parties filed Memoranda of Contentions of Fact and Law on November 20, and Rebuttal Memoranda on December 4.  In total, QUALCOMM's opening and rebuttal Memoranda contained 271 pages, and 1108 separate paragraphs of contentions.   *Mammen Dec.* ¶ 37(c).  Eight of those paragraphs were cited in the August 6, 2007 Order, and those were taken from a previously-filed expert declaration or from an insert, both of which were prepared by Heller Ehrman.  *Id.*

### D.     The Trial

On January 3, 2007, four Day Casebeer partners and eight associates relocated to San Diego for trial, which was scheduled to begin on January 9.[2]

On January 7, 2007, Adam Bier, a junior associate, became aware of an email that Viji Raveendran had received from the computer system (known as a majordomo server) that hosted the avc_ce reflector (an email circulation list). *Bier Dec., ¶25*.  The email, dated August 6, 2002, was an automated message from that system indicating that Raveendran had been subscribed to

---

[2]     This includes two individuals who did not appear at trial or in any other context, who are not named in the OSC, and who counsel for the Responding Attorneys have determined do not fall within the scope of the descriptions of attorneys directed to respond in the OSC. *See Cialone Dec.,* ¶¶ 5-7.   Three more of the Responding Attorneys did not attend trial. *Leung Dec.,* ¶ 16; *Loo Dec.,* ¶ 4; *Nelson Dec.,* ¶14.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    the reflector.  *Bier Dec.,* ¶ 27.  Bier understood and believed that Raveendran had been

2    subscribed to the email reflector without any affirmative action on her part, and Raveendran's

3    subsequent trial testimony reaffirmed that understanding.  *See Bier Dec.,* ¶ 28; *Ex. Zeldin-8*

4    *(1/24/07 Trial Tr. at 46)* (testifying that she did not place her address on the list, and she believed

5    that another member of the JVT placed her name on the list).[3]  The email did not contradict Bier's

6    understanding, and he does not specifically recall reviewing it.  Its significance was limited to

7    confirming that Raveendran's name was on the reflector list, and although it appears that he

8    conferred about the email at that time, Bier does not have a present recollection of that

9    conversation.  *Bier Dec.,* ¶28.

10        Trial began on January 9, 2007.  Each side was allocated twenty hours of trial time, and

11   the trial lasted just over two weeks.  Given the size of the case and the discovery record, this was

12   a massive undertaking.  The lawyers involved put in extremely long hours.

13        At a preparation meeting on January 14, 2007, Bier searched or directed a search of

14   Raveendran's computer that located 21 emails (after eliminating three duplicates) received from

15   the avc_ce reflector.  *Bier Dec.,* ¶ 30.[4]  Bier brought the emails to the attention of more senior

16   lawyers, Chris Mammen and Lee Patch.  *Bier Dec.,* ¶ 32. Mammen and Bier determined that the

17   emails were sent between members of a JVT subgroup and concerned preparations for comparing

18   the H.264 standard to other video compression standards; <u>they did not concern setting the H.264</u>

19   <u>standard</u>.  *Mammen Dec.* ¶¶ *43-45.*  They did <u>not</u> mention Raveendran, QUALCOMM, or any

20   QUALCOMM employee.  Given the assertion of privilege, the Responding Attorneys can only

21   add that the emails were consistent with their understanding that Raveendran had not signed up

22   for the avc_ce reflector.  *See, e.g., Mammen Dec.,* ¶ 43.  The Responding Attorneys compared the

23   emails to QUALCOMM's responses to Broadcom's document requests and, based on that review,

24   ---

[3]    On August 7, 2007, QUALCOMM, through its current counsel, produced this email and
25   two others retrieved from Raveendran's computer, which had not previously been produced.  The
     two other emails indicate that, in fact, Raveendran took action to subscribe to the avc_ce
26   reflector.  Bier did <u>not</u> see those emails on January 7, or at any time before Broadcom submitted
     them to the Court on August 8, 2007.  *Bier Dec.,* ¶ 25.

27   [4]    The August 6 Order states that QUALCOMM's counsel "stripped" these emails from
     Raveendran's computer.  *August 6 Order at 45.*  The emails were simply printed out; they were
28   not deleted or altered in any way.  *Bier Dec.,* ¶ 33.

| Case No. | RESPONDING ATTORNEYS' RESPONSE TO |
|---|---|
| 05CV1958-B (BLM) | AUGUST 13, 2007 ORDER TO SHOW CAUSE |

1   concluded that the emails did not fall within the scope of QUALCOMM's discovery

2   commitments, among other reasons, because they did not reflect QUALCOMM involvement with

3   the JVT regarding the setting of the H.264 standard, and they did not address QUALCOMM or its

4   IP. *Id.; see also Patch Dec.* ¶27.

5        On January 18, 2007, Stanley Young of Heller Ehrman stated at sidebar that there was no

6   evidence that any emails were sent to the email list on which Raveendran's name appeared. None

7   of the Responding Attorneys present at sidebar knew or suspected at the time that this statement

8   was incorrect. *Batchelder Dec.,* ¶ 41.

9        On the morning of January 24, 2007, QUALCOMM filed a Motion for Judgment as a

10   Matter of Law ("JMOL") with respect to Broadcom's waiver defense, which argued, among other

11   things, that Viji Raveendran had never received emails from the reflector list. That portion of the

12   brief was provided by Heller Ehrman. *Casebeer Dec.* ¶20. Later that day, Raveendran testified

13   on cross-examination as follows: "During the preparation for this testimony, there were some e-

14   mails pulled out of my e-mail box. E-mail archive." *Ex. Zeldin-8 (1/24/07 Trial Tr. at 53)*[5]. At

15   sidebar, Responding Attorney Lee Patch reported that he had not seen the emails and that no

16   determination had been made as to whether they were responsive to discovery requests. As

17   explained further in his Declaration *(¶¶37-4),* Patch acknowledges that he may have left the Court

18   with an incorrect impression, for which he apologizes. QUALCOMM produced the emails after

19   the lunch recess, and Broadcom questioned Raveendran about them.

20        On January 26, 2007, the jury returned a verdict against QUALCOMM on its claims of

21   patent infringement, but found the patents to be valid. The jury also returned an advisory verdict

22   against QUALCOMM on two of Broadcom's equitable defenses, waiver and inequitable conduct.

23       **E.    Initial Post-Trial Proceedings (Through March 21, 2007)**

24        On January 29, 2007, QUALCOMM filed an Amended JMOL Motion to correct the

25   statement that Raveendran had not received any emails from the avc_ce *ad hoc* subgroup, and

26

27      [5]     This may be the source of the Court's statement that the emails were "stripped" from

28   Raveendran's computer, noted above. As discussed above, no emails were deleted or altered.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 12 -

1    QUALCOMM's counsel wrote a letter to the Court apologizing for the incorrect statement in the

2    original JMOL. *Ex. Zeldin-11.*

3         On February 2, 2007, the parties submitted briefs on Broadcom's waiver and inequitable

4    conduct defenses. At that point, the Responding Attorneys knew that Raveendran had received

5    emails from the avc_ce reflector – but this was all they knew. They did <u>not</u> know about the

6    earlier involvement in the JVT by Raveendran (who had testified that the emails from the

7    reflector had come to her unsolicited and she never read them) and other QUALCOMM

8    employees, or about the large quantity of JVT-related documents that the Responding Attorneys

9    would learn about in late March and April 2007. QUALCOMM's brief therefore argued that

10   Raveendran's passive receipt of unsolicited emails did not trigger a duty to disclose

11   QUALCOMM's patents to the JVT, the legal issue at the center of Broadcom's waiver defense.

12        Judge Brewster issued an order on Broadcom's equitable defenses on March 21, 2007 (the

13   "March 21 Order"). The Court found in QUALCOMM's favor on inequitable conduct (which

14   relates to conduct before the PTO during prosecution of the patents). As for waiver, the Court

15   found in Broadcom's favor and ordered QUALCOMM to respond concerning the remedy the

16   Court should impose. The March 21 Order addressed many of the events described above. It

17   discussed, for example, the 21 emails from the avc_ce reflector that were found on Raveendran's

18   computer, contrary to representations made by Young at the January 18, 2007 sidebar. *March 21*

19   *Order at 25-26.* Despite this, the Court did not propose any sanctions against the lawyers. Even

20   as to QUALCOMM, the Court proposed a relatively-modest remedy: that the '104 and '767

21   patents would be independently unenforceable against H.264-compliant products, but those

22   patents would be included "in the MPEG LA patent pool, which received royalties from H.264

23   compliant producers ... . The extent of Qualcomm's share of the royalties would be determined

24   in accordance with procedures in effect in the MPEG LA pool." *Id. at 33.* At that time, however,

25   the Court did not know about the mass of other QUALCOMM documents that demonstrated the

26   full extent of QUALCOMM's involvement in the JVT, and the Responding Attorneys were only

27   just learning about those documents themselves.

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 13 -

### F.      Discovery Of Additional Documents After Trial

After trial, the parties' counsel discussed the adequacy of QUALCOMM's document production. As part of that process, on February 16, 2007, QUALCOMM's counsel wrote a letter explaining their view that the 21 emails from Raveendran's computer, which had already been produced during trial, were not within the scope of QUALCOMM's discovery commitments. *Bier Dec., ¶32; Mammen Dec.,* ¶ 46. On March 5, Broadcom requested that QUALCOMM run searches for specified terms on the email archives of twelve QUALCOMM employees. Two days later, on March 7, QUALCOMM agreed to perform those searches on the archives of five of those employees, the ones who had testified at trial about the JVT. *Mammen Dec.,* ¶ 22. QUALCOMM further agreed to produce all documents located through the searches, other than those protected by attorney-client privilege, regardless of whether they were responsive to any discovery request.

The Responding Attorneys involved in this post-trial process were surprised by the results of the search. Based on the information they knew, including the testimony referenced above, they expected that the searches would yield nothing and the matter would be put to rest. See e.g., *Mammen Dec.,* ¶¶ 22, 24. Instead, the initial searches of five witnesses returned thousands of documents, including documents that contradicted positions that some Responding Attorneys had advanced throughout the litigation. QUALCOMM voluntarily expanded the search to cover all twelve individuals identified in Broadcom's March 5 list, leading to thousands of additional documents being discovered and produced. Due to the volume of documents, collection and privilege review took several weeks.

On April 9, 2007, Jim Batchelder wrote to the Court to report on the results of the document searches. He stated that the recently-discussed documents were inconsistent with assertions made by QUALCOMM's counsel, and he apologized to the Court. *Batchelder Dec.* ¶48-49; *Ex. Zeldin-10.*

### G.      Broadcom's Motions For Attorney's Fees And Sanctions

On May 29, 2007, Broadcom filed a Motion for an Award Of Attorneys Fees and a Motion for Sanctions, contending that QUALCOMM had engaged in litigation misconduct by

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 14 -

concealing evidence of its involvement in the JVT during the development of H.264.   The

Responding Attorneys did not respond to either motion because Broadcom had not directed the

motions at counsel.   As Broadcom confirmed at the hearing on the Motion for Sanctions:

> THE COURT: …. [W]hy is it that you're asking for the monetary sanction only against Qualcomm and not against – Qualcomm, the corporation, and not against any of the attorneys who are involved?
>
> MR. REGAN: Well, in part because we don't know what the involvement of the attorneys was and what it wasn't, and I was taught a long time ago not to ask for serious remedies unless I really had a factual basis for asking for it, and we literally don't know why this happened.

*Ex. Zeldin-9 (July 26, 2007 Transcript of Motion Hearing at 45).*   QUALCOMM's new lead

counsel acknowledged the same point:

> THE COURT: …. If I disagree with you and I believe that some sort of sanctions are appropriate, who are those sanctions – who should those sanctions be against, Qualcomm, an individual attorney, firms?
>
> MR. BOGGS: The only party before your Honor at this motion is Qualcomm.
>
> THE COURT: And so, you believe all the sanctions should be against Qualcomm.
>
> MR. BOGGS: I don't speak for the lawyers that worked for Qualcomm back at the time.   I'm not here representing that.   It would be unfair and, I think inappropriate… to be assessing a fine or awarding sanctions against somebody who isn't here. … <u>Whatever – wherever the fault lies between Qualcomm and its lawyers, that's between them.</u>

*Id. (July 26, 2007 Transcript of Motion Hearing at 181-82;* emphasis added).   Mr. Boggs was

correct: the lawyers were the agents for a disclosed principal, and QUALCOMM as client is

legally responsible for the conduct of its lawyers during litigation.   Any disagreement between

QUALCOMM and its lawyers as to who was at fault for the discovery lapses can be resolved

between them, in a forum where the attorneys can tell their full story, free from the constraints of

QUALCOMM's attorney-client privilege.

On August 6, 2007, Judge Brewster – now aware of the large quantity of documents

discovered in the months after trial – issued the August 6 Order.   That Order not only describes

the conduct of QUALCOMM, but also contains a 20-page section titled "Misconduct of

Qualcomm's Counsel."   This Court's August 13 OSC states that the August 6 Order "impugned

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

Case No.
05CV1958-B (BLM)

RESPONDING ATTORNEYS' RESPONSE TO
AUGUST 13, 2007 ORDER TO SHOW CAUSE

1   QUALCOMM's counsel and their claims that they carried out their discovery obligations in good

2   faith" and that "th[e] Court believes that the record evidence provides a basis for finding that

3   QUALCOMM's attorneys violated this Court's discovery and/or scheduling orders." *OSC at 2.*

4   The Responding Attorneys agree that the August 6 Order "impugned QUALCOMM's counsel,"

5   providing a basis for this Court's Order to Show Cause. Responding Attorneys appreciate this

6   Court's invitation to supplement the record through a fuller explanation of the relevant

7   circumstances and the conduct of counsel. Accordingly, the Responding Attorneys have

8   submitted Declarations, which describe their own individual conduct and states of mind, as well

9   as other supporting declarations and relevant material.

10  **III.   THE RESPONDING ATTORNEYS ARE CONSTRAINED BY THE DUTY OF
        CONFIDENTIALITY AND THE ATTORNEY-CLIENT PRIVILEGE**

11

12      In considering the Responding Attorneys' Declarations, the Court should recognize the

13  unique dilemma faced by lawyers who are called to explain how they conducted themselves in the

14  course of representing a client. Here, despite repeated requests, QUALCOMM has declined to

15  waive its privilege. *Zeldin Dec.,* ¶ 2. Accordingly, the rules constraining the Responding

16  Attorneys are discussed below.

17      **A.   California Law Requires Attorneys to Comply With the Client's Assertion of
            Privilege Even When Threatened with Sanctions**

18

19      This Court's Local Rules provide that attorneys must "comply with the standards of

20  professional conduct required of members of the State Bar of California . . . ." *S.D. Cal. R.*

21  *83.4(b).* Those standards not only require attorneys to maintain the attorney-client privilege, but

22  also impose a strict duty of confidentiality. The State Bar Act requires attorneys to "maintain

23  inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or

24  her client." *Cal. Bus. & Prof. Code §6068(e)(1).* Similarly, California Rule of Professional

25  Conduct 3-100(A) provides that an attorney "shall not reveal information protected from

26  disclosure by Business and Professions Code section 6068, subdivision (e)(1) without the

27  informed consent of the client . . . ." *(Notice of Lodgment ("NOL"), Ex. 1.).*

28      California defines client confidentiality to encompass "all information gained in the

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 16 -

1   professional relationship that the client has requested be kept secret or the disclosure of which

2   would likely be harmful or embarrassing to the client." *State Bar of Cal. Formal Op. 2003-161,*

3   *at 9 (NOL, Ex. 2); State Bar of Cal. Formal Op. 2003-163, at 2* (confidential information is

4   "information that the lawyer gains as a result of the professional relationship and which the client

5   has requested to be kept confidential or the disclosure of which would be embarrassing or would

6   likely be detrimental to the client") (*NOL, Ex. 3*); *Dixon v. State Bar*, 32 Cal. 3d 728, 739 (1982)

7   (disclosing "a sensitive and confidential allegation that [the attorney] knew would be

8   embarrassing to the honor of his client . . . violated the sanctity of the confidential relationship

9   existing between attorney and client").   "Section 6068(e) has been rigidly adhered to by

10  California courts, and its command has been given liberal application." *Los Angeles County Bar*

11  *Ass'n Formal Op. No. 386 (1980)  (NOL, Ex. 4.).*

12      The State Bar has issued a formal opinion that provides specific guidance to California

13  attorneys who are faced with a sanctions motion. *State Bar of Cal. Formal Op. 1997-151 (1997).*

14  (*NOL, Ex. 5.*)  In that opinion, the State Bar has emphasized that an attorney has a continuing

15  duty to maintain client confidentiality, even if doing so prevents the attorney from presenting a

16  defense against sanctions. "If Attorney's defense to the motion [for sanctions] involves the

17  disclosure of such [confidential information] and Client does not consent to its disclosure,

18  *Attorney cannot disclose the information.*"   *State Bar of Cal. Formal Op. 1997-151* (1997)

19  (emphasis added). (*NOL, Ex. 5.*)

20      The Responding Attorneys recognize the seriousness of the Court's inquiry.  But even the

21  threat of dire sanctions outlined in the OSC does not release the Responding Attorneys from their

22  duties, under the authorities discussed above.   QUALCOMM alone holds the privilege, and

23  QUALCOMM has not waived it.  The Responding Attorneys have concluded that they may not

24  unilaterally ignore their duties in this regard, and may not disclose attorney-client privileged

25  information absent a ruling from this Court that such information may be disclosed in this

26  proceeding.[6]

27  ――――――――――

[6]    The analysis would be much different if QUALCOMM had accused the Responding
28  Attorneys of misconduct.  When *the client* accuses an attorney of misconduct or negligence, then
    the lawyer is released from confidentiality to the extent necessary for the lawyer to defend

- 17 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

**B.      The Court Has Ruled That the Self-Defense Exception to the Attorney-Client Privilege Does Not Apply but That the Attorneys May Introduce Evidence Which Would Be Protected Under the Work Product Doctrine**

On September 28, 2007, the Court denied the Heller Attorneys' motion (joined in by the Responding Attorneys) for an order that the self-defense exception applies.  At the same time, the Court ruled that the work product protection belongs to the attorney, not the client, so that disclosing work product in the Responding Attorneys' Declarations "does not violate the attorneys' ethical duties and professional responsibilities under Rule 3-100 of the California Rules of Professional Conduct, Section 6068 of the California Business and Professions Code or other applicable regulations.  *"Order Denying Motion for an Order Determining That Federal Common Law Self-Defense Exception to Disclosing Privileged and/or Confidential Information Applies, 2-3.*  Based on these rulings, the Responding Attorneys are constrained from revealing confidential communications that would be helpful in demonstrating the honesty and reasonableness of their conduct, but they have presented the Court with as much evidence as possible to respond to the OSC.

**C.      The Responding Attorneys Should Not Be Sanctioned For Conduct Or Events They Cannot Fully Explain Due To Their Duty Of Confidentiality**

**1.      Sanctioning Individual Attorneys Who Are Legally Constrained From Responding Fully To The OSC Would Violate Due Process**

Imposing liability or other adverse consequences on an attorney who cannot respond to allegations of misconduct because of the duty of confidentiality would violate due process.  In recognition of this fundamental principle of fairness, California courts have held that civil suits against an attorney must be dismissed if the attorney cannot respond due to confidentiality.  The same reasoning applies *a fortiori* to a threat of serious sanctions that could impact their careers.

In *McDermott, Will & Emery v. Superior Court*, 83 Cal. App. 4th 378, 385 (2000), shareholders of Memorial Healthcare Systems contended that the company's outside counsel had

himself or herself.  *State Bar Op. 1997-151* (attorney may reveal confidential information in responding to sanctions motion if client contends sanctionable conduct is solely attributable to attorney) (*NOL, Ex. 5*); *Cal. Evid. Code §958* ("There is no privilege under this article as to a communication relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship.").  QUALCOMM, however, has not made any such accusation.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 18 -

1   committed malpractice in connection with a merger. The shareholders brought a derivative claim

2   on behalf of Memorial against the lawyers. The Court noted that the shareholders lacked standing

3   to waive the attorney-client privilege because "the corporation, and not the shareholder . . . is the

4   holder of the privilege." *Id.* at 383. Because the corporation had not waived its privilege, the

5   Court found that it would be unfair to the defendant lawyers to permit the suit to go forward:

> 6   [S]uch a lawsuit against the corporation's outside counsel has the dangerous potential for robbing the attorney defendant of the only means he or she may have
> 7   to mount any meaningful defense. It effectively places the defendant attorney in the untenable position of having to 'preserve the attorney client privilege (the
> 8   client having done nothing to waive the privilege) while trying to show that his representation of the client was not negligent.' *(Id.* at 384 (quoting *Kracht*, 219
> 9   Cal. App. 3d at 1024))

10  The Court explained that even involuntary assignment of a legal malpractice claim is barred

11  because the assignee cannot waive confidentiality that belongs to the assignor: "We simply

12  cannot conceive how an attorney is to mount a defense in ... [an] action alleging a breach of duty

13  to the corporate client, where, by the very nature of such action, the attorney is foreclosed, in the

14  absence of any waiver by the corporation, of disclosing the very communications which are

15  alleged to constitute a breach of that duty." *Id.* at 385. *See also Kroll & Tract v. Paris & Paris*,

16  72 Cal. App. 4th 1537, 1544 (1999) (law firm sued for malpractice could not cross-claim against

17  client's other counsel who could not reveal attorney-client communications to defend himself).

18      A similar issue arose in *Solin v. O'Melveny & Myers,* 89 Cal. App. 4th 451, 466 (2001).

19  The plaintiff, Solin, was an attorney. He consulted with another attorney, Cohen at O'Melveny,

20  concerning a fee dispute with one of Solin's clients, Reich. Solin disclosed privileged

21  information about Reich to Cohen. Solin later sued Cohen for malpractice. Cohen responded that

22  his defense would require him to disclose Solin's confidential communications with Reich, and

23  Reich objected to any such disclosure. The Court held that Solin's lawsuit could not go forward

24  because it would be "fundamentally unfair" to require Cohen to defend himself while hobbled by

25  the privilege. "Simple notions of due process counsel against such a procedure." *Id.* at 463.

26      Here, the Responding Attorneys' Declarations demonstrate that the attorney-client

27  privilege prevents those individuals most closely involved in the discovery and other proceedings

28  at issue from fully responding to the ultimate question -- why the documents found after trial

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 19 -

1    were not produced during discovery. In such a circumstance, due process and fundamental

2    fairness prevent the imposition of sanctions on the Responding Attorneys because they would

3    have to reveal attorney-client communications to fully defend themselves.

**2. The Court Should Not Draw Inferences Against The Responding Attorneys Based On QUALCOMM's Assertion Of Its Privilege**

6    The Responding Attorneys do not intend to cast aspersions by noting QUALCOMM's

7    assertion of privilege. QUALCOMM has a right to assert privilege, and QUALCOMM's ongoing

8    legal disputes with Broadcom give ample reason to do so. Under *Knorr-Bremse Systeme Fuer*

9    *Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed. Cir. 2004), "no adverse

10   inference shall arise from invocation of the attorney-client . . . privilege"; *see also Nabisco, Inc. v.*

11   *PF Brands, Inc.,* 191 F.3d 208, 226 (2d Cir. 1999) (abrogated on other grounds in *Moseley v. V*

12   *Secret Catalogue, Inc.* 537 U.S. 418 (2003)) (stating "we know of no precedent supporting such

13   an [adverse] inference based on the invocation of the attorney-client privilege. This privilege is

14   designed to encourage persons to seek legal advice, and lawyers to give candid advice, all without

15   adverse effect"). More importantly, the Court cannot draw inferences against the Responding

16   Attorneys for respecting QUALCOMM's assertion of its privilege, as the Responding Attorneys

17   are required to do.

18   In this matter, the Court has acknowledged the rule against adverse inferences but stated

19   that it will not draw inferences in favor of QUALCOMM based on QUALCOMM's assertion of

20   privilege. *Ex. Zeldin-9 (7/26/07 Transcript 174:11-18)*. The Responding Attorneys, however,

21   do not control the privilege. *See In re Vargas*, 723 F.2d 1461, 1466 (10th Cir. 1983) ("an

22   attorney cannot waive the attorney-client privilege without the client's consent"). Accordingly,

23   the Court should apply to these individuals the usual presumption that attorneys, as officers of the

24   Court, are deemed to act ethically unless the contrary is proven. *Geders v. United States*, 425

25   U.S. 80, 93 (1976) (Marshall, J., concurring) ("If our adversary system is to function according to

26   design, we must assume that an attorney will observe his responsibilities to the legal system, as

27   well as to his client"); *Eaton v. Siemens*, 2007 U.S. Dist. LEXIS 58621 *22 (E.D. Cal. Aug. 10,

28   2007) ("This court properly assumes that lawyers behave ethically.") (citing *DCH Health Servs.*

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 20 -

1  *Corp. v. Waite*, 95 Cal. App. 4th 829, 834 (2002) ("[T]he court should start with the presumption
2  that, unless proven otherwise, lawyers will behave in an ethical manner.")).

3  **IV.    THE AUGUST 6 ORDER IS NOT COLLATERAL ESTOPPEL AS TO THE
         INDIVIDUAL RESPONDING ATTORNEYS**
4

5  The Responding Attorneys were not parties to the proceedings that led to the August 6
6  Order, the purpose of which was to determine the remedy for QUALCOMM's waiver of its
7  patent rights.  Nor were they parties to the Motion for Sanctions that led to the OSC.  Thus, the
8  Responding Attorneys have not had their day in court.  They did not present evidence or
9  argument on their own behalf, and QUALCOMM's counsel, DLA Piper, represented only
10 QUALCOMM's interests, and not the potentially conflicting interests of the Responding
11 Attorneys.[7]

12 Under these circumstances, basic principles of due process and collateral estoppel prohibit
13 using findings in the August 6 Order against the Responding Attorneys.  *See Blonder-Tongue*
14 *Lab. v. University of Illinois Found.*, 402 U.S. 313 (1971) ("Due process prohibits estopping
15 [litigants who did not appear in an earlier action] despite one or more existing adjudications of the
16 identical issue which stand squarely against their position") (citations omitted).  The August 6
17 findings are not binding on the Court; indeed, for purposes of assessing the conduct of the
18 Responding Attorneys, the Court should not even consider those findings.  *See M/V American*
19 *Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983) ("a court may not
20 take judicial notice of proceedings or records in another cause so as to supply, without formal
21 introduction of evidence, facts essential to support a contention in a cause then before it"); *Wyatt*
22 *v. Terhune*, 315 F.3d 1108, 1114 n.5 (9th Cir. 2002) (factual findings in one case are not
23 judicially noticeable for their truth in another case).[8]  The Responding Attorneys are entitled to be
24 heard, and findings made before they were heard are inadmissible and irrelevant.

---

[7]    California law recognizes that an attorney's role as counsel does not merge the attorney's
identity with that of a client for whom the lawyer acts as advocate. *Loube v. Loube*, 64 Cal. App.
4th 421, 428 (1998) (in malpractice action, attorney not estopped by arguments he asserted on
client's behalf in underlying case).

[8]    The Responding Attorneys recognize that the August 6 Order and this proceeding are part
of the same overall case.  The parties to the two proceedings, however, are different:  The August

- 21 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

## V.   THE RESPONDING ATTORNEYS DID NOT VIOLATE A COURT ORDER AND SHOULD NOT BE SANCTIONED UNDER RULE 37

### A.   The Responding Attorneys Assume That the OSC is Proceeding Under Rule 37

Before sanctions can be imposed, "[t]he party against whom sanctions are being considered is entitled to notice of the legal rule on which the sanctions would be based, the reasons for the sanctions, and the form of the potential sanctions." *In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 379 (3d Cir. 1997). It is not sufficient simply to list all the possible grounds for sanction and leave it to the attorney to figure out how to respond. *See Martin v. Brown*, 63 F.3d 1252, 1264 (3d Cir. 1995) ("scatter gun approach" of listing Rule 11, Rule 37, 28 U.S.C. ¶1927 and inherent powers was unfair to sanctioned counsel).

The OSC does not specify the provision of law under which the Court is considering sanctioning the Responding Attorneys. "Ordinarily a court proposing to impose sanctions notifies the person charged both of the particular alleged misconduct and of the particular disciplinary authority under which the court is planning to proceed." *In re DeVille*, 361 F. 3d 539, 548 (9th Cir. 2004). However, the OSC does question whether the Responding Attorney violated the Court's discovery or scheduling orders, and the Court explained the hearing on September 28, 2007 is proceeding essentially under Rule 37. In its written September 28, 2007 follow-up order, the Court also appears to have highlighted the specific focus of this OSC as concerning alleged "discovery" misconduct. (See Order at 2, line 8.) Thus, without waiving their due process rights, the Responding Attorneys have primarily addressed Rule 37 as the basis for imposing sanctions against the attorneys in this case.

6 Order arose from the March 21 Order, which concerned only QUALCOMM's liability, whereas the OSC concerns the liability of the Responding Attorneys. The distinction between these proceedings is underscored by the fact that QUALCOMM has appealed the August 6 Order (along with the Final Judgment), even while the instant proceeding remains pending. Responding Attorneys did not have that option. *See Nisus Corp. v. Perma-Chink System, Inc.*, 2006-1592, 2007-1142 (Fed.Cir., Aug. 13, 2007) (attorney lacks standing to appeal order that criticizes, but does not sanction, the attorney). NOL, Ex. 7.)

- 22 -

**B.    Rule 37(b) Does Not Support Sanctions Here**

**1.    The Responding Attorneys Complied With The Court's Orders**

Rule 37(b) does not provide a basis for sanctions here because (1) the Responding Attorneys complied with the Court's orders, and (2) because general orders cannot be a proper basis for sanctions. In this case, Broadcom did not move to compel discovery and no specific orders were issued compelling discovery of particular documents or information. *See July 26, 2007 Transcript, 5:17-20* (Broadcom's counsel: "There was no motion to compel or other discovery motion brought to your Honor or to Judge Brewster, for that matter, dealing with discovery issues regarding JVT"). The only potentially applicable orders, are the following:

December 8, 2005 Order Finding Early Neutral Evaluation Conference Inappropriate, Setting Rule 26 Compliance, and Notice of Case Management Conference (the "Rule 26 Order"): The Rule 26 Order, among other things, directed the parties to make Initial Disclosures and generally warned that failure to comply with discovery requests or the Federal Rules of Civil Procedure could result in sanctions. This Order was not violated. Initial Disclosures relate to a party's own claims or defenses, not to the other party's defenses. (Fed.R.Civ.P. 26(a)(1); W. Schwarzer, et al. *California Practice Guide: Federal Procedure Before Trial* at ¶11:265 (2005).) Moreover, at this early stage of the litigation, before any discovery had been conducted, Broadcom had not identified the JVT, or even the more general concept of standards-setting bodies, as part of its defenses; it had only pled waiver as part of an omnibus assertion of equitable defenses.

February 17, 2006 Case Management Conference Order (the "CMC Order"): The CMC Order set pre-trial deadlines for events such as the completion of fact and expert discovery. The Order required the parties to provide certain details relating to any claim of (1) infringement or (2) invalidity. It did not require any specific disclosure relating to the JVT or to Broadcom's waiver defense.

August 14, 2006 Joint Stipulation and Order (the "Stipulated Order"): The Stipulated Order recited that "QUALCOMM and Broadcom agree that each side shall complete its

RESPONDING ATTORNEYS' RESPONSE TO
AUGUST 13, 2007 ORDER TO SHOW CAUSE

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   document production obligations by August 21, 2006." *8/14/06 Stipulated Order at 3.*[9]   As

2   multiple Declarations from the Responding Attorneys will attest, as of August 21, they were

3   unaware of the 21 emails or the documents that were produced post-trial.  The Responding

4   Attorneys believed that QUALCOMM had produced all responsive documents evidencing

5   QUALCOMM's participation in the JVT.

6           Under Rule 37(b), the Ninth Circuit has held that "sanctions are appropriate only in

7   extreme circumstances" and where the violation is "due to willfulness, bad faith, or fault of the

8   party." *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2001), *cert. den.* 537 U.S.

9   1018 (2002); followed in *In re Heritage Bond Litigation*, 223 F.R.D. 527, 530 (C.D.Cal. 2004).

10  Considering the severe and punitive nature of the possible sanctions referenced in the Court's

11  OSC, "a court must have clear and convincing evidence of willfulness, bad faith or fault" before

12  imposing such sanctions.  *See Maynard v. Nguyen*, 332 F.3d 462, 468 (7th Cir. 2003).   These

13  standards have not been met because there is no clear and convincing evidence (or even a

14  preponderance of evidence) of an order which the Responding Attorneys violated willfully, in bad

15  faith or otherwise.

16          **2.        None Of The Orders Herein Is A Legally Proper Basis For Sanctions**

17          Rule 37(b)(2), the provision authorizing sanctions, applies only where there is a specific

18  court order compelling specific discovery and that court order is violated.  *R.W. Int'l Corp. v.*

19  *Welch Foods, Inc.* 937 F.2d 11, 15-16, 20 (1st Cir. 1991) (initial scheduling order did not qualify

20  as order compelling deponent to answer particular questions; sanctions reversed); *see also*

21  *Avionic Co. v. General Dynamics Corp.*, 957 F.2d 555, 557-58 (8th Cir. 1992) (specific order is

22  necessary to ensure that the party to whom the order is directed understands its obligations and

23

24

25  ---
    [9]    The Stipulated Order was entered pursuant to an "Order Following Telephonic Case
26  Management Conference" on August 7, 2006, which required the parties "to submit a stipulation
    and proposed order identifying dates by which they will exchange documents responsive to any
27  outstanding discovery requests."  While the Court "encourage[d] the parties to categorize their
    stipulated document production schedule by document type, document request, or other such
    logical subset of documents," the parties did not do so; they simply stipulated to a general
28  obligation to complete document production.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 24 -

1    has an opportunity to comply or contest the discovery before being exposed to sanctions). The

2    three general orders described above do not provide a basis for Rule 37(b) sanctions.

3         A Ninth Circuit opinion and a decision from the Eastern District of California clarify that

4    violation of a specific order (rather than a scheduling order or a general order) is required before

5    Rule 37(b) sanctions will be imposed. In *Fjelstad v. American Honda Motor Co.*, 762 F.2d 1334

6    (9th Cir. 1985), the district court issued an initial general order directing the parties to meet

7    discovery deadlines. The defendant then served incomplete and unsigned responses to the

8    plaintiff's interrogatories. The plaintiff moved for sanctions. The district court did not grant

9    sanctions and instead ordered the defendant to answer all interrogatories "fully and completely."

10   *Id.* at 1336. The defendant proceeded to violate that second order by failing to respond to the

11   interrogatories. As a result, the Court entered default judgment against the defendant as a

12   sanction pursuant to Rule 37(b)(2). On appeal, the Ninth Circuit explained that the general order

13   entered at the outset of the case was "a blanket directive to comply with the discovery rules" and

14   therefore was not adequate to support Rule 37(b) sanctions. *Id.* at 1338-339. In contrast, the

15   second order compelling answers to interrogatories was sufficient to form the basis for Rule

16   37(b)(2) sanctions. *Id.*

17        In *Ellington v. ES Alameida*, 2006 WL 3201088 at *2 (E.D. Cal. 2006) (following

18   *Fjelstad*), the district court held:

19        Nor can the court impose sanctions under Federal Rule of Civil Procedure 37(b).
          Although the court did issue a discovery order, it was not a specific order that
20        plaintiff provide or permit discovery, but rather a "blanket directive" governing the
          discovery process in this case. Accordingly, because plaintiff has not disobeyed a
21        specific order compelling discovery, he is not subject to sanctions or the
          imposition of fees under Rule 37(b) at this time.[10]
22

---

23   [10]    Most other circuits have reached the same conclusion as the Ninth. *See, e.g., Schoffstall v.*
24   *Henderson*, 223 F.3d 818, 823 (8th Cir. 2000) (Rule 37(b)(2) requires an order compelling
     discovery); *Shepherd v. AM. Broad. Co.*, 62 F.3d 1469, 1474 (D.C. Circuit 1995) (refusing to
25   impose Rule 37(b)(2) sanctions in the absence of a specific discovery order); *Salahuddin v.*
     *Harris*, 782 F.2d 1127, 1133 (2d Cir. 1986) (initial scheduling order not adequate under Rule
26   37(b)(2); sanctions reversed); *Big Top USA Inc. v. Wittern Group*, 183 F.R.D. 331, 338 (D. Mass
     1999) (specific court order must be in effect and violated before discovery sanctions can be
27   imposed); *Somascan Plaza, Inc. v. Siemens Med. Sys., Inc.*, 187 F.R.D. 34, 45 (D. P.R., 1999)
     (declining to construe initial scheduling order as order compelling discovery; sanctions denied);
28   *but see Hathcock v. Navistar Int'l Trans. Corp.*, 53 F.3d 36, 40 (4th Cir., 1995) (court may
     impose Rule 37 sanctions for violation of a scheduling order); *cf. Rabb v. Amatex, Corp.*, 769

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 25 -

## C.   Rule 37(c) Does Not Provide For Sanctions Against Counsel

Federal Rule of Civil Procedure 37(c), cited in Broadcom's Motion for Sanctions, provides only for sanctions against "a party." It does not authorize sanctions against counsel, and the circuit courts have consistently reversed sanctions entered against counsel under Rule 37(c). *Maynard v. Nygren, supra*, 332 F.3d at 470; *Apex Oil Co. v. Belcher Co. of N.Y.*, 855 F.2d 1009, 1013-14 (2d Cir. 1988) ("By its express terms, Rule 37(c) applies only to a party"); 7 J. Moore, *et al., Moore's Federal Practice* ¶37.04 at 37.76 (3d ed. 2007) ("Rule 37(c) precludes imposition of sanctions against party's attorney").

## VI.   SANCTIONS ARE NOT WARRANTED UNDER ANY OTHER APPLICABLE STANDARD

The OSC posed a narrow inquiry concerning whether the Responding Attorneys violated any of the Court's discovery or scheduling orders. At the September 28, 2007 hearing, the Court stated that its focus was on Rule 37. Thus, in accordance with the dictates of due process and the rules governing required notice for sanctions proceedings, the above discussion of Rule 37 is included to address fully the matters raised by the Court. Nevertheless, out of an abundance of caution, the Responding Attorneys will discuss other possible bases for sanctions and explain why they do not apply.

### A.   Sanctions Under Rule 26(g)(3) Are Not Warranted

No party has cited, nor has the Court mentioned, Federal Rule of Civil Procedure 26 as a basis for sanctions. In any event, Rule 26(g)(2) provides that, when an attorney signs a discovery response, the attorney certifies "to the best of the signer's knowledge, information and belief, formed after a reasonable inquiry," that the response is:

> (A) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;
>
> (B) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and
>
> (C) not unreasonable or unduly burdensome or expensive, given the needs

F.2d 996, 999 (4th Cir. 1985) (violation of scheduling order containing specific discovery orders aimed at the plaintiff was proper ground for Rule 37(b)(2) sanctions).

- 26 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

Rule 26(g)(3) authorizes sanctions against the signer, the party on whose behalf the response is made, or both. The August 6 Order raises three issues concerning QUALCOMM's discovery responses: (1) whether a reasonable inquiry was made into the existence of facts or documents; (2) whether objections were improper; and (3) whether it was improper for QUALCOMM to agree, in its responses, to produce some but not all of the documents Broadcom requested. These are discussed below.

### 1. The Declarations Demonstrate A Reasonable Inquiry, To The Extent That The Responding Attorneys Can Discuss Their Efforts Without Violating QUALCOMM's Privilege

To impose Rule 26(g)(3) sanctions on an attorney who signs a discovery response, the Court must find that the investigation undertaken by the attorney and the conclusions drawn therefrom were not reasonable under the circumstances. *See* Advisory Committee Notes to the 1983 Amendments to Rule 26:

> Rule 26(g) does not require the signing attorney to certify the truthfulness of the client's factual responses to a discovery request. Rather, the signature certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand.

The reasonableness of the inquiry must be determined as of the time the discovery was completed, not with the benefit of hindsight. *See Bergeson v. Dilworth*, 749 F. Supp. 1555, 1566 (D. Kan. 1990) ("the court must avoid hindsight and resolve all doubts in favor of the signer"); *see also Hurd v. Ralphs Grocery Co.*, 824 F.2d 806, 810 (9th Cir. 1987) ("If judged by an objective standard, a reasonable basis for the position exists in both law and in fact *at the time that the position is adopted*, then sanctions should not be imposed" (citation omitted) (emphasis added)). In conducting an inquiry, *an attorney is entitled to rely on representations by his or her client.* Advisory Committee Notes to the 1983 Amendments to Rule 26 ("the attorney may rely on assertions by the client and on communications with other counsel in the case as long as that reliance is appropriate under the circumstances") (emphasis added).

In this area, perhaps more than any other, the Responding Attorneys face the constraints

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 27 -

RESPONDING ATTORNEYS' RESPONSE TO
AUGUST 13, 2007 ORDER TO SHOW CAUSE

of privilege and the dangers of hindsight. Other than to reiterate that they did not have physical access to QUALCOMM's corporations, the Responding Attorneys cannot describe the details of their inquiry because any inquiry into QUALCOMM's involvement in the JVT necessarily began with communications between the Responding Attorneys and QUALCOMM employees. The Declarations and the discussion above do show, however, that the Responding Attorneys identified the QUALCOMM employees who they believed were knowledgeable about the JVT and obtained documents from their archives through QUALCOMM, which searched for responsive documents; they presented interrogatory responses that were consistent with their understanding of the facts and with the sworn testimony of QUALCOMM employees; and they reasonably believed in the truthfulness of the testimony at the time. *See Phinney v. Paulshock*, 181 F.R.D. 185, 204 (D.N.H. 1998) (declining to sanction attorney for defendants who deliberately withheld evidence, on ground that he had made "a reasonable effort under the circumstances to ensure that his clients complied with plaintiffs' discovery requests"). The Responding Attorneys conducted reasonable inquiries, the details of which they are precluded from divulging by QUALCOMM's assertion of privilege. The Court cannot simply assume that the attorneys are to blame, or that they engaged in sanctionable conduct.

As for hindsight, the Court should recognize that the discovery and production of QUALCOMM documents after trial is not evidence that the lawyers knew of the documents before trial, and not evidence that their inquiry before signing discovery responses was unreasonable. *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004).

### 2.     QUALCOMM's Objections Do Not Warrant Sanctions

The August 6 Order criticizes QUALCOMM's objections to interrogatories and documents requests. These objections were asserted in good faith. The assertion of multiple objections is consistent with established practice in large intellectual property cases like this, and it was consistent with the practice in this case. Indeed, Broadcom asserted 24 General Objections which it incorporated into every discovery response, and added specific objections in every response. Failure to raise all available objections risks waiver of unasserted objections. While the sheer number of objections (interposed by both parties) may be striking, no attorney in a

- 28 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

large, high-stakes, extremely complex, and intensely litigated case like this one can afford to risk

waiving an objection that he or she should have made. *Leung Dec.* ¶ 17; *Mammen Dec.,* ¶ 27(b);

*Exs. Leung-4 and 5.*

Broadcom apparently did not find the objections unreasonable, as it did not complain or file a motion to compel. These are the established means for challenging unwarranted objections. Failure to do so constitutes a waiver of the right to challenge the objections. *Helfand v. Gerson*, 105 F.3d 530, 536 (9th Cir. 1997); *see also* W. Schwarzer et al., *California Practice Guide: Federal Procedure Before Trial* at ¶11:2392 (2005) ("Failure to bring a motion to compel waives the right to challenge objections raised to the discovery request –*i.e.*, the discovering party cannot, at the time of trial, claim the responding party's objections were invalid or not made in good faith") (citing *Helfland*, 105 F.3d at 536).

### 3.  The Responding Attorneys Appropriately Sought To Narrow Document Requests, And Did Not Act With An Improper Purpose

The August 6 Order criticizes QUALCOMM's counsel for responding to discovery by agreeing to produce some, but not all, documents that Broadcom sought, but this is what the law requires. Federal Rule of Civil Procedure 34(b) provides: "If objection is made to part of an item or category, the part shall be specified and inspection permitted of the remaining parts." Some requests were overbroad, going beyond the technology at issue. *Mammen Dec.,* ¶ 27(c).  For example, QUALCOMM objected to a request to produce all documents concerning its participation in standards setting bodies that set standards related to the two patents-in-suit, because that request was not limited to video compression technology, was not limited to the H.264 standard at issue in the case, and was not restricted to any time frame.  On behalf of QUALCOMM, the Responding Attorneys objected in good faith and defined the categories of documents QUALCOMM would produce. Their conduct was proper, as was their intent.

### B.  The Court Should Not Invoke Its Inherent Authority To Sanction The Responding Attorneys.

The Court may impose sanctions under its inherent authority (or "inherent powers"). *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) ("The inherent powers of federal

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 29 -

RESPONDING ATTORNEYS' RESPONSE TO
AUGUST 13, 2007 ORDER TO SHOW CAUSE

1   courts are those which are necessary to the exercise of all others") (quotations and citation

2   omitted). Inherent authority sanctions are subject to very strict procedural safeguards. "Because

3   of their very potency, inherent powers must be exercised with restraint and discretion." *See*

4   *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Roadway Express*, 447 U.S. at 764 ("Because

5   inherent powers are shielded from direct democratic controls, they must be exercised with

6   restraint and discretion"). "A court must, of course, exercise caution in invoking its inherent

7   power, and it must comply with the mandates of due process, both in determining that the

8   requisite bad faith exists and in assessing fees." *Chambers*, 501 U.S. at 50. The OSC here did

9   not address inherent power sanctions, and the facts do not support such sanctions.

**1.   Inherent Powers Sanctions Must be Based on Bad-Faith Conduct, Not Negligence or Even Recklessness**

12   The Court can impose sanctions under its inherent powers only if it finds that counsel

13   acted in bad faith. *See Chambers*, 501 U.S. at 46-47; *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961

14   (9th Cir. 2006). This requirement ensures that an attorney is not punished for advocacy,

15   unintentional mistakes or the conduct of another, including conduct of the lawyer's client. "We

16   insist on the finding of bad faith because it ensures that restraint is properly exercised and it

17   preserves a balance between protecting the court's integrity and encouraging meritorious

18   arguments." *Primus Auto. Fin. Servs. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (reversing

19   sanctions against attorney who persisted in advancing a completely meritless argument because

20   there was no evidence that the attorney acted in bad faith) (internal quotations and citations

21   omitted). Negligent or even reckless conduct does not warrant inherent powers sanctions. *In re

22   Keegan Mgmt. Co. Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996) (reversing sanctions; "[o]ur

23   precedents plainly require more" than a finding of recklessness).

24   With respect to discovery, an attorney's failure to produce evidence is not punishable

25   under the Court's inherent authority unless based on a specific showing that the attorney

26   intentionally withheld the material in question. *See Maynard v. Nygren*, 332 F.3d 462, 471 (7th

27   Cir. 2003). The Declarations demonstrate that the Responding Attorneys did not at any time

28   intentionally withhold evidence, or act in bad faith.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 30 -

| Case No. | RESPONDING ATTORNEYS' RESPONSE TO |
|----------|-----------------------------------|
| 05CV1958-B (BLM) | AUGUST 13, 2007 ORDER TO SHOW CAUSE |

## 2.    Inherent Powers Sanctions May Not Be Based on Conduct of Others

"[A]ny sanctions imposed against [an attorney] should be based solely on his own improper conduct without considering the conduct of the parties or any other attorney." *Primus*, 115 F.3d at 650 (reversing sanctions entered jointly against client and attorney) (internal quotations and citations omitted); *see also Martin v. Brown*, 63 F.3d 1252, 1264 (3d Cir. 1995) (vacating sanction where district court "fail[ed] to relate its general grounds to [the attorney's] conduct (and her conduct alone)"). Special caution is required here, where the August 6 Order makes statements about "Qualcomm's counsel" generally. Each Responding Attorney is entitled to a separate and fresh evaluation of the evidence concerning that individual's conduct, as detailed in his or her Declaration. Those Declarations demonstrate that each Responding Attorney had a different and unique role (or no role whatsoever) in the events described in the August 6 Order, and demonstrate that inherent powers sanctions should not be imposed.

## 3.    Inherent Powers Sanctions Must be Based on at Least Clear and Convincing Evidence

Because of the "fundamentally punitive" nature of inherent powers sanctions, every Court of Appeals reaching the issue has held that a court must find *clear and convincing evidence of bad faith* before imposing any sanction more severe than a limited issue-related evidentiary sanction.[11] The Ninth Circuit has not yet resolved this issue, but it has cautioned that "[t]he more

---

[11]    *See Shepherd v. American Broad. Co.*, 62 F.3d 1469, 1476-75 (D.C. Cir. 1995) ("[a] heightened standard of proof is particularly appropriate because most inherent power sanctions … are fundamentally punitive"); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) ('fraud on the court' must be proved "clearly and convincingly"); *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986) (court requires "clear evidence" and a "high degree of specificity in the factual findings" before imposing attorneys' fees under inherent powers); *Qantum Communic'ns. Corp. v. Star Broad. Inc.*, 473 F. Supp. 2d 1249, 1269 (S.D. Fla., 2007) (preponderance of the evidence is not sufficient for entry of default under court's inherent powers); *Balcar v. Bell and Assocs. LLC*, 295 F. Supp. 2d 635, 640 (N.D. W. Va. 2003) ("Although the Fourth Circuit appears not to have addressed the issue, this Court believes it, too, would adopt the clear and convincing evidence standard with regard to the Court's inherent power to sanction."); *Scholastic Inc. v. Stouffer*, 221 F. Supp. 2d 425, 439 (S.D.N.Y. 2002); *see also Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003) (applying clear and convincing evidence standard to Rule 37 dismissal based on bad faith); *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995) ("the threshold for use of the inherent power sanctions is high"). *But see In re Cochener*, 360 B.R. 542, 573 (Bankr. S.D. Tex. 2007) (applying preponderance of the evidence standard although noting that clear and convincing might be the standard in the Fifth Circuit).

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

Case No.
05CV1958-B (BLM)

RESPONDING ATTORNEYS' RESPONSE TO
AUGUST 13, 2007 ORDER TO SHOW CAUSE

punitive the nature of the sanction, the greater the protection to which an individual is entitled."

*F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1137 (9th Cir. 2001).

### 4.    Punitive Sanctions Require Heightened Due Process, Including the Presumption of Innocence and Proof Beyond a Reasonable Doubt

The Ninth Circuit has held that the highest level of due process must be satisfied before a court may impose a sanction that is punitive, rather than compensatory, in nature. *Macias v. McGrath*, 439 F.3d 1141 (9th Cir. 2006) (reversing sanction of $1,500 fine and referral to State Bar, holding that heightened due process procedures were required); *Hanshaw*, 244 F.3d at 1138 ($500,000 fine for attempted bribery of court-appointed receiver was punitive; sanction reversed for lack of due process, including presumption of innocence and proof beyond a reasonable doubt); *see also Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1112 (9th Cir. 2005) (affirming fine of $5,496 payable to court where district judge had "carefully limited" fine to amount necessary to reimburse court for its own costs but noting that a "serious" monetary sanction would entitle an individual to a jury trial); *see also Mackler Prods., Inc. v. Cohen,* 146 F.3d 126, 130 (2d Cir. 1998) (vacating a $10,000 fine payable to the court).    The Ninth Circuit has differentiated between serious sanctions that require heightened due process and less serious monetary sanctions as follows:

> We have not established a precise limit for a serious sanction entitling an individual to a jury trial.  We have noted, however, that the Supreme Court has implied that $5,000, at least in 1989 dollars, is the cutoff for a serious fine warranting a jury trial.

*Lasar*, 399 F.3d at 1112 n.7[12] )(citations and internal quotations omitted).  Here, the Court has already awarded Broadcom its fees and costs incurred in defending this action from QUALCOMM.  Any monetary sanction against the Responding Attorneys (other than a sanction carefully tailored to compensate the Court for costs actually incurred, as in *Lasar*) would be punitive in nature and require heightened due process procedures.

---

[12]    In *Lasar*, The court acknowledged the sanction, $5,496.15, was slightly higher than the Supreme Court's threshold but concluded that heightened due process procedures were not required because the district court had limited the sanction to only compensatory costs.

- 32 -

| Case No. 05CV1958-B (BLM) | RESPONDING ATTORNEYS' RESPONSE TO AUGUST 13, 2007 ORDER TO SHOW CAUSE |

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1

### 5. Non-Monetary Sanctions In The Nature Of Attorney Discipline Must Be Based On Clear And Convincing Evidence

2

3          Both California and Ninth Circuit law require a showing by clear and convincing evidence

4   before imposing discipline on an attorney.  Under California law, "'[i]n a disciplinary proceeding,

5   the deputy trial counsel must prove culpability and aggravating circumstances by clear and

6   convincing evidence.'" *In re Morse*, 11 Cal. 4th 184, 206 (1995) (quoting *Matter of Respondent*

7   *H*, 2 Cal. State Bar Ct. Rptr. 234, 239 (Review Dep't 1992)); *Arden v. State Bar*, 43 Cal. 3d 713,

8   725 (1987) ("[I]n recognition of the gravity of the loss when an attorney's professional license is

9   revoked, we do not consider the allegations proven unless sustained by clear and convincing

10  evidence); Rules of Proc. of the State Bar of Cal. R. 213 ("In disciplinary matters, the State Bar

11  has the burden to prove culpability by clear and convincing evidence").  The Ninth Circuit has

12  followed this standard.  *See Peugeot v. United States Trustee*, 192 B.R. 970, 975 (9th Cir. 1996)

13  (citing *Arden*, 43 Cal. 3d 713) ("A court may disbar or suspend an attorney only upon the

14  presentation of clear and convincing evidence"); *see also Sealed Appellant 1 v. Sealed Appellee 1*,

15  211 F.3d 252, 254-55 (5th Cir. 2000) ("[A]ttorney discipline proceedings require proof only by

16  clear and convincing evidence . . . ."); S.D.N.Y. Local Rule 1.5(b), (c)(1) (discipline, which "may

17  consist of a letter of reprimand or admonition, censure, suspension, or an order striking the name

18  of the attorney from the roll of attorneys[,]" is only proper where a factual basis "is found by clear

19  and convincing evidence").

20          The Court has raised the possibility of non-monetary sanctions, including ordering the

21  Responding Attorneys to report "this Court's findings to all current clients and any courts in

22  which counsel is admitted or has litigation currently pending."  *OSC at 2*.  Such sanctions are in

23  the nature of attorney discipline, and the appropriate standards and safeguards apply.  Requiring

24  such reports would have a potentially devastating effect, not only on the Responding Attorneys'

25  careers but also on the other attorneys and non-lawyer staff of Day Casebeer, including people

26  with no involvement whatsoever in this case. The Responding Attorneys respectfully suggest that

27  the evidence they have submitted, coupled with the fact that client confidentiality limits their

28  response, strongly counsels against the Court imposing such a "scarlet letter" sanction.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 33 -

## C.   Rule 11 Does Not Apply

Under Rule 11, an attorney who presents or advocates a pleading, written motion or other paper to the Court certifies that he or she has read the paper, and to the best of his or her "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances": (1) "it is not being presented for any improper purpose"; (2) "the claims, defenses, and other legal contentions therein are warranted"; (3) "the allegations and other factual contentions have evidentiary support" or are likely to; and (4) "the denials of factual contentions are warranted on the evidence" or "based on a lack of information or belief."   Fed. R. Civ. P. 11(b).   Rule 11 does not require a determination of subjective bad faith.   *See Zaldivar v. Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986).

By its express terms, Rule 11 addresses what the attorney knew and believed, or would have learned through reasonable inquiry, at the time in question.   The only relevant inquiry is counsel's knowledge and conduct at the time.   *See In re Western Die Casting Co.*, 106 B.R. 645, 648 (Bankr. N.D. Cal. 1989).   "[T]he court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other papers was submitted."   Advisory Committee Note, 97 F.R.D. 165, 199 (1983).   The Court must also recognize that the Responding Attorneys cannot fully describe the inquiry they made without violating QUALCOMM's privilege.   Subject to that constraint, the Declarations demonstrate that the lawyers who presented the papers discussed in the August 6 Order each believed the statements therein to be true.   *E.g., Casebeer Dec.,* ¶¶ 15, 20; *Smith Dec.,* ¶ 16; *Zemlicka Dec.,* ¶ 23; *Batchelder Dec.,* ¶ 44; *Mammen Dec.,* ¶ 37(c).   The Declarations further show that the Responding Attorneys conducted reasonable inquiries, relying on sources including the extensive work done by other lawyers in the case, deposition testimony of QUALCOMM employees, and their own privileged inquiries.   And, when these attorneys learned information that contradicted motions that had been filed and were still pending, they did what Rule 11 -- with its prohibition on continued advocacy of papers known to be untrue -- was designed to make attorneys do:   They corrected those motions, and specifically alerted the Court to the incorrect statements they had made.   *Exs. Zeldin-10 and 11.*

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 34 -

1     Moreover, Rule 11 requires notice and an opportunity to be heard. Fed. R. Civ. P. 11(c).

2  When a party seeks Rule 11 sanctions, it must serve its motion 21 days before filing, in order to

3  give the other side an opportunity to withdraw the document at issue. Fed. R. Civ. P. 11(c)(1)(A).

4  When the Court acts *sua sponte*, it must "enter an order describing the specific conduct that

5  appears to violate subdivision (b)." Fed. R. Civ. P. 11(c)(1)(B). *Sua sponte* sanctions "will

6  ordinarily be issued only in situations that are akin to a contempt of court." *Barber v. Miller*, 146

7  F.3d 707, 711 (9th Cir. 1998) (citations omitted). Before imposing such sanctions, the Court

8  must provide the attorney in question an opportunity to be heard by "directing an attorney, law

9  firm, or party to show cause why it has not violated subdivision (b) with respect thereto." *Id.*; *see*

10  *Salman v. Rose*, 104 F. Supp. 2d 1255 (D. Nev. 2000) (citing *Buster v. Greisen*, 104 F.3d 1186,

11  1190 (9th Cir.), cert. denied. 522 U.S. 981, 139 L. Ed. 2d 378, 118 S. Ct. 441 (1997)). The OSC

12  did not do this, and imposing Rule 11 sanctions now would violate due process.

## VII. THE COURT MUST CONSIDER THE RESPONDING ATTORNEYS INDIVIDUALLY, AND SHOULD CONCLUDE FROM THAT CONSIDERATION THAT NONE IS SUBJECT TO SANCTIONS

15     As the above discussion demonstrates, the Court must assess the conduct, knowledge, and

16  intent of each lawyer individually before imposing sanctions. Moreover, the Court must find

17  misconduct that goes beyond negligence, or even recklessness, to bad faith. In light of the

18  punitive nature of the possible sanctions referenced in the OSC, the Court must find, by at least

19  clear and convincing evidence (and possibly beyond a reasonable doubt) that a particular

20  individual lawyer willfully breached his or her duties to the Court or to opposing counsel.

21     The Responding Attorneys respectfully submit that the evidence does not support any such

22  finding. The overarching, uncontroverted fact is that none of the Responding Attorneys knew or

23  believed that QUALCOMM consultants and employees attended JVT meetings during the

24  development of the H.264 standard, that QUALCOMM had thousands of documents evidencing

25  that fact, or that the deposition testimony to the effect that QUALCOMM had little or no

26  involvement in the JVT prior to the publication of H.264 was incorrect.

### A.    The Responding Attorneys Each had Particular Areas of Responsibility

28     Cases like this are handled by large teams of lawyers. QUALCOMM's trial team (*i.e.*,

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 35 -

1   those who attended trial and/or participated in direct trial preparation) consisted of roughly a

2   dozen Day Casebeer attorneys and several Heller Ehrman attorneys.   *Batchelder Dec.,* ¶ 24.

3   Broadcom's Corrected Memorandum of Points and Authorities in Support of Defendant

4   Broadcom Corporation's Petition for Attorneys' Fees, *Exhibit Zeldin-12*, accurately describes (at

5   11:8-17) the magnitude of the staffing and the tasks involved for both sides:

6       The docket is comprised of 616 entries to date, for less than two years of litigation.
        The fact that Broadcom and Qualcomm each relied on 19 attorneys of record
7       demonstrates that the number of attorneys working on this matter for Broadcom
        was reasonable.  Moreover, as the Court is aware, discovery was protracted and
8       extensive.  It involved more than 60 depositions (several of which took place
        abroad), production of over 1.7 million pages of documents, preparation of eight
9       expert reports, and depositions of eight expert witnesses.  The parties also engaged
        in extensive motions [sic] practice, including summary judgment briefing and a
10      number of lengthy court hearings, including two three-day *Markman* hearings
        concerning the construction of the disputed terms of the patents at issue.

11

12  In addition to 19 attorneys of record, Broadcom had numerous lawyers and paralegals who

13  worked on the case but were not "of record."  *See id.* at 12:5-13.  So did QUALCOMM.  Because

14  of the number of lawyers involved, the complexity of issues, and the compressed schedule,

15  responsibilities were delegated, and no single person had (or could possibly have) complete

16  knowledge of all aspects of the case.

17          This case was litigated in a compressed time frame.  It was filed on October 14, 2005, and

18  went to trial less than 15 months later, on January 9, 2007.  It is very unusual for patent cases of

19  this size and complexity to go from complaint to trial in such a short time.  Discovery was also

20  unusually compressed: less than three-and-a-half months elapsed between the entry of the

21  Protective Order and the end of fact discovery.  *Batchelder Dec.* ¶ 25.

22          Given the events of the past several months, it would be easy to conclude that the JVT and

23  Broadcom's waiver defense were the central issues throughout the litigation.  That conclusion

24  would be mistaken.  Most of the Responding Attorneys had no involvement in the issues of the

25  JVT or Broadcom's waiver defense.  Instead, they devoted their time to the other issues in this

26  complex, technical case, which are described in detail in the Batchelder Declaration, ¶¶ 17-23.  In

27  summarizing the individual work of the various attorneys, we therefore start by identifying those

28  attorneys who had no or little substantive involvement in anything relating to JVT and then

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 36 -

1   summarize the work of those attorneys who were involved with the JVT issue.

2   **B.**   **The Responding Attorneys Who Were Not Identified By Name in the OSC**
3   **(Ryan Scher, Ruchika Agrawal, Howard Loo, William Nelson)**

4   The Court should not sanction Ryan Scher, Ruchika Agrawal, Howard Loo or William

5   Nelson. These lawyers are not named in the OSC. In fact, while they are responding to the OSC

6   out of abundance of caution, it is not clear that they fall within its description of "attorneys who

7   signed discovery responses, signed pleadings and pre-trial motions, and/or appeared at trial on

8   behalf of Qualcomm." *OSC at 3.* However, it is clear that there is no basis for sanctioning any of

9   them.

10   Ryan Scher (first-year associate) appeared only at a conference in chambers concerning

11   jury instructions, on January 23, 2007, as one of four lawyers for QUALCOMM. She did not

12   speak on the record. *Scher Dec.,* ¶ 7. She did not sign discovery responses or any document filed

13   with the Court. She barely worked on this case at all until after trial started, when she took over

14   the responsibilities of another first-year associate who had fallen ill. *Id.,* ¶¶ 9-14. She had no

15   involvement in any issue discussed in the August 6 Order. *Id.,* ¶¶ 19-23.

16   Ruchika Agrawal (first-year associate) began working on the case in October 2006, three

17   months before trial. *Agrawal Dec.,* ¶ 10. She entered two appearances, at conferences in

18   chambers concerning jury instructions, where she was one of four QUALCOMM attorneys. She

19   spoke very briefly at the conference on January 23, 2007. She did not sign any discovery

20   responses or documents filed with the Court. *Id.,* ¶ 8. Her work focused almost exclusively on

21   helping to prepare QUALCOMM expert Dr. Maja Bystrom; Agrawal was qualified for this work

22   because of her advanced degree in Computer Science. *Id,* ¶ 13. She was not involved in

23   depositions or discovery, and she did not work on any of the pleadings discussed in the August 6

24   Order. *Id.,* ¶¶ 11, 35-36. She had no involvement in the factual or legal development of

25   QUALCOMM's case as it related to the JVT or to Broadcom's waiver defense. *Id.,* ¶ 13. She

26   worked briefly with Viji Raveendran on January 23, 2007, but that work was limited to going

27   through a mock examination prepared by someone else in order to time it. *Id.,* ¶ 24. She did not

28   see, discuss, or even know about the emails retrieved from Raveendran's computer until

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 37 -

1    Raveendran testified about them at trial. *Id.*, ¶ 25.

2         Howard Loo (junior associate) left Day Casebeer in mid-2006. *Loo Dec.*, ¶ 4. He worked

3    fewer than 30 hours on this case, exclusively on claim construction issues. *Id.*, ¶5. He signed

4    only one document, a Declaration in Support of QUALCOMM's Brief in Support of Proposed

5    Claim Construction, to which was attached a jointly submitted claim construction chart and

6    QUALCOMM's supporting evidence. *Id.*, ¶5. He had no involvement in any of the matters cited

7    in the August 6 Order. *Id.*, ¶ 6.

8         Will Nelson (associate) devoted approximately 73 hours to this case over the 15 months it

9    was pending. *Nelson Dec.*, ¶ 6. He signed one filed document, an opposition to Broadcom's

10   motion to amend its counterclaims to add patent infringement allegations, and argued that

11   opposition in Court.   *Id.*, ¶ 5.   He defended the deposition of Donald Pian, a former

12   QUALCOMM employee not mentioned in the August 6 Order. *Id.*, ¶ 11. Other than that, he did

13   virtually no work on the case, and he had no involvement in the issues discussed in the August 6

14   Order. *Id.*, ¶¶15-16.

15       **C.    Associates Named In The OSC Who Had Little Or No Involvement With**
                 **Events Referenced In The August 6 Order (Brad Waugh, Victoria Smith, Roy**
16               **Zemlicka)**

17       Although Brad Waugh (associate) was significantly involved in this case, he was not

18   responsible for dealing with Broadcom's waiver defense or the JVT issue. *Waugh Dec.*, ¶¶ 6-8.

19   Because of his advanced degree in Electrical Engineering and his prior experience, he assisted

20   lead counsel Jim Batchelder in claim construction and infringement analysis. *Batchelder Dec.*,

21   ¶ 23; *Waugh Dec.*, ¶¶ 3, 6. He signed a handful of documents filed with the Court, none of

22   which pertained to the JVT and none of which are addressed in the August 6 Order. *Waugh Dec.*,

23   ¶ 9. He had no contact, or only minimal and immaterial contact, with the fact witnesses discussed

24   in the August 6 Order. *Id.*, ¶¶ 8, 12-14, 16. He worked extensively with expert witness Dr. Iain

25   Richardson, but that was because of Waugh's responsibilities in the areas of claim construction

26   and infringement, on which Richardson opined and testified; Waugh was not responsible for

27   Richardson's input on waiver and the JVT. *Id.*, ¶ 15. He did not work on any of the motions or

28   other filings that are discussed in the August 6 Order. *Id.*, ¶¶ 15-17. There is no basis to

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 38 -

1   sanction him.

2     Victoria Smith (associate) worked primarily on inventorship issues, and she helped

3   prepare the lead inventor, Chong Lee, for deposition. *Batchelder Dec.,* ¶ 23; *Smith Dec.,* ¶ 7.

4   She defended the deposition of one individual mentioned in the August 6 Order, Seyfullah Oguz,

5   and believed at the time that Oguz had not attended any JVT meetings, as he testified. *Smith*

6   *Dec.,* ¶ 20.  She is named in the OSC because she signed QUALCOMM's JMOL Motion, filed on

7   January 24, 2007, which incorrectly asserted that Viji Raveendran had not received emails from

8   the avc_ce reflector.  She did not write that portion of the JMOL Motion, but rather relied on a

9   draft provided by Heller Ehrman, which she believed was accurate. *Id.,* ¶ 16.  Smith was not

10  aware that Raveendran had received emails from the avc_ce reflector until the afternoon of

11  January 24, after the JMOL was filed and after Raveendran had testified about receiving those

12  emails (as discussed in her Declaration, she heard a cursory mention of emails being found on

13  Raveendran's computer but did not know anything about the source or content of those

14  documents). *Id.,* ¶¶ 17-19.  She did not engage in sanctionable conduct by filing a brief she

15  believed in good faith to be accurate.  She worked under the supervision of Craig Casebeer, who

16  takes responsibility for the brief and who immediately directed that the inaccurate brief be

17  corrected when the error became known. *Id.,* ¶ 19; *Casebeer Dec.,* ¶ 20.

18    Roy Zemlicka (second-year associate) primarily assisted in research and support tasks.

19  *Batchelder Dec.,* ¶ 23; *Zemlicka Dec.,* ¶ 6.  He was not involved in discovery and did not appear

20  in Court. *Zemlicka Dec.,* ¶¶ 7-8, 10.   He is named in the OSC because he signed

21  QUALCOMM's Motion *in Limine* concerning the JVT and waiver.  This motion and the

22  supporting Memorandum were the only documents that he filed. *Id.,* ¶ 9.  In drafting that motion,

23  which addressed an area of the case that was unfamiliar to him, Zemlicka relied on the Motion for

24  Summary Adjudication that QUALCOMM had previously filed; he essentially adapted the

25  arguments from that motion into the *in limine* brief. *Id.,* ¶¶ 18-23.  He had no reason to believe

26  that the Motion for Summary Adjudication was inaccurate, and he did not engage in sanctionable

27  conduct by relying upon it.  He worked under the supervision of Craig Casebeer, who

28  acknowledges responsibility for the motion. *Casebeer Dec.,* ¶ 15

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 39 -

1    The conduct of these three associates does not suggest any basis for sanctions.

2    **D.    James Batchelder**

3    James Batchelder (partner) was lead counsel for QUALCOMM.  He devoted the vast

4    majority of his time to the issues of inventorship, claim construction, the validity of

5    QUALCOMM's patents, whether Broadcom's products infringed those patents, and whether

6    QUALCOMM had engaged in inequitable conduct by failing to submit certain alleged prior art to

7    the PTO.  This included working with the lead inventor, briefing on claim construction, an

8    extraordinary six days of hearings on claim construction, the very technical issue of whether

9    Broadcom's various encoder and decoder products infringed QUALCOMM's patents for

10   compressing and decompressing video data, responding to Broadcom's invalidity claims based on

11   prior art (which went to every patent claim asserted by QUALCOMM), and responding to

12   Broadcom's claim that QUALCOMM had fraudulently withheld prior art from the PTO.

13   *Batchelder Dec.,* ¶¶ 10-15.

14   Batchelder was deeply involved in each of these issues, both during pretrial and at trial.  As

15   a consequence, Batchelder had little or no involvement in the day-to-day details of discovery.

16   They were delegated to others on the QUALCOMM team.  *Id.,* ¶ 19.  He did not draft or sign any

17   of the written discovery requests (such as interrogatories or document requests) served by

18   QUALCOMM, or any of the responses/objections served by QUALCOMM in response to the

19   written discovery requests propounded by Broadcom.  *Id.*  He did not have any role in collecting

20   QUALCOMM documents, in fashioning or implementing the investigation for such documents,

21   or in deciding where such documents would be sought or not sought.  *Id.*

22   Batchelder did not prepare the witnesses described in the August 6 Order for their

23   depositions, nor did he attend those depositions.  *Id.,* ¶ 32.  Until trial was over, he had no

24   knowledge that a large quantity of documents existed relating to QUALCOMM's involvement in

25   the JVT prior to the adoption of the H.264 standard in May 2003.  *Id.,* ¶ 52.  His Declaration

26   describes in greater detail the extent of his involvement in the other events specifically discussed

27   in the August 6 Order.

28   The August 6 Order quotes and criticizes a passage from Batchelder's opening statement to

- 40 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

the effect that QUALCOMM began participating in extensions of the H.264 standard only after the standard was adopted. *August 6 Order at 45.* At the time of opening statement, Batchelder had no idea that QUALCOMM had been involved in the JVT prior to the adoption of the H.264 standard in May 2003, and he therefore did not know this statement would later (with the post-trial production of documents by QUALCOMM) prove to be inaccurate and misleading. *Id.,* ¶ 39.

Batchelder's Declaration describes his activities during trial in great detail. He was advised that Adam Bier had discovered JVT-related documents on the laptop computer of QUALCOMM engineer Viji Raveendran on January 14, 2007, but he was told that these documents were not authored by her and that they did not reflect QUALCOMM attendance at JVT meetings or participation by QUALCOMM in the JVT. Because of his complete absorption in other immediate trial-related tasks, he did not see or read the documents, and others on the trial team took responsibility for analyzing whether the documents should be produced on January 14. *Id.,* ¶ 40.

Batchelder's role (or lack of role) in other papers that were filed or events that occurred during trial is discussed in depth in his Declaration, but misstatements in QUALCOMM's initial Post-Trial Brief Concerning Waiver and Inequitable Conduct require some explanation here because Batchelder was heavily involved in drafting that brief. The August 6 Order quotes three statements from the brief that understated QUALCOMM's involvement in the JVT during development of the H.264 standard. Batchelder did not know that any of the statements were incorrect or misleading until well after the brief was filed, when he learned of the documents collected from QUALCOMM in March and April 2007. *Batchelder Dec.,* ¶ 44. At that point, he wrote a corrective letter of apology to the Court. *Id.,* ¶ 38; *Exhibit Zeldin-10.*

Batchelder's Declaration is a candid and complete statement of what he knew and when he knew it. Reading the Declaration as a whole confirms that he is an honest lawyer who fulfilled his responsibilities as the lead counsel on a large team of lawyers in a complex case where the client and its witnesses testified to matters that were inaccurate, and the lawyers had no knowledge of the inaccuracies. He has appeared before this Court and other courts many times

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 41 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   over many years without being sanctioned or disciplined for misconduct.  His unblemished record

2   should not be tarnished.  (His reputation and record in this regard are reflected in the Declarations

3   of Steven M. Odre and David A. Kalow, submitted herewith.)

4   **E.    Craig Casebeer**

5   Craig Casebeer (partner) first became involved in this matter at the request of Jim

6   Batchelder in late October 2006, almost a year after the case began and well after fact discovery

7   had closed.  *Casebeer Dec.*, ¶¶ 11, 13.  Given his late addition to the trial team, Casebeer had no

8   involvement in preparing QUALCOMM's written discovery responses, collecting or producing

9   responsive documents, preparing or representing deponents during the fact discovery period,[13] or

10  preparing or filing QUALCOMM's summary adjudication papers.  *Casebeer Dec.* ¶ 27.

11  Among the first tasks that Casebeer undertook was to supervise associate Roy Zemlicka's

12  effort to draft QUALCOMM's motion *in limine* regarding JVT involvement.  *Id.* ¶ 15.  In drafting

13  the motion, Casebeer instructed Zemlicka to review and rely on the factual discussion and

14  arguments that had been prepared by Heller Ehrman in QUALCOMM's Motion for Summary

15  Adjudication, which had addressed the same issue.  *Id.*

16  In his August 6 Order, Judge Brewster characterizes the motion *in limine* regarding JVT

17  issues as containing "false statements."  Judge Brewster's conclusion is based upon the

18  documents that were produced in late March and April 2007, which contradicted certain

19  statements made in the motion *in limine*.  However, at the time Casebeer oversaw the preparation

20  of that motion, he had no idea there were documents in QUALCOMM's possession that

21  contradicted QUALCOMM's stated position concerning JVT involvement.  *Casebeer Dec.* ¶¶ 15,

22  28.  As such, he had no reason to suspect or know that the arguments and factual discussions set

23  forth in the motion *in limine* (which were adapted from the Summary Adjudication papers) were

24  in any way inaccurate or misleading.  *Id.*  In supervising the preparation of the motion *in limine*,

25  Casebeer had no reason to independently confirm factual representations to which QUALCOMM

26  witnesses had testified and which co-counsel at Heller had previously presented to the Court in

27  _____

[13]    On January 10, 2007, Casebeer presented a newly-added trial witness (Marvin Blecker)
28  for deposition on matters that had nothing to do with QUALCOMM's participation in the JVT.

- 42 -

1  the Summary Adjudication papers.  As the partner who supervised the preparation of the motion

2  *in limine*, Casebeer has asked to take full responsibility for it, but he had no reason to know or

3  even suspect that the facts, as stated, were anything but the truth.  *Id.,* ¶ 15.

4       As an experienced trial lawyer, Casebeer provided input to Batchelder for his opening

5  statement and attended court on the day of opening statements.  *Batchelder Dec.* ¶ 22; *Casebeer*

6  *Dec.* ¶ 18.  Batchelder's opening statement, including his discussion of JVT-related issues, was

7  entirely consistent with Casebeer's understanding of the facts as of that time.  *Casebeer Dec.*

8  ¶ 18.  At trial, Casebeer conducted the direct examination of two witnesses, neither of whom is

9  referenced in the August 6 Order.  *Casebeer Dec.* ¶ 17.

10      On or about January 22, 2006, Casebeer began working with associate Victoria Smith to

11  prepare QUALCOMM'S JMOL.  *Casebeer Dec.* ¶ 20.  The waiver portion of the JMOL brief

12  was written and prepared as an insert by lawyers from Heller Ehrman.  *Id.*  Prior to the filing of

13  the JMOL, Casebeer reviewed the insert and believed that the statements made therein were

14  accurate.  *Id.*  As the partner who supervised Smith's work on the JMOL, Casebeer has asked to

15  take full responsibility for the preparation of that pleading but, again, he was unaware of any

16  statement in that pleading that was inaccurate.  *Id.*

17      During the lunch break on January 24, 2007, Casebeer learned that Viji  Raveendran had

18  testified about receiving certain emails from the JVT and learned for the first time that the emails

19  in question had been discovered on her laptop during an earlier trial preparation session.  *Id.* at

20  ¶ 22.  Casebeer reviewed the emails in question during the lunch break and concluded along with

21  his colleagues that, although there was a reasonable argument as to why the emails were not

22  responsive to Broadcom's discovery requests as narrowed by QUALCOMM's objections and

23  responses, the emails should be produced immediately to Broadcom.  *Id.*  At no time prior to the

24  lunch break on January 24 was Casebeer aware of the existence of the  JVT-related emails found

25  on Raveendran's laptop.   Thus, when the JMOL was filed on the morning of January 24,

26  Casebeer had no reason to believe that the statements in the JMOL to the effect that no emails had

27  been received from the JVT was incorrect or misleading.  *Id.* at ¶ 24.

28      On January 29, 2007, Casebeer sent a letter to the Court apologizing for the incorrect

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 43 -

1    statements made in the previously-filed JMOL and submitted an amended JMOL removing the

2    statements that were shown to be erroneous in light of the Raveendran emails produced to

3    Broadcom following the January 24 lunch break. *Id.* at 23.

4         Following trial, Casebeer participated in preparing QUALCOMM's February 2, 2007 post-

5    trial brief on waiver and inequitable conduct issues. *Id.,* ¶ 26. Certain statements in that brief,

6    referenced at pages 47-48 of the August 6 Order, were determined to be inaccurate only upon the

7    discovery of the documents in late March and April of 2007. Prior to that time, Casebeer had no

8    reason to believe or suspect that the JVT-related references made in the February 2 post-trial brief

9    were in any way incorrect or misleading. *Id.*

10        In summary, Casebeer pitched in to help the trial team as they were making their final pre-

11   trial preparations. He did what any seasoned trial lawyer would do: he relied on the sworn

12   deposition testimony of QUALCOMM witnesses, the pleadings that had been submitted to the

13   Court, and the documents produced in the litigation to inform his understanding of the facts of the

14   case. Before the afternoon of January 24, 2007, he was not aware of any pleadings, deposition

15   transcripts, documents or communications with any member of the trial team that in any way

16   contradicted QUALCOMM's stated position concerning its involvement in the JVT. *Id.,* ¶ 28. In

17   light of that fact, Casebeer had no reason to suspect, and certainly did not know, that certain

18   arguments and testimony presented to the Court concerning the JVT issues were in any way

19   incorrect or misleading.

20        There is simply no evidence to suggest that Casebeer acted improperly or negligently in

21   discharging his professional obligations in this case. Nor is there any suggestion in the August 6

22   Order, much less any evidence, that Casebeer engaged in any intentional effort to mislead or

23   conceal evidence from the Court or Broadcom. Casebeer has practiced law for more than three

24   decades without a blemish of any kind on his professional career or reputation. *Id.,* ¶ 7. He has

25   built his career on a scrupulous commitment to full candor and truthfulness before the Court.

26   (His reputation and record in this regard are reflected in the Declarations of Steven M. Odre and

27   Suzanne E. Gilbert, submitted herewith.)

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 44 -

1

### F.    Chris Mammen

2      Chris Mammen (a senior associate who became a partner in 2007) drafted QUALCOMM's

3   complaint.   *Mammen Dec.*, ¶ 12.   He was responsible for discovery-related activities until

4   approximately January 2006, when Kevin Leung assumed the day-to-day responsibility for

5   discovery under Mammen's supervision. *Id.*, ¶ 13.  Mammen was not involved in the depositions

6   referenced in the August 6 Order, other than to help coordinate the assignment of lawyers to

7   handle the depositions and to provide general guidance about strategy in preparing for and

8   defending depositions. *Id.*, ¶ 17.

9      Mammen supervised Leung in preparing discovery responses.  His Declaration and the

10  Leung Declaration discuss in detail the discovery responses cited in the August 6 Order.   The

11  Declarations demonstrate, most critically, that Mammen (and Leung, under Mammen's

12  supervision) acted reasonably and in good faith.    The responses include a broad range of

13  objections, which the August 6 Order criticizes.  However, such objections are common in cases

14  of this type and comparable to the objections asserted by Broadcom's discovery responses.   The

15  objections were asserted for the legitimate and proper purposes of limiting overbroad discovery

16  demands and preserving meritorious objections.   The responses were framed in a way that put

17  Broadcom on notice of the categories of documents that QUALCOMM would produce.   This is

18  consistent with the Federal Rules of Civil Procedure, and consistent with Broadcom's practice in

19  this case.

20      The responses were based on the information available at the time, and neither Mammen

21  nor Leung crafted the responses with the intent or purpose of concealing documents or

22  information showing QUALCOMM's participation in the JVT before the adoption of the H.264

23  standard.  On this last point, neither Mammen nor Leung knew at the time about the JVT-related

24  documents located and produced during and after trial.  Also, as noted above, the criticism that a

25  commitment to produce documents concerning the MPEG-4 Part 10 standard was designed to

26  avoid production of documents concerning the H.264 standard is objectively incorrect; the two

27  terms refer to the exact same standard. *Id.*, ¶¶ 27-30.

28      Mammen was not involved in drafting the summary adjudication papers, the motion *in*

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 45 -

RESPONDING ATTORNEYS' RESPONSE TO
AUGUST 13, 2007 ORDER TO SHOW CAUSE

1   limine referenced in the Order, or the JMOL papers. *Id.*, ¶ 37(a) and (b). However, he did

2   assemble and sign QUALCOMM's November 19, 2006 Memorandum of Contentions of Fact and

3   Law and its December 4, 2006 Rebuttal Memorandum of Contentions of Fact and Law. These

4   Memoranda were extremely long and complicated (they totaled 271 pages and 1108 paragraphs),

5   and Mammen relied on various existing pleadings and inserts given to him by others to assemble

6   the Memoranda. He adapted the three paragraphs in the opening Memorandum that are quoted in

7   the August 6 Order from the September 1, 2006 Declaration of Dr. Iain Richardson (at paragraphs

8   25-27), which Heller Ehrman had filed. Heller Ehrman also provided Mammen with the five

9   paragraphs in the Rebuttal Memorandum that are quoted in the August 6 Order. Mammen

10  reasonably relied on qualified and skilled co-counsel in this regard. He did not believe, or have

11  reason to believe, that these eight paragraphs were inaccurate; nor did he think that Heller

12  Ehrman had any reason to so believe. *Id.*, ¶ 37(c).

13      Although Mammen was present for parts of the trial, he did not make opening statement,

14  he was not present during the January 18 or the January 24 side-bars, and he did not participate in

15  the preparation for or examination of Viji Raveendran. Id., ¶¶ 38, 41.

16      On January 14, 2007, during trial, Adam Bier brought to Mammen's attention 21 emails

17  that had been discovered on Raveendran's laptop that day. As discussed previously, the emails

18  were sent to the avc_ce reflector by members of an *ad hoc* sub-group of the JVT that was

19  convened to design tests to evaluate the H.264 standard against other common video compression

20  standards (*e.g.*, deciding what video clips to use for a comparison test). The emails covered the

21  period from September 27, 2002 to March 27, 2003, and did not discuss any proposed changes or

22  revisions to the standard (which was nearing completion by the fall of 2002, and technically

23  frozen in December 2002). The emails did not mention QUALCOMM or any QUALCOMM

24  employee. They were consistent with Mammen's understanding at the time that the emails were

25  unsolicited by Raveendran, and that she had not signed up for ("subscribed to") the reflector.

26  From Mammen's reading, they did not have anything to do with the waiver issue. When he and

27  Bier compared them to QUALCOMM's responses to Broadcom's document requests, they

28  concluded that the documents were not within QUALCOMM's discovery commitments. *Id.*,

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 46 -

1    ¶¶ 42-45.

2            Mammen made this analysis in good faith.  He acknowledges in hindsight that he should

3    have looked beyond the specific document production commitments that he considered, and made

4    the connection between the statements (drafted by someone else but assembled by him more than

5    five weeks earlier) in QUALCOMM's Memoranda of Contentions of Fact and Law that were

6    contradicted by the mere existence of these 21 emails on Raveendran's computer.  Mammen has

7    expressed his regret for this, and for the fact that he did not produce the 21 emails when they were

8    discovered. *Id.,* ¶ 45.

9            Mammen's   decisions,   however,   were   not   motivated   by   an   intent   to   conceal

10   QUALCOMM's broader involvement in the JVT, of which he was unaware and which was

11   revealed only by the post-trial production of documents.  It is essential that the Court separate

12   Mammen's decision -- a good faith decision, in which a lawyer acting in the pressure of the

13   moment during an all-consuming trial did not consider statements made many weeks earlier --

14   from the thousands of documents produced after trial.  Mammen did not know about, and did not

15   intend to or attempt to conceal, those thousands of documents.  When the Court separates the

16   decision that Mammen <u>did</u> make, about the 21 emails, from the information that he <u>did not</u> know,

17   about the thousands of other documents in QUALCOMM's possession, it should reach the

18   conclusion that sanctions are not warranted.  Indeed, when Judge Brewster issued his March 21

19   Order (discussed above), he knew about these 21 emails, knew that they had not been produced

20   when discovered, and yet did not suggest sanctions against the attorneys.  Possible sanctions

21   against the attorneys only became an issue because of the subsequent discovery of a large number

22   of JVT-related documents in QUALCOMM's possession, something that Mammen did not know

23   about and did not conceal.

24           **G.    Kevin Leung**

25           Kevin Leung (associate) was responsible for day-to-day discovery duties.  He signed most

26   of QUALCOMM's responses to written discovery. His role, and the reasons why the responses

27   were written the way they were, are summarized above in the discussion of Chris Mammen (who

28   supervised Leung), and discussed in detail in Leung's and Mammen's Declarations. *Leung Dec.,*

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 47 -

1  ¶¶ 15-19; *Mammen Dec.,* ¶¶ 27-30.

2        Leung defended the Christine Irvine, John Determan, and Scott Ludwin depositions

3  referenced in the August 6 Order. Irvine was designated as a Rule 30(b)(6) witness on topics

4  related to the JVT's development and promulgation of the H.264 standard, and she was also

5  noticed to be deposed in her individual capacity, both on July 11, 2006. In late June 2006,

6  QUALCOMM located on a QUALCOMM server approximately 400,000 pages of documents

7  regarding the JVT which a QUALCOMM employee had downloaded from a publicly-available

8  website maintained by the JVT. *Leung Dec.,* ¶ 9. By emails dated July 5 and 6, 2006, Leung

9  advised Broadcom's counsel about these documents and offered to continue the Irvine deposition,

10  but Broadcom's counsel insisted on proceeding as scheduled on July 11. *Ex. Leung-1.* By the

11  time of Irvine's deposition, Leung had not analyzed the recently located documents and was not

12  aware they showed that Raveendran was listed on the avc_ce reflector, that QUALCOMM had

13  sponsored a JVT harbor cruise in San Diego in September 2003, or that QUALCOMM had been

14  involved in the JVT after that date. Id., ¶¶ 9-10. Broadcom was aware of these facts, however,

15  and used some of these documents from the JVT archive to impeach Irvine when she testified that

16  QUALCOMM was not a member of JVT and had never attended JVT meetings. When

17  Broadcom complained that Irvine was not well informed, Leung agreed to present an alternate

18  Rule 30(b)(6) witness for deposition. *Id.,* ¶ 10.

19        Scott Ludwin was then deposed on August 17, 2006 as a replacement 30(b)(6) witness on

20  the JVT-related topics. Ludwin was the lead in QUALCOMM's Standardization Group, which

21  was responsible for attendance at multimedia standardization meetings. He testified about

22  attendance by members of his group at JVT meetings and indicated that such attendance occurred

23  only after the H.264 standard had been published. Ludwin testified that December 2003 was

24  QUALCOMM's first participation in any formal JVT meeting, although QUALCOMM had

25  sponsored a boating event when the organization met in San Diego in September 2003. Ludwin's

26  testimony was contradicted by the documents located and produced after trial. *Id.,* ¶ 11.

27        Leung also defended the deposition of James Determan on August, 2006 (he was not a

28  30(b)(6) designee). Determan testified that he did not know whether QUALCOMM was a

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 48 -

1   member of JVT and that he personally was not a member, although these statements were also

2   contradicted by the documents discovered after trial. *Id.*, ¶ 12.

3       The August 6 Order criticizes the truthfulness of these three witnesses, based on

4   documents discovered and produced after trial, but it does not assert any role of counsel in

5   promoting this false testimony: there was none. Leung had met with the deponents in advance of

6   their depositions, and he reasonably believed that his clients were testifying truthfully. *Id.*, ¶¶ 9-

7   12. Of course, in retrospect, the documents discovered after trial contradict their testimony, but

8   Leung did not know about these documents at the time of the depositions.

9       Leung worked with QUALCOMM employees to collect responsive documents. For that

10  reason, he is particularly affected by the statement in the August 6 Order that QUALCOMM's

11  counsel "were able to locate with alacrity company records from December 2003 forward and

12  find four or more Qualcomm employees participating in proceedings of the JVT.   Yet

13  inexplicably, they were unable to find over 200,000 pages of relevant emails, memoranda, and

14  other company documents, hundreds of pages of which explicitly document massive participation

15  in JVT proceedings since at least January 2002." *August 6 Order at 39:20-25.* Respectfully,

16  Responding Attorneys note that the Court did not give them any notice or opportunity to explain

17  these facts before deeming them inexplicable. Now that the Court has provided that opportunity,

18  the knowledgeable Responding Attorneys have provided the explanation, which is described

19  below, subject to the constraints of the attorney-client privilege:

20      In late June 2006, as described above, QUALCOMM employees who were searching for

21  responsive documents located a copy of the public JVT archive on a QUALCOMM server.

22  These documents, which were produced to Broadcom, reflected only QUALCOMM's

23  involvement in the JVT from December 2003 onward (with a couple of minor exceptions that are

24  explained in Leung's Declaration, ¶ 22) by employees from Ludwin's Standardization Group

25  after H.264 had been finalized. Based on this information, in July 2006, Leung worked with

26  QUALCOMM employees to locate and produce additional documents maintained by members of

27  that group concerning QUALCOMM's involvement in the JVT.   Those documents were

28  consistent with participation starting from December 2003.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

Case No.
05CV1958-B (BLM)

RESPONDING ATTORNEYS' RESPONSE TO
AUGUST 13, 2007 ORDER TO SHOW CAUSE

After trial, documents were discovered which showed earlier involvement in the JVT by QUALCOMM's Digital Cinema Group (*i.e.*, a different group) which had been disbanded in 2003. However, Ludwin had testified at his deposition that the disbanded Digital Cinema Group "had no interest in what the JVT was doing and specifically ignored what they were doing." From this testimony and other information, Leung reasonably and in good faith concluded that QUALCOMM had identified the employees likely to have JVT-related documents (i.e., those in Ludwin's Standardization Group), and QUALCOMM produced those documents by July or August 2006. In other words, discovery of the JVT public archive led to discovery of the records relating to JVT involvement by members of Ludwin's Standardization Group from December 2003 forward, but did not lead to discovery concerning the earlier involvement in JVT by the disbanded Digital Cinema Group's earlier involvement in JVT. *Id.*, ¶¶ 20-25.

It is also important to note that the Responding Attorneys did not, themselves, conduct searches for documents. Rather, Leung and Mammen worked with QUALCOMM to determine whether categories of responsive documents existed and, if so, to identify those categories of responsive documents and individuals likely to have them. QUALCOMM's in-house legal team conducted the actual search for documents. Once they had located responsive documents, they placed them onto a Concordance database which the Responding Attorneys could access and review. *Id.*, ¶ 14.

Leung's only participation in the motion practice described by the August 6 Order was to assist Chris Mammen in compiling QUALCOMM's Memorandum and Rebuttal Memorandum of Contentions of Fact and Law. *Id.*, ¶¶ 26-27. Those Memoranda are addressed above, in the section on Mammen.

Leung was out on paternity leave from January 5-29, 2007 and did not attend trial. He did not learn of the 21 emails copied from Viji Raveendran's laptop computer until after they were disclosed to Broadcom and the trial had ended. *Id.*, ¶ 30.

In sum, Leung is a capable and dedicated young lawyer, who believed and relied on the deposition testimony of QUALCOMM employees and other communications which the attorney-client privilege prevents him from disclosing. He acted reasonably and in good faith. In light of

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 50 -

1   the discoveries after trial, it is tempting to conclude that he, or others, should have done more.

2   Such *post-hoc* review, however, is not an appropriate basis for sanctions, and any oversights the

3   Court might identify now were neither willful nor the result of bad faith. The Court should not

4   sanction Leung.

5   **H.     Adam Bier**

6   **[Submitted by Adam Bier's Separate Counsel]:**

7           Bier (junior associate) began working on this matter when he first joined the Day

8   Casebeer firm in October 2005. This was the first case he worked on as a lawyer, and his work

9   was supervised by more senior lawyers on the trial team. *Bier Dec., ¶ 11.* Prior to trial, Bier's

10  work on the case was focused on helping to obtain discovery from Broadcom. *Id., ¶ 12.*

11  Significantly, he was not involved in, and had no knowledge of, document collection efforts by

12  QUALCOMM or document production by QUALCOMM, and did not prepare or sign any

13  discovery responses. *Id., ¶ 13.* Bier was likewise not involved in most of the other events

14  identified in the August 13 Order. *Id., ¶¶ 14-18, 42-44.*

15          Bier's primary involvement in the events at issue in the OSC occurred at trial, the first

16  trial he had been involved in (other than as a law clerk). As detailed more fully in his

17  Declaration, Bier assisted partner Lee Patch in preparing witness Viji Raveendran. *Bier Dec., ¶*

18  *21.* During that preparation, Bier became aware of emails on Raveendran's computer. On

19  January 7, he believes that he became aware of an email dated August 6, 2002 received by

20  Raveendran from the computer system (known as a "majordomo" server) that hosted the email

21  list known as the avc_ce reflector. *Id., ¶ 25* That machine-generated email was consistent with

22  the facts as Bier understood them at that time, and as he expected Raveendran to testify to if

23  called: that Raveendran was a member of that list, but that she had been added to the list through

24  no action on her part. *Id., ¶¶ 26, 28.* That email does not provide any information as to how

25  Raveendran came to be on the list, and did not demonstrate any action on her part. *Id., ¶¶ 26, 27.*

26  Nothing in that email would have led Bier to conclude that Raveendran's prior testimony

27  concerning her involvement in the JVT was either false or incomplete, or that his understanding

28  of the facts was incorrect. *Id., ¶ 27.* Though Bier does not have a present recollection of

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 51 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    conferring about the August 6, 2002 email at the time, his time entry for January 7 states that he

2    conferred "regarding new discovery on waiver issues," which, as set forth more fully in his

3    Declaration, Bier believes refers to the August 6, 2002 email. *Id., ¶ 28.*

4          On January 14, during further preparation of Raveendran, Bier learned of 21 emails on

5    Raveendran's computer which, in contrast to the January 7 email, Raveendran had received from

6    the avc_ce reflector itself. *Bier Dec., ¶¶ 30-31.* These were the first evidence Bier had seen that

7    Raveendran had actually received emails from that reflector. *Id., ¶ 31.* Bier immediately brought

8    these to the attention of Patch and Mammen. *Id., ¶ 32.* At their direction, Bier assisted in

9    reviewing Broadcom's document requests and QUALCOMM's responses to determine whether

10   or not the emails should be produced. *Id.* Bier, who had had no involvement in determining

11   whether documents should be produced in the matter, reviewed the document requests and

12   responses. *Id.* It was his opinion that they had a defensible, good faith position that the emails

13   were not within the scope of what QUALCOMM had agreed to produce. Patch and Mammen,

14   each having also examined the requests and responses, then made the decision not to produce

15   those documents at that time. *Id.*

16         Bier's other involvement in the events at issue was his participation in meet-and-confer

17   after trial. Working with supervising attorneys including Mammen and Batchelder, Bier helped

18   draft letters to opposing counsel concerning the document production issues. *Bier Dec., ¶¶ 46-*

19   *55.* Bier believed the statements made there were true and correct at the time he signed those

20   letters. *Id.*

21         Bier, a junior associate, should not be sanctioned by this Court. Bier was not involved in

22   any pre-trial document collection or production to Broadcom. He had no knowledge of the

23   thousands of pages of documents later found and produced after trial, and no reason to suspect

24   their existence. He did not prepare or sign any pleadings at issue in the OSC. He acted

25   reasonably at all times, in accordance with the facts as he understood them. His actions with

26   respect to the emails discovered just before and during trial do not evidence an intent to conceal

27   facts or evidence from this Court. The email Bier believes he became aware of and conferred

28   about on January 7 merely confirmed a fact already known, and was consistent with

- 52 -

1    Raveendran's deposition testimony and expected testimony at trial.  When Bier became aware on

2    January 14 of the 21 emails, he immediately brought them to the attention of Mammen and Patch.

3    Bier acted reasonably and in good faith, and he should not be sanctioned.

4         **I.    Lee Patch**

5         **[Submitted by Lee Patch's separate counsel]:**

6         Patch (partner) joined the QUALCOMM trial team in June, 2006.  Patch Dec., ¶ 14.  At

7    the time, Patch had little courtroom experience, having joined Day Casebeer in January 2005,

8    after holding in-house counsel positions the previous 20 years.  The QUALCOMM case was his

9    first as trial counsel.  *Id.,* ¶¶ 10, 13.

10        At the outset, Patch's role was limited to investigating and responding to Broadcom's

11   Invalidity Contentions relating to prior art and Section 112 deficiencies.  *Id.,* ¶¶ 14-17.  In early

12   July 2006, Broadcom noticed the depositions of a number of QUALCOMM engineers, and

13   Patch's role was expanded to include defending their depositions.  One of the engineers was Viji

14   Raveendran.  *Id.,* ¶ 17.  In early September, Patch's role expanded again as he became involved in

15   efforts to respond to Broadcom's allegations of inequitable conduct.  *Id.*

16        Patch was not involved with any of the written discovery in the case.  Specifically, he was

17   not personally responsible for and played no role in the collection and production of

18   QUALCOMM documents or in responding to Broadcom's Requests for Production, including

19   those referenced in the August 6 Order.  *Id.,*¶ 15.  Likewise, he was not personally responsible for

20   and played no role in responding to Broadcom's interrogatories, including those referred to in the

21   August 6 Order.  *Id.*

22        During the pre-trial period, Patch's primary responsibility was preparing and responding

23   to the Motions for Summary Adjudication and Motions *in Limine* relating to the issues of

24   invalidity and inequitable conduct.  *Id.,* ¶ 18.  He did not have any responsibility for any of the

25   motions relating to QUALCOMM's involvement with the JVT or Broadcom's waiver defense.

26   *Id.*   He was involved in preparing those portions of QUALCOMM's Memorandum of

27   Contentions of Fact and Law and Rebuttal Memorandum of Contentions of Fact and Law relating

28   to invalidity and inequitable conduct.  He was not responsible for or personally involved in the

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 53 -

1   portions of those memoranda referred to in the August 6 Order. *Id.*

2       During trial, Patch put on four QUALCOMM witnesses and cross examined one

3   Broadcom witness. *Id.,* ¶ 20. Patch's involvement on the trial team, like that of all team

4   members, was all-consuming, and he spent over 400 hours on the case during the month of

5   January. *Id.,* ¶ 21.

6       Among his other trial responsibilities, Patch was responsible for the preparation and

7   examination of Viji Raveendran at trial. *Id.,* ¶ 22-25, 30-33. He had previously defended her

8   deposition, where, based on her testimony, he had understood that she had not been involved in

9   activities of the JVT prior to September 2003, and had not attended any meeting of the JVT prior

10  to 2005. *Id.,* ¶ 22.

11      The QUALCOMM team thought Raveendran would be called as a witness by Broadcom,

12  and so on the evening of January 7, 2007, Raveendran was being prepared to testify. *Id.,* ¶ 24.

13  Patch, however, was absorbed by other aspects of trial preparation that evening, and asked Adam

14  Bier to assist with Raveendran. *Id.* Raveendran did not testify that week.

15      The next Sunday, January 14, Raveendran was again being prepared to testify, this time

16  with Patch and Bier. Patch helped get her preparation started, and then excused himself to tend to

17  other trial responsibilities, including the preparation of other witnesses. *Id.,* ¶ 25. Sometime

18  during that evening, Bier told Patch and Mammen that 24 JVT-related emails were found on

19  Raveendran's laptop, three of which were duplicates. *Id.* That was the first time Patch learned of

20  the existence of these emails. *Id.,* ¶ 25. The emails were all from the "avc_ce" email list of an

21  Ad Hoc committee of the JVT. *Id.* Patch asked Mammen, who had direct involvement in the

22  discovery process, to assess whether the emails were responsive to any document requests by

23  Broadcom, and to determine whether any of the emails reflected participation in the JVT.

24  *Id.,* ¶ 26.

25      That night around midnight, Patch discussed the 21 emails with Mammen and Bier, who

26  described the emails and their analysis of why the emails were not responsive to the document

27  requests as narrowed by QUALCOMM's responses. *Id.,* ¶ 27-28. Patch did not personally read

28  the emails, but did review the document requests and QUALCOMM responses, and concurred

- 54 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   with his colleagues' conclusion that the emails as described were not responsive. *Id.,* ¶ 28. Patch

2   also considered whether the emails as described were inconsistent with QUALCOMM's

3   argument that it had not participated in the creation of the H.264 standard, and determined they

4   were not. *Id.,* ¶¶ 28-29.

5       Patch, however, did not communicate to the rest of the trial team the details of the 21

6   emails discovered on January 14. *Id.,* ¶ 34. As a result, at a sidebar in the morning on January 18,

7   a member of QUALCOMM's trial team told the court there was no evidence that any email was

8   sent from the avc_ce email list. *Id.* Patch was not present in court when the statement was made;

9   otherwise, he would have immediately corrected it. *Id.* He did not learn of the statement until the

10  end of trial. *Id.*

11      On January 24, Patch put on Raveendran as a rebuttal witness. He questioned her on four

12  discrete issues, including whether she had read any emails that came back to her from the

13  "avc_ce" email list. *Id.,* ¶ 31. On cross examination, Broadcom's attorney asked whether

14  Raveendran had received any emails from the "avc_ce" list. *Id.,* ¶ 33. Raveendran testified that

15  she had, and that the emails had been found on her laptop during trial. *Id.*

16      The testimony concerning the 21 emails led to a sidebar, referred to in the August 6 Order,

17  at which Broadcom's counsel sought production of the emails. During the sidebar, Patch made

18  several statements that may have left an erroneous impression. He stated "[I]t's not clear to me

19  [the emails are] responsive to anything. So that's something that needs to be determined before

20  they would be produced...I'm talking about whether they were actually requested in discovery."

21  "I'm simply representing I haven't seen [the emails], and [whether Broadcom requested them]

22  hasn't been determined." *August 6 Order at 46:12-17.*

23      Patch now acknowledges with regret that these statements could have left the impression

24  the emails were recently discovered, that he had not known of them, and that responsiveness had

25  not yet been determined. *Id.,* ¶¶ 37-43. These impressions were not intended by Patch, as he was

26  focused on his need to review and evaluate the responsiveness issue based on a personal

27  examination of the emails. *Id.*

28.     During the lunch break, Patch read the emails, and evaluated their responsiveness. *Id.,*

- 55 -

RESPONDING ATTORNEYS' RESPONSE TO
AUGUST 13, 2007 ORDER TO SHOW CAUSE

¶ 44. Although Patch still believed they were all incoming, passive emails that reflected no active involvement with the "avc_ce" Ad Hoc Group, the trial team, including Patch, decided to produce the emails immediately. *Id.* Broadcom's counsel then used them in a brief cross examination of Raveendran in the afternoon.

Also, on the morning of January 24, the day Raveendran testified, QUALCOMM filed a JMOL motion arguing that Broadcom failed to show Raveendran had received an email from the avc_ce list. *Id.,* ¶ 34. Patch had not read the motion and was unaware of that statement. *Id.* Otherwise, he would have brought it to the attention of the Court. *Id.*

While the thrust of the August 6 Order is that QUALCOMM in fact had participated in the JVT as early as 2002, the evidence shows that Patch was not aware before or during trial of QUALCOMM's broader involvement with and participation in the JVT prior to September 2003, or of the emails to the contrary that came to light only after the trial. Nothing in Patch's involvement with this case indicates that he had any such awareness. He had no role in collecting QUALCOMM documents or drafting QUALCOMM's responses to document requests and interrogatories. His defense of Raveendran at her deposition left him with an understanding that QUALCOMM had no involvement with the JVT prior to September 2003. When he learned during trial that she had received the 21 emails from the avc_ce list, he reasonably concluded along with his colleagues that these emails appeared to have been unsolicited, evidenced no participation or involvement by Raveendran, and did not relate to the subject of QUALCOMM patents or IP, nor the creation of the H.264 standard. Patch continued, throughout trial and initial post-trial hearings, to believe that QUALCOMM had not actively participated in the JVT prior to September 2003.

After the trial, when Patch was informed that a substantial number of QUALCOMM emails and attached documents had been collected in response to the agreed-upon search terms, he was shocked. *Id.,* ¶¶ 52-56. He did not previously know they existed and, along with the QUALCOMM trial team, insisted that they immediately be produced to the Court and Broadcom. *Id.,* ¶ 56. Although he did not know of their existence until after trial, he deeply regrets any failure to locate them or have them produced before trial. *Id.*

RESPONDING ATTORNEYS' RESPONSE TO
AUGUST 13, 2007 ORDER TO SHOW CAUSE

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   At bottom, in considering Patch's conduct, it is critical that the handling of the 21 emails

2   not be conflated with the voluminous documents identified after trial. At the time of the March

3   21 Order, when the Court was in the same position as Patch – aware of the 21 emails but unaware

4   of the thousands of documents that had yet to be discovered – the Court proposed a balanced and

5   measured remedy against QUALCOMM and imposed no sanctions against the lawyers. Clearly,

6   the harm giving rise to the August 6 Order and the subsequent OSC centers on the thousands of

7   late-produced documents. Thus, sanctions should not be imposed against Patch.

8   **VIII. CONCLUSION**

9       The Responding Attorneys recognize, and have always recognized, their duties of candor

10  and truthfulness. They have each submitted a Declaration which is comprehensive, except for

11  privileged materials which they are precluded from submitting because QUALCOMM has not

12  consented to disclosure. The Declarations tell the story of each Responding Attorney, which they

13  did not have an opportunity to tell before the August 6 Order was issued. Although some of the

14  Responding Attorneys acknowledge mistakes, their descriptions of the circumstances show that

15  they acted honestly and in good faith. Others have detailed their work on the case, and it is hard

16  to know how they could have acted differently or better.

17      The performance of each Responding Attorney should be judged individually, as of the

18  time they acted, and each should have the benefit of the presumption of good faith which lawyers

19  with unblemished records, like them, deserve. Until many weeks after trial, none of the

20  Responding Attorneys knew about the documents that were produced after trial. None of the

21  Responding Attorneys conspired to conceal evidence. None of the Responding Attorneys acted

22  in bad faith. And, we respectfully submit, none of the Responding Attorneys should be

23  sanctioned.

24  DATED: October 3, 2007        SHARTSIS FRIESE LLP

25                              */s/ Joel Zeldin*
                                By:_____

26                                  JOEL ZELDIN

27  Attorneys for Non-Parties James R. Batchelder, Craig H.
    Casebeer, Kevin K. Leung, Christian E. Mammen,
    Bradley A. Waugh, Roy V. Zemlicka, William P. Nelson,
28  Victoria Q. Smith, Ryan Scher and Ruchika Agrawal

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 57 -

1   DATED:  October 3, 2007          KERR & WAGSTAFFE, LLP

2                                              /s/ James M. Wagstaffe

3                                    By:_____
                                           JAMES M. WAGSTAFFE
4
                                     ATTORNEYS FOR NON-PARTY LEE PATCH
5

6   DATED:  October 3, 2007          CHAPMAN POPIK & WHITE LLP

7                                              /s/ Merri A. Baldwin

8                                    By:_____
                                           MERRI A. BALDWIN
9
                                     ATTORNEYS FOR NON-PARTY ADAM BIER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 58 -

Case No.                  RESPONDING ATTORNEYS' RESPONSE TO
05CV1958-B (BLM)          AUGUST 13, 2007 ORDER TO SHOW CAUSE