PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1  SHARTSIS FRIESE LLP
   JOEL ZELDIN (Bar #51874)
2  FRANK A. CIALONE (Bar #172816)
   One Maritime Plaza, Eighteenth Floor
3  San Francisco, CA  94111
   Telephone:  (415) 421-6500
4  Facsimile:  (415) 421-2922
   Email:  jzeldin@sflaw.com; fcialone@sflaw.com
5
   Attorneys for Responding Attorneys
6  JAMES R. BATCHELDER, CHRISTIAN E.
   MAMMEN, and KEVIN K. LEUNG
7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11  QUALCOMM INCORPORATED,              Case No.  05CV1958-B (BLM)

12              Plaintiff,              **RESPONDING ATTORNEYS
                                        BATCHELDER, MAMMEN AND
13       v.                             LEUNG'S OPENING MEMO ON
                                        REMANDED ORDER TO SHOW
14  BROADCOM CORPORATION,               CAUSE**

15              Defendant.              Date:    January 13, 2010
                                        Time:    TBD
16                                      Dept.    TBD
                                        Judge:   Hon. Barbara L. Major
17
    AND RELATED COUNTERCLAIMS.
18

19

20

21

22

23

24

25

26

27

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................1

II.   STATEMENT OF FACTS ..............................................................................3

    A.   Background of JVT and Related Standards-Setting Organizations........................3

    B.   Day Casebeer's Engagement on the H.264 Litigation ...........................................4

    C.   Conduct of Discovery in the Underlying Litigation ..............................................5

    D.   Responding Attorneys' Efforts to Determine Whether Qualcomm Participated in JVT ...........................................................................................7

        1.   Inquiries during initial stage of discovery ....................................................8

        2.   Inquiries during preparation for depositions.................................................13

        3.   Information learned at depositions of Qualcomm employees and in follow-up inquiries ......................................................................................18

        4.   Information learned in third-party and expert discovery.............................23

        5.   Further inquiries later in the litigation .......................................................24

        6.   Discovery of emails on Raveendran computer ...........................................27

    E.   Information Qualcomm Employees Had But Did Not Disclose .........................29

        1.   No Qualcomm employee informed Responding Attorneys that Qualcomm hired a consultant to attend JVT meetings and report on JVT activities ..............................................................................................30

        2.   No Qualcomm employee disclosed Qualcomm's desire to get its intellectual property into the developing JVT standard............................32

        3.   No Qualcomm employee acknowledged attending any JVT meeting before December 2003...............................................................................33

            a.   Members of Irvine's Digital Cinema Group attended and reported on JVT meetings in 2002................................................33

            b.   Garudadri attended the September 2003 JVT meeting as a member of Qualcomm's Standards Group..................................35

            c.   Qualcomm employees failed to disclose Qualcomm's attendance at these JVT meetings to Responding Attorneys ........36

        4.   No Qualcomm Employee Acknowledged that Qualcomm and Some of its Engineers Were Members of JVT ...................................................40

        5.   Qualcomm employees and in-house lawyers withheld infringement analyses and comparisons of Qualcomm's patents to H.264 that were done as early as 2002 or 2003 .........................................................40

            a.   Qualcomm began comparing its patents to H.264 in early 2002.......................................................................................41

            b.   Qualcomm continued comparing its patents to the standard as the standard was developed throughout 2002. ......................42

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

## **TABLE OF CONTENTS**
### (continued)

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

**Page**

c. In 2003, Raveendran prepared and circulated multiple documents analyzing the potential overlap between Qualcomm's patents and H.264 .................................. 43

d. Qualcomm's Standards Group discussed the overlap between H.264 and Qualcomm's patents in 2003, shortly after H.264 was published ................................ 45

e. Qualcomm *engineers* failed to disclose these comparison efforts to Responding Attorneys (and to JVT) ............................ 46

f. Qualcomm *lawyers* failed to disclose these comparison efforts to Responding Attorneys ................................ 47

6. No Qualcomm employee disclosed Qualcomm's decision to monitor JVT as part of Qualcomm's video strategy in 2003 ................. 50

F. Qualcomm's Efforts to Justify these Failures to Disclose Fall Short ................. 50

1. Qualcomm witnesses say they did not disclose obviously relevant facts because they did not understand the meaning of words like "participation," and "involvement." ................................ 50

2. Qualcomm witnesses claim they would have revealed all if their memories had been refreshed ................................ 55

III. LEGAL ARGUMENT ................................................................ 56

A. Due Process Limits the Scope of These Proceedings ...................... 57

B. Due Process Requires the Court to Adhere Strictly to Established Legal Authority for Imposing Sanctions ................................ 57

1. The Federal Rules of Civil Procedure have only limited applicability under the facts here ................................ 58

2. Substantive and procedural safeguards govern the Court's exercise of its inherent powers ................................ 61

C. The Court Cannot Impose New Standards and Obligations on Counsel ............ 66

1. Punitive sanctions, like those at issue here, violate Due Process when the Court retroactively applies an unforeseeable enlargement of the law ........................ 66

2. The rule in Bouie -- that judicial construction of a criminal statute to include conduct not previously addressed violates Due Process -- applies to punitive sanctions ...................... 67

3. Imposing sanctions for failing to independently verify each representation made by another attorney would violate Responding Attorneys' Due Process rights ...................... 69

4. The Court cannot impose new obligations on attorneys based on the "spirit and purposes" of the Rules ...................... 70

D. Sanctions Are Not Warranted Where an Attorney is Misled By His Client's Incorrect Representations and Omissions ................................ 72

E. Certain Factual Findings are Binding on Qualcomm ...................... 75

**TABLE OF CONTENTS**
**(continued)**

Page

IV.   THESE RESPONDING ATTORNEYS SHOULD NOT BE SANCTIONED ................77
      A.   KEVIN LEUNG ....................................................................................78
      B.   CHRIS MAMMEN ...............................................................................81
      C.   JIM BATCHELDER ............................................................................85
V.    CONCLUSION .............................................................................................89

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*A & A Concrete, Inc. v. White Mountain Apache Tribe,*
    781 F.2d 1411 (9th Cir. 1986)......................................................................76

*In re Alberto,*
    119 B.R. 985 (Bankr. N.D. Ill. 1990) ........................................................74

*United States v. All Assets Held at Bank Julius Baer & Co.,*
    571 F. Supp. 2d 1 (D.D.C. 2008) ...............................................................67

*Aoude v. Mobil Oil Corp.,*
    892 F.2d 1115 (1st Cir. 1989) ....................................................................64

*Apex Oil Co. v. Belcher Co. of N.Y.,*
    855 F.2d 1009 (2d Cir. 1988)......................................................................58

*Balcar v. Bell & Assocs. LLC,*
    295 F. Supp. 2d 635 (N.D. W. Va. 2003) ..................................................64

*Bank of N.Y. v. Fremont Gen. Corp.,*
    523 F.3d 902 (9th Cir. 2008).......................................................................76

*Beazell v. Ohio,*
    269 U.S. 167 (1925) ...................................................................................67

*Books Are Fun, Ltd. v. Rosebrough,*
    239 F.R.D. 532 (S.D. Iowa 2007) .........................................................72, 73

*Bouie v. Columbia,*
    378 U.S. 347 (1964) ...........................................................................passim

*Broadcast Music, Inc. v. Xanthas, Inc.,*
    855 F.2d 233 (5th Cir. 1988).......................................................................59

*Buildex, Inc. v. Kason Industries, Inc.,*
    849 F.2d 1461 (Fed. Cir. 1988) ..................................................................64

*Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,*
    498 U.S. 533 (1991) ...........................................................................passim

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991) .............................................................................passim

*Chaves v. M/V Medina Star,*
    47 F.3d 153 (5th Cir. 1995).........................................................................65

*Chevron, U.S.A., Inc. v. Hand,*
    763 F.2d 1184 (10th Cir. 1985)...................................................................74

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Clark v. Brown,*
450 F.3d 898 (9th Cir. 2006)..................................................................67, 69

4

*Collins v. Youngblood,*
497 U.S. 37 (1990) .............................................................................67

5

6

*Comcast Cable Communs. Corp. v. Finisar Corp.,*
571 F. Supp. 2d 1137 (N.D. Cal. 2008)..........................................................64

7

*Conn. Gen. Life Ins. Co. v. Ramsey,*
2007 U.S. Dist. LEXIS 71227 (E.D. Cal., Sept. 18, 2007)..................................62

8

9

*Exxon Valdez v. Exxon Mobil Corp.,*
490 F.3d 1066 (9th Cir. 2007).................................................................67

10

*F.J. Hanshaw Enters. v. Emerald River Dev., Inc.,*
244 F.3d 1128 (9th Cir. 2001).............................................................passim

11

*Fink v. Gomez,*
239 F.3d 989 (9th Cir. 2001)..................................................................62

12

13

*Finley v. Hartford Life & Acc. Ins. Co.,*
249 F.R.D. 329 (N.D. Cal. 2008) ..............................................................60

14

*Fleming & Assocs. v. Newby & Tittle,*
529 F.3d 631 (5th Cir. 2008).................................................................63

15

16

*Frank v. Mangum,*
237 U.S. 309 (1915) ..........................................................................66

17

*G. Heileman Brewing Co. v. Joseph Oat Corp.,*
871 F.2d 648 (7th Cir. 1989)..................................................................71

18

19

*GMAC Bank v. HTFC Corp.,*
252 F.R.D. 253 (E.D. Pa. 2008) ...............................................................64

20

*Gaytan v. Kapus,*
181 F.R.D. 573 (N.D. Ill. 1998) ...............................................................60

21

22

*Griswold v. Connecticut,*
381 U.S. 479 (1965) ..........................................................................71

23

*Henderson v. Weatherly,*
116 F.R.D. 147 (E.D. Pa. 1987) ...............................................................74

24

25

*Hydranautics v. FilmTec Corp.,*
204 F.3d 880 (9th Cir. 2000)..................................................................76

26

*International Union, UMW v. Bagwell,*
512 U.S. 821  (1994) .......................................................................62, 63

27

28

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9411

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND
LEUNG'S OPENING MEMO ON REMANDED OSC

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3   *Jimena v. UBS AG Bank, Inc.*,
        2008 U.S. Dist. LEXIS 18831 ................................................................................ 59
4

    *Macias v. McGrath*,
5       439 F.3d 1141 (9th Cir. 2006) .............................................................................. 64

6   *Mackler Productions, Inc. v. Cohen*,
        146 F.3d 126 (2d Cir. 1998) ................................................................................. 63
7

    *Magnesystems v. Nikken, Inc.*,
8       933 F. Supp. 944 (C.D. Cal. 1996) ....................................................................... 77

9   *Mendez v. County of San Bernardino*,
        540 F.3d 1109 (9th Cir. 2008) ......................................................................... 61, 62
10

    *United States v. Mest*,
11      789 F.2d 1069 (4th Cir. 1986) .............................................................................. 67

12  *Minn. Mining & Mfg. Co. v. Eco Chem*,
        757 F.2d 1256 (Fed. Cir. 1985) ("Rule 37(b)(2)(C) calls ................................. 59
13

    *Moore v. Keegan Mgmt. Co.*,
14      78 F.3d 431 (9th Cir. 1996) .................................................................................. 61

15  *NLRB v. International Medication Systems, Ltd.*,
        640 F.2d 1110 (9th Cir. 1981) .............................................................................. 59
16

    *National Collegiate Athletic Ass'n v. Tarkanian*,
17      488 U.S. 179 (1988) .............................................................................................. 68

18  *Oliveri v. Thompson*,
        803 F.2d 1265 (2d Cir. 1986) ............................................................................... 64
19

    *Pafumi v. Davidson*,
20      2008 U.S. Dist. LEXIS 67036 (S.D. Fla., Sept. 2, 2008) ..................................... 73

21  *Patton v. TIC United Corp.*,
        77 F.3d 1235 (10th Cir. 1996) .............................................................................. 68
22

    *Primus Auto. Fin. Servs. v. Batarse*,
23      115 F.3d 644 (9th Cir. 1997) ........................................................................... 61, 72

24  *Quantum Communs. Corp. v. Star Broad, Inc.*,
        473 F. Supp. 2d 1249 (S.D. Fla., 2007) ............................................................... 64
25

    *R.W. Int'l Corp. v. Welch Foods, Inc.*,
26      937 F.2d 11 (1st Cir. 1991) .................................................................................. 58

27  *Regents of University of Minn. v. National Collegiate Athletic Asso.*,
        560 F.2d 352 (8th Cir. 1977) ................................................................................ 68

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006)...................................................................76

*Ridgeway v. Montana High School Asso.*,
    858 F.2d 579 (9th Cir. 1988)...................................................................77

*Roadway Express, Inc. v. Piper*,
    447 U.S. 752 (1980) ...........................................................................57, 61

*Samuel v. Michaud*,
    980 F. Supp. 1381 (D. Idaho 1996)........................................................65

*Schaffer v. Chicago Police Officers*,
    120 F.R.D. 514 (N.D. Ill. 1988) .............................................................74

*Scholastic, Inc. v. Stouffer*,
    221 F. Supp. 2d 425 (S.D.N.Y. 2002) ...................................................65

*Schwartz v. Millon Air, Inc.*,
    341 F.3d 1220 (11th Cir. 2003)..............................................................69

*Settlegoode v. Portland Pub. Schs*,
    2002 U.S. Dist. LEXIS 20337 (D. Or., May 16, 2002) .........................71

*Shepherd v. American Broadcasting Co.*,
    62 F.3d 1469 (D.C.Cir. 1995) ..........................................................passim

*Signature Combs, Inc. v. United States*,
    222 F.R.D. 343 (W.D. Tenn. 2004).........................................................58

*Sleep Country USA, Inc. v. Northwest Pacific, Inc.*,
    2003 U.S. Dist. LEXIS 26056 (W.D. Wash., Oct. 15, 2006) .................74

*Smith v. Doe*,
    538 U.S. 84 (2003) .................................................................................67

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
    538 U.S. 408 (2003) .........................................................................67, 72

*TVT Records, Inc. v. Island Def Jam Music Group*,
    2006 U.S. Dist. LEXIS 62230 (S.D.N.Y. May 15, 2006) ......................61

*Taylor v. United States*,
    151 F.R.D. 389 (D. Kan. 1993)...............................................................74

*Town of North Bonneville v. Callaway*,
    10 F.3d 1505 (9th Cir. 1993)...................................................................76

*United States v. Trimble*,
    487 U.S. 752 (9th Cir. 2007)..................................................................68

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9411

Case No.
05CV1958-B (BLM)    RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND
LEUNG'S OPENING MEMO ON REMANDED OSC

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Webster v. Woodford,*
   369 F.3d 1062 (9th Cir. 2004)..............................................................................66, 67

*Wilson v. PFS Mgmt. Co.,*
   2008 U.S. Dist. LEXIS 22282 (S.D. Cal. (District Judge Hayes) Mar. 20, 2008)............62

*In re Yagman,*
   796 F.2d 1165 (9th Cir. 1986)....................................................................................68

*Zambrano v. Tustin,*
   885 F.2d 1473 (9th Cir. 1989)....................................................................................61

*Zubulake v. UBS Warburg LLC,*
   229 F.R.D. 422 (S.D.N.Y. 2004)................................................................................71

### STATE CASES

*Synesort Inc. v. Innovative Routines International, Inc.,*
   2008 WL 1925304 (D.N.J. April 30, 2008)................................................................60

### STATUTES

28 U.S.C. § 1927...........................................................................................................69

U.S. Const. Art. I, § 9, cl. 3.............................................................................................66

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9411

Case No.
05CV1958-B (BLM)          RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND
                          LEUNG'S OPENING MEMO ON REMANDED OSC

1  Responding Attorneys James Batchelder, Christian Mammen, and Kevin Leung

2  (collectively, "Responding Attorneys") submit this additional response, after remand, to the

3  Court's Order to Show Cause dated August 13, 2007.

4  **I.   INTRODUCTION**

5  This brief will establish four basic but essential truths:

6  1.   <u>Responding Attorneys conducted a reasonable investigation</u>.   Responding

7  Attorneys Leung and Mammen and others made repeated reasonable inquiries to Qualcomm that

8  should have elicited responsive information about Qualcomm's participation in the Joint Video

9  Team ("JVT") before the H.264 standard was finalized, Qualcomm's analyses of the link between

10  JVT's H.264 standard and the '104 or '767 patents in 2002-2003, and the existence of the

11  documents reflecting these activities.   They began their investigation began by directing good

12  inquiries to a group of people that Qualcomm identified as knowledgeable about Qualcomm's

13  standards-setting activity.   As new leads arose in the course of the investigation and in the course

14  of discovery in the case, Leung, Mammen and others diligently pursued each of those new leads.

15  Responding Attorney Batchelder did not handle day-to-day discovery, but he knew enough about

16  the initial and follow-up inquiries made by the investigating team, the responses to those

17  inquiries, and the evidence from third parties and contemporaneous documents that confirmed the

18  result of those inquiries, that he reasonably and in good faith relied on the determinations the

19  investigators had made.

20  2.   <u>Qualcomm employees failed to give forthright and complete answers to</u>

21  <u>Responding Attorneys' inquiries</u>.   Numerous Qualcomm employees misled Responding

22  Attorneys, denying that Qualcomm had any involvement in JVT or any interest in H.264 in the

23  2002-2003 period, when those individuals had <u>personally</u> attended JVT meetings and received

24  correspondence from other Qualcomm employees about their attendance, <u>personally</u> studied or

25  been informed of the relevance of the '104 and '767 patents to H.264, and <u>personally</u>

26  communicated by email more than 100 times with Jordan Isailovic, the "consultant" Qualcomm

27  hired to attend JVT in 2002 and report back on the development of H.264.   Qualcomm employees

28  gave these misleading and incomplete answers to Responding Attorneys' inquiries on numerous

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1

occasions, from the beginning of discovery in 2006 through the end of trial in 2007. They gave those misleading and incomplete answers in response to email inquiries, in telephone and in-person interviews, and even in sworn testimony. These failures were not limited to one or two Qualcomm employees. Rather, individuals ranging from engineers who had been in Qualcomm's former Digital Cinema group, to managers in Qualcomm's Standards group, to lawyers and paralegals in Qualcomm's in-house legal department helped mislead Responding Attorneys, or failed to disclose information that they had and knew was relevant in the litigation. That conduct continued in the four declarations Qualcomm submitted to this Court in October 2007, which are rife with half-truths and inaccuracies, and even into the depositions in these remand proceedings.

3.   The same Qualcomm employees who helped mislead Responding Attorneys continue to deny the truth, even today and even when confronted with the very documents that establish the truth. The Qualcomm employees who participated in JVT before the H.264 standard was finalized, who analyzed the emerging H.264 standard against the '104 or '767 patents in that same time frame, or who knew that other Qualcomm employees had been involved in such participation or analysis, still refuse to admit those facts. Those refusals simply cannot be credited, given the volume and clarity of the documents reflecting those facts. Those refusals also confirm that the problem here was not the precision or persistence of the inquiries made by Responding Attorneys. The problem was the lack of candor by certain Qualcomm employees.

4.   No court has sanctioned attorneys who conducted so thorough an investigation and were told the same false information by so many employees of a trusted client who knew better. Attorneys have a right under the law to rely on their clients' representations if those representations appear reasonable. The standards for imposing sanctions require extreme types of intentionally wrongful conduct, and a degree of proof approaching certainty. Sanctions cannot be based on hindsight, or on second-guessing about additional steps that an attorney might have taken. Rather, the Court must assess Responding Attorneys' conduct and states of mind during the time in question, based on the totality of the circumstances. Here, Qualcomm had a history with Day Casebeer that established Qualcomm's credibility, it appeared to be actively pursuing and providing information from multiple appropriate sources, and its responses to direct inquiries

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

2

1   were consistent, definitive, reasonable, and corroborated by other sources. Now that Responding

2   Attorneys can disclose the inquiries they made and the responses they received, the evidence will

3   show that their conduct was reasonable and in good faith, and does not even approach the level

4   that would support the imposition of sanctions against them.

5   ## II.   STATEMENT OF FACTS

6        Responding Attorneys previously advised the Court that they had exculpatory evidence

7   essential to their defense -- including evidence that refuted the four Declarations submitted by

8   Qualcomm employees Raveendran, Irvine, Glathe, and Ludwin -- but Qualcomm's assertion of

9   the attorney-client privilege precluded Responding Attorneys from submitting that evidence to the

10  Court. In this brief and at the hearing on this matter, Responding Attorneys will reveal previously

11  suppressed evidence to show how discovery was conducted, what inquiries Responding Attorneys

12  made to determine if Qualcomm had participated in JVT during development of the H.264

13  standard, what information Qualcomm employees provided in response to those inquiries, and

14  some of the information those same Qualcomm employees knew but did <u>not</u> provide.

15  Responding Attorneys will first provide an overview of JVT itself, to identify the specific period

16  of JVT standards-setting activity that was relevant in the underlying litigation.

17       ### A.   Background of JVT and Related Standards-Setting Organizations.

18       JVT was a joint project of the Moving Pictures Expert Group ("MPEG") and the Video

19  Coding Experts Group ("VCEG"). MPEG is itself part of the International Standards

20  Organization ("ISO") and the International Electrotechnical Commission ("IEC"), while VCEG is

21  part of the International Telecommunication Union Telecommunication Standardization Sector

22  ("ITU-T"). Prior to forming JVT, experts from MPEG (and, possibly, from the other standards

23  organizations) met as the MPEG Digital Cinema Adhoc group. That group met in 2001 and

24  focused on video applications for the cinema and other large formats. The work of the Digital

25  Cinema Adhoc group was <u>not</u> part of this litigation or part of Broadcom's defenses.

26       In December 2001, the standards groups chose to focus on video applications for small

27  devices, such as cell phones and high definition TV (as opposed to cinema projectors), and they

28  formed JVT. This group developed the H.264 standard and published the first, or "baseline,"

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

3

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

version of that standard in May 2003.  That work, and Qualcomm's participation in it, ultimately emerged as the basis of Broadcom's waiver defense in this litigation.

After publishing the H.264 standard, JVT moved onto a project known as Scalable Video Coding ("SVC").  JVT worked on SVC from late 2003 through at least 2006, but SVC was <u>not</u> part of this litigation or part of Broadcom's defenses.  *See generally* Mammen Dec., ¶ 23.

**B.   Day Casebeer's Engagement on the H.264 Litigation.**

Qualcomm first brought the '767 and '104 patents to Day Casebeer's attention in September, 2005.  On October 5, 2005, Responding Attorneys Batchelder and Mammen went to Qualcomm's offices to discuss the results of their own and Qualcomm's prefiling investigation.  Qualcomm told Batchelder and Mammen -- at that meeting, and on other occasions -- that Qualcomm first learned that these patents potentially read on the H.264 standard in July, 2005, when Yuriy Reznik, an engineer recently hired by Qualcomm, communicated that discovery to his supervisor, Hari Garudadri.  Batchelder Dec., ¶¶ 35, 55; Mammen Dec., ¶¶ 24, 40.

Day Casebeer already had a long relationship with Qualcomm and its in-house counsel, whom they believed to be honest, trustworthy, and very knowledgeable about the company.  Batchelder Dec., ¶¶ 4-10.  Lou Lupin, the General Counsel of Qualcomm, had been a partner with Batchelder and Day Casebeer's other founding partners when they all worked at Cooley Godward.  *Id.*, ¶ 6.  Batchelder handled numerous Qualcomm matters over the previous nine years, and in several years devoted the vast majority of his time to Qualcomm matters.  *Id.*, ¶ 3.  Mammen, who joined Day Casebeer in June 2005, worked almost exclusively on Qualcomm matters, including the 1958 Case and the 1392 Case (another infringement suit against Broadcom) through early 2007.  In his first weeks at Day Casebeer, Mammen was introduced to in-house Qualcomm attorney Roger Martin and several other key individuals in Qualcomm's legal department.  Mammen Dec., ¶ 13.  Kevin Leung, who joined Day Casebeer in December 2005, worked almost exclusively on Qualcomm matters, including this case and the 1392 case, through mid-2007. Leung Dec., ¶ 9.

Lupin, Martin, and Qualcomm in-house litigator Alex Rogers were all counsel of record on the 1958 Case.  Like Lupin, Martin was well known to Day Casebeer.  He had worked at

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

Qualcomm for several years as an engineer before attending law school, and then returned to Qualcomm as patent counsel in 1998.  Martin Depo. at 6:18-9:17.[1]  Martin worked with Day Casebeer on about five large cases since 2000, including patent infringement cases against GTE, against Maxim and other companies, and against Nokia, as well as on the 1392 and 1958 Cases against Broadcom.  *Id.* at 19:12-21:5.  Rogers was an experienced litigator and former litigation partner at the Gray Cary firm.  Other in-house Qualcomm attorneys were routinely consulted and were provided with drafts of discovery responses and court filings, including Tom Rouse, Sean English, Byron Yafuso, and others.  Batchelder Dec., ¶¶ 23-26; Mammen Dec., ¶¶ 12-16; *e.g.* Depo. Ex. 13.

Qualcomm also assigned in-house paralegals to the 1958 case.  Initially, the lead paralegal was Gail Myers, who was the head of Qualcomm's paralegal corps.  That role was later taken over by Christine Glathe, but Myers, along with paralegal Andrew Laxamana and several others, continued to work on the 1958 Case.  These individuals worked with Day Casebeer on the 1392 case and other Qualcomm litigation, and Responding Attorneys respected and trusted them.  Batchelder Dec., ¶ 9; Mammen Dec., ¶ 13; Leung Dec., ¶ 8.

## C.    Conduct of Discovery in the Underlying Litigation.

On August 25, 2005 -- while the 1392 case was pending, and shortly before this case was filed -- Myers sent Mammen a document titled "OVERVIEW OF DOCUMENT COLLECTION AT QUALCOMM" (the "Overview") that described Qualcomm's discovery procedures in detail.  Depo. Ex. 6.  The Overview was drafted in 2004, by two Day Casebeer associates, after a meeting with Glathe and Myers.  Depo. Ex. 7 (Myers' email describing memo as "summarizing our 5/20/04 meeting re: document collection process").  Glathe and Myers then made changes to the 2004 draft and approved the memo.  *Id.*  The memo set forth the procedures for collecting documents, and Responding Attorneys followed these procedures in the 1958 Case and the 1392

_____

[1] Cited deposition excerpts are submitted as Exhibits A-R to the Declaration of Joel Zeldin, and are in alphabetical order by deponent.  Exhibits from the depositions in these proceedings are submitted with the Declaration of Frank A. Cialone, and are cited as "Depo. Ex. __."  For ease of reference, Responding Attorneys have used the same exhibit numbers (which are Depo. Ex. 1-Depo. Ex. 199) used at deposition.  Other documents cited herein are also submitted with the Declaration of Frank A. Cialone as Exhibits 200-___, and are cited as "Ex. Cialone-___."

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

1  Case.   Mammen Dec., ¶¶ 17-19; Leung Dec., ¶ 10.   Along with the Overview, Myers sent

2  Mammen a flowchart showing Qualcomm's discovery process, which began with Qualcomm

3  collecting files and documents.  Ex. Cialone-201; Mammen Dec., ¶ 21.

4          The Overview shows the significant role that Qualcomm's in-house legal department

5  played in discovery -- and directly contradicts Glathe's October 2007 Declaration.   *See*

6  Batchelder Dec., ¶ 20.   The Overview states that the in-house team would meet to identify

7  relevant documents, and to begin collecting those documents, before a lawsuit was filed and even

8  before outside counsel was contacted.   Once discovery commenced, in-house attorneys and

9  paralegals worked with outside counsel to determine what documents to agree to collect and

10  produce.  Depo. Ex. 6 at 3; *compare* Depo. Ex. 8 (Glathe Dec.), ¶ 3 (suggesting she had no role in

11  determining what documents to collect and when to collect them).   The in-house legal team

12  would determine the document custodians to search and how to conduct that search:

13              At the same time that the in-house legal team discusses the
                categories of responsive documents with outside counsel, **the in-**
14              **house team also discusses** who and where the responsive
                documents will be [sic].  When **the paralegal team** determines that
15              a particular document request calls for a category of documents that
                have not been previously collected (and therefore would not be on
16              the MSTR database[2]), **they must determine how to go about**
                **collecting the relevant documents**.

17              …

18              The paralegal team relies primarily on guidance from in-house **and**
                **perhaps** outside counsel, and their institutional knowledge of
19              QUALCOMM to determine how to go about new document
                collections.   The majority of the paralegal team members have
20              worked at QUALCOMM for more than five years and both know
                the people in the organization that will likely be custodians of the
21              required documents.  [sic]

22              Although QUALCOMM has no formal organizational charts, it has
                a photo directory that lists people's positions and their direct
23              reporting responsibilities.  **The paralegal team use this directory**
                **to find potential custodians.**   After determining who the likely
24              custodians are, **the paralegal team can begin interviewing those**
                **custodians to determine what documents they have, to collect**
25              **those documents, and to find out who else is likely to have**
                **responsive documents**.

26

27  _____

28  [2] The MSTR database is a database of documents that Qualcomm developed from document
    productions in prior litigation since approximately 1996.  Depo. Ex. 6 at 4.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

Depo. Ex. 6 at 4-5 (emphasis added); *compare* Depo. Ex. 8 (Glathe Decl.), ¶ 5 (claiming that "outside counsel selects (i) the custodians whose documents should be searched, (ii) the categories of documents to be collected, and (iii) the method for searching documents….").

Day Casebeer relied on Qualcomm's in-house legal team to identify and search custodians, not only because Qualcomm's written instructions required them to do so, but because that was the only practical way to proceed.  Outside counsel -- particularly Mammen and Leung, who began working on Qualcomm matters in late 2005 -- typically did not know which Qualcomm employees would be knowledgeable about a particular issue.[3]  Qualcomm had more than 10,000 employees in 2006.  Ex. Cialone-202.  It had no formal organization charts, only a photo directory that the in-house paralegal team would use to find potential custodians.  Depo. Ex. 6 at 5.  Throughout the time Day Casebeer represented Qualcomm, the company had no centralized email system and no regular means of searching for electronic documents on a company-wide basis.  *See* Ex. Cialone-203 (internal Qualcomm memo dated June 18, 2007, discussing proposed new discovery system:  "Currently this [searching all email and associated attachments for all Qualcomm personnel] is very difficult and costly to do, as email is resides [sic] on **thousands of individual employee computers and laptops, and thousands of backup tapes**.") (emphasis added).  And, finally, the complicated nature of standards processes required that outside counsel look to Qualcomm employees for direction.  *See* Depo. Ex. 139 at 2 ("There are thousands of standards projects out there…Standards processes are very complex - it is hard to understand them until you have been involved with them.").

## D.   Responding Attorneys' Efforts to Determine Whether Qualcomm Participated in JVT.

This Court has previously found that Qualcomm monitored and participated in the development of H.264, while concealing its patents from JVT so that Qualcomm could become an indispensable licenser to anyone making H.264-compliant products.  Waiver Order at 9-10, 21.

---

[3] The Court has previously noted the difficulty outside counsel would have in identifying knowledgeable witnesses.  Sanctions Order at 21, n. 6 ("Qualcomm also has not presented any evidence that outside counsel knew enough about Qualcomm's organization and operation to identify all of the individuals whose computers should be searched and determine the most knowledgeable witness.")

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9 4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

Those findings are binding on Qualcomm.  *See* § III.E., *infra*.  The discussion below shows that Qualcomm also concealed its participation in JVT, and its early knowledge of the relevance of its patents to H.264, from Responding Attorneys until after the end of trial, through a pattern of misleading and incomplete responses to outside counsel's inquiries.

### 1.     Inquiries during initial stage of discovery.

Shortly after this lawsuit was filed, Mammen drafted a document preservation notice.  The notice advised that Qualcomm needed to preserve "[a]ll documents relating to QUALCOMM's participation in standards-setting activities for … H.264 … and any of the other standards or standards organizations that are relevant or related to any of the QUALCOMM patents in suit …" Mammen Dec., ¶ 25; Ex. Cialone-204 at QRA1958-00011372.  Qualcomm circulated that notice on January 9, 2006, to individuals Qualcomm selected.  *Id.;* Mammen Dec., ¶ 25.

On January 30, 2006, as discovery commenced, Leung emailed Qualcomm paralegals Glathe and Myers, describing information Day Casebeer needed to respond to Broadcom's interrogatories -- including "information relating to Qualcomm's <u>membership</u>, <u>participation</u>, <u>interaction</u>, and/or <u>involvement</u>" (emphasis added) in setting video standards, including H.264.  Depo. Ex. 3 at 2.  As the email indicates, Day Casebeer believed that Qualcomm had not participated in any relevant standards-setting activity.  *Id.* ("It is our understanding that Qualcomm has never participated in these standard setting bodies….").  That belief was based on Responding Attorneys' early discussions with Qualcomm's in-house counsel.  Leung Dec., ¶ 12.  Leung asked Qualcomm's paralegals to confirm that understanding, or to "provide contact information for QUALCOMM personnel knowledgeable about QUALCOMM's interaction with MPEG and other digital video standard bodies."  *Id.*  A copy of that email, produced from Myers' files, has "Tiedemann" written next to this paragraph -- a reference to Ed Tiedemann, who in early 2006 "had the overall responsibility for participation in standards at Qualcomm."  *Id.*; Tiedemann Depo. at 24:11-23.

Also on January 30, 2006, Leung emailed Myers and Glathe a chart summarizing categories of documents that Day Casebeer thought should be collected for possible production and proposed a conference call "to plan a strategy for collecting these documents."  Depo. Ex. 4.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9  4111

8

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

With respect to standards-setting, the chart called for collection of the following categories:

> Communications and documents sent to/received from STANDARDS BODIES (relating to the processing of digital video signals) that pertain to PIS [Patents-in-Suit]

> QUALCOMM's participation in STANDARDS BODIES (relating to the processing of digital video signals)

> Investigation/analysis of STANDARDS that pertain to PIS [focus on early STANDARDS work; pre-litigation efforts in this case are work product and will not be collected or logged on a privilege log][4]

*Id* Following Qualcomm's collection policies, the in-house team used this chart to determine the categories of documents needed, identified custodians through the knowledge and resources available to them, and apprised Responding Attorneys of their progress through weekly conference calls and regular telephone and email communication. Leung Dec., ¶¶ 13-14. Based on the information they provided, Leung periodically updated the collection chart to show what categories had been collected, and what categories had been determined not to exist. *Id.*

On February 6, 2006, Myers emailed Tiedemann, in what was apparently the first step of her effort to determine who would be knowledgeable about Qualcomm's participation in H.264 standards-setting activity. Depo. Ex. 138. Myers summarized the relevant interrogatories, noting that one called for "information relating to QC's membership, participation, interaction, and/or involvement in setting any standard relating to the processing of digital video signals that relate to the '104 and '767 patents (e.g., any MPEG video processing standards, including H.264)." *Id.* (emphasis added). This was the same language that appeared in Broadcom's Interrogatory No. 13, and in Leung's email of January 30. Ex. Cialone-205 at 41; Depo. Ex. 3 at 2. Myers asked Tiedemann: "Could you tell us if QC has every [sic] participated in any video standard setting bodies? If yes, which employees are most knowledgeable re: our interaction with MPEG and other digital video standard bodies?" Depo. Ex. 10. Tiedemann responded as follows:

---

[4] The chart included 40 other categories of documents that Qualcomm needed to collect and produce, reflecting the magnitude of discovery and the number of issues that were in dispute, beyond the question of participation in standard-setting. *Id.; see also* Batchelder Dec., ¶¶ 19-21; Mammen Dec., ¶ 27. The statement that pre-litigation documents would not be collected or logged was pursuant to an agreement between Qualcomm and Broadcom not to require logging of litigation-related documents.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

> I don't believe that anyone from the standards organization has participated in any of these meetings except recently.  Before we were more organized to centrally manage standards, I believe that people from the old Digital Cinema group may have participated in these meetings.  However, I'm not sure.  I've included several people who may know more about this or can point you to other people who know more about this.

*Id.*  Consistent with the typical flow of information, Myers sent that response to Leung.  *Id.*; Leung Dec., ¶ 15.

Tiedemann forwarded Myers' inquiry to Hari Garudadri, Scott Ludwin, and Chong Lee (the named inventor on the two Patents-in-Suit), stating that they "may know more about this or can point you to other people who know more about this."  Depo. Ex. 3 at 2.  Garudadri, an engineer in Qualcomm's Standards Group, responded that Raveendran had attended meetings of some video standards-setting bodies, but that he was "[n]ot sure if she attended the sub working group (JVT) which defined H.264."  Depo. Ex. 11 at 2.[5]  Garudadri also mentioned that Phoom Sagetong started attending JVT meetings in December 2003 (after H.264 was finalized and published), and that Yuriy Reznik started attending in April 2005 (before he joined Qualcomm).  *Id.* at 2.  Finally, Garudadri confirmed that his team -- including Reznik -- had first realized that Qualcomm's patents "could relate to H.264" and brought that to the attention of in-house attorney Tom Rouse in July 2005.  *Id.* at 3.[6]  Garudadri copied the email thread to Raveendran and to in-house attorneys Sean English, Rouse, and Kent Baker.  *Id.* at 1.

In response to Garudadri's email, Raveendran stated that Qualcomm "participated in the Digital Cinema trials conducted by MPEG," a reference to work done by the Digital Cinema Ad

---

[5] Garudadri responded differently to a separate, internal inquiry two months later.  On April 25, 2006, Qualcomm legal analyst Kayla Seignious asked him in connection with a decision whether to submit "Letters of Assurance" to the ITU and IEC, "when did Qualcomm start participating in H.264?"  Garudadri's response was, in relevant part:  "We did not contribute to H.264 activity, as far as I know.  <u>Viji attended JVT meetings (started in 2000)</u>."  Depo. Ex. 194. (emphasis added).  Garudadri also indicated to Seignious <u>that Qualcomm participated in the "baseline" H.264 standard.</u>  *Id.*  That response was copied to Scott Ludwin.  *Id.*  However, it was <u>not</u> sent to outside counsel.  Mammen Dec., ¶ 33; Leung Dec., ¶ 54.

[6] Garudadri failed to mention that he, personally, attended and reported in writing on JVT meetings over three days in September 2003; that he had known of the possible relationship between H.264 and Qualcomm's patents -- including, specifically, the '104 and '767 patents -- since 2002 or 2003; and that he had communicated about that possible relationship with Tiedemann, Raveendran, Rouse, and several other Qualcomm engineers and in-house attorneys in 2002 and 2003.  *See* §§ II.E.3-5, below.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA   94111

10

PRIVILEGED & CONFIDENTIAL – PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

Hoc group before JVT was formed.  Depo. Ex. 12 at 4.  After Garudadri's comment that Raveendran attended meetings of some video standards groups, she responded, "Yes.  I did not actively participate in JVT."  *Id.* at 3**.**  Leung understood this to mean she had attended meetings of MPEG or other groups, but not JVT, and as discussed below Raveendran confirmed in subsequent communications (and in sworn testimony) that she had not attended JVT meetings while H.264 was under development.  Leung Dec., ¶ 19.  Raveendran added in-house patent attorney Sandip ("Micky") Minhas to the email thread.  Depo. Ex. 12 at 1.  Myers forwarded those responses to Leung, and to Martin and other members of Qualcomm's in-house legal team.  *Id.* at 1; Leung Dec., ¶¶ 17-20**.**  None of the Qualcomm employees contacted acknowledged that they had attended a JVT meeting, or that any Qualcomm employee or consultant had done so before December 2003 -- even though several of them had personally attended such meetings or had seen written reports from other Qualcomm employees, and Qualcomm's consultant Jordan Isailovic, who attended such meetings.

On February 22, 2006, Leung circulated draft interrogatory responses to Qualcomm's in-house legal team, including Martin, Myers, Rogers and Rouse.  Depo. Ex. 13.  The substantive portion of the response to Interrogatory No. 13 -- by which Broadcom sought information concerning Qualcomm's "membership, participation, interaction, and/or involvement" (emphasis added) in setting video processing standards, including H.264 -- read as follows:

> Subject to and without waiving the general and specific objections set forth herein, QUALCOMM responds as follows.  [Confirm with Gail and the people identified in Ed Tiedemann's 2/7 e-mail (Scott Ludwin, Harinath Garudadri and Chong Lee) that QUALCOMM did not participate in setting any MPEG standards.]  QUALCOMM's investigation to date has produced no information responsive to this interrogatory.

*Id.* at 41 (highlighting in original).  In the transmittal email, Leung identified four facts that he "need[ed] to confirm with Gail [Myers] and the rest of the team," including: "(4) **Confirm** with Scott Ludwin, Harinath Garudadri and Chong Lee **that QUALCOMM did not participate in setting any MPEG standards**." [7]  *Id.* at 1.  (emphasis added).

---

[7] Leung's reference to "MPEG standards," included H.264 -- also known as MPEG-4 Part 10.  Leung Dec., ¶ 21.  Martin and others knew this, and Martin admitted at deposition that his statement -- "4 is almost certainly true (we had no participation)" -- "relates to our JVT

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

**PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

1   Within two minutes of receiving Leung's email, Martin responded as follows:

2   I can confirm 2 and 3 without further inquiry.  **4 is also almost
    certainly true (we had no participation)**.  1 is unclear.  We need
3   to ask.

4   Depo. Ex. 14 at 1  (emphasis added).  The same day, Myers wrote in an internal email not sent to

5   outside counsel, "**With regard to No. 4, I can take care of it**."  Depo. Ex. 15  (emphasis added).

6   A few minutes later, Myers sent another email asking several Qualcomm employees to "confirm

7   whether or not Qualcomm participated in setting any MPEG standards," in order to help respond

8   to Broadcom's discovery request.  Depo. Ex. 16 at 1.  In reply, Ludwin -- the head of

9   Qualcomm's Multimedia Development and Standardization Group -- stated:  "I believe Viji

10  Raveendran attended ISO meetings during the days when this IP was developed.  Participation in

11  ISO/MPEG meetings from my group has only been during the past 3 years in a monitoring

12  capacity...."  Depo. Ex. 16 at 1**.**  Ludwin copied Raveendran and Chris Irvine (who had been

13  Raveendran's supervisor in the Digital Cinema group) on his email.  *Id.*

14      In response to Ludwin's statement, Raveendran stated "This is true.  However, my

15  participation was limited to monitoring the Digital Cinema Adhoc group under MPEG.  We (QC)

16  did not participate in any standardization activity in MPEG."  Depo. Ex. 17 at 1.  She did not

17  disclose that she attended a JVT meeting in Klagenfurt Austria in July 2002, while H.264 was

18  being developed, or that her colleagues Amnon Silberger and Jay Yun (both Digital Cinema

19  engineers) had attended meetings in Fairfax, Virginia in May 2002 and Awaji Island, Japan in

20  December 2002, and reported back by email on topics including H.264.  *See* § II.E.3, below.  Nor

21  did she disclose that, as part of her efforts to monitor JVT, she had personally compared H.264 to

22  Qualcomm's intellectual property rights in the 2002-2003 time period.  *See* § II.E.5, below.  But

23  Raveendran remembered those comparisons in 2006:  After emailing Irvine (and copying

24  everyone else on the chain) that the inquiry concerned H.264, Raveendran emailed Irvine alone,

25  without copying Myers or anyone else, to say "2 of our ABSDCT patents have an earlier date and

26  overlap with H.264.  This is to Qualcomm's advantage in the lawsuit."  Depo. Ex. 122 at 1

27  ───────────────────────────────────

28  participation."  Martin Depo. at 158:17-159:7.  *See also* Depo. Ex. 148 (Raveendran to Irvine and
    others:  "This is in regard to H.264/AVC standardization work…").

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

(emphasis added).  Raveendran knew this because of the comparisons that she had done in 2002 and 2003.  Raveendran Depo. at 89:5-91:4.

Irvine responded that Qualcomm "participated in standardization meetings in Australia & in Arizona in 2001."  Depo. Ex. 18 at 1.  Those were meetings of the Digital Cinema Adhoc group; they preceded creation of JVT and were not relevant to H.264 meetings.  *See id.*  Irvine asked:  "What specifically is being contested so that we can ascertain whether we were involved?"  *Id.*  Raveendran responded:  "This is in regard to H.264/AVC standardization work (which started in Dec 2001)."  *Id.*  Irvine did not reply or identify any involvement in that work, even though the Digital Cinema group that she supervised, and its consultant Jordan Isailovic, had attended and reported by email to her on several JVT meetings while H.264 was being developed.

Myers forwarded all of these incomplete and misleading responses to Leung and Mammen, sending copies to several in-house attorneys including Martin and Rouse.  *E.g.*, Depo. Exs. 17, 18.  By late February 2006 **employees in three different areas of Qualcomm had informed Responding Attorneys that Qualcomm had no involvement in JVT while H.264 was being developed:**  (1) In-house counsel, including Martin, who expressly stated "we had no participation," and others, like Rouse and Minhas, who said nothing despite their own personal roles in monitoring JVT and comparing Qualcomm's IPR to the emerging H.264 standard; (2) Qualcomm's Standards group, including Tiedemann, Garudadri, and Ludwin; and (3) Irvine and Raveendran, engineers from Qualcomm's Digital Cinema group, whom several people had identified as likely to know about any relevant standardization activity.  Responding Attorneys relied, and believed that they could rely, on information provided so consistently by so many individuals.  Batchelder Dec., ¶¶ 27-29; Mammen Dec., ¶¶ 28-31; Leung Dec., ¶¶ 15-27.[8]

### 2.   Inquiries during preparation for depositions.

The next phase of Responding Attorneys' inquiry into standards-setting activity came in the summer of 2006, when Responding Attorneys were preparing witnesses for deposition, including various 30(b)(6) depositions.  Qualcomm typically selected the individuals who would

---

[8] Leung also learned that Chong Lee, the named inventor of the patents-in-suit, had left Qualcomm in 1995 for approximately eight years, and that neither he nor his co-inventor had participated in JVT.  Leung Dec., ¶ 28; Ex. Cialone-206.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

testify as persons most knowledgeable, though sometimes outside counsel would identify possible candidates for consideration by Qualcomm based on information previously communicated to them.  Mammen Dec., ¶ 35; Leung Dec., ¶ 29.  Thus, on June 5, 2006, Leung emailed Martin and others regarding Broadcom's 30(b)(6) notice.  Ex. Cialone-207.  He summarized one topic as "Qualcomm's participation in MPEG" and commented "we need to identify a witness (Chris Irvine?)."  *Id.*  In response, Martin wrote "I think Chris has the right knowledge, but I don't know one way or other whether she's a good witness.  Maybe worth giving her a phone call."  *Id.*  Later, on June 16, Leung again emailed Martin regarding 30(b)(6) depositions.  Depo. Ex. 177.  On the two standards-related topics -- the "attendance or participation by any Qualcomm principal, employee, or representative at any H.264 standards committee meetings" and "Qualcomm's knowledge regarding the development of and promulgation of the H.264 standard, and any actions taken by Qualcomm… as a result of such knowledge" -- Leung suggested "either Chris Irvine or Chong Lee (or both)."  *Id.*  Martin responded:  "Let's [] designate Chris Irvine for the standards-related stuff.  I don't think Chong Lee ever participated in the standards stuff?  I think he was at another company during the time that H.264 was being developed?"  *Id.* [9]

On June 20, 2006, Kevin Leung sent an email to Glathe identifying the "PMKs scheduled for deposition next week," including Irvine.  Irvine was set to testify on a technical issue (QDEC1000 products), but as Leung noted, she had also "been identified as the 30(b)(6) witness for Topics 10 and 11 of Notice No. 1 (QUALCOMM's attendance at H.264 standard meetings and knowledge about the H.264 standard).  **We need to collect Chris' files on the h.264 standard.**"  Depo. Ex. 21  (emphasis added).  Glathe and Drew Laxamana, another Qualcomm paralegal, then called Leung and informed him that collecting from an individual's files for a 30(b)(6) corporate witness was not consistent with Qualcomm's policies.  Leung Dec., ¶ 30.

---

[9] These emails contradict the implicit suggestion in Glathe's Declaration that selecting witnesses was the responsibility of outside counsel.  *See* Depo. Ex. 8, ¶¶ 2-3.  In the same vein, on May 31, Laxamana emailed Myers and other paralegals with three names that he stated could be used as "PMKs" for various technical issues, and asked "Are we supposed to ask and/or notify these people that we are offering their names as such?  Please let me know."  Ex. Cialone-208.  As for outside counsel's role, Laxamana merely asked Myers, "If these names are okay, can someone forward them to Kevin [Leung]."  In response, Myers replied, "[n]ormally, we have our **in-house counsel** weigh in on this -- I think it best to have Roger [Martin] and/or Byron [Yafuso] take a look and maybe even interview them before we identify as PMKs."  *Id.*  (emphasis added).

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9    4111

**PRIVILEGED & CONFIDENTIAL – PRODUCTION AND USE**
**GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

1   Qualcomm's policy on document collections for 30(b)(6) topics was to identify a "corporate

2   repository," or central custodian, for any category of documents, and collecting from an

3   individual 30(b)(6) witness **would merely be cumulative**. *Id.*

4   After consulting with Mammen, Leung accepted this approach for several reasons. He

5   knew that Qualcomm maintained control over much of the discovery process internally.

6   Qualcomm assured him that this approach of looking to a central repository had worked

7   successfully in other litigation. And, finally, Irvine had previously indicated that neither she, nor

8   anyone else at Qualcomm that she knew of, had any involvement with JVT or the development of

9   H.264, and thus Leung believed that she was not likely to have any documents responsive to

10  Broadcom's 30(b)(6) notice. Mammen Dec., ¶¶ 36-37; Leung Dec., ¶ 31.

11  Leung confirmed his conversation with Glathe and Laxamana with an email stating that

12  "We will proceed with the CM [Qualcomm's Configuration Management group]/corporate

13  repository document collection method for the 30(b)(6) witnesses in the 1958 case. Along those

14  lines, what is the corporate repository for QUALCOMM's interactions with the H.264 standards

15  body (Chris Irvine's files)?" Depo. Ex. 22**.** Later that day, Leung emailed the "QC-Broadcom

16  internal scan list" confirming this approach, and confirming that it was dictated by Qualcomm

17  policy and would assure the retrieval of any responsive documents from a corporate repository:

18  > In preparation for defending the depositions of the QUALCOMM
19  > [30(b)(6)] witnesses, I would like to make clear the procedure
>   > undertaken to collect documents in the 1958 case.

20  > **QUALCOMM's internal team (Gail, Christine, Drew)**
21  > **determines the most reliable and complete source for**
>   > **documents and collects from that source.** [This was consistent
22  > with the procedure specified in Qualcomm's Overview of document
>   > collection, Depo. Ex. 6.] Even if there are multiple sources, they
>   > only collect from the best source. **For instance, they collected**
23  > **technical documents relating to the QUALCOMM products**
>   > **that practice the PIS from their internal Configuration**
24  > **Management database and NOT from the persons most**
>   > **knowledgeable that we designated as 30(b)(6) witnesses.** … [A]s
25  > **to these individuals, it was determined that anything responsive**
>   > **in their possession would be cumulative of documents otherwise**
26  > **collected and produced.**

27  > **This was the procedure that QUALCOMM used in the ITC**
>   > **case and it did not lead to any problems at depositions.** …

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

**PRIVILEGED & CONFIDENTIAL – PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

Depo. Ex. 45 (emphasis added); *see* Mammen Dec., ¶ 37; Leung Dec., ¶¶ 32-33.   Qualcomm's in-house team received this email as well:  Qualcomm produced multiple copies of this email from the files of its paralegals, including one from Laxamana bearing his handwritten notes.  *See* Depo. Ex. 44, Laxamana Depo. at 104:8-18.  No Qualcomm paralegal disputed the accuracy of Leung's email summarizing what he had been told was the most effective way to locate responsive documents.

The approach dictated by Qualcomm, of searching for documents from a central repository might have worked but for one important problem:  the Qualcomm paralegals did not search the "Livelink" archive established in 2002 by Qualcomm's Digital Cinema engineering group.  This omission presumably resulted because neither Raveendran, Irvine, nor any of the other Qualcomm engineers who created and populated that archive -- which included a specific "JVT" sub-directory -- disclosed its existence to Qualcomm's in-house paralegals or outside counsel.  However, the Qualcomm emails from 2002 reveal the facts about this JVT archive, including the roles of Raveendran and others in creating it.  *See* Depo. Ex. 88 (May 13, 2002: Yun suggests creating directory on "Livelink" for JVT Committee Draft and other documents); Depo. Ex. 89 (May 14, 2002: Silberger states that he has created directory, "with the appropriate sub-directories for MPEG, JVT, JPEG etc."); Depo. Ex. 90 (May 14, 2002:  Raveendran separately instructs a colleague to "make the following dirs:  MPEG, JVT, JPEG, under QDM  -> Digital Cinema -> DC Regulatory Standards on livelink…").  Qualcomm's disclosure of that archive would have revealed that certain Qualcomm engineers, including those who disclaimed any interest in JVT and H.264, were deeply involved in monitoring the work of JVT, attending JVT meetings, and determining whether Qualcomm's IPR was relevant to the emerging standard.

Not being aware that the Digital Cinema engineers had an archive of JVT-related documents from 2002, Laxamana instead contacted Lisa Collichio, Qualcomm's Standards Librarian (seemingly a logical choice), and asked her to "identify the custodian or location of docs (e.g. communications, contributions, interactions) relating to the H.264 Standard/Standards body."  Depo. Ex. 186 at 3.  Collichio forwarded this message to Hari Garudadri, who in turn forwarded the inquiry to Qualcomm engineer Phoom Sagetong, and instructed him to "Point

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

16

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

[Laxamana] to the location on baggage **[a server dedicated to documents regarding standards setting bodies]**." *Id.* at 2.[10]  As a result of this inquiry, Qualcomm located about 400,000 pages of documents that Sagetong had downloaded from JVT's public archive.   Leung Dec., ¶ 34. These documents reflected Qualcomm's involvement in JVT from September 2003 and later. The fact that Qualcomm located these documents led Leung to believe that searching the "central repository" had worked; what he did not know (and had no way of knowing) was that Qualcomm employees had missed the key "Livelink" directory.  *Id.,* ¶ 36.

Leung could not review these documents before Irvine's deposition, because Qualcomm had not provided them yet and because he could not download them from the public archive in any format that would enable him to search the documents without opening each one manually. *Id.,* ¶ 35.  He knew only that it was a very large quantity of documents, pulled from JVT's public archive.  *Id.*  He therefore could not use those documents to prepare Irvine for deposition. [11]

Leung met with Irvine on July 10, 2006 to prepare for her deposition, which was set for the following day.  *Id.,* ¶ 37.  The meeting lasted most of the day, but part of it was dedicated to discussing the technical issues on which Irvine had been designated to testify, and as to which she demonstrated detailed knowledge.   *Id.*  By this time, Leung had already communicated, directly and through Qualcomm's paralegals, with several Qualcomm employees who uniformly informed him that Qualcomm had not been involved in JVT before H.264 was published.  *Id.*  Irvine confirmed this information during her preparation session, telling Leung that neither she nor anyone else she knew at Qualcomm was ever involved with JVT.  *Id.*  She further stated that Qualcomm's Digital Cinema Group did not attend JVT meetings because the Digital Cinema Group was resource-constrained and not interested in small-device applications.  *Id.*

---

[10] At deposition in these remand proceedings, Ludwin -- the leader of Qualcomm's standards team from 2005 through 2008 (Ludwin Depo. at 29:6-31:7) -- testified that he also would look on the "baggage" server if he "wanted to find reports on standard setting groups that were prepared by the Digital Cinema group."  Ludwin Depo. at 44:21-45:4; Ex. Zeldin-G.

[11] When Leung learned about these documents, he informed Broadcom about them, relating his understanding that they had been downloaded from the public JVT archive.  Leung asked Broadcom to postpone Irvine's deposition so that he could obtain and search the documents. Broadcom refused, apparently because Irvine's deposition had already been postponed to accommodate her schedule.  *Id.*

Case No.
05CV1958-B (BLM)                 RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

Shortly before their July 10 meeting, Irvine had told Leung, in a telephone conversation on July 5, 2006, that Raveendran may have been involved in H.264. Leung Dec., ¶ 38; Ex. Cialone-209. Although Raveendran and others had repeatedly denied that Qualcomm had any such involvement, Leung and Irvine called Raveendran to ask whether she had been involved in H.264 or JVT, and she confirmed that she had not been. Leung Dec., ¶ 38.[12]

During the July 10, 2006 meeting, Irvine did not tell Leung about Jordan Isailovic -- the "consultant" that Qualcomm had contracted to "[a]ttend and participat[e] in ITU JVT meeting[s]" -- even though Irvine had sent or received at least 126 emails to or from Isailovic. *Id.,* ¶¶ 37-40; Ex. Cialone-200; *see* Depo. Ex. 56 (email with Qualcomm/Isailovic contracts and extensions). She did not tell him that three engineers who had worked under her supervision -- Raveendran, Yun, and Silberger -- attended numerous JVT meetings in 2002 at locations around the world and reported back in writing. Nor did she tell him that Raveendran had realized the potential connection between Qualcomm's patents and H.264 in 2002 or 2003, and reported that discovery to Irvine, Garudadri, and Qualcomm in-house counsel. Leung Dec., ¶ 40; *see* § II.E.5., below. Nor did Raveendran disclose, during the telephone call on July 10 or at any other time until after trial, her own attendance at JVT meetings in Austria, her own efforts to monitor JVT, her comparisons of H.264 to Qualcomm's patents, or the 118 emails that she received from or sent to Isailovic (Ex. Cialone-200). Leung Dec., ¶ 40; *see* § II.E.1., below.

**3. Information learned at depositions of Qualcomm employees and in follow-up inquiries.**

Irvine's deposition testimony further confirmed to Responding Attorneys that Qualcomm did not participate in JVT during the relevant timeframe. Irvine testified that she did not "know of anybody that was doing anything with [JVT]," and that she did not even know of anyone at

---

[12] While Irvine does not remember this conversation in 2006, she does remember that, at the time of her deposition in 2006, she did not think that Raveendran had done anything with JVT. Irvine Depo. at 98:18-99:1. Nor does she remember telling Leung that Raveendran may have been involved in H.264, although on this point she was somewhat equivocal. *Id.* at 93:19-94:7 ("I don't know that I specifically said she was or wasn't [involved]."); *see also id.* at 26:3-16 ("I don't know what you mean by Viji may have been involved in H.264. … You asked me to conjecture that if someone had asked me if Viji was involved, to try to put my brain back into what I would have remembered the word 'involved' would mean in 2006? I just -- I can't get there.").

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

Qualcomm to whom she could talk to if she wanted to know about JVT's work in 2003 or later. 2006 Irvine Depo. at 117:10-17. She testified that neither she nor anyone else at Qualcomm did anything in response to learning that the H.264 standard was in development, that no one at Qualcomm sought to become involved in that development, and that no one at Qualcomm attended any JVT meetings. *Id.* at 39:23-40:18. As discussed in greater detail below, none of this was true -- not even for the period before May 2003, when JVT was developing H.264.

Irvine was impeached at her deposition with documents showing that Qualcomm had attended JVT meetings in September 2003 and thereafter. Those documents were from the public JVT archive that Leung had identified for Broadcom, and were also part of the mass of documents located on Qualcomm's "baggage" server that Qualcomm was preparing to produce. Leung Dec., ¶ 41. All of that evidence, however, concerned JVT meetings that occurred after H.264 had been finalized. Moreover, those meetings, in late 2003 and in 2005, took place long after Irvine's Digital Cinema group had disbanded, as Leung knew at the time. *Id.* None of the people identified at Irvine's deposition as having attended JVT meetings -- Sagetong, Reznik, Yan Ye , and Yiliang Bao -- had been members of Irvine's Digital Cinema group; in fact, Irvine did not even know who they were. 2006 Irvine Depo. at 82:6-9, 83:2-11.

Leung followed up on this information by conducting a further investigation at Qualcomm.[13] Leung did not demand that Qualcomm search Irvine's computer for JVT-related documents as part of that follow-up for two reasons. First, Irvine had repeatedly stated, and had now testified under oath, that she and the Digital Cinema group had not been interested or involved in JVT or H.264. Leung had no reason to doubt that testimony, which had been confirmed by a number of sources including Martin, Raveendran, and Tiedemann, and which was not contradicted by the new information revealed at Irvine's deposition. Leung Dec., ¶ 42. Second, Leung believed it was reasonable that Irvine did not know about JVT participation by people from a different part of the company, whom she did not know, and that occurred long after

---

[13] As noted above, in February 2006 Garudadri had mentioned that Sagetong began attending JVT meetings in December 2003 and Reznik began attending in April 2005. Leung had either overlooked that information or forgotten it by July 2006, so he treated it as new information requiring follow-up, which he did. Leung Dec., ¶ 17.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1    her Digital Cinema group disbanded.  *Id.*  Leung did not have any reason to disbelieve her

2    claimed ignorance, or to think that she might have documents relating to JVT.  *Id.*  Instead, Leung

3    (working with Lee Patch) followed up by examining and producing the documents recently

4    located on the "baggage" server; by interviewing the people whom they now knew had

5    participated in JVT, such as Sagetong; by producing those people for deposition; by asking

6    Qualcomm to collect documents from those people; and by identifying Scott Ludwin as a

7    replacement 30(b)(6) witness on the subject of JVT participation.

8         In the weeks following the Irvine deposition, Leung and/or Patch interviewed Bao,

9    Sagetong, Reznik, and Ye about their JVT participation.  *Id.*, ¶ 43.  In addition, a copy of the

10   Document Collection chart dated July 24, 2006 bears a note in Laxamana's writing, next to Item

11   29 ("Qualcomm's participation in Standards Bodies"), indicating the need to collect documents

12   from "Yan Ye, Yilang Bao, Yuri [Reznik] Re: Recent JVT Participation."  Ex. Cialone-210.  On

13   July 28, 2006, Leung emailed Glathe and asked her to collect all documents regarding H.264,

14   JVT, MPEG, and any other video standards group from Bao, Sagetong, and Reznik.  Ex. Cialone-

15   211.  On August 9, 2006, Patch asked Glathe to "initiate a collection of emails from Yiliang

16   [Bao] relating to JVT and the two patents in suit.  From my conversations with him I understand

17   that some of this material exists."  In response, Glathe stated that Qualcomm had already done "a

18   complete collection from Yiliang consisting of docs, emails and attachments re JVT," probably in

19   response to Leung's earlier request.  Ex. Cialone-212.  A few weeks later, Qualcomm employee

20   Barbara Agnihotri (whose title at the time was "Manager, IP Administration") informed Leung

21   that Sagetong had "confirmed on August 16, 2006 via email that he has provided us all

22   documents concerning participation by Qualcomm to JVT, including, email, correspondence, and

23   drafts."  Ex. Cialone-213.  As a result of all of these collections and communications, Leung

24   believed that Qualcomm had collected and was producing all responsive documents relating to

25   JVT.  Leung Dec., ¶ 43; *see also* Batchelder Dec., ¶¶ 30-31; Mammen Dec., ¶ 38.  Leung also

26   knew that the Qualcomm employees who had actually attended JVT meetings had been deposed,

27   or were about to be deposed, so that Broadcom could question them regarding their involvement

28   in JVT.  Ex. Cialone-214.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

During the same period following Irvine's deposition, Lee Patch contacted Kent Baker, another in-house Qualcomm attorney, to follow-up on the issue of Qualcomm's participation in JVT. Ex. Cialone-215 (July 21, 2006 email from Patch to Baker, copied to Batchelder). Baker provided information concerning JVT and identified "the individuals within Qualcomm who may be able to shed further light upon this inquiry." Patch's email further stated that "[w]e also need to understand any other involvement that Qualcomm may have had in the H.264 efforts at JVT." Patch then interviewed Garudadri, Raveendran, and in-house attorney Tom Rouse, the people identified by Baker. Leung Dec., ¶ 44. The information he received was consistent with what Responding Attorneys understood from the Irvine deposition and the recently produced public archive: That Qualcomm attended JVT meetings in late 2003 and afterwards, but that Qualcomm did not attend any JVT meetings or have any other involvement with JVT while H.264 was under development. Batchelder Dec., ¶ 31; Leung Dec., ¶ 44.

On August 6, 2006, Leung suggested that Qualcomm produce Ludwin as "a 30(b)(6) witness on JVT participation." *Id.* Ludwin was the head of Qualcomm's Multimedia Development and Standardization Group and the person responsible for assigning "which QUALCOMM employees attend which international standards organizations." 30(b)(6) 2006 Ludwin Depo. at 13:1-23. Leung proposed Ludwin based on information he learned in follow-up inquiries discussed above and in preparing Ludwin for his individual deposition, including the fact that Sagetong, Bao, and Reznik were all part of his group. Leung Dec., ¶ 45.

Ludwin's 30(b)(6) deposition testimony and information discussed during his preparation further confirmed to Leung that Qualcomm had not participated in JVT while H.264 was being developed. During preparation for deposition, Leung and Ludwin called Irvine, who stated that the Digital Cinema Group had ignored JVT. Leung Dec., ¶ 46. Ludwin, like Leung, believed it was appropriate to rely on Irvine because she had been the head of the Digital Cinema group while H.264 was under development. Ludwin Depo. at 10:19-11:17.

At his deposition in these remand proceedings, Ludwin initially denied Irvine had told him that Qualcomm's Digital Cinema group had "specifically ignored" JVT during the course of his preparation for his 30(b)(6) deposition. Ludwin Depo. at 13:8-17. However, Ludwin's

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

1   October 2007 Declaration contradicted that denial:  "My deposition testimony to the effect that

2   the Digital Cinema group had 'specifically ignored' the work of JVT was based on a very brief

3   conversation with Chris Irvine during my deposition preparation."  Depo. Ex. 110, ¶ 11.  When

4   confronted with this Declaration, Ludwin reluctantly admitted Irvine told him that Digital Cinema

5   was not interested in JVT during his deposition preparation, and also in numerous conversations

6   over the years.  Ludwin Depo. at 12:21-15:3.

7        At his 30(b)(6) deposition in 2006, Ludwin testified that Qualcomm's supplemental

8   interrogatory responses contained "a complete list of all JVT and VCEG meetings attended by

9   any Qualcomm employee" except for some minor (and, here, irrelevant) corrections.  30(b)(6)

10  2006 Ludwin Depo. at 27:23-31:22.  In fact, Leung had reviewed those responses with Ludwin

11  during the preparation for Ludwin's 30(b)(6) deposition, to verify that the list was complete.

12  Ludwin Depo. at 36:6-38:12.[14]  Those responses, which were based on information from Ludwin,

13  indicate that Qualcomm started attending JVT meetings in December 2003 -- seven months after

14  the H.264 standard was finalized and published.  Leung Dec., ¶ 43.

15       Ludwin's 30(b)(6) testimony in 2006 also addressed the issue of why Responding

16  Attorneys could not identify who from Qualcomm, if anyone, had attended the September 2003

17  JVT meetings in San Diego.  At the Irvine deposition, Broadcom introduced minutes from those

18  meetings showing that Qualcomm sponsored a harbor cruise, and that a Qualcomm representative

19  had commented on a change to the JVT specification.  2006 Irvine Depo. at 35:11-36:9; Ex.

20  Cialone-216 ("Qualcomm and Motorola expressed opposition to alteration of the definition of the

21  existing level 1.")  Leung and Patch followed up on this, but everyone to whom they spoke

---

22  [14] Ludwin averred in his October 2007 Declaration that he "did not review any of Qualcomm's
23  discovery responses" in preparing for his 30(b)(6) deposition.  *See* Depo. Ex. 110, ¶ 7(b).
    Incredibly, Ludwin claims that he did not realize that interrogatory responses constituted
24  discovery responses.  Ludwin Depo. 112:21-114:19 ("[My Declaration] was accurate at the time
    of what I understood to be Qualcomm's discovery responses. … As I sit here today, I know that
25  the phrase 'Qualcomm's discovery responses' refers to the Qualcomm interrogatory responses,
    the two pages that I did see during my 16th of August deposition preparation meeting.").
26  Similarly, the fact that Ludwin spoke to Irvine as part of the preparation for his 30(b)(6)
    deposition contradicts the claim in his Declaration, that "no one from Qualcomm participated in
27  the preparation for [that] deposition".  *See* Depo. Ex. 110, ¶5.  Ludwin attempts to rationalize this
    misstatement by claiming that he meant to say "that no one **from Qualcomm legal** participated in
28  the preparation" for his deposition.  Ludwin Depo. at 94:5-99:2 (emphasis added).

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

affirmatively stated that they were unaware of any Qualcomm employee attending that meeting -- including Sagetong, who was hired in late 2003 for duties that included monitoring JVT meetings; Ludwin, whose duties included approving proposed attendance at standards meetings; and Garudadri, who as they learned after trial was the Qualcomm employee who attended Batchelder Dec., ¶ 34; Leung Dec., ¶¶ 18, 47.  At his 30(b)(6) deposition, Ludwin offered the following explanations for the reference to Qualcomm in the September 2003 JVT minutes:

> So there is a number of explanations on why that could be indicated.  They could have -- could be a typographical error, could have misrecognized somebody as a Qualcomm employee who in fact was not.  Traditionally, these meeting reports quite often at least from other standards organizations -- again, I've never attended these, but will also have an attendance record, and I find -- I've found even in official meeting reports that occasionally those attendance records are incorrect as well.  So there is many explanations.

30(b)(6) 2006 Ludwin Depo. at 62:2-24; see Leung Dec., ¶ 47.

During the Ludwin deposition, Broadcom presented a document showing that Raveendran's email address was listed as one of the 179 subscribers to the "avc_ce" reflector.  See Ex. Cialone-236.  Once again, this new information triggered an investigation by Responding Attorneys, who spoke at length with Raveendran about this.  Leung Dec., ¶ 48.  Raveendran represented that she had not added her name to the list, and stated that she recognized some of the names on the list from her work with the Digital Cinema ad hoc group.  She stated that she believed someone from that group had added her name to the reflector, probably because of her reputation as a "golden-eye" -- someone adept at spotting quality differences in video samples.  Raveendran made those statements to Patch, who informed the team of them and also gave his view that Raveendran seemed credible, straightforward, and honest.  Batchelder Dec., ¶ 32; Mammen Dec., ¶ 48.  Raveendran provided similar information to Heller Ehrman attorney Kyle Robertson in an interview focused on this exact issue during the summary judgment phase of the litigation, information that Robertson circulated to Leung and Batchelder, among others.  Depo. Ex. 199; Ex. Cialone-217; Batchelder Dec., ¶ 33.

### 4.    Information learned in third-party and expert discovery.

Responding Attorneys received further confirmation that Qualcomm did not participate in JVT while H.264 was under development through third-party and expert discovery.  In August

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

23

1   2006, Qualcomm deposed Gary Sullivan, the chair of JVT.  Sullivan confirmed that he had never

2   seen a Qualcomm representative at a JVT meeting while H.264 was under development.  He also

3   confirmed that JVT kept attendance lists, which would show if any Qualcomm representatives

4   attended meetings.  Batchelder Dec., ¶ 37; Mammen Dec., ¶ 41; Ex. Cialone-218 at 1-2 (cover

5   email) and 74:19-75:16, 82:19-83:15 (rough transcript of Sullivan).

6        On August 10, 2006, Broadcom served the report of its expert, Cliff Reader.  According to

7   that report, Reader had personally participated in JVT as an Invited Expert since 2002.  Ex.

8   Cialone-219 at 4.  He subscribed to a JVT email reflector, and he attended three JVT meetings in

9   2002 -- in Klagenfurt, Austria; in Geneva,; and in Awaji Island, Japan.  *Id.*  He "read all of the

10  contributions and sections of meeting reports related to the major coding tools of H.264."  *Id.*

11  Reader listed all 20 JVT meetings, and noted that the proceedings "were reported in detailed

12  meeting reports."  *Id.* at 12.  Reader further noted that JVT completed its work on the final draft

13  of H.264 in May 2003; later projects such as Scalable Video Coding dealt with extensions and

14  enhancements of H.264 that were not relevant to Qualcomm's claims.  *Id.* at 13; Mammen Dec.,

15  ¶ 23.  Reader testified at deposition that Qualcomm had "no influence or effect on the technical

16  content of the H.264 standard prior to its publication in May 2003."  Reader Depo. at 67:5-14.

17       Reader's report included a section titled "Qualcomm's Participation in the JVT."  *Id.* at

18  17-20.  He stated that Qualcomm attended the September 2003 JVT meeting, based entirely on

19  the single line in the minutes of that which reads "Qualcomm and Motorola expressed opposition

20  to alternation of the existing level 1."  *Id.* at 17.  He then identified other meetings that Qualcomm

21  employees attended, one in December 2003 and the rest in 2005 or 2006.  *Id.*  Thus, based on all

22  of the information available to him, including personal participation in JVT and review of JVT

23  meeting minutes, Broadcom's expert did not identify any Qualcomm participation in JVT beyond

24  that which was already known to Responding Attorneys -- none of which was during

25  development of H.264.  This, too, confirmed to Responding Attorneys that the information

26  consistently conveyed by their client was accurate.  Batchelder Dec., ¶ 36; Mammen Dec., ¶ 42.

27       **5.   Further inquiries later in the litigation.**

28       During the summary judgment phase of the 1958 Case, Heller Ehrman -- who by that time

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

**PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

had taken over the opposition to Broadcom's waiver defense -- again interviewed Raveendran regarding Qualcomm's participation in JVT.    Heller largely relied on Day Casebeer's investigation, and on the testimony and other statements from Qualcomm employees. Nevertheless, in November 2006, Kyle Robertson of Heller interviewed Raveendran and asked her about the documents listing her email address on a reflector, because that question was not addressed in her deposition.  Depo. Ex. 199.  As before, Raveendran stated that she believed someone else had put her name on this list.  *Id..*  Raveendran also told Robertson that she never read the '104 patent, or even a draft of the patent, and that she did not read the H.264 standard until 2004.  *Id.*  Robertson summarized all of this information in an email sent to Responding Attorneys and several Qualcomm in-house attorneys.  *Id.*; Batchelder Dec., ¶ 33; Mammen Dec., ¶ 43; Ex. Cialone-217; Depo. Ex. 199.

In December 2006, Patch emailed Glathe and asked to interview Qualcomm employee Marta Karczewicz.  Exs. Cialone-220, 221.  Patch had learned that Karciewicz attended a number of JVT meetings while H.264 was under development, when she was employed by Nokia. Karciewicz was on vacation in December, but Patch spoke to her in early January, 2007.  She, too, confirmed she was not aware of any Qualcomm participation in JVT during H264 formation, information that Patch conveyed to the attorneys on the trial team.  Batchelder Dec., ¶ 38.

On January 3, 2007, shortly before trial started, Mammen interviewed Garudadri regarding several issues, including Qualcomm's participation in JVT.   Mammen Dec., ¶ 44. Garudadri was Reznik's supervisor in July 2005, when Reznik -- then a new employee at Qualcomm -- informed Garudadri that he believed Qualcomm had patents relevant to H.264.  The issue of when Qualcomm first made a connection between its patents and H.264 had become important, because if Qualcomm made that connection before Qualcomm employees began attending meetings -- attendance that, as far as Mammen knew, began only in late 2003, after H.264 was published -- then Qualcomm had, or arguably had, an obligation to disclose the patents to JVT once it started participating.  As reflected in Mammen's notes, Garudadri confirmed that Reznik "mentioned possible QC IPR on H.264" in July 2005 at a "casual lunch conversation." *Id.*, ¶ 46; Ex. Cialone-222 at DC80009552.  Garudadri had been "looking at H.264 himself," and

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

25

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1   had a stack of digital cinema patents that in-house attorney Tom Rouse had provided.  *Id.* at

2   DC80009551.  He gave these to Reznik, who identified the '767 patent as being relevant to

3   H.264.  *Id.* at DC80009552.

4        Garudadri told Mammen that Qualcomm had previously evaluated H.264, in the 2002-

5   2003 timeframe -- but this was not to determine if Qualcomm had patents that were relevant to

6   the H.264 standard, but simply part of Qualcomm's broader effort to evaluate various video

7   "codecs" (coder/decoder software) in order to determine which to use for future Qualcomm

8   products.  Mammen Dec., ¶ 47.  Indeed, as reflected in Mammen's notes of the interview,

9   Garudadri told him:

    before 2005, [Qualcomm]
10
            **-- did not participate**
11          **-- not actively monitoring it**
            -- were aware of it generally
12          **-- didn't send anyone to meetings**
13

14   Ex. Cialone-222 at DC0009552 (emphasis added)  Garudadri did not reveal, among other things,

15   that he personally attended JVT meetings before 2005.  Mammen Dec., ¶¶ 46-47, 50.

16        The next day, January 4, 2007, Mammen sent follow-up questions to Garudadri, through

17   Qualcomm paralegal Stella Hernandez.  First, Mammen asked, "Regarding his investigation of

18   H.264 circa 2002-2003 -- for what purpose was he looking into H.264?"  Depo. Ex. 42.

19   Garudadri responded, "We were evaluating various video codec solutions for broadcast video on

20   Forward Link Only air interfaces."  *Id.*  But at his deposition in this remand proceeding,

21   Garudadri admitted that he had "two purposes" in looking into H.264 in 2002-2003:  One was

22   technical, to evaluate video codec solutions, but the other was to assist people at Qualcomm in

23   determining what IPR Qualcomm had in H.264.  Garudadri Depo. at 179:5-182:7.  And yet,

24   Garudadri said nothing about this second purpose in his response to Mammen's written questions,

25   or in their interview the day before.  Depo. Ex. 42; Mammen Dec., ¶ 48.

26        Mammen also asked "did [Garudadri] specifically compare H.264 to QUALCOMM's

27   IPR?."  Depo. Ex. 42.  Garudadri responded "No."  *Id.*  Mammen asked, "did he specifically

28   compare H.264 to the '767 or '104 patents?  Why or why not?", and Garudadri responded "No.  I

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

26

am not an H.264 expert." *Id.* Once again, these answers were misleading: Garudadri admitted at deposition that he helped others make those comparisons in 2002-2003, and the documents discovered after trial show that he specifically requested Qualcomm's ABSDCT patents -- including the '767 and '104 patents -- in order to compare them to H.264. Garudadri Depo. at 180:12-181:18; Depo. Exs. 135, 149.

### 6. Discovery of emails on Raveendran computer.

On Sunday, January 14, 2007, as trial was in progress and Raveendran was being prepared to testify, Responding Attorney Adam Bier discovered 21 emails on Raveendran's laptop that she had received from the avc_ce reflector. Bier immediately printed them and gave them to Patch and Mammen; this occurred at approximately 9:00 p.m. Patch Depo. at 30:11-15; *see* Mammen Dec., ¶ 53. Patch has testified that he gave Batchelder a "brief heads-up," telling him that they had discovered some "JVT-related documents" on Raveendran's computer and he was looking into it. Patch Depo. at 32:8-37:21. According to Patch, the conversation lasted less than one minute, and Patch did not say that the documents were emails or that they came from the avc_ce reflector. *Id.* at 37:5-21. Mammen also reported the discovery to Batchelder, again without saying the documents were emails. Batchelder Dec., ¶ 40; Mammen Dec., ¶ 53. Batchelder was preparing to cross-examine Broadcom's Chairman of the Board (Henry Samueli) and Broadcom's only expert on infringement or validity of the patents-in-suit (Ramchandran), and thus did not have time to address the issue himself. He therefore directed Mammen to work with Patch to determine whether the documents should be produced. Batchelder Dec., ¶¶ 41-42.

Mammen was aware that Raveendran had previously stated that she did not sign herself up to the reflector, and that she had repeated the same thing to Patch that evening. Mammen Dec., ¶ 54. He also believed, based on everything Raveendran and others had said since the outset of the litigation, that Qualcomm did not participate in or even monitor JVT before December 2003. *Id.* In fact, Mammen had spent approximately one hour in a meeting with Raveendran earlier that week, during which Raveendran confirmed that, once the standards organizations decided to focus on video compression for handheld devices -- the purpose of H.264 -- Raveendran and Qualcomm's Digital Cinema group lost interest (because their very

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

different focus was on movie theater quality images) and stopped following that standardization work. *Id.*, ¶ 52.

Mammen reviewed all of the emails that Bier had printed to determine if they were within Qualcomm's production obligations. *Id.*, ¶ 53. He also reviewed Broadcom's document requests and Qualcomm's responses, in which Qualcomm had agreed to produce documents "that were given to or received by the standards-setting body responsible for [H.264], and which concern any Qualcomm participation in setting [H.264]." *Id.*, ¶ 54. In conducting his review, Mammen considered all of the following facts:

-- the emails did not identify Raveendran or any other Qualcomm employee, either in the body of the emails or as a sender, recipient, or cc. *Id.*; *see* Ex. Cialone-223.

-- the substance of the emails did <u>not</u> relate to setting the technical content of H.264, but rather related to issues such as selection of video clips to use in comparison testing, allocation of responsibility for encoding video sequences to be used in the testing, and the parameters to use in testing. Mammen Dec., ¶ 54-55.

-- the former JVT Chairman, Gary Sullivan, had testified that the role of an "ad hoc" group, such as the avc_ce group, was to work on a specific project between meetings and then report back to JVT. Mammen was aware of this testimony because he had been working on selecting Sullivan's deposition designations for trial. *Id.*, ¶54.

-- the purpose of the avc_ce group was to evaluate the "coding efficiency" of H.264 versus certain MPEG standards ("coding efficiency" refers to the quality of video relative to the amount of data or bandwidth required, and is a measure of how effectively a technology strikes the balance between compressing data and maintaining video quality). Mammen understood this from the December 2002 Ad Hoc report on AVC Verification Tests, which was a trial exhibit and had been an exhibit to Scott Ludwin's deposition. *Id.*.

-- Broadcom employee Xuemin Chen was the chair of this Ad Hoc Group, which Mammen knew from the December 2002 Ad Hoc Report on AVC Verification Tests. Ex. Cialone-236. Given that, and because Broadcom had long known Raveendran was on the avc_ce reflector, and was trying to use the appearance of Raveendran's name on that list as evidence indicating that Qualcomm participated in JVT, Mammen believed that if there were emails sent to the reflector indicating any work on the technical content of H.264, or if there was other evidence of Qualcomm participation or involvement in the avc_ce ad hoc group besides Raveendarn's email address on a list, Broadcom would have offered that evidence as well. Mammen Dec., ¶ 54.

On these bases, but mostly on the substance of the emails themselves, Mammen, in consultation with Patch, concluded that none of the emails were relevant to the issues in the 1958 Case or within the scope of Qualcomm's production obligations. *Id.*, ¶ 55. The emails did not

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

28

contradict Raveendran's statements that she had not signed up for the reflector and that the emails were unsolicited.   Nor did the content of the emails contradict statements from numerous Qualcomm employees that Qualcomm had not participated in developing H.264, particularly in light of Raveendran's statements about how she came to be on the reflector.   Mammen thus did not consider them to be a "red flag" suggesting that document production had been incomplete. *Id.*.   As Mammen has acknowledged, when he and Patch made the decision not to produce these emails, he did not recall or consider that Qualcomm had asserted, in its Contentions of Fact and Law and elsewhere, that Raveendran never received any emails from the reflector.   *Id.*

### E.   Information Qualcomm Employees Had But Did Not Disclose.

After trial ended, counsel for Broadcom and Qualcomm exchanged a series of letters regarding whether Qualcomm had breached its discovery obligations.   The exchange was more theoretical than practical because <u>the 21 emails had already been produced</u>.   On March 5, 2007, Broadcom asked Qualcomm to search for documents on the computers of twelve Qualcomm employees using terms like "JVT" and "H.264."   Ex. Cialone-224.   Two days later, Qualcomm and Responding Attorneys agreed to conduct those searches, on the current and archived emails of each witness questioned at trial about Qualcomm's JVT participation (*i.e.*, Bao, Irvine, Ludwin, Raveendran, and Sagetong).   Ex. Cialone-225.   At that time, because of all the information they had received, <u>Responding Attorneys did not expect to locate any material documents by these searches, or any documents suggesting that Qualcomm had participated in JVT before H.264 was published, and expected that this search would put the matter to rest.</u>   Batchelder Dec., ¶ 45; Mammen Dec., ¶ 57.   When the searches did yield material documents, Responding Attorneys sought and obtained Qualcomm's consent to expand the search to other witnesses, as initially requested by Broadcom. *See* Ex. Cialone-226.   Indeed, Qualcomm and Responding Attorneys agreed to produce all non-privileged documents located through using those search terms, without regard to whether they were responsive to any discovery request.   Ex. Cialone-227.[15]

---

[15] Responding Attorneys did not delay the post-trial production.   Qualcomm took several weeks to conduct the searches agreed to in the March 7, 2007 letter and to provide the resulting documents to Day Casebeer for review.   Conducting this search required Qualcomm to restore

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

The results of that search demonstrated that Qualcomm had monitored and participated in JVT throughout the time that H.264 was under development; that Qualcomm realized that H.264 might infringe its patents long before July 2005 (a realization that arguably triggered Qualcomm's disclosure obligations to JVT); and that many of the individuals who told Responding Attorneys that Qualcomm ignored JVT and had not attended its meetings were the very same people who had attended JVT meetings, or had received written reports from other Qualcomm employees (or from Qualcomm's "consultant" Jordan Isailovic) about JVT meetings, or had performed or knew about the early comparisons of Qualcomm's patents to the emerging H.264 standard.  Qualcomm did not disclose any of this information to Responding Attorneys before or during trial.  Rather, Responding Attorneys learned this information only during the post-trial period, or in some cases only during discovery in these remand proceedings.  Qualcomm's failure to disclose was not limited to two or three people: numerous individuals, including engineers in Qualcomm's Digital Cinema group, managers of Qualcomm's Standardization Group, and even attorneys in Qualcomm's legal department, received inquiries from Responding Attorneys or Qualcomm paralegals about JVT participation and related subjects but failed to provide critical information they had.  Responding Attorneys discuss some of that withheld information below.

### 1.   No Qualcomm employee informed Responding Attorneys that Qualcomm hired a consultant to attend JVT meetings and report on JVT activities.

On January 15, 2002, Qualcomm retained Jordan Isailovic to "[a]ttend and participation [sic] in ITU JVT meeting held January 29 through February 1, 2002," among other services.  Depo. Ex. 56, Ex. A ("Contractor Services").   Isailovic's contract further described his responsibilities to include "attendance at industry meetings … for each of which a written report shall be submitted; evaluation of compression technologies discussed at such meetings and/or included in standards …."  *Id.*  Qualcomm renewed Isailovic's contract on May 30, 2002, and again August 30, 2002. *Id.* at 17, 19.  Isailovic attended many JVT meetings for Qualcomm, and

electronic files for each individual, from multiple sources and systems going back several years. *See, e.g.* Ex. Cialone-228.  Qualcomm and its lawyers could not begin reviewing documents for privilege until late March 2007.  Once that review began, Responding Attorneys recognized that the documents contradicted positions taken at trial, and sent a letter on April 9, 2007 to Judge Brewster to acknowledge this fact.  Ex. Cialone-229.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

1    reported on those meetings to Qualcomm in writing.  Ex. Cialone-200.  Qualcomm employees

2    who received, forwarded, or replied to these emails included Irvine (126 emails sent or received),

3    Raveendran (118 emails), Silberger (119 emails), and Yun (116 emails).  *Id.*

4         Qualcomm retained Isailvoic in part because it wanted, as Silberger suggested, to

5    "monitor [JVT] from a distance."  Depo. Ex. 81 at 1.  Isailovic not only reported on meetings, but

6    sent lists of JVT documents for Qualcomm employees to review before they attended JVT

7    meetings.  Depo. Ex. 82.  He advised on possible submissions to JVT.  Depo. Ex. 70.  And,

8    perhaps most significantly, Isailovic informed Qualcomm that JVT was using ABS (or ABT)

9    technology, the very technology that was at the heart of the two Qualcomm patents-in-suit in the

10   1958 Case.  Depo. Ex. 74; Depo. Ex. 161; *see* Depo. Ex. 156 (Raveendran asking Isailovic for "a

11   summary of the various aspects of ABT in JVT," for use in "patent reviews for JVT and studying

12   ABT with respect to [Qualcomm's] patent.")

13        Irvine was personally involved in the decision to retain Isailovic to attend and report on

14   JVT meetings.  Irvine Depo. at 122:13-17, 125:1-126:6.  In fact, it was apparently her idea that

15   Qualcomm work with Isailovic to compare the ABS technology reflected in the JVT standard

16   with Qualcomm's own ABS technology.  Depo. Ex. 108.  She is identified as a sender or recipient

17   of at least 126 emails sent to or from Isailovic.  Ex. Cialone-200.  In 2006, Irvine <u>still</u>

18   <u>remembered</u> Isailovic, that he had been Qualcomm's "eyes-and-ears" at JVT, that he had sent

19   numerous email reports on JVT subjects including reports from JVT meetings, and that she still

20   had those reports on her computer.  Irvine Depo. at 14:1-4., 88:15-22, 89:6-12, 127:25-128:8.

21   And yet, Irvine did not disclose any information about Isailovic in response to any of Responding

22   Attorneys' inquiries.  Leung Dec., ¶¶ 20, 37.  Worse yet, when Irvine was asked by Broadcom at

23   her 30(b)(6) deposition what Qualcomm had done in response to learning that H.264 was under

24   development, she did <u>not</u> disclose that Qualcomm hired Isailovic to attend JVT meetings, report

25   on those meetings, monitor the developing standard, or help compare the ABS scheme in that

26   standard to the scheme in Qualcomm's patents.  Instead, she testified that "no steps were taken."

27   2006 Irvine Depo. at 39:23-40:18.[16]  She also told Ludwin and Leung, during their preparation for

28   ─────────────────
     [16] During post-trial interviews, Irvine claimed that "the questions she was asked at her deposition

31

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1   Ludwin's 30(b)(6) deposition, that her Digital Cinema group had ignored JVT -- even though she

2   remembered at the time that her group had used Isailovic to monitor and report on JVT meetings.

3   Ludwin Depo. at 14:8-24.  Similarly, Raveendran did not disclose Qualcomm's hiring of Isailovic

4   to attend and report on JVT meetings when she responded to the inquiry in early February 2006

5   about Qualcomm's "interaction with" JVT.  Depo. Ex. 12.  As for Yun and Silberger, no one

6   identified them to Responding Attorneys as Qualcomm employees who were potentially

7   knowledgeable about JVT or had undertaken any JVT-related activities.  Batchelder Dec., ¶ 51;

8   Mammen Dec., ¶ 51; Leung Dec., ¶ 50.

9       **2.      No Qualcomm employee disclosed Qualcomm's desire to get its
            intellectual property into the developing JVT standard.**

10

11      Through monitoring JVT and analyzing the emerging H.264 standard, Qualcomm's

12   Digital Cinema group recognized the possibility of getting Qualcomm's IPR into H.264, which

13   would enable Qualcomm to exploit its patents.  Early in the process, in March 2002, John Ratzel

14   emailed in-house attorney Joyce Nelson, noting that "H.26L [an earlier name for H.264] is a next

15   generation of video codec that we are interested in learning about/getting our IP into."  Depo. Ex.

16   60, at 1.[17]  Later that month, Silberger wrote:

17          For several days now, Jay [Yun] and myself have been looking at
            ways to incorporate our ABS into H.26L  for submission in the JVT
18          May meeting [which both Yun and Silberger attended].

19          The benefit for us would be recognition, a (small) chance of getting
            it accepted into this proposal, and gaining experience in the
20          standardization process.

21   Depo. Ex. 74 at 2.  In his response -- which was copied to Irvine -- Yun wrote:

22          After discussing JVT ideas with Amnon, I remembered that there
            were some recent proposals that have to do with variable block

23   _____
     were about QUALCOMM employees (or she so construed them), so those questions did not cover
24   Isailovic, who was a contractor and not an employee."  Depo. Ex. 57 at 1.  But the questions were
     actually about Qualcomm generally, including any representative.  *E.g.*, 2006 Irvine Depo. at
25   34:23-35:1 ("Has Qualcomm ever attended any meeting of the JVT?").  And simply hiring and
     communicating with a consultant was, obviously, a step taken by Qualcomm employees
26   (including Irvine) in response to the development of H.264.

27   [17] Ratzel later stated that his preference would be "to have Jordan **act as our agent** to get ahold
     of" the H.26L-related software, which he believed was "JVT-owned."  Depo. Ex. 61 at 2
28   (emphasis added).  Ratzel was the top engineer in Qualcomm Digital Media, the division that
     included the Digital Cinema group; he died some time after 2002.  Silberger Depo. at 32:11-33:5.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

1  sizes.  I re-read those proposals, Jordan's report and our patents and
2  came up with following observations:

3  …

**3.  We should go to all JVT meetings at least for the time being**
4  **to be on top of their work on ABT,** which Jordan says is brand
new.

5  4. … [W]e can **use our interframe ABS patent** [the '767 patent,
6  *see* **Depo. Ex. 36**] and then either recommend BSA for motion
block size assignment/representation and/or **attack or block JVT's**
7  **scheme** for using variable block size….

8  Depo. Ex. 74 at 1-2 (emphasis added).  In April 2002, Silberger recommended that Qualcomm

9  "consider efficient ways for lobbying our technology in the appropriate forums," including JVT.

10  Depo. Ex 81 at 2.  In November 2002, Sanjay Jha wrote, to Garudadri and others, that "[w]e do

11  need some way to get into JVT."  Depo. Ex. 32.   Jha was then the head of Qualcomm's QT&V

12  division, but later became president of Qualcomm's CDMA technologies group, and then

13  Qualcomm's Chief Operating Officer.  Raveendran Depo. at 112:14-20, 167:4-13.

14         **3.        No Qualcomm employee acknowledged attending any JVT meeting**
**before December 2003.**
15

16         Although Qualcomm employees freely acknowledged that they or their colleagues

17  attended both Digital Cinema Adhoc meetings before JVT was formed, and JVT meetings in

18  December 2003 or later, after H.264 was finalized and published, no Qualcomm employee ever

19  told Responding Attorneys that he, she, or a colleague had attended a JVT meeting in the critical

20  period from early 2002 through May 2003, while H.264 was in development, or in September

21  2003, when enhancements were under discussion.  Mammen Dec., ¶ 50; Leung Dec., ¶ 20; *see*

22  Depo. Exs. 27, 40, 65.  It was only after trial that Garudadri disclosed that he had attended the

23  September 2003 meetings, and that he was the person who objected to a change in the standard

24  during a September 2003 JVT meeting.  Leung Dec., ¶ 18.

25         a.        **Members of Irvine's Digital Cinema Group attended and**
**reported on JVT meetings in 2002.**
26

27         Raveendran, Yun, and Silberger each attended JVT meetings in 2002: in Fairfax, Virginia,

28  in May 2002; in Klagenfurt, Austria, in August 2002; and in Awaji Island, Japan, in December

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

33

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

2002. They each discussed their plans to attend JVT with each other and with Irvine in writing, and they each reported from the meetings that he or she attended to the other members of the group, often including Irvine, also in writing.

On April 16, 2002, Yun emailed Irvine, Raveendran, James Determan, and others about the upcoming JVT meetings in Virginia, stating that "I'm assuming that Amnon [Silberger] and I are going," and that "[t]his is a joint MPEG and JVT meeting <u>so we can benefit from having at least two persons attend to cover both MPEG, DC and JVT discussions</u>." Depo. Ex. 79 (emphasis added).[18] On April 25, 2002, Yun emailed the same people to say that he was "going to register for this JVT meeting just in case. Amnon, perhaps you should too." Depo. Ex. 80. That same day, Silberger emailed Yun, Raveendran, Irvine and others to suggest that Qualcomm "should monitor [JVT] from a distance." Depo. Ex. 153 at 1. Silberger also noted that he had websites for JVT documents, and was "also on the reflector." *Id.* at 3. In fact, both Yun and Silberger attended JVT meetings and reported back from them, in writing, in emails sent to Irvine, Raveendran, Determan, and others. *E.g.* Depo. Ex. 85 at 2 (Yun: "I've attended some JVT meetings and saw some demo (so did Amnon). …"); Depo. Ex. 86 at 2 (Silberger discussing "JVT status" as reported at meeting: "Jay was present there for longer than I was."); Depo. Ex. 87. After Yun and Silberger returned from the Fairfax meetings, Qualcomm's Digital Cinema group set up a "Livelink" directory *(i.e.*, a computer archive), to retain all JVT-related materials that they and their colleagues were gathering. Depo. Exs. 88-90.

Raveendran attended, and Irvine considered attending, the next JVT meetings, in Klagenfurt, Austria. On July 8, 2002, Isailovic forwarded an email titled "JVT Klagenfurt Attendance Registration" to Qualcomm, with the message "This is for Chris." Depo. Ex. 120. Irvine discussed attending with Raveendran, but ultimately did not attend. Irvine Depo. at 194:18-196:25. Raveendran did attend, a fact that she reported to her colleagues in writing. *E.g.*, Depo. Ex. 109 (Raveendran to Silberger and dc-system-eng@qualcomm.com: "Today I intend to

---

[18] At her deposition in this proceeding, Irvine testified that she was not sure what "cover" meant; that "covering" JVT discussions did not necessarily mean attending JVT meetings; and that she could not tell if Yun, by suggesting that he and another person "cover JVT discussions," was proposing that they would actually attend JVT <u>meetings or if they would just sit in the lunchroom and hope to hear discussions about JVT</u>. Irvine Depo. at 169:7-173:6.

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1   attend more of JVT"); Depo. Ex. 159 (email exchange between Raveendran and Isailovic, cc'd to

2   Irvine and others: "I attended few of the JVT sessions and I'm curious.").

3      In November 2002, Silberger sent an email identifying "issues [he] thought are worth

4   pursuing in the December JVT meeting." Depo. Ex. 30. The "December JVT meeting" took

5   place on Awaji Island, Japan, and Silberger attended. Silberger Depo. at 8:18-9:1; 135:18-

6   136:10. By this time, Qualcomm's Digital Cinema group had been disbanded. Irvine Depo. at

7   31:16-18. Silberger sent his email not only to people who had been part of that group, including

8   Raveendran and Yun, but also to people in Qualcomm's Standards group -- including Garudadri

9   and Tiedemann. Depo. Ex. 30. In fact, Silberger finished the email with "Qualcomm's agenda,

10  I'll leave that for Hari [Garudadri] to explain." *Id.* Another November 2002 email shows that

11  Silberger discussed his plans to attend JVT meetings with several other Qualcomm employees,

12  including Jha. Depo. Ex. 129.

**b.   Garudadri attended the September 2003 JVT meeting as a member of Qualcomm's Standards Group.**

15     Garudadri attended JVT meetings in San Diego in September 2003, while he was a

16  member of Qualcomm's Standards Group. Garudadri Depo. at 29:8-21. He attended for three

17  straight days, and sent detailed emails to Qualcomm reporting on each day of meetings. Depo.

18  Exs. 23, 25. In those reports, he discussed the potential overlap between H.264 and Qualcomm's

19  ABSDCT patents, and informed his colleagues that they could monitor the technical work of

20  JVT, by looking at "JVT-1003" (a list of email lists and FTP sites).[19] He also asked Lisa

21  Colicchio, Qualcomm's Standards Librarian, to put contributions to JVT on Qualcomm's internal

22  "baggage" website. Depo. Ex. 23; Garudadri Depo. at 43:19-44:5.

23     Garudadri addressed his email reports to Tiedemann, his supervisor, and to the mailing list

24  "multimediat.all@qualcomm.com" (Depo. Exs. 23, 25), a list that included engineers in the

25  multimedia group and could have included more than 50 Qualcomm employees (Garudadri Depo.

26  at 29:22-30:16). Raveendran received and responded to those email reports. Depo. Ex. 147

27  (Raveendran's response to one of Garudadri's reports).

---

28  [19] FTP (or "File Transfer Protocol") sites allow users to download large documents.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

Case No.
05CV1958-B (BLM)

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

c.    **Qualcomm employees failed to disclose Qualcomm's attendance at these JVT meetings to Responding Attorneys.**

While any number of Qualcomm employees attended JVT meetings in 2002 and in September 2003, or knew that their colleagues had attended those meetings, none informed Responding Attorneys of those facts -- despite repeated, straightforward questions by Responding Attorneys, and in depositions, directed to exactly that information. Instead, the individuals contacted during Responding Attorneys' inquiries or deposed in the underlying case gave misleading and incomplete answers, and failed to disclose what they knew.

Raveendran, for example, denied that she was involved in JVT when H.264 was under development. On February 7, 2006, she stated "I did not actively participate in JVT." Depo. Ex. 12. She later clarified that her "participation was limited to monitoring the Digital Cinema Adhoc group under MPEG" -- without disclosing that she had also "monitored" JVT by a host of means, including travelling to Austria to attend meetings. Depo. Ex. 17. In fact, at her deposition in 2006, she denied that there even was a JVT meeting in Klagenfurt, Austria -- even though she travelled to Austria, for the first and only time in her life, to attend those meetings. 2006 Raveendran Depo. at 41:15-19 ("Q.  Was there meeting of JVT in August 2002 in Klagenfurt, Austria?  A.  No.  I don't know."); Raveendran Depo. at 11:16-12:17; *but see* Depo. Ex. 145, ¶7 (Raveendran Declaration:  Admitting that she was aware of the JVT meetings in Austria, which were co-located with MPEG meetings).  Indeed, even today Raveendran denies that she attended any JVT meetings in Austria, and claims that she went only to MPEG meetings.  Raveendran Depo. at 15:16-16:3, 17:2-16.  Her contemporaneous emails, however, tell a different story. Depo. Ex. 109 ("Today I intend to attend more of JVT"), Depo. Ex. 159 ("I attended few of the JVT sessions and I'm curious.").

Irvine testified in 2006 that Qualcomm did nothing in response to learning that H.264 was under development -- even though engineers working under her supervision travelled to meetings around the world, and reported back in writing.  *See* 2006 Irvine Depo. at 39:23-40:18.  She told Ludwin, during his deposition preparation, that her group ignored JVT, a fact she initially denied at her deposition in these proceedings (Irvine Depo. at 10:2-13:5), but eventually admitted:

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9    4111

36

Q.   Did you tell [Ludwin] anything specific that digital cinema did with respect to the JVT?

A.   I can't give you specifics of the phone call because I don't recall it.  I can give you generalities.

Q.   Did you tell him anything general about what digital cinema did with respect to the JVT?

A.   Yes.

Q.   What?

A.   That we weren't that interested; that it was secondary.  We -- maybe even tertiary of -- **it just wasn't on our radar of importance**.

Irvine Depo. at 24:18-25:19 (emphasis added); *see also* Ludwin Depo. at 14:8-24; Leung Dec., ¶ 46.  In fact, to this day, despite being confronted with document after document in which engineers from her Digital Cinema group reported from JVT meetings around the world, Irvine continues to insist, "I don't believe we sent people to [JVT] meetings."  Irvine Depo. at 23:18-22.

Neither Irvine, Raveendran, nor anyone else identified Yun and Silberger as knowledgeable about JVT, despite knowing that they strategized about JVT and attended JVT meetings in Virginia and Japan in 2002.  Mammen Dec., ¶ 51; Leung Dec., ¶ 50.  None of the Qualcomm employees who received Myers' inquiries in February 2006, for example, forwarded those inquiries to Yun or Silberger.  Yun was never even mentioned to Responding Attorneys before the end of trial in the 1958 Case, except for being identified in one email, irrelevant to the issues here, as the supervisor of Yan Ye (whose deposition had just been noticed).  Ex. Cialone-230.  The only mention of Silberger was from Raveendran, in her November 2006 call with Kyle Robertson, stating only that Silberger attended MPEG meetings.  Depo. Ex. 199.  By that time, Responding Attorneys knew that Qualcomm's attendance at MPEG meetings was not relevant to Broadcom's waiver defense, and thus they did not view this as information requiring any follow-up.  Leung Dec., ¶ 50. [20]

---

[20] Raveendran also apparently mentioned Silberger to Qualcomm paralegal Christine Glathe.  On July 6, 2006, Glathe interviewed Raveendran regarding "H.264 JVT participation MPEG or JVT."  Depo. Ex. 19.  Glathe's notes state, in part, "2002; Anil [sic] Silberger."  *Id.*  The notes do not capture what Raveendran said about Silberger, but they do suggest that Raveendran was not forthcoming about his or her own participation in JVT:  The next line reads "QC did not attend

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

Discovery in these remand proceedings has revealed another instance where Yun and Silberger might have been identified to Responding Attorneys, but were not.  In February 2006 (*i.e.*, at the same time Leung's inquiries were being circulated at Qualcomm), Franklin Antonio, Qualcomm's Chief Scientist and a founder of the company, emailed Lupin to state:

> There's a group [of engineers] in mediaflo who are experts in various aspect of H.264 and other video compression methods. These folks were earlier on the digital cinema project.  Viji Raveendran, Chris Irvine, **and several other people**.

Depo. Ex. 137 (emphasis added).  Silberger, like Raveendran, had moved to MediaFlo after the Digital Cinema group disbanded.  *See* Depo. Ex. 26 at 1.  Lupin forwarded the email to Martin and Rouse, each of whom regularly communicated with Responding Attorneys about the 1958 Case.  *Id.*; Batchelder Dec., ¶ 23.  Martin and Rouse responded to Lupin (Depo. Exs. 137, 175), but no one followed up with Antonio to identify the "several other people."  Martin Depo. at 118:2-25; Rouse Depo. at 71:6-72:1.  Nor did anyone forward Antonio's message to Responding Attorneys, or pass on names of the "several other people."  Batchelder Dec., ¶ 51; Mammen Dec., ¶ 32; Leung Dec., ¶ 53.  Martin Depo. at 113:11-21; Rouse Depo. at 72:2-4.

Nor did Qualcomm employees disclose Garudadri's attendance at the September 2003 JVT meeting -- <u>again despite repeated straightforward questions directed to exactly that information</u>.  On February 6, 2006, Myers asked Garudadri: "Could you confirm for me if QC has ever participated in these standards setting bodies."  He responded, among other things, that Sagetong had started attending JVT meetings in December 2003.  Depo. Ex 27 at 2.  But he did not disclose that he personally attended three days of JVT meetings in September 2003, just three months earlier.  Even Ludwin, Garudadri's supervisor, acknowledged that this was misleading:

---

any of H.264 standards committees."  *Id.*  Finally, the notes end with "<u>Not participating or even monitoring</u>," presumably a quote from Raveendran.  *Id.* (emphasis added*).*

The notes also contain a list of dates, apparently Raveendran's available dates for deposition.  *Id.*  At the top of the page, Glathe writes "7/6 sent info to K.L."  *Id.*  The only "info" she sent to Leung, however, was Raveendran's available dates.  Depo. Ex. 20**.**

Glathe now claims that Leung was on this call, and that she emailed him the deposition dates just after the call so that "He didn't need to worry about actual dates per se" while on the call.  Glathe Depo. at 165:5-167:25.  This is not correct:  Leung was not on this July 6, 2006 telephone call. Leung Dec., ¶ 52; *see also* Depo. Ex. 145, ¶¶ 3 (Raveendran Declaration:  "From early February until July 16, 2006,  I believe I neither met with nor spoke to anyone from Day Casebeer.").

38

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

Q.  You would expect that an honest answer from Dr. Garudadri would have included a disclosure that he attended the JVT meeting in September of 2003, wouldn't you?

A.  Yes.

Ludwin Depo. at 63:17-64:19.[21]  Similarly, in January 2007, Garudadri told Mammen that before 2005, Qualcomm did not participate in JVT, did not monitor it, and "didn't send anyone to meetings."  Mammen Dec., ¶ 47; Ex. Cialone-222.  Garudadri also claimed ignorance when Responding Attorneys, in their follow-up after the Irvine deposition, asked what Qualcomm representative attended the September 2003 meeting and voiced objections; it was only after trial that Garudadri admitted that he himself was that Qualcomm representative.  Leung Dec., ¶ 18.

Tiedemann, to whom Myers directed her initial inquiry, also failed to disclose Garudadri's attendance at the September 2003 meeting.  Tiedemann is a 20-year Qualcomm employee and currently a Senior Vice President of Engineering.  Tiedemann Depo. at 17:7-10.  In February 2006, he "had overall responsibility for participation in standards at Qualcomm," he was consulted about standards participation in this and other litigation, and he knew about participation in standards activities.  *Id.* at 24:11-23, 25:11-22, 26:1-20.  He was Garudadri's supervisor in September 2003, and Garudadri reported on those JVT meetings to him.  Depo. Exs. 23, 25.  Yet, in February 2006, Tiedemann told Myers that he did <u>not</u> believe "that anyone from the standards organization has participated in any of these meetings except recently."  Depo. Ex. 10; *compare* Garudadri Depo. at 29:8-21 ("Q. And you attended this meeting as part of the standards group?  A.  Correct. … Q. And you cc'd your report to Ed Tiedemann as the head of the standards group, correct?  A.   Correct.").

Tiedemann testified in these proceedings that Qualcomm maintained electronic records to show which employees were going to standards meetings.  Tiedemann Depo. at 19:5-20:18, 24:24-25:5, 34:24-35:13.  However, Tiedemann did not check those records to determine whether anyone from Qualcomm attended JVT meetings in 2002 and 2003, either in response to Myers'

---

[21]  Incredibly, Ludwin "corrected" this answer after his deposition.  Rather than "Yes," Ludwin now wants to say "Yes, but I don't know what he recalled when he answered this."  Ex. Zeldin-G.  Ludwin's new answer does not suggest why Garudadri, who remembered that Sagetong started attending JVT meetings in December 2003, might have forgotten that he personally attended and reported on three days of JVT meetings (plus a boat cruise) in September 2003.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9  4111

39

inquiry in the underlying case or in preparation for his deposition here.  *Id.* at 25:6-10; 27:12-21.

Nor did he mention those records in his response to Myers in February 2006.  *See* Depo. Ex. 27.

### 4.  No Qualcomm Employee Acknowledged that Qualcomm and Some of its Engineers Were Members of JVT

Neither Garudadri, Raveendran, nor any other Qualcomm employee acknowledged, in response to Leung's inquiries about Qualcomm's membership in video standards-setting organizations, that Qualcomm had been a member of JVT.  Leung Dec., ¶ 20; *see* Depo. Ex. 138.

Qualcomm's documents tell a different story.  On January 13, 2004, a Qualcomm administrative employee Laura Chiu sent an email entitled "Subject: JVT Membership Renewal" to the Associate Manager of Membership Services of ITI asking her to

> please send me the invoices for membership renewal for Viji Raveendran (Principal), Amnon Silberger, and an application for Seyfullah Oguz (new member).

Depo. Ex. 26 at 3-4.  Later in that email strain, the Associate Director of ITI Standards Operations wrote back to Chiu explaining that, before making changes, she wanted to verify the membership information from 2003 in their database, which showed Qualcomm's member representatives to include Silberger, Garudadri, and Raveendran.  Depo. Ex. 26 at 2.  By email dated January 19, 2004, Chiu forwarded these emails to Garudadri, Silberger, Raveendran, and others saying, "Please let me know if you are still interested in being a JVT member." *Id.* at 1.  These emails reflect information about Qualcomm's membership in JVT that at least Raveendran and Garudadri should have disclosed to Responding Attorneys in response to their direct inquiries.

### 5.  Qualcomm employees and in-house lawyers withheld infringement analyses and comparisons of Qualcomm's patents to H.264 that were done as early as 2002 or 2003.

Qualcomm consistently told Responding Attorneys that Yuriy Reznik was the first Qualcomm employee to discover the potential connection between H.264 and Qualcomm's patents, and that he made this discovery in July 2005.  Batchelder Dec., ¶¶ 35, 54-55; Mammen Dec., ¶¶ 24, 40.  But Qualcomm actually discovered the connection between its patents and H.264 through a series of comparisons done in 2002 and 2003.  Most of these facts have not previously been disclosed to the Court because documents regarding them were properly withheld from

40

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

**PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

1  Qualcomm's post-trial production as privileged. Those documents show that even members of

2  Qualcomm's in-house legal team -- including attorneys like Rouse and Minhas, among others --

3  who were consulted on the 1958 Case -- knew of Qualcomm's early efforts to compare H.264 to

4  Qualcomm's patents. Those withheld comparisons are important because they helped confirm

5  Qualcomm's belief that JVT was using its IPR, which would make Qualcomm "an indispensable

6  licensor to anyone in the world seeking to produce H.264-compliant products." *See* Waiver

7  Order at 21. They contradict Raveendran's repeated statements that Qualcomm did not

8  participate in or even monitor JVT, they eviscerate Irvine's testimony and statements that

9  Qualcomm was not interested in JVT, and they demonstrate that Garudadri misled the

10  investigation team both early in the case and again on the eve of trial.

11          **a.**      **Qualcomm began comparing its patents to H.264 in early 2002.**

12        Qualcomm began comparing its patents to the emerging H.264 standard by March 2002.

13  A report dated March 6, 2002, which Responding Attorneys believe was written by Raveendran

14  but that she denies having written, states that "we are looking into proposing some of the features

15  of our ABSDCT compression algorithm to one of these standards bodies." Depo. Ex. 150; *see*

16  *also* Depo. Ex. 73 (March 26, 2002 email discussing possible submission of Qualcomm's ABS

17  technology to JVT). The author of the March 6, 2002 report further stated that he or she had

18  "reviewed the JVT draft and prepared a spreadsheet detailing the aspects of these algorithms. …

19  The purpose behind this is for us to decide where our ABSDCT Intra and interframe algorithms

20  will fit in the JVT scenario." Depo. Ex. 150. *See also* Depo. Ex. 156 (July 12, 2002 email from

21  Raveendran to Isailovic: "About patent reviews for JVT and studying ABT with respect to our

22  patent, it was decided that we would like a summary of various aspects of ABT in JVT.").

23        Documents from late 2002 refer to this early investigation of potential overlap between

24  H.264 and Qualcomm's patents, or to some other such investigation that took place in early 2002.

25  *E.g.,* Depo. Ex. 33 at 4 ("The issue of applicability of QDC IPR to still developing video

26  standards **has resurfaced**…") (emphasis added); Depo. Ex. 149 at 2 (Garudadri: "Do you know

27  if above [ABSDCT] concepts are used in JVT?"; Raveendran response: "We went through this

28  exercise almost a year back.").

Shartsis  Friese  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

---

41