PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

b.   **Qualcomm continued comparing its patents to the standard as the standard was developed throughout 2002.**

In early 2002, Minhas, an in-house patent attorney, was copied on an email exchange between Qualcomm Digital Media Division Counsel Joyce Nelson and Digital Cinema lead John Ratzel, referencing Qualcomm's interest in getting its "IP inserted into" H.264. Depo. Ex. 60, 61. In October 2002, Qualcomm Senior Patent Counsel George Pappas emailed Minhas and Irvine:

> The issue of applicability of QDC [Qualcomm Digital Cinema] IPR to still developing video standards has resurfaced, particularly as relate [sic] to MPEG4 (high data rate profiles), H.263, H.263+, and/or H.26L [an early name for H.264].
>
> I understand we've visited these issues in the past.
>
> The goal is to identify any and all IPR -- irrespective of whether or not it's mobile application specific -- which we may be able to claim has essentiality to any of the above standards.
>
> [Qualcomm engineer] Chienchung [Chang] mentions below possible applicability of our adaptive window size DCT patent(s) as possible candidates. I would appreciate your input.

Depo. Ex. 33 at 4-5 (emphasis added). In response, Minhas searched Qualcomm's patents in the digital cinema area, and provided a spreadsheet listing them to Pappas. Depo. Ex. 33 at 3-4.

On November 6, 2002, Qualcomm employees held a "video meeting" that included Raveendran, Silberger, and Jha. Depo. Ex. 129 at 1. An "Action Item" from that meeting was described as "QDM IP Infringement," a task assigned to Silberger. *Id.* at 2. Later that month, Silberger emailed Garudadri and others on the subject of "Topics for the JVT discussion tomorrow," and sought to list "issues [he] thought [were] worth pursuing in the December JVT meeting." Depo. Ex. 30. These included "Track their ABT scheme [in the standard] for possible overlap with our ABSDCT [Qualcomm's IPR]." Garudadri replied, indicating that he had reviewed the draft standard and that he knew Qualcomm planned to attend the December 2002 meetings. Depo. Ex 31 ("I could not find anything equivalent in H.264 … That may be an issue to look into while we're there."). He then emailed Raveendran to ask the following questions:

> [D]o you know which patents from QDM may have the variable DCT block size claims? Could you please send the PA numbers [Qualcomm's internal designation for patent files], so that I can get a soft copy and read them?

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1   Also, have you looked at the JVT specification?  Do you know if
2   above concepts are used in JVT?  If you or Kent have not gone
    through this exercise, one of us may need to take this action item.

3   Depo. Ex. 33 at 1.

4   Raveendran responded to Garudadri's first question by providing a list of Qualcomm's

5   relevant issued patents -- including the '104 and '767 patents.  Depo. Ex. 149.[22]  She responded to

6   his second question about whether the JVT specification implicated Qualcomm's patents by

7   stating: "We went through this exercise almost a year back…," likely referring to the analysis

8   mentioned in the March 6, 2002 Report of Activities.  Depo. Ex. 149 at 2; *see* Depo. Ex. 150.

9               **c.     In 2003, Raveendran prepared and circulated multiple**
                         **documents analyzing the potential overlap between**
10                       **Qualcomm's patents and H.264.**

11  In February 2003, Raveendran forwarded the November 2002 email thread, including the

12  list of patents that she had provided to Garudadri, to her supervisor Mark Maggenti.  Depo.

13  Ex. 165.  She described it as "the email thread on QT&V's investigation on infringement of ABS

14  patents by JVT," and stated that she would "compile an email to Joyce Nelson" on the subject.

15  *Id.*  Her email to Nelson, later that day, was intended "to inform you that JVT … involve[s]

16  variable block-size compression that **could potentially infringe on Digital Cinema patents**."

17  Raveendran also noted that "Minhas has been involved in the discussions between QT&V and

18  QDM in this regard."  *Id.* (emphasis added).

19  On March 5, 2003, Garudadri also raised the potential connection between H.264 and

20  Qualcomm's patents.  He emailed Tiedemann, Raveendran, and others:  "As we go through

21  HVT/H.264, Viji and QDM folks keep point [sic] out similarities with techniques that were

22  patented by QDM for digital cinema.  I think it is very important for us to understand what IPR

23  we have in this area."  Depo. Ex. 34.  He requested "legal expertise" to conduct this analysis.  *Id.*

24  [22] At her deposition in this proceeding, Raveendran claimed that she did not learn that Qualcomm
25  had any patents on ABSDCT that potentially overlapped with H.264, and that in her various
    comparisons of Qualcomm's IPR to H.264 she looked only at patent applications.  Raveendran
26  Depo. at 76:15-79:2.  When confronted with Deposition Exhibit 149, in which she specifically
    identified, by Patent Number, five issued patents that used this technology -- in November 2002 --
27  she claimed it wasn't her, but Garudadri himself, who provided the list of patents.  In other words,
    according to Raveendran's explanation, Garudadri wrote "Hi Viji, do you know which patents
28  from QDM may have the variable DCT block size claims?," and then Garudadri listed those
    patents in response to his own question.  *See id.* at 100:13-104:3.

Case No.                    RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
05CV1958-B (BLM)                      OPENING MEMO ON REMANDED OSC

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9     4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

On March 6, 2003, Raveendran created a document with columns comparing "JVT Features" to "Digital Cinema Patent[s]."  Depo. Ex. 37.[23]  Raveendran created this chart at the direction of Minhas to summarize work that they had performed.  Leung Dec., ¶ 57; Ex. Cialone-231.  Indeed, while Minhas denied working with Raveendran or receiving her chart in 2003 (Minhas Depo. at 64:22-24, 110:8-11), contemporaneous emails contradict this.  Depo. Ex. 62 at 3 (minutes of MediaFlo meeting:  "Viji:  working with Micky on the QDM patents and checking it against the JVT IPs."); *id* at 1-2 (Pappas to Minhas:  "Are you supporting the JVT effort for Media FLO?"; Minhas:  "Yes, I've been supporting this matter.").

Later in March 2003, Raveendran created another, more detailed, comparison chart that summarized "valid JVT IPRs and relevant Digital Cinema patents."  Depo. Ex. 35 at 1.  She attached this to a memo addressed to Minhas, Garudadri and Richard Lane, a Qualcomm employee who was identified in emails discovered after trial as Qualcomm's "principal" member of JVT. Depo. Exs. 35, 26**.**  Once again, Raveendran did this work at the direction of Qualcomm in-house counsel, Minhas.  Raveendran Depo. at 178:10-179:16.  The charts included the '104 and '767 patents (identified by their internal Qualcomm numbers, respectively PA036 and PA056; *see* Ex. Cialone-232).  As discussed below, Minhas kept this chart through February 2007 at least, but did not disclose it to Responding Attorneys.

Raveendran reported her comparisons to her others.  On March 14, 2003, she emailed her supervisors a schedule of tasks, including "IPR Investigations -- DC, JVT and ABSDCT/ MediaFLO related IPRs of other companies …."  Depo. Ex. 167.  On March 21, she set a meeting with Minhas and Garudadri regarding "JVT IPRs".  Depo. Ex. 63 (meeting invitation).  Later that day, she sent a report to "dbm.syseng@qualcomm.com" describing her tasks for the week, including, under the heading "JVT IPR Investigation," a meeting with Minhas and Garudadri about subjects including "Identification of JVT IPRs; Overlap with Digital Cinema IPRs".  Depo. Ex. 64.  And on March 11, 2004, she sent her first comparison chart to Irvine.  Depo. Ex. 123.

---

[23] Raveendran testified at deposition in these proceeding that she does not recall when she created this chart, though it could have been 2003 "or around that time frame."  Raveendran Depo. at 175:6-24.  However, during an interview following up on the post-trial document searches, Leung determined that Raveendran had created the document on March 6, 2003.  Leung Dec., ¶ 57; Depo. Ex. 37 (chart with handwritten notation by Leung).

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

    d.    **Qualcomm's Standards Group discussed the overlap between H.264 and Qualcomm's patents in 2003, shortly after H.264 was published.**

In August 2003, the issue of overlap between Qualcomm's patents and H.264 arose again -- this time, within Qualcomm's Standards Group.  On August 4, 2003, Tiedemann wrote to Garudadri, Rouse, and others:

> I understand that we have IPR on adaptive block sizes for video coding which came out of our digital cinema work.  Hari says that he believes that H.264 uses adaptive block sizes.  Thus, we need to verify this, and <u>if out [sic] IPR falls on top of H.264, make the appropriate statements to the standards body</u>.

Depo. Ex. 134 (emphasis added).  Tiedemann knew that Qualcomm's patents might "fall on top of" H.264 because he "remember[ed] Hari [Garudadri] telling me at some point that we had some IPR that he believed had relevance."  Tiedemann Depo. at 64:9-24.  Tiedemann expected that, in response to his August 4, 2003 email, "someone would analyze the standard and analyze [Qualcomm's] patents to see if the standard infringed the patents."  *Id*. at 70:3-13.  Tiedemann's email not only shows that he understood the potential connection between Qualcomm's patents and H.264, but also suggests that he knew, in August of 2003, that Qualcomm had already been participating in JVT; otherwise, he would not have suggested that Qualcomm might have an obligation to disclose its intellectual property rights.

In response to Tiedemann's email, Qualcomm in-house attorney Rouse stated, "It definitely does and we have some" -- meaning that H.264 definitely uses adaptive block size technology, and that Qualcomm had intellectual property rights in that area.  Depo. Ex. 134**;** *see* Rouse Depo. at 38:17-24.  Rouse then sent references and/or copies of various Qualcomm patents to Garudadri -- including the '104 and '767 patents -- and asked Garudadri to look at them to determine if they were relevant to H.264.  Depo. Ex. 135**;** Rouse Depo. at 41:8-42:13.

A month later, Garudadri attended the September 2003 JVT meeting.  This sequence of events suggests that he attended JVT to pursue Qualcomm's infringement analysis.  In a written report from that meeting, Garudadri states that an engineer from Dolby who also attended the JVT meetings had informed him that "JVT was looking at adaptive block size DCT (ABSDCT) for the transform."  Depo. Ex. 23 at 1.  Garudadri noted that "Qualcomm has IPR in this, going

45

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

back to 1992 and QDM days" -- a reference that he specifically meant to include the '104 patent. *Id.*; Garudadri Depo. at 34:4-9.  Raveendran responded to that comment with "Don Pian has filed the earlier patents on ABSDCT (including interframe ABSDCT)," an apparent reference to the '767 patent on which Pian was co-inventor.  Depo. Ex. 147; *see* Depo. Ex. 36.

### e.   Qualcomm *engineers* failed to disclose these comparison efforts to Responding Attorneys (and to JVT).

None of the Qualcomm employees involved in these comparisons disclosed any of this information to Responding Attorneys -- <u>again despite repeated straightforward questions targeting exactly this information</u>.  Instead, Qualcomm affirmatively led Responding Attorneys to believe, and to represent to the Court, that Qualcomm first discovered the potential connection between its patents and H.264 in July 2005.  Indeed, Tiedemann had even suggested that Qualcomm might have to disclose it patents to JVT in 2003, but did not disclose this to Responding Attorneys.

Garudadri not only was involved in these comparison efforts, but remembered them when the 1958 Case was initiated.  In July 2005, after Reznik informed Garudadri that he believed Qualcomm had patents relevant to H.264, Garudadri emailed Rouse, stating that he was "**taking another shot** at this analysis."  Depo. Ex. 39 (emphasis added).  The earlier 'shots' included the work done in 2002 and 2003.  Garudadri Depo. at 168:10-169:13.  Yet, when Mammen asked, in January 2007, "for what purpose was [Garudadri] looking into H.264" in 2002-2003, Garudadri failed to acknowledge what he now, finally, admits:  That one purpose was to help determine what IPR Qualcomm had in H.264.  *Compare* Depo. Ex. 42 *with* Garudadri Depo. at 179:5-182:7 ("there are some employees of Qualcomm for whom **it is extremely important to find out the relevance of the patents to H.264**. … So my purposes -- this is for what purpose I was looking at H.264.  My purposes were technical **and to help other people.**") (emphasis added).

Raveendran also disclosed nothing to Responding Attorneys about her efforts to compare H.264 to Qualcomm's patents.  Instead, she testified at deposition that she never even saw the '104 patent.  2006 Raveendran Depo. at 89:15-90:1.  Moreover, Raveendran recognized <u>during trial</u> that Qualcomm's position -- that in 2005 Reznik was the first to discover the connection -- was wrong.  Her handwritten notes, apparently written some time after trial, state: "Comparison -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   - (during trial wondered why Yuriy's email started this while work was previously done &

2   dropped).   Inform or not.   Not sure of privilege -- couldn't clarify."   Ex. Cialone-233.

3   Raveendran chose not to inform Responding Attorneys about that previous work.   Batchelder

4   Dec., ¶ 56; Mammen Dec., ¶ 49.

5           f.      **Qualcomm *lawyers* failed to disclose these comparison efforts to
                    Responding Attorneys.**

6

7           Qualcomm in-house lawyers also failed to tell Responding Attorneys about these early

8   comparison efforts.   For example, Minhas received Myers' February 6, 2006 inquiry.   Depo. Ex.

9   65.   Minhas immediately forwarded the email to his paralegal, Courtney Etnyre, and asked for the

10  Invention Disclosure Forms (an internal Qualcomm document describing a proposed patent) and

11  files for the patents-in-suit.   Ex. Cialone-232; *see also* Minhas Depo. at 91:2-93:12.   But he did

12  not respond to Myers' inquiry, or inform Myers or Responding Attorneys that Qualcomm had

13  analyzed whether H.264 infringed its patents years earlier.   Leung Dec., ¶ 49.[24]   Joyce Nelson,

14  Minhas's supervisor during 2002-2003 (*see* Minhas Depo. at 26:7-8), also did not mention these

15  early comparison efforts, although she was consulted on certain aspects of the 1958 Case.   *See*

16  Glathe Depo. at 105:22-106:5; Depo. Ex. 9.

17          Rouse similarly did not disclose Qualcomm's efforts before July 2005 to compare H.264

18  to its patents.   Rouse participated in numerous telephone conferences and other discussions with

19  Responding Attorneys regarding the 1958 Case.   Batchelder Dec., ¶ 23.   He knew Qualcomm's

20  position in the lawsuit was that Reznik was the first Qualcomm employee to identify the potential

21  overlap between Qualcomm's patents and H.264, and that Reznik did so in July 2005.   *See* Rouse

22  Depo. at 23:17-24:10 (stating his belief that he was aware of the factual grounds Qualcomm

23  _____

24  [24] At deposition, Minhas testified that the questions in Myers' February 6, 2006 email were not
    directed to him, and that he did not understand what it meant to "participate" in a video standards
25  setting body.   Minhas Depo. at 112:9-22.   As a lawyer, however, Minhas had to know that he
    should provide any information he had particularly where, as here, his personal experience
26  contradicted the responses of other witnesses who claimed that Qualcomm monitored only the
    MPEG Adhoc group.   As a lawyer, if Minhas did not understand the question, he knew to request
27  clarification, or to provide to Qualcomm's counsel whatever relevant information he did have and
    let counsel decide if that constituted "participation," "involvement," "interaction," or something
28  else.   Finally, as a patent lawyer, Minhas likely knew the implications if Qualcomm had in fact
    made a connection between H.264 and its patents years before the lawsuit was filed.

SHARTSIS   FRIESE   LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

1  presented for summary judgment on Broadcom's waiver defense); 29:22-30:7 (discussing his

2  understanding of what Qualcomm's counsel presented as basis for arguing that Qualcomm had no

3  duty to disclose patents to JVT).  Nevertheless, Rouse did not disclose his own involvement with

4  earlier comparison efforts that reached the same conclusions as Reznik's later analysis.

5  Batchelder Dec., ¶ 56; Mammen Dec., ¶ 49; Leung Dec., ¶ 40.

6       On February 6, 2006, Myers emailed Rouse and other in-house counsel in connection with

7  Qualcomm's interrogatory responses.  Depo. Ex. 136 (Rouse and other in-house counsel received

8  a full draft of those responses two weeks later; Depo. Ex. 14.)  Myers, who was following up on a

9  request for information from Leung, stated that she wanted to confirm that Qualcomm had not

10  conducted any prior art searches, validity studies, or infringement analyses on the '104 and '767

11  patents, and she asked in-house counsel to identify people to contact for that confirmation.  *Id.*

12  Rouse did not disclose the infringement analysis he had assisted in 2002-2003; nor did he identify

13  Garudadri or the others involved in that analysis as people whom Myers should contact.  *Id.*

14       Even after trial, Qualcomm's in-house lawyers failed to reveal relevant information to

15  Responding Attorneys.  On February 10, 2007, Minhas emailed Raveendran's March 25, 2003

16  comparison chart to Rouse.  Depo. Ex. 35 at 1.  At that time, Rouse was Qualcomm's Chief

17  Patent Counsel, reporting directly to General Counsel Lou Lupin.  Rouse Depo. at 58:7-11.  On

18  February 7, 2007, at the hearing on waiver and inequitable conduct, Qualcomm had argued that it

19  was not aware of the relevance of Qualcomm's IPR to H.264 while the standard was under

20  development.  That same day, Minhas sent one of Raveendran's 2003 comparisons to Rouse.

21  Neither Minhas nor Rouse sent it to Day Casebeer.  Batchelder Dec., ¶¶ 52-55.

22       The cover email from Minhas indicates that he and Rouse had discussed the document:

23  The Subject line reads "Viji's document," and Minhas wrote "Hey Tom - Couldn't forward the

24  email b/c its in Eudora, but here it is.  It was sent to me on 3/25/2003 by Viji, addressed to Hari

25  and me, cc'd Tom Kilpatrick."  Minhas had shown Rouse the document on his computer shortly

26  before February 10, 2007.  Rouse Depo. at 49:6-47:1.  Rouse testified that he did not remember

27  why Minhas showed him "Viji's document," what Minhas said, or anything else about the

28

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1   circumstances that led to him seeing the document.  *Id.* at 50:2-53:14.[25]  Rouse even hedged about

2   whether the memo from Raveendran was the document Minhas showed him.  *Id.* at 53:18-54:4.

3        At his deposition in these proceedings, Rouse acknowledged the potential importance of

4   "Viji's document":  "I think it would have been important had it had either of the two patents in

5   suit.  I don't know whether it did."  *Id.* at 61:12-25.  In fact, the document does reference the '767

6   patent, by Qualcomm's internal designation PA056, but Rouse claims he did not bother to

7   confirm this important fact -- even though he would merely have had to ask a paralegal to check.

8   Ex. Cialone-232; Rouse Depo. at 73:15-74:14.  Within two hours of receiving the document,

9   however, Rouse forwarded it to Roger Martin and Alex Rogers, both counsel of record in this

10  litigation -- though he cannot remember why he did so, or whether they discussed the document,

11  or whether he received any response.  Depo. Ex. 35 at 1**;** Rouse Depo. at 56:14-58:6.

12       Neither Rouse, Martin, Rogers, nor anyone else at Qualcomm forwarded "Viji's

13  document" to Responding Attorneys, or told them about it, in February 2007.  Batchelder Dec.,

14  ¶¶ 52-55; Rouse Depo. at 59:20-60:4; Martin Depo. at 144:9-145:16.  Remarkably, Martin claims

15  that he did not even look at this document when he received it.  *Id.* at 143:11-22.  Martin even

16  claims he did not realize that Qualcomm's position in the 1958 Case was that its employees had

17  never made the connection between Qualcomm's intellectual property rights and H.264 until

18  shortly before the lawsuit was filed (*id.* at 140:14-141:8), even though Martin had received <u>and</u>

19  <u>responded to</u> an email confirming this exact position.  Depo. Ex. 179.  He also received a draft of

20  Qualcomm's summary judgment motion on waiver, and attended the hearing on that motion.  Ex.

21  Cialone-234; Martin Depo. at 187:5-15.  And On January 18, 2007 -- just three weeks before he

22  received "Viji's document" -- Martin emailed his colleagues to state Qualcomm's position that

23  "the individual attending the [JVT] meetings didn't know of the patents."  Depo. Ex. 180.  As in-

24  house counsel and counsel of record, Martin was regularly apprised of the themes and issues in

25  the case. Batchelder Dec., ¶¶ 39, 55.  Yet Martin did not disclose "Viji's document" to outside

26  counsel when he received it.

---

27  [25] Minhas claimed at deposition that something in the Waiver Order caused him to remember this
    document in February 2007.  Minhas Depo. at 72:13-73:5.  That order, however, was not issued
28  until August 2007, six months <u>after</u> Minhas gave "Viji's document" to Rouse.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

**6.     No Qualcomm employee disclosed Qualcomm's decision to monitor JVT as part of Qualcomm's video strategy in 2003.**

Qualcomm's Digital Cinema group disbanded in late 2002.   In December 2002, Raveendran emailed a proposed "QC video strategy" to Sanjay Jha, part of which involved monitoring JVT to "help us better understand the standard and the general MPEG/ITU standardization process."  Depo. Ex. 164 at 3.  This proposed "video strategy" was an outcome of the QT&V "video meeting" held in November 2002.  Depo. Ex. 129 at 2 ("Action Items: … Provide thorough presentation on possible video strategies for QC by 11/25/02 -- Rick, Amnon, Viji, Kent.").  Jha responded that he wanted Raveendran "to be involved full time" in "driving the video codec strategy."  *Id.* at 1.

Raveendran's analysis of the emerging H.264 standard, as part of Qualcomm's video strategy ultimately led her to conclude, as Qualcomm had earlier suspected, that H.264 potentially infringed Qualcomm's patents.  *See* Raveendran Depo. at 173:19-174:11.  Neither Raveendran nor anyone else informed Responding Attorneys that a senior Qualcomm executive had asked her to "drive" a strategy that included exploiting the work of JVT, especially its inclusion of Qualcomm's IPR in H.264, to gain a competitive advantage.

**F.     Qualcomm's Efforts to Justify these Failures to Disclose Fall Short.**

Responding Attorneys do not need to prove why Qualcomm witnesses failed to disclose information to them, and do not wish to speculate on any individual's motives.  Nevertheless, Responding Attorneys will address some of the explanations that Qualcomm witnesses have given in their deposition testimony and Declarations.

**1.     Qualcomm witnesses say they did not disclose obviously relevant facts because they did not understand the meaning of words like "participation," and "involvement."**

Virtually every Qualcomm witness deposed in these remand proceedings indicated that he or she could not understand basic words like "participation" and "involvement" -- the words used in Broadcom's interrogatories, in Myers' February 2006 inquiries, and in other efforts to find out what Qualcomm did regarding JVT.  Several even claimed that attending JVT meetings did not constitute "participation" or "involvement" in JVT.  But none of these individuals expressed any

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

such confusion, or explained that they were secretly applying narrow definitions, when they received and responded to the inquiries from Responding Attorneys, from Qualcomm's paralegals, or from Broadcom. In fact, many used "participation" and "involvement" themselves, often with examples showing that they knew what those words meant and knew that attendance at JVT meetings was information they should disclose.

At his deposition in these proceedings, Garudadri testified that he was unsure what the terms used in Myers' February 6, 2006 inquiry meant. Garudadri Depo. at 63:2:64:20 (did not understand "interaction" or "participate"); *id.* at 67:23-68:16. Similarly, he testified that he did not understand what it meant to be a member of JVT. *Id.* at 21:9-22:13. He testified that attending JVT meetings was not "participation," and that participation requires "making a written contribution or objections." *Id.* at 12:14-16 ("Q. Would you consider attending a meeting to be part of participation in JVT? A. No, I do not."); 67:20-22 ("Q. I'm asking you did you participate in any JVT meetings in 2003? Q. I did not."); 11:15-14:10. Even going to a JVT meeting and objecting to a definition in an extension to the H.264 standard, as Garudadri belatedly admitted he did, did not constitute "participation" in JVT. *Id.* at 14:4-10.

Garudadri knew better. In February 2006, he responded to Myers' inquiry, "has [Qualcomm] ever <u>participated</u> in these standards setting bodies," by saying that Sagetong "started <u>attending</u>" in December 2003, and that others began "<u>attending</u>" at other times -- showing that he personally understood "participating" to include "attending." Depo. Ex. 27 at 2 (emphasis added). Similarly, when Garudadri received a purely internal inquiry -- one that was not shared with Responding Attorneys -- asking "when did Qualcomm start participating in JVT?," he did not ask what "participating" meant, but rather stated that Raveendran had "attended JVT meetings" since 2000, and even acknowledged that Qualcomm participated <u>in the baseline standard</u> (*i.e.*, the work done before May 2003) -- information he never gave Responding Attorneys, and that was actually contrary to what he told Responding Attorneys in February 2006 and again in January 2007. Depo. Ex. 194 (emphasis added). And, in a complete reversal later in his deposition, he testified that participation in a standards-setting organization <u>would include merely observing</u> its work:

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

Q. In your understanding of the term "participation in a standard-setting body, that would not include being an observer, correct"

A. To the best of my knowledge, that is not correct. **I think participate would include observing.**

Q. Okay. **And you could observe by going to a meeting, correct?**

A. That is one way, **yes**.

Q. And **you could observe by sending someone to a meeting and asking them to report back to you, correct?**

A. **I think so**.

Garudadri Depo. at 101:10-23 (emphasis added.)

Other Qualcomm deponents in these proceedings similarly claimed not to understand simple words, or to give them unduly restrictive definitions. *E.g.* Ludwin Depo. at 15:4-16:18 (did not understand what "participate" meant, or understood it only to mean that "you do research and development and you make contributions to the JVT."); Minhas Depo. at 110:24-112:22 (regarding Myers' February 6, 2006 inquiry: "Q. And you don't understand what participated in a video standard setting body means? A. No."); 118:4-5 ("Q What about interaction? A. I'm not sure what that would mean."); 118:6-7 ("Q. What would involvement mean, do you know? A. I'm not sure what that would mean either."). Irvine claimed that she did not understand "participate" or "involvement," that she had different understandings at different times, and that any understanding was very narrow. *E.g.*, Irvine Depo. at 23:1-24:16 (stating that she "probably" had a different definition of "involved with the JVT" now than in 2006, and that in 2006 her definition of that term did not include sending people to JVT meetings); *id.* at 36:4-7 ("Q. You participated in the preparation for [Ludwin's] deposition? A. I don't know what you mean by participated."). In fact, Irvine testified that she does not even understand her own October 2007 Declaration, where she referenced Qualcomm's "involvement with JVT" three times and also referred to being "involved in standards body participation." *Id.* at 109:11-110:11 ("I'm not certain I could regurgitate what my version of the word 'involved' was at that point in time in my declaration. So it may or may not have changed."); *see* Depo. Ex. 111, ¶¶ 6, 7, and 14.

Raveendran also claims that "participation" requires making technical contributions, and

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9 4111

1   not merely attending meetings.   Raveendran Depo. at 28:23-24; *see also* Ex. Cialone-231

2   (summary of post-trial interview with Raveendran):

> When Viji told Gail [Myers] that neither she nor the Digital Cinema
> group had "participated" in any MPEG standardization activity
> related to video compression, she was, **without saying so**, defining
> participate to mean "contributing a technical proposal for inclusion
> in the standard.

6   (emphasis added).  She also variously claimed that "involvement with JVT," a phrase she used in

7   her October 2007 Declaration (Depo. Ex. 145, ¶¶ 5, 23), meant the same as "participation" (or

8   "active participation"), or had some other meaning unknown to her -- testimony that must be read

9   in full to appreciate the "Alice in Wonderland" quality of Raveendran's answers.   Raveendran

10  Depo. at 26:9-40:11; *see also id.* at 75:15-23 ("And with respect to the -- to involvement here in

11  paragraph 5 of my declaration, I would like to clarify that during the preparation for my

12  deposition and in February 2006, when I stated 'involvement,' that means active participation --

13  [w]hen I  -- when I signed the declaration, I may have meant involvement to mean more than

14  active participation.").

15      Even Roger Martin, counsel of record in the 1958 Case, denied understanding the word

16  "participation" (Martin Depo. at 122:4-123:16), even though he used the term in several written

17  communications.   In February 2006, Leung requested confirmation that Qualcomm "did not

18  participate" in setting the standard, and Martin replied without hesitation that this was "almost

19  certainly true (we had no participation)."  Depo. Ex. 15.   But at deposition, Martin could not

20  understand that word, claimed that he "wasn't confirming anything," and avoided acknowledging

21  the obvious meaning of his email -- that he was telling Responding Attorneys that Qualcomm

22  almost certainly had no participation in relevant standards-setting -- for nearly eight pages of

23  utterly evasive testimony.  Martin Depo. at 93:11-101:1.

24      Martin similarly denied the plain meaning of, and claimed he could not understand, an

25  email that he wrote shortly after trial, for circulation by Tiedemann.   The email reads:  "the facts

26  are that <u>we did not participate in the JVT standards body (no attendance, not a member, no</u>

27  <u>contributions, et cetera</u>), until several months after the H.264 standard was published."  Depo. Ex.

28  139 at 1 (emphasis added); *see* Martin Depo. at 146:8-148:15, Tiedemann Depo. at 44:22-45:7.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

But at deposition, Martin denied that "attendance" constitutes "participat[ing] in the JVT." Martin Depo. at 152:19-154:10 ("Q. And those things that you say Qualcomm did not do [no attendance, not a member, no contribution] were things that would, in your view, constitute participation in the JVT standards body, correct? A. I don't think that conclusion can be drawn. I think that's a logical fallacy."). The email further provided "talking points" that Qualcomm employees were "free to say," including "WE DID NOT PARTICIPATE IN STANDARDIZATION." Depo., Ex. 139 at 2 (capitalization in original). But Martin now cannot say what that "talking point" meant, or even whether the documents discovered and shown to him in the months following trial were in any way inconsistent with that "talking point." Martin Depo. at 162:4-163:25, 164:16-167:15, 173:3-174:17.[26]

As counsel of record in the 1958 Case, Martin more than any other Qualcomm employee had a responsibility to convey to outside counsel only that information that was based on a reasonable inquiry or his own knowledge and experience.[27] In fact, though, Martin did not make any inquiry or have any knowledge before confirming that "we had no participation." Id. at 82:5-85:3. Instead, he claims that he merely asked "outside counsel about facts and circumstances relating to the JVT" -- even though he was actually responding to an inquiry from outside counsel. Id. But in 2007, before Qualcomm introduced the accusatory adversity that resulted in this remand proceeding, Martin acknowledged that his statement confirming that Qualcomm "had no participation" contributed to the discovery failures in this case. Batchelder Dec., ¶¶ 47-50; Leung Dec., ¶¶ 58-59.

---

[26] As for Tiedemann, he cannot even say whether he believed that this statement ("WE DID NOT PARTICIPATE IN STANDARDIZATION"), or any statement that Martin drafted, was true when Tiedemann sent the email. Tiedemann Depo. at 42:16-55:8.

[27] Martin took a different position at deposition: That his duties as counsel of record were only "to make appearance on behalf of Qualcomm in Markman hearings and other technical hearings and to conduct myself in a professional manner." Martin Depo. at 56:22-57:20. Martin claimed, moreover, that despite all of his experience on Qualcomm litigation, he did not know how discovery was conducted, he had never seen the Overview memo describing how discovery was conducted (Depo. Ex. 6), he did not understand that memo, and he did not know whether outside counsel at Day Casebeer, having received a memo from Qualcomm employees setting forth guidelines for discovery and document collection at Qualcomm, would be expected to follow those guidelines. Martin Depo. at 35:5-51:22, 57:22-64:25. Martin also testified that, as counsel of record in the 1958 Case, he did not have a custom and practice of reading emails that were sent to him about Broadcom's discovery requests. Id. at 87:12-19.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

Qualcomm employees did not demonstrate any difficulty understanding "participation," "involvement," "interaction," or "membership," when those words were used in inquiries from Responding Attorneys and Qualcomm's paralegals.  Mammen Dec., ¶ 51; Leung Dec., ¶ 19.  No Qualcomm employee asked for clarification of those words, or asked whether activities like attending JVT meetings or hiring a consultant to attend and report back were within the definitions of those words.  They did not have to:  Qualcomm witnesses affirmatively understood the broad meaning of "participation" before these remand proceedings began.  For example, Ludwin testified in the underlying case that he understood "participation" to mean attendance:

> Q. When did Qualcomm first **decide to participate** in JVT?
>
> A. Our first record of attending JVT is in December 2003 **so when you say participate, I will assume that means in actually attending meetings**…"

30(b)(6) 2006 Ludwin Depo. at 96:8-16 (emphasis added).  In response to Myers' second February 2006 inquiry, he wrote that "[p]articipation in ISO/MPEG meetings from my group has only been during the past 3 years in a monitoring capacity," demonstrating that he understood "participation" to include "monitoring." Depo. Ex. 16**.**  And he admitted, at his deposition in this proceeding, that Garudadri should have disclosed his attendance at a JVT meeting in response to the February 6, 2006 inquiry about "participation."   Ludwin Depo. at 63:17-64:19. Similarly, Raveendran responded to Myers' second February 2006 inquiry by stating that her "participation was limited to monitoring the Digital Cinema Adhoc group under MPEG."  Depo. Ex. 17.  Thus, she recognized that "participation" includes "monitoring" -- but she failed to state that she also "monitored" JVT, by attending meetings, by reviewing reports on meetings from her colleagues, and by other means including at least 118 emails with Isailovic.

## 2.   Qualcomm witnesses claim they would have revealed all if their memories had been refreshed.

Qualcomm employees did not give Responding Attorneys reason to believe that, in 2006, they might have forgotten their involvement with JVT in 2002-2003.  In fact, they remembered details of standardization activity that occurred in 2002-2003 and earlier.  Irvine remembered her group's participation in the Digital Cinema Adhoc group, in 2001, as did Raveendran.  Depo.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9    4111

1  Ex. 66.  Garudadri remembered that Sagetong started attending JVT meetings in December 2003.

2  And it is unlikely that anyone forgot why they travelled from San Diego to Klagenfurt, Austria or

3  Awaji Island, Japan, or even Fairfax, Virginia.

4  Nor is the rationale suggested in the Qualcomm Declarations valid -- that they failed to

5  disclose information because they did not review their documents.  Each Qualcomm employee

6  who responded to an inquiry knew that the inquiry related to litigation, and knew the need for

7  accurate and complete responses.  *E.g.*, Raveendran Depo. at 57:10-23.  If they chose to respond

8  without reviewing documents, they must have believed they could respond accurately -- they are,

9  after all, adults and professionals.  *See id.* at 58:23-59:3 ("Q.  So in paragraph 2 of your

10  declaration, you say (as read): 'At the time I provided this information, I did so to the best of my

11  recollection and without having reviewed any documents.'  And that was your choice, right?  A.

12  Yes."); *id.* at 59:10-19 (admitting she did not give anyone reason to believe that her response to

13  Myers' February 2006 inquiry was inaccurate).  Nor did any other Qualcomm employee suggest

14  that they needed more time to review their documents before they could answer questions fully.

15  Mammen Dec., ¶ 51; Leung Dec., ¶ 51.  Moreover, now that they have read their documents,

16  these employees continue to deny the JVT participation reflected in them.  *E.g.*, Irvine Depo. at

17  23:18-22; Raveendran Depo. at 15:16-16:3, 17:2-16.

18  ## III.   LEGAL ARGUMENT

19  Responding Attorneys are before this Court in these remand proceedings as a result of

20  Judge Brewster's referral of Broadcom's Motion for Sanctions to this Court ("Referral Order"

21  [Doc. No. 494]) and Judge Brewster's March 5, 2008 Order ("Remand Order" [Doc. No. 744])

22  vacating the January 7, 2008 Order ("Sanctions Order" [Doc. No. 718]).  The Remand Order

23  noted that Responding Attorneys were denied due process because they were not allowed to use

24  exculpatory privileged communications, under the self-defense exception to the attorney-client

25  privilege, when faced with the accusations in the four Declarations submitted by Qualcomm in

26  October 2007.  This Court must now consider the evidence anew in order to determine whether

27  the exacting standard for imposing sanctions has been met.  Responding Attorneys submit that the

28  evidence of privileged communications -- including the inquiries Responding Attorneys and their

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

**PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE**
**GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

1  colleagues made, the responses they received from their client, and the information that their

2  client failed to provide -- establish that Responding Attorneys should not be sanctioned for any of

3  the discovery violations that occurred in the 1958 Case.

**A.  Due Process Limits the Scope of These Proceedings.**

5  These proceedings are limited to discovery.  As this Court noted, **"Judge Brewster**

6  **referred only the discovery violation to this Court.  Judge Brewster did not refer any**

7  **sanction motions relating to false statements made to the trial judge or in pleadings resolved**

8  **by the trial judge**."  Sanctions Order at 18, n. 5 *citing* Referral Order (emphasis added).  In

9  reliance on that statement, Responding Attorneys have addressed only their putative roles in

10 Qualcomm's discovery violations.  Responding Attorneys should not be subject to sanctions for

11 any false statement to the trial judge or in pleadings because they acted in good faith, after a

12 reasonable inquiry or in reasonable reliance on the inquiries conducted by others, and they made

13 only those statements that they believed to be true.  However, should this Court consider such

14 statements as a basis for imposing sanctions, then **fundamental due process requires that**

15 **Responding Attorneys be given notice and an opportunity to submit briefs and to be heard.**

**B.  Due Process Requires the Court to Adhere Strictly to Established Legal**
**Authority for Imposing Sanctions.**

18 The authority upon which the Court may base any sanction is limited and specific.  The

19 Court's authority to impose sanctions arises only from the Federal Rules of Civil Procedure or

20 from the Court's inherent powers. In the event the Court looks to its inherent powers, then due

21 process requires that the Court exercise restraint and afford Responding Attorneys strong

22 protections.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("Because of their very potency,

23 inherent powers must be exercised with restraint and discretion."); *Roadway Express, Inc. v.*

24 *Piper*, 447 U.S. 752, 764 (1980) ("Because inherent powers are shielded from direct democratic

25 controls, they must be exercised with restraint and discretion.").  The Court cannot expand the

26 law, or impose sanctions based on the "spirit and purposes" of the Federal Rules.  In particular,

27 the Court cannot impose upon Responding Attorneys a new standard that requires any individual

28 lawyer in a case to independently verify information provided by other attorneys working on the

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

1  same team.  Nor can the Court impose a new standard that requires lawyers to mistrust their

2  clients or that precludes lawyers from relying on factual representations by their clients that

3  appear reasonable under all the circumstances.

**1.     The Federal Rules of Civil Procedure have only limited applicability under the facts here.**

6      Rule 26 is the only rule that potentially applies to any Responding Attorney, and that Rule

7  would apply only to Leung -- who, for the reasons discussed below, should not be sanctioned

8  under Rule 26 or any other authority.  Rule 26 does not apply to Batchelder or Mammen, and no

9  other Federal Rule applies to the discovery violations at issue in these proceedings.

10     As a threshold matter, Rule 11 does not apply here, because this proceeding is limited to

11  discovery violations.  *See* Rule 11(d) ("This rule does not apply to disclosures and discovery

12  requests, responses, objections, and motions under Rules 26 through 37."); Sanctions Order at 18

13  n.5.

14     Similarly, Rule 37 does not even potentially apply in these proceedings, as the Court

15  correctly recognized in its Sanctions Order.  Sanctions Order at 26 n.9**.**  Rule 37 allows a court to

16  impose discovery sanctions in limited sets of circumstances, as set forth in sub-sections (b)(2) and

17  (c) of the Rule.  Rule 37(c) applies to parties only, and does not authorize sanctions against

18  attorneys.  *E.g., Apex Oil Co. v. Belcher Co. of N.Y.*, 855 F.2d 1009, 1014 (2d Cir. 1988) ("By its

19  express terms, Rule 37(c) applies only to a party.").  Rule 37(b)(2) authorizes sanctions against

20  attorneys, but only where they have violated a specific discovery order.  *E.g., R.W. Int'l Corp. v.*

21  *Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir. 1991) ("The rule's language clearly requires two

22  things …: a court order must be in effect, and then must be violated, before the enumerated

23  sanctions can be imposed.").  In this case, there were no such specific orders, but only general

24  case management orders that are insufficient to support Rule 37(b) sanctions.  *Signature Combs,*

25  *Inc. v. United States,* 222 F.R.D. 343, 345 n.1 (W.D. Tenn. 2004) (37(b) sanctions inappropriate

26  because court had not entered an order regarding contested discovery and "violations of the Case

27  Management Order do not involve discovery orders").  Courts within the Ninth Circuit have

28  consistently held that Rule 37(b) sanctions are available only after the court has issued a

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1    discovery order.  *E.g., NLRB v. International Medication Systems, Ltd.*, 640 F.2d 1110, 1115 (9th

2    Cir. 1981) ("courts can only impose rule 37(b)(2) sanctions after a ruling on all objections, and

3    then only for disobedience of a judicial order compelling discovery . . . ."); *Jimena v. UBS AG

4    Bank, Inc.*, 2008 U.S. Dist. LEXIS 18831, at p. 10 (E.D.Cal. 2008) ("Rule 37(b) permits sanctions

5    against the party failing to comply with a court order compelling production of the discovery.").

6    Courts outside the Ninth Circuit are in accord.  *E.g., Broadcast Music, Inc. v. Xanthas, Inc.*, 855

7    F.2d 233, 238 (5th Cir. 1988) ("Sanctions . . . may be imposed under Rule 37(b) for failure to

8    produce documents only when the court has entered an order compelling discovery."); *Shepherd

9    v. American Broadcasting Co.*, 62 F.3d 1469, 1474 (D.C.Cir. 1995) ("As we have stated, '[a]

10   production order is generally needed to trigger Rule 37(b).'"); *Minn. Mining & Mfg. Co. v. Eco

11   Chem*, 757 F.2d 1256, 1261 (Fed. Cir. 1985) ("Rule 37(b)(2)(C) calls for an order compelling a

12   better and more complete response as a mandatory predicate to the imposition of sanctions.").

13   Rule 37 does not apply here.

14        Rule 26 does potentially apply here, but not to Batchelder or Mammen.  Under Rule

15   26(g)(1), "every discovery request, response, or objection must be signed by at least one attorney

16   of record in the attorney's own name--or by the party personally, if unrepresented ...."  An

17   attorney signing such a document certifies, "to the best of the person's knowledge, information,

18   and belief formed after a reasonable inquiry," that the request, response, or objection is

19               (i) consistent with these rules and warranted by existing law or by a
                 nonfrivolous argument for extending, modifying, or reversing
20               existing law, or for establishing new law;

21               (ii) not interposed for any improper purpose, such as to harass,
                 cause unnecessary delay, or needlessly increase the cost of
22               litigation; and

23               (iii) neither unreasonable nor unduly burdensome or expensive,
                 considering the needs of the case, prior discovery in the case, the
24               amount in controversy, and the importance of the issues at stake in
                 the action.

25   Fed. R. Civ. Proc. 26(g)(1)(B)(i)-(iii).  Rule 26(g)(3) authorizes sanctions for certifications that

26   violate the above rule, but such sanctions "may be imposed **only on the signer of the document**

27   **or the party on whose behalf the certificate was made**."  Hon. William W Schwarzer, *et al.*,

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9  4111

Case No.                          RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
05CV1958-B (BLM)                  OPENING MEMO ON REMANDED OSC

Practice Guide: Federal Civil Procedure Before Trial, National Edition at ¶11:2326 (The Rutter Group 2008) (emphasis added); *see also* Sanctions Order at 26 n.9.  Thus, Rule 26 cannot support sanctions against Batchelder or Mammen.

Nor should Leung be sanctioned under Rule 26.  The Rule requires only a reasonable inquiry.  It does not require the attorney to guarantee the truth of information provided by knowledgeable clients.  Rather, as case law demonstrates, <u>a lawyer is entitled to rely on his clients</u>, as Leung did here.  *Synesort Inc. v. Innovative Routines International, Inc.,* 2008 WL 1925304 (D.N.J. April 30, 2008) (declining to impose sanctions under Rule 26(g) where counsel spoke to key management personnel who provided incorrect information, explaining that court should not use the "wisdom of hindsight"); *Finley v. Hartford Life & Acc. Ins. Co.,* 249 F.R.D. 329 (N.D. Cal. 2008) (declining to impose sanctions under Rule 26(g) where counsel relied on client's defective search methods); *Gaytan v. Kapus,* 181 F.R.D. 573 (N.D. Ill. 1998) (declining to sanction attorney who relied on accuracy of files without even asking client to verify facts).

The legislative history of Rule 26 confirms that the Court cannot evaluate Leung's conduct in hindsight, or impose sanctions merely because the information Leung received from his client and upon which he relied was inaccurate.  According to the Advisory Committee, Rule 26 "<u>simply requires that the attorney make a reasonable inquiry into the factual basis of his response, request, or objection.</u>"  Fed. R. Civ. Proc. 26 Advisory Committee Notes (1983 Amendment) (emphasis added). According to the Advisory Committee, the Rule 26 reasonable inquiry requirement "is an objective standard similar to the one imposed by Rule 11." *Id.*  <u>The reasonable inquiry duty "is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances."</u>  *Id.* (emphasis added). "What is reasonable is a matter for the Court to decide on the totality of the circumstances." *Id.* Rule 26 sanctions are not imposed even for performance that falls below the standard of care for negligence; sanctions can be imposed only upon a finding that the attorney's conduct was unreasonable.

No such finding is possible here.  Leung's efforts constituted a reasonable inquiry under the standard established by case law.  He initiated a series of inquiries starting in January 2006

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

1   that should have generated information about Qualcomm's JVT participation.  His requests to

2   search for documents generated a large quantity of JVT materials, and would have uncovered

3   Qualcomm's early JVT attendance and monitoring if the Qualcomm paralegals had found the

4   right archive.   He and his colleagues interviewed numerous Qualcomm employees who gave

5   misleading or incomplete responses.  That information was confirmed time and time again, by

6   Qualcomm employees, by third parties, and by the records of JVT itself.

7            **2.      Substantive and procedural safeguards govern the Court's exercise of
                     its inherent powers.**

8

9            The only remaining source of sanctioning authority is the Court's inherent powers.

10   However, inherent powers are not merely a "catchall" available to punish any undesirable

11   conduct.  Rather, the Court must "exercise caution in invoking its inherent power, and it must

12   comply with the mandates of due process, both in determining that the requisite bad faith exists

13   and in assessing fees." *Chambers*, 501 U.S. at 50.

14            First and foremost, the Court cannot impose inherent powers sanctions unless the Court

15   finds that Responding Attorneys acted in bad faith, or finds conduct tantamount to bad faith -- a

16   finding that cannot be made here.   *Chambers*, 501 U.S. at 46-47; *Roadway Express*, 447 U.S. at

17   766-67; *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1131 (9th Cir. 2008).   Courts

18   "insist on the finding of bad faith because it ensures that 'restraint is properly exercised,' ... and it

19   preserves a balance between protecting the court's integrity and encouraging meritorious

20   arguments." *Primus Auto. Fin. Servs. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) quoting

21   *Zambrano v. Tustin*, 885 F.2d 1473, 1478 (9th Cir. 1989).  <u>Bad faith must be determined as of the

22   time of the conduct, without the benefit of hindsight.</u>  *TVT Records, Inc. v. Island Def Jam Music

23   Group,* 2006 U.S. Dist. LEXIS 62230, *33 (S.D.N.Y. May 15, 2006) (discussing inherent powers

24   sanctions and stating that "any hindsight analysis would be inappropriate").

25            "The bad faith requirement sets a high threshold."  *Primus Auto.*, 115 F.3d at 649;

26   *Mendez*, 540 F.3d at 1131.  <u>Negligent or even reckless conduct does not warrant inherent power

27   sanctions.</u>  *Moore v. Keegan Mgmt. Co. (In re Keegan Mgmt. Co. Sec. Litig.),* 78 F.3d 431, 436

28   (9th Cir. 1996) (reversing inherent powers sanctions based on recklessness because "[o]ur

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

61

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1   precedents plainly require more"). In fact, "[e]ven in a case where the district court described a

2   litigant's arguments as 'totally frivolous,' 'outrageous' and 'inexcusable' and called his behavior

3   'appall[ing],' [the Ninth Circuit] nonetheless refused to equate this characterization of conduct as

4   synonymous with a finding of bad faith." *Mendez*, 540 F.3d at 1132.

5        In its Sanctions Order, this Court cited *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir.

6   2001) for the proposition that "an attorney's reckless misstatements of law and fact, when

7   coupled with an improper purpose . . . are sanctionable under a court's inherent power."

8   Sanctions Order at 26. *Fink* did not lower the high threshold that exists for imposing inherent

9   powers sanctions, but only explained what constitutes "conduct tantamount to bad faith." *Id*. at

10  993; *see also Wilson v. PFS Mgmt. Co.*, 2008 U.S. Dist. LEXIS 22282, at *13 (S.D. Cal. (District

11  Judge Hayes) Mar. 20, 2008) (stating that the rule in *Fink* is an explanation of the "tantamount to

12  bad faith" requirement). Thus, the reckless conduct coupled with improper purpose must be

13  equally as egregious as (and thus, "tantamount to") bad faith conduct. Accordingly, inherent

14  powers sanctions based on recklessness plus an improper purpose are appropriate only in "rare

15  and exceptional case[s] ...." *Conn. Gen. Life Ins. Co. v. Ramsey*, 2007 U.S. Dist. LEXIS 71227,

16  *14 (E.D. Cal., Sept. 18, 2007).

17       The Court must find bad faith -- or recklessness plus an improper purpose -- by evidence

18  beyond a reasonable doubt, or at least by clear and convincing evidence. The Ninth Circuit has

19  held that the highest levels of procedural due process must be satisfied before a court may impose

20  serious punitive sanctions. *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d 1128,

21  1137 (9th Cir. 2001) ("To protect against abuse and to ensure parties receive due process,

22  individuals subject to sanction are afforded procedural protections, the nature of which varies

23  depending upon the violation, and the type and magnitude of the sanction." Thus, "[t]he more

24  punitive the nature of the sanction, the greater the protection to which an individual is entitled.").

25       In *Hanshaw*, the Ninth Circuit held that "substantial punitive sanctions [are] enough like

26  criminal contempt to warrant the same due process protections" -- including "the greater

27  protection that a reasonable doubt standard of proof provides." *Hanshaw*, 244 F.3d at 1139;

28  emphasis added. The court relied on *International Union, UMW v. Bagwell*, 512 U.S. 821

SHARTSIS   FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9     4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

(1994), and *Mackler Productions, Inc. v. Cohen*, 146 F.3d 126 (2d Cir. 1998).  *Hanshaw*, 244 F.3d at 1139.  In *Bagwell*, 512 U.S. at 825, 838, the district court issued multimillion dollar contempt fines against the plaintiff labor union, which the Supreme Court termed to be criminal in nature.  In the words of the Court, "Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." *Id*. at 829.  Thus, "a 'flat, unconditional fine' totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *Id*.

Similarly, in *Mackler Productions*, the Second Circuit recognized that "sanctions and contempts raise certain similar concerns."  146 F.3d at 130.  In that case, the district court imposed a $10,000 sanction against the defendants' attorney.  The Second Circuit held that the sanction required heightened due process protections:

> The sanction was not intended to be compensatory; indeed, the court imposed it in addition to a compensatory sanction and explicitly labeled it as punitive. The imposition was retrospective, by reason of past wrongful conduct; it did not seek to coerce future compliance, and no opportunity to purge was provided. The sanction was payable to the court, rather than to the injured party, further confirming its punitive nature. And the size of the required payment was substantial.

*Id*. at 129.  The court concluded "that the imposition of a sufficiently substantial punitive sanction requires that the person sanctioned receive the procedural protections appropriate to a criminal case" and "the imposition of a $10,000 punitive sanction on an individual (as opposed to a corporation or collective entity) requires such protections." *Id*. at 130.

Any sanction this Court may impose on Responding Attorneys would be punitive, not compensatory, especially since Broadcom has already been fully compensated by an award of its fees and costs.  Sanctions Order at 36.[28]  "[A] compensatory sanction--primarily intended to compensate a party for a wrong committed against it by the opposing party--is substantially different from a purely punitive sanction, in which a litigant must pay the court or perform some other penance for misbehavior." *Fleming & Assocs. v. Newby & Tittle*, 529 F.3d 631, 639 (5th

---

[28] The concern here is over punitive sanctions that ruin careers, not mere criticisms from the bench that a lawyer could have performed certain functions better.  Indeed, the experience of Responding Attorneys to date demonstrates that any sanction imposed by this Court -- even a sanction that has since been vacated -- has serious, punitive consequences on attorneys' careers. Mammen Dec., ¶¶ 6-8; Leung Dec., ¶¶ 6-7.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

**PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE**
**GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

1  Cir. 2008).  Indeed, courts have held that the types of sanctions that this Court has previously

2  imposed -- referral to the State Bar and participation in the CREDO program -- are punitive, and

3  serious, despite their non-monetary nature.   For example, in *Macias v. McGrath*, 439 F.3d 1141

4  (9th Cir. 2006), the Ninth Circuit held that a sanction of <u>referral to the state bar</u> and a modest

5  $1500 fine was sufficiently serious as to require the heightened due process protections stated in

6  *Hanshaw.  See also GMAC Bank v. HTFC Corp.*, 252 F.R.D. 253, 261 n.4 (E.D. Pa. 2008)

7  (recognizing that referral to a disciplinary body is more serious than a monetary sanction when it

8  held that the attorney had notice that "not only ... monetary sanctions might issue, but also that

9  <u>more severe penalties</u> might be imposed, <u>such as</u> the revocation of his pro hac vice admission and

10  <u>referral of the matter to the disciplinary board</u>") (emphasis added).   Here, this Court referred

11  Responding Attorneys to the State Bar, and there is no doubt that such a referral is serious.

12      Even if the Court considers imposing only some sanction that it deems not "serious," the

13  law would require the Court to apply a clear and convincing standard of proof.[29]  In the context of

14  non-serious inherent powers sanctions, "[t]he Ninth Circuit has not yet determined by what

15  standard of proof the district court must make its bad faith determination."  *Hanshaw*, 244 F.3d at

16  1143 n.11.   However, the weight of authority from other jurisdictions that have addressed this

17  issue dictates that a court must find <u>clear and convincing evidence of bad faith</u>.  See *Shepherd*, 62

18  F.3d at 1476-75 ("[a] heightened standard of proof is particularly appropriate because most

19  inherent power sanctions … are fundamentally punitive"); *Aoude v. Mobil Oil Corp.*, 892 F.2d

20  1115, 1118 (1st Cir. 1989) ('fraud on the court' must be proved "clearly and convincingly")**;**

21  *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986) (court requires "clear evidence" and a

22  "high degree of specificity in the factual findings" before imposing attorneys' fees -- a

23  <u>compensatory</u> sanction -- under inherent powers); *Quantum Communs. Corp. v. Star Broad, Inc.*,

24  473 F. Supp. 2d 1249, 1269 (S.D. Fla., 2007) (preponderance of the evidence is not sufficient for

25  entry of default under court's inherent powers); *Balcar v. Bell & Assocs. LLC*, 295 F. Supp. 2d

---

26  [29] "'[C]lear and convincing' evidence has been described as evidence which produces in the mind
   of the trier of fact an abiding conviction that the truth of [the] factual contentions are highly
27  probable."  *Comcast Cable Communs. Corp. v. Finisar Corp.*, 571 F. Supp. 2d 1137, 1141 (N.D.
   Cal. 2008) (quoting *Buildex, Inc. v. Kason Industries, Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988))
28  (internal quotation omitted).

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

Case No.                    RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
05CV1958-B (BLM)                   OPENING MEMO ON REMANDED OSC

635, 640 (N.D. W. Va. 2003) ("Although the Fourth Circuit appears not to have addressed the issue, this Court believes it, too, would adopt the clear and convincing evidence standard with regard to the Court's inherent power to sanction."); *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 439 (S.D.N.Y. 2002) (before inherent power sanctions can be imposed, "it must be established by clear and convincing evidence that [the party to be sanctioned] has 'sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate' the action"); *Samuel v. Michaud*, 980 F. Supp. 1381, 1408 (D. Idaho 1996) ("Courts require clear and convincing evidence of misconduct before imposing attorneys' fees under their inherent power."); *see also Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995) ("the threshold for the use of inherent power sanctions is high").

In issuing the Sanctions Order, the Court appears to have applied a preponderance of the evidence standard. The Court enumerated four possible scenarios regarding Responding Attorneys' role in the discovery failures in this case: (1) "Qualcomm intentionally hid the documents from its retained lawyers and did so so effectively that the lawyers did not know or suspect the suppressed documents existed"; (2) "the retained lawyers failed to discover the intentionally hidden documents or suspect their existence due to their complete ineptitude and disorganization"; (3) "Qualcomm shared the damaging documents with its retained lawyers . . . and the knowledgeable lawyers worked with Qualcomm to hide the documents and all evidence of Qualcomm's early involvement in the JVT"; and (4) "while Qualcomm did not tell the retained lawyers about the damaging documents and evidence, the lawyers suspected there was additional evidence or information but chose to ignore the evidence and warning signs and accept Qualcomm's incredible assertions regarding the adequacy of the document search and witness investigation." Sanctions Order at 24. The Court rejected the first two scenarios based on the fact that Responding Attorneys are "talented, well-educated, and experienced," and thus should have known that Qualcomm had failed to conduct an adequate search for documents. *Id* at 24-25. The Court found no direct evidence of scenario three. *Id.* at 25. Then, by process of elimination, the Court found it "likely that some variation of option four occurred ...." *Id.* at 26 (emphasis added).

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

The privileged communications that Responding Attorneys have revealed for the very first time in this brief demonstrate that the Court's first scenario, or something close to it, is what actually happened here -- and that **even talented, well-educated and experienced lawyers can be fooled by a client that is not forthcoming**. The Court could not have known whether that in fact occurred without actually seeing the privileged communications, and without actually knowing what Responding Attorneys asked Qualcomm and how Qualcomm responded. The process in the Sanctions Order, of eliminating three scenarios (one without benefit of a complete record) and then selecting the fourth as "likely," falls well short of a clear-and-convincing finding of bad faith, and even further short of the "beyond a reasonable doubt" test adopted by the Ninth Circuit in *Hanshaw* for serious, punitive sanctions. To impose inherent powers sanctions here, the Court must apply stronger safeguards and a higher standard of proof.

## C.   The Court Cannot Impose New Standards and Obligations on Counsel.

In its Sanctions Order, the Court appeared to rule that Responding Attorneys could be sanctioned for a failure to independently verify representations made by other attorneys before relying on them. *See* Sanctions Order at 26 n.9, 31 n.13. Similarly, the Court stated that Responding Attorneys could be sanctioned pursuant to a duty of good faith and reasonable inquiry derived from the "spirit and purposes" of the Rules, even if no specific Rule applied. *Id*. Responding Attorneys would be deprived of their due process right to fair notice if sanctions were imposed under either of these approaches.

### 1.   Punitive sanctions, like those at issue here, violate Due Process when the Court retroactively applies an unforeseeable enlargement of the law.

An unforeseeable judicial expansion of the law applied retroactively operates like an *ex post facto* law and violates due process rights. "The Ex Post Facto clauses of the United States Constitution prohibit the states and the federal government from passing criminal or penal statutes that have a retroactive effect." *Webster v. Woodford*, 369 F.3d 1062, 1066 (9th Cir. 2004) (citing U.S. Const. Art. I, § 9, cl. 3 ("No ... ex post facto Law shall be passed.")). Although the Supreme Court has yet to "extend[] the Ex Post Facto clauses to judicial acts," *id.* at 1066-67 citing *Frank v. Mangum*, 237 U.S. 309, 344 (1915), the Supreme Court in *Bouie v. Columbia*, 378 U.S. 347,

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1  353-54 (1964) held that "a judicial construction of a criminal statute encompassing conduct not

2  previously addressed by the statute can violate the Due Process Clause." *See also Webster*, 369

3  F.3d at 1066. Such a judicial construction "operates precisely like an ex post facto law." *Bouie*,

4  378 U.S. at 353. "The fundamental principle that the required criminal law must have existed

5  when the conduct in issue occurred . . . must apply to bar retroactive criminal prohibitions

6  emanating from courts as well as from legislatures." *Id.* at 354. Thus, "[a]n unforeseeable

7  judicial enlargement of a criminal statute, applied retroactively, violates the federal due process

8  right to fair warning of what constitutes criminal conduct." *Clark v. Brown*, 450 F.3d 898, 911

9  (9th Cir. 2006).

### 2. The rule in *Bouie* -- that judicial construction of a criminal statute to include conduct not previously addressed violates Due Process -- applies to punitive sanctions

12  The constitutional prohibition against *ex post facto* laws is not strictly limited to criminal

13  statutes. Rather, it applies to laws that are "criminal or penal in nature." *United States v. Mest*,

14  789 F.2d 1069, 1071 (4th Cir. 1986) (emphasis added); *United States v. All Assets Held at Bank*

15  *Julius Baer & Co.*, 571 F. Supp. 2d 1, 7 (D.D.C. 2008). "The constitutional prohibition is

16  addressed to laws, 'whatever their form,' which make innocent acts criminal, alter the nature of

17  the offense, or increase the punishment." *Collins v. Youngblood*, 497 U.S. 37, 47 (1990) quoting

18  *Beazell v. Ohio*, 269 U.S. 167, 170 (1925). "Subtle ex post facto violations are no more

19  permissible than overt ones." *Id.* "If the intention of the legislature was to impose punishment,

20  that ends the inquiry." *Smith v. Doe*, 538 U.S. 84, 92 (2003) *Id.* (internal quotations omitted).

21  Similarly, due process protections are not strictly limited to criminal statutes, but rather

22  apply to all judicial actions that are punitive in nature. For example, in *State Farm Mutual*

23  *Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 417 (2003), the Supreme Court recognized

24  in the context of civil punitive damages that "elementary notions of fairness enshrined in our

25  constitutional jurisprudence dictate that a person receive fair notice . . . of the conduct that will

26  subject him to punishment." Punitive sanctions, though not criminal, implicate the fair notice

27  requirement of the Due Process Clause. *Exxon Valdez v. Exxon Mobil Corp. (In re Exxon*

28  *Valdez)*, 490 F.3d 1066, 1078 (9th Cir. 2007) ("[A] punitive damage award violated the Due

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

67

1   Process Clause of the Fourteenth Amendment when it was so grossly excessive that the defendant

2   lacked fair notice that it would be imposed."); *see also Patton v. TIC United Corp.*, 77 F.3d 1235

3   (10th Cir. 1996) (indicating that the notice component of the due process clause would be

4   violated if the law did not fairly indicate that a punitive damages award might be imposed in

5   response to egregiously tortious conduct); *Regents of University of Minn. v. National Collegiate*

6   *Athletic Asso.*, 560 F.2d 352, 369 (8th Cir. 1977) (not limiting due process protections to criminal

7   proceedings, but rather stating that "due process does require that lawful punitive action can only

8   be imposed where fair notice has been given," citing *Bouie*), disapproved on other grounds in

9   *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 182 (1988).

10       The Ninth Circuit has implicitly recognized that attorney sanctions are similar to criminal

11   penalties, and therefore implicate the due process requirement that the attorney receive fair notice

12   that the conduct could subject the attorney to sanctions. *United States v. Trimble*, 487 F.3d 752,

13   756-57 (9th Cir. 2007) addressed the penalty imposed for traffic tickets but relied upon the due

14   process analysis in an attorney sanction case. In *Trimble*, the defendant was charged a processing

15   fee on a traffic ticket. *Id*. at 753. Other drivers appeared before the magistrate on the same day

16   and received similar citations covering the same period but were not charged the processing fee

17   because they received the older version of the citation notice. *Id*. at 753. The government argued

18   that the defendant could not complain about this discrepancy because she was put on notice of the

19   processing fee when she received her ticket. *Id*. at 756. The Ninth Circuit rejected this argument

20   and stated that "telling offenders after they have committed an offense what the penalty is for

21   doing so serves none of the usual due process functions served by the notice requirement in

22   criminal law." *Id*. The Ninth Circuit relied on the Supreme Court's due process holding in *Bouie*

23   (discussed above) and cited *In re Yagman*, 796 F.2d 1165, 1168, 1170 (9th Cir. 1986), a case that

24   dealt with Rule 11 sanctions against an attorney. *Id*. at 756-57. The reference to a Rule 11 case

25   shows that the Ninth Circuit recognizes the potentially punitive value of sanctions imposed on an

26   attorney under the Federal Rules and that due process protections against retroactive applications

27   attach in attorney sanctions proceedings.

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

**3.    Imposing sanctions for failing to independently verify each representation made by another attorney would violate Responding Attorneys' Due Process rights.**

"An unforeseeable judicial enlargement of a criminal statute, applied retroactively, violates the federal due process right to fair warning of what constitutes criminal conduct." *Clark*, 450 F.3d at 911.   Imposing sanctions on Responding Attorneys for relying on another attorney's representations without independently verifying each representation would be a judicial expansion of law that was unforeseeable and retroactively applied.

No authority -- not a Rule, a case, a standard of professional conduct, or any similar authoritative directive -- requires an attorney to independently verify every representation made by another attorney in his or her firm or by competent co-counsel before relying on it.   In fact, courts have stated the opposite.   For example, in *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 549 (1991), the Supreme Court stated that a law firm should not be sanctioned for relying (without independent verification) on the statements of the client's in-house counsel.   Similarly, in *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1226 (11th Cir. 2003), the Eleventh Circuit refused to impose sanctions under 28 U.S.C. § 1927 on counsel who had relied on representations by the attorney who had referred the case.   *See also* Fed. R. Civ. Proc. 26 Advisory Committee Notes (1983 Amendment) ("[T]he attorney may rely ... on communications with other counsel in the case as long as that reliance is appropriate under the circumstances."); Thomas Allman, *Deterring E-Discovery Misconduct by Counsel Sanction: The Unintended Consequences of* Qualcomm v. Broadcom, 118 YALE L.J. POCKET PART 161, 163-64 (2009); Appendix of Supplemental Authority, Ex. A ("if the benefits of a team approach -- allowing for effective, timely management of the complex demands of e-discovery -- are to be realized in a cost-effective manner, mutual reliance in good faith must be realized." (emphasis added)).   Requiring attorneys on a team to independently confirm each other's representations would be an unwise judicial expansion of the law.

To require an attorney to independently verify each representation of another attorney before relying on it would be impractical and contrary to current custom and practice.   Zaitlen

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

69

Expert Dec., ¶ 4.   If an attorney were required to independently verify co-counsel's representations, clients would be repeatedly billed for the same work as attorneys confirmed the prior work of attorneys in their firm and of co-counsel engaged by the client to work with them. Such a rule would mean that work could not be spread among several attorneys because each attorney would have to verify the others' work before using it.   Moreover, unless such a rule was publicly announced (in advance), any firm following this procedure would be at a competitive disadvantage to the vast majority of other firms who were not performing duplicative investigations.   Simply put, requiring attorneys to verify other attorneys' work would be inefficient and costly.   Such a requirement can be imposed only by a statute or court rule announced in advance so that all law firms are universally subject to the same requirements.

Finally, imposing sanctions on Responding Attorneys for failing to verify representations made by another attorney would be a retroactive application of an unforeseeable judicial enlargement of the law.   The Court would not be announcing this principle and informing Responding Attorneys that they could be sanctioned under it for future conduct.   Rather, the Court would be announcing this principle after the conduct at issue occurred.   Fundamental principles of due process require that the rule being used to impose sanctions "must have existed when the conduct in issue occurred ..." *Bouie*, 378 U.S. at 354.   No such rule, requiring attorneys to confirm the work done by other co-counsel before relying on that work, existed while this case was pending.   Imposing sanctions on this basis would violate Responding Attorneys' due process right to fair notice.

### 4.   The Court cannot impose new obligations on attorneys based on the "spirit and purposes" of the Rules.

The Court does not have authority to impose sanctions based on anything other than the strictures of the actual existing Rules or the court's inherent powers.   The Rules provide a number of mechanisms for sanctioning attorneys. *See, e.g.,* Fed. R. Civ. Proc. 11; 26; 37.   "When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." *Shepherd v. ABC*, 62 F.3d 1469, 1474 (D.C. Cir. 1995) citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991).   Courts must rely on

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

70

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1   the Rules first, and look to inherent powers only if the Rules do not reach the conduct at issue.

2   *Chambers*, 501 U.S. at 50 ("court[s] ordinarily should rely on the Rules rather than the inherent

3   power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the

4   task, the court may safely rely on its inherent power.")  When courts do invoke their inherent

5   powers, they must apply strong procedural and substantive protections, as discussed above.

6       Inherent powers sanctions -- and the substantive and procedural restrictions on their

7   application -- provide the <u>only</u> means for the Court to impose sanctions for conduct not expressly

8   prohibited by the Rules, as several courts have recognized.  *E.g., Shepherd*, 62 F.3d at 1474; *G.*

9   *Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 666 (7th Cir. 1989); *Zubulake v. UBS*

10  *Warburg LLC*, 229 F.R.D. 422, 430 n.60 (S.D.N.Y. 2004); *Settlegoode v. Portland Pub. Schs*,

11  2002 U.S. Dist. LEXIS 20337, at *13-14 (D. Or., May 16, 2002).  No authority allows a federal

12  court to look to the "spirit and purpose" of the Federal Rules of Civil Procedure, and to impose

13  sanctions on that basis.[30]  Responding Attorneys recognize that the Advisory Committee Notes to

14  Rule 26 state that Rule 26(g) "imposes an affirmative duty to engage in pretrial discovery in a

15  responsible manner that is consistent with the spirit and purposes of Rules 26 through 37."  Yet

16  no court has used this statement as a basis to impose sanctions under the Rules for conduct that

17  would not be subject to sanctions under the express provisions of the Rules themselves.  Nor has

18  any court expanded its sanctioning authority to punish a perceived failure to comply with the

19  general "spirit and purpose" of the Rules governing discovery.

20       The real vice of using the "spirit and purposes" of the Rules to impose sanctions is that

21  attorneys representing a client in federal proceedings believe that they know the complete set of

22  standards that will govern their conduct in advance of engaging in that conduct.  The Rules, when

23  considered with other stated rules of professional conduct, present a comprehensive framework

24

25  _____

[30] The concept of looking to the "spirit and purpose" of the Rules bears a superficial resemblance to the concept of recognizing the "penumbra" to a constitutional right -- but there is a crucial

26  difference.  In each instance where the court has relied on the "penumbra," the court has *expanded* an individual *freedom*.  *Cf, e.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 484-46 (1965)

27  (holding that criminalizing the use of contraceptives infringed on the right to privacy found to be in the penumbra of the rights enumerated in the Bill of Rights).  The concept of a "penumbra" to

28  a stated group of rules (such as the Federal Rules of Civil Procedure) has never been used to expand the scope of conduct for which an individual could be punished.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9    4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

governing attorney behavior, except in the most extraordinary circumstances where inherent powers (with their strong procedural and substantive safeguards) are necessary to protect the administration of justice and maintain the authority and dignity of the court. See *Chambers*, 501 U.S. at 50; *Lasar*, 399 F.3d at 1109-10; *Primus Auto.*, 115 F.3d at 648; *Shepherd*, 62 F.3d at 1474. Retroactively announcing the application of an additional, new, and amorphous concept of unspecified infractions that violate the "spirit and purposes" of the Rules in general -- but not the provisions of any specific Rule -- and can be sanctioned on a lower standard of proof, or without a finding of subjective bad faith, would deny fundamental Constitutional rights to notice and due process. See *State Farm*, 538 U.S. at 417; *Bouie*, 378 U.S. at 353-54.

### D. <u>Sanctions Are Not Warranted Where an Attorney is Misled By His Client's Incorrect Representations and Omissions.</u>

Under any of the applicable sanctioning authority, sanctions against an attorney are inappropriate where the attorney relied upon, and was affirmatively misled by, his client on matters as to which the client had knowledge. That is precisely what occurred here: Responding Attorneys looked to Qualcomm, a large company with a sophisticated in-house legal staff, for complete and accurate information. Responding Attorneys questioned numerous individual Qualcomm employees; those individuals had sufficient information to answer the questions accurately and completely; yet those individuals provided incorrect information and omitted key facts in response to those questions. Under these circumstances, Responding Attorneys cannot be sanctioned -- especially under inherent powers, which requires a finding of subjective bad faith.

Cases declining to impose sanctions on a lawyer who was misled by his or her client have arisen in the context of sanctions under Rule 26, the inherent powers doctrine, and Rule 11. In *Books Are Fun, Ltd. v. Rosebrough*, 239 F.R.D. 532, 551, 556 (S.D. Iowa 2007), the court refused to impose Rule 26 and inherent powers sanctions against a third party's counsel where the client was at fault for concealing relevant information that counsel did not know existed. There, before the plaintiff filed its complaint, the third party executed an agreement with the defendant that outlined a potential business arrangement. *Id.* at 536. The third party did not deliver the executed agreement to the defendant but rather gave it to his own counsel in a sealed envelope, and asked

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9 4111

72

counsel to store it.  *Id.* at 535-36.  After filing suit, the plaintiff served a subpoena on the third party that required disclosure of the agreement, but neither the third party nor his counsel disclosed it.  *Id.* at 536-37.  When the plaintiff's president was deposed, he referenced rumors of the agreement.  After the deposition, the third party's counsel retrieved the sealed envelope with the agreement, and the third party opened it in his counsel's presence.  *Id.* at 537-38.  Soon thereafter, the agreement was disclosed.  *Id.* at 538.

The plaintiff requested sanctions under Rule 26 and pursuant to the court's inherent powers against counsel for concealing the agreement.  *Id.* at 550, 552.  The court refused the Rule 26 sanctions against counsel because there was no showing that counsel knew of the agreement, and therefore "sanctioning [counsel] would be improper."  *Id.* at 551.

With respect to the inherent powers sanctions, the court in *Books Are Fun* stated that there was "no specific evidence" that the third party's counsel "took a conscious, deliberate step to conceal the [agreement] or misrepresent its contents."  *Id.* at 556.  The court concluded that counsel "did not engage in bad faith or other misconduct by failing to produce [the agreement]," and that the "request for sanctions against [counsel] arising from any failure to produce the [agreement] must therefore be denied."  *Id.*; *see also Pafumi v. Davidson*, 2008 U.S. Dist. LEXIS 67036, *15-16 (S.D. Fla., Sept. 2, 2008) (inherent powers sanction not imposed on attorneys for litigating meritless case where counsel did not know that the claims were meritless because the clients withheld information).

The rule protecting a lawyer who was misled by his or her client has been similarly applied to Rule 11 sanctions proceedings.  In *Business Guides*, 498 U.S. at 549, the Supreme Court stated that a law firm who had been misled by its client should not be sanctioned under Rule 11.  In that case, client Business Guides filed, through its counsel Finley, Kumble, an action for copyright infringement, conversion, and unfair competition, and sought a temporary restraining order.  *Id.* at 535-36.  The request for a temporary restraining order was signed by both Finley, Kumble and Business Guides, but Finley, Kumble had relied heavily on Business Guides' representations to it.  *Id.* at 536, 549.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

73

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

**PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE**
**GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

1   The request for a temporary restraining order was denied because the information

2   supporting the request was incorrect, thereby rendering the request baseless. *Business Guides*,

3   498 U.S. at 536-37.  Though Business Guides provided a satisfactory excuse why the information

4   was incorrect, the district court issued Rule 11 sanctions against it for failing to conduct a proper

5   inquiry and causing unreasonable and false information to be presented to the court. *Id.* at 539-

6   40.  The Supreme Court affirmed the sanctions against Business Guides but stated that its lawyers

7   should not be sanctioned for relying on its clients' incorrect factual statements. *Id.* at 549 ("Quite

8   often it is the client, not the attorney, who is better positioned to investigate the facts supporting a

9   paper or pleading ….").  The Supreme Court's reasoning applies equally to Rule 26 and inherent

10  powers sanctions.

11  Other courts are in accord with the Supreme Court's statements in *Business Guides* that an

12  attorney who is misled by his or her client should not be sanctioned.  *See Sleep Country USA, Inc.*

13  *v. Northwest Pacific, Inc*., 2003 U.S. Dist. LEXIS 26056 at *4-7 (W.D. Wash., Oct. 15, 2006)

14  (when "the client mislead[s] its attorney as to the truth of certain factual allegations, the court

15  may impose sanctions on the client and not the attorney"); *Taylor v. United States*, 151 F.R.D.

16  389, 394 (D. Kan. 1993) (Rule 11 sanctions not imposed on an attorney for relying on client's

17  incorrect representation that she never received a notice from the IRS); *In re Alberto*, 119 B.R.

18  985, 993 (Bankr. N.D. Ill. 1990) (citing *Chevron, U.S.A., Inc. v. Hand*, 763 F.2d 1184, 1187 (10th

19  Cir. 1985)) (stating in the context of Rule 11, "sanctions fall wholly on the client when he has

20  misled his attorney as to the facts or purpose of the proceeding . . . ."); *Schaffer v. Chicago Police*

21  *Officers*, 120 F.R.D. 514, 516 n.1 (N.D. Ill. 1988) ("[S]hould a client mislead an attorney as to the

22  facts or purpose behind a proceeding, then the sanctions most likely would be assessed solely

23  against the client."); *Henderson v. Weatherly*, 116 F.R.D. 147, 148 (E.D. Pa. 1987)  ("Federal

24  Rule of Civil Procedure 11 <u>does not require an attorney to disbelieve his own client</u> merely on the

25  strength of contrary assertions by opposing counsel . . . .") (emphasis added).

26  In short, "[R]etained counsel may rely on reasonable assurances by its client as to the

27  adequacy of the client's [discovery] efforts without independent verification."  Allman , <u>Deterring</u>

28  <u>E-Discovery Misconduct, etc.</u>, *supra*, 118 Yale C.J. Pocket Part at 163-164, Appendix of Other

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

Authority, Ex. A.  Here, Responding Attorneys went beyond assurances from their client, to sources including public records of JVT, statements of third parties like Sullivan (the JVT Chair) and Reader (Broadcom's own expert), and more -- and all of those sources corroborated Qualcomm's story.

### E.   Certain Factual Findings are Binding on Qualcomm.

Responding Attorneys do not know whether or to what extent Qualcomm will attempt to participate in these sanction proceedings.  However, Qualcomm is prevented by the doctrines of collateral estoppel/issue preclusion and law of the case from contesting certain factual determinations already made by Judge Brewster, including some relating to the credibility of specific Qualcomm employees.   In the Waiver Order, Judge Brewster made the following findings that are binding upon Qualcomm here:

(1)   Instead of disclosing the '104 and '767 patents to the JVT and offering to license them royalty-free or under non-discriminatory, reasonable terms during the development phase of the JVT work on the H.264 standard, Qualcomm closely monitored and participated in the development of the H.264 standard, all the while concealing the existence of at least two patents it believed were likely to be essential to the practice of the standard, until after the development was completed and the standard was published internationally.  Waiver Order at 9.

(2)   Qualcomm participated in the JVT as early as January 2002, well before the release of the H.264 standard in May 2003.  Waiver Order at 9.

(3)   As early as January 2002, Qualcomm hired an outside consultant, Jordan Isailovic, to attend JVT meetings on Qualcomm's behalf and send reports to Qualcomm summarizing the progress of the JVT, which he did on multiple occasions.  Waiver Order at 10-11.

(4)   At least 118 emails, and probably in excess of 120 emails, discussing the work of the JVT were sent between (a) Qualcomm employees, including Irvine and Raveendran; (b) Qualcomm consultant Isailovic; and/or (c) a Qualcomm email list "DC-System-Eng." dated from March 11, 2002 to July 22, 2004.  About 107 of these emails were sent before the H.264 standard was released in May 2003.  Waiver Order at 11.

(5)   Not only did Qualcomm consultant Isailovic attend JVT meetings as early as January 2002, Qualcomm employees attended JVT meetings well before the H.264 standard was released in May 2003.  Waiver Order at 11.

(6)   Qualcomm employees Yun and Silberger attended the May 2002 JVT meeting in Fairfax, Virginia.  On May 8, 2002, Yun sent a three-page meeting report email to eight Qualcomm employees, including Irvine, Raveendran, Determan, and Silberger with an explicit reference to Yun having attended some JVT meetings.  Waiver Order at 11-12.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

(7) Qualcomm voted on ballots affecting JVT as early as June 2002.  Waiver Order at 12.

(8) JVT participants treated the JVT IPR Policies as imposing a duty to disclose patents that reasonably may be essential to the H.264 standard.  Qualcomm was aware of this treatment by JVT participants as early as August 2002.  Waiver Order at 13 and 16.

(9) Qualcomm had knowledge as early as March 2002 that its ABT-related patents, including the '104 and '767 patents, reasonably might be necessary to practice the H.264 standard.  Waiver Order at 16, 17 and 20.

(10) Qualcomm intentionally organized a plan of action to shield the '104 and '767 patents from consideration by the JVT with the anticipation that (a) the resulting H.264 standard would infringe these patents, and (b) Qualcomm would then have the opportunity to become an indispensable licensor to anyone in the world seeking to produce H.264-compliant products.  Waiver Order at 21.

The Waiver Order, and these specific findings, are final as to Qualcomm.[31]  Waiver Order at 54; Remand Order at 2.

The doctrine of issue preclusion, sometimes referred to as collateral estoppel, makes the findings in the Waiver Order binding against Qualcomm.  It prevents the relitigation of issues adjudicated in an earlier proceeding when three requirements are met:

(1) the issue necessarily decided at the previous proceeding is identical to the one which sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding.

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.* 442 F.3d 741, 746 (9th Cir. 2006); *Hydranautics v. FilmTec Corp.,* 204 F.3d 880, 885 (9th Cir. 2000); *Town of North Bonneville v. Callaway*, 10 F.3d 1505, 1508 (9th Cir. 1993).  These conditions are all met here.

"Under the law of the case doctrine, a court is precluded from re-examining an issue previously decided by the same court, or a higher appellate court, in the same case." *A & A Concrete, Inc. v. White Mountain Apache Tribe,* 781 F.2d 1411, 1418 (9th Cir. 1986).  This doctrine applies to factual findings previously made by the Court, *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 912 n.6 (9th Cir. 2008) (declining to remand because the district court

---

[31] The findings against Qualcomm cannot be asserted in any way against Responding Attorneys because they were not parties to the waiver proceedings before Judge Brewster, and all findings against them in the initial sanction proceedings were reversed on due process grounds because Qualcomm's assertion of the attorney-client privilege effectively precluded Responding Attorneys from having their "day in court."

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

**PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

1  would be bound by previous findings of fact and conclusions of law), even if those factual

2  findings were made at the trial court level and not passed upon by a higher court, see *Ridgeway v.*

3  *Montana High School Asso.,* 858 F.2d 579, 587-88 (9th Cir. 1988) (rejecting contention that law

4  of the case applies only to issues that have been decided by an appellate court that has ordered a

5  remand in the proceeding and declaring that district court judge was not free to disregard orders

6  of the judge who formerly presided over the matter).  "A court will generally not depart from the

7  law of the case unless one of three "exceptional" situations is presented: (1) an intervening

8  change in controlling law: (2) new evidence has surfaced; or (3) the previous disposition has

9  resulted in clear error or manifest injustice.").  See *Magnesystems v. Nikken, Inc.,* 933 F.Supp.

10  944, 948-49 (C.D. Cal. 1996)  No exception to the law of the case doctrine applies here.

11        Under the doctrines of issue preclusion and law of the case, if Qualcomm elects to

12  participate in these proceedings, it should be precluded from contesting Judge Brewster's findings

13  set forth above and precluded from introducing argument or evidence to contradict those findings.

14  **IV.    THESE RESPONDING ATTORNEYS SHOULD NOT BE SANCTIONED.**

15        The facts in this case do not support sanctions under the legal standards discussed above.

16  The only legal basis for sanctions on Responding Attorneys would be the Court's inherent powers

17  and, as to Leung only, Rule 26(g) because he signed Qualcomm's discovery responses.  But

18  neither basis supports the imposition of sanctions here.

19        Responding Attorneys acted in good faith, and in reasonable reliance on their client --

20  whom they were entitled to presume was being truthful.  Responding Attorneys repeatedly asked

21  numerous Qualcomm employees questions that would have uncovered Qualcomm's early JVT

22  participation, had the answers been forthright and complete.  Those inquiries began in January

23  2006 if not before, and were repeated and expanded on multiple occasions through trial in

24  January 2007.  Responding Attorneys received consistent answers to those inquiries -- that

25  Qualcomm was not involved in JVT while H.264 was under development, that Qualcomm did not

26  pay attention to JVT during that time, and that Qualcomm did not compare its patents to H.264

27  until July 2005 -- from numerous Qualcomm employees from the Standards group, from the

28  Digital Cinema group, and from the in-house legal department.  Responding Attorneys reasonably

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9 4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1  and in good faith relied on those answers, which were confirmed by information from third

2  parties including Sullivan, Reader, and JVT's own detailed public records of meetings.

3  Responding Attorneys, moreover, reasonably relied on Qualcomm's discovery process, under

4  which Qualcomm's in-house legal department retained initial and primary responsibility for

5  identifying knowledgeable witnesses and likely custodians from among the company's 10,000-

6  plus employees, a process that had worked successfully in numerous prior litigations.

7      The Court cannot impose sanctions simply because Qualcomm failed to disclose

8  documents or information to Responding Attorneys until after trial.  Nor can the Court sanction

9  Responding Attorneys because there were "red flags," when Responding Attorneys conducted

10  reasonable and good faith follow-up inquiries in response to those red flags.  Now that

11  Responding Attorneys have been able to disclose their communications with Qualcomm, the

12  "totality of the circumstances" demonstrates that Responding Attorneys acted in good faith, that

13  they conducted a reasonable initial inquiry, that they conducted new and reasonable further

14  inquiries in response to any potential red flags, and that those inquiries confirmed what

15  Responding Attorneys genuinely believed throughout the 1958 Case:  That Qualcomm was not

16  involved in JVT until after H.264 was published.

17      **A.    <u>KEVIN LEUNG</u>**

18      Leung was a mid-level associate who had worked at two law firms before he came to Day

19  Casebeer in December 2005.  He was responsible for day-to-day discovery in the 1958 case.  He

20  was directly supervised by then-senior associate Chris Mammen.  Together they kept Jim

21  Batchelder generally apprised on discovery, although Batchelder was not directly involved in the

22  conducting day-to-day details of discovery with respect to JVT.

23      Leung's communications with Qualcomm (a) demonstrate that he made reasonable

24  inquiries into Qualcomm's involvement in JVT and H.264, and (b) preclude any finding of bad

25  faith on Leung's part.  The facts that are detailed in Leung's Supplemental Declaration and in this

26  brief will be summarized here to show that sanctions against Leung are not justified.

27      In January and February 2006, Leung initiated multiple inquiries into whether Qualcomm

28  had any participation, involvement, membership, or interaction with JVT or H.264.  Those

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1   inquiries, which Qualcomm personnel directed to the people they believed, or claimed to believe,

2   were likely to have relevant information, reached a host of individuals from Qualcomm's

3   Standards Group, its former Digital Cinema group, and its in-house legal department, including

4   Tiedemann, Garudadri, Ludwin, Lee, Raveendran, Irvine, English, Rouse, Baker, Martin, Rogers,

5   and Minhas.  These individuals -- several of whom were key actors in Qualcomm's early efforts

6   to monitor and participate in JVT -- gave responses ranging from Martin's "[it] is almost certainly

7   true (we had no participation)," to Tiedemann's "I don't believe that anyone from the standards

8   organization has participated in any of these meetings except recently," to Raveendran and

9   Garudadri concealing their own attendance at JVT meetings, to Irvine claiming that her Digital

10  Cinema group had specifically ignored JVT -- when, in reality, that group had hired Isailovic, had

11  sent engineers around the world to JVT meetings, and had worked with in-house counsel and

12  others to compare H.264 to Qualcomm's patents.

13        Leung continued these inquiries in the deposition phase.  When Martin selected Irvine as

14  Qualcomm's 30(b)(6) witness on JVT, Leung requested her documents on H.264.  Then, after

15  consulting with his supervisor, he deferred to Qualcomm's stated preference of looking to central

16  repositories to produce documents responsive to a 30(b)(6) notice, which is after all directed to

17  the corporation, not an individual.  Qualcomm told Leung that the approach had worked in

18  another case identified to him, and that any documents in Irvine's possession would be

19  cumulative of the central repository.  The central repository method made sense given Irvine's

20  avowed lack of interest in JVT.  Leung believed that the execution of that approach -- an inquiry

21  to Qualcomm's Standards Librarian, Lisa Collicchio (an appropriate person), which led to the

22  "baggage" server and ultimately to the production of 400,000 pages of JVT-related documents --

23  was not only reasonable, but effective.  He did not know, and had no way of knowing, about the

24  "Livelink" directory that members of the long-disbanded Digital Cinema group had created in

25  2002.  Nor would he have any reason to suspect that there was such a directory, when Irvine -- the

26  former head of Digital Cinema -- was telling him, during preparation for deposition and on other

27  occasions, that the group had ignored JVT.

28        Leung could not review the documents from "baggage" before Irvine's deposition because

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

**PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE**
**GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

1  Qualcomm had not provided them, and he could not download those 400,000 pages from JVT's

2  server in any form that would enable him to search the documents without opening each one

3  manually.  Thus, he did not know about the post-H.264 participation those documents revealed,

4  and he did not prepare Irvine to testify about that participation.   And so, when Irvine was

5  impeached at deposition, Leung reasonably, and correctly, concluded that she simply was

6  unaware that Qualcomm employees, from a different part of the company and whom she did not

7  personally know, had gone to JVT meetings in late 2003 and in 2005.  Leung did not suspect --

8  and nothing about the deposition suggested -- that Irvine was concealing her own interest in the

9  early work of JVT, or the efforts that her own group had put into attending JVT meetings,

10  monitoring its activities, and comparing H.264 to Qualcomm's IPR, or the "consultant" that

11  Qualcomm hired to assist those efforts.  Thus, Responding Attorneys' follow-up after the Irvine

12  deposition -- their response to this purported "red flag" -- was to interview and get documents

13  from the Qualcomm employees who they now knew <u>had</u> participated in JVT, and to pursue the

14  leads arising from those interviews and documents.  They continued and expanded that follow-up

15  after the Ludwin deposition, to include interviews with Garudadri, Rouse, Raveendran, and

16  others.  Those efforts were reasonable and in good faith, and those efforts once again confirmed

17  that Qualcomm was not involved in JVT during the period that mattered in this case.

18      Finally, Leung's April 4, 2007 memo to Qualcomm, describing the trial themes

19  Responding Attorneys presented and the documents that contradicted those trial themes, refutes

20  any suggestion that Leung acted in bad faith, or that he did not actually believe that the

21  information presented on Qualcomm's behalf was true.  *See* Ex. Cialone-235; Leung Dec., ¶ 56.

22  Leung wrote that memo before any "accusatory adversity" between Qualcomm and Responding

23  Attorneys arose, and before there was any suggestion that Responding Attorneys themselves

24  might be subject to sanctions.  He expected the memo to be privileged, as an attorney-client

25  communication and as attorney work product.  Thus, the memo is trustworthy, as an indication of

26  Leung's actual state of mind at the time.  The memo conclusively demonstrates that Leung was

27  not aware of, and did not anticipate, the Qualcomm documents that refuted Qualcomm's trial

28  themes until they were located and reviewed after trial, and its existence and tone utterly

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

80

1   contradict any suggestion of "bad faith."

2       It does not appear that any other conduct by Leung has been criticized or identified as a

3   possible basis for sanctions.  Leung was on paternity leave from January 5 through 29, 2007,

4   during trial.  Leung Dec., ¶ 55.  He had no role in uncovering the 21 emails on Raveendran's

5   computer or the decisions about whether to produce them.

6       **B.    CHRIS MAMMEN**

7       Mammen was a senior associate.  From the time he joined Day Casebeer in June 2005, he

8   worked on several Qualcomm matters in addition to the 1958 Case.  Discovery in those cases was

9   conducted consistent with the Overview memo (Depo. Ex. 6).  Mammen informed Leung of those

10  procedures in January 2006, when Leung took over day-to-day discovery tasks on the 1958 Case.

11      Mammen was copied on or apprised of Leung's inquiries with Qualcomm, and the follow-

12  up inquiries Qualcomm paralegals conducted in response to Leung's inquiries.  He concurred in

13  the decision by Qualcomm's paralegals to rely on Qualcomm's corporate repositories, rather than

14  on Irvine, to locate and produce documents responsive to Broadcom's 30(b)(6) deposition notice

15  to Qualcomm.  He relied on Qualcomm's policies as established by the Overview memo, on the

16  superior knowledge that Qualcomm's in-house legal department had of the company, and on

17  Qualcomm's representations that the corporate repository approach had been effective in other

18  litigation, that it would produce a more complete set of documents, and that a collection from

19  individual 30(b)(6) witnesses would only be cumulative.  Moreover, Mammen knew that Irvine

20  had denied any interest in JVT and had no reason to believe she was likely to have responsive

21  documents.  Like Leung, he did not know, and could not have known, about the "Livelink"

22  repository.  Rather, he believed that the corporate repository approach had worked, because it

23  resulted in the production of voluminous documents, it revealed Qualcomm's later participation

24  in JVT of which Mammen had not known, and Qualcomm assured him and Leung that this

25  approach, in conjunction with searches of the engineers identified at Irvine's deposition as having

26  attended JVT meetings, had resulted in production of all JVT-related documents.

27      Mammen believed, reasonably and in good faith, that Qualcomm was not involved in JVT

28  while H.264 was under development.  Mammen Dec., ¶¶ 22, 59.  He based that belief on the same

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

**PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE**
**GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

1   information on which Leung relied, including the responses from Martin, Tiedemann,

2   Raveendran, Garudadri, and Irvine, the testimony of Sullivan and Reader, and the public archives

3   of JVT itself.  Mammen carried this inquiry further in January 2007, by which time Leung was on

4   parental leave.  Mammen interviewed Garudadri, who again confirmed that Qualcomm did not

5   participate in, or even monitor, JVT before H.264 was published.  Garudadri also told Mammen

6   that he did not compare H.264 to Qualcomm's patents.  And Garudadri concealed the reason, or

7   at least one reason, why he and Raveendran had looked at H.264 in 2002-2003:  To determine if

8   H.264 infringed Qualcomm's IPR, because "there [were] some employees of Qualcomm for

9   whom it [was] extremely important to find out the relevance of the patents to H.264."  Garudadri

10  thus confirmed to Mammen that Qualcomm first learned that its patents were relevant to H.264 in

11  July 2005 -- a story that Garudadri knew from his own experience was incorrect.

12      Mammen knew of a potential "red flag," the fact that Raveendran's email address

13  appeared on the December 2002 report of the ad hoc committee.  Mammen and others followed

14  up on this.  Raveendran repeatedly assured Responding Attorneys and their colleagues that she

15  had not signed herself up to this reflector, that someone else who knew of Raveendran's skill in

16  evaluating video quality must have done so, and that she had not monitored or been interested in

17  JVT while H.264 was under development.  This is what she told Patch in July or August 2006,

18  what she told Kyle Robertson in November 2006, and what she said again during trial.  These

19  inquiries were a reasonable and good faith response to the fact that Raveendran's email address

20  appeared as one of 179 subscribers to the avc_ce reflector, and Mammen acted consistently with

21  custom and practice in relying on them without duplicating the inquiries himself.  Zaitlen Expert

22  Dec., ¶¶ 4(b) and (d).

23      Mammen also acted in good faith in contributing to the decision not to produce the 21

24  emails located on Raveendran's laptop during trial.  Mammen has acknowledged, in retrospect,

25  that his decision that Qualcomm did not need to produce the emails was a mistake, but he did not

26  act in bad faith, or recklessly, or with an improper motive.  Rather, he considered a number of

27  reasonable factors.  He reviewed the 21 emails and saw that neither Raveendran nor any other

28  Qualcomm employee was identified as a sender, an addressee, or a copy recipient, or mentioned

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

**PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE**
**GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER**

in the body of emails.  He further determined that the emails, which were sent by an ad hoc subcommittee designated to design tests to compare the H.264 standard to earlier MPEG standards (*see* Ex. Cialone-236), did not relate to setting the technical content of H.264, but rather concerned issues like the selection of video clips to be used in such testing.  He knew of and considered Raveendran's and Qualcomm's consistent denial of involvement in JVT before H.264 was published, which other evidence confirmed and the 21 emails did not contradict.  He knew of and considered Raveendran's repeated representation that she did not sign herself up to the avc_ce reflector, and that she denied even reading the emails.  Mammen knew of and considered the fact that a Broadcom employee, Xuemin Chen, had led the ad hoc group; given that, and in view of Broadcom's efforts to use the appearance of Raveendran's email address on the December 2002 Ad Hoc Report on AVC Verification Tests, he believed that if there were emails sent to the reflector that indicated any work on the technical content of H.264, Broadcom would have offered some evidence of that.  He compared the content of the emails to the scope of Broadcom's document requests and Qualcomm's responses, and concluded that the emails were non-responsive, an assessment that he discussed with Patch, who concurred.  As Mammen has acknowledged, he did not consider that the mere existence of the emails on Raveendran's computer was material in that they contradicted assertions that Qualcomm had made in its Contentions of Fact and Law and elsewhere.  But the considered and thoughtful process that led Mammen to conclude that the 21 emails need not be produced -- a process that he had to conduct while responding to the extraordinary demands of this large and complex trial in progress -- demonstrates that he did not act recklessly or in bad faith.

It is important not to overstate the significance of these 21 emails -- the failure to produce them was <u>not</u> the cause of the discovery failure in this case, which had already occurred because knowledgeable Qualcomm employees had repeatedly and persistently withheld information about interactions with JVT.  The 21 emails were found on January 14, 2006, which was after discovery had closed and during trial.  They were produced ten days later, on January 24, 2006.  At most, Mammen contributed to an unwise decision that was remedied ten days later.  While it may now seem, in hindsight, that the 21 emails were the "tip of the iceberg," or an event that should have

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

alerted Responding Attorneys to Qualcomm's broad discovery failures, neither Mammen nor anyone else believed that at the time, and the Court cannot evaluate their conduct based on hindsight.  Based on evidence that included repeated and consistent representations from their client, Responding Attorneys believed that Raveendran had simply never known about, or had forgotten, the 21 unsolicited emails she had received four years earlier, from an ad hoc group she never joined, regarding tests for a standard in which she and her colleagues had no interest.[32] Indeed, Mammen and the other Responding Attorneys continued to believe, even after the 21 emails were produced, that Qualcomm had not participated in JVT while H.264 was under development, and that the post-trial searches Qualcomm eventually agreed to would come up empty.  Had they been right, it is unlikely that anyone would suggest that the failure to produce the 21 emails on January 14, 2007, in and of itself, would support the rare invocation of the Court's inherent powers.  Indeed, on March 21, 2007, when the initial failure to produce the 21 emails was known, Judge Brewster entered an order [Docket No. 528] rejecting the jury's advisory finding of inequitable conduct but adopting the jury's advisory verdict of waiver and issuing an order to Qualcomm to show cause why the Court's proposed remedy on waiver should not be adopted.  .  The Court discussed the 21 emails from Raveendran's computer in that order, but proposed only a relatively mild sanction on Qualcomm.

Mammen was not a primary actor in connection with the post-trial searches, but he was involved.  Mammen Dec., ¶ 57.  After the 21 emails had been produced and after trial had ended, and following an exchange of correspondence concerning whether the 21 emails were within the scope of documents that should have been produced pursuant to Broadcom's document demands, Broadcom sent a letter dated March 5, 2007 requesting for the first time that Qualcomm search the computers of twelve identified individuals.  Ex. Cialone-224.  Qualcomm did not believe that the searches would produce any documents, but nevertheless sent a letter dated March 7, 2007 (*i.e.,* two days later) agreeing to restore, collect and produce documents from a sample of five of

---

[32]     The information Raveendran gave to Patch further supported this understanding. Raveendran apparently averred that she had several hundred email boxes on her computer, that an automatic filter routed emails to these various boxes, and that the 21 emails had probably been routed automatically to one of these boxes, so that she never read them or even knew that they were there.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

1    the individuals who had been identified by Broadcom, the five who had testified at trial.   Ex.

2    Cialone-225;  Batchelder Dec., ¶¶ 45-46; Mammen Dec., ¶ 57; Leung Dec., ¶ 56.   When those

3    searches turned up relevant documents, Qualcomm promptly expanded the list to include all of

4    those individuals who had been identified by Broadcom.   Neither Mammen nor any of the other

5    outside counsel delayed the process of searching for and producing the documents requested by

6    Broadcom in its March 5, 2007 letter, a process that had to be approved and carried out by the

7    client.  Mammen Dec., ¶ 58.

8        **C.    JIM BATCHELDER**

9        Batchelder was Qualcomm's lead counsel in the 1958 case.  He was the principal lawyer

10   responsible for such issues as inventorship, claim construction, plaintiff's infringement

11   allegations, defendant's assertions of patent invalidity, and defendant's assertions of inequitable

12   conduct.  Batchelder Dec., ¶¶ 12-13.  Partly because of these demands on his time in the 1958

13   case and the demands of other litigation in which he was simultaneously acting as lead counsel,

14   Batchelder had only limited involvement in discovery and in preparing Qualcomm's response to

15   Broadcom's waiver defense, the issues that are central to these proceedings.  *Id.*, ¶¶ 14-15.  Other

16   attorneys were responsible for working with Qualcomm to collect documents and information for

17   use in responding to Broadcom's discovery demands, and other attorneys had primary

18   responsibility for investigating the issue of Qualcomm's participation in standards-setting bodies

19   and opposing Broadcom's waiver defense.  For the most part, Day Casebeer was responsible for

20   investigating the JVT issues, although Heller Ehrman pitched in on the investigation and assumed

21   primary responsibility for the substance of opposing Broadcom's waiver defense.  *Id.*, ¶¶ 17-18.

22       These statements about the limitations of Batchelder's role -- including that he was <u>not</u>

23   involved in conducting the day-to-day discovery regarding JVT or H.264 -- are not to suggest that

24   he removed himself from these or any other issues in the case.  To the contrary, he kept up with

25   developments in the case, including the results of various factual inquiries, through participating

26   in regular conference calls and team meetings, engaging in update and brainstorm sessions with

27   the attorneys who were on the front lines of the discovery and investigation efforts, reviewing

28   draft and final discovery responses, and being copied on emails.  As a result, he believed that the

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

85

1  attorneys on the team who were primarily responsible for discovery regarding Qualcomm's

2  involvement with JVT had made reasonable inquiries and undertook reasonable follow-up.  *Id.*,

3  ¶¶ 16, 22.

4       The magnitude and complexity of large cases like the 1958 case require that senior

5  lawyers delegate responsibility for certain tasks to other more junior lawyers and allocate

6  responsibility by subject matter or task to other senior lawyers.  *See* Zaitlen Expert Dec., ¶¶ 4(a)

7  and (e).  There are simply not enough hours in the day for the lead attorney in large case litigation

8  to do everything himself, or even to directly supervise everything that is done to prepare a large

9  patent case for trial.  *Id.*  Thus, most firms use a team approach to large case litigation,

10  particularly in the patent area.  *Id.* at ¶4(d).  To achieve the benefits of the team approach in a

11  cost-effective manner, a substantial degree of reliance on the work of others is necessary.  *Id.*

12  This includes reliance on other attorneys in the firm, attorneys in any firm that is co-counsel, the

13  client's in-house legal staff, and the client's employees.  *Id.*

14       The senior lawyers on a large case try to enlist qualified lawyers to assist them and to

15  assign responsibilities to those lawyers that are appropriate for their levels of competence and

16  experience.  *Id.* at ¶4(a).  Batchelder delegated responsibility for the conduct of discovery to

17  senior associate Mammen and mid-level associate Leung, although Batchelder and others on the

18  team were available to consult and assist when needed.  Leung was competent to manage the

19  discovery, and Mammen was competent to supervise him in that work, by virtue of their

20  education, experience and intelligence.

21       It is not consistent with custom and practice, and no statute or rule requires, that a lawyer

22  making a presentation to the Court regarding the state of the evidence re-trace the steps of the

23  attorneys who undertook discovery-related investigations.  The custom and practice is to rely on

24  work done by other members of the legal team, in part because of time constraints, and in part

25  because clients will not pay for such duplication of effort unless it is universally required by an

26  existing rule or law governing all lawyers.[33]  Zaitlen Expert Dec., ¶4(b).

---

[33] As an example, Mammen signed the opening and reply Memoranda of Contentions of Law and Fact, which he assembled from past pleadings and other counsel.  The opening memo was 252 pages containing 953 paragraphs.  The three paragraphs pertaining to waiver were lifted from the

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1    This is not to say that lawyers who make representations to the Court or the opposing

2   party merely repeat what they are told without critical evaluation -- they do not, and Batchelder

3   did not.  He used a practical common sense approach.  Like other lead counsel in large patent

4   cases (*see* Zaitlen Expert Dec., ¶ 4(c)), he started by being generally familiar with the case and

5   the issues.  He then considered whether what other lawyers on the team presented seemed

6   consistent with what he knew about the facts and the law, and whether the statements appeared to

7   be logical and internally consistent.  Through this process, Batchelder was informed of the vast

8   majority of the relevant facts uncovered by Leung, Mammen, and the rest of the JVT

9   investigation team -- including the substance of the statements made by Qualcomm employees

10   Chris Irvine, Viji Raveendran, Scott Ludwin, Hari Guradadri,  Ed Tiedemann, Yuri Reznick,

11   Marta Karczewicz, Roger Martin, Alex Rogers and Kent Baker.  He was informed that the

12   information from all of these Qualcomm employees had, without exception, pointed to the same

13   conclusions: that, before the H.264 standard was finalized, Qualcomm (1) had not attended or

14   otherwise participated in the JVT, and (2) had not compared the content of the draft H.264

15   standard to either of the two patents-in-suit. Batchelder also was informed of other information

16   that the investigation team had concluded, and that he concurred, corroborated those conclusions,

17   including Broadcom expert Cliff Reader's testimony that, despite his significant interaction with

18   JVT and his reading of the JVT minutes, he was not aware of any Qualcomm JVT involvement

19   prior to the standard's publication; JVT Chairman Gary Sullivan's testimony to the same effect;

20   the independent analysis of the JVT minutes by the investigating team, reaching the same

21   conclusion; and the fact that a Broadcom employee chaired the sub-committee that appeared to

22   have promulgated the lengthy email list containing Viji Raveendran's email address, but neither

23   that chairman nor any other Broadcom employee had come forward with any evidence of any

24   participation by Raveendran or any other Qualcomm employee before H.264 was published.

25   declaration of Qualcomm's expert which the expert prepared with assistance from the Heller firm.
The reply was another 19 pages containing 155 paragraphs.  The five paragraphs on waiver were

26   provided by the Heller firm.  Under the circumstances, where these documents were compiled at
the culmination of the pretrial preparation process, and members of the litigation team provided

27   sections of these documents on the issues with which they had been involved, it would be
unreasonable to expect Mammen, Qualcomm's local counsel, or any other lawyer in a similar

28   position to re-verify the factual accuracy of every paragraph in such voluminous documents.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1    Batchelder also knew that significant follow up investigation was undertaken by the team both

2    when it was learned in Chris Irvine's deposition that Qualcomm employees unknown to her had

3    attended JVT meetings after H.264 was published, and when it was learned that Raveendran's

4    email address appeared on the email reflector referenced above.  That follow up, and the results

5    of it, were summarized for him, and he was satisfied that both the investigation and its

6    conclusions were reasonable.

7            Since Batchelder did not sign any discovery responses, the only theoretical legal basis for

8    sanctions against him is the Court's inherent powers, which requires proof beyond a reasonable

9    doubt (or at least by clear and convincing evidence) of bad faith (or stated differently, reckless

10   misstatements coupled with improper purpose).  The evidence will not support such a finding, or

11   anything close to it.  In this regard, inherent powers sanctions can be imposed on an attorney

12   based only on that attorney's conduct, not on the acts of others.  Responding Attorneys are not

13   aware of any case that authorizes imposition of inherent powers sanctions based on a theory of

14   vicarious liability.  In fact, case law is to the contrary.  As stated in *Wolters Kluwer Financial*

15   *Services, Inc. v. Scivantage*, an inherent powers sanctions case: "[A] finding of bad faith is

16   personal to the offender and thus cannot be attributed to another, such as an offending attorney's

17   client or law firm, through such legal doctrines as vicarious liability."  525 F. Supp. 2d 448, 539

18   n.331 (S.D.N.Y. 2007) (emphasis added) (*citing* Gregory P. Joseph, Sanctions--The Federal Law

19   of Litigation Abuse 446 (Matthew Bender 2000)), *aff'd in part, rev'd in part*, 564 F.3d 110 (2d

20   Cir. 2009).  Any retroactive application of a theory of inherent powers sanctions based on the acts

21   of another or vicarious liability would be *ex post facto* and violative of due process.

22           Batchelder's role in response to the discovery of 21 emails on Raveendran's laptop

23   similarly does not warrant the imposition of sanctions.  Around 9:00 p.m. on January 14, 2007,

24   during a trial that had pushed his physical endurance to the limit, Batchelder was preparing his

25   upcoming cross-examinations of two key witnesses -- Broadcom's Chairman of the Board and

26   Broadcom's only expert on the subjects of infringement, patent invalidity, and inequitable

27   conduct.  Mammen came to where Batchelder was working and told him that JVT-related

28   documents had just been discovered on Raveendran's laptop.  In a brief conversation, Batchelder

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

88

Case No.
05CV1958-B (BLM)

RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
OPENING MEMO ON REMANDED OSC

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2006 ORDER

1   was told that the documents were not authored by Raveendran and that they did not reflect

2   Qualcomm attendance at JVT meetings or participation by Qualcomm in JVT.  Patch has testified

3   that, a short while later, he also told Batchelder about the documents.  Patch Depo. at 32:8-33:11.

4   The conversation with Patch lasted less than a minute.  *Id.*  Batchelder was not told about the

5   nature or content of the documents, or even that they were emails.  *Id.* at 37:5-10.  Later that

6   evening, Mammen reported back that the documents appeared to be non-responsive and explained

7   why he was not inclined to produce them.  Batchelder explained that, because of his other

8   pressing responsibilities, he did not have time to review the documents or make his own analysis,

9   so he told Mammen to be sure he was comfortable with his own assessment.  Mammen said that

10  he would consult with Patch, who was more senior.  Ultimately, Batchelder relied on the

11  judgment of these two capable and experienced lawyers, because he was devoting his time to

12  other trial tasks that required his immediate attention and because he reasonably believed that

13  they would make a thoughtful and careful decision.  His conduct is not even close to the showing

14  of bad faith required to impose sanctions under the Court's inherent powers.

15  **V.    CONCLUSION**

16      Batchelder, Mammen, and Leung did not engage in conduct that is sanctionable under any

17  established theory.  None of them deserves to be sanctioned; all of them have suffered enough.

18  The Order to show cause issued to them should be dissolved.

19

20  DATED:        October 12, 2009            Respectfully submitted,

21                                           SHARTSIS FRIESE LLP

22                                                   */s/ Joel Zeldin*
                                             By:_____

23                                                    JOEL ZELDIN

24                                           Attorneys for Non-Parties
                                             JAMES R. BATCHELDER, CHRISTIAN E.
25                                           MAMMEN, and KEVIN K. LEUNG

7527\001\1604174.13

26

27

28

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

Case No.                    RESPONDING ATTORNEYS BATCHELDER, MAMMEN AND LEUNG'S
05CV1958-B (BLM)                    OPENING MEMO ON REMANDED OSC