PRIVILEGED & CONFIDENTIAL – PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2008 ORDER

1  H. SINCLAIR KERR, JR. (61713)
   JAMES M. WAGSTAFFE (95535)
2  ADRIAN J. SAWYER (203712)
   **KERR & WAGSTAFFE LLP**
3  100 Spear Street, Suite 1800
   San Francisco, CA 94105–1528
4  Telephone: (415) 371-8500
   Fax: (415) 371-0500
5
   Attorneys for Responding Attorney
6  LEE PATCH

7

8              **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  QUALCOMM INCORPORATED,              Case No. 05-cv-1958-B (BLM)

12            Plaintiff,                **RESPONSE BY RESPONDING
                                        ATTORNEY LEE PATCH TO ORDER
13       v.                            TO SHOW CAUSE (ON REMAND)**

14  BROADCOM CORPORATION,               Dates:   January 13-15, 2010
                                        Time:    TBD
15            Defendant.                Crtrm:   TBD

16                                      Hon. Barbara L. Major

17  ─────────────────────────────

18  AND RELATED COUNTERCLAIMS.

19

20

21

22

23

24

25

26

27

28

KERR
&
WAGSTAFFE
LLP

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2008 ORDER

# TABLE OF CONTENTS

*Page*

I.  INTRODUCTION ............................................................................................... 1

II. OVERVIEW OF MR. PATCH'S INVOLVEMENT WITH THE 1958 LAWSUIT AND HIS INQUIRIES REGARDING JVT PARTICIPATION BY QUALCOMM ............... 3

III. QUALCOMM ATTORNEYS AND ENGINEERING WITNESSES LED MR. PATCH TO BELIEVE THAT QUALCOMM HAD NOT PARTICIPATED IN THE JVT PRIOR TO SEPTEMBER 2003. .................................................................................... 7

    A.  Viji Raveendran's Deposition Preparation and Deposition ................... 7

    B.  Mr. Patch's Inquiry Following the Raveendran and Irvine Depositions ............ 11

        1.  Mr. Patch's Inquiry of Mr. Rouse ............................................ 12

        2.  Mr. Patch's Inquiry of Mr. Garudadri ..................................... 13

        3.  Mr. Patch's Inquiry Following the Ludwin Deposition .......... 13

    C.  Mr. Patch's Inquiries of Yiliang Bao, and Marta Karciewicz ............ 16

    D.  Mr. Patch's Awareness of Other Corroborating Information .............. 16

    E.  Mr. Patch's Preparation of Viji Raveendran for Trial and Her Trial Testimony ....................................................................................... 17

        1.  The January 14, 2007 Discovery of 21 Emails ....................... 17

        2.  Ms. Raveendran's January 24, 2007 Trial Testimony ............ 19

    F.  The Post-Trial Search and Discovery of Additional Documents ........ 19

IV. QUALCOMM WITNESSES' CONTINUING EFFORTS TO CONCEAL JVT PARTICIPATION ............................................................................................... 20

V.  THERE IS NO FACTUAL OR LEGAL BASIS TO SANCTION MR. PATCH .......... 23

VI. CONCLUSION .................................................................................................. 26

KERR
&
WAGSTAFFE
LLP

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2008 ORDER

## TABLE OF AUTHORITIES

*Page*

### *Cases*

Chambers v. NASCO, Inc.,
   501 U.S. 32 (1991)..............................................................................................23

Roadway Express, Inc. v. Piper,
   447 U.S. 752 (1980)............................................................................................23

KERR
&
WAGSTAFFE
LLP

## I.   INTRODUCTION

When this Court issued its January 7, 2008, order imposing sanctions, the attorney-client privilege prevented the disclosure of communications between Responding Attorney Lee Patch and other attorneys at Day Casebeer and Heller Ehrman, on the one hand, and their former client Qualcomm on the other hand.  That is no longer the case.  Discovery of Qualcomm has now been taken, even more evidence of Qualcomm's misconduct has been uncovered, and Mr. Patch and his former colleagues are free to tell the Court what actually transpired between them and representatives of Qualcomm during the discovery period and trial of the underlying case.  What will be abundantly clear to the Court is that Mr. Patch and his colleagues consistently pursued the appropriate inquiries, asked the right questions of the right people at the right times, and were given false and incomplete answers.  And indeed, the pattern of obfuscation that was a hallmark of Qualcomm personnel's interaction with their outside counsel in the pretrial period has continued in their declarations and post-remand testimony, with Qualcomm personnel still feigning ignorance of the meaning of the word "participate" (even when examining their own documents that use the term), and claiming not to have attended JVT meetings when the very documents they have authored make clear that they did.

Mr. Patch joined the 1958 case at a stage after much of the discovery was complete, and was primarily responsible for an unrelated aspect of the case: defending Qualcomm's patents against Broadcom's invalidity challenges.  However, from the time he joined the trial team through trial and thereafter, Mr. Patch made specific inquiries into whether Qualcomm had participated in the Joint Video Team that developed the H.264 standard (the "JVT"):

- Prior to the Raveendran deposition, Mr. Patch asked Mr. Leung what he had been told by Qualcomm concerning its JVT participation, and was informed that there was no JVT involvement by Qualcomm.

- Also before the Raveendran deposition, Mr. Patch reviewed all documents in the production database involving Raveendran, and found no evidence of Qualcomm JVT involvement.

- While preparing Ms. Raveendran for her deposition, Mr. Patch asked her about Qualcomm's JVT involvement, and she told him that Qualcomm had not been involved in the JVT.

1

KERR
&
WAGSTAFFE
LLP

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2008 ORDER

- Following the Raveendran deposition, Mr. Patch took the initiative and prepared a memorandum for the trial team that addressed the need to investigate JVT, DARPA and related issues. He then personally followed up regarding JVT by scheduling meetings with Alex Rogers and Kent Baker, and speaking by phone with Hari Garudadri and Tom Rouse. He was assured that Qualcomm had no involvement with JVT while H.264 was being developed.

- Mr. Patch prepared Phoom Sagetong for his deposition, who at the time was a new Qualcomm employee assigned the responsibility for Qualcomm's participation in the JVT in 2006. He asked Mr. Sagetong about Qualcomm involvement in the JVT while H.264 was under development, and Mr. Sagetong told him he was not aware of any.

- Following the discovery that Ms. Raveendran's email address appeared on a JVT Ad Hoc Committee email list, Mr. Patch promptly spoke with her about that fact and was told that she had not added herself to the list and must have been added by someone else without her knowledge. Ms. Raveendran also assured him that she had no involvement with that or any JVT committee and had received no email as a result of her name appearing on the committee list.

- On separate occasions, Mr. Patch asked Yiliang Bao and Marta Karciewicz, two Qualcomm engineers who had been employed at Nokia while H.264 was being developed and had attended JVT meetings, whether they were aware of Qualcomm involvement with the JVT, and they answered (apparently truthfully) that they were not aware of any such activity by Qualcomm.

- Together with Chris Mammen, Mr. Patch again spoke with Hari Garudadri just prior to trial and was told that Qualcomm had not even monitored the JVT.

- While preparing Ms. Raveendran for her trial testimony, Mr. Patch made repeated inquiries of her regarding JVT participation, including intensive inquiry upon discovery of 21 JVT-related emails in her laptop email archive. She assured him that she had never been involved with JVT and that she had no knowledge of the existence of the 21 emails until their discovery during trial, and that they must have been routed by an automatic email routing tool on her computer to a "junk" email box that she never reviewed.

The sad fact is that the responses Mr. Patch and his colleagues received in response to their pointed inquiries were absolutely untrue. For example, neither Ms. Raveendran nor Mr. Garudadri told Mr. Patch what they undoubtedly knew: (a) that the Digital Cinema group received regular detailed reports concerning the early JVT meetings from a paid consultant, Jordan Isailovic; (b) that Qualcomm employees, including Ms. Raveendran and Mr. Garudadri, were JVT members; (c) that in 2002 Ms. Raveendran and other of her close colleagues attended JVT meetings and reported back to the Digital Cinema group about them; (d) that in September

2

KERR
&
WACSTAFFE
LLP

1    2003, Mr. Garudadri himself attended a JVT meeting in San Diego and objected to a proposed

2    change in the standard; (e) that in 2003, Mr. Rouse, Mr. Garudadri, and Ed Tiedemann, a senior

3    Qualcomm engineering executive, discussed whether Qualcomm's patents sat on top of H.264;

4    or (f) that in 2002-2003 Ms. Raveendran had compared the Qualcomm patents-in-suit and the

5    H.264 standard then under development at JVT.

6        Mr. Patch asked the right people the right questions at the right times and got the

7    wrong—no, false—answers. Such a situation does not approach the high standard for sanctions

8    that applies here—bad faith conduct. Mr. Patch acted in the utmost good faith, in reasonable

9    reliance on misleading and incomplete information supplied by his clients' legal department and

10    senior technical staff to him and to his colleagues. Mr. Patch respectfully requests that the Court

11    discharge the OSC against him and allow him to continue the career he spent decades building.

12    **II.  OVERVIEW OF MR. PATCH'S INVOLVEMENT WITH THE 1958 LAWSUIT AND HIS INQUIRIES REGARDING JVT PARTICIPATION BY QUALCOMM**

13

14        Mr. Patch, a former partner of the Day Casebeer firm, joined the Qualcomm trial team in

15    June, 2006. (Patch Decl. ¶ 15.) Patch had little courtroom experience, having joined Day

16    Casebeer in January 2005 after holding in-house counsel positions the previous 20 years. (Id. ¶¶

17    10, 11.) The Qualcomm case was to be his first as trial counsel, and ultimately he presented four

18    Qualcomm witnesses and cross examined one Broadcom witness. (Id. ¶¶ 14, 22.)

19        When Mr. Patch joined the Qualcomm team in this litigation, the matter was over seven

20    months old. (Id. ¶ 15.) It had progressed to the stage that the Markman claim construction was

21    complete, Infringement and Invalidity Contentions had been served, discovery was far along and

22    fact discovery was scheduled to close at the end of August 2006. (Id.)

23        Mr. Patch's initial role in this action was to investigate and respond to Broadcom's

24    Invalidity Contentions relating to prior art and Section 112 deficiencies. (Patch Decl. ¶ 17.)

25    Although that role expanded to encompass deposition discovery and some related issues,

26    discussed in more detail below, Mr. Patch was not responsible for or involved with any of the

27    written discovery in the case, including any of the discovery requests and responses referred to in

28    Judge Brewster's Order or this Court's order of January 7, 2008. He did not sign any Qualcomm

1   responses to Broadcom's requests for production or interrogatories.[1]

2   　　　　In early July, Broadcom noticed a significant number of depositions of Qualcomm video

3   compression engineers, and Mr. Patch was asked to assist in the effort to defend some of them.

4   (Patch Decl. ¶ 18.)  He defended the depositions of three Qualcomm engineers: Ms. Viji

5   Raveendran, Dr. Yiliang Bao, and Ms. Yan Ye; and assisted in the preparation of two others:

6   Phoom Sagetong and Scott Ludwin.  (Id.)  Mr. Patch's first interaction with each of these

7   engineers came in connection with preparation for their depositions.  (Id.)  His experience

8   defending Ms. Raveendran was his first interaction with the issue that drives this OSC

9   proceeding:  Qualcomm's participation in the JVT.  (Id. ¶ 24.)  As will be seen below, nothing in

10  his preparation of Ms. Raveendran, in her deposition testimony, or any post-deposition or pretrial

11  interactions with her led him to believe that her involvement with JVT started any earlier than

12  she said it did:  at a JVT meeting in Poland in 2005, long after the JVT standard was finalized.

13  　　　　At her deposition, Ms. Raveendran testified about JVT submissions by Qualcomm in

14  2006. (Patch Decl. ¶ 30.)  Mr. Patch aggressively followed up on this, writing a memo to the trial

15  team recommending that immediate inquiry be made into the history and extent of Qualcomm

16  interaction with the JVT.  (Patch Decl. Ex. A.)  He met separately with two senior attorneys of

17  the Qualcomm legal department: Alex Rogers and Kent Baker, and spoke by telephone with

18  Tom Rouse, a third Qualcomm senior attorney responsible for standards activity, and Hari

19  Garudadri, a senior engineering manager knowledgeable about Qualcomm standards activity.

20  (Patch Decl. ¶ 30.) Mr. Patch was repeatedly assured by all that Qualcomm had no participation

21  in the JVT while H.264 was under development.  (Id.)

22  　　　　Mr. Patch also reviewed a voluminous JVT archive of JVT meeting minutes and related

23  materials from the time H.264 first was under development.  (Patch Decl. ¶ 37, 38.)  There was

24  
_____

25  [1]　　　Similarly, Mr. Patch was not responsible for or personally involved in the preparation of
any other submission made by Qualcomm that is identified in Judge Brewster's Order.  Although

26  a draft version of each of the Qualcomm submissions identified in Judge Brewster's Order would
have been circulated for comment among the Qualcomm trial team, he has no recollection of

27  reviewing or commenting upon the substance of any of them except as stated in his Declaration
in this remand proceeding.  (Patch Decl. ¶ 16, 21.)

28  

4

no mention of Qualcomm in any of the materials, with the sole exception of a September 2003 meeting in San Diego. (Id. ¶ 38.) That meeting, of course, prompted significant follow up with numerous people, including Mr. Garudadri, but even Mr. Garudadri, who had attended the meeting and objected to a modification of the standard, said he did not know who had attended that September 2003 meeting or had objected. (Id. ¶ 32, 33.)

Following the deposition of Scott Ludwin on August 17, 2006, at which Broadcom used an exhibit showing that in 2002 Raveendran's name appeared on an email reflector list for the "avc_ce" Ad Hoc Committee of the JVT, Mr. Patch again turned to Ms. Raveendran. (Patch Decl. ¶ 34, 35.) He asked her how her name came to be on the list, and, she told him a detailed and convincing story about how she did not sign up for the list but must have been signed up by someone else as an attempt to elicit her interest and contribution. (Id. ¶ 35.) Ms. Raveendran assured Mr. Patch that she and Qualcomm had no involvement with the JVT and that she had not received any emails as a result of her name being on the avc_ce reflector. (Id.)

Mr. Patch also prepared Phoom Sagetong for his deposition. Mr. Sagetong, a young engineer who had responsibility for Qualcomm's 2006 JVT participation, told Mr. Patch he was not aware of participation by Qualcomm in JVT while H.264 was under development.[2] (Id. ¶ 40.)

In the pre-trial period, Mr. Patch was aware of other information corroborating this. Gary Sullivan, the chair of the JVT, and Cliff Reader, Broadcom's own JVT expert witness, both testified in deposition that they were not aware of Qualcomm presence at JVT meetings or participation in the JVT while H.264 was under development. (Patch Decl. ¶ 43.) And Kyle Robertson of the Heller Ehrman firm spoke with Ms. Raveendran again in November 2006 concerning participation in standards setting bodies. (Id. ¶ 44.) Raveendran's statements to Mr. Robertson tracked her statements to Mr. Patch. (Id.)

Leading up to trial, Mr. Patch made further inquiries into Qualcomm's JVT participation. In January 2007, he asked Marta Karciewicz, a senior engineer formerly of Nokia and then at

---

[2]   Mr. Patch does not contend Mr. Sagetong misled him or anyone else on the trial team.

KERR
&
WAGSTAFFE
LLP

1    Qualcomm, whether she was aware of Qualcomm participation in the JVT while H.264 was

2    being developed. (Patch Decl. ¶ 39.) She said no, and that she was not aware of any Qualcomm

3    attendance at any meetings during that time frame. (Id.) This mirrored an inquiry Mr. Patch had

4    made of Yiliang Bao, another former Nokia employee who was at Qualcomm, and Bao had

5    given the same responses.[3] (Id.) Also in early January 2007, Mr. Patch and Mr. Mammen asked

6    Mr. Garudadri again about Qualcomm's JVT involvement and were told Qualcomm had not

7    even monitored the JVT. (Id. ¶ 33.)

8       Finally, Mr. Patch prepared Ms. Raveendran for trial testimony and conducted her direct

9    examination.  Mr. Patch repeated his earlier inquiries of Ms. Raveendran at each preparation

10   session, and on January 14, 2007, when 21 emails were found in one of Ms. Raveendran's email

11   boxes, Mr. Patch questioned her extensively as to why those emails had appeared on her

12   computer.  (Id. ¶¶ 45-47.)  She gave a convincing story, detailed in Section III.E.1., *infra*, noting

13   that she had numerous mailboxes and, because of the volume of emails she received, had set up

14   rules to automatically route emails to certain boxes, so she might never even see them.  (Id. ¶

15   48.)

16       In the post-trial period, Mr. Patch participated in the collection of Qualcomm documents

17   that reflected the consistent involvement by Qualcomm with the JVT from its inception, and in

18   interviews of Qualcomm witnesses including Ms. Raveendran, Chris Irvine, Sandip ("Micky"

19   Minhas, Amnon Silberger, Jay Yun and Dr. Garudadri, learning to his shock and chagrin the

20   facts that had earlier been concealed from him and his colleagues. (Id. ¶¶ 75, 76, 77, 78, 79.) He

21   participated in the large post-trial meeting in which the results of the post-trial investigation were

22   reported to the Qualcomm in-house legal and executive team, and observed the responses of

23   Qualcomm personnel present at that meeting. (Id. ¶¶ 80, 81, 82, 83, 85.)

24       These inquiries and the false or incorrect responses they elicited are detailed below, and

25

26     _____

27   [3]    Neither Karciewicz nor Bao misled Mr. Patch; both were at Nokia while H.264 was under development, and both simply had never observed or heard of anyone at Qualcomm attending JVT meetings.

28

KERR
&
WAGSTAFFE
LLP

contrasted with the information withheld by Qualcomm personnel.

## III. QUALCOMM ATTORNEYS AND ENGINEERING WITNESSES LED MR. PATCH TO BELIEVE THAT QUALCOMM HAD NOT PARTICIPATED IN THE JVT PRIOR TO SEPTEMBER 2003.

### A. VIJI RAVEENDRAN'S DEPOSITION PREPARATION AND DEPOSITION

Mr. Patch was asked to defend Viji Raveendran's deposition a few days before the deposition was to occur. (Patch Decl. ¶ 24.) Prior to this time, he had had no involvement with Ms. Raveendran. (Id.) He was given a background briefing on her by his colleague Mr. Leung. Mr. Leung had spoken with Ms. Raveendran earlier by telephone, while preparing for the Irvine 30(b)(6) deposition that had taken place on July 11, 2006. As discussed in the brief submitted by Mr. Leung, Mr. Leung, with Irvine on the phone, had directly asked Ms. Raveendran whether she had participated in the JVT or development of H.264 (Ms. Irvine, for her part, had already assured Mr. Leung that she had not, and that Qualcomm had not). Ms. Raveendran had told Mr. Leung that she had not been involved in H.264 or in JVT. Mr. Leung assumed Ms. Raveendran was telling him the truth, and passed along this information to Mr. Patch in connection with Ms. Raveendran's deposition preparation. (Patch Decl. ¶ 24.)

Mr. Patch's understood that Ms. Raveendran had been noticed primarily because of her personal knowledge of the activities of Qualcomm's Digital Cinema group, which had been responsible for the early Qualcomm products that had utilized the technology of the patents-in-suit. (Id. ¶ 25.) Mr. Patch had two areas of focus in his preparation of Ms. Raveendran. First, he needed to prepare her concerning the commercial viability of products that incorporated the patents-in-suit. (Id.) Second, he had to prepare her for anticipated questions as to whether and when she or anyone from Qualcomm had participated in the JVT. (Id.)

Shortly before Ms. Raveendran's deposition, Mr. Patch became aware that a large collection of JVT public archives had been identified within Qualcomm and was in the process of being reviewed for production, but the archive review was still underway. (Id. ¶ 26.) He also requested that the Qualcomm production database be searched for documents relating to Ms. Raveendran or to the Digital Cinema group, and at least one full box of responsive documents was provided him for use in his preparations. (Id. ¶ 27.) Mr. Patch reviewed the documents,

7

1   which did not indicate in any way that Ms. Raveendran or Qualcomm had any involvement with

2   the JVT, and used a portion of the documents in preparing Ms. Raveendran to testify.  (Id.)

3          The day before the Raveendran deposition, Mr. Patch met with Ms. Raveendran to

4   prepare her.  (Patch Decl. ¶ 28.)  During the deposition preparation, Mr. Patch reviewed with Ms.

5   Raveendran her and Qualcomm's involvement with the JVT.  (Id.)  Ms. Raveendran confirmed

6   that neither she nor Qualcomm had participated in or been involved with the JVT while H.264

7   was being developed.  (Id.)  Instead, she described for Mr. Patch her and Qualcomm's

8   participation with an MPEG project in the 2000 and 2001 time frame, which included making

9   technical contributions, attending meetings, and working with an ad hoc working group inside

10  MPEG relating to large-screen digital cinema technology.  (Id.)  Ms. Raveendran also explained

11  that she was considered a "golden eye," an observer who can pick up very small flaws in digital

12  cinema images.  (Id.)  As such, she said, her evaluations of a video compression technology were

13  highly regarded.  (Id.)  This would later be an important part of Ms. Raveendran's explanation

14  for how she came to be on the email reflector for the avc_ce Ad Hoc Working Group of the JVT

15  starting in 2002.

16         Mr. Patch also asked Ms. Raveendran what she knew about the patents-in-suit.  (Id. ¶ 29.)

17  She said that until just prior to the suit being filed, she had only a general knowledge of their

18  existence, and had only seen the front cover of one of the patents on a colleague's desk.  (Id.)

19  She did not say that she had performed a detailed comparison of the patents and the H.264

20  standard in 2002-2003, even though she had been at the forefront of that comparison.  (Id.)

21         The next day, Ms. Raveendran's deposition testimony tracked her statements to Mr.

22  Patch during the preparation.  Under questioning from Mr. Tompros, she said she had seen only

23  the cover page of the '104 patent on a colleague's desktop;  she testified at length about

24  Qualcomm's earlier submissions to the unrelated MPEG project; and she testified that she

25  attended a meeting in Poland in 2005 that was a co-located JVT and MPEG meeting, and

26

27

28

1    attended JVT portions.[4]   (2006 Raveendran Depo. at 22:8-27:11; 89:15-90:1; 91:10-92:18.)

2          In short, nothing in the deposition gave Mr. Patch any reason to suspect that Ms.

3    Raveendran or Qualcomm had had anything at all to do with the JVT while H.264 was under

4    development.  At that time there were no red flags at all.

5          We know now that Raveendran did not disclose numerous critical facts to Mr. Patch in

6    response to his questioning in the preparation session, and in fact, during the deposition gave

7    answers that the Court has recognized were flat-out false.  First, Ms. Raveendran did not tell Mr.

8    Patch that in December of 2002, she had attended a co-located JVT and MPEG meeting in

9    Klagenfurt Austria, as documents later revealed.  (Depo. Exs. 109, 159.)  This was her one and

10   only trip to that country, (Raveendran Depo. at 11:16-18), on a project (Digital Cinema) with

11   which she was deeply involved, and she had sent detailed email reports back to her colleagues.

12   (Id.).  Yet Raveendran never mentioned it either in preparation or in her testimony.

13         Ms. Raveendran was also intimately aware of reports on the JVT and from JVT meetings

14   authored by others for the Qualcomm Digital Cinema group.  She had repeated correspondence

15   with Jordan Isailovic, a consultant hired by Qualcomm to attend JVT meetings on its behalf.[5]

16   (Depo. Exs. 78, 82, 94, 96, 154, 155, 156, 157, 159, 162.) She received reports from Amnon

17   Silberger and Jay Yun, Qualcomm engineers who, like Raveendran, attended JVT meetings and

18   reported back.  (Depo. Exs. 79, 80, 85, 86, 87, 107, 108.)

19         Ms. Raveendran also failed to disclose that in 2002, as part of Qualcomm's efforts with

20   respect to JVT, she had signed herself up for an email reflector list for the avc_ce (Advanced

21   Video Coding:  Coding Efficiency) Ad Hoc group.  In her deposition in this remand proceeding,

22   she testified that she did not recall signing up for this email reflector. (Raveendran Depo. at

23   146:10-15, 195:19-196:2.)

---

[4]       This seemed largely irrelevant to Mr. Patch.  The relevant time frame in question was
early 2003, while the H.264 standard was being developed.

[5]       Mr. Isailovic did not identify himself as being a representative of Qualcomm while he
attended on its behalf.

9

KERR
&
WACSTAFFE
LLP

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2008 ORDER

1    Finally, Ms. Raveendran did not tell Mr. Patch that in 2002 and 2003, she had been at the

2    forefront of a Qualcomm effort to compare the H.264 standard then in development with

3    Qualcomm's IPR.  That analysis, done with Harinath Garudadri and Qualcomm in-house

4    attorney Micky Minhas, was part of Qualcomm's emerging Digital Cinema strategy, along with

5    monitoring the JVT throughout 2002 and 2003 both through a consultant and in person.  (Depo.

6    Exs. 31, 33, 34, 35, 37, 62, 63, 64, 149, 165, 167.)  Ms. Raveendran made no mention of it at all,

7    giving instead the impression that JVT was entirely off her radar.[6]  Her omission is even more

8    shocking in light of the fact that Sanjay Jha himself had asked Viji to drive Qualcomm's digital

9    cinema strategy.  (Depo. Ex. 129.)  Jha was the head of Qualcomm's QT&V division in 2002; he

10   then became president of Qualcomm's CDMA Technologies group, and then Qualcomm's Chief

11   Operating Officer.  (Raveendran Depo. at 113:14-20, 167:4-13.)  But, like the trip to Austria, this

12   project too was omitted from her responses to Mr. Patch's questions.

13       The simple fact is that Ms. Raveendran knew full well the importance of giving the

14   impression to Qualcomm's outside attorneys that Qualcomm had nothing to do with JVT, as

15   evidenced in emails first uncovered during post-remand discovery in this case.  In February

16   2006, when Day Casebeer was making its first inquiry into participation in the JVT, Ms.

17   Raveendran sent an email that was forwarded to Day Casebeer in which she responded that she

18   had not participated in JVT; however, she also sent a private email to Irvine that was never

19   provided to Day Casebeer.  (Depo. Ex. 122.)  That email forwarded to Ms. Irvine an email chain

20   of inquiries initiated by Mr. Leung regarding participation in JVT and responses by Qualcomm

21   employees.  But Ms. Raveendran's own, separate email to Ms. Irvine is succinct and revealing:

22

23

24

25

---

26   [6]    Ms. Raveendran was not alone in this omission.  Mr. Minhas and Mr. Garudadri, like Ms.
     Raveendran, received email inquiries in February 2006 that were initiated by Kevin Leung, and
27   failed to disclose the 2003 work done by them and Raveendran to compare H.264 and
     Qualcomm's patents. (Depo. Exs. 10, 12, 27, 65, 66.)
28

KERR
&
WAGSTAFFE
LLP

CASE NO. 05-CV-01958 B (BLM)          RESPONSE BY LEE PATCH TO ORDER TO SHOW CAUSE

Hi Chris:

**Two of our ABSDCT patents have an earlier date and overlap
with H.264.**

**This is to Qualcomm's advantage in the lawsuit.**

*I've been working with Micky to verify that H.264 infringes on
more of our DC patents (and it does in some cases).*

*Thanks,*

*Viji.*

(Depo. Ex. 122 at 1 (emphasis added).)  One can speculate as to why the email was sent only to Ms. Irvine, and one can speculate that it demonstrates a motive in Ms. Raveendran to conceal her participation in JVT.  But one need not speculate as to something much more central:  Ms. Raveendran was well aware in February 2006 of her earlier work with Mr. Minhas to determine whether H.264 infringed the Qualcomm patents-in-suit.  Indeed, she testified at her post-remand deposition that her private email was referring to that earlier infringement analysis.  (Raveendran Depo. at 90:5-91:4.)  Yet although that information was fresh in her mind and important enough to discuss with Ms. Irvine, it was not important enough for either of them to share with Qualcomm's outside lawyers.  And of course, Ms. Raveendran well understood that it was important to maintain that Qualcomm was nowhere near the JVT while H.264 was being developed; as she herself said, it was "to Qualcomm's advantage in the lawsuit." (Depo. Ex. 122.)  Yet Mr. Patch was told of <u>none</u> of this, and instead was sold a bill of goods.

## B.   MR. PATCH'S INQUIRY FOLLOWING THE RAVEENDRAN AND IRVINE DEPOSITIONS

Following the Raveendran deposition, Mr. Patch looked further into Qualcomm's participation in the JVT.  This inquiry was precipitated by three categories of recently uncovered, potentially relevant information: testimony from Ms. Raveendran regarding more recent involvement in 2006 (2006 Raveendran Depo. at 65); Broadcom assertions that someone from Qualcomm had attended a September 2003 JVT meeting in San Diego and sponsored a harbor cruise at that meeting, and reports that someone at Qualcomm had submitted declarations to a JVT-related standards body that Qualcomm IPR was essential to H.264.  Mr. Patch wrote a

11

1    detailed memo to the trial team advocating that each of these recently uncovered pieces of

2    information be investigated and their implications resolved. (Patch Decl. Ex. A.)  In turn, Mr.

3    Patch personally undertook the inquiry within Qualcomm, including meeting with Alex Rogers

4    to inform him of the issues raised in the memo and inquire as to who he should speak with

5    regarding Qualcomm's involvement with the JVT. (Patch Decl. ¶ 30.) He met with and emailed

6    Kent Baker, a Qualcomm senior attorney who had prior standards body responsibilities in

7    Qualcomm. (Id.)  Mr. Baker said he thought Qualcomm might have had involvement with JVT

8    during the H.264 development, but did not know and referred Mr. Patch to people who he said

9    would know.  (Id.)  He referred Mr. Patch to Tom Rouse (the senior Qualcomm attorney with

10   then-current standards body responsibilities in Qualcomm), who connected him with Hari

11   Garudadri, a senior Qualcomm engineer with standards body responsibilities.  (Id.)  Neither of

12   these individuals informed Mr. Patch of Qualcomm's JVT involvement in 2002 and 2003,

13   although as discussed below, it is clear that Mr. Rouse and Mr. Garudadri were aware of such

14   involvement.

15              **1.    Mr. Patch's Inquiry of Mr. Rouse**

16              Mr. Patch spoke with Mr. Rouse about the history of Qualcomm's involvement with JVT,

17   yet Mr. Rouse did not disclose to him that Qualcomm had compared the Qualcomm patents-in-

18   suit to H.264 in 2003.  Emails from August 2003 regarding this comparison reveal that Mr.

19   Rouse and others at Qualcomm knew its significance.  (Depo. Exs. 134, 135.) Indeed, as Mr.

20   Tiedemann recognized:

21              I understand that we have IPR on adaptive block sizes for video
             coding which came out of our digital cinema work.  Hari says that
22              he believes that H.264 uses adaptive block sizes.  Thus, we need to
             verify this, and if out [sic] IPR falls on top of H.264, make the
23              appropriate statements to the standards body.

24   (Depo. Ex. 134.)  Mr. Rouse and Mr. Garudadri collaborated on the comparison, with Mr. Rouse

25   specifically noting Mr. Garudadri's familiarity with H.264.  (Depo. Ex. 135.)  Mr. Rouse

26   disclosed none of this to Mr. Patch, and further did not disclose anything about Qualcomm's

27   involvement with JVT in the 2002 and 2003 time frame.  (Patch Decl. ¶ 30.)

28

KERR
&
WAGSTAFFE
LLP

### 2.   Mr. Patch's Inquiry of Mr. Garudadri

Continuing his efforts, in early August 2006, Mr. Patch also spoke with Mr. Garudadri by phone. (Patch Decl. ¶ 32.)  Mr. Patch asked Mr. Garudadri about the history of Qualcomm's involvement with the JVT, and specifically asked him what he knew about the September 2003 JVT meeting in San Diego. (Id.)  That meeting had emerged as a potentially important event following Ms. Irvine's deposition, when Ms. Irvine was impeached with minutes from the meeting showing that someone from Qualcomm had attended and raised an objection.

This is a prime example of Mr. Patch asking the right person the right question at the right time and getting a misleading answer, because we now know that the "someone" from Qualcomm at the September 2003 meeting was Mr. Garudadri himself. (Patch Decl. ¶ 78.)  But Mr. Garudadri did not tell Mr. Patch that in August 2006.  Rather, Mr. Garudadri confirmed for Mr. Patch that no one at Qualcomm had participated in JVT prior to September 2003, that Qualcomm had not even monitored the JVT prior to that time, and that Qualcomm had participated in an unrelated MPEG project in an earlier time frame. (Patch Decl. ¶ 33.)  His responses tracked his responses to the February 2006 email inquiries by Mr. Leung.

Of course, we know now that Mr. Garudadri, like others, concealed from Mr. Patch the 2002 and 2003 comparisons made by Ms. Raveendran, and did not tell Mr. Patch that it was he, Mr. Garudadri, who had attended the September 2003 JVT meeting in San Diego, at which he had objected to a proposed change in the standard, and arranged funding for Qualcomm's sponsorship of a harbor cruise. To Mr. Patch, Mr. Garudadri's August 2006 statements were in line with what he knew from preparing Ms. Raveendran and observing her deposition testimony, and he reported it back to the team. (Patch Decl. ¶ 32.)  And of course, Mr. Garudadri's statements then were entirely consistent with what Mr. Garudadri would tell Chris Mammen and Mr. Patch a few months later, when, on the eve of trial, he told Mr. Mammen that <u>Qualcomm had not even passively monitored the JVT</u>! (Id. ¶ 33.)

### 3.   Mr. Patch's Inquiry Following the Ludwin Deposition

At the Ludwin deposition on August 17, 2006, Broadcom used an exhibit showing that Ms. Raveendran's email address appeared on a December 2002 email list of the avc_ce Ad Hoc

13

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2008 ORDER

1  group of the JVT.  (Patch Decl. ¶ 34.)  Upon being informed of this new information, Mr. Patch

2  immediately confronted Ms. Raveendran in a telephone call and asked her why her email address

3  appeared on the ad hoc group email list.  (Id. ¶ 35.)  She explained that she had had no

4  involvement with that group, or the JVT itself.  (Id.)  She unequivocally stated that she had never

5  subscribed herself to the list or communicated with others using it.  (Id.)  Mr. Patch asked her

6  directly how her address got onto the email list, and she speculated that one of the co-chairs of

7  the Ad Hoc group, with whom she had worked before on the unrelated MPEG-sponsored project,

8  probably placed her name on the list in the hope that it would encourage her to volunteer to help

9  with the activities of the ad hoc group.  (Id.)  She stated that, because she was recognized as a

10  "goldeneye," the co-chair would have wanted her to be involved with the group. (Id.)  She also

11  explained that the administrator of an email list could add anyone they wanted onto such a list.

12  (Id.)  Ms. Raveendran also informed Mr. Patch very clearly that she had no recollection of ever

13  having received a single email from that email list.  (Id.)

14          Mr. Patch had no reason to doubt these statements, which were consistent with earlier

15  statements.  But he even went beyond them and probed the avc_ce group itself.  He examined the

16  function of the avc_ce Ad Hoc group by reviewing the reports of the group that were included

17  among the publicly available JVT archives, in order to understand the function of the group.

18  (Patch Decl. ¶ 37.) It was his understanding that the avc_ce group had been formed by the JVT

19  for the purpose of comparing the capabilities and performance of the then-virtually-completed

20  H.264 standard to the capabilities and performance of the previously-created video compression

21  standard known as MPEG-4. (Id.) In other words, the avc_ce group was formed not to contribute

22  to the technical content of the H.264 standard, but rather to perform the "marketing" of the

23  standard to the industry by publishing benchmarking data to demonstrate the new standard's

24  efficacy in comparison to its predecessor standard. (Id.) This further buttressed his belief in what

25  Ms. Raveendran had told him.

26          Mr. Patch also instructed a Day Casebeer paralegal to conduct a review of the

27  voluminous archives of the JVT to look for any evidence of Ms. Raveendran or Qualcomm's

28

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2008 ORDER

1   attendance, submissions, or communications with the JVT.  (Patch Decl. ¶ 38.)  The JVT

2   archives revealed no additional relevant information. (Id.)

3          In August 2006, Mr. Patch also prepared Phoom Sagetong for his deposition.  (Id. ¶ 40.)

4   Mr. Sagetong was a young Qualcomm engineer tasked with responsibility for Qualcomm's

5   interactions with the JVT in 2006, and Mr. Patch thought it reasonable that he would know the

6   history of Qualcomm's prior involvement with JVT.  (Id.)  He asked Mr. Sagetong what he knew

7   about this, and Mr. Sagetong said Qualcomm had not been involved with JVT while H.264 was

8   under development, and had only become involved recently. (Id.)

9          Mr. Patch's inquiries over this time frame dovetailed with Mr. Leung's own inquiries that

10  followed the Irvine deposition, described in the brief submitted on Mr. Leung's behalf.  In

11  tandem, the two attorneys collectively interviewed Ms. Raveendran, Mr. Garudadri, Yiliang Bao,

12  Yan Ye, Phoom Sagetong, Scott Ludwin, and Yuri Reznik, and thereby confirmed their

13  understanding that Qualcomm did not participate in JVT and/or H.264 prior to September 2003.

14  No one that the attorneys spoke with revealed that: (1) Qualcomm had paid an *undercover*

15  consultant to monitor the early meetings of the JVT in 2002 and report back concerning the

16  content and progress of the effort (Depo. Ex. 95); (2) Qualcomm had joined the JVT and sent its

17  own employees who were personally knowledgeable of Qualcomm's IP to JVT meetings in the

18  critical time period (none of whom apparently signed the attendee's list at the meetings) (Depo.

19  Exs. 23, 25, 86, 87, 109, 110); (3) Qualcomm (specifically Ms. Raveendran, Mr. Garudadri, and

20  Mr. Minhas) had compared the H.264 standard then under development with Qualcomm's own

21  Digital Cinema patents in the 2002 and 2003 time frame (Depo. Exs. 33, 34, 35, 37, 62, 63, 64,

22  123, 164, 165, 167, 168); (4) Messrs. Rouse, Garudadri, and Tiedemann had discussed that

23  Qualcomm would have to make disclosure of its technology to the JVT if in fact Qualcomm

24  intellectual property sat on top of the standard (Depo. Exs. 134 and 135); and (5) Ms.

25  Raveendran had personally attended a JVT meeting in Klagenfurt in 2002 and had added herself

26  to the avc_ce reflector that same year. (Depo. Exs. 109, 154, 155.)

27

28

KERR
&
WAGSTAFFE
LLP

### C.    MR. PATCH'S INQUIRIES OF YILIANG BAO, AND MARTA KARCIEWICZ

Ironically, two Qualcomm employees that Mr. Patch interviewed, Yiliang Bao and Marta Karciewicz, apparently told the truth as they knew it, but the steps taken by Qualcomm to cover its tracks at the JVT had also fooled them. Both engineers were formerly of Nokia and had attended JVT meetings while H.264 was under development. (Patch Decl. ¶ 39.)  Mr. Patch asked them both at different times whether they were aware of Qualcomm participation in JVT. In August 2006, he asked Bao, and in January 2007, he asked Karciewicz. (Id.)  Both said they were not aware of any Qualcomm participation in JVT, including attendance at meetings.  (Id.)

### D.    MR. PATCH'S AWARENESS OF OTHER CORROBORATING INFORMATION

Other sources corroborated Mr. Patch's understanding that Qualcomm had not participated in JVT during the development of H.264.  Mr. Patch had many conversations with Roger Martin, a senior in-house Qualcomm attorney, in which Mr. Martin maintained the opinion stated in response to the February 2006 emails, namely that Qualcomm had had no JVT involvement.  (Patch Decl. ¶ 42; Depo. Exs. 14, 136.)  These conversations continued up through the preparation of the opening statement the night before trial. (Patch Decl. ¶ 42.)

Mr. Patch even looked to statements by persons outside of Qualcomm.  He was informed that the JVT Chairperson, Gary Sullivan, and Broadcom's JVT expert, Cliff Reader, each testified at deposition that they were not aware of any participation by Qualcomm during the critical period of H.264 development.  (Patch Decl. 43.)  Mr. Patch relied on this independent corroboration of what he had been told by Qualcomm personnel.  If the chairperson, technical expert, and people who had worked for other companies and had attended JVT meetings in the relevant time frame were not aware of Qualcomm participation or involvement while H.264 was under development, it appeared that everyone was telling the truth.

Finally, in November 2006, Kyle Robertson interviewed Ms. Raveendran again and reported back on his interview to the group.  (Depo. Ex. 199.)  As Mr. Robertson's memorandum makes clear, Ms. Raveendran told him the same story regarding the email reflector, her knowledge of the patents-in-suit, and her non-involvement with JVT, that she told Mr. Patch.

### E. MR. PATCH'S PREPARATION OF VIJI RAVEENDRAN FOR TRIAL AND HER TRIAL TESTIMONY

During trial, Mr. Patch put on four Qualcomm witnesses and cross examined one Broadcom witness. (Patch Decl. ¶ 22.) Mr. Patch's effort, like that of all team members, was all-consuming, and he spent over 400 hours on the case during the month of January. (Id. ¶ 23.)

Among his other trial responsibilities, Mr. Patch was responsible for the preparation and possible examination of Ms. Raveendran at trial. (Patch Decl. ¶ 22, 46.) The Qualcomm trial team thought Ms. Raveendran would be called as a witness by Broadcom, and so on the evening of January 7, 2007, Ms. Raveendran was being prepared to testify. (Patch Decl. ¶ 45.) Mr. Patch, however, was absorbed by other aspects of trial preparation that evening, and after getting her preparation started, asked Adam Bier to continue the preparation with Ms. Raveendran. (Id.) Mr. Patch understands now, but did not know then, that later that evening, Ms. Raveendran forwarded to Mr. Bier an email that appears to have been one that was automatically generated by the avc_ce email server computer in 2002, at or near the time Ms. Raveendran's email address was added to that email list. (Id.) Mr. Patch was not informed of the existence of that email at any time before or during trial. (Id.) Ms. Raveendran did not testify that week.

#### 1. The January 14, 2007 Discovery of 21 Emails

The following Sunday night, January 14, Ms. Raveendran was again being prepared to testify, this time with Mr. Patch and Mr. Bier. As before, Mr. Patch helped get her preparation started, and then excused himself to tend to other trial responsibilities, including the preparation of other witnesses. (Id. ¶ 46.) Sometime during that evening, Mr. Bier came out of the preparation room and told Mr. Patch and Mr. Mammen that 24 JVT-related emails had been found as a result of a search of Ms. Raveendran's laptop, three of which were duplicates. (Id.) That was the first time Mr. Patch learned of the existence of these emails. (Id.) The emails were all from the avc_ce email list, and Mr. Patch understood that they had been discovered following a search of Ms. Raveendran's laptop. (Id.) Mr. Patch asked Mr. Mammen, who had direct involvement in the discovery phase of the case, to assess whether the emails were responsive to

17

KERR
&
WACSTAFFE
LLP

1  any document requests by Broadcom, and to determine whether any of the emails reflected

2  Qualcomm participation in the JVT.  (Id. ¶ 47.)

3      Mr. Patch then returned into the witness preparation room to ask Ms. Raveendran why

4  these 21 emails were present on her laptop computer, contrary to what she had led him to

5  believe.  (Id. ¶ 48.)  Ms. Raveendran strongly disaffirmed any prior awareness of their existence

6  or any understanding concerning how they came to be on her computer, repeating the story that

7  she had not signed herself up for the reflector list.  (Id.)

8      Ms. Raveendran then went further, explaining to Mr. Patch that because she received

9  such a large volume of email, she had instituted an automated email filtering program onto her

10  email system and had established a large number of different email boxes into which email

11  would be automatically deposited by that email filter.  (Id.)  She said that she had almost two

12  hundred distinct email boxes on her laptop, due to the operation of the email filter and due to

13  email system crashes and rebuilds that had occurred over the many years involved.  (Id.)  Ms.

14  Raveendran speculated that the 21 emails had arrived unsolicited to her computer and had been

15  automatically routed without her awareness to one of her many email boxes.  (Id.)  This was

16  consistent with her earlier explanation that her email address had been added to the avc_ce email

17  list without her knowledge and was likely due to the Ad Hoc group co-chairperson putting her

18  name on the list without asking or telling her.

19      During the evening, Mr. Patch gave a brief heads-up to Mr. Young and Mr. Batchelder,

20  telling them that some JVT-related documents had been located on Raveendran's laptop.  (Id. ¶

21  49.)  He was not explicit that they were emails from the avc_ce reflector, and did not

22  communicate details regarding the emails.  (Id.)

23      That night around midnight, Mr. Patch discussed the 21 emails with Mr. Mammen and

24  Mr. Bier, who described the content of the emails and their analysis of why the emails were not

25  responsive to Broadcom's document requests as narrowed by Qualcomm's responses.  (Id. 50.)

26  Patch did not personally read the emails, but did review the document requests and Qualcomm

27  responses, and concurred with his colleagues' conclusion that the emails as described were not

28  responsive.  (Id. ¶ 50, 51.)  Mr. Patch also considered whether the emails as described were

18

inconsistent with Qualcomm's argument that it had not participated in the creation of the H.264 standard, and determined they were not.  (Id. ¶ 51.)

At a sidebar on January 18, a member of Qualcomm's trial team told the court there was no evidence that any email was sent from the avc_ce email list.  (Id. ¶ 57.)  Mr. Patch was not present in court when the statement was made; otherwise, he would have immediately corrected it.  (Id.)  He did not learn of the statement until the end of trial. (Id.)

### 2.   Ms. Raveendran's January 24, 2007 Trial Testimony

On January 24, Mr. Patch put on Ms. Raveendran as a rebuttal witness.  He questioned her on four discrete issues, including whether she had read any emails that came back to her from the avc_ce email list.  (Patch Decl. ¶ 54, 56.)  On cross examination, Broadcom's attorney asked whether Ms. Raveendran had received any emails from the avc_ce list.  (Id. ¶ 56.)  Ms. Raveendran testified that she had, and that the emails had been found on her laptop during trial.  (Id. ¶ 56.)

The testimony concerning the 21 emails led to a sidebar at which Broadcom's counsel sought production of the emails.  During the lunch break, Mr. Patch read the emails, and evaluated their responsiveness.  (Id. ¶ 67.)  Although Mr. Patch still believed they were all incoming, passive emails that reflected no active involvement with the avc_ce Ad Hoc group, the trial team, including Mr. Patch, decided to produce the emails immediately.  (Id.)  Broadcom used them in a brief cross examination of Raveendran in the afternoon. (Id. ¶ 69.)

### F.   THE POST-TRIAL SEARCH AND DISCOVERY OF ADDITIONAL DOCUMENTS

After the trial, when Mr. Patch was informed that a substantial number of Qualcomm emails and attached documents had been collected in response to the agreed-upon search terms, he, along with his colleagues, was shocked.  (Id. ¶ 74.)  He did not previously know they existed and, along with the Qualcomm trial team, insisted that they immediately be produced to the Court and Broadcom.  (Id. ¶ 79.)  Although he did not know of their existence until after trial, he deeply regrets any failure to locate them or have them produced before trial.  (Id. ¶ 2.)

Mr. Patch, together with Mr. Leung and others, also interviewed Qualcomm personnel following the trial.  One persons interviewed was Mr. Garudadri, who informed them for the first

time that he had attended the September 2003 meeting and had objected to a proposed change to the standard at that meeting. (<u>Id.</u> ¶ 78.) Mr. Patch was floored by this revelation. (<u>Id.</u>) It was at odds with everything he had been told by Mr. Garudadri, and he was left confused as to why Mr. Garudadri would keep such a basic fact from Qualcomm's outside attorneys. (<u>Id.</u>)

On April 5, 2007, Day Casebeer attorneys met with Qualcomm's General Counsel Louis Lupin, Roger Martin, Alex Rogers, Bill Sailer and other Qualcomm in-house attorneys and senior executives. (Patch Decl. ¶ 80.) The purpose of the meeting was to review with Qualcomm the disturbing content of the large volume of recently discovered Qualcomm emails relating to the JVT. (<u>Id.</u>) Mr. Patch participated in the presentation to Qualcomm. (<u>Id.</u>) Near the end of the presentation, Mr. Sailer asked the obvious question of how all this could have happened. (<u>Id.</u> ¶ 83.) Unsolicited, Roger Martin spoke up and explained that it was probably at least partially his fault because he had, from a very early point in the litigation, told the Day Casebeer lawyers that Qualcomm had had no participation in JVT while H.264 was under development. (<u>Id.</u>) This was a gracious and professional act.[7] After Day Casebeer had summarized briefly the inquiries that had been made of Qualcomm personnel during discovery and the inaccurate and incomplete responses provided by various Qualcomm employees, Mr. Lupin publicly apologized to the Day Casebeer attorneys for Qualcomm putting them in a position that jeopardized their reputations and careers. (<u>Id.</u> ¶ 85.)

## IV.   QUALCOMM WITNESSES' CONTINUING EFFORTS TO CONCEAL JVT PARTICIPATION

The foregoing discussion discloses several critical outright misstatements by Qualcomm personnel to their outside lawyers. Despite repeated inquiries, Mr. Patch and others were not told key facts during the discovery and trial phase of this case. That is bad enough. What is even more disturbing, particularly given that Mr. Patch is here fighting for his career, is that

---

[7]    At his deposition in this remand proceeding, Mr. Martin testified that he had not acknowledged any fault at that April 5, 2007 meeting. (Martin Depo. 180:9-25; 181:8-18.)

KERR
& 
WAGSTAFFE
LLP

1  certain Qualcomm witnesses have continued to make misleading statements both in declarations

2  and deposition testimony in this OSC proceeding.

3      Ms. Raveendran filed a declaration in this proceeding on October 3, 2007.  (Depo. Ex.

4  145).  The declaration was submitted well after Ms. Raveendran had a chance to review the

5  documents uncovered in the post-trial phase of the case, and was drafted with extensive time and

6  effort. (Raveendran Depo: 251:12-254:17.)  Paragraph 11 of that declaration represents an

7  attempt by Ms. Raveendran to explain why, when she was asked in her July 2006 deposition

8  when she "first learn[ed] of the Joint Video Team that developed the H.264 standard," she

9  answered "Somewhere in the 2003 time frame." (Depo. Ex. 145, ¶ 11.) The deposition answer

10  was clearly false, as Ms. Raveendran knew of the JVT from its inception and most certainly by

11  mid-2002, when she attended the JVT meeting in Klagenfurt, Austria.  In the declaration, Ms.

12  Raveendran stated that she had misinterpreted the question as asking when she began to learn

13  about the H.264 standard; but she then affirmed that it was true that she only educated herself

14  about the standard in "the 2003 time frame" "through literature." (Depo. Ex. 145, ¶ 11.)

15      Even this tortured explanation in the sworn declaration is untrue.  Ms. Raveendran began

16  to study the H.264 standard from its inception, initially based upon reports received from Mr.

17  Isailovic, and then based upon personal attendance and reports received as a result of Mr. Yun

18  and Mr. Silberger's attendance. (See discussion at p. 10, supra.)  In fact, Ms. Raveendran was at

19  the forefront of Qualcomm's effort to **compare the technical details of the standard to**

20  **Qualcomm's own intellectual property, while the standard was in development.**  That

21  comparison, revealed in documents marked as exhibits, predated "the 2003 time frame" to which

22  Ms. Raveendran testified to in her declaration.  (Depo. Exs. 33, 34, 35, 37, 62, 63, 64, 123, 164,

23  165, 167, 168.)  And of course, Ms. Raveendran was part of a November 2002 presentation to

24  Sanjay Jha regarding the JVT.

25      At her deposition in this remand proceeding, Ms. Raveendran was confronted with the

26  emails she wrote to her colleagues from the 2002 Klagenfurt JVT meeting, emails in which she

27  reports on JVT and agrees to look into certain issues at the JVT meeting for her boss, Amnon

28  Silberger.  (Raveendran Depo. at 143:2-145:25)  She also was shown emails from Jordan

21

1   Isailovic regarding the JVT meeting in Klagenfurt, which were emails responding to Ms.

2   Raveendran's own requests for information about that meeting.  (Raveendran Depo. at 137:5-

3   138:4, 147:5-149:13.)  Yet under questioning in her remand deposition, and after having been

4   shown the emails, Raveendran again testified under oath that she had not attended a JVT meeting

5   in Klagenfurt, only an MPEG meeting.[8]  (Raveendran Depo. at 145:8-11, 144:17-19, 259:9-14.)

6          Finally, Ms. Raveendran, like every Qualcomm remand deponent, professed ignorance of

7   the meaning of the word "participate" in the context of the JVT.  (Raveendran Depo at 47:3-48:6,

8   60:17-61:2, 62:5-63:1, 72:2-73:11, 83:1-24, 87:18-88:1.)  As we know from the February 2006

9   email chains initiated by Kevin Leung, Ms. Raveendran and others, including Mr. Garudadri and

10  Ms. Irvine, responded to questions at that time regarding "participation" in standards setting

11  bodies without ever voicing a concern over what the word meant.  (Depo. Exs. 65, 66.)  Yet, as

12  discussed in the accompanying brief by Messrs. Batchelder, Mammen, and Leung, a parade of

13  Qualcomm employees came through the post-remand deposition room and testified that they did

14  not know what the word participate meant, in some cases even when the word was used in a

15  document they had authored.

16         But there is no need to single out Ms. Raveendran.  Harinath Garudadri testified in his

17  remand deposition that he did not express opposition to a proposed alteration of the H.264

18  standard at the September 2003 meeting, despite his statements to Messrs. Patch and Leung in

19  summer 2007 that it was he who had objected at that meeting.  For some inexplicable reason,

20  Garudadri has now retreated at least in part to his pre-trial stance.

21         In her post-remand testimony, Christine Irvine initially denied telling Scott Ludwin, in

22  August 2006, that Qualcomm had "specifically ignored" the work of the JVT, despite the fact

23  that Ludwin stated in his declaration and in his post-remand testimony that she had.  (Irvine

24  Depo. at 10:2-14:6; Ludwin Depo. at 10:19-11:17.)

25  _____

26  [8]     The import of this is profound.  In her declaration in October 2007, Ms. Raveendran
    claimed that had she looked at her "documents," it would have refreshed her recollection about

27  participation in JVT.  (Depo. Exs. 145, ¶ 5.)  Yet here is a clear example of Ms. Raveendran
    being shown numerous documents and still denying participation or even attendance at JVT!

28

22

KERR
&
WAGSTAFFE
LLP

1        Qualcomm paralegals testified that Qualcomm's document-discovery-procedures

2    memorandum was mysteriously not followed in the 1958 case. (Glathe Depo. at 47:12-22, 68:13-

3    22, 69:17-70:1, 73:2-20; Laxamana Depo at 24:21-24, 26:3-8, 18-23.)  This is inexplicable

4    (procedures are created for a reason) and untrue, as the email chains make clear.  First, Myers

5    specifically sent the memorandum to Chris Mammen to inform him of Qualcomm's standard

6    procedures. (Depo. Exs. 6, 7.) Second, in February 2006, when Kevin Leung needed information

7    to respond to written discovery, everyone followed the procedures in the Qualcomm discovery

8    memorandum; he began his inquiry with the Qualcomm in-house paralegals, who then selected

9    the persons in Qualcomm to whom email Qualcomm was forwarded. What actually happened is

10    consistent with the memorandum and inconsistent with the testimony of Qualcomm paralegals.

11  **V.**     **THERE IS NO FACTUAL OR LEGAL BASIS TO SANCTION MR. PATCH**

12        Mr. Patch did not sign any discovery responses, and did not violate any discovery orders.

13    Accordingly, he may not be sanctioned under Rules 26 or 37, and the only sanctioning authority

14    as against him is the Court's inherent authority.[9]  Due process constrains the inherent authority to

15    issue sanctions.  The Court cannot impose inherent powers sanctions unless the Court first finds

16    that Responding Attorneys acted in bad faith, or finds conduct tantamount to bad faith.

17    Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991), 501 U.S. at 46-47; Roadway Express, Inc. v.

18    Piper, 447 U.S. 752, 764, 766-767 (1980) ("Because inherent powers are shielded from direct

19    democratic controls, they must be exercised with restraint and discretion.").

20        In addition to this limitation, there is another important due process limitation here.  As

21    the Court has made clear, these proceedings are limited to discovery:  **"Judge Brewster**

22    **referred only the discovery violation to this Court.  Judge Brewster did not refer any**

23    **sanction motions relating to false statements made to the trial judge or in pleadings**

24    **resolved by the trial judge."**  Sanctions Order at 18, n. 5 citing Doc. No. 494 (emphasis added).

25

26    _____

    [9]    Mr. Patch incorporates the discussion of the Court's sanctions authority in the brief by

27    Messrs. Batchelder, Mammen, and Leung, and further incorporates the arguments made in that

28    brief and in the briefs by other responding attorneys, as applicable.

KERR
&
WAGSTAFFE
LLP

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2008 ORDER

1   The issue here, therefore, is whether Mr. Patch's conduct in connection with discovery

2   constituted bad faith conduct.  Statements to the trial court and examination of a witness are not

3   within this proceeding.  Should this Court consider such statements as a basis for imposing

4   sanctions, then fundamental due process requires that Mr. Patch be given notice and an

5   opportunity to submit briefs and to be heard on whether such non-discovery conduct is

6   "tantamount to bad faith."

7        Far from nefarious or reckless, Mr. Patch's conduct relating to Qualcomm's JVT

8   participation was diligent and in the utmost good faith.  He made repeated inquiries of

9   Qualcomm personnel, beginning in July 2006 and continuing through trial.  In his efforts to

10  determine whether, when, and to what extent Qualcomm had participated in the JVT, he

11  personally spoke with Viji Raveendran, Hari Garudadri, Alex Rogers, Kent Baker, Tom Rouse,

12  Yiliang Bao, Phoom Sagetong, Scott Ludwin, and Marta Karciewicz.  He reviewed the JVT

13  archive of meeting minutes.  He was aware that Gary Sullivan, the former chair of the JVT, Cliff

14  Reader had stated that Qualcomm did not participate.  And he knew his colleagues were

15  conducting similar inquiries and receiving consistent responses.

16       Beyond the quantity of Mr. Patch's inquiries is the timing.  When there were red flags, he

17  followed up.  He spoke with Ms. Raveendran before her deposition.  When she testified

18  concerning Qualcomm submissions to the JVT in 2006, he investigated not only those

19  submissions but whether there was any earlier interaction with the JVT, and went beyond just

20  speaking with her in his efforts.  When Broadcom asserted that Qualcomm was involved in a

21  September 2003 JVT meeting and associated harbor cruise, he immediately initiated an inquiry.

22  He reviewed the JVT archives for any sign of Qualcomm involvement after they came to his and

23  the litigation team's attention.  When Ms. Raveendran's email address was shown to have been

24  on a JVT reflector, he promptly interviewed her again, and was told a consistent story.  Leading

25  into trial, he spoke with Mr. Bao, Ms. Karciewicz, and (again) with Mr. Garudadri.  And of

26  course he interviewed Ms. Raveendran concerning the 21 emails on her computer when they

27  were located at trial.

28

24

KERR
&
WAGSTAFFE
LLP

PRIVILEGED & CONFIDENTIAL - PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2008 ORDER

1   Finally, in considering whether Mr. Patch acted in good faith, it is important to consider

2   the content of the responses he received and place them in the larger context.  Mr. Patch did not

3   rely on mere "no's" when he conducted his inquiries.  He was given factually rich explanations

4   by witnesses.  Before her deposition, Ms. Raveendran did not merely state that she had not

5   participated in JVT, but explained in detail her participation in the unrelated MPEG project at an

6   earlier date and her goldeneye status.  Her statements came in the context of her and Ms. Irvine's

7   earlier statements to Mr. Leung that Qualcomm had not had involvement with JVT.  And when

8   she was confronted again after her email address showed up on the JVT reflector, she had a

9   detailed and plausible explanation about who might have put her on that list and why.  Ample

10  statements from other Qualcomm representatives, both those who were with Qualcomm while

11  H.264 was under development and (even more importantly) those who were with other

12  companies during that time and attended JVT meetings were squarely in line with what Ms.

13  Raveendran was telling Mr. Patch.  Even the 21 emails (1) did not reflect attendance at a JVT

14  meeting; (2) did not reflect that Qualcomm had conducted a comparison of its IPR and H.264

15  while the standard was under development; (3) did not reveal that Qualcomm had sent a

16  representative; and (4) did not prompt anything from Ms. Raveendran except the same steadfast

17  denial of how she came to be on that list and the same statement that she had not participated in

18  the JVT while the standard was under development.

19       All in all, Mr. Patch relied on his detailed and repeated inquiries of Qualcomm witnesses

20  (and even third parties Gary Sullivan and Cliff Reader), his review of JVT archives, and his

21  review of the Qualcomm production database.  Where a new fact came to his attention, like the

22  September 2003 JVT meeting, 2006 technical submissions or the email address list for the JVT

23  reflector, he went straight to the source and related sources.  As was said at the start of this brief,

24  he asked the right people the right questions at the right time; he received false answers over and

25  over again from people who, frankly, continue to display a reluctance to be forthcoming.   Where

26  Mr. Patch has expressed his regret, they have not, but have instead recanted prior statements to

27  him, denied the obvious meanings of their own documents, and attempted to explain away false

28  statements to the Court without even a nod to the momentous events that have unfolded here.

25

KERR
&
WAGSTAFFE
LLP

PRIVILEGED & CONFIDENTIAL – PRODUCTION AND USE
GOVERNED BY PARAGRAPH 3 OF THE NOVEMBER 7, 2008 ORDER

1  Despite the uncertainties of this proceeding, there is one certainty:  Mr. Patch acted in utmost

2  good faith throughout the litigation.  He respectfully requests that the OSC be discharged.

## VI.    CONCLUSION

4         For the foregoing reasons, Mr. Patch respectfully requests that the Order to Show Cause

5  be discharged.

6  DATED: October 13, 2009

**KERR & WAGSTAFFE LLP**

By  _____
     H. SINCLAIR KERR, JR.

Attorneys for Responding Attorney
LEE PATCH

KERR
&
WAGSTAFFE
LLP