1  David J. Noonan (SBN 55966)
   dnoonan@knlh.com
2  Steven W. Sanchez (SBN 128669)
   ssanchez@knlh.com
3  Ethan T. Boyer (SBN 173959)
   eboyer@knlh.com
4  **KIRBY NOONAN LANCE & HOGE LLP**
   350 Tenth Avenue, Suite 1300
5  San Diego, California  92101-8700
   Telephone (619) 231-8666
6  Facsimile (619) 231-9593

7  Attorneys for Respondent Stanley Young

8

9             **UNITED STATES DISTRICT COURT**

10          **SOUTHERN DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| 12  QUALCOMM INCORPORATED, | CASE NO. 05CV1958-B (BLM) |
| 13          Plaintiff, | **DECLARATION OF DAVID J. NOONAN LODGING EXHIBITS IN SUPPORT OF MEMORANDUM OF POINTS AND AUTHORITIES OF STANLEY YOUNG IN RESPONSE TO REMANDED ORDER TO SHOW CAUSE** |
| 14          vs. | |
| 15  BROADCOM CORPORATION, | |
| 16          Defendant. | |
| 17  and RELATED COUNTERCLAIMS. | Date:        January 13-15, 2010 |
| 18 | Time:        To Be Determined |
| 19 | Courtroom:   A |
| | Judge:       Hon. Barbara L. Major |

20

21       I, David J. Noonan, declare as follows:

22       1.      I am an attorney duly licensed to practice law in the State of California and before

23  this Court and am a member of the law firm of Kirby Noonan Lance & Hoge, LLP, counsel of

24  record for Respondent Stanley Young ("Mr. Young") in the above-captioned matter.  I have

25  personal knowledge of the facts contained herein and, if called upon to testify, could and would

26  testify competently thereto.

27       2.      Attached hereto as Exhibit A is a true and correct copy of an excerpt (p. 23) from

28  the transcript from the hearing before this Court on September 28, 20007 regarding the motion by

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1   Responding Attorneys Young, Jaideep Venkatesan and Kyle Robertson for a ruling that the self-

2   defense exception to the attorney-client privilege was applicable in these proceedings.

3         3.     Attached hereto as Exhibit B is a true and correct copy of an excerpt (pp. 46-47, 78-

4   79, 138 and 141) of a hearing transcript from the hearing held in response to this Order to Show

5   Cause on October 12, 2007.

6         4.     Attached hereto as Exhibit C is a true and correct copy of the condensed version of

7   the deposition of Lee Patch with exhibits taken in this matter by me on May 8, 2009.

8         5.     We also are filing herewith the Declaration of Stanley Young in Response to Order

9   to Show Cause Why Sanctions Should Not Be Imposed – Sealed Documents Submitted to

10   Chambers, executed by Mr. Young on September 21, 2007. As the Court may recall, while the

11   motion for application of the self-defense exception was pending, we submitted to the Court in a

12   sealed envelope – but did not file – a brief along with declarations executed by Mr. Young,

13   Mr. Venkatesan and Mr. Robertson. Both the brief and the declarations contained information

14   protected by the attorney-client privilege, including statements in the declarations and exhibits

15   attached thereto. We submitted these declarations and brief in a sealed envelope in the event the

16   Court ruled in our favor on the application of the self-defense privilege. When the Court denied

17   that motion, the sealed brief and declarations were returned to our office. Thereafter, on

18   October 3, 2007, we filed redacted versions of these three declarations indicating where we were

19   unable to provide testimony due to the assertion of the attorney-client privilege by Qualcomm,

20   Inc. ("Qualcomm"). We have maintained the original of the three declarations dated

21   September 21, 2007. We are submitting them in connection with these remanded proceedings in

22   light of the District Court's order that Mr. Young and the other responding attorneys may present

23   pertinent attorney-client privileged information. The October 3, 2007 declaration of Mr. Young

24   contains this additional privileged information which Mr. Young previously could not disclose as

25   referenced in his October 3, 2007 declaration. With the addition of this privileged material, it is

26   otherwise identical in all material respects to the October 3, 2007 declaration of Mr. Young

27   already on file with this Court and is otherwise identical in all material respects.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1      6.      We also are filing herewith the September 21, 2007 Declaration of Jay Venkatesan.

2  As with Mr. Young's two declarations, this declaration contains the attorney-client information

3  that was redacted from Mr. Venkatesan's October 3, 2007 declaration.

4      7.      We also are filing herewith the September 21, 2007 Declaration of Kyle Robertson.

5  Again, this declaration contains the attorney-client privileged information redacted from

6  Mr. Robertson's October 3, 2007 declaration already on file with this Court. Mr. Robertson's

7  October 3, 207 declaration corrected one error in fact in the September 21, 2007 declaration – at

8  paragraph 37 wherein Mr. Robertson had indicated certain interrogatory responses were served on

9  July 31, 2006. This was corrected in the October 3, 2007 declaration to state that those

10  interrogatory responses were served on August 16, 2006. Other than this correction, and the

11  addition of the attorney-client privileged information, the September 21, 2007 declaration is in all

12  material respects identical to the October 3, 2007 declaration.

13      I declare under penalty of perjury under the laws of the State of California that the

14  foregoing is true and correct and that this Declaration was executed this _____13th_____ day of October

15  2009, at San Diego, California.

16

17                       _____

18                    David J. Noonan

19

20

21

22

23

24

25

26

27

28

*Kirby Noonan Lance & Hoge LLP*
*350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700*

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

DECLARATION OF DAVID J. NOONAN
LODGING EXHIBITS IN SUPPORT OF MEMORANDUM OF
POINTS AND AUTHORITIES OF STANLEY YOUNG IN RESPONSE
TO REMANDED ORDER TO SHOW CAUSE

<u>INDEX OF EXHIBITS</u>

EXHIBIT NO.     PAGE NOS.

A          1 – 2
B          3 – 9
C          10 - 101

KNLH655047.1

**Exhibit A** to
Declaration of David J. Noonan Lodging Exhibits in
Support of Memorandum of Points and Authorities
of Stanley Young in Response to Remanded Order
to Show Cause

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF CALIFORNIA

3

4   QUALCOMM INC.,                )    Case No. 05CV1958-B(BLM)
                                   )
5            Plaintiff,            )    San Diego, California
                                   )
6   vs.                           )    Friday,
                                   )    September 28, 2007
7   BROADCOM CORPORATION,          )    10:30 a.m.
                                   )
8            Defendant.            )
                                   )
9   _____)

10                   TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE BARBARA LYNN MAJOR
11                UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiff:            WILLIAM S. BOGGS, ESQ.
                                  BRIAN A. FOSTER, ESQ.
14                                DLA Piper US, LLP
                                  401 B Street, Suite 1700
15                                San Diego, California 92101
                                  (619) 699-2700
16

    For the Defendant:            ROBERT S. BREWER, ESQ.
17                                McKenna, Long & Aldridge
                                  750 B Street, Suite 3300
18                                San Diego, California 92101
                                  (619) 595-5408
19

                                  MARK D. SELWYN, ESQ.
20                                Wilmer, Cutler, Pickering
                                   Hale & Dorr, LLP
21                                60 State Street
                                  Boston, Massachusetts 02109
22                                (617) 526-6453

23

24

    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Echo Reporting, Inc.*

Ex. A, Pg. 1
Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

23

1          Can I ask the Court, with respect to the Court's

2  view, is the Court's view that we are -- this is a Rule 37

3  proceeding, that's where we are, or is it --

4          THE COURT:  Essentially, yes.

5          MR. NOONAN:  Okay.  And so, the issue here are the

6  discovery abuse or discovery transgressions.

7          THE COURT:  Correct.

8          MR. NOONAN:  Well, I have nothing -- I could talk

9  a lot longer.  But, I don't think I'd give you anything

10 further to say, and so, I'll yield the floor to other

11 counsel.

12         THE COURT:  All right, thank you.

13         MR. NOONAN:  Thank you, your Honor.

14         MR. BUTZ:  Good morning, your Honor.  Doug Butz on

15 behalf of Mr. Kleinfeld, Mr. Tucker and Ms. Gutierrez.  I

16 just want to make a couple of points, not to repeat anything

17 that's been said or discussed with the Court, but just a

18 couple of points.

19         I do not think that the papers submitted on behalf

20 of my clients intrude upon or implicate or in any way

21 infringe upon either attorney-client, work product or 6068.

22 And I think the Court will make that judgment as well, and

23 again, I'm not suggesting any conclusion on the part of the

24 Court.  And in that sense, your Honor, I guess it could be

25 pointed out that this tentative ruling by the Court maybe

*Echo Reporting, Inc.*

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

**Exhibit B** to
Declaration of David J. Noonan Lodging Exhibits in
Support of Memorandum of Points and Authorities
of Stanley Young in Response to Remanded Order
to Show Cause

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

4  QUALCOMM INC.,                    )    Case No. 05CV1958-B(BLM)
                                     )
5          Plaintiff,                )    San Diego, California
                                     )
6  vs.                               )    Friday,
                                     )    October 12, 2007
7  BROADCOM CORPORATION,             )    9:30 a.m.
                                     )
8          Defendant.                )
   _____    )
9

10        TRANSCRIPT OF ORDER TO SHOW CAUSE HEARING
          BEFORE THE HONORABLE BARBARA LYNN MAJOR
11             UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiff:         WILLIAM S. BOGGS, ESQ.
                               BRIAN A. FOSTER, ESQ.
14                             DLA Piper US, LLP
                               401 B Street, Suite 1700
15                             San Diego, California 92101
                               (619) 699-2700
16

17  For the Defendant:         ROBERT S. BREWER, ESQ.
                               McKenna, Long & Aldridge
18                             750 B Street, Suite 3300
                               San Diego, California 92101
19                             (619) 595-5408

20                             WILLIAM F. LEE, ESQ.
                               KATE SAXTON, ESQ.
21                             Wilmer, Hale, Cutler Pickering
                                & Dorr
22                             60 State Street
                               Boston, Massachusetts 02109
23                             (617) 526-6000

24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

*Echo Reporting, Inc.*

Ex. B, Pg. 3

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

46

1  satisfactory solution to us. But what I neglected to do was

2  explain that that does not in any way alleviate the due

3  process concerns. Those concerns were there before.

4          THE COURT: Right.

5          MR. ZELDIN: And that's why we made the self-

6  defense motion. And if you read the declarations, what we

7  tried to do is go through everything in Judge Brewster's

8  order that he found to be misconduct, and anything that came

9  up in the transcript of the hearing before your Honor on

10 July 26 we tried to address it. And I'll bet you that

11 there's more than 50 occasions in there where the declarant

12 says "I'd love to tell you more. If it were up to me, I

13 would, but I can't." And so the due process argument is

14 there, and the declarations just exacerbated the problem.

15         THE COURT: Okay.

16         MR. ZELDIN: Thank you, your Honor.

17         THE COURT: Certainly. Anyone else? Okay.

18         On that issue, I'm going to take that under

19 submission at this point. I do find that the declarations

20 submitted by Qualcomm -- the Qualcomm employees add another

21 level of concern to the due process arguments that

22 previously had been voiced by counsel, and I will address

23 that in the written ruling that I issue after this hearing.

24         Moving on to the next issue, and that is as I

25 reviewed the declarations and the history of this case, the

*Echo Reporting, Inc.*

Ex. B, Pg. 4

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

47

1  first discovery violation -- and to me it's a critical

2  discovery violation, that caught my attention was how in the

3  world over 200,000 E-mails clearly responsive were not found

4  and weren't produced.  While all of those E-mails haven't

5  been submitted to me and I haven't reviewed all of them,

6  there are a number that have been submitted either to me or

7  to Judge Brewster that are clearly responsive, and the

8  initial concern is how in the world Qualcomm, a huge

9  corporation with lots of very good in-house lawyers and some

10  very good outside counsel, how in the world 200,000 E-mails

11  and documents were not produced.  To me, that is a

12  fundamental and monumental error.  And to me that is what

13  led to all of the rest of the misconduct in this case.  And

14  even as we sit here today, I don't see that explained.

15          Does anyone want to -- I guess let me give you a

16  couple more thoughts.  As I looked at it, I disagree with

17  some of the statements made by counsel.  The law does not

18  require me to make a finding of intentional misconduct.  The

19  discovery rules are very clear that I can sanction lawyers

20  and corporations who are parties for failures that are

21  premised upon a lesser conduct than intentional, certainly

22  all the way down to negligent.

23  In addition, the Federal Rules do not require that there be

24  a specific motion to compel.  And, in fact, in this case, as

25  the parties have stated, Broadcom did not make a motion to

*Echo Reporting, Inc.*

Ex. B, Pg. 5

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

78

1  who's interviewed her about the very document.  So to say

2  there's no investigation I don't think is correct, your

3  Honor.

4          THE COURT:  Shouldn't there be an investigation of

5  her records, though?

6          MR. NOONAN:  Well --

7          THE COURT:  I mean, the search of her records

8  begins the process of turning up --

9          MR. NOONAN:  So stipulated, your Honor.  I don't

10  -- I'm not disputing the Court if -- if Ms. Raveendran is a

11  relevant witness on JVT, then during the course of the

12  document production, I would assume there would have been

13  some inquiry made of Ms. Raveendran.  I don't know, and

14  that's why I'm kind of -- I think --

15          THE COURT:  I understand that.

16          MR. NOONAN:  -- he should have gone first because

17  I don't -- I don't know what the answers to those questions

18  are.  I don't know what she was asked.  I don't know what

19  she said.  I don't know what she produced.  I have no idea

20  at this point in time.

21          THE COURT:  But I guess my concern with regard to

22  the reasonableness of Mr. Young's statement is he had no

23  idea whether any search had been done.  I mean, I -- I

24  accept what you're saying, that he made the statement

25  believing it to be true.  I'm accepting that.  But what I'm

*Echo Reporting, Inc.*

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

79

1 looking at is the reasonableness of making that statement.

2 At the time, he did not know whether any search had been

3 done of her records. The only thing that it sounds like he

4 knew was that she had denied prior knowledge. Excuse me,

5 that she had denied receiving E-mails.

6          MR. NOONAN: Right. But at -- at this point in

7 time, after they stake out the position they did, Broadcom

8 didn't come across with any additional controverting

9 information.

10          THE COURT: Because Qualcomm hadn't provided it.

11          MR. NOONAN: Well, I -- I -- but there are other

12 ways. I said Mr. Chen was involved. There were other

13 Broadcom people apparently involved in this group.

14          THE COURT: Yeah, I see.

15          MR. NOONAN: And I'm saying it's reasonable for

16 him to believe at this point in time that the record is what

17 it is. He also knows Ms. Raveendran is a trial witness.

18          THE COURT: Okay.

19          MR. NOONAN: He also knows that he's seen her

20 being prepared for her -- for her testimony. So when he

21 goes forward on the 18th, what I'm trying to indicate to the

22 Court, there was nothing new or different in his mind with

23 respect to her lack of involvement in the JVT prior to May

24 of 2003, and nothing that indicated to her that -- to him

25 that she had been involved in this group in May of 2002,

Ex. B , Pg. 7
Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

138

1  study for, but all he's doing is interposing the objection

2  which is Exhibit 8 --

3            THE COURT:  Right.

4            MR. NOONAN:  -- to his declaration, and that was

5  an objection that was set forth on November 27th of 2006.

6            THE COURT:  I agree with that.  The problem I had

7  is if you're relying on lack of foundation, then you stand

8  on lack of foundation, but he went one step further and said

9  there are no E-mails going to this address, and that

10 statement is not going to foundation.  That statement it

11 turns out to be a complete lie.  I mean --

12           MR. NOONAN:  Well, it's not a lie if he doesn't --

13 if he doesn't know it's untrue, it's not a lie.

14           THE COURT:  Right.  I'll take that back.  It was a

15 false statement.

16           MR. NOONAN:  But when -- if you look at what is,

17 in fact, transpiring, and we appended the transcript, your

18 Honor, and --

19           THE COURT:  I read that.

20           MR. NOONAN:  -- I suspect you've read it all, but

21 when he got to sidebar, it wasn't simply a case of standing

22 up and going -- repeating the rote objection that had been

23 interposed on November 29th.  Colloquy from Broadcom counsel

24 started and there began to be a discussion.

25           THE COURT:  All right.

*Echo Reporting, Inc.*

Ex. B, Pg. 8

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

141

1 in communication.

2          MR. NOONAN:  Correct, your Honor.  And so when he

3 -- he goes --

4          THE COURT:  When he made that statement, he should

5 have known that those E-mails existed.  Somebody should have

6 told him.

7          MR. NOONAN:  Well, he should have known.  He

8 should have been told.

9          THE COURT:  Because that's his issue.

10          MR. NOONAN:  Right.  I mean, and I'll use the

11 phrase he got hung out to dry.  I'm not saying that anyone

12 intentionally sent him up there so that he could make a

13 misstatement.  But one wonders if he made the statement and

14 if the E-mails hadn't tumbled out on the 24th, Mr.

15 Batchelder may have very well walked up in closing argument

16 and made the exact same statement based upon the state of

17 the evidence.  So --

18          THE COURT:  I think Mr. Batchelder did make the

19 argument.  He didn't make that statement, but he certainly

20 made the argument that there was no involvement in opening

21 and closing.

22          MR. NOONAN:  Well, he made the involvement (sic),

23 but the question of this specific statement about what's the

24 probative value of this document, that argument changed once

25 the E-mails came tumbling out.  He wasn't going to walk up

*Echo Reporting, Inc.*

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

**Exhibit C** to
Declaration of David J. Noonan Lodging Exhibits in
Support of Memorandum of Points and Authorities
of Stanley Young in Response to Remanded Order
to Show Cause

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

LEE PATCH    July 14, 2009
PRIVILEGED AND CONFIDENTIAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

```
- - - - - - - - - - - - - - - -
QUALCOMM INCORPORATED,            )
                                  )
              Plaintiff,          )
                                  )
       vs.                        )    No. 05CV1958-B (BLM)
                                  )
BROADCOM CORPORATION,             )
                                  )
              Defendant.          )
- - - - - - - - - - - - - - - -)
AND RELATED COUNTERCLAIMS.        )
- - - - - - - - - - - - - - - -
```

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL:  PRODUCTION

AND USE GOVERNED BY 5/8/2009 COURT ORDER

VIDEOTAPED DEPOSITION OF LEE PATCH

TAKEN ON:  Tuesday, July 14, 2009

TAKEN AT:  401 B Street, Suite 1700

San Diego, California


REPORTED BY:  JOYCE E. HOSTETLER

CSR No. 5216, RPR

1

Ex. C Pg. 10

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

LEE PATCH     July 14, 2009
PRIVILEGED AND CONFIDENTIAL

---

**Page 2**

```
 1  APPEARANCES:
 2  FOR PLAINTIFF:
 3    CRAVATH, SWAINE & MOORE LLP
        825 Eighth Avenue
 4      New York, New York 10019-7475
        (212)474-1328
 5      BY:  ELIZABETH GRAYER
             egrayer@cravath.com
 6           KYLE W. MACH
 7  FOR PLAINTIFF:
 8    DLA Piper
        401 B Street, Suite 1700
 9      San Diego, California 92101
        (619)699-2986
10      BY:  CRIS J. BEAL
             cris.beal@dlapiper.com
11           BRIAN FOSTER
12  FOR JAMES R. BATCHELDER, CHRISTIAN E. MAMMEN AND KEVIN
      K. LEUNG:
13
      SHARTSIS FRIESE LLP
14      One Maritime Plaza, 18th Floor
        San Francisco, California 94111-3598
15      (415)421-6500
        BY:  JOEL ZELDIN
16           jzeldin@sflaw.com
17  FOR LEE PATCH:
18    KERR & WAGSTAFFE
        100 Spear Street, Suite 1800
19      San Francisco, California 94105
        (415)371-8500
20      BY:  H. SINCLAIR KERR, JR.
             ADRIAN J. SAWYER
21           sawyer@kerrwagstaffe.com
22
23
24
25
```

---

**Page 4**

```
 1              I N D E X
 2  WITNESS      EXAMINED BY         PAGE
 3  LEE PATCH
 4    Mr. Noonan           6
 5
 6
 7
 8         E X H I B I T S
 9
10  NUMBER      DESCRIPTION         PAGE
11  Exhibit 140  letter dated February 7, 2007   6
               from Louis W. Tompros
12
    Exhibit 141  Letter dated February 16, 2007   11
13             from Adam Bier
14  Exhibit 142  E-mail string, the top one dated  14
               January 29, 2007
15
    Exhibit 143  Declaration of Non-Party Lee Patch  22
16             in Response to Order to Show Cause
17  Exhibit 144  Order Granting in Part and Denying  41
               in Part Defendant's Motion For
18             Sanctions and Sanctioning Qualcomm,
               Incorporated and Individual Lawyers
19             filed January 7, 2008
20
21
22
23
24
25
```

---

**Page 3**

```
 1  FOR ADAM BIER:
 2    CHAPMAN, POPIK & WHITE LLP
        650 California Street, 19th Floor
 3      San Francisco, California 94108
        (415)352-3000
 4      BY:  MERRI A. BALDWIN
             mbaldwin@chapop.com
 5
    FOR STANLEY YOUNG:
 6
      KIRBY NOONAN LANCE & HOGE LLP
 7      350 Tenth Avenue, Suite 1300
        San Diego, California 92101-8700
 8      (619)231-8666
        BY:  DAVID J. NOONAN
 9           dnoonan@knlh.com
10  VIDEOGRAPHER:
11    MERRILL LEGAL SOLUTIONS LOS ANGELES
        20750 Ventura Boulevard, Suite 205
12      Woodland Hills, California 91364
        (818)593-2300
13      BY:  JAMIE CARLSON
14  ALSO PRESENT:
15    SARA NOONAN
        Kirby Noonan Lance & Hoge, LLP
16
17
18
19
20
21
22
23
24
25
```

---

**Page 5**

```
 1    San Diego, California; July 14, 2009; 1:45 p.m.
 2
 3        THE VIDEOGRAPHER: Here begins Volume 1,
 4  Videotape No. 1 in the deposition of Lee Patch in the
 5  matter of Qualcomm Incorporated versus Broadcom
 6  Corporation filed in the United States District Court,
 7  Southern District of California, Case No.
 8  05CV1958-B(BLM).
 9        Today's date is July 14th, 2009.  The time is
10  1:45 p.m.  The video operator today is Jamie Carlson, a
11  notary public contracted by Merrill Legal Solutions.
12  This video deposition is taking place at DLA Piper at
13  401 B Street, Suite 1700, San Diego, California 92101.
14        Counsel, please voice identify yourselves and
15  state whom you represent.
16        MR. NOONAN:  Yes, good afternoon.  Dave Noonan
17  appearing for Respondent Stanley Young.
18        MR. ZELDIN:  Joel Zeldin for Batchelder, Mammen
19  and Leung.
20        MR. SAWYER:  Adrian Sawyer for Lee Patch.
21        MS. BALDWIN:  Merri Baldwin for Adam Bier.
22        MR. MACH:  Kyle Mach, Cravath Swaine & Moore
23  for Qualcomm.
24        MR. BEAL:  Cris Beal, DLA Piper for Qualcomm.
25        MR. FOSTER:  Brian Foster, also for Qualcomm.
```

---

2 (Pages 2 to 5)

Ex. C, Pg. 11

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

LEE PATCH      July 14, 2009
PRIVILEGED AND CONFIDENTIAL

6

1      MS. GRAYER: Elizabeth Grayer for Qualcomm.
2      MR. KERR: Rod Kerr on behalf of Lee Patch.
3      THE VIDEOGRAPHER: The court reporter today is
4  Joyce Hosteler of Merrill Legal Solutions. Would the
5  court reporter please swear in the witness.
6
7              LEE PATCH,
8  having been administered an oath, testified as follows:
9
10             EXAMINATION
11 BY MR. NOONAN:
12 .  Q   Good afternoon, Mr. Patch. Would you state
13 your full name for the record, please?
14    A   Lee Patch.
15    Q   Mr. Patch, I want to show you what I've marked
16 as Exhibit No. 140 to the deposition. It purports to be
17 a letter dated February 7, 2007 from Louis W. Tompros to
18 Lee Patch, Esquire and is three pages in length.
19       (Exhibit 140 was marked for identification.)
20 BY MR. NOONAN:
21    Q   Let me show you what we've marked as Exhibit
22 No. 140. Would you take a look at Exhibit 140. I'm
23 going to ask you some questions about it.
24    A   Okay.
25    Q   Did you receive the original or a copy of

7

1  Exhibit No. 140 in or about February 7th of 2007?
2    A   I believe so.
3    Q   And you've seen -- you've seen Exhibit 140
4  before; is that correct?
5    A   That's correct.
6    Q   And in Exhibit No. 140, Mr. Tompros of the
7  Wilmer Hale firm writes on page 1, "Dear Lee: I write
8  to follow up on our telephone conversation of
9  February 1, 2007 concerning the 21 e-mails produced to
10 Broadcom on January 24, 2007 during the last day of
11 testimony at trial. Qualcomm did not notify Broadcom of
12 these e-mails until their existence was disclosed during
13 Ms. Raveendran's cross-examination on January 24, 2007."
14       Do you have in mind the particular telephone
15 conversation to which Mr. Tompros is referring?
16    A   Yes.
17    Q   And do you recall that on February 1, 2007 you
18 participated in a telephone conversation which involved
19 yourself, Mr. Adam Bier and Mr. Stan Young, and also
20 Ms. Kate Saxton and Mr. Louis Tompros of the Wilmer Hale
21 law firm?
22    A   I remember the conversation as a general
23 matter. I don't remember the precise date or all of the
24 individuals you've identified as having been
25 participants on the call.

8

1    Q   But do you have a general recollection of the
2  call that Mr. Tompros is referring to here in his
3  letter?
4    A   I do.
5    Q   And, generally speaking, was the purpose of the
6  telephone conference to "meet and confer" with respect
7  to the issue of production of documents?
8    A   Generally, yes.
9    Q   All right. Now, in this particular letter on
10 page -- the second page of Exhibit No. 140, Mr. Tompros
11 states in the first full paragraph, he says, "During our
12 conversation you also explained how the 21 e-mails came
13 into the possession of Qualcomm's legal team." Let me
14 stop you there.
15       Do you recall that that was one of the subjects
16 that was discussed in the course of the February 1, 2007
17 telephone conference?
18    A   In general, yes.
19    Q   All right. Mr. Tompros goes on to state, "As I
20 understand your explanation, on January 14, 2007
21 attorneys for Qualcomm learned of an archive of e-mails
22 belonging to Viji Raveendran. Ms. Raveendran had
23 maintained this e-mail archive apart from Qualcomm's
24 main e-mail system." Let me stop there.
25       Is what I've recited so far, does that comport

9

1  with your recollection as to something you stated or
2  words to the effect in the February 1, 2007
3  conversation?
4    A   I do not recall the words that were expressed
5  on the phone call.
6    Q   All right.
7    A   In general, the subject matter that Mr. Tompros
8  is reporting upon was included in that conversation, but
9  I don't recall the precise words that were expressed.
10    Q   Mr. Tompros goes on to state, "On January 14,
11 2007 Qualcomm attorneys ran a search through this
12 archive for e-mails from the address 'AVC_CE' which is
13 the address for one of the JVT e-mail reflectors." Let
14 me stop there.
15       The person who ran the search, was that Adam
16 Bier?
17       MS. BALDWIN: Objection; lacks foundation.
18       THE WITNESS: I was not present, so I only have
19 second-hand information concerning that matter.
20 BY MR. NOONAN:
21    Q   I understand that. But to your knowledge, in
22 the conversation of February 1, 2007, was it discussed
23 that Mr. Bier was the person who ran the search?
24    A   I don't recall.
25    Q   Mr. Tompros goes on to state -- this is in the

3  (Pages 6 to 9)

Ex. C  Pg. 12

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

LEE PATCH    July 14, 2009
PRIVILEGED AND CONFIDENTIAL

10

1  second full paragraph of page 2 of Exhibit 140 -- says,
2  "That search resulted in the identification of the 21
3  e-mails that Qualcomm produced on January 24, 2007."
4  Then he goes on to state, "Mr. Young did not know about
5  this search when he represented to the court on
6  January 18, 2007 that there was no evidence of any
7  e-mail from the JVT to Ms. Raveendran, a representation
8  that has since been withdrawn."
9       Did you -- did you state that to Mr. Tropos in
10 the course of the conversation on February 1, 2007?
11   A  I don't recall exactly what was expressed on
12 that telephone call.
13   Q  Did you state to Mr. Tompros in the call on
14 February 1, 2007 that Mr. Young did not know about this
15 search when he represented to the court on January 18,
16 2007 that there was no evidence of any e-mail from the
17 JVT to Ms. Raveendran? Did you state that or words to
18 that effect?
19   A  I recall that that was expressed on the call.
20 I do not recall as I sit here today who made that
21 expression to Mr. Tompros.
22   Q  Are you stating that you did not make that
23 statement?
24   A  No, I'm not making that statement.  It may have
25 been me, it may have been one of the other participants.

11

1  I simply, as I sit here today, don't recall precisely
2  who made those statements.
3    Q  Is the statement, "Mr. Young did not know about
4  this search when he represented to the court on
5  January 18, 2007 that there was no evidence of any
6  e-mail from the JVT to Ms. Raveendran," was that -- is
7  that statement consistent with what your knowledge was
8  as of February 1, 2007?
9    A  Yes.
10   Q  Do you recall -- in the telephone call that
11 we're discussing, do you recall anyone on the phone call
12 demurring to or disputing the notion that's set forth
13 here; that is, that Mr. Young did know about -- did not
14 know about this search?
15   A  No.
16   Q  Let me show you what we're going to mark as
17 Exhibit No. 141 to your deposition. It's a letter
18 from -- it is a letter from -- it purports to be from
19 Adam Arthur Bier to Louis Tompros dated February 16 of
20 2007.
21       (Exhibit 141 was marked for identification.)
22 BY MR. NOONAN:
23   Q  Let me show you Exhibit 141.
24       Taking a look at what we've marked as Exhibit
25 No. 141, have you seen 141 before?

12

1    A  Yes.
2    Q  Did you see Exhibit 141 at or about the time it
3  was sent on February 16th of 2007?
4    A  I don't know.  Can't recall if I saw it
5  contemporaneously.
6    Q  Did you author all or any part of Exhibit 141?
7    A  Not to my recollection.
8    Q  Did you approve the content of Exhibit No. 141
9  before it was sent out?
10   A  I don't have a recollection about that.
11   Q  Mr. Bier was an associate attorney at the time;
12 is that correct?
13   A  That is correct.
14   Q  Do you believe that Mr. Bier sent Exhibit 141
15 without having you review it and advise as to the
16 appropriateness of the letter?
17   A  I don't know what Mr. Bier did.  I would be
18 surprised if he sent it without review by someone.  I
19 have no personal recollection that that reviewer
20 happened to be me.
21   Q  Okay.  In the first line Mr. Bier states, "I
22 write in response to your letter to Lee Patch of
23 February 7, 2007 concerning the 21 e-mails, et cetera."
24 Let me stop you there.
25       Do you recall why it was that Mr. Bier

13

1  responded to Mr. Tompros' letter to you rather than you
2  responding to the letter?
3    A  .I have no recollection for why that occurred
4  that way.
5    Q  And do you recall that either in this letter or
6  in any subsequent communication or correspondence with
7  Mr. Tompros or Ms. Saxton, anyone from your firm
8  disputing the notion set forth in Exhibit 140,
9  Mr. Tompros' letter, that Mr. Young did not know about
10 the search when he represented to the court on
11 January 18, 2007 that there was no evidence of any
12 e-mail from the JVT to Ms. Raveendran?
13   A  I'm sorry, that was a little confusing.  You
14 make reference to both letters?
15   Q  The question was, do you recall that Mr. Bier
16 or anyone else from Day Casebeer, either in Exhibit 141
17 or any later correspondence, ever disputed the notion
18 that Mr. Young did not know about the search when he
19 made his representations to the court on January 18 of
20 2007?
21   A  I've never heard anyone dispute that.
22   Q  You can put 140 and 141 away.
23       I want to mark as Exhibit No. 142 an e-mail
24 string Bates stamped DC 00087044 through DC 00087050.
25 The top e-mail on page 1 of Exhibit 142 is from

4 (Pages 10 to 13)

Ex. C  Pg. 13
Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

14

1  Mr. Bier, Monday, January 29, 2007 at 2:28 p.m.
2       (Exhibit 142 was marked for identification.)
3  BY MR. NOONAN:
4       Q   Let me show you Exhibit 142.
5       MR. KERR: Do you want him to read this,
6  Mr. Noonan, or --
7       MR. NOONAN: Yes, I would like him to generally
8  look at it and familiarize himself with it, and then
9  I'll -- I'll direct him to some specific portions. And
10 if he needs additional time to read it --
11      MR. KERR: That's fine.
12      MR. NOONAN: -- then he can have additional
13 time.
14      THE WITNESS: You wish me to read all of them
15 or just the first in the series?
16 BY MR. NOONAN:
17      Q   I really would like you to -- well, I can
18 direct your attention to the portion. Let me, before I
19 tie -- before I get into this, there's one other
20 question I wanted to ask you about the February 1
21 conversation, Mr. Patch.
22      Do you recall that prior to you and Mr. Young
23 and Mr. Bier getting on the line with Ms. Saxton and
24 Mr. Tompros for the telephonic meet and confer, do you
25 recall you and Mr. Young and Mr. Bier having a separate

15

1  conversation?
2       A   Generally, yes.
3       Q   Do you recall in that conversation anything
4  that was stated about whether or not Stan Young was
5  aware of the existence of the 21 e-mails prior to the
6  time he made his statement to the side bar on
7  January 18th of 2007?
8       A   I don't have any specific recollection of what
9  was discussed there other than preparation for the
10 scheduled meeting to follow.
11      Q   Let's go to Exhibit numbered -- what I've
12 marked here as Exhibit No. 142. In Exhibit No. 142, on,
13 I'm going to say, the third page from the bottom, the
14 bottom e-mail is from Anna Folmer, F-o-l-m-e-r, Tuesday,
15 January 23, 2007.
16      A   I'm sorry, I'm not with you.
17      MR. KERR: What's the Bates number? That might
18 be easier.
19      MR. NOONAN: 70 -- 87048.
20      MR. KERR: Okay.
21      THE WITNESS: Okay.
22 BY MR. NOONAN:
23      Q   And it's to Victoria Smith, subject is the
24 Latest Version of JMOL 52(c) 1/23/07 at 7:51 p.m. Who
25 is Anna Folmer?

16

1       A   Anna is a legal secretary at Day Casebeer.
2       Q   And Victoria Smith was an associate attorney at
3  Day Casebeer at the time; is that correct?
4       A   Correct.
5       Q   And do you recall that Ms. Smith was generally
6  involved in the effort to put together and have filed
7  the JMOL or the Judgment as a Matter Of Law motion under
8  Rule 52(c)?
9       A   I did not have that recollection.
10      Q   Let's go to the next page -- excuse me, the one
11 page closer to the top which is DC 87047. And this is
12 an e-mail from Mr. Young on Saturday, January 27th of
13 2007 to a number of people including yourself; is that
14 correct?
15      Q   Are you at the very bottom of this page?
16      Q   Yes.
17      A   Yes, I see that.
18      Q   And do you recall, January 7, 2007 was several
19 days -- couple days after the conclusion of the trial;
20 is that correct?
21      A   Correct.
22      Q   And do you recall that there was an effort
23 being undertaken at that time to file a correction to
24 the JMOL brief that had been previously filed? Do you
25 recall that effort?

17

1       A   In general I do.
2       Q   And in the e-mail just above the one I just
3  referred to you, Mr. Casebeer states on Saturday,
4  January 27th of 2007, he says, "Stan, I agree that we
5  should file a correction on Monday that is consistent
6  with Viji's testimony and reconfirms the point that
7  there was no evidence of her involvement or
8  participation in the JVT or the AHG during the period
9  through 5/03."
10      Is that correct?  Do you see what I've just
11 read?
12      A   I see that you read it.
13      Q   And do you recall that you were involved in
14 this effort to put together a corrected JMOL?
15      A   I don't recall having close involvement in the
16 process.  I am copied on some of the e-mail exchanges, I
17 see.
18      Q   Let me -- go to the second page from the top on
19 Exhibit 142, Mr. Young's e-mail. It's the bottom one,
20 Mr. Patch, dated January 29th of 2007 at 6:33 a.m.
21      A   I'm there.
22      Q   Okay. And Mr. Young states, "Can Day Casebeer
23 file this this morning? I do not have page cites for
24 the JMOL brief as filed. Thanks very much."
25      And then Ms. Smith responds, "If we are all in

5 (Pages 14 to 17)

Ex. C Pg. 14

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

LEE PATCH      July 14, 2009
PRIVILEGED AND CONFIDENTIAL

18

1  agreement with the wording, I can file it this morning.
2  Please confirm that this hasn't been done already and I
3  will take care of it." Do you see that?
4      A  I do.
5      Q  And does this bring to mind or refresh your
6  recollection that you were generally aware of this
7  process, this ongoing process to get an amended or
8  corrected JMOL on file?
9      A  Oh yes, I was aware of it.
10     Q  Okay. Now, Ms. Smith in the -- if you go to
11 page 1 of Exhibit 142, Ms. Smith on Monday, January 29th
12 of 2007 at 1:57 p.m. in an e-mail to a number of
13 individuals, including yourself, she says, "FYI, we
14 called Judge Brewster's clerk. She informs us that we
15 should file an amended, not corrected, pleading.
16 Attached is the redlined amended 52(c) motion. The only
17 changes are to the title and on redline page 11 re
18 Viji's e-mails. Craig suggested that the language Stan
19 provided in his earlier e-mail be sent to the court in
20 the form of a letter also attached." Then she says,
21 "There are only two loose ends."
22     I want to go to No. 2. And this is on page 2
23 of Exhibit 142. She says, "Is it true that we as
24 counsel to Qualcomm first became aware of Viji's e-mails
25 during trial? This is what the letter now says, and I

19

1  just want to make sure that this is the correct
2  information." All caps, "I need your, the attorney's,
3  confirmation on this."
4      Do you recall seeing this on or about
5  January 29 of 2007?
6      A  I have no present recollection of having seen
7  this e-mail.
8      Q  Do you recall, did you respond to this at all,
9  either in writing or verbally?
10     A  I don't recall.
11     Q  All right. Mr. Mammen then states in his
12 e-mail, Exhibit 142 on the first page at 2:11 p.m. on
13 January 29, he says, "My understanding is that we first
14 learned of the e-mails when we first met with Viji to
15 prep her for her trial testimony." Do you see what I've
16 just read?
17     A  No, actually I've lost you now.
18     Q  It's in the middle of the page on page 1.
19     MR. KERR:  I'm sorry, page 1?
20     MR. NOONAN:  Yes.
21     MR. KERR:  Okay. You referred to Chris
22 Mammen's e-mail which also is on page 2. I think that's
23 what threw us off. So now you're backed up then to the
24 middle of page 1?
25     MR. NOONAN:  Yes.

20

1      THE WITNESS:  Okay. I'm back with you again.
2  BY MR. NOONAN:
3      Q  Do you see where I've just read? Did you see
4  that on or about January 29 of 2007?
5      A  I don't recall if I saw it at that time. I'm
6  copied, so high probability I was.
7      Q  Again, seeing -- let me -- Mr. Mammen responds,
8  and then you see above where Mr. Bier responds to the
9  e-mail?
10     A  I do.
11     Q  All right. And Mr. Bier states on January 29,
12 2007, he states, "In a nutshell, on Sunday, January 14
13 during her prep (the second such session as I recall)
14 I ran a single search against Viji's locally stored on
15 her laptop e-mail archives for the phrase 'AVC_CE' which
16 is the address of the reflector at issue. The search
17 resulted in 21 e-mails. I examined a sample of them and
18 discussed them with a couple people on our team (Chris
19 and one or two others) and we concluded they were not
20 responsive to any Broadcom's RFPs for reasons Lee and I
21 have discussed at length. Stan made his comment on I
22 believe the 18th, not having been privy to or present
23 during the previous conversation."
24     Did you see the language that I've just read,
25 did you see this on or about January 29 of 2007?

21

1      A  I don't have any present recollection, but I
2  believe I probably did see it.
3      Q  And seeing that Mr. Mammen and Mr. Bier
4  responded, does it bring to mind that you made any type
5  of response to Ms. Smith, either orally or in writing,
6  as to the query that she had posed in her earlier e-mail
7  of that day?
8      A  No, I don't see any indication that I
9  responded.
10     Q  And as far as what Mr. Bier states here, that
11 is, "Stan made his comment on I believe the 18th, having
12 not been privy to or present during the previous
13 conversation," that was an accurate statement as far as
14 you knew, correct?
15     A  Yes.
16     Q  And as far as you know, did anyone from Day
17 Casebeer, any attorney at Day Casebeer -- after seeing
18 or receiving Mr. Bier's e-mail here, January 29th at
19 2:28 p.m., did anyone at Day Casebeer, either verbally
20 or in writing, dispute the accuracy of what Mr. Bier had
21 stated about Stan Young's e-mail?
22     A  No.
23     Q  Now let's go to -- mark as Exhibit No. 143
24 document titled Declaration of Non-Party Lee Patch in
25 Response to Order to Show Cause.

6 (Pages 18 to 21)

Ex. C  Pg. 15

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

22

1        (Exhibit 143 was marked for identification.)
2   BY MR. NOONAN:
3        Q   Show you what we marked as Exhibit 143.
4        A   Thank you.
5        Q   Do you recognize Exhibit 143 as a declaration
6   under penalty of perjury that you signed and was
7   submitted to the district court on or about October 3,
8   2007?
9        A   I do.
10       Q   And that is your signature on page 15 of 143,
11  correct?
12       A   Correct.
13       Q   I want to go over just certain of the
14  paragraphs within this declaration.
15           Would you take a look at -- and again, feel
16  free, if you need to review the entire declaration or if
17  you want to review more than what I'm directing you to,
18  just simply indicate that to me and we'll take time and
19  you can do it. Okay?
20       A   Okay.
21       Q   Would you take a look at paragraph 24 on
22  page 5.
23       A   Okay.
24       Q   The information that you impart here in
25  paragraph 24, am I correct this is not information that

23

1   you became aware of on January 7?
2        A   That is correct.
3        Q   And am I correct that this was not information
4   that you became aware of prior to January 14th?
5        A   That is correct.
6        Q   All right. So in paragraph 24 you're
7   recounting for the court what you -- some information
8   you learned later; is that correct?
9        A   Correct.
10       Q   And then in paragraph 25 the statement is made,
11  "During trial on Sunday evening, January 14,
12  Ms. Raveendran was again present in the witness
13  preparation room, being prepared more fully for being
14  called as an adverse witness by Broadcom in the next
15  week of trial." Let me stop you there.
16           When you use the term "witness preparation
17  room," do you have a specific room or location in mind?
18       A   Yes.
19       Q   Okay. Where was the witness preparation room
20  that you refer to in Exhibit 25?
21       A   In the Day Casebeer working suite in which I
22  had my files. It was the auxiliary room that was to the
23  left as you enter.
24       Q   And just so that we're clear, were there --
25  there were two Day Casebeer working suites; is that

24

1   correct?
2        A   That is correct.
3        Q   And the one that you're referring to, is that
4   one -- is that the place that you normally, I'll say,
5   hung out or did your work?
6        A   Yes, it is.
7        Q   And within that suite -- let me drop back for a
8   second.
9            Was there -- were there other partners of Day
10  Casebeer who normally utilized that same suite when they
11  were working on the case?
12       A   I paused because I wasn't sure whether Chris
13  Mammen was at that point in time a Day Casebeer partner
14  or not a Day Casebeer partner. He was co-located in
15  that suite along with a number of other associates.
16       Q   And then there was another suite. Was it
17  directly adjacent? Was the other working suite directly
18  adjacent to the suite that you're describing?
19       A   It was adjacent and to the right as you're
20  facing the doorway entry.
21       Q   And that's where -- is that where
22  Mr. Batchelder and Mr. Casebeer were housed, for lack of
23  a better term?
24       A   Correct, and a number of associates as well.
25       Q   And within the suite, your working suite, was

25

1   there more than one room that you would describe as a
2   witness preparation room?
3        A   There were two.
4        Q   And did the attorneys from Heller Ehrman, did
5   they have a room or rooms on the same floor that they
6   normally worked out of?
7        A   They did.
8        Q   And where were they in relationship to the
9   working suite, your working suite?
10       A   Mine was located centrally, with the -- with
11  Jim Batchelder's suite to my right as I'm facing the
12  entry and Stan Young's suite to the left as I'm facing
13  my entryway.
14       Q   And was Stan Young's -- was that -- room, was
15  that immediately adjacent?
16       A   No, it was around the corner a bit. Perhaps
17  two or three doors down.
18       Q   Now, on this Sunday evening, as I understand
19  it, you state here on page 6, lines 1 through 2, you
20  say, "Again, I was primarily devoted to other tasks that
21  evening, and Mr. Bier was working with Ms. Raveendran."
22           Was -- had you worked at all with
23  Ms. Raveendran earlier that evening or at any point in
24  time that evening?
25       A   I greeted her and spent the initial time of her

7 (Pages 22 to 25)

Ex. C, Pg. 16

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

26

1  arrival getting her settled, getting Mr. Bier and
2  Ms. Raveendran working in a particular direction
3  together, and then excused myself.
4     Q  Okay.  And to your knowledge and recollection,
5  after the time you left the witness preparation room,
6  was it -- was it Mr. Bier, was he the only lawyer
7  working with Ms. Raveendran that evening?
8     A  I believe so, although I wasn't there to
9  confirm that.
10        MS. BALDWIN:  I was just going to say,
11  objection, calls for speculation.
12  BY MR. NOONAN:
13     Q  And then you go on to state here -- again, you
14  say, "I was primarily devoted to other tasks."  Do you
15  recall what tasks you were working on that evening?
16     A  I recall I had another witness in the other
17  witness preparation room with whom I was working.
18     Q  Do you recall who the witness was?
19     A  My best recollection is it was Dr. Bystrom, our
20  technical expert.
21     Q  So you were working with Dr. Bystrom.  Was
22  anyone else working with you along with Dr. Bystrom at
23  that time?
24     A  I don't recall.
25     Q  Okay.  And then you state in this declaration

27

1  in paragraph 25, line 2, you say, "Around 9:00 p.m.
2  Mr. Bier came out of the preparation room and informed
3  Chris Mammen and me that he had conducted a search of
4  Ms. Raveendran's laptop computer and had unexpectedly
5  found 24 e-mails from the JVT AVC_CE e-mail list
6  apparently received by Ms. Raveendran in late 2002 and
7  early 2003."  Let me stop you there.
8        Did Mr. Bier come into the witness preparation
9  room and inform you of this information; that is, the
10  one where you were with Dr. Bystrom?
11     A  I don't recall whether he knocked on the door
12  and asked me to step out or I was already out in the
13  central area at the time he came.
14     Q  So as you sit here today, you don't recall
15  exactly physically where you were located at the time
16  Mr. Bier gave you this information; is that correct?
17     A  I remember he gave me the information itself in
18  the central area of our work suite.  But whether I came
19  out of the witness preparation room to receive that
20  information, I don't recall.
21     Q  Okay.  And when he gave you this information in
22  the central area of the work suite, was Mr. Mammen also
23  present?
24     A  He was.
25     Q  So Mr. Bier was talking directly to you and

28

1  Mr. Mammen when he imparted this information; is that
2  correct?
3     A  For at least some portion of the communication,
4  yes, that is absolutely correct.
5     Q  You state in paragraph 26, you say, "In
6  response to the discovery of the e-mails, I asked that
7  Mr. Bier and Mr. Mammen determine whether the e-mails
8  needed to be produced to Broadcom pursuant to any
9  discovery requests that had been promulgated in the
10  pretrial period."
11        Was that while you and Mr. Bier and Mr. Mammen
12  were still in the same location in this ---
13     A  Yes.
14     Q  -- central area of the working suite?
15     A  It was.
16     Q  And approximately how long after Mr. Bier had
17  advised you of what he had discovered did you give this
18  direction to Mr. Bier and Mr. Mammen?
19     A  I don't recall precisely.  Five or 10 minutes.
20     Q  And as I recall -- am I correct, Mr. Bier
21  didn't have physically e-mails, the e-mails in hand, did
22  he?
23     A  I don't recall him having them physically in
24  hand.
25     Q  Then you state on line 12 here, you say, "I

29

1  also asked them to determine whether any of the e-mails
2  reflected active participation, involvement or acts of
3  authorship by Ms. Raveendran with the members of the
4  AVC_CE e-mail list."
5        Again, was that direction given to you at the
6  same time that you gave them the direction to determine
7  whether the e-mails needed to be produced?
8     A  It was.
9     Q  And then you state, "I also returned to the
10  witness preparation room to speak with Ms. Raveendran
11  about the 21 e-mails."  Now, when you -- did you
12  conclude your conversation with Mr. Mammen and Mr. Bier
13  and then you yourself proceed to go into the witness
14  preparation room where Ms. Raveendran was located?
15     A  Yes.
16     Q  And how long did you spend in the room with
17  Ms. Raveendran?
18     A  Five or 10 minutes.
19     Q  All right.  Was anyone else in the room with
20  you in that five- or 10-minute period of time other than
21  yourself and Ms. Raveendran?
22     A  I don't recall if Mr. Bier was in the room at
23  that time or not in the room at that time.
24     Q  Incidentally, did you, on or about January 14
25  or 15 of 2007, did you make any notes or in any way

8  (Pages 26 to 29)

Ex. _C_ Pg. _17_

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

30

1 memorialize your recollection of the events as they
2 unfolded that evening with respect to the discovery of
3 these e-mails?
4    A  I don't know if I did. I have not found any
5 such notes.
6    Q  Do you recall authoring or penning an e-mail to
7 any of your colleagues that evening or the next morning
8 describing the circumstances under which these e-mails
9 had been discovered on Ms. Raveendran's laptop?
10    A  No.
11    Q  And approximately -- to the best of your
12 recollection, approximately what time was it when
13 Mr. Bier advised you of what he had discovered on
14 Ms. Raveendran's laptop?
15    A  It was approximately 9 o'clock.
16    Q  And is there any way that you can fix that it
17 was approximately 9 o'clock?
18    A  None that I can think of as I sit here.
19    Q  Did you return to your task of preparing
20 Dr. Bystrom that evening?
21    A  Eventually.
22    Q  Do you recall when in the sequence of events,
23 when was it in relationship to when you learned this
24 information at approximately 9 o'clock that you returned
25 to the task at hand with Dr. Bystrom?

31

1    A  I can't give you a time of evening. I can tell
2 you that it was subsequent to the events that you've
3 just inquired about, and it was subsequent to the events
4 in which I alerted some of my other colleagues
5 concerning what had occurred, and upon concluding that,
6 I returned to my previous efforts with Dr. Bystrom.
7    Q  Now, in your -- in your declaration here on
8 page 6, line 16, you state, "Shortly after this
9 discovery, I gave a brief heads-up to my other
10 colleagues, including Jim Batchelder and Stanley Young,
11 of the discovery of the JVT-related documents on
12 Ms. Raveendran's laptop." That's from line 16-18.
13    So first of all, with respect to your
14 statement, "shortly after this discovery," are you
15 talking about shortly after Mr. Bier informing you of
16 what he had discovered around 9:00 p.m.?
17    A  Specifically I'm referring to that plus the
18 time elapse during which I was with Ms. Raveendran in
19 the witness preparation room inquiring of her.
20    Q  So your -- what's your best recollection as to
21 how long your conversation with Mr. Bier and Mr. Mammen
22 took before you went in to see Ms. Raveendran?
23    A  15 or 20 minutes.
24    Q  And then you were with Ms. Raveendran for
25 approximately five to 10 minutes; is that correct?

32

1    A  That's my best recollection right now.
2    Q  And did you -- have you memorialized
3 anywhere -- strike that.
4    Did you memorialize anywhere in the year 2007
5 what your conversation with Ms. Raveendran was when you
6 went to see her in the witness preparation room?
7    A  No.
8    Q  Now, going back to your statement on line 16
9 where you say, "Shortly after this discovery, I gave a
10 brief heads-up to my other colleagues, including Jim
11 Batchelder and Stanley Young." Let me stop there.
12    When you said "a brief heads-up," are you
13 saying you spoke to other colleagues, including
14 Mr. Batchelder and Mr. Young?
15    A  I spoke individually to Mr. Batchelder and
16 individually to Mr. Young.
17    Q  In what sequence?
18    A  Mr. Batchelder first, and Mr. Young second.
19    Q  And where was Mr. Batchelder located at the
20 time you spoke to him?
21    A  He was located in the other Day Casebeer work
22 suite down the corridor from mine.
23    Q  So you had to exit your working suite and go
24 next door to --
25    A  That's correct.

33

1    Q  And was Mr. Batchelder alone at the time you
2 provided him the information?
3    A  No. He was in a working suite where others
4 were present.
5    Q  When you refer to a heads-up, did you give a
6 heads-up to anyone else in that suite?
7    A  I can't recall as I sit here today whether
8 anyone else was included in that brief communication.
9    Q  How long was your communication? How long did
10 it last with Mr. Batchelder?
11    A  Less than a minute.
12    Q  And as you sit here today, you can't recall
13 whether anyone else was included in that conversation;
14 is that correct?
15    A  That's correct.
16    Q  And as you sit here today, do you recall the
17 faces of any of the other folks or individuals that were
18 in the suite, Mr. Batchelder's working suite at the time
19 you gave him this information?
20    A  I can picture the suite with faces, but I can't
21 say for sure it was that particular evening. I know
22 where everybody sat all the time when that suite was
23 occupied. That's the image I have in my mind right now.
24    Q  Now -- and I take it when you went into
25 Mr. Batchelder's suite, you were alone?

9  (Pages 30 to 33)

Ex. C  Pg. 18

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

LEE PATCH    July 14, 2009
PRIVILEGED AND CONFIDENTIAL

34

1    A    Correct.
2    Q    And then what did you do after you left
3  Mr. Batchelder's suite?
4    A    I went back out into the corridor, walked in
5  the opposite direction, went past the central suite
6  where I normally worked to the working area where
7  Heller Ehrman had their people.
8    Q    And what time would this be?  Would this be
9  sometime between 9:30 and 10:00, approximately?
10   A    Yes, approximately.
11   Q    And did you encounter Mr. Young?
12   A    He was present in his suite.  And I went to the
13 doorway, and he was occupied at that moment upon my
14 arrival.
15   Q    What was he doing?
16   A    I don't recall if he was speaking with somebody
17 face to face or whether he was on the phone, but I
18 remember standing in the doorway waiting for an
19 opportunity to catch his attention because he was
20 engaged.
21   Q    Did you encounter any other Heller Ehrman
22 lawyers at that time?
23   A    I don't recall.
24   Q    And did you ultimately speak to Mr. Young?
25   A    I did.

36

1    Q    Now, is that -- are you piecing together what
2  you think you told him, or do you have a specific
3  recollection as you sit here today as to the exact words
4  that you used?
5    A    I do not have a recollection of exact words.
6    Q    So as you sit here today, you can't
7  specifically state that you used the term "JVT related";
8  is that correct?
9    A    That's correct.
10   Q    And you said some people were looking into it.
11 Was that your reference to Mr. Bier and Mr. Mammen?
12   A    Correct.
13   Q    But I take it you didn't tell him who the
14 people were; is that correct?
15   A    I have no recollection of identifying people.
16   Q    And was that the sum and substance of your
17 conversation?
18   A    Totality of it.
19   Q    Do you recall any -- any gestures or body
20 language or anything from Mr. Young in response to what
21 you had told him?
22   A    I recall no reaction or response.
23   Q    Did you state anything else to Mr. Young at
24 that time other than what you've told us?
25   A    I don't believe I said anything further.

35

1    Q    Was anyone else within earshot, to your
2  estimation, at the time you spoke --
3    A    Not as I recall.
4    Q    Is he sitting at a desk or a table?
5    A    He was sitting at his desk or table that was
6  against the right-hand wall.
7    Q    And did you speak to him?
8    A    I did.
9    Q    And how long did your encounter with Mr. Young
10 last?
11   A    30 seconds.
12   Q    I take it you spoke; is that right?
13   A    I spoke.
14   Q    All right.  Did he speak at all?
15   A    I don't recall.
16   Q    And when you spoke to him, were you standing
17 up?
18   A    I believe I was standing.  Stan was still
19 seated.
20   Q    All right.  And as you sit here today, do you
21 have a specific recollection of what you stated to
22 Mr. Young?
23   A    To my recollection, that I told him that some
24 JVT-related documents had been located on Viji's
25 computer and that people were looking into it.

37

1    Q    And have you, to the best of your recollection,
2  imparted to me what you can recall about the
3  conversation with Mr. Young?
4    A    I have.
5    Q    In your declaration at paragraph 26 at line 18
6  you state, "However, I do not recall that I was explicit
7  with them that the documents were e-mails."  And the
8  "them" refers to Mr. Batchelder and Mr. Young; is that
9  correct?
10   A    That is correct.
11   Q    And is that your still -- your recollection
12 today, that you do not recall that you were explicit
13 with either Mr. Batchelder or Mr. Young that the
14 documents about which you were imparting them
15 information were e-mails?
16   A    Correct.
17   Q    And is it still your recollection today that
18 you do not recall that you were explicit that the
19 documents that you were describing were from the AVC_E.
20 e-mail list?
21   A    That's correct.
22   Q    And in paragraph 27 on page 6 of your
23 declaration, which is Exhibit No. 143, at line 23 you
24 say, "At approximately midnight and after my colleagues
25 had analyzed the discovery requests in conjunction with

10  (Pages 34 to 37)

**Merrill Legal Solutions**
**(800) 869-9132**

Ex. C Pg. 19
Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

**38**

1  the manner in which they were narrowed by unchallenged
2  responses, I was informed by Mr. Mammen and Mr. Bier
3  that the e-mails were not responsive to the discovery
4  requests as narrowed by the responses." Let me stop
5  there.
6       The colleagues that you're referring to do not
7  include Mr. Young, correct?
8    A  That is correct.
9    Q  All right. And nor do they include any other
10 attorney with the Heller Ehrman law firm; is that true?
11   A  That is true.
12   Q  Am I correct that on this evening, either late
13 in the evening on January 14 or early in the morning on
14 January 15, that you did not request that Mr. Young
15 undertake any analysis of the subject e-mails in
16 conjunction with the discovery requests in order to
17 determine whether or not the documents should have been
18 produced; is that correct?
19   A  That is correct.
20   Q  All right. And with respect to the analysis --
21 you state at the top of page 7 on lines 1 and 2, you
22 state, "After that review I concurred with the analysis
23 of my colleagues." Let me stop you there.
24       Am I correct that you did not go back and
25 inform Mr. Young of what analysis had been undertaken or

**39**

1  what the outcome had been of the analysis; is that
2  correct?
3    A  That is correct.
4    Q  Nor did you discuss that that evening with any
5  other lawyer from Heller Ehrman; is that correct?
6    A  That's correct.
7    Q  Now, you -- if you would go to paragraph 34,
8  Mr. Patch, on page 8. You state on paragraph 34 at line
9  19, you say, "It is important for the court to note" --
10 "to know that at the time of Ms. Raveendran's testimony,
11 I did not know that on the morning of January 18 one of
12 the attorneys for Qualcomm from the Heller Ehrman firm
13 had argued in a side bar that there were no e-mails or
14 any evidence that any e-mails were actually sent to the
15 list."
16       Is that a true statement that I've just read?
17   A  Yes.
18   Q  Then you state, "I was not present in court on
19 this" -- "on that morning." What was that -- is that a true
20 statement?
21   A  Yes.
22   Q  And then you state in line 24, page 8 of
23 Exhibit 143, you state, "Obviously if I had known of the
24 side bar comments or if we had more effectively
25 communicated with the Heller Ehrman attorneys on those

**40**

1  matters, the statements would either never have been
2  made or I would have been in a position to immediately
3  take corrective action with the court after they were
4  made." And was that a true statement?
5    A  Yes.
6    Q  And when you talk about if you had more
7  effectively communicated with Heller Ehrman attorneys,
8  are you referring to the fact that you had, as of
9  January 18th, only had this one brief conversation with
10 Mr. Young on the subject?
11   A  Yes.
12   Q  And you had not communicated to Mr. Young at
13 any time prior to January 18 that what had been
14 discovered on Ms. Raveendran's laptop computer were 21
15 or more e-mails to or from the AVC_CE reflector list; is
16 that correct?
17   A  That is correct.
18   Q  And on page 9 of your declaration at line 4 you
19 state, "Again, I regret and apologize that I did not
20 share the information about the 21 e-mails more fully
21 with all other members of the trial team."
22       And members -- all other members of the trial
23 team would include Mr. Young; is that true?
24   A  That is true.
25   Q  I want to show you what we'll mark as

**41**

1  Exhibit 144. This is a multi-page document. I probably
2  didn't need to copy it all, but I did. This is the --
3  we'll mark as 144 a document titled Order Granting in
4  Part and Denying in Part Defendant's Motion For
5  Sanctions and Sanctioning Qualcomm, Incorporated and
6  Individual Lawyers filed January 7, 2008. Let me show
7  you Exhibit 144.
8       (Exhibit 144 was marked for identification.)
9  BY MR. NOONAN:
10   Q  Could you take a look at page 30. Would you
11 take a look at footnote 30?
12       MR. KERR: Footnote 30 --
13       MR. NOONAN: Footnote 11, excuse me.
14   Q  In footnote 11 on page 30, one of the
15 statements is made is "Patch claims that he told Young
16 about the 21 Raveendran e-mails, but Young denies it."
17 Let me stop you there.
18       Have you ever claimed that you told Mr. Young
19 about the 21 Raveendran e-mails?
20   A  Never.
21   Q  And again, if you go to page 47 and you go to
22 the third line down from the top, this portion of --
23 this is Exhibit A to the court's decision. It says,
24 "Although Young denies knowing about the 21 Raveendran
25 e-mails, his statement occurred four days after Patch

11  (Pages 38 to 41)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

LEE PATCH   July 14, 2009
PRIVILEGED AND CONFIDENTIAL

42

1  claims he notified Young of the discovery."
2       And again, to your understanding, Mr. Patch,
3  you did not notify Mr. Young of the discovery of the 21
4  Raveendran e-mails either four days prior or any days
5  prior to January 18th; is that correct?
6    A  That is correct.
7    Q  Finally, if you take -- on this document if
8  you'd look at page 28.  On page 28 at line 22 of the
9  court's decision here, Exhibit 144, it's stated at line
10  22, it says, "Similarly, when Bier found the 21 e-mails
11  on Raveendran's computer that had not been produced in
12  discovery, he took the appropriate action and informed
13  his supervisors Mammen and Patch."  Citation to the Bier
14  declaration at 7.  It then says, "Patch discussed the
15  discovery and production issue with Young and
16  Batchelder," citing to Patch declaration at paragraph 6
17  and 7.
18       And am I correct, sir, you did not discuss with
19  Mr. Young on January 14th or 15th or any date prior to
20  January 18th, you did not discuss with him the issue as
21  to whether or not the documents should be produced or
22  should have been produced; is that correct?
23    A  That is correct.
24    Q  And again, to the extent that this portion of
25  the court's order refers to -- I believe it refers to

43

1  pages 6 and 7 of your declaration, again, you did not
2  discuss and advise Mr. Young on the evening of
3  January 14, 2007 that 21 e-mails had been discovered on
4  Ms. Raveendran's laptop computer, correct?
5    A  That's correct.
6    Q  Now, did you -- do you recall, sir, that -- I'm
7  not going to go through the whole sequence of events of
8  January 24, but do you recall that it was on January 24
9  that there were the proceedings in court, Ms. Raveendran
10  testifies, e-mails are produced after lunch, et cetera.
11  Do you recall, following court that day, having any
12  conversations with Mr. Young about the subject of the
13  21 e-mails and how they had been discovered?
14    A  I recall a conversation with Mr. Young after
15  the conclusion of the trial testimony.  I don't recall
16  precisely what day it occurred.
17    Q  Do you recall in that conversation Mr. Young
18  expressing to you some concern about the statements that
19  he had made to Judge Brewster at side bar on the 18th in
20  light of what had been learned that day in court about
21  the e-mails?
22    A  I do in general recall that conversation.  It
23  was the first time I learned of the fact that Mr. Young
24  had made those side bar statements in court previously.
25    Q  And do you have any reason to believe that

44

1  prior to January 24, and being present in court and
2  seeing the proceedings unfolding, do you have any reason
3  to believe that Mr. Young was aware of the existence of
4  those e-mails prior to that time?
5    A  Absolutely not.
6    Q  Do you recall the specifics of any of your
7  conversation with Mr. Young, as you described it,
8  following the conclusion of the trial testimony and on
9  this subject?
10    A  I remember him seeking confirmation that he had
11  not been advised of the discovery of those e-mails prior
12  and during the course of trial, and I remember
13  confirming to him that I did not recall having informed
14  him of the discovery of e-mails in that period.
15    Q  And you believe that's still to be the case
16  today; is that correct?
17    A  Yes, I do.
18    Q  So as you sit here today, you don't have any
19  recollection of informing Mr. Young of the existence of
20  the Raveendran e-mails at any time prior to January 24th
21  of 2007; is that correct?
22    A  That's correct.
23    Q  And in your declaration at paragraph 34 --
24  strike that.
25       Can we take a short break and see whether we're

45

1  concluded or not?
2       MR. ZELDIN:  Yes.
3       MR. NOONAN:  Can we just take five minutes?
4       MR. KERR:  That's fine.
5       THE VIDEOGRAPHER:  Going off record, the time
6  is 2:47 p.m.
7       (Recess.)
8       THE VIDEOGRAPHER:  Back on the record, the time
9  is 2:54 p.m.
10       MR. NOONAN:  I have no further questions.
11       MR. ZELDIN:  I have no questions.
12       MS. BALDWIN:  None.
13       MS. GRAYER:  None at this time.
14       MR. KERR:  Thank you very much.
15       MR. NOONAN:  Thank you.  We're concluded.
16       THE VIDEOGRAPHER:  This marks the end of the
17  deposition.  Going off the record, the time is 2:54 p.m.
18       (Whereupon at 2:54 p.m. the proceedings
19       were concluded.)
20
21
22
23
24
25

12 (Pages 42 to 45)

Merrill Legal Solutions
(800) 869-9132

Ex. C Pg. 21

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

LEE PATCH     July 14, 2009
PRIVILEGED AND CONFIDENTIAL

46

1      I hereby declare under penalty of perjury that
2  the foregoing is my deposition under oath; that these
3  are the questions asked of me and my answers thereto;
4  that I have read my deposition and have made the
5  necessary corrections, additions or changes to my
6  answers that I deem necessary.
7      In witness thereof, I hereby subscribe my name
8  this _____ day of _____, 2009.
9
10
11
       _____
       LEE PATCH
12
13
14
15
16
17
18
19
20
21
22
23
24
25

47

1  STATE OF CALIFORNIA )
2                      ) ss.
3  COUNTY OF SAN DIEGO )
4      I, Joyce E. Hostetler, Certified Shorthand
5  Reporter No. 5216 for the State of California, do
6  hereby certify:
7      That prior to being examined, the witness named
8  in the foregoing deposition was duly sworn to testify
9  the truth, the whole truth, and nothing but the truth;
10     That said deposition was taken down by me in
11 shorthand at the time and place therein named and
12 thereafter reduced by me to typewritten form and that
13 the same is a true, correct, and complete transcript
14 of said proceedings.
15     Before completion of the deposition, review of the
16 transcript {X} was { } was not requested.  If requested,
17 any changes made by the deponent and provided to the
18 reporter during the period allowed are appended hereto.
19     I further certify that I am not interested in the
20 outcome of the action.
21     Witness my hand this 15th day of July, 2009.
22
23
       _____
24     JOYCE E. HOSTETLER, CSR No. 5216
25

13 (Pages 46 to 47)

Ex. C, Pg. 22

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

02/07/2007 14:56 FAX  2028830383          WILMERHALE                                    ☒ 002/004

WILMERHALE

February 7, 2007

**By Facsimile and First Class Mail**

Lee Patch, Esq.
Day Casebeer Madrid & Batchelder LLP
20300 Stevens Creek Blvd.
Suite 400
Cupertino, CA 95014

Re: *Qualcomm, Inc. v. Broadcom Corporation*, 05-CV-1958 B (BLM)

Dear Lee:

I write to follow up on our telephone conversation of February 1, 2007, concerning the twenty-one emails produced to Broadcom on January 24, 2007, during the last day of testimony at trial. Qualcomm did not notify Broadcom of these e-mails until their existence was disclosed during Ms. Raveendran's cross-examination on January 24, 2007.

During our discussions, you stated that Qualcomm believes that there was no Broadcom request for production to which the twenty-one emails are responsive. You also asked that Broadcom identify the requests for production that it believes call for the twenty-one emails from the JVT email reflector to Ms. Raveendran. During our conversation, Ms. Saxton identified one such request:

- **Request for Production No. 93 (issued July 14, 2006):** All documents referring to or evidencing any participation by Qualcomm in the proceedings of the JVT, the ISO, the IEC, and/or the ITU-T.

In addition to the request identified by Ms. Saxton, Broadcom believes that at least the following Broadcom requests for production called for the withheld twenty-one emails:

- **Request for Production No. 49 (issued January 23, 2006):** All documents given to or received from a standards setting body or group that concern any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent, including without limitation communications, proposals, presentations, agreements, commitments, or contracts to or from such bodies.

- **Request for Production No. 50 (issued January 23, 2006):** All documents concerning any Qualcomm membership, participation, interaction, and/or involvement in setting any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent. This request also covers all proposed or potential standards, whether or not actually adopted.

Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, Massachusetts 02109

Baltimore    Beijing    Berlin    Boston    Brussels    London    New York    Oxford    Palo Alto    Waltham    Washington

Production & Use Governed by 11/07/08 Ct. Order

Patch
EXHIBIT NO. 140
7/14/09
J. HOSTETLER

QRA1958_00029664

Ex. C , Pg. 23

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

02/07/2007 14:57 FAX 2026636363     WILMERHALE            @003/004

Lee Patch, Esq.
February 7, 2007
Page 2

**WILMERHALE**

- Request for Production No. 81 (issued January 23, 2006): To the extent not produced in response to other Broadcom document requests, all documents constituting, concerning, or relating to any Topic noticed in a Rule 30(b)(6) deposition notice. [Topic No. 11 of Broadcom's 30(b)(6) Notice No. 1 (May 23, 2005), is: Qualcomm's knowledge regarding the development and promulgation of the H.264 standard, and any actions taken [by] Qualcomm or any of its principals, employees, or representatives as a result of such knowledge.]

- Request for Production No. 89 (issued July 14, 2006): All documents constituting, referring to, or evidencing any submission by Qualcomm to the JVT, the ISO, the IEC, and/or the ITU-T.

During our conversation, you also explained how the twenty-one emails came into the possession of Qualcomm's legal team. As I understood your explanation, on January 14, 2007, attorneys for Qualcomm learned of an archive of emails belonging to Viji Raveendran. Ms. Raveendran had maintained this email archive apart from Qualcomm's main email system.

On January 14, 2007, Qualcomm attorneys ran a search through this archive for emails from the address "AVC_CE," which is the address for one of the JVT email reflectors. This search resulted in the identification of the twenty-one emails that Qualcomm produced on January 24, 2007. Mr. Young did not know about this search when he represented to the Court, on January 18, 2007, that there was no evidence of any email from the JVT to Ms. Raveendran, a representation that has since been withdrawn. You did not identify which or how many of the other attorneys representing Qualcomm knew of the twenty-one emails prior to Ms. Raveendran's testimony on January 24, 2007.

We understand from your statements that no other searches, either manual or by keyword, have been performed on Ms. Raveendran's archive, and no other emails from Ms. Raveendran's archive have been reviewed or produced in connection with this litigation. Qualcomm's attorneys have not asked the other Qualcomm employees connected to this litigation, including but not limited to those who testified at the trial or by deposition, whether they, like Ms. Raveendran, maintain email archives.

Please let me know if there is any additional relevant information that I have left out, or if any part of my description of events is inaccurate.

USIDOCS 6058412v1

QRA1958_00029665

Ex. C Pg. 24

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

02/07/2007 14:57 FAX  2028635363          WILMERHALE                          Ø004/004

Lee Patch, Esq.                                    WILMERHALE
February 7, 2007
Page 3

Very truly yours,

Louis W. Tompros

cc:  Stanley Young, Esq.

USIDOCS 605641Iv1

DAY CASEBEER
MADRID & BATCHELDER LLP

20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014
Telephone: (408) 873-0110
Facsimile: (408) 873-0220

Adam Arthur Bier
(408) 342-4554
abier@daycasebeer.com

February 16, 2007

VIA FACSIMILE & U.S. MAIL

Louis Tompros, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

RE: QUALCOMM v. Broadcom, S.D. Cal. Case No. 05-cv-1958 B (BLM)

Dear Louis:

I write in response to your letter to Lee Patch of February 7, 2007 concerning the twenty-one emails received by Viji Raveendran from the avc_ce@ient.rwth-aachen.de email reflector ("avc_ce reflector") that QUALCOMM discovered and produced during trial. As explained earlier in our meet and confer, QUALCOMM voluntarily produced the emails during trial in the interest of expeditiousness. We continue to believe that QUALCOMM performed a reasonable search of QUALCOMM's documents in response to Broadcom's Requests for Production and that the twenty-one unsolicited emails received by Ms. Raveendran from individuals on the avc_ce reflector are not responsive to any valid discovery obligation or commitment.

QUALCOMM disputes your contentions that it had a duty to produce the emails pursuant to the requests for production that you identified in your February 7 letter. None of the emails in question was authored by or included content from or relating to Ms. Raveendran or any other QUALCOMM employee. None of the emails was addressed specifically to Ms. Raveendran or any other QUALCOMM employee. None of the emails was authored by a JVT, MPEG, ISO/IEC or ITU-T representative, and since the source of the emails appears to be a German university (avc_ce@ient.rwth-aachen.de), there is no evidence of any affiliation with those standards setting organizations. None of the emails relates to QUALCOMM's patents-in-suit or QUALCOMM participation in setting the H.264 standard.

As a preliminary matter, in its written objections and responses dated February 24, 2006 (Responses to First Set of Requests for Production) and August 16, 2006 (Responses to Second Set of Requests for Production), QUALCOMM properly objected to each request for production enumerated in your letter, and either refused to produce any documents based on those objections or agreed to produce

594897

Subject to Protective Order Dated
November 7, 2008United States District
Court, Southern District of California/Case
No. 05cv1958-B (BLM)

Patch
EXHIBIT NO. 141
7/14/09
J. HOSTETLER

DCMB-SY007751

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order



DAY CASEBEER
MADRID & BATCHELDER LLP

Louis Tompros, Esq.
February 16, 2007
Page 2

a reasonable, narrowed class of documents in response to such requests. Having received QUALCOMM's objections, Broadcom never moved to compel or otherwise challenged QUALCOMM's written responses to these requests. Accordingly, pursuant to the 30-day rule for discovery motions, set forth in paragraph 6 of the Court's February 17, 2006 Case Management Conference Order Regulating Discovery and Other Pretrial Proceedings, Broadcom's time to challenge QUALCOMM's timely-served discovery responses and the scope of QUALCOMM's commitment to produce documents expired long ago. The proper analysis, therefore, is whether the emails are within the scope of any of the categories of documents which QUALCOMM agreed to produce. They are not. As set forth below, incorporating by reference the objections previously stated,[1] the twenty-one emails are plainly outside the scope of QUALCOMM's discovery obligations.

- Request for Production No. 49. QUALCOMM agreed to produce "non-privileged documents that were given to or received from standards-setting bodies in connection with the ISO/IEC MPEG-4 Part 10 standard, and which relate to the QUALCOMM Patents-in-Suit." The twenty-one emails fall outside the scope of this category for numerous reasons. First, they, unlike technical proposals, policy documents, or meeting notes, were neither given to nor received from a standards-setting body, but were instead simply a discussion thread among individuals who may or may not have been participants in such a body. More importantly, none of the emails relates to either of the two QUALCOMM Patents-in-Suit. Even under the request as propounded by Broadcom, the request covers only documents that pertain to the '104 or '767 Patents ("QUALCOMM Patents" in the request is a defined term, limited to those two patents). Because the emails make no mention of either of the two patents, and indeed contain no discussion of any patents or intellectual property rights at all, let alone with respect to QUALCOMM's patents, the emails cannot reasonably be said to "pertain in any way" to the QUALCOMM Patents-in-Suit and therefore cannot be responsive to this request.

- Request for Production No. 50. QUALCOMM agreed to produce "non-privileged documents that were given to or received from standards-setting body responsible for the ISO/IEC MPEG-4 Part 10 standard, and which concern any QUALCOMM participation in setting the ISO/IEC MPEG-4 Part 10 standard. As explained above, the emails were not received from a standards-setting body. We understand that Broadcom may contend that Ms. Raveendran's mere passive receipt of unsolicited emails on this mass-email distribution

---

[1] QUALCOMM Incorporated's Response to Broadcom Corporation's First Set of Requests for Production of Documents and Things (Nos. 1-88), dated February 24, 2006 and QUALCOMM Incorporated's Response to Broadcom Corporation's Second Set of Requests for Production of Documents and Things (Nos. 89-115), dated August 16, 2006.

594897

Subject to Protective Order Dated November 7, 2008 United States District Court, Southern District of California Case No. 05cv1958-B (BLM)

DCMB-SY007752

Ex. C, Pg. 27

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

DAY CASEBEER
MADRID & BATCHELDER LLP

Louis Tompros, Esq.
February 16, 2007
Page 3

list constitutes "participation." We strongly disagree. A rule that a person is deemed to "participate" in every organization that sends her unsolicited email would lead to overbroad, untenable and absurd results. They also cannot be said to concern any QUALCOMM participation in setting the H.264 standard, since they were neither written by or about QUALCOMM (and indeed make no mention of QUALCOMM or its employees whatsoever except in computer-generated email headers), and do not concern activities constituting the "setting" of the standard such as voting or submission of technical proposals for inclusion in the standard. At most, the emails relate to an evaluation of the performance of the standard in comparison to the MPEG-2 and MPEG-4 standards.

- Request for Production No. 81. QUALCOMM refused to produce any documents in response to this improper request, which sought, in violation of Rule 34's requirement that requested documents be described with reasonable particularity, to incorporate by reference the topics of Broadcom's Rule 30(b)(6) deposition notices. Broadcom had the right during discovery to propound specific requests for production relating to the topics of noticed 30(b)(6) depositions, either pursuant to Rule 30(b)(5) or pursuant to Rule 34. Indeed, a number of the requests in Broadcom's Second Set of Requests for Production, which issued after Broadcom's 30(b)(6) Notice No. 5 [H.264 Participation], appear to have been made for this purpose. Broadcom cannot now, after having declined to seek to compel a response to this request during discovery, invoke the request as a "catch-all" for all documents it thinks may in some abstract and distant way relate to the testimony of QUALCOMM's 30(b)(6) witnesses.

- Request for Production No. 89. Broadcom's request seeks "all documents constituting, referring to, or evidencing any submission by QUALCOMM to the JVT, the ISO, the IEC, and/or the ITU-T." Nothing in the twenty-one emails remotely falls within this subject. Moreover, QUALCOMM's agreement to produce (never contested by Broadcom) is narrower: "non-privileged...documents constituting any submission by QUALCOMM to the JVT, if any, which can be located after a reasonable search." None of the emails can reasonably be said to constitute a submission by QUALCOMM; indeed, they cannot plausibly be said to constitute a submission by anyone. Moreover, as discussed below, the evidence indicates that the avc_ce reflector was established and maintained by MPEG, not JVT.

- Request for Production No. 93. Broadcom's request seeks "all documents referring to or evidencing any participation by QUALCOMM in the proceedings of the JVT, the ISO, the IEC and/or the ITU-T." QUALCOMM agreed to produce "non-privileged...documents describing QUALCOMM's participation in the JVT, if any, which can be located after a reasonable search." None of the emails can reasonably be said to describe QUALCOMM's

594897

Subject to Protective Order Dated November 7, 2008/United States District Court, Southern District of California/Case No. 05cv1958-B (BLM)

DCMB-SY007753

Ex. _C_ Pg. _258_

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order



DAY CASEBEER
MADRID & BATCHELDER LLP

Louis Tompros, Esq.
February 16, 2007
Page 4

participation in the JVT, since none were authored by QUALCOMM personnel, nor do they contain any mention whatsoever of QUALCOMM or its agents or employees, save for computer-generated email headers specific to and seen only by each recipient. The passive receipt of unsolicited emails sent to an MPEG distribution list to which the recipient, who regularly received and ignored large volumes of unsolicited emails from many sources, did not voluntarily subscribe, without the transmission of communications back to the distribution list or its participants, cannot constitute "participation in the JVT" under any fair or reasonable reading of that term.

In addition, I believe you mischaracterize the ave_ce reflector when you refer to it as a "JVT email reflector[]." As indicated in various JVT Meeting Notes, the reflector was set up and maintained under the auspices of MPEG, not JVT.[2]

Finally, contrary to the implications in your penultimate paragraph, QUALCOMM has at all times conducted reasonably diligent searches for all categories of documents that it has agreed to produce, including searches of email archives reasonably likely to contain such documents.

Very truly yours,

DAY CASEBEER
MADRID & BATCHELDER LLP

Adam Arthur Bier

AAB:sr

cc:    Stanley Young, Esq.

---

[2] *See, e.g.,* PX_895.17; PX_137.15.

594897

Subject to Protective Order Dated November 7, 2008/United States District Court, Southern District of California/Case No. 05cv1958-B (BLM)

DCMB-SY007754

Ex. C, Pg. 29

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

Patch, Lee



| | |
|---|---|
| **From:** | Bier, Adam Arthur |
| **Sent:** | Monday, January 29, 2007 2:28 PM |
| **To:** | Mammen, Chris E.; Smith, Victoria; Young, Stanley; Batchelder, Jim; Casebeer, Craig; Patch, Lee |
| **Cc:** | 'Robertson, Kyle S.'; 'Venkatesan, Jaideep' |
| **Subject:** | RE: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m. |

In a nutshell, on Sunday, Jan. 14, during her prep (the second such session, as I recall), I ran a single search against Viji's locally-stored (on her laptop) email archives for the phrase "avc_ce", which is the address of the reflector at issue. The search resulted in 21 emails.

I examined a sample of them and discussed them with a couple people on our team (Chris and one or two others), and we concluded that they were not responsive to any of Broadcom's RFPs, for reasons Lee and I have discussed at length.

Stan made his comment on, I believe, the 18th, having not been privy to or present during the previous conversation.

Though we voluntarily produced the documents on the last day of trial testimony, we maintain our position that we were not obligated to produce them under any Broadcom RFP.

-----Original Message-----
From: Mammen, Chris E.
Sent: Monday, January 29, 2007 2:11 PM
To: Smith, Victoria; Young, Stanley; Batchelder, Jim; Casebeer, Craig; Patch, Lee; Bier, Adam Arthur
Cc: 'Robertson, Kyle S.'; 'Venkatesan, Jaideep'
Subject: RE: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.

My understanding is that we first learned of the emails when we first met with Viji to prep for her trial testimony.

-----Original Message-----
From: Smith, Victoria
Sent: Monday, January 29, 2007 01:57 PM Pacific Standard Time
To: Mammen, Chris E.; Young, Stanley; Batchelder, Jim; Casebeer, Craig; Patch, Lee; Bier, Adam Arthur
Cc: 'Robertson, Kyle S.'; 'Venkatesan, Jaideep'
Subject: RE: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.

FYI

We called Judge Brewster's clerk and she informs us that we should file an amended (not corrected) pleading. Attached is the redlined amended 52(c) motion. The only changes are to the title and on redlined page 11 (re Viji's emails). Craig suggested that the language Stan provided in his earlier email be sent to the Court in the form of a letter (also attached).

There are only two loose ends:

1

Subject to Production Order Dated
November 7, 2008 United States District
Court, Southern District of California Case
No. 05cv1958-B (BLM)

DC00087044

DCMB-SY022470

Patch
EXHIBIT NO. 142
2/14/08
J. HOSTETLER

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1) The paralegals are trying to get the 1/24 trial transcript (the server with the loaded transcripts are in transit); and
2) Is it true that we, as counsel to QUALCOMM, first became aware of Viji's emails during trial?  This is what the letter now says, and I just want to make sure that this is the correct information.  **I NEED YOUR (THE ATTORNEYS') CONFIRMATION ON THIS.**

As soon as we get to those two loose ends squared away, the following will be filed:

1)  Letter
2)  Amended 52(c) motion; and
3)  Smith Decl. iso amended motion plus exhibits (with 1/24 transcript as an added exhibit).

-----Original Message-----
From: Mammen, Chris E.
Sent: Monday, January 29, 2007 10:30 AM
To: Smith, Victoria; Young, Stanley; Batchelder, Jim; Casebeer, Craig; Patch, Lee; Bier, Adam Arthur
Cc: 'Robertson, Kyle S.'; 'Venkatesan, Jaideep'
Subject: RE: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.

Sounds like jim, stan and I are al ok with it. I won't be in today.  Nor will jim. Go ahead and take care of it.

-----Original Message-----
From:    Smith, Victoria
Sent:    Monday, January 29, 2007 10:10 AM Pacific Standard Time
To: Young, Stanley; Batchelder, Jim; Mammen, Chris E.; Casebeer, Craig; Patch, Lee; Bier, Adam Arthur
Cc:  Robertson, Kyle S.; Venkatesan, Jaideep
Subject:  RE: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.

If we are all in agreement with the wording, I can file it this morning.  Please confirm that this hasn't been done already, and I will take care of it.

_____

From: Young, Stanley [mailto:Stanley.Young@hellerehrman.com]
Sent: Monday, January 29, 2007 6:33 AM
To: Batchelder, Jim; Mammen, Chris E.; Casebeer, Craig; Patch, Lee; Bier, Adam Arthur; Smith, Victoria
Cc: Robertson, Kyle S.; Venkatesan, Jaideep
Subject: Re: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.

Can Day Casebeer file this this morning?  I do not have the page cites for the JMOL brief as filed.  Thanks very much.

Stanley Young | Attorney | HellerEhrmanLLP | 275 Middlefield Road | Menlo Park, CA 94025

2

Subject to Production Order Dated November 7, 2008,United States District Court, Southern District of California/Case No. 05cv1958-B (BLM)

DC00087045

DCMB-SY022471

Ex. C Pg. 31

tel: +1.650.324.7049 | fax: +1.650.324.6006 | email:
stanley.young@hellerehrman.com | web: www.hellerehrman.com


-----Original Message-----
From: Batchelder, Jim <jbatchelder@daycasebeer.com>
To: Mammen, Chris E. <CMammen@daycasebeer.com>; Young, Stanley; Casebeer,
Craig <ccasebeer@daycasebeer.com>; Patch, Lee <lpatch@daycasebeer.com>;
Bier, Adam Arthur <abier@daycasebeer.com>; Smith, Victoria
<vsmith@daycasebeer.com>
CC: Robertson, Kyle S.; Venkatesan, Jaideep
Sent: Sun Jan 28 21:36:27 2007
Subject: RE: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.

me too


_____

James R. Batchelder
Day Casebeer Madrid & Batchelder LLP | 20300 Stevens Creek Blvd, Ste. 400 |
Cupertino, CA 95014 jbatchelder@daycasebeer.com | Phone 408-342-4565 | Fax
408-873-0220


_____

From: Mammen, Chris E.
Sent: Sunday, January 28, 2007 11:27 AM
To: Young, Stanley; Casebeer, Craig; Batchelder, Jim; Patch, Lee; Bier,
Adam Arthur; Smith, Victoria
Cc: Robertson, Kyle S.; Venkatesan, Jaideep
Subject: RE: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.


That seems fine to me.

-----------------------------------------------------
Christian E. Mammen
Day Casebeer Madrid & Batchelder LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014
Direct Line (408) 342-4541
Fax (408) 873-0220
cmammen@daycasebeer.com

Subject to Protective Order Dated
November 7, 2008/United States District
Court, Southern District of California/Case
No. 05cv1958-B (BLM)


_____

From: Young, Stanley [mailto:Stanley.Young@hellerehrman.com]    DCMB-SY022472
Sent: Saturday, January 27, 2007 11:46 PM
To: Casebeer, Craig; Batchelder, Jim; Patch, Lee; Mammen, Chris E.; Bier,
Adam Arthur; Smith, Victoria
Cc: Robertson, Kyle S.; Venkatesan, Jaideep
Subject: RE: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.

                                    3

                                                        DC00087046

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order



How about something like the following (to be entitled "Correction to QUALCOMM Incorporated's Motion for Judgment as a Matter of Law Pursuant to Rule 52(c)"):

QUALCOMM's January __, 2007 Motion for Judgment as a Matter of Law Pursuant to Rule 52(c), at page __, lines __, states, with respect to an email reflector list appearing in DX 5219 and DX 5836, that "Broadcom failed to show . . . that [QUALCOMM witness Viji] Raveendran ever received a single email related to this list" and that "there is no evidence that Ms. Raveendran ever received an email from this email list." In unsuccessfully objecting to the admission of DX 5219 (later replaced by DX 5836), QUALCOMM's counsel similarly stated during a sidebar at trial that "there's no evidence that any e-mail was actually sent to this list." Transcript January 18, 2007, 92:6-11.

In fact, as Ms. Raveendran testified, she did receive emails sent to that email reflector list (although she did not read them or send her own emails to that list). See Transcript January 24, 2007, _____, and DX ____ (copies of e-mails). Based on that evidence, which counsel for QUALCOMM learned about during the trial, the statements listed in the above paragraph are incorrect, and Qualcomm withdraws those statements, with apologies to the Court and opposing counsel for the error.

If this is OK, I would like to file this, or something like this, on Monday.

---

From: Casebeer, Craig [mailto:ccasebeer@daycasebeer.com]
Sent: Saturday, January 27, 2007 4:03 PM
To: Young, Stanley; Batchelder, Jim; Patch, Lee; Mammen, Chris E.; Bier, Adam Arthur; Smith, Victoria
Cc: Robertson, Kyle S.; Venkatesan, Jaideep
Subject: RE: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.

---

Stan: I agree that we should file a correction on Monday that is consistent with Viji's testimony and re-confirms the point that there was no evidence of her involvement or participation in the JVT or the AHG during the period through 5/03. Craig

---

From: Young, Stanley [mailto:Stanley.Young@hellerehrman.com]
Sent: Saturday, January 27, 2007 2:20 PM
To: Batchelder, Jim; Patch, Lee; Casebeer, Craig; Mammen, Chris E.; Bier, Adam Arthur; Smith, Victoria
Cc: Robertson, Kyle S.; Venkatesan, Jaideep
Subject: RE: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.

Subject to Protective Order Dated
November 7, 2008 United States District
Court, Southern District of California/Case
No. 05cv1958-B (BLM)

DCMB-SY022473

DC00087047

4

---

Ex. C Pg. 33

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

The last draft of the Rule 52(c) motion that I saw contained the language set forth below. It is similar to the language I used earlier in objecting to the Ad Hoc report's admission. While both sets of statements were literally true, I think in light of the evidence subsequently introduced through Raveendran we should file something on Monday withdrawing both the statements in the motion and my statement in making the objection. Thoughts?

Broadcom failed to show (1) that Ms. Raveendran ever received a single email related to this list, (2) that anyone on this list ever communicated regarding the H.264 standard, and (3) that the email list in question was even a JVT list at all.

First, there is no evidence that Ms. Raveendran ever received an email from this email list, or that she participated in this list in any way. In fact, Broadcom did not submit any evidence of activity on the part of people on this list or of JVT participation on the part of others with their email addresses on this list. Given that one of the chairpersons of this ad hoc group, Xuemin Chen, is a Broadcom employee, Broadcom's failure to present a scintilla of evidence about activity on the part of people on this list indicates that no such evidence exists.[1] <outbind://4/#_ftn1> Broadcom's failure to produce any evidence on these points, even while employing a chairman of this ad hoc group is telling.

---

[1] <outbind://4/#_ftnref1> See DX-5836 (listing Xuemin Chen as a Chairman of the ad hoc group and a Broadcom employee).

---

From: Smith, Victoria [mailto:vsmith@daycasebeer.com]
Sent: Tuesday, January 23, 2007 8:00 PM
To: QC Trial Team
Cc: Young, Stanley; Robertson, Kyle S.; Venkatesan, Jaideep
Subject: FW: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.

---

From: Folmer, Anna
Sent: Tuesday, January 23, 2007 7:57 PM
To: Smith, Victoria
Subject: Latest version of JMOL 52(c) 1-23-07 at 7:51 p.m.

Subject to Protective Order Dated November 7, 2008 United States District Court, Southern District of California/Case No. 05cv1958-B (BLM)

5

DCMB-SY022474
DC00087048

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Confidentiality Notice
This message is being sent by or on behalf of a lawyer.  It
is intended exclusively for the individual or entity to which
it is addressed.  This communication may contain information that
is proprietary, privileged or confidential or otherwise
legally exempt from disclosure.  If you are not the named
addressee, you are not authorized to read, print, retain, copy or
disseminate this message or any part of it.  If you have
received this message in error, please notify the sender
immediately by email and delete all copies of the message.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

=============================================

This email is sent by a law firm and contains information that may
be privileged and confidential. If you are not the intended
recipient,
please delete the email and notify us immediately.

=============================================

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Confidentiality Notice
This message is being sent by or on behalf of a lawyer.  It is
intended exclusively for the individual or entity to which it is
addressed.  This communication may contain information that
is proprietary, privileged or confidential or otherwise legally
exempt from disclosure.  If you are not the named addressee,
you are not authorized to read, print, retain, copy or
disseminate this message or any part of it.  If you have
received this message in error, please notify the sender
immediately by email and delete all copies of the message.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Subject to Protective Order Dated
November 7, 2008/United States District
Court, Southern District of California/Case
No. 05cv1958-B (BLM)

**DCMB-SY022475**

**DC00087049**

6

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

===========================================

This email is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the email and notify us immediately.

===========================================

*****************************************************
Confidentiality Notice
This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by email and delete all copies of the message.
*****************************************************

===========================================

This email is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the email and notify us immediately.

===========================================

Subject to Protective Order Dated
November 7, 2008/United States District
Court, Southern District of California/Case
No. 05cv1958-B (BLM)

DCMB-SY022476

DC00087050

7

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  H. SINCLAIR KERR, JR. (61713)
   JAMES M. WAGSTAFFE (95535)
2  ADRIAN J. SAWYER (203712)
   **KERR & WAGSTAFFE LLP**
3  100 Spear Street, Suite 1800
   San Francisco, CA 94105–1528
4  Telephone: (415) 371-8500
   Fax: (415) 371-0500
5
   Attorneys for Non-Party
6  LEE PATCH

7

8              UNITED STATES DISTRICT COURT

9           SOUTHERN DISTRICT OF CALIFORNIA

10  QUALCOMM INCORPORATED,            Case No. 05-cv1958-B (BLM)

11         Plaintiff,                 **DECLARATION OF NON-PARTY LEE
                                      PATCH IN RESPONSE TO ORDER TO
12         v.                         SHOW CAUSE**

13  BROADCOM CORPORATION,             Date:    October 12, 2007
                                      Time:    9:30 a.m.
14         Defendant.                 Crtrm:   A

15                                    Hon. Barbara L. Major

16  AND RELATED COUNTERCLAIMS.

17

18

19

20

21

22

23

24

25

26

27

28

KERR
&
WAGSTAFFE
LLP

No. 05cv1958-B (BLM)                  DECLARATION OF NON-PARTY LEE PATCH
                                      IN RESPONSE TO ORDER TO SHOW CAUSE

*Patch*
EXHIBIT NO. 143
7/14/09
J. HOSTETLER

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

I, Lee Patch, declare:

**Introduction and Overview**

1.     I am submitting this declaration with a profound appreciation of the seriousness of this matter. As an officer of the court, I am deeply distressed by the realization that relevant documents in this case were not produced and briefs and arguments were presented with incorrect information. However, as I will describe below, I acted at all times in the good faith belief that I was accurately presenting the evidence to the Court, based on the information available to me at the time.

2.     As discussed in detail below, I went into the trial in this matter believing that QUALCOMM had no involvement with the setting of the H.264 standard before the JVT, based on my understanding that QUALCOMM had no involvement with the JVT prior to September 2003.

3.     In the middle of trial, 21 JVT-related emails from the pre-September 2003 timeframe were discovered by a colleague in my firm and unfortunately, for reasons discussed below, I did not appreciate their significance at the time of their discovery. As a result, I participated in a decision not to produce the 21 emails upon their discovery, based upon an analysis of their non-responsiveness to Broadcom Requests for Production ("RFPs"), as narrowed by uncontested QUALCOMM responses.

4.     Later in trial, I conducted the direct examination of the recipient of the emails, Ms. Raveendran, who testified on cross examination that she had received the emails from the JVT-related email list. In a sidebar that occurred shortly afterward relating to production of the emails, I accurately but perhaps confusingly stated that I had not seen the emails. I now appreciate that I may have inadvertently created the misimpression that I had become aware of their existence either just then or on the previous day. After that sidebar and my review of the emails over the lunch break, they were voluntarily produced to Broadcom. Broadcom thereafter conducted a further cross examination concerning the emails.

5.     In late March 2007, I first became aware of the existence of the large volume of pre-September 2003 JVT-related QUALCOMM documents and the information contained

KERR
WAGSTAFFE
LLP

NO. 05CV1958-B (BLM)

1

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Ex. C, Pg. 38

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  within them.  Thereafter, I was personally involved in the review of that collection of documents,

2  and realized that the documents were inconsistent with arguments and positions that we had

3  made on behalf of QUALCOMM at trial.  I also realized to my great distress that I had

4  participated in trial under a gross misunderstanding concerning QUALCOMM's involvement

5  with the JVT.

6          6.      I concurred in the decision to inform the Court and Broadcom immediately of the

7  discovery and to apologize to the Court for having advanced arguments and positions at trial that

8  were plainly inconsistent with the content of the QUALCOMM documents discovered after trial.

9  Thereafter, I participated in the decision to conduct two additional more expansive document

10 searches to be assured that the facts were fully understood and disclosed to the Court and to

11 Broadcom.

12         7.      In the following paragraphs I will discuss my involvement in this case and

13 address the specific issues raised in Judge Brewster's August 6 Order.

14 **Personal Background**

15         8.      I am 54 years old, married to my wife Louise for 31 years, and the father of 10

16 year old twins, a son and daughter.

17         9.      I have been a partner at Day Casebeer Madrid & Batchelder L.L.P. since July

18 2006. I joined the firm on January 1, 2005 in an "Of Counsel" position.

19         10.     Prior to joining Day Casebeer, I was employed in an in-house counsel position for

20 14 years at Sun Microsystems, Inc. in various roles that began with chief patent counsel and

21 concluded as a senior vice president.  Prior to my positions at Sun Microsystems, Inc., I was in-

22 house chief patent counsel at National Semiconductor Company for five years, and before that,

23 an in-house patent counsel for Fairchild Semiconductor and Schlumberger Limited.

24         11.     In 1982, I received a J.D. from the Duquesne University School of Law in

25 Pittsburgh, Pennsylvania.  I was admitted as an attorney in Pennsylvania in 1982.  In 1974, I

26 received a B.S. in Physics from Carnegie Mellon University, and taught high school physics for

27 five years before going to law school.

28



KERR
&
WAGSTAFFE
LLP

NO. 05CV1958-B (BLM)                                        2

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Ex. C , Pg. 39

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

12.     I have never been sanctioned or disciplined by any court, government agency or State Bar.

13.     As should be clear from the description above concerning my professional career, I had limited courtroom experience before appearing before Judge Brewster in this case. This was my first case as trial counsel.

**My Roles In The QUALCOMM Case**

14.     My participation in the QUALCOMM case did not begin until June 5, 2006. At the time that I joined the QUALCOMM team, the matter had progressed to the stage that the Markman claim construction was complete, Infringement and Invalidity Contentions had been served, discovery was far along and fact discovery was scheduled to close at the end of August, 2006.

15.     I was not responsible for or involved with any of the written discovery in the case, including any of the discovery requests and responses referred to in Judge Brewster's Order. Specifically, I had no role in the collection or production of any QUALCOMM documents during the discovery process and I did not sign any QUALCOMM responses to RFPs. Similarly, I had no role in responding to Broadcom's interrogatories and did not sign any QUALCOMM responses thereto.

16.     My initial role in the QUALCOMM case was to be responsible for investigating and responding to Broadcom's Invalidity Contentions relating to prior art and Section 112 deficiencies, issues that are not the subject of this Order to Show Cause.

17.     My role was limited to those activities until early July, when a significant number of depositions of QUALCOMM video compression engineers were noticed by Broadcom, and I was asked to assist in the effort to defend some of them. As a part of that effort, I defended the depositions of three QUALCOMM engineers; Ms. Viji Raveendran, Dr. Yiliang Bao, and Ms. Yan Ye. Prior to preparing them for their depositions, I had not known or met any of them. My role in the QUALCOMM action was expanded again in early September when I accepted responsibility for defending against newly introduced allegations of inequitable conduct.



KERR
&
WAGSTAFFE
LLP

NO. 05CV1958-B (BLM)

3

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Ex. C, Pg. 40

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

18.   During the pre-trial activities, I was primarily responsible for preparing and responding to the Motions for Summary Adjudication and Motions in Limine on the issues of invalidity and inequitable conduct. I was not responsible for the Summary Adjudication issues relating to JVT or Broadcom's waiver defense. I also played the same contained role with respect to QUALCOMM's submissions regarding Contentions of Fact and Law.

19.   I was also not responsible for or personally involved in the preparation of any other submission made by QUALCOMM that is identified in Judge Brewster's Order. Although a draft version of each of the QUALCOMM submissions identified in Judge Brewster's Order would have been circulated for comment among the QUALCOMM trial team, I have no recollection of reviewing or commenting upon the substance of any of them except as stated in this Declaration.

20.   I was one of QUALCOMM's trial counsel in this matter and presented four QUALCOMM witnesses and cross examined one Broadcom witness. As a group effort within the QUALCOMM trial team, I contributed to the drafting of QUALCOMM's opening statement. At the time of QUALCOMM's opening statement, I believed to be true the statement from QUALCOMM's opening relating to QUALCOMM's JVT participation that is quoted in Judge Brewster's Order on page 45.

21.   A case of this complexity requires a substantial effort by all members of a large trial team and many attorneys, like me, had delineated responsibilities. During the month of January, when the trial took place, I spent over 400 hours working on this case, and, for the first time in my career juggled numerous responsibilities as trial counsel.

**Preparation Of Viji Raveendran At Trial**

22.   Based on the documents I understood existed and on the other information to which I had access during the pretrial process, including Ms. Raveendran's deposition testimony, it was my understanding and belief that neither QUALCOMM nor Ms. Raveendran had participated in activities of the JVT prior to September 2003. Specifically, I understood that Ms. Raveendran never attended a meeting of the JVT prior to September 2003 and that her only attendance at a JVT meeting occurred in Poland in 2005 when she attended an MPEG meeting



KERR
&
WAGSTAFFE
LLP

NO. 05CV1958-B (BLM)                                              4

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Ex. C , Pg. 41

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   located at the same location as the JVT meeting that related to a different technology (Scalable

2   Video Coding). I also understood that her email address on an attachment to an "avc_ce" Ad

3   Hoc Group report to the JVT in December 2002 appeared, not because she was a subscriber or

4   participant in that Ad Hoc Group, but because a person's email address could be readily added to

5   such list by another individual without their knowledge. Nothing occurred in the time before

6   trial that caused me to have a different understanding.

7       23.    I understood during the pre-trial period and throughout the trial, based upon my

8   review of the Reports of the "avc_ce" Ad Hoc Group that were included among the publicly

9   available JVT archives, and based upon my prior experience with industry standard setting

10  bodies, that the "avc_ce" Ad Hoc Group had been formed by the JVT for the purpose of

11  comparing the capabilities and performance of the then-virtually-completed H.264 standard to

12  the capabilities and performance of the previously created video compression standard known as

13  MPEG4. In other words, the "avc_ce" Ad Hoc Group was formed not to contribute to the

14  technical content of the H.264 standard, but rather to perform the "marketing" of the standard to

15  the industry by publishing benchmarking data to demonstrate the new standard's efficacy in

16  comparison to its predecessor standard. I continue to believe that this understanding of the

17  purpose of the "avc_ce" Ad Hoc Group was accurate.

18      24.    On January 7, 2007, the Sunday evening prior to the start of trial, Adam Bier, at

19  my direction, was preparing Ms. Raveendran to testify while I was attending to other trial

20  preparation tasks. I understand now, but did not know then, on that evening, Mr. Bier believes

21  he became aware of an email that appears to have been one that was automatically generated by

22  the "avc_ce" email server computer in 2002 at or near the time Ms. Raveendran's email address

23  was added to that email list. I was not informed of the existence of that email at any time before

24  or during trial. That single email, however, was not inconsistent with what I understood to be the

25  case, i.e., Ms. Raveendran's email address was or could have been added to such a list and that

26  Ms. Raveendran had not been aware of its existence previously.

27      25.    During trial, on Sunday evening, January 14, Ms. Raveendran was again present

28  in the witness preparation room being prepared more fully for being called as an adverse witness

KERR
WAGSTAFFE
LLP

NO. 05CV1958-B (BLM)                                    5

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   by Broadcom in the next week of trial. Again, I was primarily devoted to other tasks that

2   evening and Mr. Bier was working with Ms. Raveendran. Around 9:00 p.m., Mr. Bier came out

3   of the preparation room and informed Chris Mammen and me that he had conducted a search of

4   Ms. Raveendran's laptop computer and had unexpectedly found 24 emails from the JVT

5   "avc_ce" email list, apparently received by Ms. Raveendran in late 2002 and early 2003. Of the

6   24 emails, I was informed that 3 were duplicates. Prior to this time, I had no knowledge of these

7   emails.

8       26.     In response to the discovery of the emails, I asked that Mr. Bier and Mr. Mammen

9   determine whether the emails needed to be produced to Broadcom pursuant to any discovery

10  request that had been promulgated in the pre-trial period. I asked Mr. Mammen to perform this

11  evaluation since, he along with an associate attorney Kevin Leung, had been directly involved in

12  the document production process. I also asked them to determine whether any of the emails

13  reflected active participation, involvement or acts of authorship by Ms. Raveendran with the

14  members of the "avc_ce" email list. I also returned to the witness preparation room to speak

15  with Ms. Raveendran about the 21 emails. I am precluded from communicating the content of

16  that discussion by the attorney-client privilege. Shortly after this discovery, I gave a brief heads-

17  up to my other colleagues, including Jim Batchelder and Stanley Young, of the discovery of

18  JVT-related documents on Ms. Raveendran's laptop. However, I do not recall that I was explicit

19  with them that the documents were emails or that they were from the "avc_ce" email list, and

20  this I regret in light of later events. It was my understanding at that time that the search that Mr.

21  Bier had conducted had identified all emails on Ms. Raveendran's laptop that had originated

22  from the "avc_ce" email list

23      27.     At approximately midnight and after my colleagues had analyzed the discovery

24  requests in conjunction with the manner in which they were narrowed by unchallenged

25  responses, I was informed by Mr. Mammen and Mr. Bier that the emails were not responsive to

26  the discovery requests as narrowed by the responses. I also asked to look at the identified

27  Requests for Production, as well as the objections and narrowing responses thereto--neither of

28

KERR
—&—
WAGSTAFFE
LLP

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   which were challenged by Broadcom or became the subject of a meet and confer process. After

2   that review, I concurred with the analysis of my colleagues.

3       28.     It was after midnight and I did not personally read the content of the emails at that

4   time, relying on the description of them by my colleagues. I was informed by Messrs. Bier and

5   Mammen that all of them were "incoming" emails that appeared to have been unsolicited,

6   evidencing no participation, involvement or acts of authorship of any kind by Ms. Raveendran. I

7   was informed that none of the emails related to the subject of QUALCOMM patents or IP, nor

8   did they appear to relate to the creation of the H.264 standard. The description of the emails was

9   entirely consistent with my understanding of the purpose of the "avc_ce" Ad Hoc Group, and of

10  how they might have been present on Ms. Raveendran's laptop. Nothing in my colleagues'

11  description of the 21 emails suggested to me that QUALCOMM or Ms. Raveendran had

12  participated in the creation of the H.264 standard.

13      29.     Based upon my understanding of the emails discussed above, and my review of

14  the identified RFPs and associated QUALCOMM responses, I believed they did not need to be

15  produced and that their apparent content was consistent fully with the representations that I was

16  aware had been made to the Court concerning involvement by QUALCOMM with the JVT.

17  Now, with the knowledge that there was a large volume of documents later to be discovered and

18  an awareness of then-unknown but contrary statements to be made in later court submissions, I

19  realize that we should have immediately produced the emails and now regret not having done so.

20  However, based on the information I had at that point in the trial, I believe that we were acting

21  properly in connection with this matter.

22  **Ms. Raveendran's Testimony**

23      30.     Although Broadcom dropped Ms. Raveendran from their live witness list, I

24  decided, along with the QUALCOMM trial team, that she should be called as a rebuttal witness.

25  I developed her direct testimony to include the subject matter of the email list on the final day of

26  testimony at trial.

27      31.     As a result of the Court's strict time limits, by the end of trial, there was a severe

28  shortage of time left for QUALCOMM's rebuttal case and closing. As a result, the testimony of

7

NO. 05CV1958-B (BLM)

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

KERR
WAGSTAFFE
LLP

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  the final witnesses, including Ms. Raveendran, had to be bare bones, narrowed to just a few

2  minutes. We were acutely aware that every minute that was used on rebuttal testimony was

3  reducing the time for closing argument, which was already going to be constrained to less than

4  an hour. As a result, Ms. Raveendran's direct examination needed to be limited to ten minutes or

5  less and was intended to address four distinct issues in this limited time: (i) the presence of her

6  email address on the "avc_ce" email list; (ii) that her familiarity with the '104 patent was based

7  upon a passing glance of the front cover sheet; (iii) that she had attended only one JVT meeting,

8  in Poland in 2005; and (iv) that QUALCOMM had made an earlier disclosure and License Offer

9  to MPEG.

10      32.    Among other things, the testimony of Ms. Raveendran was intended to rebut what

11  I sincerely believed at the time to be inaccurate arguments made by Broadcom, i.e., that the

12  presence of her email address on the "avc_ce" email list in December 2002 proved

13  QUALCOMM's active participation in the JVT in that time period.

14      33.    The direct examination was short, lasting 7-10 minutes. During that examination,

15  I asked Ms. Raveendran: "Do you have any knowledge of having read email that came back to

16  you from this email list?" On cross examination, Ms. Raveendran was asked about receiving any

17  emails from the "avc_ce" email list, and she answered that the emails had been received but had

18  not been read.

19      34.    It is important for the Court to know that at the time of Ms. Raveendran's

20  testimony, I did not know that on the morning of January 18, one of the attorneys for

21  QUALCOMM from the Heller Ehrman firm had argued in a sidebar that there are no emails or

22  any evidence that any emails were actually sent to the list. I was not present in court on that

23  morning because I had remained at the hotel to finalize the direct examination of

24  QUALCOMM's technical expert, Dr. Bystrom, who testified that afternoon. Obviously, if I had

25  known of the sidebar comments or if we had more effectively communicated with the Heller

26  Ehrman attorneys on these matters, the statements would either never have been made, or I

27  would have been in a position to immediately take corrective action with the Court after they

28  were made. The same is true as to similar statements made in QUALCOMM's JMOL motion

KERR
&
WAGSTAFFE
LLP

NO. 05CV1958-B (BLM)

8

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Ex. C  Pg. 45

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  filed on January 24, of which I was unaware. Unfortunately, I did not personally learn that such

2  arguments had been made at sidebar on January 18 or in QUALCOMM's JMOL motion until at

3  the conclusion of trial. By that time, others on the QUALCOMM trial team were already writing

4  to correct any misimpressions that were generated by such arguments. Again, I regret, and

5  apologize, that I did not share the information about the 21 emails more fully with all other

6  members of the trial team.

7      35.    In retrospect, I recognize that my approach to Ms. Raveendran's direct

8  examination could have been more explicit with respect to the existence of the 21 emails.

9  However, I had no intention to conceal the existence of them from the Court, the jury or

10 Broadcom.

11 **Sidebar Following Ms. Raveendran's Testimony**

12     36.    At a sidebar following Ms. Raveendran's testimony, Broadcom counsel sought

13 access to the 21 emails in order to be able to conduct a supplemental cross examination of Ms.

14 Raveendran after the lunch break.

15     37.    During the sidebar, I believed that the prior discovery requests as narrowed did

16 not compel the production of the emails (that I had not yet read personally) and that they were

17 not harmful to QUALCOMM's case.

18     38.    It was my intention at the sidebar to make several points to the Court concerning

19 Broadcom's request for the emails: (i) that the Court should not automatically assume that the

20 emails were properly responsive to Broadcom RFPs, but instead would itself need to make such

21 a determination before production of them would be appropriate; (ii) that I had not personally

22 looked at the content of the emails previously, but based upon what I had been told of their

23 contents, I believed that they were not responsive to any Broadcom RFP (as modified by

24 QUALCOMM's unchallenged responses); and (iii) that I would personally look at the content of

25 the emails over the lunch break to check the basis for determining that they were not responsive,

26 so that we could resolve the Parties' positions without delaying the trial.

27     39.    The court reporter's transcription of my statements at the sidebar are generally

28 consistent with my intent:



KERR
&
WAGSTAFFE
LLP

NO. 05CV1958-B (BLM)                                    9

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1    "[I]t's not clear to me [the email are] responsive to anything. So that's

2    something that needs to be determined before they would be produced...I'm

3    talking about whether they were actually requested in discovery." (Order, p. 46)

4    "I'm simply representing I haven't seen [the emails], and [whether

5    Broadcom requested them] hasn't been determined." (Order, p. 46)

6    40.    At the sidebar, I had no sense that my communications were creating

7    misimpressions for the Court or that they were being understood in a manner that was not

8    intended by me. If that had been the case, I would have acted immediately to correct any

9    misunderstandings that I perceived the Court to have reached from my comments.

10   41.    Nevertheless, having now reviewed the transcript of the sidebar, it is clear to me

11   that I did an ineffective job in communicating our handling of the emails. In particular, I never

12   intended to communicate to the Court the impression that an internal responsiveness

13   determination had not already been made by our trial team. My statements were only intended to

14   impress upon the Court that a necessary analytical step was needed before the Court could

15   conclude that production of the emails should be ordered; i.e., that the Court first evaluate

16   whether the materials were called for during the discovery process. I believe that this is how the

17   Court understood my statements at the time, as reflected in the full text of this portion of the

18   sidebar exchange:

19   The Court: It's not the case that they should have been produced?

20   Mr. Patch: There's no – it's not clear to me they're responsive to anything. So that's

21   something that needs to be determined before they would be produced.

22   The Court: Well, if they're emails out of the JVT, you wouldn't have any worry about

23   relevance, would you?

24   Mr. Patch: No. I'm talking about whether they were actually requested in discovery."

25   The Court: Oh, well, that's a good question. Did you request them?

26   42.    I also never intended by my statements that "I had not seen the emails" to mislead

27   the Court or Broadcom to believe that I first learned about the existence of the emails during Ms.

28   Raveendran's testimony on cross. I meant only that I had not personally read them at that point.

10



NO. 05CV1958-B (BLM)

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

43. Looking back at the transcript of the January 24 sidebar, I can see now how a misimpression might have been created about when I first became aware of the 21 emails, and I regret that I did not inform the Court explicitly at the time that I had been aware of the 21 emails for 10 days.

44. I did personally look at each of the emails over the lunch break and found that the description of them had been accurate; they were all incoming, passive emails; they reflected no active involvement by Ms. Raveendran with the "avc_ce" Ad Hoc Group; and they had nothing of substance within them that related to the subject matter of the QUALCOMM patents-in-suit. My personal review of the emails for the first time at the lunch break revealed nothing within them that was inconsistent with my prior understanding of the purpose of the "avc_ce" Ad Hoc Group or my understanding that neither QUALCOMM nor Ms. Raveendran had participated in the creation of the H.264 standard prior to September, 2003. Nevertheless, to dispel any mystery or appearance of keeping evidence from the jury, we decided to produce the emails over lunch.

45. I put on the record after the lunch break that QUALCOMM still believed that the emails were non-responsive. At the time that I made those statements to the Court, I had personally reviewed the content of the emails and believed in good faith that our earlier responsiveness determination had been correct.

46. After the lunch break, Broadcom cross examined Ms. Raveendran concerning the 21 emails.

**Post-Trial Activities**

47. At the bottom of page 46 and the top of page 47 of Judge Brewster's Order, the Court refers to a February 1, 2007 telephone call between QUALCOMM counsel and Broadcom counsel, in which

"Qualcomm counsel finally admitted ... that on January 14, 2007, attorneys for Qualcomm learned of an archive of emails [sent to this email list for the JVT ad hoc group] belonging to Viji Raveendran."

48. I was the QUALCOMM attorney participating on that call that confirmed to Broadcom counsel that the 21 emails had been discovered during trial on January 14. As noted



NO. 05CV1958-B (BLM)

11

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Ex. C Pg. 48

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   above, it was never my intention at any time to conceal the fact that we discovered the 21 emails

2   on January 14.

3       49.    I was one of QUALCOMM's counsel at the post-trial equitable hearing conducted

4   before Judge Brewster and referred to in Judge Brewster's Order on pages 47 and 48. I had

5   significant responsibility for and contributed to the portion of QUALCOMM's briefing and

6   presentation concerning the issue of inequitable conduct.  I was not responsible for and did not

7   make significant contribution to the portion of QUALCOMM's briefing and presentation

8   concerning the issue of waiver. I presented a QUALCOMM expert witness to testify concerning

9   issues relating to inequitable conduct at that hearing.  At the time of that briefing and hearing, I

10  believed it to be true that "QUALCOMM Did Not Participate in the Development of the H.264

11  Standard Prior to the Publication of That Standard in May, 2003." At that time, I also believed it

12  to be true that "No QUALCOMM Participant Was Aware Of The Potential Application Of The

13  Patents-In-Suit To The H.264 Standard During The Relevant Time Period."

14      50.    I was not involved in the preparation or submission of the letters that were sent to

15  Broadcom counsel dated February 8, and February 16, 2007, referred to in Judge Brewster's

16  Order on page 48-49 and 50-51.  I was aware that such letters were being sent.

17      51.    I was not involved in the communications that occurred between QUALCOMM

18  counsel and Broadcom counsel relating to the performance of an initial phase of additional post-

19  trial email searching, or the decision to perform such searching, as referred to in Judge

20  Brewster's Order on page 50 and 51.  When I was informed that an agreement had been reached

21  concerning post-trial searching, my expectation was that no emails were likely to result from

22  such a search that were inconsistent in any way with the arguments that had been made on

23  QUALCOMM's behalf during trial or post-trial proceedings.  I understood that the additional

24  post-trial email searching was being conducted by the QUALCOMM in-house legal staff, as

25  earlier pre-trial document collections had been done.

26      52.    On March 28, I was shocked to be informed that a substantial number of

27  QUALCOMM emails and attached documents had been collected in response to the agreed-upon

28


KERR
WAGSTAFFE
LLP

NO. 05CV1958-B (BLM)

12

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Ex. C Pg. 49

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1 search terms, and on that day, I first gained access to the results of that phase of post-trial

2 searching on the QUALCOMM-maintained collection database.

3    53.    Due to the surprise that the unexpectedly large number of documents caused

4 within the QUALCOMM trial team, I became deeply involved in an immediate review of the

5 content of the documents, and the organization and implementation of a privilege review for

6 them. Within a few days of having access to the large volume of search results, it was apparent

7 to me that (a) some of the newly collected documents were responsive to Broadcom RFPs that

8 had been promulgated during the pre-trial period; (b) some of the newly collected documents

9 were inconsistent with positions and arguments that had been advanced on QUALCOMM's

10 behalf in pre-trial, trial and post-trial communications to the Court, and (c) some of the newly

11 collected documents reflected the existence of additional, previously unidentified QUALCOMM

12 employees who appeared to have been involved in relevant activities relating to the JVT.

13    54.    I immediately informed the QUALCOMM trial team of this realization and I

14 personally participated and concurred in a decision to initiate a second phase of post-trial

15 document collection and review by QUALCOMM's legal department that included all of the

16 individuals that had originally been requested by Broadcom plus a list of additional

17 QUALCOMM employees identified as a result of the initial post-trial collection.

18    55.    Upon review of the results of the voluntary second phase of post-trial searching

19 that was conducted, I participated and concurred in a decision to initiate a voluntary third phase

20 that included individuals who appeared to have some involvement or role based upon the second

21 phase collection. I understand that all three phases of post-trial document collections were

22 promptly produced to Broadcom as soon as the privilege review was completed.

23    56.    During this period, after the trial, when I was informed that a substantial number

24 of QUALCOMM emails and attached documents had been collected in response to the agreed-

25 upon search terms, I was shocked and was learning of all these emails and documents for the

26 very first time. I did not previously know they existed and I, along with the QUALCOMM

27 defense team, insisted that they immediately be produced to the Court and Broadcom. There is

28 no question, had I known of these documents, I would have seen them as relevant and responsive

13

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

KERR
WAGSTAFFE
LLP

Ex. C Pg. 50

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1    to Broadcom discovery requests. However, I did not know of their existence and regret any
2    failure to locate them or have them produced. I understand that I am precluded from
3    communicating the content of discussions that would better explain the reasons for our failure to
4    do so.

5        57.    I learned for the first time in August 2007 that three additional JVT-related emails
6    had been located on Ms. Raveendran's laptop computer that had not been revealed during the
7    post-trial email searches. As I understood the content of the emails, two appear to reflect that in
8    August of 2002, Ms. Raveendran subscribed herself to the "avc_ce" email list, and another
9    appears to reflect that an automatic, computer-generated confirmation email message was sent
10   back to her email address by the email system server. Prior to August 2007, I had not previously
11   seen or been aware of the existence of these three emails.

12   **The Roles Of Day Casebeer Associates In The QUALCOMM Case**
13       58.    A number of the associates of the Day Casebeer firm fall within the scope of this
14   Court's August 13, 2007 Order To Show Cause Why Sanctions Should Not Be Imposed. I
15   believe that all of the associates worked under the supervision of a trial team partner, who was
16   responsible for the associate's activity in the case. I accept personal responsibility for the work
17   of the associates that was performed under my supervision. I sincerely believe that each of the
18   firm's associates acted in good faith throughout their hard work on this matter, and I request that
19   the Court impose no sanction upon any of them.

20   **Conclusion**
21       59.    I want to assure the Court that my actions and decisions discussed above were all
22   undertaken in good faith and with no intention to violate Court Orders or to mislead the Court in
23   any way. I was unaware until after trial that a substantial number of relevant documents had not
24   been produced to Broadcom. Likewise, I sincerely believe that the same is true of all of my
25   colleagues on the QUALCOMM trial team. I appreciate that the discovery obligations imposed
26   on counsel require us to be particularly vigilant when vast quantities of documents are stored
27   electronically, so that the situation presented here is not repeated.
28

KERR
&
WAGSTAFFE
LLP

NO. 05CV1958-B (BLM)                    14

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Ex. C Pg. 51

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1    I make this declaration of my own personal knowledge. If called as a witness as to the

2  truth of the matters stated herein, I could and would competently testify thereto.

3    I declare under penalty of perjury that the foregoing is true and correct and was executed

4  in Cupertino, California on October 3, 2007.

5

6

7

8                                    /s/Lee Patch
                                      Lee Patch
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KERR
&
WAGSTAFFE
LLP

NO. 05CV1958-B (BLM)                        15

DECLARATION OF NON-PARTY LEE PATCH
IN RESPONSE TO ORDER TO SHOW CAUSE

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1       I make this declaration of my own personal knowledge.  If called as a witness as to the

2   truth of the matters stated herein, I could and would competently testify thereto.

3       I declare under penalty of perjury that the foregoing is true and correct and was executed

4   in Cupertino, California on October 3, 2007.

5

6

7

8                                      Lee Patch

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KERR
AGSTAFFE
LLP

NO. 05CV1958-B (BLM)                                15          DECLARATION OF NON-PARTY LEE PATCH
                                                                IN RESPONSE TO ORDER TO SHOW CAUSE

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11 | QUALCOMM INCORPORATED,                    )   Case No. 05cv1958-B (BLM)
12 |                         Plaintiff,        )   **ORDER GRANTING IN PART AND**
                                              )   **DENYING IN PART DEFENDANT'S**
13 | v.                                        )   **MOTION FOR SANCTIONS AND**
                                              )   **SANCTIONING QUALCOMM,**
14 | BROADCOM CORPORATION,                     )   **INCORPORATED AND INDIVIDUAL**
                                              )   **LAWYERS**
15 |                         Defendant.        )
16 | _____       )   **[DOC. NOS. 489, 540, 599, 614]**
                                              )
17 | and RELATED COUNTERCLAIMS.                )
                                              )

18 |     At the conclusion of trial, counsel for Broadcom Corporation
19 | ("Broadcom") made an oral motion for sanctions after Qualcomm
20 | Incorporated ("Qualcomm") witness Viji Raveendran testified about emails
21 | that were not produced to Broadcom during discovery. Doc. No. 489. The
22 | trial judge, United States District Court Judge Rudi M. Brewster,
23 | referred the motion to this Court pursuant to 28 U.S.C. § 636(b) and
24 | Civil Local Rule 72.1(b) of the United States District Court for the
25 | Southern District of California. Doc. No. 494. On May 29, 2007,
26 | Broadcom filed a written motion requesting that the Court sanction
27 | Qualcomm for its failure to produce tens of thousands of documents that
28 | Broadcom had requested in discovery. Doc. No. 540. Qualcomm timely

Patch
EXHIBIT NO. 144
7/14/07
J. HOSTETLER

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   opposed, and Broadcom filed a reply. Doc. Nos. 568, 578, 581. This
2   Court heard oral argument on Broadcom's motion on July 26, 2007.
3       After hearing oral argument and reviewing Judge Brewster's Order
4   on Remedy for Finding of Waiver ("Waiver Order") and Order Granting
5   Broadcom Corporation's Motion for Exceptional Case Finding and for an
6   Award of Attorney's Fees (35 U.S.C. § 285) ("Exceptional Case Order"),
7   this Court issued an Order to Show Cause Why Sanctions Should Not be
8   Imposed against Qualcomm's retained attorneys ("OSC"). Doc. No. 599.
9   Specifically, this Court ordered James R. Batchelder, Adam A. Bier,
10  Craig H. Casebeer, David E. Kleinfeld, Kevin K. Leung, Christian E.
11  Mammen, Lee Patch, Kyle Robertson, Victoria Q. Smith, Barry J. Tucker,
12  Jaideep Venkatesan, Bradley A. Waugh, Stanley Young, Roy V. Zemlicka,
13  and any and all other attorneys who signed discovery responses, signed
14  pleadings and pretrial motions, and/or appeared at trial on behalf of
15  Qualcomm to appear and show cause why sanctions should not be imposed
16  for their failure to comply with this Court's orders. Id.
17      On October 3, 2007, nineteen attorneys filed declarations and
18  briefs responsive to the OSC. Doc. Nos. 670; 673-74, 676-80, 682, 685-
19  87, 689-91, 693-700. Qualcomm filed a brief and four declarations.
20  Doc. Nos. 675, 681, 683-84, 692. The attorneys filed objections to
21  Qualcomm's brief on October 5, 2007 [Doc. No. 704], and both Broadcom
22  and Qualcomm filed responsive briefs on October 9, 2007 [Doc. Nos. 705-
23  06]. This Court heard extensive oral argument on the sanctions issue
24  on October 12, 2007. Doc. No. 709 (October 12, 2007 Hearing
25  Transcript).
26      Having considered all of the written and oral arguments presented
27  and supporting documents submitted, and for the reasons set forth more
28  fully below, the Court **GRANTS IN PART** and **DENIES IN PART** Broadcom's

-2-

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  motion for sanctions against Qualcomm, **REFERS TO THE STATE BAR OF**
2  **CALIFORNIA** six attorneys, and **SANCTIONS** Qualcomm and six of its retained
3  lawyers. Doc. Nos. 489, 540, 599, 614.

4                                    BACKGROUND

5  A.  **The Patent Infringement Case**

6         Qualcomm initiated this patent infringement action on October 14,
7  2005, alleging Broadcom's infringement of Qualcomm patent numbers
8  5,452,104 (the "'104 patent'") and 5,576,767 (the "'767 patent'") based
9  on its manufacture, sale, and offers to sell H.264-compliant products.
10 Compl. ¶¶ 7-16.  Qualcomm sought injunctive relief, compensatory
11 damages, attorneys' fees and costs.  Id. at 3.  On December 8, 2006,
12 Broadcom filed a First Amended Answer and Counterclaims in which it
13 alleged (1) a counterclaim that the '104 patent is unenforceable due to
14 inequitable conduct, and (2) an affirmative defense that both patents
15 are unenforceable due to waiver.  Doc. No. 370.  Broadcom's waiver
16 defense was predicated on Qualcomm's participation in the Joint Video
17 Team ("JVT") in 2002 and early 2003.  Doc. No. 540-2 at 3.  The JVT is
18 the standards-setting body that created the H.264 standard, which was
19 released in May 2003 and governs video coding.  Waiver Order at 5-9.

20 B.  **Evidence of Qualcomm's Participation in the JVT**

21        Over the course of discovery, Broadcom sought information
22 concerning Qualcomm's participation in and communications with the JVT
23 through a variety of discovery devices.  For example, as early as
24 January 23, 2006, Broadcom served its First Set of Requests for the
25 Production of Documents and Things (Nos. 1-88), in which it requested:

26        [a]ll documents given to or received from a standards setting
       body or group that concern any standard relating to the
27     processing of digital video signals that pertains in any way
       to any Qualcomm Patent, including without limitation
28     communications, proposals, presentations, agreements,

                                    -3-

                                                        05cv1958-B (BLM)

Ex. C Pg. 56

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  commitments, or contracts to or from such bodies... . [and]

2  [a]ll documents concerning any Qualcomm membership,
3  participation, interaction, and/or involvement in setting any
   standard relating to the processing of digital video signals
4  that pertains in any way to any Qualcomm Patent. This
   request also covers all proposed or potential standards,
5  whether or not actually adopted.

6  Decl. of Kate Saxton Supp. Broadcom's Mot. for Sanctions [Doc. No. 540]

7  ("Saxton Decl."), Ex. BB-2 (Request for Production Nos. 49 & 50). On

8  July 14, 2006, Broadcom served its Second Set of Requests for Production

9  of Documents and Things (Nos. 89-115), calling for production of:

10    [a]ll documents referring to or evidencing any participation
11    by Qualcomm in the proceedings of the JVT, the ISO, the IEC,
      and/or the ITU-T; and

12    [a]ll documents constituting, referring to, or evidencing any
13    disclosure by any party to the JVT, the ISO, the IEC, and/or
      the ITU-T of any Qualcomm Patent and/or any Related Qualcomm
14    Patent.

15  Id., Exs. D & DD (Request for Production Nos. 93-94). Broadcom also

16  requested similar information via interrogatories and multiple Rule

17  30(b)(6) deposition notices. See id., Ex. EE (Broadcom Interrogatory

18  Nos. 19-20); Saxton Suppl. Decl., Ex. K (Broadcom Interrogatory No. 13);

19  Broadcom's Mem. Supp. Mot. for Sanctions [Doc. No. 540] ("Def.'s Mem.")

20  at 4 n.4 (sample excerpt from Broadcom deposition notice directed to the

21  Qualcomm witness knowledgeable about "attendance or participation by any

22  Qualcomm principal, employee, or representative at any H.264 standards

23  committee meetings").

24    On their face, Qualcomm's written discovery responses did not

25  appear unusual. In response to Broadcom's request for JVT documents,

26  Qualcomm, in a discovery response signed by attorney Kevin Leung, stated

27  "Qualcomm will produce non-privileged relevant and responsive documents

28  describing QUALCOMM's participation in the JVT, if any, which can be

-4-

05cv1958-B (BLM)

Ex. C, Pg. 57

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  located after a reasonable search." Doc. No. 543-3, Ex. X (Qualcomm's
2  Response to Broadcom's Request for Production No. 93); Decl. of Kevin
3  Leung at 5-6, Ex. 3. Similarly, Qualcomm committed to producing
4  "responsive non-privileged documents that were given to or received from
5  standards-setting body responsible for the ISO/IEC MPEG-4 Part 10
6  standard, and which concern any Qualcomm participation in setting the
7  ISO/IEC MPEG-4 Part 10 standard."[1] Leung Decl. at 6; Decl. of Christian
8  Mammen at 7-8. When asked for "the facts and circumstances of any and
9  all communications between Qualcomm and any standards setting body
10 relating to video technology, including ... the JVT ...," Qualcomm
11 responded that it first attended a JVT meeting in December 2003 and that
12 it first submitted a JVT proposal in January 2006. Decl. of Stanley
13 Young at 14 and Ex. 6 (Response to Interrogatory No. 19). In response
14 to Interrogatory No. 13, Qualcomm stated that it submitted four
15 proposals to the JVT in 2006 but had no earlier involvement. Leung
16 Decl. at 6-7; Decl. of Kyle S. Robertson at 11 and Ex. 2. This response
17 included the statement that "Qualcomm's investigation concerning this
18 interrogatory is ongoing and Qualcomm reserves the right to supplement
19 its response to this interrogatory as warranted by its investigation."
20 Id. Kevin Leung signed both of these interrogatory responses. See
21 Robertson Decl., Ex. 2 (Response to Interrogatory No. 13) and Young
22 Decl., Ex. 6 (Response to Interrogatory No. 19).
23       Qualcomm's responses to Broadcom's Rule 30(b)(6) deposition notices
24 were more troubling. Initially, Qualcomm designated Christine Irvine
25
26
27 _____
    [1]    The standard adopted by the JVT and at issue in this case is known by two
    names: H.264 and MPEG-4 Part 10. The MPEG-4 Part 10 nomenclature is used by the
28 ISO/IEC organization but both names refer to the same standard. Leung Decl. at 6;
    Mammen Decl. at 7. The Court will use the H.264 designation throughout this Order.

-5-

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   as the corporation's most knowledgeable person on the issue of

2   Qualcomm's involvement in the JVT. Leung Decl. at 3-4. Although

3   attorney Leung prepared Irvine for her deposition (id.), Qualcomm did

4   not search her computer for any relevant documents or emails or provide

5   her with any information to review (Decl. of Christine Irvine at 2-3;

6   Decl. of Christine Glathe at 3). Irvine testified falsely that Qualcomm

7   had never been involved in the JVT. Leung Decl. at 4. Broadcom

8   impeached Irvine with documents showing that Qualcomm had participated

9   in the JVT in late 2003. Id. Qualcomm ultimately agreed to provide

10  another Rule 30(b)(6) witness. Id.

11      Qualcomm designated Scott Ludwin as the new representative to

12  testify about Qualcomm's knowledge of and involvement in the JVT. Id.

13  Leung prepared and defended Ludwin at his deposition. Id. Qualcomm did

14  not search Ludwin's computer for any relevant documents nor take any

15  other action to prepare him. Decl. of Scott Ludwin at 2-3 (listing all

16  of the preparation he did not do); Glathe Decl. at 3. Ludwin testified

17  falsely that Qualcomm only began participating in the JVT in late 2003,

18  after the H.264 standard had been published. Id. In an effort to

19  impeach him (and extract the truth), Broadcom showed Ludwin a December

20  2002 email reflector list from the Advanced Video Coding ("AVC") Ad Hoc

21  Group that listed the email address viji@qualcomm.com.[2] Decl. of

22  Stanley Young at 19-20; Robertson Decl. at 14, Ex. 3; Leung Decl. at 8.

23

---

24      [2]   The document is an "Input Document to JVT" entitled "Ad Hoc Report on AVC
    Verification Test." Robertson Decl., Ex. 3. The report discusses a meeting set to

25  take place on Awaji Island. Id. Annex A to the document is entitled a "list of Ad Hoc
    Members." Id. It includes Raveendran's email address, viji@qualcomm.com, and

26  identifies her as a member of list avc_ce. Id. While the document is not an email
    sent to or from Raveendran, it indicates that a Qualcomm employee was receiving JVT/AVC

27  reports in 2002. This document became critical to Broadcom as it was the only evidence
    in Broadcom's possession indicating the truth-that Qualcomm had been actively involved

28  in the JVT and the development of the H.264 standard in 2002.

-6-

Ex. C Pg. 59

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  Although Ludwin did not recognize the document, Broadcom utilized the

2  document throughout the litigation to argue that Qualcomm had

3  participated in the JVT during the development of the H.264 standard.

4  Young Decl. at 19-20; Robertson Decl. at 14-17; Decl. of Jaideep

5  Venkatesan at 14-15.

6      As the case progressed, Qualcomm became increasingly aggressive in

7  its argument that it did not participate in the JVT during the time the

8  JVT was creating the H.264 standard.[3]  This argument was vital to

9  Qualcomm's success in this litigation because if Qualcomm had

10  participated in the creation of the H.264 standard, it would have been

11

12  _____

13  [3]    For example, on September 1, 2006, Qualcomm submitted an expert declaration
confirming the absence of any corporate records indicating Qualcomm's participation in

14  the JVT. Saxton Decl., Ex. Z. The declaration was prepared by the Heller Ehrman
lawyers and reviewed by numerous Day Casebeer and Qualcomm in-house attorneys.

15  Venkatesan Decl. at 9-12; Robertson Decl. at 9; Young Decl. at 15-16. In November,
Qualcomm filed a Motion for Summary Adjudication ("MSA") and supporting reply arguing

16  that the evidence established Qualcomm's non-participation in the JVT during .the
relevant period. Saxton Decl., Exs. FF & GG. Numerous in-house and outside counsel

17  reviewed the pleadings and attorneys Young, Batchelder and Patch argued the motion.
Young Decl. at 18-22; Vekatesan Decl. at 12-15; Robertson Decl. at 10-16; Batchelder

18  Decl. at 14-15; Patch Decl. at 4; Decl. of Barry J. Tucker at 4 '(Tucker signed the MSA
pleadings); Decl. of David E. Kleinfeld at 4 (Kleifeld signed the reply pleadings).

19  In its reply, Qualcomm dismissed the appearance of Raveendran's email address on the
JVT ad hoc group email reflector list and denied any suggestion that the email

20  reflector list indicated Raveendran received any JVT-related information or otherwise
had any involvement in the JVT ad hoc committee. Saxton Decl., Ex. II. On November

21  19, 2006, Qualcomm filed (1) a Motion in Limine to exclude evidence relating to, among
other things, Qualcomm's participation in the JVT, declaring that the "facts

22  demonstrate" Qualcomm "did not participate in JVT deliberations while the H.264
standard was being created" and (2) a Memorandum of Contentions of Fact and Law in

23  which it similarly asserted its lack of involvement in the H.264 standardization
process. Id., Exs. HH & KK at 2. Numerous in-house and outside counsel also reviewed

24  these pleadings. Mammen Decl. at 15 (Mammen signed the Memorandum); Decl. of Craig H.
Casebeer at 4-5; Decl. of Roy V. Zemlicka at 2, 5-6; Batchelder Decl. at 15; Venkatesan

25  Decl. at 15-16; Robertson Decl. at 16-17; Tucker Decl. at 4 (Tucker signed the motion
and related pleadings on behalf of Zemlicka). Qualcomm reiterated these arguments in

26  its Rebuttal Memorandum of Contentions of Fact and Law filed on December 4, 2006 and
signed by Mammen. Saxton Decl., Ex. JJ; Mammen Decl. at 15. On January 24, 2007,

27  after the discovery of the Raveendran emails, Qualcomm filed its Motion for Judgment
as a Matter of Law ("JMOL") asserting the same lack of participation argument. Decl.

28  of Victoria Q. Smith at 2-5; Casebeer Decl. at 7; Robertson Decl. at 19. Smith signed
the JMOL. Smith Decl. at 2.

-7-

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  required to identify its patents that reasonably may be essential to the

2  practice of the H.264 standard, including the '104 and '767 patents, and

3  to license them royalty-free or under non-discriminatory, reasonable

4  terms.  Waiver Order at 5-9.  Thus, participation in the JVT in 2002 or

5  early 2003 during the creation of the H.264 standard would have

6  prohibited Qualcomm from suing companies, including Broadcom, that

7  utilized the H.264 standard.  In a nutshell, the issue of whether

8  Qualcomm participated in the JVT in 2002 and early 2003 became crucial

9  to the instant litigation.

10  C.  **Trial and Decision Not to Produce avc_ce Emails**

11      Trial commenced on January 9, 2007, and throughout trial, Qualcomm

12  argued that it had not participated in the JVT in 2002 and early 2003

13  when the H.264 standard was being created.  In his opening statement,

14  Qualcomm's lead attorney, James Batchelder, stated:

15      Later, in May of '03, the standard is approved and published.
        And then Qualcomm, in the fall of 2003, it begins to
16      participate not in JVT because it's done.  H.264 is approved
        and published.  Qualcomm begins to participate in what are
17      called professional extensions, things that sit on top of the
        standard, additional improvements.
18

19  Waiver Order at 45; Batchelder Decl. at 15.

20      While preparing Qualcomm witness Viji Raveendran to testify at

21  trial, attorney Adam Bier discovered an August 6, 2002 email to

22  viji@qualcomm.com welcoming her to the avc_ce mailing list.  Decl. of

23  Adam Bier at 4, Ex. A.  Several days later, on January 14, 2007, Bier

24  and Raveendran searched her laptop computer using the search term

25  "avc_ce" and discovered 21 separate emails, none of which Qualcomm had

26  produced in discovery.  Id. at 7.  The email chains bore several dates

27  in November 2002 and the authors discussed various issues relating to

28  the H.264 standard.  Mammen Decl. at 16-19, Ex. 8.  While Raveendran was

-8-

05cv1958-B (BLM)

Ex. C  Pg. 101

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  not a named author or recipient, the emails were sent to all members of
2  two JVT email groups (jvt-experts and avc_ce) and Raveendran maintained
3  them on her computer for more than four years. Id. The Qualcomm trial
4  team decided not to produce these newly discovered emails to Broadcom,
5  claiming they were not responsive to Broadcom's discovery requests.
6  Bier Decl. at 7; Mammen Decl. at 18-19; Patch Decl. at 6-7; Batchelder
7  Decl. at 16. The attorneys ignored the fact that the presence of the
8  emails on Raveendran's computer undercut Qualcomm's premier argument
9  that it had not participated in the JVT in 2002. Mammen Decl. at 18-19;
10 Bier Decl. at 7; Patch Decl. at 7. The Qualcomm trial team failed to
11 conduct any investigation to determine whether there were more emails
12 that also had not been produced.

13     Four days later, during a sidebar discussion, Stanley Young argued
14 against the admission of the December 2002 avc_ce email reflector list,
15 declaring: "Actually, there are no emails -- there are no emails ...
16 there's no evidence that any email was actually sent to this list. This
17 is just a list of email ... addresses. There's no evidence of anything
18 being sent." Trial Tr. vol. VII at 91-92; Young Decl. at 25-29. None
19 of the Qualcomm attorneys who were present during the sidebar mentioned
20 the 21 avc_ce emails found on Raveendran's computer a few days earlier.
21 Id.; Batchelder Decl. at 16-17; Casebeer Decl. at 6.

22     During Raveendran's direct testimony on January 24th, attorney Lee
23 Patch pointedly did not ask her any questions that would reveal the fact
24 that she had received the 21 emails from the avc_ce mailing list;
25 instead, he asked whether she had "any knowledge of having read" any
26 emails from the avc_ce mailing list. Patch Decl. at 8-9; Trial Tr. vol.
27 VIII at 46. But on cross-examination, Broadcom asked the right question
28 and Raveendran was forced to admit that she had received emails from the

-9-

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1    avc_ce mailing list.  Trial Tr. vol. VIII at 53.  Immediately following

2    this admission, in response to Broadcom's request for the emails, and

3    despite the fact that he had participated in the decision three days

4    earlier not to produce them, Patch told the Court at sidebar:

> [I]t's not clear to me [the emails are] responsive to
> anything.  So that's something that needs to be determined
> before they would be produced ... I'm talking about whether
> they were actually requested in discovery... . I'm simply
> representing that I haven't seen [the emails], and [whether
> Broadcom requested them] hasn't been determined.

9    Order at 46; Patch Decl. at 10.  Over the lunch recess that same day,

10   Qualcomm's counsel produced the 21 emails they previously had retrieved

11   from Raveendran's email archive.  Trial Tr. vol. VIII at 114.

12        On January 26, 2007, the jury returned unanimous verdicts in favor

13   of Broadcom regarding the non-infringement of the '104 and '767 patents,

14   and in favor of Qualcomm regarding the validity and non-obviousness of

15   the same.  Doc. No. 499.  The jury also returned a unanimous advisory

16   verdict in favor of Broadcom that the '104 patent is unenforceable due

17   to inequitable conduct and the '104 and '767 patents are unenforceable

18   due to waiver.  Id. at 14.

19        On March 21, 2007, Judge Brewster found (1) in favor of Qualcomm

20   on Broadcom's inequitable conduct counterclaim regarding the '104

21   patent, and (2) in favor of Broadcom on Broadcom's waiver defense

22   regarding the '104 and '767 patents.  Doc. No. 528.  On August 6, 2007,

23   Judge Brewster issued a comprehensive order detailing the appropriate

24   remedy for Qualcomm's waiver.  Doc. No. 593.  After a thorough overview

25   of the JVT, the JVT's policies and guidelines, and Qualcomm's knowledge

26   of the JVT and evidence of Qualcomm's involvement therein, see id. at

27   5-22, Judge Brewster found:

28        by   clear   and   convincing   evidence   that   Qualcomm,   its

-10-

05cv1958-B (BLM)

Ex. C, Pg. 63

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   employees, and its witnesses actively organized and/or
2   participated in a plan to profit heavily by (1) wrongfully
    concealing the patents-in-suit while participating in the JVT
3   and then (2) actively hiding this concealment from the Court,
    the jury, and opposing counsel during the present litigation.

4   Id. at 22.   Judge Brewster further found that Qualcomm's "counsel

5   participated in an organized program of litigation misconduct and

6   concealment throughout discovery, trial, and post-trial before new

7   counsel took over lead role in the case on April 27, 2007." Id. at 32.

8   Based on "the totality of the evidence produced both before and after

9   the jury verdict," and in light of these findings, Judge Brewster

10  concluded that "Qualcomm has waived its rights to enforce the '104 and

11  '767 patents and their continuations, continuations-in-part, divisions,

12  reissues, or any other derivatives of either patent." Id. at 53.

13      Also on August 6, 2007, Judge Brewster granted Broadcom's Motion

14  for an Award of Attorneys' Fees pursuant to 35 U.S.C. § 285. Doc. No.

15  594. Judge Brewster found clear and convincing evidence that Qualcomm's

16  litigation misconduct, as set forth in his Waiver Order, see Doc. No.

17  593, justified Qualcomm's payment of all "attorneys' fees, court costs,

18  expert witness fees, travel expenses, and any other litigation costs

19  reasonably incurred by Broadcom" in the defense of this case. Doc. No.

20  594 at 4.   On December 11, 2007, Judge Brewster adopted this court's

21  recommendation and ordered Qualcomm to pay Broadcom $9,259,985.09 in

22  attorneys' fees and related costs, as well as post-judgment interest on

23  the final fee award of $8,568,633.24 at 4.91 percent accruing from

24  August 6, 2007.   Doc. Nos. 715 & 717.

25  D.  **Qualcomm's Post-Trial Misconduct**

26      Following trial, Qualcomm continued to dispute the relevancy and

27  responsiveness of the 21 Raveendran emails.   Bier Decl., Exs. B-E.

28  Qualcomm also resisted Broadcom's efforts to determine the scope of

-11-

Ex. C , Pg. 64

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   Qualcomm's discovery violation.  Id., Exs. B-F.  By letter dated

2   February 16, 2007, Bier told Broadcom "[w]e continue to believe that

3   Qualcomm performed a reasonable search of Qualcomm's documents in

4   response to Broadcom's Requests for Production and that the twenty-one

5   unsolicited emails received by Ms. Raveendran from individuals on the

6   avc_ce reflector are not responsive to any valid discovery obligation

7   or commitment."  Id., Ex. C.  In response to Broadcom's request that

8   Qualcomm conduct additional searches to determine the scope of

9   Qualcomm's discovery violation, Bier stated in a March 7, 2007 letter,

10  we "believe your negative characterization of Qualcomm's compliance with

11  its discovery obligation to be wholly without merit" but he advised that

12  Qualcomm agreed to search the current and archived emails of five trial

13  witnesses using the requested JVT, avc_ce and H.264 terms.  Id., Exs.

14  D & E.  Bier explained that Qualcomm has "not yet commenced these

15  searches, and [does] not yet know the volume of results we will obtain."

16  Id., Ex. E.  Throughout the remainder of March 2007, Bier repeatedly

17  declined to update Broadcom on Qualcomm's document search.  Id., Ex. F.

18      But, on April 9, 2007, James Batchelder and Louis Lupin, Qualcomm's

19  General Counsel, submitted correspondence to Judge Brewster in which

20  they admitted Qualcomm had thousands of relevant unproduced documents

21  and that their review of these documents "revealed facts that appear to

22  be inconsistent with certain arguments that [counsel] made on Qualcomm's

23  behalf at trial and in the equitable hearing following trial."  Saxton

24  Decl., Exs. H & I.  Batchelder further apologized "for not having

25  discovered these documents sooner and for asserting positions that

26  [they] would not have taken had [they] known of the existence of these

27  documents."  Id., Ex. H.

28  ///

05ev1958-B (BLM)

Ex. C, Pg. 165

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1    As of June 29, 2007, Qualcomm had searched the email archives of
2    twenty-one employees and located more than forty-six thousand documents
3    (totaling more than three hundred thousand pages), which had been
4    requested but not produced in discovery. Broadcom's Reply Supp. Mot.
5    for Sanctions at 1 n.2. Qualcomm continued to produce additional
6    responsive documents throughout the summer. Doc. No. 597 (Qualcomm's
7    August 7, 2007 submission of three additional avc_ce emails it had not
8    produced to Broadcom).

9                                    **DISCUSSION**

10    As summarized above, and as found by Judge Brewster, there is clear
11    and convincing evidence that Qualcomm intentionally engaged in conduct
12    designed to prevent Broadcom from learning that Qualcomm had
13    participated in the JVT during the time period when the H.264 standard
14    was being developed. To this end, Qualcomm withheld tens of thousands
15    of emails showing that it actively participated in the JVT in 2002 and
16    2003 and then utilized Broadcom's lack of access to the suppressed
17    evidence to repeatedly and falsely aver that there was "no evidence"
18    that it had participated in the JVT prior to September 2003. Qualcomm's
19    misconduct in hiding the emails and electronic documents prevented
20    Broadcom from correcting the false statements and countering the
21    misleading arguments.

22    **A.   Legal Standard**

23    The Federal Civil Rules authorize federal courts to impose
24    sanctions on parties and their attorneys who fail to comply with
25    discovery obligations and court orders. Rule 37 authorizes a party to
26    file a motion to compel an opponent to comply with a discovery request
27    or obligation when the opponent fails to do so initially. Fed. R. Civ.
28    P. 37(a). If such a motion is filed, the rule requires the court to

                                    -13-

                                                            05cv1958-B (BLM)

Ex. C , Pg. 66

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   award reasonable attorney's fees to the prevailing party unless the

2   court finds the losing party's position was "substantially justified"

3   or other circumstances make such an award unjust.  Id.  Depending upon

4   the circumstances, the court may require the attorney, the client, or

5   both to pay the awarded fees.  Id.  If the court grants a discovery

6   motion and the losing party fails to comply with the order, the court

7   may impose additional sanctions against the party.  Fed. R. Civ. P.

8   37(b).  There is no requirement under this rule that the failure be

9   willful or reckless; "sanctions may be imposed even for negligent

10  failures to provide discovery." Fielstad v. Am. Honda Motor Co., Inc.,

11  762 F.2d 1334, 1343 (9th Cir. 1985).

12      The Federal Rules also provide for sanctions against individual

13  attorneys who are remiss in complying with their discovery obligations:

14      [e]very discovery request, response or objection made by a
        party ... shall be signed by at least one attorney [and]
15      [t]he signature of the attorney ... constitutes a
        certification that to the best of the signer's knowledge,
16      information, and belief, *formed after a reasonable inquiry*,
        the request, response, or objection is: consistent with the
17      rules and law, not interposed for an improper purpose, and
        not unreasonable or unduly burdensome or expensive.
18

19  Fed. R. Civ. P. 26(g)(2) (emphasis added).  "[W]hat is reasonable is a

20  matter for the court to decide on the totality of the circumstances."

21  Fed. R. Civ. P. 26 Advisory Committee Notes (1983 Amendment).  The

22  Committee explained that:

23      Rule 26(g) imposes an affirmative duty to engage in pretrial
        discovery in a responsible manner that is consistent with the
24      spirit and purposes of Rules 26 through 37.  In addition,
        Rule 26(g) is designed to curb discovery abuse by explicitly
25      encouraging the imposition of sanctions.  This subdivision
        provides a deterrent to both excessive discovery and evasion
26      by imposing a certification requirement that obliges each
        attorney to stop and think about the legitimacy of a
27      discovery request, a response thereto, or an objection.  The
        term "response" includes answers to interrogatories and to
28      requests to admit as well as responses to production
        requests.  [¶] If primary responsibility for conducting

-14-

05cv1958-B (BLM)

Ex. C, Pg. 67

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  discovery is to continue to rest with the litigants, they
2  must be obliged to act responsibly and avoid abuse. With
   this in mind, Rule 26(g), which parallels the amendments to
3  Rule 11, requires an attorney ... to sign each discovery
   request, response, or objection.

4  _Id._ If an attorney makes an incorrect certification without substantial

5  justification, the court must sanction the attorney, party, or both and

6  the sanction may include an award of reasonable attorney's fees. Fed.

7  R. Civ. P. 26(g)(3). If a party, without substantial justification,

8  fails "to amend a prior response to discovery as required by Rule

9  26(e)(2)," the court may prevent that party from using that evidence at

10 trial or at a hearing and impose other appropriate sanctions, including

11 the payment of attorney's fees. Fed. R. Civ. P. 37(c)(1). As the

12 Supreme Court confirmed, Rule 26(g), like Rule 11, requires that the

13 court impose "an appropriate sanction" on the attorney; in other words,

14 one which is commensurate with the discovery harm. _See_ Fed. R. Civ. P.

15 26(g)(3); _Chambers v. NASCO, Inc._, 501 U.S. 32, 51 (1991).

16      In addition to this rule-based authority, federal courts have the

17 inherent power to sanction litigants to prevent abuse of the judicial

18 process. _See_ _Chambers_, 501 U.S. at 44-46. All "federal courts are

19 vested with inherent powers enabling them to manage their cases and

20 courtrooms effectively and to ensure obedience to their orders.... As

21 a function of this power, courts can dismiss cases in their entirety,

22 bar witnesses, award attorney's fees and assess fines." _Aloe Vera of_

23 _Am., Inc. v. United States_, 376 F.3d 960, 964-65 (9th Cir. 2004)

24 (citation omitted). Sanctions are appropriate in response to "willful

25 disobedience of a court order ... or when the losing party has acted in

26 bad faith, vexatiously, wantonly, or for oppressive reasons." _Fink v._

27 _Gomez_, 239 F.3d 989, 991 (9th Cir. 2001). When a court order is

28 violated, a district court considering the imposition of sanctions must

05cv1958-B (BLM)

Ex. _C_, Pg. _68_

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  also examine the risk of prejudice to the complying party and the

2  availability of less drastic sanctions. See Commodity Futures Trading

3  Comm'n v. Noble Metals, 67 F.3d 766, 771 (9th Cir. 1995).

4      Regardless of whether sanctions are imposed under the Federal Rules

5  or pursuant to a court's inherent power, the decision to impose

6  sanctions lies within the sound discretion of the court. See Lasar v.

7  Ford Motor Co., 399 F.3d 1101, 1109-14 (9th Cir. 2005) (reviewing

8  sanctions imposed under the court's inherent power); Payne v. Exxon

9  Corp., 121 F.3d 503, 510 (9th Cir. 1997) (upholding sanctions imposed

10  under the Federal Rules).

11  B.  __Broadcom Did Not File a Motion to Compel Discovery__

12      As summarized above, Broadcom served interrogatories and requested

13  documents relating to Qualcomm's participation in the JVT. Qualcomm

14  responded that "Qualcomm will produce non-privileged relevant and

15  responsive documents describing QUALCOMM's participation in the JVT, if

16  any, which can be located after a reasonable search." Doc. No. 543-3,

17  Ex. X (Qualcomm's Response to Broadcom's Request for Production No. 93).

18  Qualcomm also committed to producing "responsive non-privileged

19  documents that were given to or received from standards-setting body

20  responsible for the [H.264] standard, and which concern any Qualcomm

21  participation in setting the [H.264] standard." Mammen Decl. at 7-8.

22      Despite these responses, Qualcomm did not produce over 46,000

23  responsive documents, many of which directly contradict the non-

24  participation argument that Qualcomm repeatedly made to the court and

25  jury. Because Qualcomm agreed to produce the documents and answered the

26  interrogatories (even though falsely), Broadcom had no reason to file

27  ///

28  ///

-16-

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  a motion to compel.[4]  And, because Broadcom did not file a motion to

2  compel, Broadcom's possible remedies are restricted.  If Broadcom had

3  filed a motion to compel, it could have obtained sanctions against

4  Qualcomm and its attorneys.  Fed. R. Civ. P. 37(a) & (b).  Because

5  Broadcom did not file a motion to compel, it may only seek Rule 37

6  sanctions against Qualcomm.  Fed. R. Civ. P. 37(c).  Thus, Qualcomm's

7  suppression of documents placed its retained attorneys in a better legal

8  position than they would have been in if Qualcomm had refused to produce

9  the documents and Broadcom had filed a motion to compel.

10      This dilemma highlights another problem with Qualcomm's conduct in

11  this case.  The Federal Rules of Civil Procedure require parties to

12  respond to discovery in good faith; the rules do not require or

13  anticipate judicial involvement unless or until an actual dispute is

14  discovered.  As the Advisory Committee explained, "[i]f primary

15  responsibility for conducting discovery is to continue to rest with the

16  litigants, they must be obliged to act responsibly and avoid abuse."

17  Fed. R. Civ. P. 26(g) Advisory Committee Notes (1983 Amendment).  The

18  Committee's concerns are heightened in this age of electronic discovery

19  when attorneys may not physically touch and read every document within

20  the client's custody and control.  For the current "good faith"

21  discovery system to function in the electronic age, attorneys and

22

23  ────────────

    [4]     Qualcomm attempts to capitalize on this failure, arguing "Broadcom never
24  raised any concern regarding the scope of documents Qualcomm agreed to produce in
    response to Request No. 50, and never filed a motion to compel concerning this request.
25  Accordingly, there is no order compelling Qualcomm to respond more fully to it."
    Mammen Decl. at 9.  Qualcomm made the same argument with regard to its other discovery
26  responses.  Id. at 9-11; see also Bier Decl., Ex. C.  This argument is indicative of
    the gamesmanship Qualcomm engaged in throughout this litigation.  Why should Broadcom
27  file a motion to compel when Qualcomm agreed to produce the documents?  What would the
    court have compelled: Qualcomm to do what it already said it would do?  Should all
28  parties file motions to compel to preserve their rights in case the other side hides
    documents?

                                        -17-

Ex. C , Pg. 70

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  clients must work together to ensure that both understand how and where
2  electronic documents, records and emails are maintained and to determine
3  how best to locate, review, and produce responsive documents.  Attorneys
4  must take responsibility for ensuring that their clients conduct a
5  comprehensive and appropriate document search.  Producing 1.2 million
6  pages of marginally relevant documents while hiding 46,000 critically
7  important ones does not constitute good faith and does not satisfy
8  either the client's or attorney's discovery obligations.  Similarly,
9  agreeing to produce certain categories of documents and then not
10 producing all of the documents that fit within such a category is
11 unacceptable.  Qualcomm's conduct warrants sanctions.

12  C.   **Sanctions**

13       The Court's review of Qualcomm's declarations, the attorneys'
14  declarations, and Judge Brewster's orders leads this Court to the
15  inevitable conclusion that Qualcomm intentionally withheld tens of
16  thousands of decisive documents from its opponent in an effort to win
17  this case and gain a strategic business advantage over Broadcom.
18  Qualcomm could not have achieved this goal without some type of
19  assistance or deliberate ignorance from its retained attorneys.
20  Accordingly, the Court concludes it must sanction both Qualcomm and some
21  of its retained attorneys.[5]

22
23       [5]   The Court is limited in its review and analysis of the debacle that
24  occurred in this litigation because Judge Brewster only referred the discovery
    violation to this Court.  Doc. No. 494 ("Dft's Oral Motion [489] for Sanctions re
    Production of Documents re Witness Viji Raveendran - made and submitted on 01-24-07 -
25  Referred to the Magistrate Judge").  Judge Brewster did not refer any sanction motions
    relating to false statements made to the trial judge or in pleadings resolved by the
26  trial judge.  Id.  Accordingly, this Court is limited in its review, analysis, and
    conclusion to discovery violations and applicable discovery rules and remedies.  See
27  Fed. R. Civ. P. 11(d) (Rule 11 does "not apply to disclosures and discovery requests,
    responses, objections, and motions").
28

-18-

05cv1958-B (BLM)

Ex. C, Pg. 71

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

### 1.   Misconduct by Qualcomm

Qualcomm violated its discovery obligations by failing to produce more than 46,000 emails and documents that were requested in discovery and that Qualcomm agreed to produce.  See Fed. R. Civ. P. 26(g) Advisory Committee Notes (1983 Amendment) ("Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37).  Rule 37 dictates that "[a] party that without substantial justification fails to ... amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use" the suppressed evidence in court proceedings.  Fed. R. Civ. P. 37(c)(1).  The court also may impose other appropriate sanctions, including the imposition of reasonable attorneys' fees.  Id.

Qualcomm has not established "substantial justification" for its failure to produce the documents.  In fact, Qualcomm has not presented any evidence attempting to explain or justify its failure to produce the documents.  Despite the fact that it maintains detailed records showing whose computers were searched and which search terms were used (Glathe Decl. at 3 (identifying the individuals whose computers were not searched for specific types of documents)), Qualcomm has not presented any evidence establishing that it searched for pre-September 2003 JVT, avc_ce, or H.264 records or emails on its computer system or email databases.  Qualcomm also has not established that it searched the computers or email databases of the individuals who testified on Qualcomm's behalf at trial or in depositions as Qualcomm's most knowledgeable corporate witnesses; in fact, it indicates that it did not conduct any such search.  Id.; Irvine Decl. at 2; Ludwin Decl. at 3; Decl. of Viji Raveendran at 1, 4.  The fact that Qualcomm did not

-19-

05cv1958-B (BLM)

Ex. C , Pg. 72

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  perform these basic searches at any time before the completion of trial

2  indicates that Qualcomm intentionally withheld the documents.  This

3  conclusion is bolstered by the fact that when Qualcomm "discovered" the

4  21 Raveendran emails, it did not produce them and did not engage in any

5  type of review to determine whether there were additional relevant,

6  responsive, and unproduced documents.  Bier Decl. at 7; Mammen Decl. at

7  16-18; Patch Decl. at 5-7. The conclusion is further supported by the

8  fact that after trial Qualcomm did not conduct an internal investigation

9  to determine if there were additional unproduced documents (Bier Decl.,

10  Ex. E (Qualcomm still had not searched as of March 7, 2007)); but,

11  rather, spent its time opposing Broadcom's efforts to force such a

12  search and insisting, without any factual basis, that Qualcomm's search

13  was reasonable.  Id. at 10-11, Exs. B-F; Patch Decl. at 11-14.

14      Qualcomm's claim that it inadvertently failed to find and produce

15  these documents also is negated by the massive volume and direct

16  relevance of the hidden documents.  As Judge Brewster noted, it is

17  inexplicable that Qualcomm was able to locate the post-September 2003

18  JVT documents that either supported, or did not harm, Qualcomm's

19  arguments but were unable to locate the pre-September 2003 JVT documents

20  that hurt its arguments.  Waiver Order at 38.  Similarly, the

21  inadvertence argument is undercut by Qualcomm's ability to easily locate

22  the suppressed documents using fundamental JVT and avc search terms when

23  forced to do so by Broadcom's threat to return to court.  See October

24  12, 2007 Hearing Transcript at 192.  Finally, the inadvertence argument

25  also is belied by the number of Qualcomm employees and consultants who

26  received the emails, attended the JVT meetings, and otherwise knew about

27  the information set forth in the undisclosed emails.  Waiver Order at

28  10-12, 21-32.  It is inconceivable that Qualcomm was unaware of its

-20-

05cv1958-B (BLM)

Ex. C, Pg. 73
Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  involvement in the JVT and of the existence of these documents.

2      Assuming *arguendo*, that Qualcomm did not know about the suppressed

3  emails, Qualcomm failed to heed several warning signs that should have

4  alerted it to the fact that its document search and production were

5  inadequate. The first significant concern should have been raised in

6  connection with the Rule 30(b)(6) depositions of Christine Irvine and

7  Scott Ludwin. Both individuals testified as the Qualcomm employee most

8  knowledgeable about Qualcomm's involvement in the JVT. But, Qualcomm

9  did not search either person's computer for JVT documents, did not

10  provide either person with relevant JVT documents to review, and did not

11  make any other efforts to ensure each person was in fact knowledgeable

12  about Qualcomm's JVT involvement. Irvine Decl. at 2; Ludwin Decl. at

13  3; Glathe Decl. at 3. These omissions are especially incriminating

14  because many of the suppressed emails were to or from Irvine. Waiver

15  Order at 10-12, 25-26. If a witness is testifying as an organization's

16  most knowledgeable person on a specific subject, the organization has

17  an obligation to conduct a reasonable investigation and review to ensure

18  that the witness does possess the organization's knowledge.[6] Fed. R.

19  Civ. P. 30(b)(6); In re JDS Uniphase Corp. Sec. Litig., 2007 WL 219857,

20  *1 (N.D. Cal. 2007) (the corporation "must prepare the designee to the

21

22      [6] Qualcomm's self-serving statements that "outside counsel selects ... the
23  custodians whose documents should be searched" and the paralegal does not decide "what
witnesses to designate to testify on behalf of the company" (Glathe Decl. at 1) does
24  not relieve Qualcomm of its obligations. Qualcomm has not presented any evidence
establishing what actions, if any, it took to ensure it designated the correct
25  employee, performed the correct computer searches, and presented the designated
employee with sufficient information to testify as the corporation's most knowledgeable
26  person. Qualcomm also has not presented any evidence that outside counsel knew enough
about Qualcomm's organization and operation to identify all of the individuals whose
27  computers should be searched and determine the most knowledgeable witness. And, more
importantly, Qualcomm is a large corporation with an extensive legal staff; it clearly
28  had the ability to identify the correct witnesses and determine the correct computers
to search and search terms to use. Qualcomm just lacked the desire to do so.

-21-

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  extent matters are reasonably available, whether from documents, past

2  employees, or other sources") (internal citation omitted); 1 Discovery

3  Proceedings in Federal Court § 8.6 (3rd ed. 2007) ("[a] party responding

4  to a request for a deposition of a corporate representative to testify

5  on behalf of the corporation must make a good-faith endeavor to

6  designate the persons having knowledge of the matters sought by the

7  interrogator and to prepare those persons in order that they can answer

8  fully, completely, and unevasively, the questions posed by the

9  interrogator as to the relevant subject matters").   An adequate

10  investigation should include an analysis of the sufficiency of the

11  document search and, when electronic documents are involved, an analysis

12  of the sufficiency of the search terms and locations.   In the instant

13  case, a reasonable inquiry should have included using the JVT, avc and

14  H.264 search terms and searching the computers of Raveendran, Irvine,

15  Ludwin (and other Qualcomm employees identified in the emails discovered

16  on the computers of these witnesses).  This minimal inquiry would have

17  revealed the existence of the suppressed documents.  Moreover, the fact

18  that Broadcom alleged, and Qualcomm agreed or acquiesced, that Irvine

19  was not sufficiently knowledgeable about Qualcomm's JVT involvement or

20  adequately prepared for her deposition, should also have alerted

21  Qualcomm to the inadequacy of its document search and production.

22     Another ignored warning flag was the December 2002 avc_ce email

23  reflector containing Raveendran's email address. Broadcom utilized this

24  document in several ways to argue that Qualcomm was involved in the JVT

25  prior to September 2003.  Patch Decl. at 19-20 (document was shown to

26  Ludwin during his deposition); Leung Decl. at 8; Robertson Decl. at 14

27  (document attached to Broadcom's opposition to Qualcomm's MSA).  Even

28  though this document indicated that in December 2002, a Qualcomm

-22-

Ex. C , Pg. 75

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  employee was a member of the avc_ce email group, which related to the

2  JVT and the development of the H.264 standard, there is no evidence that

3  its presence triggered a search by Qualcomm for "avc_ce," "JVT," or any

4  other relevant term on Raveendran's computer or any other Qualcomm

5  database. Again, if Qualcomm had performed this search, it would have

6  located the suppressed emails. The fact that Qualcomm chose not to

7  investigate this document supports the conclusion that Qualcomm

8  intentionally withheld the 46,000 emails. This conclusion is reinforced

9  by the fact that, without any investigation, Qualcomm repeatedly tried

10  to discredit the document and Broadcom's reliance on it. Waiver Order

11  at 45; Young Decl. at 25-29.

12      Qualcomm had the ability to identify its employees and consultants

13  who were involved in the JVT, to access and review their computers,

14  databases and emails, to talk with the involved employees and to refresh

15  their recollections if necessary, to ensure that those testifying about

16  the corporation's knowledge were sufficiently prepared and testified

17  accurately, and to produce in good faith all relevant and requested

18  discovery. See Nat'l Assoc. of Radiation Survivors v. Turnage, 115

19  F.R.D. 543, 557-58 (N.D. Cal. 1987) (holding in case where sanctions

20  imposed for withholding of documents that "a reasonable inquiry into the

21  factual basis of its discovery responses as well as the factual basis

22  of subsequent pleadings, papers, and motions based on those responses

23  ... would have required, at a minimum, a reasonable procedure to

24  distribute discovery requests to all employees and agents of the

25  defendant potentially possessing responsive information, and to account

26  for the collection and subsequent production of the information"). 

27  Qualcomm chose not to do so and therefore must be sanctioned.

28  ///

05cv1958-B (BLM)

Ex. C , Pg. 76

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

### 2.   Attorneys' Misconduct

The next question is what, if any, role did Qualcomm's retained lawyers play in withholding the documents?  The Court envisions four scenarios.  First, Qualcomm intentionally hid the documents from its retained lawyers and did so so effectively that the lawyers did not know or suspect that the suppressed documents existed.  Second, the retained lawyers failed to discover the intentionally hidden documents or suspect their existence due to their complete ineptitude and disorganization. Third, Qualcomm shared the damaging documents with its retained lawyers (or at least some of them) and the knowledgeable lawyers worked with Qualcomm to hide the documents and all evidence of Qualcomm's early involvement in the JVT.  Or, fourth, while Qualcomm did not tell the retained lawyers about the damaging documents and evidence, the lawyers suspected there was additional evidence or information but chose to ignore the evidence and warning signs and accept Qualcomm's incredible assertions regarding the adequacy of the document search and witness investigation.

Given  the  impressive  education  and  extensive  experience  of Qualcomm's retained lawyers (see exhibit A[7]), the Court rejects the first  and  second  possibilities.   It  is  inconceivable  that  these talented,  well-educated,  and  experienced  lawyers  failed  to  discover through their interactions with Qualcomm any facts or issues that caused (or should have caused) them to question the sufficiency of Qualcomm's

---

[7]   Additional information regarding each attorney's role and involvement in this litigation is set forth in his or her declaration and summarized in Exhibit A to this Order. To address the attorneys' Due Process concerns arising from Qualcomm's self-serving and misleading declarations (Doc. No. 704), the Court will not consider the Qualcomm declarations (Glathe, Raveendran, Irvine and Ludwin) in evaluating the conduct of Qualcomm's retained counsel.

05cv1958-B (BLM)

Ex. C, Pg. 77
Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  document search and production:  Qualcomm did not fail to produce a

2  document or two; it withheld over 46,000 critical documents that

3  extinguished Qualcomm's primary argument of non-participation in the

4  JVT.   In addition, the suppressed documents did not belong to one

5  employee, or a couple of employees who had since left the company; they

6  belonged to (or were shared with) numerous, current Qualcomm employees,

7  several of whom testified (falsely) at trial and in depositions.  Given

8  the volume and importance of the withheld documents, the number of

9  involved Qualcomm employees, and the numerous warning flags, the Court

10 finds it unbelievable that the retained attorneys did not know or

11 suspect that Qualcomm had not conducted an adequate search for

12 documents.

13     The Court finds no direct evidence establishing option three.

14 Neither party nor the attorneys have presented evidence that Qualcomm

15 told one or more of its retained attorneys about the damaging emails or

16 that an attorney learned about the emails and that the knowledgeable

17 attorney(s) then helped Qualcomm hide the emails.  While knowledge may

18 be inferred from the attorneys' conduct, evidence on this issue is

19 limited due to Qualcomm's assertion of the attorney-client privilege.[*]

20

21 _____

22      [*]   Qualcomm asserted the attorney-client privilege and decreed that its
   retained attorneys could not reveal any communications protected by the privilege.

23 Doc. No. 659; October 12, 2007 Hearing Transcript at 38.  Several attorneys complained
   that the assertion of the privilege prevented them from providing additional

24 information regarding their conduct.  See, e.g., Young Decl. at 12; Leung Decl. at 3-5;
   Robertson Decl. at 14-16.  This concern was heightened when Qualcomm submitted its

25 self-serving declarations describing the failings of its retained lawyers.  Doc. No.
   704. Recognizing that a client has a right to maintain this privilege and that no

26 adverse inference should be made based upon the assertion, the Court accepted
   Qualcomm's assertion of the privilege and has not drawn any adverse inferences from it.

27 October 12, 2007 Hearing Transcript at 4-5.  However, the fact remains that the Court
   does not have access to all of the information necessary to reach an informed decision

28 regarding the actual knowledge of the attorneys.  As a result, the Court concludes for
   purposes of this Order that there is insufficient evidence establishing option three.

Ex. C , Pg. 78

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   Thus, the Court finds it likely that some variation of option four
2   occurred; that is, one or more of the retained lawyers chose not to look
3   in the correct locations for the correct documents, to accept the
4   unsubstantiated assurances of an important client that its search was
5   sufficient, to ignore the warning signs that the document search and
6   production were inadequate, not to press Qualcomm employees for the
7   truth, and/or to encourage employees to provide the information (or lack
8   of information) that Qualcomm needed to assert its non-participation
9   argument and to succeed in this lawsuit.  These choices enabled Qualcomm
10  to withhold hundreds of thousands of pages of relevant discovery and to
11  assert numerous false and misleading arguments to the court and jury.
12  This conduct warrants the imposition of sanctions.[9]

13          a.   __Identity of Sanctioned Attorneys__

14      The Court finds that each of the following attorneys contributed
15  to Qualcomm's  monumental  discovery  violation  and  is  personally

16

---

17       [9]    The applicable discovery rules do not adequately address the attorneys'
18  misconduct in this case.  Rule 26(g) only imposes liability upon the attorney who
    signed the discovery request or response.  Fed. R. Civ. P. 26(g).  Similarly, Rule
19  37(a) authorizes sanctions against a party or attorney only if a motion to compel is
    filed; Rule 37(b) authorizes sanctions against a party or an attorney if the party
20  fails to comply with a discovery order; and, Rule 37(c) only imposes liability upon a
    party for the party's failure to comply with various discovery obligations.  Fed. R.
21  Civ. P. 37.  Under a strict interpretation of these rules, the only attorney who would
    be responsible for the discovery failure is Kevin Leung because he signed the false
22  discovery responses.  Doc. No. 543-3, Exs. W, X & Y; Robertson Decl., Ex. 2.  However,
    the Court believes the federal rules impose a duty of good faith and reasonable inquiry
23  on all attorneys involved in litigation who rely on discovery responses executed by
    another attorney.  _See_ Fed. R. Civ. P. 26 Advisory Committee Notes (1983 Amendment)
24  (Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a
    responsible manner that is consistent with the spirit and purposes of Rules 26 through
25  37); Fed. R. Civ. P. 11 (by signing, filing, submitting or advocating a pleading, an
    attorney is certifying that the allegations have factual, evidentiary support).
26  Attorneys may not utilize inadequate or misleading discovery responses to present false
    and unsupported legal arguments and sanctions are warranted for those who do so.  _Id._
27  The facts of this case also justify the imposition of sanctions against these attorneys
    pursuant to the Court's inherent power.  _See_ _Pink_, 239 F.3d at 993-94 ("an attorney's
28  reckless misstatements of law and fact, when coupled with an improper purpose ... are
    sanctionable under a court's inherent power").

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   responsible:   James Batchelder, Adam Bier, Kevin Leung, Christopher

2   Mammen, Lee Patch, and Stanley Young ("Sanctioned Attorneys").

3        Attorneys Leung, Mammen and Batchelder are responsible for the

4   initial discovery failure because they handled or supervised Qualcomm's

5   discovery responses and production of documents.   The Federal Rules

6   impose an affirmative duty upon lawyers to engage in discovery in a

7   responsible manner and to conduct a "reasonable inquiry" to determine

8   whether discovery responses are sufficient and proper.   Fed. R. Civ. P.

9   26(g); Fed. R. Civ. P. 26 Advisory Committee Notes (1983 Amendment).

10  In the instant case, a reasonable inquiry should have included searches

11  using fundamental terms such as JVT, avc_ce or H.264, on the computers

12  belonging to knowledgeable people such as Raveendran, Irvine and Ludwin.

13  As the post-trial investigation confirmed, such a reasonable search

14  would have revealed the suppressed documents.   Had Leung, Mammen,

15  Batchelder, or any of the other attorneys insisted on reviewing

16  Qualcomm's records regarding the locations searched and terms utilized,

17  they would have discovered the inadequacy of the search and the

18  suppressed documents.[10]   Similarly, Leung's difficulties with the Rule

19

20       [10]   Leung's attorney represented during the OSC hearing that Leung requested
     a more thorough document search but that Qualcomm refused to do so.   October 12, 2007
21   Hearing Transcript at 14-15.  If Leung was unable to get Qualcomm to conduct the type
     of search he deemed necessary to verify the adequacy of the document search and
22   production, then he should have obtained the assistance of supervising or senior
     attorneys.  If Mammen and Batchelder were unable to get Qualcomm to conduct a competent
23   and thorough document search, they should have withdrawn from the case or taken other
     action to ensure production of the evidence.  See The State Bar of California, Rules
24   of Professional Conduct, Rule 5-220 (a lawyer shall not suppress evidence that the
     lawyer or the lawyer's client has a legal obligation to reveal); Rule 3-700 (a lawyer
25   shall withdraw from employment if the lawyer knows or should know that continued
     employment will result in a violation of these rules or the client insists that the
26   lawyer pursue a course of conduct prohibited under these rules).  Attorneys' ethical
     obligations do not permit them to participate in an inadequate document search and then
27   provide misleading and incomplete information to their opponents and false arguments
     to the court.  Id.; Rule 5-200 (a lawyer shall not seek to mislead the judge or jury
28   by a false statement of fact or law); see also, In re Marriage of Gong and Kwong, 157

-27-

Ex. C , Pg. 80

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   30(b)(6) witnesses, Irvine and Ludwin, should have alerted him (and the

2   supervising or senior attorneys) to the inadequacy of Qualcomm's

3   document production and to the fact that they needed to review whose

4   computers and databases had been searched and for what. Accordingly,

5   the Court finds that the totality of the circumstances establish that

6   Leung, Mammen and Batchelder did not make a reasonable inquiry into

7   Qualcomm's discovery search and production and their conduct contributed

8   to the discovery violation.

9       Attorneys Bier, Mammen and Patch are responsible for the discovery

10  violation because they also did not perform a reasonable inquiry to

11  determine whether Qualcomm had complied with its discovery obligations.

12  When Bier reviewed the August 6, 2002 email welcoming Raveendran to the

13  avc_ce email group, he knew or should have known that it contradicted

14  Qualcomm's trial arguments and he had an obligation to verify that it

15  had been produced in discovery or to immediately produce it. If Bier,

16  as a junior lawyer, lacked the experience to recognize the significance

17  of the document, then a more senior or knowledgeable attorney should

18  have assisted him. To the extent that Patch was supervising Bier in

19  this endeavor, Patch certainly knew or should have recognized the

20  importance of the document from his involvement in Qualcomm's motion

21  practice and trial strategy sessions.

22      Similarly, when Bier found the 21 emails on Raveendran's computer

23  that had not been produced in discovery, he took the appropriate action

24  and informed his supervisors, Mammen and Patch. Bier Decl. at 7. Patch

25  discussed the discovery and production issue with Young and Batchelder.

26  _____

27  Cal. App. 4th 939, 951 (1st Dist. 2007) ("[a]n attorney in a civil case is not a hired
    gun required to carry out every direction given by the client;" he must act like the
28  professional he is).

-28-

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  Patch Decl. at 6-7.  While all of these attorneys assert that there was
2  a plausible argument that Broadcom did not request these documents, only
3  Bier and Mammen actually read the emails.  Patch Decl. at 6-7;
4  Batchelder Decl. at 16.  Moreover, all of the attorneys missed the
5  critical inquiry:  was Qualcomm's document search adequate? If these 21
6  emails were not discovered during Qualcomm's document search, how many
7  more might exist?  The answer, obviously, was tens of thousands.  If
8  Bier, Mammen, Patch, Young or Batchelder had conducted a reasonable
9  inquiry after the discovery of the 21 Raveendran emails, they would have
10 discovered the inadequacy of Qualcomm's search and the suppressed
11 documents.  And, these experienced attorneys should have realized that
12 the presence on Raveendran's computer of 21 JVT/avc_ce emails from 2002
13 contradicted Qualcomm's numerous arguments that it had not participated
14 in the JVT during that same time period.  This fact, alone, should have
15 prompted the attorneys to immediately produce the emails and to conduct
16 a comprehensive document search.

17      Finally, attorneys Young, Patch, and Batchelder bear responsibility
18 for the discovery failure because they did not conduct a reasonable
19 inquiry into Qualcomm's discovery production before making specific
20 factual and legal arguments to the court.  Young decided that Qualcomm
21 should file a motion for summary adjudication premised on the fact that
22 Qualcomm had not participated in the JVT until after the H.264 standard
23 was adopted in May 2003.  Given that non-participation was vital to the
24 motion, Young had a duty to conduct a reasonable inquiry into whether
25 that fact was true.  And, again, had Young conducted such a search, he
26 would have discovered the inadequacy of Qualcomm's document search and
27 production and learned that his argument was false.  Similarly, Young
28 had a duty to conduct a reasonable inquiry into the accuracy of his

-29-

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1    statement before affirmatively telling the court that no emails were

2    sent to Raveendran from the avc_ce email group.[11]   Young also did not

3    conduct a reasonable (or any) inquiry during the following days before

4    he approved the factually incorrect JMOL.[12]  A reasonable investigation

5    would have prevented the false filing.

6          Patch was an integral part of the trial team—familiar with

7    Qualcomm's arguments, theories and strategies.  He knew on January 14th

8    that 21 avc_ce emails had been discovered on Raveendran's computer.

9    Without reading or reviewing the emails, Patch participated in the

10   decision not to produce them.   Several days later, Patch carefully

11   tailored his questions to ensure that Raveendran did not testify about

12   the unproduced emails.   And, after Broadcom stumbled into the email

13   testimony, Patch affirmatively misled the Court by claiming that he did

14   not know whether the emails were responsive to Broadcom's discovery

15   requests.   This conduct is unacceptable and, considering the totality

16   of the circumstances, it is unrealistic to think that Patch did not know

17   or believe that Qualcomm's document search was inadequate and that

18   Qualcomm possessed numerous, similar and unproduced documents.

19

20   _____

21   [11]     Patch claims that he told Young about the 21 Raveendran emails, but Young
     denies it.  Under either scenario, however, Young had a duty to conduct a reasonable
22   investigation before making that affirmative statement to the court.  Sadly, Young did
     not conduct any investigation; he merely assumed that others had conducted an adequate
23   investigation.

24   [12]     While the Court recognizes that the Day Casebeer attorneys were primarily
     responsible for discovery in this case, the Heller Ehrman attorneys took on the task
25   of preparing witnesses and briefing regarding the JVT and, thus, were in a position to
     evaluate during this process whether the underlying discovery upon which they relied
26   was adequate.  Young, unlike Venkatesan and Robertson, was the primary liaison with Day
     Casebeer and also was privy to the evolving theories of the case.  As such, he was made
27   aware of some of the red flags such as the discovery of the JVT emails on Raveendran's
     computer and was in the best position both to understand their significance and to
28   communicate any concerns to the Day Casebeer attorneys or Qualcomm in-house counsel.

-30-

Ex. C, Pg. 83
Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   Batchelder also is responsible because he was the lead trial

2   attorney and, as such, he was most familiar with Qualcomm's important

3   arguments and witnesses.  Batchelder stated in his opening statement

4   that Qualcomm had not participated in the JVT before late 2003. Despite

5   this statement and his complete knowledge of Qualcomm's legal theories,

6   Batchelder did not take any action when he was informed that JVT

7   documents that Qualcomm had not produced in discovery were found on

8   Raveendran's computer.  He did not read the emails, ask about their

9   substance, nor inquire as to why they were not located during discovery.

10  And, he stood mute when four days later, Young falsely stated that no

11  emails had been sent to Raveendran from the avc_ce email group.

12  Finally, all of the pleadings containing the lie that Qualcomm had not

13  participated in the JVT in 2002 or early 2003 were sent to Batchelder

14  for review and he approved or ignored all of them. [13]  The totality of

15  the circumstances, including all of the previously-discussed warning

16  signs, demanded that Batchelder conduct an investigation to verify the

17  adequacy of Qualcomm's document search and production.  His failure to

18  do so enabled Qualcomm to withhold the documents.

19      For all of these reasons, the Court finds that these attorneys did

20  not conduct a reasonable inquiry into the adequacy of Qualcomm's

21  document search and production and, accordingly, they are responsible,

22  along with Qualcomm, for the monumental discovery violation.

23  ///

24  ///

25

26  _____

27  [13]    Several declarations state or imply that senior lawyers failed to review
    or comment on pleadings prepared by junior lawyers and sent to them prior to filing.
    If this is true, it constitutes additional evidence that the senior lawyers turned a
28  blind eye to Qualcomm's discovery failures.

-31-

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

b.   <u>Identity of Non-Sanctioned Attorneys</u>

Based upon the Court's review of the submitted declarations (see Exhibit A), the Court finds that the following attorneys do not bear any individual responsibility for the discovery violation and, on that basis, declines to sanction them:  Ruchika Agrawal, Howard Loo, William Nelson, Ryan Scher, Bradley Waugh, David Kleinfeld, Barry Tucker, Heidi Gutierrez, Victoria Smith, Roy Zemlicka, Craig Casebeer, Jaideep Venkatesan, and Kyle Robertson.

The Court declines to sanction attorneys Agrawal, Loo, Nelson, Scher, Waugh and Guiterrez because they did not significantly participate in the preparation or prosecution of the instant case or primarily participated in aspects of the case unrelated to those at issue in this Order and Judge Brewster's Waiver Order and Exceptional Case Order.  <u>See</u> Exhibit A.

The Court also declines to sanction Heller Ehrman attorneys Kleinfeld and Tucker.  These attorneys primarily monitored the instant case for its impact on separate Qualcomm/Broadcom litigation.  However, for logistical reasons, both attorneys signed as local counsel pleadings that contained false statements relating to Qulacomm's non-participation in the JVT.  Given the facts of this case as set forth above and in the declarations, the limitations provided by the referral, and the totality of the circumstances, the Court finds that it was reasonable for these attorneys to sign the pleadings, relying on the work of other attorneys more actively involved in the litigation.[14]

---

[14]    The Court is declining to sanction these attorneys for their role in signing and filing false pleadings, but the Court notes that sanctioning local counsel for such conduct is possible and may be imposed in another case under different circumstances.  Attorneys must remember that they are required to conduct a reasonable inquiry into the accuracy of the pleadings prior to signing, filing or arguing them.

-32-

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   While a closer call, the Court also declines to sanction Day

2   Casebeer attorneys Casebeer, Smith and Zemlicka. Unlike the Sanctioned

3   Attorneys, Casebeer did not begin working on this case until after

4   discovery had closed and he did not learn about the Raveendran emails

5   until after she testified at trial. Thus, he would not have been privy

6   to any of the red flags, which should have alerted the Sanctioned

7   Attorneys to the fact that significant discovery gaps existed and

8   further investigation was necessary.

9   Smith and Zemlicka prepared and signed pleadings containing false

10  statements about Qualcomm's non-participation in the JVT. While they

11  did more substantive work on the false motions than Kleinfeld and

12  Tucker, all four relied on work conducted by other lawyers who were more

13  involved in the discovery and litigation. In addition, Smith and

14  Zemlicka worked under the direction of Casebeer who told them to rely

15  on and conform the motion to the discussion of facts set forth in

16  Qualcomm's MSA.[15] Although the Court questions the reasonableness of

17  the attorneys' decision to rely on the MSA without conducting any

18  independent investigation under the facts of this case, the Court

19  concludes that the totality of the circumstances do not justify

20

21

22  Fed. R. Civ. P. 11. While it may be reasonable for attorneys to rely on the work
    conducted by other attorneys (Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1364

23  (9th Cir. 1990)(en banc)(describing various applications of the "reasonableness"
    inquiry)), that determination is dependent on the circumstances of each case.

24      [15]   The Court notes that Casebeer stated that "[i]t was not then, or now, my

25  practice to independently confirm factual representations that had previously been made
    to a court by colleagues working on a case, where I had no reason to question the

26  accuracy of such representations." Casebeer Decl. at 5. It is the last phrase that
    the Court considers critical. As discussed in previous sections, the fault that the

27  Court finds throughout this case was the failure of Qualcomm and many of its attorneys
    to realize (or take appropriate action based upon the realization) that there was a

28  reason (actually several reasons) to question the accuracy of the representations and
    the adequacy of the discovery search and production.

-33-

Ex. C , Pg. 86

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   sanctioning Zemlicka or Smith.  This conclusion is bolstered by the fact

2   that the pleadings were reviewed and approved by attorneys with more

3   litigation experience and more familiarity with this case.

4        For similar reasons, the Court finds it inappropriate to

5   individually sanction Heller Ehrman attorneys Kyle Robertson and Jaideep

6   Venkatesan.  These attorneys, working for Stanley Young, began work on

7   JVT-related issues in August 2006.  Robertson, under the supervision of

8   Venkatesan, made significant efforts to confirm the accuracy of the

9   facts upon which he relied in drafting various pleadings, including:

10   (1) reviewing numerous deposition transcripts and discovery responses,

11   (2) circulating drafts of all pleadings he prepared to more senior

12   outside and inside counsel with the expectation that they would inform

13   him of any factual inaccuracies, and (3) upon learning from Broadcom's

14   opposition to the MSA of the December 2002 report listing Raveendran's

15   email address, searching the JVT website for information about the Ad-

16   Hoc Group email list, contacting numerous Day Casebeer and Heller Ehrman

17   attorneys for more information, and finally calling Raveendran at home.

18   The Court again finds it troubling that these attorneys failed to

19   investigate the adequacy of Qualcomm's document search and production

20   before filing the pleadings but, given the totality of the

21   circumstances, the Court declines to sanction Robertson and Venkatesan.

22      3.   **Imposed Sanctions**

23      As set forth above, the evidence establishes that Qualcomm

24   intentionally withheld tens of thousands of emails and that the

25   Sanctioned Attorneys assisted, either intentionally or by virtue of

26   acting with reckless disregard for their discovery obligations, in this

27   discovery violation.  The remaining issue, then, is what are the

28   appropriate sanctions.

-34-

05cv1958-B (BLM)

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

a.     <u>Monetary Sanctions Against Qualcomm</u>

In its sanction motion, Broadcom requested that this Court order Qualcomm to (1) reimburse Broadcom for its attorneys' and experts' fees incurred in litigating this case, to the extent not already awarded pursuant to the Exceptional Case Order, (2) pay a substantial fine to the Court, (3) implement a discovery compliance program to prevent Qualcomm's future litigation misconduct, and (4) identify all false statements and arguments. Doc. No. 540 at 2, 14. Broadcom also requested an opportunity to conduct additional discovery regarding Qualcomm's discovery violations. <u>Id.</u> Because Broadcom prevailed at trial and in post-trial hearings, despite the suppressed evidence, and because the case is on appeal, oversight sanctions such as monitoring Qualcomm's discovery efforts, or identifying false testimony and arguments are not appropriate. Monetary sanctions, however, are appropriate.

The suppressed emails directly rebutted Qualcomm's argument that it had not participated in the JVT during the time the H.264 standard was being developed. As such, their absence was critical to Qualcomm's hope and intent of enforcing its patents against Broadcom (as well as presumably all other cellular companies utilizing the H.264 technology in their products). Because Broadcom prevailed at trial and in the post-trial hearings despite the suppressed evidence, it is reasonable to infer that had Qualcomm intended to produce the 46,000 incriminating emails (and thereby acknowledge its early involvement in the JVT and its accompanying need to disclose its intellectual property), the instant

Ex. C , Pg. 88

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  case may never have been filed.[16]  Even if Qualcomm did file this case,

2  the hidden evidence would have dramatically undermined Qualcomm's

3  arguments and likely resulted in an adverse pretrial adjudication, much

4  as it caused the adverse post-trial rulings.  See Waiver Order;

5  Exceptional Case Order.  Accordingly, Qualcomm's failure to produce the

6  massive number of critical documents at issue in this case significantly

7  increased the scope, complexity and length of the litigation and

8  justifies a significant monetary award.  See, Fed. R. Civ. P. 26(g)(3)

9  & 37(c).

10      The Court therefore awards Broadcom all of its attorneys' fees and

11  costs incurred in the instant litigation.  Because Judge Brewster

12  already has awarded these costs and fees to Broadcom in the Exceptional

13  Case Order and a double recovery would be improper, this Court directs

14  that Qualcomm receive credit toward this penalty for any money it pays

15  to Broadcom to satisfy the exceptional case award.  Accordingly, for its

16  monumental and intentional discovery violation, Qualcomm is ordered to

17  pay $8,568,633.24 to Broadcom; this figure will be reduced by the amount

18  actually paid by Qualcomm to Broadcom to satisfy the exceptional case

19  award.[17]

20  ///

21  ///

22

23

24  [16]  Qualcomm argues that while it was aware of the H.264 standard and its
application to the instant litigation, it was not aware of the issue that if it had
25  participated in the JVT's development of the H.264 standard, it could not have enforced
its H.264 patents until Broadcom raised this issue as an affirmative defense.  Mammen
26  Decl. at 11-12.  This argument strains credulity as the potential defense screams for
consideration prior to filing this suit.

27  [17]  Because the attorneys' fees sanction is so large, the Court declines to
fine Qualcomm.  If the imposition of an $8.5 million dollar sanction does not change
28  Qualcomm's conduct, the Court doubts that an additional fine would do so.

-36-

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

### b. Referral to the California State Bar

1    As set forth above, the Sanctioned Attorneys assisted Qualcomm in

2    committing this incredible discovery violation by intentionally hiding

3    or recklessly ignoring relevant documents, ignoring or rejecting

4    numerous warning signs that Qualcomm's document search was inadequate,

5    and blindly accepting Qualcomm's unsupported assurances that its

6    document search was adequate.  The Sanctioned Attorneys then used the

7    lack of evidence to repeatedly and forcefully make false statements and

8    arguments to the court and jury.  As such, the Sanctioned Attorneys

9    violated their discovery obligations and also may have violated their

10   ethical duties.  See e.g., The State Bar of California, Rules of

11   Professional Conduct, Rule 5-200 (a lawyer shall not seek to mislead the

12   judge or jury by a false statement of fact or law), Rule 5-220 (a lawyer

13   shall not suppress evidence that the lawyer or the lawyer's client has

14   a legal obligation to reveal or to produce).  To address the potential

15   ethical violations, the Court refers the Sanctioned Attorneys to The

16   State Bar of California for an appropriate investigation and possible

17   imposition of sanctions.[18]  Within ten days of the date of this Order,

18   each of the Sanctioned Attorneys must forward a copy of this Order and

19   Judge Brewster's Waiver Order to the Intake Unit, The State Bar of

20   California, 1149 South Hill Street, Los Angeles, California 90015 for

---

[18]   Monetary sanctions would be appropriate to address the discovery violations.  However, the Court declines to impose monetary sanctions against the Sanctioned Attorneys for several reasons.  First, if the imposed sanctions do not convince the attorneys to behave in a more ethical and professional manner in the future, monetary sanctions are unlikely to do so.  Second, it is possible that Qualcomm will seek contribution from its retained attorneys after it pays Broadcom's attorneys' fees and costs and, in light of that significant monetary sanction, an additional fine is unlikely to affect counsel's future behavior.  Third, the Court acknowledges the limitations on its authority (see sections A and B and footnotes 5 and 9) and, based on those concerns, declines to impose significant monetary sanctions.

Ex. C, Pg. 90

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  appropriate investigation.

2   c.   **Case Review and Enforcement of Discovery Obligations**

3  The Court also orders Qualcomm and the Sanctioned Attorneys to

4  participate in a comprehensive Case Review and Enforcement of Discovery

5  Obligations ("CREDO") program.  This is a collaborative process to

6  identify the failures in the case management and discovery protocol

7  utilized by Qualcomm and its in-house and retained attorneys in this

8  case, to craft alternatives that will prevent such failures in the

9  future, to evaluate and test the alternatives, and ultimately, to create

10 a case management protocol which will serve as a model for the future.

11 Because they reviewed and approved the false pleadings, the Court

12 designates the following Qualcomm attorneys to participate in this

13 process as Qualcomm's representatives:  Alex Rogers, Roger Martin,

14 William Sailer, Byron Yafuso, and Michael Hartogs (the "Named Qualcomm

15 Attorneys").[19]  Qualcomm employees were integral participants in hiding

16 documents and making false statements to the court and jury.  Qualcomm's

17 in-house lawyers were in the unique position of (a) having unlimited

18 access to all Qualcomm employees, as well as the emails and documents

19 maintained, possessed and used by them, (b) knowing or being able to

20 determine all of the computers and databases that were searched and the

21 search terms that were utilized, and (c) having the ability to review

22 all of the pleadings filed on Qualcomm's behalf which did (or should

23 have) alerted them to the fact that either the document search was

24

25 _____

26 [19]   Qualcomm chose not to provide any information to the Court regarding the
   actions of Qualcomm's counsel or employees so the Court must rely on the retained
27 attorneys' statements that these attorneys were involved in the case.  Robertson Decl.
   at 13, 22; Venkatesan Decl. at 14; Young Decl. at 18, 21, 35.  Qualcomm's General
28 Counsel at the time, Lou Lupin, is not included in this list since he has resigned from
   the company.  October 12, 2007 Hearing Transcript at 108, 198.

-38-

05cv1958-B (BLM)

Ex. C, Pg. 91

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   inadequate or they were knowingly not producing tens of thousands of
2   relevant and requested documents. Accordingly, Qualcomm's in-house
3   lawyers need to be involved in this process.

4   At a minimum, the CREDO protocol must include a **detailed analysis**
5   (1) identifying the factors [20] that contributed to the discovery
6   violation (e.g., insufficient communication (including between client
7   and retained counsel, among retained lawyers and law firms, and between
8   junior lawyers conducting discovery and senior lawyers asserting legal
9   arguments); inadequate case management (within Qualcomm, between
10  Qualcomm and the retained lawyers, and by the retained lawyers);
11  inadequate discovery plans (within Qualcomm and between Qualcomm and its
12  retained attorneys); etc.), (2) creating and evaluating proposals,
13  procedures, and processes that will correct the deficiencies identified
14  in subsection (1), (3) developing and finalizing a comprehensive
15  protocol that will prevent future discovery violations (e.g.,
16  determining the depth and breadth of case management and discovery plans
17  that should be adopted; identifying by experience or authority the
18  attorney from the retained counsel's office who should interface with
19  the corporate counsel and on which issues; describing the frequency the
20  attorneys should meet and whether other individuals should participate
21  in the communications; identifying who should participate in the
22  development of the case management and discovery plans; describing and
23  evaluating various methods of resolving conflicts and disputes between
24  the client and retained counsel, especially relating to the adequacy of
25
26

27  [20]   In the CREDO program, the Court does not seek the identities of individuals
    who contributed to the discovery failure, nor the content of communications between or
    among counsel and client so this program does not implicate the attorney-client
28  privilege.

-39-

05cv1958-B (BLM)

Ex. C , Pg. 92

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  discovery searches; describing the type, nature, frequency, and
2  participants in case management and discovery meetings; and, suggesting
3  required ethical and discovery training; etc.), (4) applying the
4  protocol that was developed in subsection (3) to other factual
5  situations, such as when the client does not have corporate counsel,
6  when the client has a single in-house lawyer, when the client has a
7  large legal staff, and when there are two law firms representing one
8  client, (5) identifying and evaluating data tracking systems, software,
9  or procedures that corporations could implement to better enable inside
10 and outside counsel to identify potential sources of discoverable
11 documents (e.g. the correct databases, archives, etc.), and (6) any
12 other information or suggestions that will help prevent discovery
13 violations.

14      To facilitate development of the CREDO program, the Sanctioned
15 Attorneys and Named Qualcomm Attorneys are required to meet[21] at 9:00
16 a.m. on Tuesday, January 29, 2008, in the chambers of the Honorable
17 Barbara L. Major, United States Magistrate Judge, 940 Front Street,
18 Suite 5140, San Diego, California, 92101.  The Court will participate
19 only to the extent necessary to ensure that the participants are
20 complying with the instructions in this Order.  The Court will provide
21 whatever time is necessary for the participants to fully and completely
22 examine, analyze and complete the CREDO protocol.  At the conclusion of
23 the process, the participating attorneys will submit their proposed
24 protocol to the Court.  The Court will review the proposed protocol and,

25

26  _____

27  [21]    While not required to do so, a Broadcom attorney may participate in the
    process.  If Broadcom decides to participate, Qualcomm and the Sanctioned Attorneys
    must pay the Broadcom attorney's reasonable costs and fees incurred in traveling to and
28  participating in this program.

Ex. C , Pg. 93

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   if sufficient, order it filed.  The Court will notify the Sanctioned

2   Attorneys and Named Qualcomm Attorneys if the proposed protocol is

3   insufficient so further revisions can be implemented.  When completed

4   protocol is submitted, the Sanctioned Attorneys and Named Qualcomm

5   Attorneys shall each file a declaration under penalty of perjury

6   affirming that they personally participated in the entire process that

7   led to the CREDO protocol and specifying the amount of time they spent

8   working on it.

9       While no one can undo the misconduct in this case, this process,

10  hopefully, will establish a baseline for other cases.  Perhaps it also

11  will establish a turning point in what the Court perceives as a decline

12  in and deterioration of civility, professionalism and ethical conduct

13  in the litigation arena.  To the extent it does so, everyone benefits --

14  Broadcom, Qualcomm, and all attorneys who engage in, and judges who

15  preside over, complex litigation.  If nothing else, it will provide a

16  road map to assist counsel and corporate clients in complying with their

17  ethical and discovery obligations and conducting the requisite

18  "reasonable inquiry."

19                           **CONCLUSION**

20      For the reasons set forth above, the Court **GRANTS IN PART** and

21  **DENIES IN PART** Broadcom's sanction motion and **ORDERS** Qualcomm to pay

22  Broadcom $8,568,633.24.  Qualcomm will receive credit toward this

23  sanction for any amount it pays to Broadcom to satisfy the Exceptional

24  Case sanction.  The Court also **REFERS to The State Bar of California** for

25  an investigation of possible ethical violations attorneys James R.

26  Batchelder, Adam A. Bier, Kevin K. Leung, Christian E. Mammen, Lee Patch

27  and Stanley Young.  The Court **ORDERS** these six attorneys and Qualcomm

28  in-house attorneys Alex Rogers, Roger Martin, William Sailer, Byron

-41-

05cv1958-B (BLM)

Ex. __C__, Pg. __94__

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  Yafuso, and Michael Hartogs to appear 9:00 a.m. on Tuesday, January 29,

2  2008, in the chambers of the Honorable Barbara L. Major, United States

3  Magistrate Judge, 940 Front Street, Suite 5140, San Diego, California,

4  92101 to develop the comprehensive Case Review and Enforcement of

5  Discovery Obligations protocol in accordance with this Order.

6      **IT IS SO ORDERED.**

7  DATED:  January 7, 2008

8

9                          BARBARA L. MAJOR
                           United States Magistrate Judge
10

11

12

13  COPY TO:

14  HONORABLE RUDI M. BREWSTER
    U.S. DISTRICT JUDGE
15
    ALL COUNSEL
16

17

18

19

20

21

22

23

24

25

26

27

28

05cv1958-B (BLM)

Ex. C , Pg. 95

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1
**Exhibit A**[22]

2
**Day Casebeer Madrid & Batchelder**

3

4
**James R. Batchelder**-Partner and founding member of Day Casebeer, B.A. from Franklin & Marshall College, J.D. from University of California, Los Angeles, School of Law. Qualcomm's lead attorney throughout this case. Delivered Qualcomm's opening and closing arguments and refined Qualcomm's trial strategies and theories. Delegated case preparation and trial issues to other attorneys or teams of attorneys but was available for consultation on discovery and all trial issues. Was told on January 14, 2007 that JVT documents that Qualcomm had not produced in discovery were located on Raveendran's computer, but he did not review them and directed other attorneys to handle the issue. Present for the January 18, 2007 sidebar during which Young stated that there was no evidence that any emails were sent to the viji@qualcomm.com address and he did not correct the statement nor mention the 21 Raveendran emails. Present for the January 24, 2007 sidebar after Raveendran's testimony during which Patch implied that the 21 emails had not been reviewed. Participated in drafting several pleadings that ultimately were determined to contain false statements and arguments, including Qualcomm's Post-Trial Brief Concerning Waiver and Inequitable Conduct. Doc. No. 678.

5

6

7

8

9

10

11

12

13

14
**Lee Patch**-Partner, B.S. from Carnegie Mellon University, J.D. from Duquesne University School of Law. Defended Raveendran's deposition. Responsible for defending Qualcomm against Broadcom's inequitable conduct allegations. Supervised Bier in the trial preparation of Viji Raveendran and conducted the direct examination of Raveendran. Learned about the 21 Raveendran emails on January 14, 2007, told Batchelder and Young about the email discovery, and did not review the emails but participated in the decision not to produce them. Did not ask Raveendran about the 21 emails discovered on her laptop or whether she had received any avc_ce emails; asked her whether she had read any avc_ce emails. In the sidebar immediately after Raveendran admitted she received avc_ce emails, Patch stated that he had not seen the emails and did not know whether they were responsive to Broadcom's discovery requests; he did not tell the court that Qualcomm already had reviewed the emails and decided not to produce them to Broadcom. Participated in drafting and arguing pleadings that contained false and misleading statements regarding Qualcomm's non-participation in the JVT. Doc. No. 676.

15

16

17

18

19

20

21

22

23

24

25

26
_____

27
[22]   All of the information in this exhibit was obtained from the attorneys' declarations.

28

-43-

05cv1958-B (BLM)

Ex. C , Pg. 96

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   **Christian E. Mammen**-Senior Associate during trial and currently a
2   Partner, B.A. from Trinity University, J.D. from Cornell Law School, D.
    Phil. in law from Oxford University.  Drafted the complaint, handled
3   day-to-day discovery activities, and supervised Leung in additional
    discovery matters.  Prepared memoranda regarding document retention,
4   collection and production.  Reviewed the 21 Raveendran emails on January
    14, 2007 and made the decision not to produce them.  Helped prepare,
5   reviewed, and signed some of the pleadings which contained false
    statements.  Participated in the post-trial correspondence and
6   resistance to Broadcom's requested additional document searches.  Doc.
    No. 682.

7
    **Kevin Leung**-Associate, B.A. from University of California at Berkeley,
8   J.D. from University of California at Los Angeles.  Had primary
    responsibility for discovery duties, including drafting and signing
9   written discovery responses; supervised by Mammen.  Prepared and
    defended Christine Irvine's personal and Rule 30(b)(6) depositions.
10  Supervised by Mammen and Batchelder in this regard.  Discovered shortly
    before Irvine's deposition 400,000 pages of publicly available JVT
11  documents that a Qualcomm employee had downloaded to Qualcomm's computer
    system but Broadcom refused to continue the deposition.  Irvine
12  testified that Qualcomm had never been involved in the JVT but
    subsequent review of the publicly available JVT documents established
13  that Qualcomm was involved in the JVT in late 2003.  The subsequent
    review also revealed December 2002 and March 2003 reports of an ad hoc
14  group concerning coding efficiency analysis and testing of H.264 that
    listed Raveendran's email address.  Based upon at least Irvine's false
15  statement, Leung agreed to Broadcom's request for a new Rule 30(b)(6)
    witness on Qualcomm's involvement in the JVT.  Scott Ludwin was the
16  replacement Rule 30(b)(6) witness and Leung defended his deposition.
    Ludwin testified that Qualcomm had not participated in the JVT prior to
17  late 2003.  After Ludwin's deposition, Leung worked with Qualcomm and
    produced additional documents concerning Qualcomm's involvement in the
18  JVT in and after December 2003.  Leung explains that the earlier
    document were not discovered because the mid-2006 search involved
19  computers belonging to the Multimedia Development and Standardization
    Group, not the Digital Cinema Group.  Doc. No. 680.
20
    **Adam Bier**-Junior associate, undergraduate degree from University of
21  California, Berkeley, J.D. from New York University School of Law.
22  Bier did not participate in pre-trial document collection.  During
    trial, he was responsible for the twice-daily disclosures of evidence
23  to be used and witnesses to be called at trial.  Patch also asked him
    to assist in preparing Raveendran to testify at trial.  In that regard,
24  he met with Raveendran on several days in January 2007.  On or about
    January 7, 2007, Bier became aware of an August 6, 2002 email received
25  by Raveendran welcoming her to the avc_ce email group.  Bier does not
    recall what, if anything, he did after learning about this document.
26  On January 14, 2007, Bier and Raveendran searched her computer using the
    search term "avc_ce" and discovered 21 separate emails that had not been
27  produced to Broadcom.  Bier brought those emails to the attention of
    Mammen and Patch.  The three attorneys decided not to produce the emails
28  to Broadcom.  After Raveendran testified on January 24, 2007, Bier

-44-

_____ Ex. _C_ , Pg. _97_

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  helped produce to Broadcom the 21 emails found on Raveendran's computer.
2  The August 6, 2002 email was not included in this document production.
   After trial, Bier, under the supervision of Batchelder, Patch and
3  Mammen, corresponded with Broadcom's counsel, arguing that the 21
   Raveendran emails were not covered by any Broadcom discovery request and
   resisting Broadcom's attempts to force Qualcomm to conduct additional
4  searches for JVT documents.  In March 2007, Bier advised Broadcom that
   Qualcomm would conduct limited additional document searches.  Doc. No.
5  686.

6

7  **Craig Casebeer**-Partner and founding member of Day Casebeer, B.A. from
   Stanford University, J.D. from University of California at Berkeley,
   Boalt Hall.  Joined this litigation shortly before trial and provided
8  assistance and trouble-shooting experience to Batchelder and the rest
   of Qualcomm's trial team.  Supervised the preparation of motions in
9  limine.  Directed Zemlicka to use Qualcomm's MSA to draft the motion in
   limine to exclude evidence relating to Qualcomm's participation in the
10 JVT.  Conducted the trial testimony of two witnesses who were not
   mentioned in Judge Brewster's Waiver Order.  Present for the January 18,
11 2007 sidebar during which Young stated that there was no evidence of
   emails being sent to the group, including Raveendran.  Supervised Smith
12 in the drafting, editing and finalizing of the JMOL, although the waiver
   portion was prepared by the Heller Ehrman lawyers.  Participated in the
13 decision to produce the 21 emails after Raveendran's testimony.
   Authored the letter to Judge Brewster submitting the Amended JMOL, which
14 corrected the statements determined to be false based upon the
   Raveendran emails.  Participated in drafting Qualcomm's Post-Trial Brief
15 Concerning Waiver and Inequitable Conduct, which contained statements
   later determined to be false and misleading.  Doc. No. 679.

16

17 **Victoria Q. Smith**-Junior associate, B.S. from University of Tulsa, J.D.
   from University of Michigan.  Assisted in the preparation of expert
18 witnesses and other technical witnesses.  Helped prepare and signed both
   of Qualcomm's Motions for Judgment as a Matter of Law.  Smith did not
19 draft the portion of the JMOL that concerned waiver.  Doc. No. 691.

20

21 **Roy V. Zemlicka**-Junior associate, bachelor's degree from University of
   California at Santa Cruz, J.D. from Santa Clara University.  Performed
22 discrete tasks to assist senior lawyers in pre-trial litigation.  Signed
   two pleadings relating to Qualcomm's Motion in Limine to Exclude
23 Evidence relating to Qualcomm's participation in the JVT.  Also helped
   prepare the motion, although the majority of his work was on an issue
24 that was subsequently moved to another motion in limine and then
   resolved prior to court argument.  Inserted language from Qualcomm's MSA
25 into the Motion in Limine and this language subsequently was determined
   to be false and misleading.  Zemlicka did not perform any independent
26 factual investigation; he relied on prior Qualcomm pleadings.  Doc. No.
   694.

27

28

-45-

Ex. C , Pg. 98
Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1  **Ruchika Agrawal**-First year associate, Bachelor's degree from Rutgers
University, Master's degree from Stanford University, J.D. from
2  University of Virginia Law School. Attended two chamber's conferences
regarding jury instructions. Assisted with discrete tasks during trial,
3  including assisting in the mock cross-examination of Raveendran. Was
present in court during Raveendran's testimony and sat with her during
4  break in testimony but did not discuss her testimony or the 21 emails.
Doc. No. 677.

5

6  **William F. Nelson**-Associate, J.D. from University of California, Boalt
Hall. Had minimal involvement in the instant litigation and none
7  related to Qualcomm's participation in the JVT. Signed Qualcomm's
opposition to Broadcom's motion for leave to file an amended answer and
8  counterclaims and argued the motion in court. Doc. No. 689.

9

**Howard T. Loo**-Associate, B.A. from Stanford University, J.D. University
10  of California at Berkeley's Boalt Hall. Only billed 11.8 hours to this
case but signed a pleading unrelated to the JVT or H.264 standard. Doc.
11  No. 687.

12
**Ryan L. Scher**-First year associate, J.D. from Tulane University.
13  Attended two chamber's conferences regarding jury instructions. Also
performed discrete tasks related to trial for more senior lawyers. Doc.
14  No. 690.

15
**Bradley A. Waugh**-Associate, B.S. from Georgia Institute of Technology,
16  M.S. from Rice University, J.D. from Stanford University. Heavily
involved in instant case but vast majority of work related to claim
17  construction, infringement and some invalidity. Waugh also provided
technical assistance to lawyers responsible for the JVT issues. Signed
18  several pleadings unrelated to the issues addressed in Judge Brewster's
order. Doc. No. 693.

19

20
**Heller Ehrman LLP**
21

22  **Stanley Young**-Firm shareholder, A.B., A.M. from Stanford University,
J.D. from Harvard Law School. Became involved with this case in early
23  2006. Initially only responsible for damages issues. Understood that
Day Casebeer was responsible for written discovery and document
24  production. In August 2006, Young agreed to Batchelder's request to
have Heller Ehrman assume responsibility for handling JVT issues.
25  Decided to file the MSA arguing that Qualcomm had not participated in
the JVT at any time before the H.264 standard was established.
26  Supervised Venkatesan and Robertson in the preparation of expert reports
and pleadings relating to JVT issues, including the MSA and reply.
27  Argued the MSA to Judge Brewster on December 5, 2006. Agreed to present
the JVT witnesses at trial, although they ultimately were not used at
28  trial. Argued at sidebar on January 18, 2007 to exclude the December

-46-

05cv1958-B (BLM)

Ex. C, Pg. 99

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

2002 email reflector list containing Raveendran's email address and affirmatively stated that there was no evidence that any emails had been sent to Raveendran's email address. Although Young denies knowing about the 21 Raveendran emails, his statement occurred four days after Patch claims he notified Young of the discovery. Directed Day Casebeer and Heller Ehrman lawyers to prepare an Amended JMOL to correct the false statements regarding Qualcomm's non-participation that had been included in the original JMOL filed on January 24, 2007. Doc. No. 699-4.

**Jaideep Venkatesan**-Associate, J.D. from University of California at Los Angeles. At Young's direction, worked on the damages aspect of this case and later on responding to the expert report relating to JVT issues. Venkatesan and Young discussed the JVT discovery and issues with Patch and other Day Casebeer lawyers. Supervised Robertson in preparing Dr. Richardson's expert declaration. Transmitted the draft declaration to Day Casebeer lawyers Patch, Leung and Waugh and Qualcomm in-house lawyers Alex Rogers and Roger Martin for review. Worked with Robertson to prepare Qualcomm's MSA and the related reply. The Reply, which addressed the December 2002 email reflector list including Raveendran's address, was sent to Day Casebeer lawyers Leung, Mammen, Patch and Batchelder and Qualcomm lawyers Rogers, Martin and Byron Yafuso. Also prepared or assisted in preparing and/or reviewing other pleadings ultimately determined to contain false or misleading JVT statements. Doc. No. 699-3.

**Kyle S. Robertson**-Junior associate, B.A. from Grinnel College, J.D. from Boalt Hall School of Law at the University of California at Berkeley. In August 2006, Young directed Robertson to become involved in the JVT issues. To become familiar with the subject, Robertson went to the JVT website and learned about its work and intellectual property rights policies. In late August, he attended the deposition of Gary Sullivan, the Chairman of the JVT. It was the first deposition Robertson had attended and he obtained background information and specific questions from Patch. He also reviewed a number of JVT-related depositions taken by other attorneys. Under Venkatesan and Young's supervision, Robertson prepared several pleadings, including the MSA and related Reply, and an expert declaration, all of which were sent to other attorneys for review. In preparing those documents, Robertson relied on depositions taken and discovery prepared by Day Casebeer lawyers. He circulated the MSA pleadings to Qualcomm attorneys Rogers, Martin, Louis Lupin, William Sailer and Michael Hartogs and Day Casebeer attorneys Batchelder, Patch and Mammen. When Robertson received Broadcom's opposition to the MSA, which included the December 2002 email reflector, he searched the JVT website to learn about the AVC ad hoc group, discussed it with senior lawyers at Heller Ehrman and Day Casebeer, and contacted Raveendran. Robertson also prepared a portion of the JMOL and post-trial briefs, which later were determined to contain the false and misleading statements regarding Qualcomm's non-participation in the JVT. The documents were transmitted to a number of Day Casebeer and Qualcomm in-house lawyers for review prior to filing. Doc. No. 699-2.

—— Ex. C , Pg. 106

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order

1   **Heidi M. Gutierrez**-Firm shareholder, B.S. from United States Naval
Academy, J.D. University of San Diego Law School.   Had minimal
2   responsibility with the instant case and none related to the JVT or
H.264 standard.   Doc. No. 670-6
3

4   **David E. Kleinfeld**-Firm shareholder.  Not actively involved in this case
but monitored instant litigation for developments that might affect
5   other Qualcomm/Broadcom litigation. Signed several pleadings, including
Qualcomm's Reply to its MSA, as local counsel.   The pleadings were
6   prepared by other lawyers in Northern California but signed by Kleinfeld
for logistical reasons.  Doc. No. 670-4.
7

8   **Barry J. Tucker**-Firm shareholder, B.A. University of California, Los
Angeles, J.D. from University of California, Hastings College of Law.
9   Not actively involved in this case but coordinated instant litigation
with other Qualcomm/Broadcom litigation.   Signed approximately 15
10   Qualcomm pleadings, including the MSA and Motion in Limine to Exclude
Evidence relating to Qualcomm's participation in the JVT, as local
11   counsel.  The documents were prepared by Heller Ehrman or Day Casebeer
lawyers located outside of San Diego but signed by Tucker for logistical
12   reasons.  Doc. No. 670-5.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-48-

Ex. C , Pg. 101

Privileged and Confidential – Production and Use Governed by Paragraph 3 of the November 7, 2008 Order