UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM INCORPORATED,<br><br>　　　　Plaintiff,<br><br>v.<br><br>BROADCOM CORPORATION,<br><br>　　　　Defendant.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 05cv1958-B (BLM)<br><br>**ORDER DECLINING TO IMPOSE SANCTIONS AGAINST THE RESPONDING ATTORNEYS AND DISSOLVING THE ORDER TO SHOW CAUSE** |

On January 7, 2008, this Court issued an Order Granting in Part and Denying in Part Defendant's Motion for Sanctions and Sanctioning Qualcomm Incorporated and Individual Lawyers ("Sanctions Order"). Doc. No. 718. The Court found that Plaintiff Qualcomm Incorporated ("Qualcomm") intentionally withheld tens of thousands of documents that Defendant Broadcom Corporation ("Broadcom") had requested in discovery. Id. at 18-23. In reaching this conclusion, the Court emphasized that the suppressed documents directly contradicted a key argument advanced by Qualcomm in pretrial motions and throughout trial and supported a defense asserted by Broadcom. Id. The Court also stressed the quantity of suppressed documents, the ease with which Qualcomm ultimately was able to locate the documents, the simplicity and relevancy of the search terms and search locations that led to the discovery of the documents, and the lack of evidence indicating that Qualcomm had engaged in any meaningful oversight of its document production. Id. The Court also

found that six attorneys assisted Qualcomm in withholding the critical documents by failing to conduct a reasonable inquiry into the adequacy of Qualcomm's document production and by ignoring warning signs, which indicated that the document search was not thorough and that Qualcomm's document production was not complete. Id. at 23-31. The Court specifically identified several inadequacies in Qualcomm's document search that should have been apparent to outside counsel, including the failure to search the computers belonging to, or used by, deponents and trial witnesses, the failure to adequately investigate when significant, relevant, and unproduced documents were discovered, and the failure to ensure there was a legitimate factual basis for the legal arguments made to the Court before making them. Id. Qualcomm did not appeal the $8.5 million sanction imposed against it.

The sanctioned attorneys[1] ("Responding Attorneys") filed objections to the Sanctions Order with the trial judge, United States District Judge Rudi M. Brewster. On March 5, 2008, Judge Brewster vacated the Sanctions Order as to the Responding Attorneys and remanded the matter to this Court, finding that the Responding Attorneys had a due process right to defend themselves and, therefore, should "not be prevented from defending their conduct by the attorney-client privilege of Qualcomm and its employees and representatives because of the application of the self-defense exception to the attorney-client privilege of Qualcomm." Doc. No. 744. This Court provided Responding Attorneys with an almost unlimited opportunity to conduct discovery and to present new facts to the Court.

Over a period of roughly fifteen months, the parties undertook a massive discovery effort. Qualcomm searched for, uploaded to its internal review database, and had its outside counsel review for responsiveness and privilege, over 1.6 million documents. It ultimately produced approximately 22,500 documents (totaling well over 100,000 pages) to Responding Attorneys. The Day Casebeer firm produced approximately 31,000 pages of hard copy documents and 39,000 electronic documents to attorney Young in response to his document requests. These documents were reviewed by Day Casebeer's outside counsel, Young's outside counsel, and Qualcomm's outside counsel prior to use in these proceedings. And, all of the parties producing documents prepared and provided extensive

---

[1] The Court sanctioned James Batchelder, Christian Mammen, Kevin Leung, Lee Patch, Adam Bier and Stanley Young. Doc. No. 718.

privilege logs and, where appropriate, redacted responsive documents. They then culled this universe of documents down to the subset to be used for depositions. All told, Responding Attorneys deposed seven Qualcomm engineers, three of Qualcomm's in-house attorneys, two of Qualcomm's in-house paralegals, and one fellow Responding Attorney during the remand proceedings. Excerpts from all of these depositions, as well as three depositions of Qualcomm engineers from the underlying proceedings (depositions taken by Broadcom), were presented via video at the three-day evidentiary hearing before this Court.

In resolving this Order to Show Cause ("OSC"), the Court has reviewed and considered all of the submitted documents, including expert opinions, lengthy declarations from all of the Responding Attorneys, and extensive legal arguments from all of the parties, has heard and considered the testimony of the Responding Attorneys and deponents, and has thought long and hard about this case. There still is no doubt in this Court's mind that this massive discovery failure resulted from significant mistakes, oversights, and miscommunication on the part of both outside counsel and Qualcomm employees. The new facts and evidence presented to this Court during the remand proceedings revealed ineffective and problematic interactions between Qualcomm employees and most of the Responding Attorneys during the pretrial litigation, including the commission of a number of critical errors. However, it also revealed that the Responding Attorneys made significant efforts to comply with their discovery obligations. After considering all of the new facts, the Court declines to sanction any of the Responding Attorneys.

Given the large amount of detailed evidence presented to the Court and the frequently conflicting nature of the testimony and evidence, the Court has elected not to summarize the evidence in this order. The evidence is available in the court record to anyone interested in reviewing it and the parties are extremely familiar with it. Instead, the Court will summarize the major errors it perceives as contributing to the massive cache of critical documents remaining undiscovered by Responding Attorneys and unproduced by Qualcomm until after trial.

///

///

///

## Discovery Errors

The fundamental problem in this case was an incredible breakdown in communication. The lack of meaningful communication permeated all of the relationships (amongst Qualcomm employees (including between Qualcomm engineers and in-house legal staff), between Qualcomm employees and outside legal counsel, and amongst outside counsel) and contributed to all of the other failures. The Court was not presented with any evidence establishing that either in-house lawyers or outside counsel met in person with the appropriate Qualcomm engineers (those who were likely to have been involved in the conduct at issue and who were likely to be witnesses) at the beginning of the case to explain the legal issues and discuss appropriate document collection.[2] Moreover, outside counsel did not obtain sufficient information from any source to understand how Qualcomm's computer system is organized: where emails are stored, how often and to what location laptops and personal computers are backed up, whether, when and under what circumstances data from laptops are copied into repositories, what type of information is contained within the various databases and repositories, what records are maintained regarding the search for, and collection of, documents for litigation, etc. Finally, no attorney took supervisory responsibility for verifying that the necessary discovery had been conducted (including ensuring that all of the correct locations, servers, databases, repositories, and computers were correctly searched for potentially relevant documents) and that the resulting discovery supported the important legal arguments, claims, and defenses being presented to the court. These fundamental failures led to the discovery violations.

Another factor that contributed to the discovery failure was a lack of agreement amongst the participants regarding responsibility for document collection and production. Batchelder delegated discovery responsibility to Leung and Mammen, assuming they would be assisted by capable and

---

[2] Such a meeting may have clarified for the engineers that, though Qualcomm was *arguing* that only submission of a technical proposal to JVT, not mere attendance or participation, would trigger Qualcomm's disclosure obligations (see, e.g., 9/21/07 Young Decl. ¶ 67), Broadcom was requesting (and was entitled to receive) a broader scope of information through discovery - namely, information about Qualcomm's attendance, participation, and involvement in JVT (see, e.g., Doc. No. 565-2, Ex. D-9 (30(b)(6) Topic 10) and Doc. No. 540, Ex. BB-2 (Request for Production No. 50)). The attorneys also should have explained to the engineers that they should provide to the lawyers *all* information and documents relating in any way to the JVT and let the attorneys decide how to handle the information during the litigation.

trustworthy in-house lawyers and paralegals. 10/09/09 Batchelder Decl.[3] ¶¶ 3-18. Leung and Mammen testified that they followed the procedure set forth in the memorandum entitled "Overview of Document Collection at Qualcomm" ("Overview Memo") in which Qualcomm legal staff dictates which databases and computers are searched.  1/15/10 Hearing Tr.[4] at 112:12-16 (Mammen); 10/10/09 Leung Decl. ¶10.  In contrast, in-house legal personnel apparently were unaware of the Overview Memo. 7/16/09 Martin Depo. Tr. at 35:5-13 (attorney Roger Martin did not recall seeing the memo or hearing about it); 6/29/09 Glathe Depo. Tr. at 10:24-11:3, 54:18-55:2 (the lead paralegal on this case from May or June 2006 forward did not recall seeing the Overview Memo until after trial concluded); 7/16/09 Laxamana Depo. Tr. at 47:21- 48:12 (another paralegal did not recall reading the memo).  Morever, contrary to the guidelines set forth in the Overview Memo, the paralegals understood that while they might suggest potential search locations or custodians, it was outside counsel's role to direct them to documents and to instruct them as to what to collect. 6/29/09 Glathe Depo. Tr. at 68:13-69:8, 70:2-13, 73:25-74:13; 7/16/09 Laxamana Depo. Tr. at 26:18-27:7.

With regard to the Rule 30(b)(6) deponents, in-house attorneys provided guidance on the appropriate witnesses. See, e.g.,10/10/09 Leung Decl. ¶ 29 (Roger Martin suggested Chris Irvine for the standards issues).  Leung followed the advice and then specifically requested that the designated individuals' files be collected. Depo. Ex.[5] 21/QX[6] 85. In response, Qualcomm paralegals advised Leung that they believed there was no need to search the witnesses' individual files or laptops because

---

[3] Because many of the witnesses and participants to these remand proceedings were deposed on more than one occasion or provided multiple declarations, the Court will precede each citation to a deposition transcript or a declaration with the date on which the deposition occurred or the declaration was signed.  The documents themselves may be found on the docket attached to declarations of counsel.

[4] The Court refers to the transcript of the evidentiary hearing held before this Court on January 13, 2010 through January 15, 2010 by the hearing date (e.g. "1/13/10 Hearing Tr. at ___")

[5] As explained in Frank A. Cialone's October 10, 2009 Declaration [Doc. No. 941-7], the exhibits filed with his declaration and listed as "Appendix of Deposition Exhibits 1-199" are true and correct copies of exhibits used during depositions taken during these remand proceedings. 10/10/09 Cialone Decl. ¶¶ 2-3. These exhibits, which can be found at Doc. No. 941, will be referred to as "Depo. Ex. __" in this order.

[6] Qualcomm provided the Court with a binder of exhibits it intended to use during the evidentiary hearing. These documents were marked "QX __," with the QX number being the same as the corresponding exhibit number given to the document in Timothy Blackford's October 13, 2009 Declaration [Doc. No. 963-1].

1  the information was likely to duplicate information and documents contained in other corporate
2  repositories that already were being searched. Moreover, the paralegals represented that this procedure
3  had been utilized successfully in other litigation against Broadcom proceeding in the International
4  Trade Commission ("ITC"). <u>See</u> 11/5/09 Leung Decl. ¶ 11 and Depo. Ex. 45; <u>see</u> also 1/15/10
5  Hearing Tr. at 180:21-181:9 (Leung testimony). Leung and Mammen acquiesced to this suggestion even
6  though they had not reviewed any of the witnesses' individual files, did not know what information was
7  contained in the databases or repositories that were being searched, and had not been involved in the
8  ITC litigation and did not know how documents were collected for it. <u>See</u>, e.g., 1/15/10 Hearing Tr.
9  at 119:20-23 and 141:24-143:9 (Mammen's testimony), 181:1-6 and 199:7-13 (Leung's testimony);
10 11/5/09 Leung Decl. ¶ 11; Depo. Ex. 22; Mammen Decl. ¶¶ 36-37. Leung then sent an email to the
11 trial team[7] explaining that they were not going to search individual computers or files of deponents
12 because "none of the document requests propounded by Broadcom call for documents uniquely in
13 the possession of these individuals" and "it was determined that anything responsive in their
14 possession would be cumulative of documents otherwise collected and produced." Depo. Ex. 45;
15 1/15/10 Hearing Tr. at 181:11-23 (Leung testimony). Apparently no one, including in-house attorneys
16 or more experienced outside counsel, responded to the email or otherwise advised Leung that the
17 proposed method of collecting documents was inadequate.

18      These failures were exacerbated by an incredible lack of candor on the part of the principal
19 Qualcomm employees. For example, Viji Raveendran repeatedly told Responding Attorneys, other
20 outside counsel, and Qualcomm employees that she had not participated in, and had no involvement
21 with, the JVT during development of the H.264 standard and she testified to those facts under oath.
22 10/10/09 Leung Decl. ¶¶ 44-45; 10/13/09 Patch Decl. ¶¶ 28-33; 1/15/10 Hearing Tr. at 207:21-22;
23 <u>see</u> generally, 7/15/09 Raveendran Depo. Raveendran made these statements despite the fact that she
24 personally had attended some of the JVT meetings (<u>see, e.g.,</u> Depo. Ex. 159 (Raveendran telling
25 Isailovic "I attended (sic) few of the JVT sessions and I'm curious")), had analyzed the H.264 standard

---

27   [7] The email is addressed to the "QC-Broadcom Internal scan list." Depo. Ex. 45. It appears this list included
     the attorneys at Day Casebeer and at least some in-house legal personnel at Qualcomm, but not Young. 10/10/09 Leung
28   Decl. 33; 1/15/10 Hearing Tr. at 228:16-21.

for in-house counsel (see, e.g., Depo. Ex. 165 (email thread regarding Raveendran's January 2003 report to Qualcomm's patent counsel of an earlier "investigation on infringement of ABS patents by JVT") and Depo. Ex. 166 (February 2003 email from Raveendran to in-house counsel stating "[t]his is to inform you that JVT ... could potentially infringe on Digital Cinema patents, specifically ABS and related patents")), and had exchanged emails with other Qualcomm employees and consultants regarding the meetings (see, e.g., 10/10/09 Cialone Decl., Ex. 200 (appendix of emails between Raveendran and Qualcomm's JVT consultant, Jordan Isailovic, many of which were copied to other Qualcomm employees)). In fact, when directly asked whether a consultant working for Qualcomm had attended the JVT meetings, Raveendran replied "I don't know," despite having personally exchanged approximately 118 emails with Qualcomm's paid JVT consultant, Jordan Isailovic. 7/18/06 Raveendran Depo. Tr. at 79:8-12. While Raveendran provided a nuanced explanation for her statements during the remand proceedings, the fact remains that she did not provide any of these facts to Responding Attorneys, even when asked. 10/10/09 Leung Decl. ¶¶ 19, 24, 38, and 40; 10/10/09 Mammen Decl. ¶ 30(b); 10/13/09 Patch Decl. ¶¶ 28-29; see generally, 7/15/09 Raveendran Depo. Unfortunately, this lack of candor was not limited to her JVT attendance nor was it unique to Raveendran, or even to just the Qualcomm engineers. The remand proceedings have clarified that a number of Qualcomm employees, including legal counsel, knew that Qualcomm had analyzed the H.264 standard and had attended JVT meetings during the relevant time period and yet no one informed Responding Attorneys.

While they did not adequately search for documents, Responding Attorneys did repeatedly try to determine whether Qualcomm had participated in the JVT proceedings during the time the H.264 standard was being developed. As previously discussed, outside counsel, including Responding Attorneys, repeatedly asked Raveendran and other Qualcomm employees about Qualcomm's alleged participation. In addition, Batchelder explained that one of the reasons he brought Patch into the case was to provide a "fresh pair of eyes" to the JVT fact investigation. 1/15/10 Hearing Tr. at 24:20-25:4. Patch conducted a "fresh" investigation (although it included the erroneous assumption that the deponents' and potential trial witnesses' personal computers had been searched) and reached the same conclusion-that Qualcomm had not participated in the JVT proceedings during the relevant time

period. 10/13/09 Patch Decl. ¶¶ 24-27; 1/15/10 Hearing Tr. at 206:14-207:5, 211:5-212:9, 220:13-221:22. Moreover, five third-parties, including the chair of the JVT and a Broadcom employee involved in the JVT proceedings, confirmed their belief that Qualcomm was not involved with JVT during development of the H.264 standard. As Batchelder's counsel concisely summed it up, Responding Attorneys received confirmation by fifteen Qualcomm employees, including lawyers, on thirty-one occasions that Qualcomm did not participate in JVT or that the same was probably or almost certainly correct. 1/13/10 Hearing Tr. at 116:24-117:8.

The problems created by this pervasive miscommunication and incomplete document search were compounded by an inadequate follow-up in response to contradictory, or potentially contradictory evidence. Although numerous Qualcomm employees indicated that the same employees, including Raveendran and Garudadri, were the employees most likely to have been involved in the JVT process, neither in-house nor outside counsel ensured that the identified employees' computers were searched for relevant documents and emails. Similarly, no one checked the standards group's travel records to verify which employees went to the locations where JVT meetings were held. Even when the avc_ce reflector list with Raveendran's email address on it was discovered, Raveendran's personal computer and emails were not searched for similar documents. Finally, when the twenty-one emails were found on Raveendran's computer during trial, none of the attorneys considered the fact that the discovery of the "new" emails proved Qualcomm's document collection and production had been inadequate, reviewed the discovery production log to determine the scope of the document collection and production, or otherwise reflected on the state of the discovery or its application to trial arguments.

## Legal Standard and Analysis

The Federal Rules of Civil Procedure authorize federal courts to impose sanctions on parties and their attorneys who fail to comply with discovery obligations. Rule 26 provides for sanctions against individual attorneys who are remiss in complying with their discovery obligations:

> [E]very discovery request, response, or objection must be signed by at least one attorney of record... By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry ... [the] discovery request, response, or objection, [] is:

(i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;

(ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

(iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

Fed. R. Civ. P. 26(g)(1)[8]. "[W]hat is reasonable is a matter for the court to decide on the totality of the circumstances." Fed. R. Civ. P. 26 Advisory Committee Notes (1983 Amendment). If an attorney makes an incorrect certification without substantial justification, the court must sanction the attorney, party, or both and the sanction may include an award of reasonable attorney's fees. Fed. R. Civ. P. 26(g)(3). As the Supreme Court confirmed, Rule 26(g), like Rule 11, requires that the court impose "an appropriate sanction" on the attorney. Chambers v. NASCO, Inc., 501 U.S. 32, 51 (1991).

In this case, Leung is the attorney who signed the discovery responses and, therefore, was responsible for the accuracy and propriety of them. While some of the interrogatory responses were not accurate and the document productions were not complete, after considering all of the evidence presented to the Court during the remand proceedings, including Leung's testimony during the hearing and the correspondence and communications between Qualcomm employees and outside counsel, the Court finds that his discovery responses were made after a reasonable, although flawed, inquiry and were not without substantial justification. While he certainly could (and should) have conducted a more thorough effort to collect and produce relevant discovery, Leung did take appropriate actions to learn the truth but was misled by Qualcomm employees. Accordingly, the Court declines to sanction Leung pursuant to the Federal Rules of Civil Procedure.

The Court also has the inherent power to levy sanctions on parties or attorneys who engage in abusive litigation practices. Roadway Express, Inc. v. Piper, 447 U.S. 752, 765 (1980) (citing Link v. Wabash R. Co., 370 U.S. 626, 632 (1962)). However, a court must "exercise caution in invoking its

---

[8] Rule 26 has been renumbered and stylistically revised since the Sanctions Order issued, but remains substantively the same.

inherent power, and it must comply with the mandates of due process..." Chambers, 501 U.S. at 50. Sanctions only may be imposed under the court's inherent authority upon a finding that the attorney acted in bad faith. Roadway Express, 447 U.S. at 766; Fink v. Gomez, 239 F.3d 989, 994 (9th Cir. 2001). Bad faith "includes a broad range of willful improper conduct." Fink, 239 F.3d at 992 (relying on Roadway Express and Chambers).

The evidence presented during these proceedings clarified that, although a number of poor decisions were made, the involved attorneys did not act in bad faith. While Leung and Mammen did not pursue several discovery paths that seem obvious, at least in hindsight, they did make repeated efforts to verify that Qualcomm's discovery responses were accurate. Similarly, when Patch became involved in discovery, while he did not determine whether Raveendran's personal computer had been searched, he did take numerous, reasonable steps to verify the truth of her statements.

With regard to the August 6, 2002 email welcoming Raveendran to the avc_ce email group discovered on her computer by Bier on January 7, 2006, Bier states that he does not recall reviewing the email or showing it to Patch[9], though he does recall telling Patch that he confirmed that Raveendran's email address was subscribed to the reflector (though at that time, he still did not know how it had been added or by whom). 10/13/09 Bier Decl. ¶ 28. However, Bier adds that even if he had reviewed the email, he would not have considered its impact on discovery because he had not been part of the defensive discovery process and the document did not convey any new information such as how Raveendran was added to the list. Id. ¶ 29. Because no one has presented evidence to the Court suggesting that Bier received any other new information from Raveendran or anyone else on January 7, 2006, the Court accepts Bier's representations and finds that he did not act in bad faith when he failed to produce it to Broadcom, to notify his supervisors, or to otherwise deal with the new document. While the Court is surprised that the attorney charged with preparing a trial witness was not in a position to recognize the significance of the email, that was not Bier's fault and it does not establish bad faith in this case.

---

[9] In his declaration, Patch confirms that he tasked Bier with preparing Raveendran to testify and that no one, including Bier, informed him of the existence of the August 6, 2002 email prior to or during trial. 10/13/09 Patch Decl. ¶ 45.

As to the attorneys involved in the decision not to produce the twenty-one emails discovered during trial, they themselves acknowledge that it was a mistake. 11/2/09 Patch Decl. ¶ 52; 1/15/10 Hearing Tr. at 134:11-23 (Mammen testimony). The Court is dismayed that none of the involved attorneys considered the larger discovery picture: the presence of "new" JVT emails on Raveendran's computer, which no attorney had seen or reviewed, clearly proved that the prior document collection had been inadequate. Yet, no one suggested that any follow-up discovery investigation be conducted. And, none of the attorneys considered how the "new" documents affected the arguments being presented during trial. But again, in light of all the evidence presented during these remand proceedings, the Court finds that the decision by Bier, Mammen and Patch to withhold the twenty-one emails as non-responsive was not made in bad faith. Similarly, while Patch and Mammen should have provided more detailed information regarding the newly discovered emails to Batchelder and Young, who were presenting Qualcomm's witnesses and arguments to the court and jury, and Batchelder[10] should have asked more specific questions about the newly discovered evidence, their respective failures do not establish bad faith in light of all of the remand evidence. In summary, while the Court believes the attorneys should have considered the contents of the documents and their relevance to the arguments being presented in court[11] and to the adequacy of the discovery process, the Court finds that the evidence does not establish that any of the Responding Attorneys acted in bad faith.

Finally, the remand proceedings clarified Young's lack of knowledge about, and involvement in, the discovery violations. Prior to these remand proceedings, the Court understood that the Heller Ehrman attorneys were responsible for preparing witnesses and briefing regarding the JVT. Sanctions

---

[10] Young states in his declaration that he does not recall Patch telling him on January 14, 2007, or at any other time, about finding new JVT documents. 10/13/09 Young Decl. ¶ 7. He submits that had Patch made a statement of this nature to him, he would have asked questions or had some kind of response or reaction. Id. This is consistent with Patch's testimony that he recalls Young having "no reaction or response" following the "brief heads up" Patch believes he gave Young. 7/14/09 Patch Depo. Tr. at 36:19-22. Because Young apparently did not learn about the new evidence, he did not have any reason to request additional details from Patch.

[11] During these remand proceedings, both Patch and Young have argued that the Sanctions Order exceeded the scope of the referral to the extent it tied the discovery violations to arguments these attorneys made in pleadings or to the court. The unusual facts of this case have made it difficult for the Court to draw a distinct line between the violations governed by Rule 11 and those governed by Rule 26 and only the latter were referred to this Court. This Court does believe that case discovery is intertwined with the resulting legal arguments and that Rule 26 was implicated by the conduct described in the Sanctions Order.

Order at 30 n.12.  For that reason, the Court believed Young had a duty to conduct a reasonable inquiry into whether the fact discovery Day Casebeer provided was adequate and accurate before presenting the non-participation argument in briefing and in arguments to the Court.  Id. at 29-30. Over the course of these remand proceedings, the Court has learned that neither Young nor any of the other Heller attorneys took on the task of preparing fact witnesses regarding the JVT.  See, e.g., 10/13/09 Young Decl. ¶ 8.  Moreover, it now is apparent that Young did not learn from Patch[12] about the discovery of new JVT emails on Raveendran's computer so there is no evidence that Young knowingly or intentionally misled Judge Brewster when he subsequently stated at sidebar that there was no evidence that any emails were sent to the avc_ce reflector list.  In light of the foregoing, the Court finds that Young did not act in bad faith and should not be sanctioned.

## Conclusion

It is undisputed that Qualcomm improperly withheld from Broadcom tens of thousands of documents that contradicted one of its key legal arguments.  However, the evidence presented during these remand proceedings has established that while significant errors were made by some of the Responding Attorneys, there is insufficient evidence to prove that any of the Responding Attorneys engaged in the requisite "bad faith" or that Leung failed to make a reasonable inquiry before certifying Qualcomm's discovery responses.  Accordingly, the Court declines to impose sanctions on the Responding Attorneys and hereby dissolves the order to show cause that initiated these proceedings.[13] [Doc. No. 599].

**IT IS SO ORDERED.**

DATED: April 2, 2010

BARBARA L. MAJOR
United States Magistrate Judge

---

[12] As described above, it appears either Patch did not say anything to Young or Young did not hear Patch.

[13] The Court notes that one of the provisions of its original Sanctions Order was the CREDO program, which was designed to provide the involved parties with an opportunity to examine what happened in this case and to make recommendations as to how individual lawyers, law firms, and corporations can avoid similar mistakes in future cases. Sanctions Order at 37-41. The remand proceedings served this function and, as a result, the Court finds there no longer is a need for the CREDO program and, therefore, relieves Qualcomm of that obligation.